FILED
2018 Apr-06  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

In the United States District Court
Northern District of Alabama
Western Division


John and Kimberly Staples v. HWE, RMFS, Simmons


Exhibit 10

DSM Operating Agreement Prepared by Greenburg Traurig, LLP

THE MEMBERSHIP INTERESTS REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"), IN RELIANCE UPON THE EXEMPTION PROVIDED IN SECTION 4 (2) THEREOF NOR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE MEMBERSHIP INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, ASSIGNED, OR TRANSFERRED AT ANY TIME EXCEPT IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT AND (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER APPLICABLE STATE SECURITIES LAWS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER APPLICABLE STATE SECURITIES LAWS OR WHICH IS OTHERWISE IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE FEDERAL ACT.

# LIMITED LIABILITY COMPANY AGREEMENT OF DSM SALES AND MARKETING, LLC

## DATED: SEPTEMBER 23, 2016

ATL 21468154v1

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## DSM SALES AND MARKETING, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT OF DSM SALES AND MARKETING, LLC, is made and entered into as of September 23, 2016, (the "Effective Date") by and among those Persons executing this Limited Liability Company Agreement as Members and Persons hereafter becoming parties hereto (hereinafter referred to in the singular as "Member" and collectively as the "Members").

### W I T N E S S E T H:

WHEREAS, the Members have formed a Delaware limited liability company (the "Company") to be operated subject to the terms and provisions set forth in this Limited Liability Company Agreement (the "Agreement") including, without limitation, the within provisions related to the management of the business and affairs of the Company, the respective rights and obligations of the Members to each other and to the Company and certain other matters described herein.

NOW, THEREFORE in consideration of the premises, and of the mutual promises, obligations, and agreements contained herein and other consideration, the receipt and sufficiency of which are acknowledged, the parties hereto, intending to be, and being, legally bound, do hereby covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Definitions. In addition to terms defined in the body of this Agreement, each of the following capitalized terms has the meaning hereinafter provided (such meanings shall also be applicable to the plural use of such terms herein):

2015 Act "2015 Act" means Title XI of the Bipartisan Budget Act of 2015, including the corresponding provisions of the Code impacted thereby, and any corresponding provisions of state or local income tax law, as the same may be amended from time to time.

Act. "Act" means the Delaware Limited Liability Company Act as hereafter amended, and any successor statute thereto.

Additional Capital Contribution. "Additional Capital Contribution" means a Capital Contribution to the Company made by a Member pursuant to Section 3.3 hereof.

Affiliate. A Person shall be deemed an "Affiliate" of a party in the event the Person controls, is controlled by or under common control with the party. "Control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") as applied to any person, means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of that person, whether through the ownership of voting securities, by contract or otherwise. Without limiting the foregoing, no Member will be considered an Affiliate of the Company or any other Member solely by reason of a Member's Member Interest.

Agreement. "Agreement" means this Limited Liability Company Agreement of the Company, as it may be amended, modified, supplemented or restated from time to time, as provided herein.

Approve; Approval. "Approve" and "Approval" means approval, in accordance with this Agreement, by the Members, or Managers, as the case may be, of any matter or action requiring such approval hereunder. Unless otherwise specifically indicated in this Agreement, any matter submitted to the Members for Approval shall require the Approval (by vote or written consent) of a Majority in Interest of the Class A Members. Unless otherwise specifically indicated in this Agreement, any matter submitted to the Board for Approval shall require the Approval (by vote or written consent) of a majority of the Managers in number.

Assumed Tax Rate. "Assumed Tax Rate" means, with respect to a Fiscal Year, the highest effective marginal combined federal, state and local income tax rate applicable to the Member having the highest combined income tax bracket, taking into account the character (e.g. long-term or short-term capital gain or ordinary or tax-exempt) of the applicable income.

Board; Board of Managers. "Board" or "Board of Managers" means the Board of Managers which shall be comprised of all of the Company's Managers. Nothing herein shall prohibit the Board from being comprised of a single Manager.

Business Day. means any day of the week other than a Saturday, Sunday or a day on which the commercial banks in Atlanta, Georgia are not open for business.

Capital Accounts. The term "Capital Account" is defined in Section 3.5 hereof.

Capital Call Notice. The term "Capital Call Notice" is defined in Section 3.3 hereof.

Capital Contribution. "Capital Contribution" means any contribution, as defined in Section 18-101 of the Act, whenever made in accordance with Article 3 hereof by a Member or Economic Interest Owner to the capital of the Company in cash or, with the approval of the Board, non-cash property (valued at its Gross Asset Value).

Capital Contribution Account. "Capital Contribution Account" means a bookkeeping account maintained for each Member equal to the aggregate of all Capital Contributions (including Initial Capital Contributions and Additional Capital Contributions) to the Company made by such Member pursuant to Sections 3.1 or 3.3, respectively, of this Agreement, less the aggregate distributions to such Member pursuant to Sections 5.2.2 and 14.2.3 of this Agreement (until such Capital Contribution Account equals zero). If any Member owns more than one class of Member Units, the Capital Contribution Account will be allocated among the classes of Member Units owned by such Member as agreed upon by the Member and the Board (although no Capital Contribution will be counted more than once). The Capital Contribution Accounts for

the Class A Members and the Class B Members, as of the Effective Date, are as set forth on Exhibit "A."

Capital Transaction. "Capital Transaction" means (a) a transaction pursuant to which the indebtedness secured by any significant assets of the Company is refinanced by the Company; (b) a sale, exchange or disposition of any significant assets of the Company; or (c) the condemnation or casualty of any significant assets of the Company.

Certificate of Formation. "Certificate of Formation" means the Certificate of Formation of the Company, as filed with the Secretary of State of Delaware, as the same may be amended, supplemented or restated from time to time.

Class A Member. "Class A Member" means each of the parties holding Class A Member Units and designated as a Class A Member on EXHIBIT "A", as amended from time to time or in the Company's ownership records. In the event of a conflict between the Company's ownership records and EXHIBIT "A", the Company's ownership records shall control.

Class A Member Unit. "Class A Member Unit" means the personal property ownership right of a Class A Member in the Company, which shall entitle such Member to (a) an allocation of the Net Profits and Net Losses as set forth herein, (b) distributions of cash or property as set forth herein, and (c) one vote for each Class A Member Unit upon all matters that require or are submitted to the Board to a vote or other action by the Members.

Class B Member. "Class B Member" means each of the parties holding Class B Member Units and designated as a Class B Member on EXHIBIT "A", as amended from time to time or in the Company's ownership records. In the event of a conflict between the Company's ownership records and EXHIBIT "A", the Company's ownership records shall control.

"Class B Member Unit" means the personal property ownership right of a Class B Member in the Company, which shall entitle such Member to (a) an allocation of the Net Profits and Net Losses as set forth herein, and (b) distributions of cash or property as set forth herein. Each Class B Member Unit held by a Profits Interest Member shall be subject to such vesting schedule as set by the Board in the grant of such Class B Member Unit. Any granted Class B Member Units may be subject to a different vesting schedule than any other granted Class B Member Unit whether or not granted to the same Person.

Code. "Code" means the Internal Revenue Code of 1986, as amended from time to time. All references herein to specific sections of the Code shall be deemed to refer also to any corresponding provisions of succeeding law.

Company. "Company" means this DSM Sales and Marketing, LLC, a Delaware limited liability company.

Company Minimum Gain. "Company Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Regulations. Subject to the foregoing, Company Minimum Gain shall equal the amount of gain, if any, which would be recognized by the Company with respect to each Nonrecourse Liability of the Company if the Company were to transfer the Company's property which is subject to such Nonrecourse Liability in full satisfaction thereof.

<u>Contributing Member</u>.   The term "Contributing Member" is defined in Section 3.8.2 hereof.

<u>Delinquent Member</u>.   The term "Delinquent Member" is defined in Section 3.8 hereof.

<u>Delinquent Rate</u>.   The term "Delinquent Rate" is defined in Section 3.8.3 hereof.

<u>Depreciation</u>.   "Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deductions allowable for federal income tax purposes with respect to any Company property for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

<u>Disabling Event</u>.   The term "Disabling Event" is defined in Section 13.1 hereof.

<u>Disabled Member</u>.   The term "Disabled Member" is defined in Section 13.1 hereof.

<u>Distributable Cash</u>.   "Distributable Cash" means all cash, revenues and funds received by the Company including Net Proceeds, including Reserves that the Board deems to be no longer necessary (but excluding Capital Contributions or the proceeds of loans made to the Company, unless such loan proceeds constitute Net Proceeds), less the sum of the following to the extent paid, set aside or accrued by the Company:   (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; and (b) all expenditures incurred incident to the operation of the Company's business; and (c) such Reserves as the Board deems reasonably necessary to the proper operation of the Company's business.   Nothing herein shall apply to revenues of Renaissance Man Food Services, LLC.

<u>Economic Interest</u>.   "Economic Interest" means a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any right to vote on, consent to or otherwise participate, as a Member, in any action or decision of the Members or management of the Company or, except as required by the Act or applicable tax laws, to receive information concerning the Company

<u>Economic Interest Owner</u>.   "Economic Interest Owner" means the owner of an Economic Interest who is not a Member with respect to such interest.

<u>Fair Market Value.</u>   "Fair Market Value" of the Company at any time and from time to time means the fair market value of the Company as of the last day of the month immediately prior to the relevant date, such fair market value being determined in good faith by the Board.   In making the determination of the Fair Market Value pursuant to this subsection, the Board shall assume that the Company's Fair Market Value is equal to the amount which would be paid in

cash for the Company, as a going concern, in a negotiated arm's-length transaction by an unaffiliated third party buyer. The Fair Market Value of any Member Interest shall be based upon the Fair Market Value of the Company. The Board may, but shall not be obligated to, engage the services of an experienced investment banking or business valuation firm to assist it in the determination of Fair Market Value. The cost of determining Fair Market Value shall be borne by the Company.

Fiscal Year. "Fiscal Year" means the fiscal year of the Company. The first Fiscal Year shall commence on the date of the formation of the Company, and each succeeding Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year. Each Fiscal Year shall end on the earliest to occur after the commencement of such Fiscal Year of (i) December 31, or (ii) the date on which the Company is terminated under Section 14.4.

Governmental Authority. "Governmental Authority" means any United States or foreign, national, federal, state, municipal or local or other government, quasi-governmental, regulatory or administrative authority, agency or commission (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any court, tribunal, or judicial or arbitral body, each of competent jurisdiction.

Grant Agreement. "Grant Agreement" means the agreement by which the Company will, if applicable, grant a Class B Member Unit to a Profits Interest Member.

Gross Asset Value. "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset as of the date of such contribution, as determined by the Board;

(b)     the Gross Asset Values of all Company assets may be adjusted to equal their respective gross fair market value, each as determined by the Board, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution and on a basis other than as contemplated herein regarding the acquisition of interests in the Company; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company; (iii) the grant of an additional interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by any new or existing Member in such Member's capacity as a member of the Company or in anticipation of becoming a Member of the Company and (iv) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, that adjustments pursuant to clauses (i), (ii) and (iii) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     the Gross Asset Value of any Company asset shall be increased (or

decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Subsection (c) to the extent the Board determines that an adjustment pursuant to Subsection (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Subsection (c);

(d)    the Gross Asset Value of any Company asset distributed to any Member shall be the fair market value of such asset on the date of distribution, as determined by the Board; and

(e)    if the Gross Asset Value of an asset has been determined or adjusted pursuant to the foregoing Subsections (a), (b) or (c) of this definition, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

Hurdle Amount.  "Hurdle Amount" means an amount equal to the amount determined by the Board to be necessary to cause the Class B Member Units to constitute a "profits interest" in the Company within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, as clarified by Revenue Procedure 2001-43, 2001-2 C.B. 191) or as provided in Section 2.9.  The Hurdle Amount for each Class B Member Unit granted to a Profits Interest Member shall be set forth in the applicable Grant Agreement for such Profits Interest Member.

Initial Capital Contribution.  "Initial Capital Contribution" means a Capital Contribution to the Company made by a Member pursuant to Section 3.1 hereof.

Majority in Interest.  A "Majority in Interest" of any relevant group or class of Members, as of any given date, means those Members in such group or class owning a majority of the Member Ownership Percentages in the Company owned by all of the Members in such group.  Unless otherwise indicated, a Majority in Interest of the Members refers to a Majority in Interest of the Class A Members.

Manager.  "Manager" means the Person or each of the Persons listed on Exhibit "B" attached hereto, who shall manage the Company, any successor thereto and any other managers, elected, from time to time, in accordance with the terms of this Agreement.  Each Manager shall be deemed a "manager" as such term is used in the Act.

Member.  "Member" means each of the Persons holding Member Units and executing this Agreement as a Member, such Members being listed on Exhibit "A" attached hereto and made a part hereof, and any other Person which may hereafter become a Member in accordance with this Agreement (but excluding any Person which ceases to own any Member Interest).  If a Manager holds a Member Interest in the Company, such Manager will have all the rights of a Member with respect to such Member Interest, and the term "Member" as used herein shall include a Manager to the extent such Manager holds a Member Interest in the Company.  In the event of a conflict between the Company's ownership records and Exhibit "A", the Company's ownership records shall control.

Member Interest.  "Member Interest" means the interest of a Member in the Company (represented by Class A Member Units and Class B Member Units), including all rights, duties and obligations of being a Member in accordance with this Agreement.

Member Minimum Gain.  "Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability.

Member Nonrecourse Debt "Member Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

Member Nonrecourse Deductions.  "Member Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i) of the Regulations.  Subject to the foregoing, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year over the aggregate amount of any distribution during that fiscal year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i) of the Regulations.

Member Ownership Percentage.  A Member's "Member Ownership Percentage" shall be the percentage of any Member's Member Interest relative to the aggregate of all Members' Member Interests.  Each Member's Member Ownership Percentage is listed on EXHIBIT "A", as amended from time to time.

Member Units.  The term "Member Units" means the units of all classes of equity issued by the Company pursuant to this Agreement or as hereafter approved by the Board, each such class of equity representing the right to receive distributions pursuant to the terms of this Agreement and granting the Member such other rights and privileges as set forth in this Agreement.  The Member Units will initially consist of the Class A Member Units and the Class B Member Units.

Member Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in this Agreement or otherwise as shall be fixed by the Board by resolution thereof.

Minimum Gain.  "Minimum Gain" as of any particular date, means an amount determined with respect to the Company as of such date in accordance with Section 1.704-2(d) of the Regulations.

Net Proceeds.  "Net Proceeds" means the amount by which any cash proceeds received or collected by the Company from any Capital Transaction exceeds any closing or other costs, including taxes and commissions, incurred or required to be paid by the Company in connection with any such Capital Transaction.

Net Profit and Net Loss.  The Company's "Net Profit" or "Net Loss" means, for each Fiscal Year, the Company's taxable income, gain or loss for such Fiscal Year, as determined under Section 703(a) of the Code, and Section 1.703-1 of the Regulations (and for this purpose all items to income, gain, loss, or deductible required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or taxable loss), but with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company asset is adjusted in compliance with Regulation Section 1.704-1(b), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(d)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, whenever the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of a fiscal year, depreciation, amortization or other cost recovery deductions allowable with respect to an asset shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income taxes of an asset at the beginning of a year is zero, depreciation, amortization or other cost recovery deductions shall be determined by reference to the beginning Gross Asset Value of such asset using any reasonable method selected by the Manager; and

(f)     Any items of income, gain, loss or deduction which are specially allocated pursuant to Section 4.4 shall not be taken into account in computing Net Profits or Net Losses.

Nonrecourse Deductions. "Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Regulations. Subject to the preceding sentence, the amount of Nonrecourse Deductions for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that fiscal year (determined under Section 1.704-2(d) of the Regulations) over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain (determined under Section 1.704-2(h) of the Regulations).

Nonrecourse Liability. "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

Notice. "Notice" means a written notice required or permitted by this Agreement which is given in the manner prescribed in Section 15.2.

Objectionable Transferee. "Objectionable Transferee" means any Person that engages in a business that is in direct or indirect competition with the Company, as determined in good faith by the Board.

Officer. "Officer" has the meaning set forth in Section 7.2.

Permitted Transfer. "Permitted Transfer" means a Transfer of Class B Member Units by a Class B Member (excluding any Profits Interest Members) to: (a) a trust, partnership or other entity formed primarily for estate or family planning purposes (such as a family limited partnership) (collectively, a "Trust") that is solely for the benefit of the Member, a spouse or former spouse of such Member (or Herschel Walker in the case of Julie Blanchard), one or more of the descendants of such Member (Herschel Walker in the case of Julie Blanchard) (irrespective of the age of such descendants), if and so long as the terms of such Trust prohibit the distribution or other Transfer, free and clear of the Trust, of the Member Interest (or any portion thereof) to a Person other than such Member (or Herschel Walker in the case of Julie Blanchard) or a Person described in this clause; (b) subject to Section 13.1, if the Transfer occurs upon, as a result of, or in connection with the death of a Member, any of the individuals described in clause (a) above or any other individual by will or the laws of descent (except a Person that is a creditor or competitor of the Company, as determined in good faith by the Board); (c) an Affiliate of a Member (or Herschel Walker in the case of Julie Blanchard and John Staples in the case of Kimberly Staples) if such Member (or the sole Member/member of the Member) owns one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, or (d) another Member, except that a Transfer to an Objectionable Transferee under clauses (a) through (c) will not be considered a Permitted Transfer, and provided further, however, that any subsequent Transfer of any outstanding equity interest in the Affiliate, other than to any of the Persons described in clause (a), (b), (c) or (d) above, will be considered not a Permitted Transfer. In the case of Julie Blanchard, a Permitted Transfer includes a transfer of Class A Member Units or Class B Member Units to Herschel Walker or an entity solely owned by Herschel Walker and in the case of Kimberly Staples, a Permitted Transfer includes a transfer of Class A Member Units or Class B Member Units to John Staples or an entity solely owned by John Staples (in each case subject to Section 11.9).

Person.  "Person" means any person or any corporation, partnership (general or limited), limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, or other business entity or organization.

Post-TEFRA Period.  "Post-TEFRA Period" means each federal income tax period of the Company beginning on or after the date that Sections 6221-6241 of the Code, as amended by the 2015 Act, would apply to the Company.

Prime Rate.  The term "Prime Rate" is defined in Section 5.7 hereof.

Profits Interest Member means each Person holding Class B Member Units granted to such Person as a profits interest pursuant to a Grant Agreement.

Promissory Note.  The term "Promissory Note" is defined in Section 13.1.4 hereof.

Proprietary Information.  The term "Proprietary Information" is defined in Section 6.3 hereof.

Regulations.  The "Regulations" means the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.  All references herein to specific sections of the Regulations shall be deemed to refer also to any corresponding provisions of succeeding Regulations.

Reserves.  "Reserves" means, with respect to any Fiscal Year, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Board for working capital and to pay taxes, insurance, debt service or other costs or expenses or liabilities, of any nature, incident to the ownership or operation of the Company's business or for investment in activities or properties related to the Company's business.

Safe Harbor Election.  The term "Safe Harbor Election" is defined in Section 2.9.

Section 83(b) Election.  "Section 83(b) Election" means the election under Code Section 83(b) and the Regulations thereunder that may be made by a Person receiving property in exchange for services for the purpose of reporting the receipt thereof as gross income in the year in which received, in the manner provided therein.

Share of Minimum Gain.  A Member's "Share of Minimum Gain," as of any particular date, means an amount determined with respect to such Member as of such date in accordance with Section 1.704-2(g) and (i) of the Regulations.

Tax Distribution.  "Tax Distribution" means any distributions by the Company to the Members, related to the Member's Tax Liability Amounts, pursuant to Section 5.8.

Tax Liability Amount.  "Tax Liability Amount" means, with respect to a Member, for any given Fiscal Year, an amount equal to (a) the Assumed Tax Rate multiplied by (i) the taxable income and gain allocated to such Member for such Fiscal Year (as shown on the applicable Internal Revenue Service Form 1065 Schedule K-1 filed by the Company), excluding partner-level taxable income adjustments made under Code Section 743(b) or allocations of taxable income or loss pursuant to Code Section 704(c), minus (ii) the cumulative losses that have been

allocated to such Member to the extent such losses have not previously reduced taxable income and gain pursuant to this provision, minus (b) the sum of (i) such Member's pro rata share of any creditable foreign taxes imposed on and paid by the Company to a non-U.S. governmental authority, and (ii) the amount, if any, of taxes withheld by the Company pursuant to Section 5.7 with respect to such Member.

Transfer.  The term "Transfer" is defined in Section 11.1.1 hereof.

Transferring Member.  The term "Transferring Member is defined in Section 11.1.2 hereof.

1.2   General Usage.   The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (a) all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement; (b) use of the terms "herein" or "hereof" and other words of similar import refer to this Agreement as a whole and not to any particular Section, subsection, paragraph, clause or other subdivision; (c) instances of gender or entity-specific usage (*e.g.,* "his", "her", "its", "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (d) the word "or" shall not be applied in its exclusive sense, unless the context otherwise requires; (e) "including" shall mean "including, without limitation"; (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such laws, regulations, rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor laws, regulations, rules and instruments thereto; and (g) references to "days" shall mean calendar days.

## ARTICLE 2
## THE COMPANY

2.1   Formation of Limited Liability Company.   The Members have formed the Company, under the Act, effective as of the date upon which the Certificate of Formation was filed with the Secretary of State of Delaware (the "Date of Organization"). The Members hereby ratify, adopt and approve such formation by entering into this Agreement. This Agreement shall constitute the limited liability company agreement of the Company.   The rights, powers, obligations and liabilities of the Members will be determined pursuant to the Act, the Certificate of Formation and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement will, to the extent permitted by the Act, control.   To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended (in the most minimal manner possible) in order to make such provision effective under the Act.

2.2   Name.   The name of the Company is DSM Sales and Marketing, LLC.   The Company may adopt such trade or business names as the Board shall consider appropriate.

2.3     Principal Office.  The principal office of the Company shall be located at such place as the Board may from time to time and at any time designate after giving Notice of such designation to the Members.  The Company may establish such additional places of business as may be determined by the Board.

2.4     Registered Agent and Registered Office.  The initial registered agent and initial registered office of the Company is as set forth in the Certificate of Formation.  Such registered agent and registered office may be changed from time to time by designation of the Board.

2.5     Purpose of Company.  The purpose of the Company shall be:

    (a)     To engage in any lawful business, purpose or activity selected by the Board; and

    (b)     To exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, the property and funds held or owned by the Company (subject to applicable laws and this Agreement); and

    (c)     To engage in such other lawful transactions involving the Company's assets as the Board may, from time to time, determine, including entering into, making, and performing contracts and undertakings with respect thereto (subject to applicable laws and this Agreement); and

    (d)     To engage in all activities necessary, customary, convenient, or incident to the foregoing or such other lawful activities as the Board may deem appropriate, necessary or advisable (subject to applicable laws and this Agreement).

2.6     Powers of Company.  The Company shall possess and may exercise all powers and privileges granted by the Act or any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company as are reasonably connected with the Company's business described in Section 2.5.

2.7     Term.  The term of the Company commenced upon the filing for record of the Certificate of Formation of Company, for and on behalf of the Company, in the office of the Secretary of State of the State of Delaware.  The term of the Company, shall continue until the Company is dissolved, liquidated, and terminated under Article 14.

2.8     Tax Treatment.  Except as set forth below, the Members intend that the Company will not be a partnership (including a limited partnership) or joint venture, and that no Member, Economic Interest Owner, Manager or Officer will, solely by virtue of this Agreement, be a partner or joint venturer of any other Member, Economic Interest Owner, Manager or Officer for any purposes, and this Agreement will not be construed to the contrary.  The Members intend that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board.

2.9.   <u>Election for Profits Interests</u>.

(a)   By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company.  For purposes of making such Safe Harbor election, the Tax Matters Member is hereby designated as the "partner who has responsibility for U.S. federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Member constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice.  The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Member shall prepare and file any U.S. federal income tax returns such Member is required to file reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice.  A Member's obligations to comply with the requirements of this Section 2.9 shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 2.9, the Company shall be treated as continuing in existence.  Each Member authorizes the Tax Matters Member to amend this Section 2.9 to the extent necessary to achieve similar tax treatment with respect to any Member Interest transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent U.S. Department of Treasury or Internal Revenue Service guidance).

(b)   In the event of forfeiture of any Class B Member Units, the Company shall conform to requirements of the Regulations with respect to allocations of Profits and Losses.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1   <u>Initial Capital Contributions by Members</u>.  Except as may otherwise be provided herein, or agreed upon by the Board, upon the execution of this Agreement, the Initial Members shall contribute to the capital of the Company the amounts, or property set forth in Exhibit "A", attached hereto and made a part hereof.  Persons becoming Members after the Effective Date, and becoming parties to this Agreement, shall make such Capital Contributions as determined by the Board.  Except as otherwise approved by the Board in its discretion, all Capital Contributions shall be made in United States dollars.

3.2   <u>Permitted Use of Capital Contributions</u>.  Capital Contributions shall be applied to the payment of costs incurred by the Company in connection with the conduct of its business as the Board determines to be appropriate.  Such contributions may also be used, as the Board determines to be appropriate, to reimburse Members or Managers for costs incurred by them for, or on behalf of, the Company.

3.3   <u>Additional Capital Contributions by Members</u>.  In the event that at any time or from time to time the Board believes the Company is in need of additional capital, or will be in

need of additional capital within ninety (90) days, the Board may approve a capital call requiring Additional Capital Contributions by delivering a notice to each Member specifying (a) the total amount of the additional capital required, and (b) the proposed use to which such capital will be applied.  Solely to the extent the Board approves a capital call requiring Additional Capital Contributions, then within ten (10) days of such Approval, the Managers shall send a notice ("Capital Call Notice") to each Class A Member setting forth (i) the amount of the total capital call, (ii) the date the capital call was approved and (iii) such Class A Member's pro-rata share of such capital call, such pro-rata share being equal to the Class A Member's Class A Member Ownership Percentage.  Notwithstanding the foregoing, the Class A Members may elect to make some or all of the Additional Capital Contribution in the form of a loan in lieu of a Capital Contribution.

3.4    Limit on Contributions and Obligations of Members.    Except as expressly provided in this Article 3, the Members shall not be required or obligated (i) to make any Capital Contributions to the Company, (ii) to loan any money to the Company, or  (iii) to endorse or to guaranty the payment or performance of any obligations of the Company.

3.5    Capital Accounts.    A separate capital account ("Capital Account") shall be maintained for each Member in accordance with the following:

3.5.1   To each Member's Capital Account there shall be credited (A) the amount of money contributed or deemed contributed pursuant to Code Section 752 by the Member to the Company, (B) the fair market value, as of the date of contribution, of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or be subject to under Code Section 752), and  (C) any allocation of items in the nature of income or gain, including tax exempt income and gain as provided in Treas. Reg. §1.704-1(b)(2)(iv).

3.5.2   To each Member's Capital Account there shall be debited (a) the amount of money distributed or deemed distributed pursuant to Code Section 752 to the Member by the Company, (b) the fair market value, as of the date of distribution, of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject under Code Section 752), (c) allocations to such Member of certain Company loss and deductions as provided in Treas. Reg. §1.704-1(b)(2)(iv), and (D) certain other adjustments required to be made in accordance with Treas. Reg. §1.704-1(b)(2)(iv).

3.5.3   In the event any Member Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred Member Interest.

The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations and shall be applied in a manner consistent therewith and, as such, a Member's Capital Account shall also be increased or decreased to reflect any items described in Regulation Section 1.704-1(b)(2)(iv) that are required to be reflected in such Member's Capital Account

under such Regulation and which are not otherwise taken into account in computing such Capital Account under this Section 3.5.

A loan by a Member to the Company (with the approval of the Board) shall not be considered a Capital Contribution to the Company and the balance of such Member's Capital Account shall not be increased by the amount so loaned nor decreased by the repayment of such loan (principal and interest) by the Company.

Notwithstanding anything contained herein to the contrary, the Members' Capital Accounts shall be at all times maintained in accordance with the provisions of Regulation Section 1.704-1(b)(2).

If the Board determines that the manner in which the Members' Capital Accounts are maintained should be modified, or that any particular item of income, gain, loss, deduction or credit should be allocated in a manner other than as provided above, in order to comply with the Treasury Regulations, the Board may make the modification or the allocation without the consent of any of the Members; provided, however, that no such amendment may be made to the extent it is likely to have a material effect on the amounts distributable to any Member (or Economic Interest Owner) during the term of this Agreement or upon dissolution of the Company.

3.6   Interest on and Return of Capital.  No Member shall be entitled to any interest from the Company on such Member's Capital Account or on such Member's Capital Contributions to the Company, and except for distributions as provided in Articles 5 and 14, no Member shall have the right to demand or to receive the return of all or any part of such Member's Capital Account or of such Member's Capital Contributions to the Company.

3.7   No Third Party Beneficiaries.  The obligations of the Members to make Capital Contributions to the Company are only for the benefit of, and are only enforceable by, the Company and the Members and shall not be for the benefit of, or be enforceable by, any other Person.

3.8   Member Guarantees.  To the extent any lender to the Company, or any other party, requires that the Company obligations to such lender or other party be guaranteed by a Member, and a Member, in its sole and absolute discretion, agrees to guaranty such Company obligations, the Company shall indemnify the Member guarantying such obligations against all losses, expenses and liabilities with respect to such guaranty.

3.9   Loans from Related Parties.  Subject to any Approvals required under this Agreement, the Company may, with Board Approval, borrow funds from any Member, Manager or Affiliate thereof for any authorized Company purpose and, in connection therewith, mortgage, pledge, or otherwise encumber any asset of the Company as security therefor, provided that any such loan and security shall be upon terms no less favorable to the Company than the terms then available to the Company from unrelated third party lenders or, if no such third party terms are available to the Company, on such terms as the Board deems commercially reasonable.

## ARTICLE 4
## ALLOCATION OF NET PROFITS AND NET LOSSES

4.1     Allocation of Net Profits and Net Losses.

4.1.1   The rules set forth below in this Section 4.1 shall apply for the purpose of determining each Member's allocable share of the items of income, gain, loss and expense of the Company comprising Net Profits or Net Losses of the Company for each taxable year, determining special allocations of other items of income, gain, loss and expense, and adjusting the balance of each Member's Capital Account to reflect the aforementioned general and special allocations.  For each taxable year, the special allocations in Section 4.4 shall be made immediately prior to the general allocations of Section 4.1.

4.1.2   For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to Section 4.4 with respect to such Fiscal Year, all Net Profits and Net Losses (other than Profits and Losses specially allocated pursuant to Section 4.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Gross Asset Value thereof and distribute the proceeds thereof pursuant to Section 14.2 hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain" (as determined according to Regulation Sections 1.704-2(d) and (g)(3),) and Member Nonrecourse Debt Minimum Gain" (as determined according to Regulation Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

4.2     Limitation on Loss Allocations.  Notwithstanding anything in this Agreement to the contrary, no loss or item of deduction shall be allocated to a Member if such allocation would cause the Capital Account of such Member to have a deficit in excess of the sum of (i) the amount, if any, of additional capital such Member would be required to contribute to the Company if the Company were to dissolve on the last day of the accounting period to which such allocation relates plus (ii) such Member's distributive share of Company Minimum Gain as of the last day of such accounting period, determined pursuant to Regulation Section 1.704-2(g)(1), plus (iii) such Member's share of Member Minimum Gain as of the last day of such year, determined pursuant to Regulation Section 1.704-2(i)(5).  Any amounts not allocated to a Member pursuant to the limitations set forth in this paragraph shall be allocated to the other Members to the extent possible without violating the limitations set forth in this paragraph.

4.3     Intentions and Construction of Allocations.  It is the intention of the Members to allocate Net Profits and Net Losses in such a manner as to cause each Member's Capital Account to always equal the amount of cash such Member would be entitled to receive if the Company sold its assets for their Gross Asset Value and, after satisfying all Company liabilities, the proceeds from such sale, as well as all other funds of the Company, were then distributed to the Members pursuant to Section 5.2.  It is the intention of the Members that the aggregate Net

Profits allocated to the Members pursuant to this Agreement equal the economic profits of the Members (i.e. the excess of distributions over capital contributions to the Company). These provisions shall be so interpreted as necessary to accomplish such result.

4.4     Special Allocations.

The following special allocations shall be made in the following order:

4.4.1    Minimum Gain Chargeback.   Except as otherwise provided in Section 1.704-2(f) of the Regulations, in the event there is a net decrease in Company Minimum Gain during a Company taxable year, each Member shall be allocated (before any other allocation is made pursuant to this Article 4) items of income and gain for such year (and, if necessary, for subsequent years) equal to that Member's share of the net decrease in Company Minimum Gain. The determination of a Member's share of the net decrease in Company Minimum Gain shall be determined in accordance with Regulation Section 1.704-2(g). The items to be specially allocated to the Members in accordance with this Subsection 4.4.1 shall be determined in accordance with Regulation Section 1.704-2(f)(6). This Subsection 4.4.1 is intended to comply with the Minimum Gain chargeback requirement set forth in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

4.4.2    Member Minimum Gain Chargeback:   Except as otherwise provided in Regulation Section 1.704-2(i)(4), in the event there is a net decrease in Member Minimum Gain during a Company taxable year, each Member who has a share of that Member Minimum Gain as of the beginning of the year, to the extent required by Regulation Section 1.704-2(i)(4) shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Minimum Gain. Allocations pursuant to this Subsection 4.4.2 shall be made in accordance with Regulation Section 1.704-4(i)(4). This Subsection 4.4.2 is intended to comply with the requirement set forth in Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

4.4.3    Qualified Income Offset Allocation.    In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) which would cause the negative balance in such Member's Capital Account to exceed the sum of (i) his obligation to restore a Capital Account deficit upon liquidation of the Company, plus (ii) his share of Company Minimum Gain determined pursuant to Regulation Section 1.704-2(g)(1), plus (iii) such Member's share of Member Minimum Gain determined pursuant to Regulation Section 1.704-2(i)(5), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess negative balance in his Capital Account as quickly as possible. This Subsection 4.4.3 is intended to comply with the alternative test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

4.4.4    Allocation of Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Member Ownership Percentage.

4.4.5    Allocation of Member Nonrecourse Deductions.  Member Nonrecourse Deductions shall be allocated as prescribed by the Regulations.

4.4.6    Allocation of Nonrecourse Liabilities.  The "excess nonrecourse liabilities" of the Company (within the meaning of Section 1.752-3(a)(3) of the Regulations) shall be allocated to the Members in accordance with their respective Ownership Percentage.

4.4.7    Recapture.  Ordinary taxable income arising from the recapture of depreciation and/or investment tax credit shall be allocated to the Members in the same manner as such depreciation and/or investment tax credit was allocated to them.

4.4.8    Code Section 754 Adjustment.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Member Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

4.5    Curative Allocations.  The allocations set forth in Section 4.4 hereof, (the "Regulatory Allocations") are intended to comply with certain requirements of Regulation Section 1.704-1(b).  Notwithstanding any other provisions of this Section 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gains, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other profits, losses and other items in the Regulatory Allocations to the Members shall be equal to the net amount that would have been allocated to them if the Regulatory Allocations had not occurred.

4.6    Character of Gain.  In the event any sale gain recognized by the Company in any Fiscal Year is for income tax purposes in part ordinary income and in part capital gain, then, for income tax purposes and subject to Section 4.4, each Member's distributive share of such ordinary income shall be the lesser of (i) the entire amount of such sale gain allocated to such Member, or (ii) an amount determined by multiplying the total amount of such ordinary income required to be recognized by the Company by a fraction, the numerator of which shall be the amount of excess depreciation allocated to such Member for income tax purposes through the sale date and the denominator of which shall be the amount of such excess depreciation allocated to all of the Members for income tax purposes through the sale date.

4.7     Adjustment of Percentage Interests.  In the event the percentage interests in the Company of the Members are adjusted during a Company Fiscal Year and the effective date of such adjustment is other than on the first day of a Fiscal Year, the Company's Net Profit or Net Loss, as the case may be, shall be computed and allocated pursuant to Sections 4.1 and 4.2 hereof, respectively, as if the periods between such variation were each a separate Fiscal Year.

4.8     Allocations to Take Account of Differences Between Gross Asset Value and Tax Basis of Property.  Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code Section 704(c) and the related Treasury Regulations under Code Sections 704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Gross Asset Value at the time of its contribution to the Company.  If the Gross Asset Value of any Company property is adjusted, as provided in Treasury Regulations Section 1.704-1(b)(2)(iv), then subsequent allocations of income, gain, loss and deduction shall be as provided in Code Section 704(c) and the related Treasury Regulations.  Allocations under this Section 4.8 shall be made in accordance with the traditional method set forth in Treasury Regulation Section 1.704-3(b) and are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Agreement.

## ARTICLE 5
## DISTRIBUTIONS TO MEMBERS

5.1     Determination of Distributable Cash.  The Distributable Cash of the Company shall be determined by the Board at least annually but may be determined at such other times during the Company's Fiscal Year as the Board deems appropriate.

5.2     Distribution of Distributable Cash.  Except as otherwise provided in Article 14 and this Article 5, and subject to any contractual restrictions thereon agreed to by the Company, the Distributable Cash of the Company, as determined under Section 5.1, shall be distributed to the Members, as may be determined from time to time by the Board.  Amounts of Distributable Cash, if any, being distributed to the Members hereunder shall be distributed in the following manner and in the following order or priority:

5.2.1     First, to Julie Blanchard an annual amount equal to the positive difference between (a) One Hundred Twenty-Five Thousand Dollars ($125,000), as adjusted from time to time by the Board (subject to proration for Fiscal Years of less than 12 months, including 2016) minus (b) the amount of compensation, if any, paid to Julie Blanchard during such year (such difference increased by amounts equal to any shortfalls in such payments hereunder from any previous Fiscal Years of the Company which shortfalls have not been previously paid); then, any additional amounts

5.2.2     Second, pro rata to the Members in accordance with their respective Capital Contribution Account balances until their Capital Contribution Account balances are reduced to zero; then, any additional amounts

5.2.3   To the Members in accordance with their respective Member Ownership Percentages.

5.3   <u>Limitations on Distributions to Class B Members who are Profits Interests Members</u>.   Notwithstanding the provisions of Section 5.2 to the contrary, Profits Interests Members who are holders of Class B Member Units subject to a Hurdle Amount will not be entitled to receive any distributions pursuant to Section 5.2, with respect to such Class B Member Units, other than pursuant to Section 5.8 in respect of such Class B Member Units, unless and until the aggregate distributions by the Company in respect of all Units entitled to distributions (other than distributions in respect of Class B Member Units with higher Hurdle Amounts) exceeds the Hurdle Amount applicable to such Class B Member Units, and then only such Class B Member's Membership Ownership Percentage interest of such excess distributions. In the event that a Class B Member is entitled to distributions with respect to unvested Class B Member Units, other than pursuant to Section 5.8, then the Company shall retain the amount of such distribution.  Upon such Class B Member Units vesting, the Class B Member shall receive such amount (related to the vested Class B Member Units) or if the granted Class B Member Units are forfeited, then the right to such distributions shall be automatically forfeited.

5.4   <u>Distributions Following Liquidation</u>.   In the event of the dissolution of the Company in accordance with Article 14 below or any other event which results in a "liquidation" of the Company (within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations), after making provision for expenses, debt, Reserves and otherwise (in the event such event does not constitute a dissolution under Article 14) or Sections 14.2.1 and 14.2.2 (if the event does constitute a liquidation and dissolution under Article 14), remaining proceeds shall be distributed to the Members in accordance with Section 14.2, as the case may be. All distributions pursuant to this Section 5.4 shall be made in accordance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations.

5.5   <u>Consent to Distributions; Distributions in Kind</u>.   Each of the Members hereby consents to the distributions provided for herein.  All distributions shall be made in cash or cash equivalents unless the Board shall have approved a distribution of property in kind.  Any such distribution shall be valued based on the fair market value of the property to be distributed.

5.6   <u>Adjustment of Percentage Interests</u>.  In the event the percentage interests of the Members are adjusted during a Fiscal Year pursuant to Section 4.7 hereof, Distributable Cash shall be determined pursuant to Section 5.1 and distributed pursuant to Section 5.2 hereof for the period commencing with the beginning of the Fiscal Year in which such adjustment is effected (or, if later, the date of the most recent prior adjustment of Company percentage interests) and ending on the date immediately preceding the effective date of such adjustment as if such period were also a Fiscal Year, and Distributable Cash shall be determined pursuant to Section 5.1 and distributed pursuant to said Section 5.2 for the period commencing with the effective date of such adjustment and ending on the last day of the Fiscal Year in which such adjustment is effected as if such period were also a Fiscal Year.

5.7   <u>Withholding on Members</u>.  The Company will at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold or make payments to any taxing authority or other governmental entity

with respect to any distribution, allocation of income or gain, or compensation paid or deemed paid to such Member that arises as a result of such Member's Member Interest or receipt of an interest in the Company (including, without limitation, in accordance with the Foreign Account Tax Compliance Act, as amended). If the Company makes any payment to a taxing authority or other governmental entity in respect of a Member hereunder that is not withheld from a concurrent distribution to the Member, then the Member will reimburse the Company for the amount of such payment, plus interest, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) to the Company at the Prime Rate from time to time (and any such payment will not constitute a Capital Contribution). The amount of a Member's reimbursement obligation under this Section 5.7, to the extent not paid, will be deducted from the distributions to such Member; any amounts so deducted will constitute a repayment of such Member's obligation hereunder. Any funds withheld from a distribution by reason of this Section 5.7 will nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member or imposed in respect of compensation paid or deemed paid to such Member. Any amount payable as indemnity hereunder by any Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distribution due to such Member for all such amounts. For purposes hereof, "*Prime Rate*" means the rate published as the prime rate for such date (or if such day is not a Business Day, for the immediately preceding Business Day) by the *Wall Street Journal* or, if the *Wall Street Journal* does not publish the prime rate, by any publication or other source reasonably selected by the Board.

      5.8    Tax Distributions. Notwithstanding the foregoing provisions of Article 5, and subject to Section 5.9, to the extent Distributable Cash is available, the total distributions to a Member for each Fiscal Year (and the 90-day period following such Fiscal Year) shall not be less than such Member's Tax Liability Amount. To the extent that such minimum distributions requirement increases the amount of distributions beyond the amount to which a Member would be entitled in the absence thereof, the excess portion shall be considered a prepayment of future distributions allocable to such Member; provided that adjustments to any such future distributions to that Member shall not decrease such Member's aggregate distributions below an amount necessary to meet the Tax Liability Amount for such Member for subsequent Fiscal Years. For this purpose, any compensation paid by the Company to such Member or the Member's spouse during such Fiscal Year will be considered as part of total distributions.

      5.9    Limitations on Distributions. The Company shall not make any distribution, as described in Article 5, to the extent that such tax distribution would violate Section 18-607 or 18-804 of the Act or other applicable law, but shall instead make such distribution as soon as practicable after the making of such distribution would not cause such violation. Members who receive distributions made in violation of the Act or this Agreement shall return such distributions to the Company.

## ARTICLE 6
## MEMBERS

6.1     Limited Liability.  Notwithstanding the provisions hereof for the allocation of the Company's Net Loss and for the distribution of cash to the Members by the Company, except as otherwise provided in Article 3 or specifically required under the Act or this Agreement, the Members shall not be required to make any Capital Contributions to the Company for the payment of any losses incurred by the Company or for any other purposes and the Members shall not, solely by reason of being a Member and a party to this Agreement, be responsible or obligated to any third parties (including any other Member or former Member) for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise.  Nothing in this Section 6.1 shall be deemed to limit a Member's liability to the Company or to another Member in respect of (a) any fraud by such Member, (b) any breach by such Member of this Agreement or pursuant to any express provision of this Agreement or (c) pursuant to the terms of any other agreement entered into between such Member and the Company or any other Member(s).

6.2     Negative Capital Accounts.  The Members shall not be required to pay to the Company or to any other Member any deficit or negative balance which may exist from time to time in their respective Capital Accounts as a result of the provisions hereof for the allocation to the Members of the Company's Net Loss and for the distribution of cash to the Members by the Company.

6.3     Confidentiality. The Members will not, and will use their good faith efforts to cause their Affiliates to not, use or disclose to any Person (other than a Member) any trade secrets, technical information, processes, know-how, financial or business data or other proprietary information relating to or in the possession of the Company, including the Company's long-term business plan (collectively, "**Proprietary Information**") for any purpose which does not relate to the Company; provided, however, that a Member may disclose any such Proprietary Information: (a) that has become generally available to the public (other than disclosure by the Member or its Affiliate in violation of this Section 6.3); (b) to its employees and professional advisers who need to know such information and agree to keep it confidential in accordance with the terms of this Section 6.3; (c) to the extent required in order to comply with contractual reporting obligations to its members who have agreed to keep it confidential in accordance with the terms of this Section 6.3; (d) to the extent necessary in order to comply with any law, order, regulation or ruling applicable to such Member; and (e) as may be required in response to any summons, subpoena or discovery request in connection with any litigation or proceeding, it being agreed that, unless such Proprietary Information has become generally available to the public (x) the Member will give the Company prompt notice of such summons, subpoena or discovery request and will cooperate with the Company at the Company's request so that the Company may, in its discretion, seek a protective order or other appropriate remedy, if available, and (y) in the event that such protective order is not obtained (or sought by the Company after notice), the Member (1) will furnish only that portion of the Proprietary Information which, in accordance with the advice of counsel, is legally required to be furnished and (2) will exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such Proprietary Information; provided, further, that nothing contained in this Section 6.3 will prohibit any Member from disclosing Proprietary Information in the context of a

proposed sale of its Member Interest or Economic Interest in the Company in accordance with this Agreement to a Person who has first signed and delivered to the Company a confidentiality agreement in a form reasonably acceptable to the Company.

6.4     Member Meetings; Voting.

6.4.1   Except as required by the Act or this Agreement, the Board may, but shall not be required to convene or hold a meeting of the Members. In any matter described in this Agreement on which any Member is entitled to grant or deny such Member's Approval, such Member may accomplish the same by attending any meeting convened by the Board for all of the Class A Members. The Board may, at any time and upon receiving a written request signed by the holders of not less than twenty percent (20%) of the total Class A Member Units then outstanding, requesting that the Board convene a meeting of the Members to consider approval of any action upon which the Members are entitled to vote, the Board shall convene a meeting of the Class A Members and shall submit any matter (upon which the Members are entitled to vote) to such Members for a vote at such meeting. Notice of any such meeting shall be given to each Class A Member not less than seven (7) days nor more than sixty (60) days before the date of the meeting. Notice may be given personally or by first class mail, facsimile, electronic mail or overnight delivery and shall be deemed given three (3) Business Days after being mailed, if mailed, or one Business Day after being sent by facsimile or electronic mail (with delivery confirmation) or being delivered to a nationally recognized overnight delivery service for next business day delivery, addressed to the Member at the Member's address as it appears on the records of the Company. For avoidance of doubt, except as specifically required by the Act, Class B Members shall not be entitled to (a) any notice of a Member meeting or notice of any actions taken at a Member meeting, (b) attend any such Member meeting, or (c) any voting rights with respect to their Class B Member Units.

6.4.2   The Company will be entitled to treat the owner of record of any Member Unit as the owner in fact of such Unit for all purposes, and accordingly will not be bound to recognize any equitable or other claim to or interest in such Unit on the part of any other Person, whether or not the Company will have express or other notice of such claim or interest, except as expressly provided by this Agreement or the Act. A Member may grant to any person a special or general power of attorney or proxy to vote for such Member at any such Member meeting. The presence in person or by proxy of holders of not less than a Majority in Interest of all outstanding Class A Member Units shall constitute a quorum at any such meeting, and any action requiring Approval of the Members or of a Majority in Interest of the Members under this Agreement may be taken by a Majority in Interest of the Class A Members. Any meeting may be held within or without the State of Delaware at such place as may be determined by the person or persons calling the meeting (although any such location must be one at which a Member may participate in the meeting by means of conference telephone or similar communications equipment, by means of which all participating Members can hear each other). Any Class A Member may participate in a meeting of the Class A Members by means of conference telephone or similar communications equipment, by means of which all participating Class A Members can hear each other. Such participation shall

constitute presence, in person, by such Class A Member at such Members meeting. The business to be conducted at any Members meeting need not be limited to the purpose(s) described in the meeting notice provided to the applicable Class A Members and may include other business that the Board may put before the Members at such meeting. For avoidance of doubt, except as specifically required by the Act, Class B Members shall have no right to participate in any meeting of the Members unless so provided by the Board.

6.4.3   Notwithstanding the foregoing, any action that is required to be or may be taken at a meeting of the Members may be taken without a meeting if written consent, setting forth the action, shall be signed by Class A Members, in person or by proxy, who would be entitled to vote at a meeting those Class A Member Units having the right to cast not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Class A Member Units entitled to vote were present and voted. A consent transmitted by "electronic transmission" (as defined in Section 18-404(d) of the Act), by a Member or a person or persons authorized to act for a Member shall be deemed written and signed for purposes of this subsection. If any action under this Section 6.4.3 is taken by less than unanimous written consent of the Class A Members, Notice of such action shall be given to those Members, determined on the effective date of such action, whose Member Interests were not represented on the written consent, provided that the failure to give such Notice shall not invalidate the consent or action so taken.

## ARTICLE 7
## MANAGEMENT OF COMPANY

7.1   <u>Powers and Duties of Managers</u>. Except as otherwise provided in this Agreement, the Board shall be responsible for, and have, from and after the Date of Organization, the right, power and authority with respect to, the conduct of the Company's business and affairs. Subject to the provisions hereof and of Sections 7.2 and 7.3, the Board shall have, and is hereby granted, full and complete power, authority, and discretion to take such action for and on behalf of the Company, and in its name, as the Board deems necessary or appropriate to carry out the purposes for which the Company was organized. Each Member, by execution of this Agreement, agrees to, consents to, and acknowledges the delegation of powers and authority to the Board, and to the actions and decisions of the Board within the scope of the Board's authority as provided herein. The Managers shall devote such time and effort to the Company as they deem necessary for the Company's welfare and success. The Board may delegate to any Officers such power and authority as the Board determines is appropriate (in which event such Officers may exercise the delegated powers and authority). To the extent that the Board designates Officers pursuant to Section 7.2, the day-to-day activities of the Company may be conducted on the Company's behalf by the Officers, who shall be agents of the Company (subject to this Section 7.1). At any time that there is more than one (1) Manager on the Board, actions by the Board shall require the approval of a majority of the Managers on the Board (each of whom shall have one vote). Except as may be permitted or approved by the Board, no Manager, in such capacity, shall be authorized to bind or act on behalf of the Company. In the event that a Manager is other than an individual, such Manager shall act through its duly authorized representatives. Notwithstanding

the foregoing, no Manager or Officer shall, without the prior consent of the Board, have authority to:

(a)   merge or consolidate the Company with or into any other Person;

(b)   sell, exchange or otherwise dispose of (or enter into any binding agreement to sell, exchange or otherwise dispose of) all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a twelve (12) month period, except in the orderly liquidation and winding up of the business of the Company pursuant to Article 14 following the Company's dissolution;

(c)   borrow on the credit of the Company, or refinance any approved loans or indebtedness of the Company,;

(d)   subject all or any portion of the Company's assets to any security interest, lien or other encumbrances;

(e)   purchase, contract to purchase, lease or execute any option for the purchase of (i) any real property, or (ii) any personal property with a value in excess of $5,000;

(f)   sell, exchange, convey, lease, or otherwise transfer any significant Company property, or portion thereof, or grant to any person an option with respect thereto;

(g)   admit Members to the Company (other than substituted Members Approved in accordance with Article 11) or issue any additional Member Units to any Person (including a Profits Interest Member);

(h)   redeem the Member Units of any Member (except pursuant to this Agreement or an applicable Grant Agreement, including vested Class B Member Units held by a Profits Interest Member);

(i)   borrow funds from the Company;

(j)   make a payment to a Member, except as otherwise provided in this Agreement;

(k)   confess a material judgment against the Company, commence any material legal action against a third party or settle any material legal action involving the Company;

(l)   make any election under the tax laws of the United States or the State of Georgia, including elections described in the Bipartisan Budget Act of 2015, except as expressly permitted in this Agreement;

(m)     enter into any contract or agreement by the Company that shall obligate the Company, either directly or contingently, to provide products or services valued in excess of, or pay more than, **$50,000** over the entire term of the contract or agreement;

(n)     select professional advisers for the Company, including certified public accountants (other than Smith & Howard, P.C. in Atlanta, Georgia who shall be the Company's initial accountants) and attorneys;

(o)     modify or amend the Certificate of Formation;

(p)     cause the Company to hire any management employee, Officer or any employee making over $20,000 per year in compensation or to increase the compensation or benefits of any Company Manager, Officer, employee or contractor;

(q)     cause the Company to guarantee or become obligated for the debts or obligations of any other person or entity or hold out its credit as being available to satisfy the obligations of others, or pledge its assets for the benefit of any other person or entity; or

(r)     increase or decrease the number of Managers on the Board.

7.2     _Appointment and Duties of Officers._  The Board may, but is not required to, appoint from time to time such Officers of the Company (each an "Officer") as it shall determine.  The Officers will have such powers and duties as may be prescribed by the Board, in any employment agreement with such Officer, or as set forth in this Agreement (subject to the limitations in Section 7.1).  All Officers shall serve at the pleasure of the Board and shall, at all times, be under the direction of and subject to the authority of the Board.  The Board may remove any Officer at any time, with or without cause and with or without prior notice, whenever in the Board's judgment the best interests of the Company will be served thereby.  Any Officer may resign at any time by giving written notice to the Company, and such resignation will take effect at the date of the receipt of that notice or any later time specified in that notice; _provided_ that, unless otherwise specified in that notice, the acceptance of the resignation will not be necessary to make it effective.  Any such resignation will be without prejudice to the rights, if any, of the Company or such Officer under this Agreement.

7.3     _Compensation of Managers or Officers for Services._  Except as specifically approved by the Board, no Manager or Officer shall receive any compensation (or any increase in compensation) from the Company for services as a Manager or Officer of the Company.  The Company shall pay all of its own operating, overhead and administrative expenses of every kind, and the Manager shall be reimbursed for all costs and expenses it may have incurred or may hereafter incur on behalf of the Company (subject to any restrictions imposed by the Board).

7.4     _Election of the Managers._

(a)     The Board will be composed of two (2) Managers, unless or until the size of the Board is changed with the Approval of the Board and a Majority in Interest of the Members. Each Manager shall hold office until such Manager resigns, retires, dies or is removed in accordance with the terms of this Agreement.  The Company's initial Managers are listed on

Exhibit "B." By executing this Agreement, each Class A Member hereby agrees to vote all of such Member's Class A Member Units for the election of the Managers designated in accordance with this Section 7.4.

(b)      Subject to Section 7.4(a) and Section 11.9, (i) Julie Blanchard (or her designee, if so authorized by Julie Blanchard) shall have the right to appoint one (1) Manager of the Company (Julie Blanchard being such initial Manager) or a successor for any such designated Manager to be determined; (ii) Kimberly Staples (or her designee, if so authorized by Kimberly Staples) shall have the right to appoint one (1) Manager of the Company (Kimberly Staples being such initial Manager) or a successor for such designated Manager.  If any such Manager ceases to act as a Manager for any reason, such Manager's replacement as a Manager shall be appointed by whichever Member nominated the Manager being replaced.

7.5      Limited Member Management.  Except as otherwise provided in this Agreement or as specifically required by the Act, the Members, in such capacity, shall not participate in the management of the Company's Business and affairs or have any right or authority to act for or on behalf of or to bind the Company nor execute any agreement or instrument on behalf of the Company. Each Class A Member agrees that it will cast all votes ascribed to its Class A Units, if any, or execute consents, as the case may be, and take all other necessary action (including causing the Company to call a special meeting of Class A Members) in order to elect individuals, who have been nominated in accordance with the provisions of Section 7.4, to serve as Managers and otherwise to ensure that the composition of the Board is at all times consistent with Section 7.4.

7.6      Liability of Managers and Officers.  A Manager or Officer shall not be liable or accountable to the Company or to any of the Members, in damages or otherwise, for any error of judgment, for any mistake of fact or of law, or for any other act or thing which it or he may do or refrain from doing in connection with the business and affairs of the Company, except in the case of any loss incurred by the Company for which the Company is not fully insured and which results from the intentional misconduct, knowing violation of law or gross negligence of the Manager or Officer or for any transaction for which the Manager or Officer received a personal benefit in violation or breach of this Agreement and except in the case of any loss incurred by the Company which results from the Manager's or Officer's bad faith violation of the implied contractual covenant of good faith and fair dealing. No person who is a Manager or Officer or both a Manager and Officer of the Company shall be personally liable under any judgment, decree or order of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, or for the acts or omissions of any other manager, member, agent or employee of the Company whether arising in contract, tort, or otherwise, solely by reason of being a Manager or Officer or both a Manager and Officer of the Company.

7.7      Indemnification of Members, Managers and Officers.

7.7.1  The Company shall, to the fullest extent permitted by the Act, indemnify each Member, Manager and Officer against judgments, fines, amounts paid in settlement, and expenses (including attorneys' fees and costs of investigation) reasonably incurred by such Member, Manager or Officer in any civil, criminal, or investigative proceeding in

which they, or any one or more of them, are involved or threatened to be involved by reason of such person or entity being a Member, Manager or Officer of the Company or acting on behalf of the Company or any direct or indirect subsidiary of the Company, provided that the Member, Manager or Officer acted in good faith, within what it reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in, or not opposed to, the best interests of the Company or the Members and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful; provided, however, that the Company shall not be required to indemnify the Member, Manager or Officer for any loss, expense, or damage which it may suffer as a result of its willful misconduct, knowing violations of law, gross negligence, or bad faith in failing to perform its duties hereunder, or for any loss, expense, or damage arising out of any transaction in which the Member, Manager or Officer received a benefit in violation or breach of any provision of this Agreement.

7.7.2  The Company may reimburse or pay such expenses incurred by a Member, Manager or Officer in his or her capacity as a Member, Manager or Officer (and not in any other capacity) in advance of the final disposition of a proceeding, upon delivery to the Board of an undertaking, by or on behalf of such Member, Manager or Officer, to repay all amounts so advanced if it shall ultimately be determined that such Member, Manager or Officer is not entitled to be indemnified under this Section or otherwise.

7.7.3  The Board shall have the power to purchase and maintain insurance in reasonable amounts (as determined from time to time by the Board) on behalf of itself and the Members, Managers, Officers, and any employees and other agents of the Company against any liability incurred by them in their capacities as such, whether or not the Company has the power to indemnify them against such liability.  Any right of indemnification granted under this Section 7.7 hereof may be satisfied only out of the assets of the Company (or insurance proceeds received with respect thereto) and no Member, Manager or Officer shall be personally liable with respect to any such claim for indemnification of another Member, Manager or Officer.  If any Member, Manager or Officer recovers any amounts advanced or paid by the Company under this Section 7.7 from any insurance coverage, then such person shall, to the extent that such recovery is duplicative, reimburse the Company for any such amounts previously paid to such Member, Manager or Officer under this Section 7.7.

7.7.4  The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Formation, this Agreement or otherwise.

7.7.5  Notwithstanding the foregoing provisions of this Section 7.7, the provisions of Section 7.7.1 and 7.7.2 shall, unless otherwise specifically provided by the Board, not apply with respect to any civil, criminal, or investigative proceeding, claim, action or matter initiated by, or on behalf of the Company, against such Member, Manager or Officer.

7.8     Other Activities of Members and Managers. Each Member, Manager and Officer, in its, her or his individual capacity or otherwise from time to time, but subject to the terms of any other agreement between such Person and the Company, shall be free to engage in, to conduct, or to participate in any business or activity whatsoever. Notwithstanding the foregoing provisions of this Section 7.8, no Member or Manager may use or involve the Company's facilities, equipment, records or personnel in connection with any such outside activity or business (other than with respect to Renaissance Man Food Services, LLC), unless specifically approved by the Board.

7.9     Removal of Managers. Julie Blanchard may remove, at any time, with or without cause, any Manager appointed by either of them. Kimberly Staples may remove, at any time, with or without cause, any Manager appointed by either of them. Such removed Manager's replacement as a Manager shall be appointed, in accordance with Sections 7.4 and 7.10, by whichever of the Class A Members appointed the Manager being replaced.

7.10    Vacancies. A Manager may resign at any time by giving written notice to such effect to the Board. Any such resignation shall take effect at the time of the receipt of that notice or any later effective time specified in that notice and, unless otherwise specified in such notice, the acceptance of the resignation shall not be necessary to make it effective. Any vacancy occurring for any reason in the position of Manager shall be filled by whichever of the Class A Members appointed the Manager being replaced.

7.11    Certificated Interests. Ownership of Units may, but need not, be evidenced by certificates. In the discretion of the Board, the Company may issue certificates to the Members of the Company which evidence the Member's Member Interest. Such certificates shall bear such legends, including those regarding restrictions on transfer in this Agreement, any applicable agreement to which the Company is a party or bound and appropriate securities laws, all as determined by the Board. Unless otherwise directed by the Board or required by the Act, any such Member Unit certificates may be signed by any Manager or by the Chairman, Chief Executive Officer or President, if any, of the Company (only one such signature being required, unless otherwise directed by the Board or the Act). Certificates evidencing Member Units will provide that they shall constitute a "security" within the meaning of, and be governed by, Article 8 of the Uniform Commercial Code as in effect from time to time in the State of Delaware.

The Board may direct a new certificate to be issued in place of any certificate previously issued by the Company alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming the certificate to be lost, stolen or destroyed. When authorizing such issue of a new certificate, the Board may, in its sole discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate to give the Company a bond sufficient to indemnify the Company against any claim that may be made against the Company on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

7.12    Board Meetings.

7.12.1  The Board (if there is more than one Manager) shall unless waived by the Board meet at least annually; provided that the failure to hold the annual meeting shall not work a forfeiture or affect otherwise valid Board or Company acts.

7.12.2  Special meetings of the Board may be called at any time by the Chairman, if any, the President or by any Manager, on two (2) Business Days' notice, which may be given personally or by first class mail, facsimile, electronic mail or overnight delivery and shall be deemed given three (3) Business Days after being mailed, if mailed, one Business Day after being sent by facsimile or electronic mail (with delivery confirmation) or one Business Day after being delivered to a nationally recognized overnight delivery service, addressed to the Manager at the Manager's address as it appears on the records of the Company.    Notwithstanding the foregoing, a Manager may call an emergency meeting of the Board upon twenty-four (24) hours' notice delivered personally or by telephone, electronic mail or facsimile (with confirmation of delivery) if such Manager believes in good-faith that such emergency meeting is necessary to preserve a material Company right or to avoid a material Company liability or material adverse consequence to the Company.    Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting the lack of notice to such Manager (prior to its commencement).    All such waivers, consents and approvals will be filed with the Company records or made a part of the minutes of the meeting.

7.12.3  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting and waiver of any and all objections to the place of the meeting, the time of the meeting, or the manner in which it has been called or convened, except when a Manager states, at the beginning of the meeting or promptly upon arrival, any such objection or objections which such Manager may have to the transaction of business at such meeting.

7.12.4  Any meeting of the Board may be held within or without the State of Delaware at such place as may be determined by the person or persons calling the meeting (although any such location must be one at which a Manager may participate in the meeting by means of conference telephone or similar communications equipment, by means of which all participating Managers can hear each other).    Any Manager may participate in a meeting of the Board by means of conference telephone or similar communications equipment, by means of which all participating Managers can hear each other.    Such participation shall constitute presence, in person, by such Manager at such Board meeting.

7.12.5  At all meetings of the Board, the majority of the whole Board, attending in person or by proxy, shall be necessary and sufficient to constitute a quorum for the transaction of business.    The act of a majority of the Managers shall be the act of the Board (with each Manager having one (1) vote, except as may be otherwise specifically provided by the Act, the Certificate of Formation or by this Agreement.    Any meeting of

the Board may be adjourned to meet again at a stated day and hour. Even though no quorum is present, as required in this Section 7.12.5, a majority of the Managers present at any meeting of the Board, either regular or special, may adjourn from time to time until a quorum be had. Notice of any adjourned meeting need not be given.

7.12.6 Any action required to be taken at a meeting of the Board, or any action that may be taken at a meeting of the Board may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by Managers (in person or by proxy) having voting power to cast not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Managers entitled to vote were present and voted. A consent transmitted by "electronic transmission" (as defined in Section 18-404(d) of the Act), by a Manager or a person or persons authorized to act for a Manager shall be deemed written and signed for purposes of this subsection. Notice shall be given promptly after the taking of such action without a meeting, by less than unanimous written consent, to those Managers entitled to vote on such action who did not participate in taking the written action, provided that the failure to give such notice shall not invalidate the consent or action so taken.

7.13   Duties of Managers and Members.

(a)   To the fullest extent permitted by the Act, a person, in performing his or her duties and obligations as a Manager under this Agreement, shall be entitled to act or omit to act at the direction of the Member that designated such person to serve on the Board, considering only such factors, including the separate interests of the designating Member, as such Manager or Members choose to consider, and any action of a Manager or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Manager or Members designating such Manager, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law, rule or regulation) on the part of such Manager or Members to the Company or any other Manager or Member.

(b)   The Members (in their own names and in the name and on behalf of the Company) hereby:

(i)   agree that the terms of this Section 7.13, to the extent that they modify or limit a duty or other obligation, if any, (including fiduciary duties) that a Manager may have to the Company or any another Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and the terms of this Section 7.13 shall control to the fullest extent possible if it is in conflict with a duty (including fiduciary duties), if any, that a Manager may have to the Company or another Member, under the Act or any other applicable law, rule or regulation; and

(ii)   waive to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Member may have to the Company or another Member, (including fiduciary duties) pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 7.13.

## ARTICLE 8
## INVESTMENT BY MEMBERS

8.1    <u>Subscription for Member Interest</u>.  Each Member hereby subscribes for the Member Interest described in Exhibit "A."  Each Member and all additional Members, if any, will execute such subscription agreements as may be required by the Board.  The provisions of any such subscription agreements shall be in addition to, and not in lieu of, the provisions of this Agreement.

8.2    <u>Investment Intent</u>.  Each Member hereby represents and warrants that the Member Interest being subscribed for and purchased by the Member is being acquired (a) with the intent of holding the Member Interest for investment only and not with the intent of participating directly or indirectly in any distribution thereof; and (b) with the understanding that the Member Interest may not be sold or transferred except as permitted by this Agreement, the Federal Act (as hereafter defined) and the Act.

8.3    <u>Unregistered Member Interest; Legends</u>.  The certificates, if any, representing the Member Units will bear the following legends (and/or any other legends determined by the Board):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

THE TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE ISSUER (THE 'COMPANY'), AS IN EFFECT FROM TIME TO TIME.  A COPY OF SUCH LIMITED LIABILITY COMPANY AGREEMENT AS IN EFFECT FROM TIME TO TIME WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

8.4    <u>Ability to Bear Risk</u>.  Each Member represents and warrants that (a) the financial situation of the Member is such that the Member can afford to bear the economic risk of holding the Member Interest purchased by the Member hereunder for an indefinite period, (b) the Member can afford to suffer the complete loss of the Member's investment in the Member Interest, (c) the Member has adequate means of providing for the Member's and the Member's dependents' current needs and possible personal contingencies, (d) the Member has no need for liquidity in this investment, and (e) the Member can afford a complete loss of such investment.  The Member is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire Member Units in the Company.

8.5    <u>Accredited Investor</u>.  Such Member is fully aware that: (i) the offering and sale of Member Interests in the Company have not been and will not be registered under the Securities Act and are being made in reliance upon federal and state exemptions for transactions not

involving a public offering; and (ii) the Company will not be registered as an investment company under the Investment Company Act in reliance upon an exemption therefrom. In furtherance thereof, such Member represents and warrants that he, she or it is an "accredited investor" (as defined in Regulation D under the Securities Act, as amended). Such Member agrees that he, she or it will not take any action that could have an adverse effect on the availability of such exemptions from registration with respect to the offer and sale of the Member Units.

8.6    Tax Matters. Such Member represents and warrants that the Member understands the tax consequences of the transactions contemplated by this Agreement, including the Member's subscription for, and purchase of, the Member Interests, and the ownership and any disposition thereof (subject to this Agreement), and acknowledges that such Member will be solely responsible for any and all tax liabilities payable in connection with the ownership of the Member Interests including the purchase, ownership and disposition thereof.

8.7    Units Subject to Agreement. Each Member understands that the Member Units acquired by it shall, upon issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement. Each Profits Interest Member acknowledges and agrees that Class B Member Units shall also be subject to the terms and conditions of the Grant Agreement pursuant to which such Class B Member Units were granted.

## ARTICLE 9
## BANKING

The funds of the Company shall be kept in one or more separate bank or brokerage accounts in the name of the Company in such banks or other federally insured depositories or brokerage firms as may be designated by the Board or shall otherwise be invested in the name of the Company in such manner and upon such terms and conditions as the Board deems appropriate. No funds, other than funds of the Company, shall be deposited in any of such accounts, and no funds shall be commingled with the Company's funds (a common investment account shall not be deemed a commingling so long as the Company's funds therein are separately accounted for). All withdrawals from any such bank accounts or investment accounts established by the Board hereunder shall be made on such signature or signatures as may, from time to time, be designated by the Board. The Board may revoke any person's signature authority at any time, with or without cause and with or without prior notice. Board members shall each receive copies of monthly or quarterly bank account and investment account statements.

## ARTICLE 10
## ACCOUNTING

10.1    Method of Accounting. The Company's books of account shall be maintained, and its income, gains, losses, and deductions shall be determined and accounted for, in accordance with such method of accounting as may be adopted, from time to time, by the Board.

10.2   <u>Financial and Operating Statements and Tax Information</u>.  Following the end of each Fiscal Year of the Company, the Board, at the expense of the Company, shall cause to be prepared annual financial statements of the Company for such Fiscal Year, reviewed, compiled or audited (as determined by the Board) by the Company's firm of independent certified public accountants, as of the last day of such Fiscal Year.  In addition, the Board, at the expense of the Company, shall cause to be prepared such quarterly or other interim financial statements of the Company as the Board may deem appropriate.  Further, the Board, at the expense of the Company, shall cause to be prepared and delivered to each of the Members, promptly following the end of each Fiscal Year of the Company, an income tax information return containing such information and data as required by law with respect to the operation of the Company for such Fiscal Year.  Upon request by any of the Members with respect to any Fiscal Year, the Company shall provide to such Member a copy of the federal and state income tax returns for the Company for such year.  Each Board member shall receive a copy of all such financial statements.

10.3   <u>Location of and Access to Books of Account and Other Information</u>.

(a)   The Company's books of account shall be kept at such locations as may be designated by the Board.  The Board shall provide or make available to each Member upon written request (which shall include a description of the Member's purpose for inspecting the records and the records the Member desires to inspect) at the principal office of the Company during ordinary business hours (i) a current list of the full name and address of each Member, (ii) a copy of the Certificate of Formation of the Company and all amendments thereto, (iii) copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years (or all of its tax years if fewer than three), (iv) copies of this Agreement and all amendments hereto, and (v) other information regarding the financial condition and affairs of the Company, reasonably relevant to the Member's legitimate interest as a Member, as shall be reasonably requested by such Member (and the provision of which is not unduly burdensome to the Company).  The Board shall also provide or make available to each Member upon written request, at the office of the Company during ordinary business hours, such additional information and records, if any, as required by the Act and other applicable law.  The Company may maintain its records in other than written form if such form is capable of conversion into written form within a reasonable time.

(b)   Notwithstanding anything to the contrary in Section 10.3(a), the Board may keep confidential from any Member for such period of time as the Board deems reasonable, any information that the Board reasonably believes to be in the nature of a trade secret or other information the disclosure of which to the requesting Member the Board in good faith believes is not in the best interest of the Company or could damage the Company or its business or which the Company is required by law or by agreement with a third party to keep confidential.

10.4   <u>Tax Matters Member; Partnership Representative</u>.

10.4.1  Pursuant to Section 6231(a)(7) of the Code, the Members hereby designate Julie Blanchard as the Company's "tax matters partner" ("Tax Matters Member").  The Tax Matters Member, on behalf of the Company, will timely file all writings required by

any governmental authority having jurisdiction to require such filing, including all state and local withholding tax requirements on distributions and/or income allocations and will cause the timely filing and reporting of such information to the governmental authorities and to the Members. The Tax Matters Member shall inform each other Member of all significant matters that may come to the Tax Matters Member's attention in such individual's capacity as Tax Matters Member by giving notice thereof within a reasonable time after becoming aware thereof and, within a reasonable time, shall forward to each other Member copies of all significant written communications it may receive as Tax Matters Member. The Tax Matters Member shall immediately notify, as soon as practicable, each other Member of any significant communications received from the Internal Revenue Service. The Tax Matters Member shall consult in good faith with, and shall consider the views of, each other Member regarding such matters and shall make a good faith attempt to reach a consensus on all issues. The Tax Matters Member will have the authority and responsibility to arrange for the preparation of, and timely file, the Company's tax returns. The Company will reimburse the Tax Matters Member for any and all reasonable expenses (including legal and accounting fees) incurred by the Tax Matters Member in connection with the fulfilment of its duties under this Section 10.4.

10.4.2 The Members hereby appoint Julie Blanchard as the Person with authority to act on behalf of the Company (the "Partnership Representative") pursuant to Section 6223(a) of the Code (as amended by the 2015 Act) for any Post-TEFRA Period.

10.4.3 The Partnership Representative shall have the right to make on behalf of the Company any and all elections and take any and all actions that are available to be made or taken by the Tax Matters Member under the Code or by the Partnership Representative or the Company under the Partnership Tax Audit Rules (including an election under Section 6226 of the Code, as amended by the Partnership Tax Audit Rules), and the Members and former members who were members in the applicable tax year of the audit shall take such actions requested by the Partnership Representative consistent with any such elections made and actions taken by the Partnership Representative, including filing amended tax returns and paying any Tax due in accordance with Section 6225(c)(2) of the Code as amended by the Partnership Tax Audit Rules, it being understood that no such amended tax return shall be filed in accordance with such section with respect to the Company without the advance written consent of the Partnership Representative in its sole discretion. The Board shall attempt to allocate the burden of (or any diminution in distributable proceeds resulting from) any Taxes, penalties or interest imposed on the Company pursuant to the Partnership Tax Audit Rules to those Members to whom such amounts are specifically attributable (whether as a result of their status, actions, inactions or otherwise) where such allocation can be achieved without unwarranted expense and effort (as measured in relation to the aggregate amount in question) as determined by the Board.

10.4.4 In the event the Company incurs any liability for taxes, interest or penalties pursuant to the 2015 Act:

(a)      the Partnership Representative may cause the Members (including any former Member) to whom such liability relates, as determined by the Partnership Representative in its sole good faith discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company, and such amount shall not be treated as a Capital Contribution may cause the Members (including any former Member) to whom such liability relates, as determined by the Partnership Representative in its sole good faith discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company, and such amount shall not be treated as a Capital Contribution;

(b)      any amount not paid by a Member (or former Member) at the time requested by the Partnership Representative shall accrue interest at the Prime Rate (or if higher, the rate assessed by the applicable taxing jurisdiction), until paid, and such Member (or former Member) shall also be liable to the Company for any damages resulting from a delay in making such payment beyond the date such payment is requested by the Partnership Representative, and for this purpose the fact that the Company could have paid this amount with other funds shall not be taken into account in determining such damages; and

(c)      without reduction in a Member's (or former Member's) obligation under clauses (a) and (b), any amount paid by the Company that is attributable to a Member (or former Member), as determined by the Partnership Representative in its reasonable good faith discretion, and that is not paid by such Member pursuant to clauses (a) and (b) shall be treated for purposes of this Agreement as a distribution to such Member (or former Member).

10.4.5 The obligations of each Member (or former Member) under this Section 10.4 shall survive the transfer by such Member of its Member Interest and the dissolution of the Company.  In the event a Member Transfers its Member Interest, the transferee and transferor shall be jointly and severally liable for any liability with respect to obligations of the transferor Member under this Section 10.4.

10.5   Notice of Inconsistent Treatment of Company Item.  No Member shall file a notice with the Internal Revenue Service under Code Section 6222(b) in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return unless such Member has, not less than thirty (30) days prior to the filing of such notice, provided the Tax Matters Member with a copy of the notice and thereafter in a timely manner provides such other information related thereto as the Tax Matters Member shall reasonably request.

## ARTICLE 11
## TRANSFER OF COMPANY INTERESTS

11.1   Definition of Terms.  For purposes of this Article 11 the following terms shall be defined as follows:

11.1.1 <u>Transfer</u>. A "Transfer" by a Member shall be deemed to include any transfer, sale, assignment, pledge, hypothecation, or other disposition of such Member's Member Interest, voluntarily, involuntarily, or by operation of law (including any judicial charging order with respect to a Member's Member Interest) or an agreement to do any of the foregoing. The terms "Transferred" and "Transferring" shall have correlative meanings.

11.1.2 <u>Transferring Member</u>. A "Transferring Member" is any Member who desires to Transfer all or any part of such Member's Member Interest.

11.1.3 <u>Non-Transferring Member</u>. A "Non-Transferring Member" is each Member other than the Transferring Member.

11.2 <u>Limitations on Transfers of Member Interests</u>. Except as otherwise provided herein (including Section 11.3), the Members hereby covenant and agree not to Transfer all or any part of their respective Member Interests at any time without the prior consent of the Board and any parties whose consent is required under any agreement to which the Company is a party or by which the Company or its Members is bound. Any purported Transfer made in violation of this Agreement shall be null and void and not binding on the Company. If any Member is an entity, then the transfer of equity interests of such Member or a change in control of such Member shall constitute a Transfer of the Member Interest owned by such entity Member hereunder. For purposes of this Agreement, any transfer, exchange or series of transfers (or exchanges), directly or indirectly, of the stock, partnership, member or other ownership interests of any Member that is a business organization or an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the Member, and any similar transactions involving the stock or other ownership interests of such Member), the effect of which is that the Persons who owned more than fifty (50%) of the outstanding stock or other ownership interests in such Member at the time this Agreement is signed, no longer own more than fifty percent (50%) of such stock or other ownership interests, then a Transfer shall also be deemed to have occurred with regard to the Interest owned by such Member.

No Profits Interest Member shall Transfer any Class B Member Units in violation of any applicable Grant Agreement. Any purported Transfer made in violation of any applicable Grant Agreement, shall be null and void and not binding on the Company. For avoidance of doubt, Section 11.7.4 will apply to each Class B Member in any Company Sale (as defined in Section 11.7.2) in which Class B Member Units are also sold, regardless of whether a Required Sale Notice is sent thereunder, such that Section 5.3 will apply thereto.

11.3 <u>Transfer of Interest of a Member</u>.

11.3.1 Any purported Transfer by a Member of all or any part of such Member's Member Interest (even if Approved by the Board), but excluding a Permitted Transfer or a Transfer to the Company (including pursuant to Article 13), shall be subject to the Option provision set forth in Section 11.5 hereof and the right of first refusal set forth in

Section 11.6 hereof (both subject to the exceptions set forth in Section 11.3.2) (unless the Board exempts such purported Transfer from either or both of such Sections) and any purported Transfer shall be valid and effective only if the Transferring Member and the transferee (i) execute, acknowledge and deliver to the Company Members such instruments of transfer and assignment as are in form and substance satisfactory to the Company Members; and (ii) pay all costs, including, without limitation, legal expenses incurred by the Company, which are associated with such Transfer.

11.3.2  Permitted Transfers of all or any part of a Member's Member Interest shall be subject to (i) all of the other terms and provisions of Article 11, (ii) all of the other terms and provisions of this Agreement, (iii) any restrictions on Transfers in any agreement to which the Company is a party or by which the Company or its Members is bound, and (iv) any restrictions reasonably imposed by the Board to prevent a deemed termination of the Company for federal income tax purposes.  All applicable provisions of this Agreement shall apply with respect to any further Transfers of such Member Interest.

11.3.3  Notwithstanding anything to the contrary in this Agreement, no Unit may be Transferred unless (i) such Transfer will not affect the Company's existence or qualification as a limited liability company under the Act, (ii) such Transfer will not cause the Company to be classified as other than a partnership for United States federal income tax purposes, (iii) such Transfer will not result in a termination of the Company under Code Section 708, unless the Board determines that any such termination will not have a material adverse impact on the Members and (iv) such Transfer will not cause the application of the tax exempt use property rules of Code Sections 168(g)(l)(B) and 168(h) to the Company or its Members.  In addition, no Unit may be Transferred or issued by the Company if such Transfer or issuance would require the Company to register under the Investment Company Act of 1940, as amended from time to time.

11.4    Substituted Member.

11.4.1  In the event a Member Transfers all or any part of such Member's Member Interest in compliance with the provisions of this Article 11 (or if any such transfer is ordered by a court), the transferee of such Member's Member Interest shall not have the right to become a substituted Member of the Company (and such transferee shall have no right to participate in the management of the Company or to participate in any decision affecting the Company) unless the Transferring Member has specifically given such transferee such right and unless:

> (i)      the Transferring Member and such transferee execute and deliver such instruments as the Board deems legally necessary or reasonably desirable to affect such substitution;

> (ii)     such transferee accepts and agrees in writing to be bound by all of the terms and provisions of this Agreement (including by execution and delivery of a Joinder Agreement acceptable to the Board);

(iii)   such transferee pays all reasonable expenses incurred by the Company connected with such substitution; and

(iv)   the Board consents to the substitution of such transferee as a substituted Member.

Any Member who Transfers all of such Member's Member Interest (1) shall cease to be a Member upon such Transfer and (2) shall no longer possess or have the power to exercise any rights or powers of a Member of the Company (regardless of whether the transferee becomes a substituted Member).   Upon admission to the Company as a substituted Member, such transferee shall have the same Member Interest, the same rights in and to all distributions made by the Company in liquidation or otherwise, the same duties, including without limitation, duties to make contributions to the capital of the Company, and the same share of the Company's capital, profits, losses and other distributive tax items as the Transferring Member had, prior to such transfer, with respect to the transferred Member Interest in the Company. Notwithstanding the preceding sentence, if the Transferor was also a Manager, the Transfer of such Member Interest shall not, by itself, cause the transferee to become a successor Manager and any successor Manager shall be designated in accordance with Article 7 of this Agreement). In the event that any transferee does not become a substituted Member, such Class A Member Units transferred to such transferee shall automatically be converted into Class B Member Units and the votes previously associated with such Member Units shall thereafter be cancelled and disregarded for all purposes of this Agreement and such transferee shall have no right to participate in the management of the Company or to participate in any decision affecting the Company or the Members.

11.4.2 Upon the transfer of the Transferring Member's Member Interest during any Fiscal Year, Net Profits, Net Losses, and each item thereof attributable to the transferred Member Interest for such period shall be divided and allocated between the Transferring Member and the transferee by taking into account their varying Member Interests during the period in accordance with Code Sec. 706(d), using any convention permitted by law and approved by the Board. All distributions on or before the date of such Transfer shall be made to the Transferring Member and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that if the Company does not receive a notice stating the date such Member Interest was transferred and such other information as the Board may require within thirty (30) days after the end of the accounting period during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Company, on the last day of the accounting period during which the Transfer occurs, was the owner of the Member Interest. Neither the Company nor any other Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 11.4, whether or not any Member or the Company has knowledge of any transfer of ownership of any Member Interest.

11.5     Option to Purchase Member Interests.

In the event that any Member desires to dispose of all or any portion of its Member Interest, (in which event such Transferring Member shall give notice to the Board and each other Member of such desire to dispose of such Member Interest) such Member shall sell such Member Interest ("Offered Member Interest") as hereinafter set forth. This Section 11.5 shall not apply to Permitted Transfers described in Section 11.3.2, transfers required under Section 11.7 (Drag-Along), if applicable or if the Board, in its absolute discretion, consents to the purported Transfer not being subject to this Section 11.5. No Class B Member shall Transfer any Class B Member Units in violation of any applicable Grant Agreement. Nothing herein shall be deemed to limit any repurchase rights of the Company set forth in any applicable Grant Agreement.

11.5.1 The Company shall have the right, but not the obligation, to purchase all but not less than all of the Transferring Member's Offered Member Interest. It is hereby acknowledged and agreed that the option granted pursuant to this Section 11.5.1 shall only be effective if the Company elects to purchase all of the Transferring Member's Offered Member Interest. Any sales hereunder shall be subject to any consents required under any agreements to which the Company is a party or bound.

11.5.2 Such option shall be exercised by written notice to the Transferring Member within ninety (90) days after the receipt of the Transferring Member's notice (such period being the "Option Period").

11.5.3 The purchase price for the Offered Member Interest purchased by the Company shall be the greater of (i) One Hundred Dollars ($100.00) or (ii) the amount that would be payable to the Transferring Member, pursuant to Section 14.2, as if the Company's assets were sold to an unrelated purchaser at the Company's Fair Market Value as of the last day of the month immediately preceding the commencement date of the Option Period and such amounts were thereafter distributed pursuant to Section 14.2.

11.5.4 The sale and transfer of the Transferring Member's Member Interest pursuant to this Section 11.5 shall take place within one hundred eighty (180) days following the date of the Transferring Member's notice or other event described in Section 11.5.1. At the closing, the Transferring Member shall execute and deliver all documents and instruments to the purchasing Member(s) as are reasonably deemed appropriate by counsel to the Company to effectuate the transfer of the Member Interest.

11.5.5 The purchase price paid by the purchasing Member(s) for the Transferring Member's Member Interest shall be paid, in full, at the closing; provided, however, if the aggregate purchase price is in excess of Five Thousand Dollars ($5,000), the purchase price may be paid by the purchaser pursuant to a promissory note ("Promissory Note") to be executed at the Closing. The Promissory Note shall provide, in part, that principal shall be payable in thirty-six (36) monthly installments beginning one month after the Closing. The principal shall be paid, as indicated above, together with interest on the unpaid principal at a rate equal to the appropriate "Applicable Federal Rate", as determined pursuant to Internal Revenue Code Section 1274, with respect to the month in

which the Closing occurs.  The Promissory Note may be prepaid in full or in part, at any time, without penalty or premium with interest to the day of prepayment.

11.5.6  In the event that the Transferring Member's Member Interest is not purchased by the Company pursuant to subsections 11.5.1 through 11.5.5 hereof, the Transferring Member may, subject to the provisions of Section 11.6, dispose of such Member's Offered Member Interest to any person, subject to any consents required under any agreement to which the Company is a party or bound, provided a bona fide offer is received within one hundred eighty (180) days after the expiration of the Option Period and the sale or transfer is consummated within the period set forth in Section 11.6.4.  If such disposition is not so consummated, no further disposition shall be made except in the manner herein set forth in Sections 11.5 and 11.6.

11.6  <u>First Refusal Rights</u>.  Except for the Permitted Transfers described in Subsection 11.3.2 (or transfers required under Section 11.7 (Drag Along), if applicable), any Member Interest proposed to be transferred by a Member (the "Offered Member Interest") pursuant to Section 11.5.6 shall be subject to the right of first refusal contained in this Section 11.6.  No Class B Member shall Transfer any Class B Member Units in violation of any applicable Grant Agreement.  Nothing herein shall be deemed to limit any repurchase rights of the Company set forth in any applicable Grant Agreement.

11.6.1  <u>Notice of Proposed Transfer</u>.  The Transferring Member, prior to making any proposed transfer of such Transferring Member's Offered Member Interest, shall first give Notice to the Board and the other Members of the proposed transfer and the terms of the proposed transfer, including the number and Class of Member Units to be transferred, the proposed transferee (and its owners if it is not an individual), sale price, payment terms and other relevant details (such notice being hereinafter referred to as the "First Offer Notice").  Such First Offer Notice shall constitute an offer by the Transferring Member to sell to the Company all, but not less than all, of the Offered Member Interest that the Transferring Member proposes to transfer upon the terms and conditions set forth in the First Offer Notice.  The date on which, pursuant to the provisions of Section 15.2, the First Offer Notice is deemed to be given to the Company is hereinafter referred to as the "Notice Date."  Any sale hereunder shall be subject to any consents required under any agreements to which the Company is a party or bound.  In the event that the terms include non-monetary terms, related to the purchase price of the Offered Member Interest, such terms shall be reasonably valued by the Board and included in the proposed purchase price.

11.6.2  <u>Notice of Acceptance</u>.  The Company shall have sixty (60) days from the Notice Date (the "Offer Period") to elect to purchase such Offered Member Interest.  Such election shall be exercised by the giving of Notice of such exercise to the Transferring Member.  No such exercise shall be valid unless said option to purchase has been exercised with respect to the entire Offered Member Interest.

11.6.3  <u>Acceptance of Offer; Closing</u>.  Upon the acceptance by the Company of the Transferring Member's offer, the transfer of the Offered Member Interest from the Transferring Member to Company shall be closed and consummated in the principal

office of the Company at 11:00 A.M. local time on or before the ninetieth (90) day following the Notice Date (or, if such day is not a Business Day, the Business Day next following such day). At the closing, the Transferring Member shall execute and deliver all documents and instruments to the Company as are reasonably deemed appropriate by counsel to the Company to effectuate the transfer. Upon the acceptance by the Company of the Transferring Member's offer (i) the Transferring Member's Member Interest shall be deemed cancelled and automatically converted from an outstanding Member Interest into the right to receive the applicable purchase price and any other amounts due under this Agreement.

11.6.4  <u>Transfer to Third Party; Later Transfer</u>.  If the Company fails to give Notice, prior to the expiration of the Offer Period, of its desire to acquire the Offered Member Interest offered by the Transferring Member, then the Transferring Member shall be permitted to transfer all, but not less than all, of the Offered Member Interest; provided, however, that such transfer shall be made substantially in accordance with the terms of the proposed transfer as described in the First Offer Notice (and to the proposed transferee described in the First Offer Notice); and provided further that such transfer must be consummated prior to the one hundred twentieth (120th) day following the Notice Date; and provided further that such transfer shall comply with all the terms and conditions of Article 11, including Section 11.9, as applicable.  The transferee shall acquire such Offered Member Interest subject to the transfer restrictions of this Agreement as to further transfers of all or any part of such interest.  In the event the Transferring Member fails, prior to such date, to consummate such proposed transfer, then prior to any subsequent transfer of all or any portion of the Transferring Member's Member Interest, the Transferring Member shall be required to give the Members and the Board Notice thereof, and the option provisions of Section 11.5 and the right of first refusal provisions described in this Section 11.6 shall again be exercisable with respect thereto.

11.7  <u>Drag-Along Rights</u>.

11.7.1  If (a) the Board receives a bona fide proposal from an independent third party to engage in a transaction that would result in a Company Sale (as defined below), (b) the Board and a Majority in Interest of the Members approves of the Company Sale and elects for this Section 11.7 to apply to such Company Sale, then within ninety (90) days after receiving the Required Sale Notice (as defined below) in accordance with Section 11.7.3, all Members shall consent to (and if required by law, vote in favor of), and shall raise no objections against the Company Sale, and if the Company Sale is structured as (i) a merger or consolidation of the Company, or (ii) a sale or recapitalization of the Company, each Member shall agree to sell all of its Member Units (or, in the case of a recapitalization or the sale or transfer of less than one hundred percent (100%) of the Member Units of the Company, its *pro rata* portion of such Member Units) which are the subject of the Company Sale, on the terms and conditions set forth in the Required Sale Notice. The Members shall take all necessary and desirable actions in connection with the consummation of the Company Sale, including the execution of such agreements and instruments and the taking of such other actions as the Board may determine to be reasonably necessary to (x) provide customary

representations, warranties, indemnities, and escrow arrangements relating to such Company Sale and (y) effectuate the allocation and distribution of the aggregate consideration upon the Company Sale as set forth in Section 11.7.4 below. Nothing in this Section 11.7 shall be deemed to limit any repurchase rights of the Company set forth in any applicable Grant Agreement.

11.7.2 The term "Company Sale" shall mean the sale to an independent third party or affiliated group of independent third parties pursuant to which such party or parties will acquire more than fifty percent (50%) of the outstanding Class A Member Units (whether such acquisition is effected by merger, consolidation, recapitalization, sale or transfer of the Company's interests or any similar transaction).

11.7.3 In the event this Section 11.7 is invoked, the Company shall deliver written notice (the "Required Sale Notice") to the Members; *provided* that no Member shall be obligated to participate in a Company Sale unless the following conditions are satisfied: (a) if any holder of a particular class of Member Units is given an option as to the form and amount of consideration to be received, all holders of such class of Member Units will be given the same option with respect to such consideration; (b) no Member shall be obligated to pay more than his, her or its *pro rata* share (based upon the amount of consideration received) of the costs of any Company Sale to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party; and (c) in the event that the Members are required to make any indemnities for representations and warranties they may be required to make or that are made by the Company, then (i) no Member shall, without such Member's consent, be liable for more than his, her or its share of any indemnification liability (based upon such Member's Member Ownership Percentage), and (ii) such indemnification liability shall not exceed the value of the total amount received by such Member as a result of his, her or its participation in such Company Sale.

11.7.4 The amount each Member will receive as a result of participation in the Company Sale shall equal the amount such Member would have received if the Company assets had been sold for the purchase price being paid in the Company Sale as set forth in the Required Sale Notice, and such amounts were distributed pursuant to Section 14.2.

11.7.5 The Required Sale Notice shall set forth: (a) the date of such notice; (b) the name and address of the acquiring party; (c) the proposed amount (or the method for determining the amount) and form of consideration and terms and conditions of payment offered by the acquiring party, together with written proposals or agreements, if any, with respect thereto; and (d) the proposed date of the Company Sale (the "Required Sale Date"), which shall be not less than thirty (30) nor more than one hundred and eighty (180) calendar days after the date of such notice.

11.7.6 All of the Members and the Managers shall cooperate in good faith with the Company and any potential purchaser in connection with consummating the Company Sale. On the Required Sale Date, each Member shall execute and deliver to the acquiring party (to the extent necessary to effect the consummation of the Company Sale) written instruments of transfer in form reasonably satisfactory to the Company and the

acquiring party, in the manner and at the address indicated in the Required Sale Notice and each Member shall be paid the amount to which he, she or it may be entitled as described in the Required Sale Notice.   Sections 11.5 and 11.6 shall not apply to Transfers of Member Interests under this Section 11.7

11.8     Enforcement.   The Members hereby expressly agree that it would be impossible to measure in money the damages which would accrue to the Members and the Company by reason of a selling Member's failure to perform any of the obligations under Sections 11.6, 11.7 and 13.1 of this Agreement.   Therefore, each Member expressly agrees that in the event such selling Member (or such Member's estate) fails to tender the applicable Member Units to the purchasing Company as required by this Agreement, such purchaser(s) may demand compliance by the seller with the terms of this Agreement by sending written notice thereof to the selling Member (or such Member's estate).   If the selling Member (or such Member's estate) fails to comply with the terms of this Agreement within fifteen (15) days after receipt of such written notice, then any such purchase of the selling member's Member Units may be consummated by transferring, on the Company's books, the selling Member's Member Units to Company and tendering to the selling Member, all sums, promissory notes and other documents due hereunder. Each Member irrevocably authorizes Company, as its agent and attorney-in-fact, to take all steps necessary to effect such purchase and sale.   The foregoing shall not limit the right of any party, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance to effect compliance by the seller with the terms of this Agreement.

11.9     Special WBE Provisions.   During any period for which the Company is certified, or has applied to become certified, as an woman owned business enterprise ("WBE"), the following rules shall apply and shall supersede any conflicting provision of this Agreement, unless otherwise Approved by the Board (in connection with the decision to no longer remain a certified WBE):

(a)     The President, if any, will be an eligible female;

(b)     No less than fifty-one percent (51%) of the outstanding Class A Member Units and fifty-one percent (51%) of all outstanding Member Units will be owned by eligible female members, as described by applicable WBE guidelines;

(c)     No Member may transfer any Member Units to any Person who is not an eligible female if such transfer would adversely affect the Company's WBE certification or the Company's status as a WBE; and

(d)     No fewer than fifty-one percent (51%) of all Managers shall be designated by Members who are eligible females.

## ARTICLE 12
## WITHDRAWALS

12.1     Withdrawal of Members.   The Members shall not be permitted to withdraw from the Company except as permitted in Article 11, Article 13 or Article 14.

12.2 <u>Withdrawing Member's Interest</u>. In accordance with the terms of Section 18-604 of the Act, a withdrawing Member is not entitled to receive any amount from the Company in connection with such withdrawal except to the extent specifically provided in this Agreement or an applicable Grant Agreement.

# ARTICLE 13
# DISABLED MEMBER

13.1 <u>Disabled Member</u>. Upon the death of any Member, the occurrence of any event described in Section 18-304 of the Act (collectively, a "Disabling Event") with respect to any Member ("Disabled Member"), the Company shall have the option to purchase all, but not less than all, of the Member Interest owned by the Disabled Member, and the Disabled Member, or the Disabled Member's estate, as the case may be, shall be obligated to sell such Member Interest for which such options are exercised. A Class B Member who is a Profits Interest Member may be required to withdraw from the Company if such Profits Interest Member is no longer an employee of the Company. Withdrawals pursuant to this Section will be effected by the Company's purchase of such Class B Member's vested Class B Member Units on the terms and conditions set forth in any Grant Agreement pursuant to which such Class B Member Units were granted and issued to such Class B Member, or if no such purchase terms are set forth in such Grant Agreement (or no such Grant Agreement is applicable), then as set forth in this Article 13, as if such Class B Member became a Disabled Member as of the date of termination of his or her employment. Nothing herein shall be deemed to limit any repurchase rights set forth in any applicable Grant Agreement. Non-Vested Class B Member Units shall be forfeited and cancelled for no consideration, as set forth in the applicable Grant Agreement.

13.1.1 The option to purchase shall be exercisable by the Company by written notice to the Disabled Member or the Disabled Member's estate, as the case may be within one year after the Disabling Event (such period being the "Option Period"). The Board may extend the Option Period for up to an additional six (6) months in the event that any Governmental Authority or any credit, financing or security agreement (or similar agreement) binding the Company prohibits such purchase of the Disabled Member's Member Interest. If the Disabling Event is the Disabled Member's death and the Company maintains life insurance policies purchased on the Disabled Member's life for purposes of a buy-out under this Section 13.1, then the Company shall exercise such option on or before the expiration of the Option Period.

13.1.2 The purchase price for the Disabled Member's Member Interest purchased by the Company shall be the amount that would be payable to the Disabled Member, pursuant to Section 14.2, as if the Company's assets were sold to an unrelated purchaser at the Company's Fair Market Value as of the last day of the month immediately preceding the date of the occurrence of the Disabling Event and such amounts were distributed pursuant to Section 14.2.

13.1.3 The sale and transfer of the Disabled Member's Member Interest pursuant to this Section 13.1 shall take place on such date selected by the Company, within sixty

(60) days following the expiration of the Option Period. At the closing, the Disabled Member shall execute and deliver all documents and instruments to the Company as are reasonably deemed appropriate by counsel to the Company to effectuate the transfer of the Member Interest.

13.1.4 The purchase price paid by the Company for the Disabled Member's Member Interest shall be paid pursuant to an unsecured promissory note ("Promissory Note") to be executed at the Closing. The Promissory Note shall provide, in part, that principal shall be payable in sixteen (16) quarterly installments beginning as of the first to occur of March 31, June 30, September 30 or December 31, as the case may be, following the month in which the closing of the purchase occurs. The principal shall be paid, as indicated above, together with interest on the unpaid principal at a rate equal to the appropriate "Applicable Federal Rate", as determined pursuant to Internal Revenue Code Section 1274, with respect to the month in which the Closing occurs. The Promissory Note may, at the Company's sole discretion, be prepaid in full or in part, at any time, without penalty or premium with interest to the day of prepayment. The election by the Company to so pay the purchase price with respect to any Disabled Member shall not require the Company to pay the full purchase price at closing with respect to any other Disabled Member.

13.1.5 As of the date of the occurrence of a Disabling Event (i) the Disabled Member's Member Interest shall be deemed cancelled and automatically converted from an outstanding Member Interest into the right to receive the Purchase Price and any other amounts due under this Agreement in connection with such Disabling Event, (ii) such Member Interest shall no longer be deemed to be an outstanding Member Interest in the Company as of such date (nor constitute an Economic Interest) and (iii) the Disabled Member shall have no further rights as a Member (other than the right to receive the Purchase Price and such other amounts due to the Disabled Member in connection with such Disabling Event through such date under this Agreement). Any Member Interest acquired by the Company pursuant to this Section 13.1 shall be considered redeemed as of the date of the occurrence of the Disabling Event and the respective Member Ownership Percentage of each of the remaining Members shall be increased proportionately at such time, in accordance with their respective Member Ownership Percentages, to reflect such redemption.

Notwithstanding Section 13.1.4, if the Disabling Event is the Disabled Member's death, the Company shall pay to the Disabled Member's estate at closing the full amount of life insurance proceeds, if any, received by the Company, at or before the closing (not to exceed the purchase price), with respect to life insurance policies purchased on the Disabled Member's life for purposes of a buy-out under this Section 13.1. If the amount of such life insurance proceeds, if any, received in connection with the Disabled Member's death is less than the purchase price, the unpaid portion thereof, shall be paid pursuant to Section 13.1.4.

13.2   Successor Member. In the event the Disabled Member's Member Interest is not purchased by the Company pursuant to Section 13.1 hereinabove, said Member may continue to own said Member Interest and in the event said Member Interest passes to a successor in interest

of said Member (by bequest, court order or otherwise), such successor in interest shall succeed to the Disabled Member's entire Member Interest and shall have the same percentage interest in the Company, the same obligations with respect to contributions to the capital of the Company, the same rights in and to all distributions made by the Company, in liquidation or otherwise, and the same share of the Company's Net Profit, Net Loss, and specially allocated items of income and deduction as the Disabled Member had with respect to such Member's Member Interest. In the event a successor in interest of a Member is admitted to the Company as a Member hereunder, subject to and in accordance with Section 11.4, such successor shall promptly, upon demand of the Company, execute and deliver to the Company, and does hereby irrevocably constitute and appoint the Manager as his or its true and lawful attorney to execute and to deliver to the Company for and on such transferee's behalf, all documents that may be necessary or appropriate, in the opinion of counsel for the Company, to reflect such transferee's admission to the Company as a Member and his or its agreement to be bound by all of the terms and conditions of this Agreement, as amended from time to time.

## ARTICLE 14
## DISSOLUTION, LIQUIDATION, AND TERMINATION OF COMPANY

14.1   <u>Dissolving Events</u>.  The Company shall be dissolved, liquidated, and terminated in the manner hereinafter provided upon the happening of any of the following events:

14.1.1  the agreement of the Board and a Majority in Interest of the Members to dissolve, liquidate and terminate the Company; or

14.1.2  the sale by the Company of all of its assets and the collection of all amounts derived from any such sale or sales, including all amounts payable to the Company under any promissory notes or other evidences of indebtedness derived by the Company from any such sale or sale; or

14.1.3  upon the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act.

14.2   <u>Method of Liquidation</u>.  Upon the happening of any event specified in Section 14.1 which requires the Company to be dissolved, liquidated, and terminated, the Company's assets shall be converted by the Board into cash, and all cash held by the Company at the time of the happening of such event and all cash received by the Company after the happening of such event (irrespective of whether such cash was or would otherwise have been considered cash flow or Net Proceeds under the terms of this Agreement), notwithstanding the terms of Section 18-804 of the Act, shall be applied and distributed as follows:

14.2.1  To the repayment of debts and liabilities of the Company (including any debts and liabilities owed to a Member), and to the expenses of liquidation in the order of priority as provided by law; then

14.2.2  To the establishment of such Reserves as the Board deems appropriate for any contingent or unforeseen liabilities of the Company; provided, however, that at the expiration of such period as the Board deems advisable, the balance of such Reserves shall be distributed to the Members in the manner hereinafter provided; then

14.2.3  In accordance with Section 5.2.

14.3  Reasonable Time for Liquidation.  A reasonable time shall be allowed for the orderly liquidation of the Company's assets pursuant to Section 14.2 above in order to minimize the risk of loss which might be attendant upon such a liquidation.  During such period, the Board shall have full authority and power to liquidate the Company's assets and wind up the Company's business and affairs in due course.  The Board may appoint a Person to act as the "**Liquidator**," and such Person will act as the Liquidator unless and until a successor Liquidator is appointed as provided in this Section 14.3.  The Liquidator may be removed at any time, with or without cause, by notice of removal and appointment of a successor Liquidator approved by the Board.  Any successor Liquidator will succeed to all rights, powers and duties of the former Liquidator.  The right to appoint a successor or substitute Liquidator in the manner provided in this Section 14.3 will be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions of this Agreement, and every reference in this Agreement to the Liquidator will be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided in this Section 14.3.

14.4  Distribution in Kind.  Notwithstanding the provisions of Section 14.2 that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 14.2, if upon dissolution of the Company the Board determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members and Economic Interest Holders, the Board may, in its sole discretion, defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, distribute to the Members and Economic Interest Holders, in lieu of cash, as tenants in common or otherwise, as the Board may elect, and in accordance with the provisions of Section 14.2, such Company assets as the Liquidator (or the Board) deems not suitable for liquidation or undivided interests therein.  Any such distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator (or the Board) deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, the Board will determine the Fair Market Value of any property to be distributed.

14.5  Date of Termination.  The Company shall be terminated when all of its assets have been converted into cash, all promissory notes or other evidences of indebtedness derived by the Company from such conversion of its assets have been collected or otherwise converted into cash, and all such cash, together with any other cash held by the Company, has been applied and distributed in accordance with the provisions of Section 14.2.  The establishment of any reserves pursuant to Section 14.2.2 shall not have the effect of extending the term of the Company, but any such reserves shall be applied and distributed in the manner provided in such Section upon expiration of the period of such reserve.  The Board shall cause the Company to file such certificates of dissolution or other instruments as may be required under the laws of the State of Delaware.

# ARTICLE 15
# GENERAL PROVISIONS

15.1  Waiver of Right of Partition; No Appraisal Right.

15.1.1 Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be vested in the Company as an entity, and no Member, Manager or Officer, individually or collectively, shall have any direct ownership interest in the Company's assets or any portion thereof. Each of the Members hereby agrees to and hereby waives any right such Member may otherwise have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any proceeding at or in equity seeking to have any one or all of the assets partitioned.

15.1.2 Each of the Members hereby acknowledges and agrees that no Member shall have any contractual appraisal rights, as described in Section 18-210 of the Act and no such rights shall be created or apply with respect to any action related to the Company.

15.2   Notices.  Whenever any Notice is required or permitted hereunder, such Notice shall be in writing and shall be (as elected by the party giving such Notice) (i) delivered in person, (ii) sent by U.S. registered or certified mail, return receipt requested, postage prepaid, (iii) sent by U.S. Express Mail, postage prepaid, (iv) delivered by recognized air courier service, or (v) transmitted by facsimile or electronic mail to the person to whom such Notice is intended, in each case to be given at such address (including electronic mail address) or facsimile number as such person may have previously furnished in writing to the Company or to such person's last known address or facsimile number.  Except as expressly stated otherwise in this Agreement, any Notice delivered in person or by air courier shall be deemed effectively given when delivered, and Notice mailed as herein provided shall be deemed effectively given on the earlier of the date of receipt or the fifth (5th ) Business Day after being so mailed, and any notice or other communication transmitted by facsimile or electronic mail shall be deemed effectively given on the date of transmission with confirmed answer back (if transmitted on a Business Day and if not transmitted on a Business Day on the next Business Day).

15.3   Amendments.  No amendment of this Agreement shall be valid unless in writing, approved by the Board and signed by a Majority in Interest of the Class A Members in which event such amendment will be binding on all Members.  Amendments to Exhibit A following any issuance, redemption, repurchase, reallocation or Transfer of Member Interests in accordance with this Agreement may be made by the Board without the consent of or execution by the Members.

15.4   Binding Effect.  This Agreement shall inure to the benefit of and shall be binding upon the Members, their respective legal representatives, transferees, heirs, successors, and permitted assigns.  Nothing in this Agreement will be construed to be to the benefit of or enforceable by any Person that is not a party to this Agreement, including any creditor of the Company.

15.5   Duplicate Originals.  For the convenience of the Members, any number of counterparts hereof may be executed, and each such counterpart shall be deemed to be an original instrument but all shall be one and the same agreement.  Any counterpart transmitted by facsimile or electronic transmission shall be treated the same as an original counterpart.

15.6    Governing Law; Jurisdiction.  This Agreement shall be interpreted, construed, and enforced in accordance with the laws of the State of Delaware without giving to effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of any other law.  Each Member hereby consents to the exclusive jurisdiction of the federal and state courts located in Atlanta, Georgia in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement.  Each Member (a) consents to submit itself to the personal jurisdiction of any such court see forth in this Section 15.6 in the event any dispute arises out of this Agreement, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or (c) agrees that personal jurisdiction over him, her or it may be effected by service of process by registered or certified mail addressed as provided in Exhibit A of this Agreement, and that when so made will be as if served upon him, her or it personally within his, her or its state of residence.

15.7    Time of Essence.  Time is of the essence of this Agreement.

15.8    Severability.  If any provision of this Agreement or the application thereof to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to parties or circumstances other than those to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

15.9    Entire Agreement.  This Agreement and the Certificate of Formation embody the complete agreement and understanding among the parties to this Agreement with respect to the subject matter of this Agreement and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, that may have related to the subject matter of this Agreement in any way.

15.10   Inclusion/Exclusion of Economic Interest Owners.   In sections (or portions thereof) of this Limited Liability Company Operating Agreement dealing with allocations, distributions and other economic matters (but not including matters dealing with consents, voting rights, rights to inspect Company's books and records or other matters strictly limited to Members) the term "Member" shall be deemed to also refer to and include Economic Interest Owners.   In sections (or portions thereof) of this Limited Liability Company Operating Agreement dealing with consents, voting rights, rights of governance or management, rights to inspect Company's books and records or other matters strictly limited to Members, the term "Member" shall not be deemed to refer to or include Economic Interest Owners.

15.11   Further Documents and Acts.  Each Member agrees to cooperate fully with the other Members and the Company, to execute and deliver such additional documents and instruments, to give such further written assurances and to perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

15.12   Costs.  Except as expressly provided herein, each party will be solely responsible for and bear all of its respective expenses, including expenses of lenders, legal counsel,

investment bankers, consultants, accountants and other advisors, incurred at any time in connection with the transactions contemplated by this Agreement.

15.13  Interpretation.   The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement.  If any claim is made by a party relating to any conflict, omission or ambiguity in the provisions of this Agreement, no presumption or burden of proof or persuasion will be implied because this Agreement was prepared by or at the request of any party or its counsel.

15.14  Offset. Whenever the Company is to pay any sum to any Member (for any reason), any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment, after written notice to the Member describing the nature of the offset and the amount to be offset.

## ARTICLE 16
## POWER OF ATTORNEY

16.1   Grant of Power.   Each of the Members does hereby irrevocably constitute and appoint the Board as such Member's true and lawful attorney-in-fact, in such Member's name, place, and stead, to make, execute, consent to, swear to, acknowledge, record, and file:

16.1.1 amended Certificate of Formation, Approved in accordance with this Agreement, under the applicable laws of the State of Delaware and under the applicable laws of any other jurisdiction in which the Board deems such filing to be necessary or desirable;

16.1.2 any certificate or other instrument which may be required to be filed by the Company or the Members under the laws of the State of Delaware and/or under the applicable laws of any other jurisdiction to the extent the Board deems such filing to be necessary or desirable;

16.1.3 any and all amendments or modifications to this Agreement or to said Certificate of Formation or any other instrument described above pursuant to the provisions of this Agreement solely for the purpose of reflecting the admission of additional Members, transfers of Company interests, or adjustments to the percentage interests in the Company of the Members; and

16.1.4 all certificates and other instruments which may be required to effectuate the dissolution, liquidation, and termination of the Company pursuant to the provisions of this Agreement.

16.2   Irrevocability of Power.   The limited grant of a power of attorney to the Board pursuant to this Agreement is coupled with an interest, is irrevocable, and shall survive the death or legal incompetence of any of the Members or the assignment of such Member's Interest in the Company.

*[SIGNATURES ON FOLLOWING PAGE]*

IN WITNESS WHEREOF, the parties hereto have executed, sealed and delivered this Limited Liability Company Agreement as of the date first above written.

MEMBERS:

_____
Julie Blanchard, Member

_____
Kimberly Staples, Member


COMPANY:

By:_____
Julie Blanchard, Manager

By:_____
Kimberly Staples, Manager

## EXHIBIT A

### MEMBER INFORMATION

| Member Name | Member Units and Class | Capital Contribution Account | Member Ownership Percentage |
|---|---|---|---|
| Julie Blanchard | 200 Class A Units 300 Class B Units | | 50% |
| Kimberly Staples | 200 Class A Units 300 Class B Units | | 50% |

## **EXHIBIT B**

<u>Managers</u>

Julie Blanchard

Kimberly Staples