FILED
2019 Feb-11 PM 07:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# **TAB C**

# Joint Status Report (Dkt 66)

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

**KIMBERLY and JOHN STAPLES,** )
)
)
**Plaintiffs,** )
)
**V.** ) **Civil Action No.: 7:18-cv-00160-LSC**
)
**H. WALKER ENTERPRISES, LLC; RENAISSANCE MAN FOOD SERVICES, LLC; and SIMMONS PREPARED FOODS, Inc.** )
)
**Defendants.** )

## JOINT STATUS REPORT

COME NOW the Plaintiffs and Defendants and submit this joint report to the Court pursuant to the Court's Scheduling Order entered on May 15, 2018 (Crt.Rec.Doc. 43).

### A. Plaintiffs Narrative Statement of the Case[1]

1. This case concerns several claims which relate to the following: (1) the wrongful employment termination of John Staples, (2) the wrongful interference with Mr. Staples' employment relationship as a consultant for the

[1] Simmons refers to Defendant Simmons Prepared Foods, Inc. HWE refers to Defendant H. Walker Enterprises, LLC. RMFS refers to Renaissance Man Food Services, LLC. HWE is the only member of RMFS, LLC and owns 100% of the LLC entity.

LLC entity DSM Sales and Marketing (DSM3) owned in part and operated by his wife and Plaintiff Kimberly Staples in the State of Alabama, (3) the wrongful oppression, breach of fiduciary obligations, and interference related to Mrs. Staples' ownership and employment interest in DSM3, (4) defamation against Mr. Staples by HWE/RMFS, and finally (5) conspiracy to commit these wrongs as between the Defendants.

2. The claims of Plaintiffs are best summarized and outlined in a December 21, 2017 document which shows the Defendants' collaborative plans of actions directed against Mr. Staples, Mrs. Staples, and their Daughter Blair Staples.[2]

<u>Choice of Law Rules in the Case:</u>

1. A Federal Court sitting in Alabama applies Alabama's Choice of Law rules. <u>See</u> *Erie Doctrine.*; *Ferris v. Jennings*, 851 F.Supp. 418 (M.D. Ala. 1993) (under the *Erie* doctrine when a Federal Court exercises diversity-of-citizenship jurisdiction the Court is bound to apply the substantive law of the state in which it sits, and the doctrine extends to choice-of-law questions).

---

[2] Exhibit 1. Mr. Staples claims that if he was an alleged at-will employee then there was no reason for a Plan A or B as developed by Defendants concerning him and his family on December 12, 2017 and memorialized by Defendants in writing on December 21, 2017. Defendants produced the document in discovery in the case. Blair Staples, Mr. and Mrs. Staples daughter, was employed by Simmons also.

*2.* Alabama's choice-of-law rule is to be followed. The Court, therefore, must determine which of Alabama's choice-of-law rules to apply and must first determine the "nature of the problem involved, i.e., is the specific issue at hand a problem of law of contracts, torts, property, etc.,". *Jennings* at 421 applying *Garcia v. Public Health Trust of Dade County,* 841 F.2d 1062 (11th Cir. 1988).

3. "Alabama law follows the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti.*" See *Liberty Mut. Ins. Co. v. Wheelwright*, 851 So.2d 466 (Ala. 2020). Under the principles of *lex loci contractus* a contract is governed by the law of the jurisdiction where the contract is made or formed. *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502 (Ala. 1991). Under the principle of *lex loci delicti* an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred. *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So.2d 819 (Ala. 1991).

Mr. Staples' Wrongful Termination Claims are Contractual Under Arkansas Law as between Mr. Staples and Simmons:

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 4 of 63

1. Prior to March 6, 2009 Mr. Staples was recruited by Simmons on at least three (3) occasions.[3] On March 6, 2009 he became an employee of Simmons up until his termination. He was originally hired to manage a joint venture relationship known as Walker Foods, LLC, but, his employment agreement was subsequently changed for him to manage a different joint venture between Simmons and H. Walker Enterprises (HWE) concerning RMFS. The original employment relationship was modified after his original hire date of March 6, 2009.

2. He worked remotely from Tuscaloosa at the time of termination on or about December 27, 2017 or December 28, 2017.[4] The employment relationship was formed in Arkansas where Simmons operates its Food

---

[3] Mr. Staples' has testified that he hesitated to accept employment due to concerns related to Herschel Walker's anger issues and mental health concerns as set out in Walker's book known as *Breaking Free* and his CNN interview. The concerns dealt primarily with Walker's conduct to harm people whom Walker deemed had slighted or disrespected him. By way of example, Walker testified in this case individually and as the Rule 30 representative for HWE (RMFS) that Christopher Thurber, one of the DSM3 employees, who disrespected him "had to go also" implying he too was terminated from employment like Mr. Staples. Walker Depo. at 277-278.

[4] A dispute exists as concerns who exactly terminated him and when such termination occurred. Simmons cut off his access to their email system and demanded return of his laptop on or about December 28, 2017. Mr. Staples claims his immediate Simmons' boss Chip Miller authorized him working remotely in the early part of 2015.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 5 of 68

Business and has its food production facilities. Simmons allowed Mr. Staples to work remotely in 2015 from Tuscaloosa, Alabama.

3. Arkansas does not have a statute which determines the status of an employee. Wrongful termination claims in Arkansas are **contract-based** claims inclusive of damages. See *Sterling Drug, Inc., v. Oxford*, 743 S.W.2d 380 (Ark. 1988) (an action for wrongful discharge under the public policy exceptions to the employment-at-will doctrine sounds exclusively in contract); see also *Marlow v. United Systems of Arkansas, Inc.*, 2013 WL542866 (public policy exception presents an exclusive contract cause of action).

4. Arkansas law allows recovery for emotional damages as well as attorney fees. See *Crain Industries, Inc. v. Cass*, 810 S.W.2d 910 (Ark. 1991). When an employer makes **definite statements about what its conduct will** be concerning an employee, an employee has a contractual right to expect the employer **to perform as promised**. *Crain Indus*., 810 S.W.2d at 915. The employees' continued employment supplies any necessary consideration for the promises or assurances.

HWE and RMFS' interference with Mr. Staples' Arkansas employment relationship with Simmons occurred in Arkansas where the relationship was formed and severed upon termination by the conduct of HWE and/or RMFS:

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 6 of 63

1. Arkansas employs an "improper" rule with respect to tortious interference of contract or business expectancy. See *Stewart Title v. American Abstract & Title*, 215 S.W. 3d 596 (Ark. 2005). To show tortious interference under Arkansas law the following elements exists: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) improper and intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Id.

2. Any prospective business relationship that would be of pecuniary value is a valid "business expectancy" within the meaning of the tort of interference with business expectancy. Id.

3. For tortious interference under Arkansas law, the conduct of a Defendant must be at least "improper" and Arkansas Courts look to the factors of the Restatement (Second) of Torts for guidance about what is improper which include: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interest of the other with which the actor's conduct interferes; (4) the interest sought to be advanced by the actor; (5) the social interest in protecting the freedom of action of the actor and the actor's conduct to the interference and the relations between the parties. Restatement (Second) of Torts Section 767.

See *Baptist Health v. Murphy*, 373 S.W.3d 269 (Ark. 2010).[5] Neither HWE or RMFS was a party to the employment contract or Mr. Staples expectancy concerning his employment with Simmons.

The remainder of Mr. and Mrs. Staples' Claims are Tort Claims under Alabama Law:

1. Mr. and Mrs. Staples were citizens of Alabama and residing in Tuscaloosa at the time of the remaining tort claims which occurred two days after Christmas 2017.
2. The operations of DSM3 were conducted from Tuscaloosa by Mrs. Staples. These claims are governed by Alabama law inclusive of damages. As Exhibit 1 shows the Defendants agreed among themselves on December 12, 2017 to extinguish Mr. Staples employment with Simmons, his consulting agreement with DSM3, end Mrs. Staples' ownership and employment interest in DSM3, and sever Mr. and Mrs. Staples' Daughter's employment with Simmons.

B. Parties Agreement concerning Undisputed Facts:

The Parties agree to the following undisputed facts. The Parties agree the remaining facts concerning the Parties' claims and defense are in dispute.

1. Herschel Walker (Walker) is the sole owner of H. Walker Enterprises, LLC (HWE).

[5] Arkansas rejects and does not apply the Alabama stranger or interwoven relationship doctrine to tortious interference claims. *Baptist Health* at 283-284.

2. HWE owns 100% of Renaissance Man Food Services, LLC (RMFS).

3. From March 2009 until December 27, 2017 John Staples (Mr. Staples) served as the general manager of RMFS.

4. RMFS buys chicken from Simmons Prepared Foods, Inc. (Simmons).

5. HWE and Simmons also have a business arrangement pertaining to RMFS in which Simmons shares a 35% portion of the profits of RMFS.

6. Simmons was the direct employer of Mr. Staples.

7. Mr. Staples did not want to be directly employed by RMFS, in part, due to its lack of employee benefits.

8. Mr. Staples signed an offer letter of employment with Simmons on March 6, 2009.

9. Mr. Staples did not have a written employment contract with Simmons during his employment (J. Staples Depo. at 376:4-7).

10. As part of the business relationship between Simmons and RMFS, Simmons was refunded in full for Mr. Staples' compensation by RMFS.

11. While technically employed by Simmons as its Director of Distribution Sales Food Service, Mr. Staples was functionally expected to manage the business operation of RMFS as the General Manager of RMFS.

12. Mr. Staples did not have an employment agreement with RMFS.

13. When chicken was sold by RMFS, Simmons "was actively involved in every part of that process." (J. Staples Depo. at 59:23 to 60:3).

14. Simmons also provided the back-office accounting functions for RMFS. (J. Staples Depo. at 60:4-7).

15. DSM Sales and Marketing, LLC (DSM3) is a company owned by Kym Staples (Mrs. Staples) and Julie Blanchard.

16. DSM3's principal place of business is in Tuscaloosa, Alabama.

17. DSM3's financial transactions were conducted through an operating account with West Alabama Bank, an Alabama Bank with offices in Tuscaloosa, Alabama.

18. Mrs. Staples' citizenship as an LLC member is in Alabama.

19. Kym Staples is married to John Staples.

20. DSM3 had a brokerage agreement with RMFS (Brokerage Agreement) to broker the same of RMFS' products.

21. Simmons was not a party to the Brokerage Agreement between DSM3 and RMFS, and Simmons did not sign such agreement nor is its name mentioned in such agreement.

22. DSM3 provided broker services from October 1, 2016 until it received notice of termination on December 30, 2017.

23. RMFS had the right to terminate the broker agreement with DSM3 for any reason.

24. As part of its performance of administrative functions for RMFS, Simmons sent DSM3 commission checks representing the amount of commissions due to DSM3 pursuant to the brokerage agreement between DSM3 and RMFS.

25. Simmons mailed the physical checks representing the commission payments to Mrs. Staples' home in Alabama.

26. The commission check were then deposited in a DSM3 bank account.

27. In addition to her ownership interest in DSM3, Mrs. Staples was employed by DSM3 at an annual salary of $85,000.00.

28. Mrs. Staples worked solely within the business relationship of RMFS and DSM3 and did not perform work on behalf of Simmons.

29. Mr. Staples received a consulting fee from DSM3 in the amount of $40,000.00 per year.

30. The Brokerage Agreement was signed by Mr. Staples on behalf of RMFS and Mrs. Staples on behalf of DSM3. (J. Staples Depo. Ex. 5).

31. Around December 2017 or January 2018, Simmons withheld commission payments owed to DSM3.

32. The previously withheld commission payments have since been paid by Simmons in accordance with written instructions received from RMFS.

33. Mrs. Staples alleges that her intentional interference claim against Simmons is based solely on her allegation that Simmons withheld commission payments to DSM2 (K. Staples Depo. at 54:22-55:5).

34. Mr. Staples sent a copy of the Brokerage Agreement to Simmons because Simmons managed the broker agreement and performed the accounting function that paid the commissions. (J. Staples Depo. Ex. 5; 114:21).

35. Mr. Staples believes that he was defamed by Walker who he alleges told Kristin Caffey that Mr. Staples was not working and that he was playing. (J. Staples Depo. at 64:7-13).

36. Mr. Staples told Ms. Caffey that he was working, and that "she knew I was working." (J. Staples Depo. at 66:15-17).

37. Mr. Staples does not know whether he was harmed by the alleged statement. (J. Staples Depo. at 66:19-22).

38. The other statement to Ms. Caffey alleged to have been made by Walker was that Mr. Staples was trying to steal his company.

39. Mr. Staples did not take the words of Walker to mean that somebody was literally going to walk in and steal the assets of RMFS because RMFS "has no assets, so no, I didn't take it to mean much." (J. Staples Depo at 88:11-12).

40. Mr. Staples does not know of any damages specifically attributable to Walker's statements. (J. Staples Depo. at 89:22 to 90:3).

41. Mr. Staples also alleges that Walker defamed him when he told David Jones that Mr. Staples was charging purchases of sports memorabilia to him and then selling the items through Mr. Staples' memorabilia company. (J. Staples Depo. 92:10-16).

42. As to damages, Mr. Staples suspects that his reputation has been damaged, but "do I have factual evidence to support that, no." (J. Staples Depo. at 94:20-21).

43. On December 27, 2017, Mr. Staples was informed of his termination as the General Manager of RMFS.

44. When Mr. Staples lost his position as the General Manager of RMNFS, he was no longer able to perform job duties in furtherance of the business relationship between Simmons and RMFS.

45. After his separation as General Manager of RMFS, Simmons terminated Mr. Staples on December 28, 2017.

46. Mr. Staples alleges that the laws identified in Count VII of the Complaint comprise the only federal or state laws that he contends that he refused to violate which allegedly led to his wrongful termination.

47. Mr. Staples also alleges that the laws identified in Count VIII of the Complaint comprise the only federal or state laws that he allegedly reported violations of which supposedly led to his wrongful termination.

48. The only specific federal or state law identified in Count VIII of the Complaint is Ark. Code Section 5-36-100 to 5-36-124 which relates to the unlawful taking of property.

49. Around May 2015 Mrs. Staples moved to Alabama.

50. Mr. Staples also moved from Arkansas to Alabama in August or September of 2015. (J. Staples Depo. at 328:12-15).

51. Both Mr. and Mrs. Staples were full-time residents of Alabama as of the date of Mr. Staples' separation from RMFS and Simmons and were Alabama residents at the time of the filing of this lawsuit.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 12 of 68

C. Plaintiffs' Contentions:

**Wrongful termination of Mr. Staples' employment with Simmons**:

Breach of Employment Contract:

1. Before March 6, 2009, John Staples was employed by SmithField Farms in Virginia. Beginning in June of 2008 Simmons began recruiting Mr. Staples to leave employment with SmithField, move to Arkansas, and come to work for Simmons concerning a relationship between Simmons and Herschel Walker. Mr. Staples hesitated and discussed with Simmons his concerns related to Herschel Walker and Mr. Walker's behavior concerning people Mr. Walker intended to harm, particularly those with whom he had concluded had slighted or disrespected him in some fashion.

2. Mr. Staples contends that Simmons, through its agents, servants, or employees, promised and represented to him that Simmons would protect him from Walker and his employment with Simmons would be secure and he would not be terminated except for cause. Mr. Staples contends these assurances were made to him on numerous occasions during his 8-year employment with Simmons. Mr. Staples continued to work with Simmons after each assurance.

3. On March 6, 2009 Mr. Staples accepted an offer of employment with Simmons. Mr. Staples agreed to move with his family to Arkansas and begin

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 13 of 68

work for Simmons. Following acceptance of the offer, Simmons modified Mr. Staples' employment and he began managing a different venture than the one Simmons had hired him originally to manage.[6] Under the original venture Staples was not expected to deal directly with Walker-under the modified venture he was charged to manage he would be. Staples continued to discuss his concerns about Walker with Simmons and Simmons continued to reassure him his job would be protected.

4. The relationship which Mr. Staples began managing was a joint venture between Simmons and HWE concerning RMFS. Although neither party signed a written agreement, over the years they followed a written Memorandum of Understanding.[7]

5. The agreement between Simmons and HWE was that HWE would receive 65% and Simmons 35% of the profits from the venture after Herschel Walker was paid a set salary and Simmons deducted an administrative fee. **The parties would establish a board to oversee and set policy for the RMFS**

[6] Mr. Staples was originally hired to mange an LLC entity known as Walker Foods, LLC in which Simmons was an LLC member. Simmons originally planned for Mr. Staples to mange this entity and report to persons other than Herschel Walker. When Simmons changed Mr. Staples employment situation to manage RMFS and interact with Walker, Mr. Staples again addressed concerns with Simmons regarding Walker and his job security.

[7] The Memorandum is attached as Exhibit 2.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 14 of 68

**food business**.[8] Mr. Staples was assigned to be the General Manager of the RMFS food business and would report to Herschel Walker and the Board inclusive of agents, servants, or employees of Simmons. Further, to offset the costs of Simmons providing administrative functions, Simmons would charge the administrative fee even to the sale of non-Simmons manufactured food products-including the Jet Food Waffles involved in this case.

6. Following Mr. Staples' employment in the Spring of 2009 several instances occurred over the years involving HWE and/or RMFS which concerned incidents where Herschel Walker became upset, concluded he had been slighted, and sought to act against those he deemed had slighted him. When this would occur, Mr. Staples would discuss the incidents with the Simmons' employees he reported to as well as the Human Resources personnel. **They all assured him that his job with Simmons was secure, that he would be protected from Walker, and would not lose his job except for cause.**

7. After Mr. Staples was originally hired Simmons developed a progressive disciple program and the program was consistent with what Mr. Staples had been promised and assured concerning his job security.[9] He continued to

---

[9]Exhibit 3.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 15 of 63

work for Simmons up until he was terminated. Simmons did not follow these disciplinary procedures regarding Mr. Staples' termination in this case.

8. Beginning in 2015 Sysco, the largest customer of the Simmons and HWE/RMFS venture, approached Simmons directly and requested that Simmons begin selling food products directly to Sysco without any involvement of HWE/RMFS. HWE and RMFs thereafter began efforts to grow the sources of revenue into HWE the parent company and sole member of the LLC HWE. HWE is the sole member owner of 100% of RMFS.

9. In October of 2016 Mr. Staples convinced Sysco to buy from the Simmons and HWE venture one more time.[10] In accordance with the new bid from Sysco, DSM3 was created as the food broker for the Sysco bid. Julie Blanchard owned 50% and Mrs. Staples owned 50%. Mrs. Staples paid 50% of the legal fees of counsel for HWE and RMFS in these proceedings related to creation and operation of the LLC. The LLC was registered to operate from and was operated by Mrs. Staples in Tuscaloosa, Alabama. The LLC employed Alabama based employees. Ms. Blanchard was not active in the business and instead indicated that she worked for HWE- the parent company of RMFS.

[10] Mr. Staples has enjoyed a long-term relationship with Sysco in the food industry inclusive of a business relationship with the former Senior Director of Poultry Kristin Caffey.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 16 of 63

10. After these developments, Walker and/or Blanchard began efforts to develop new sources of revenue for HWE through RMFS. One new source of revenue concerned the sale of retail waffles through C-Stores located throughout the State of Georgia known as Jet Foods.

11. In June or July of 2017 Walker and Blanchard, Walkers' finance or girlfriend, instructed Mr. Staples to make a presentation to Jet Foods. After the presentation was completed, Walker and Blanchard displayed their displeasure to Mr. Staples concerning the displays and manner the waffles would be staged for sale within the interior of the Jet Food C-Stores. Because of the Memorandum of Understanding, of which Mr. Staples has been charged to manage the relationship between Simmons and HWE (RMFS), Mr. Staples proceeded to order the waffles and process the costs for production through the Simmons and HWE/RMFS venture.

12. The day after Mr. Staples had the waffle production purchase order (PO) submitted to the maker of the waffles, Ms. Blanchard changed the order out of the Savanah, Georgia office of HWE. Due to this change, when Mr. Staples received the bills for the displays and film to produce the Jet Food Waffles and their packaging, he gave them to Mr. Walker and Ms. Blanchard to be paid by HWE and not Simmons. It became clear to Mr. Staples that

Walker and Blanchard intended to sale the Waffles outside the Simmons HWE/RMFS venture which he was employed by Simmons to manage.

13. In early October 2017, Carol Walker, the sister of Walker and who is employed by HWE and operates the principal office in Savanah, Georgia, submitted the bills related to production of the Jet Food Waffles to Simmons. The Simmons controller contacted and asked Mr. Staples if Simmons was getting into the Retail Waffle business to which Mr. Staples stated no and instructed the controller not to pay the bills as requested to be paid by the Savanah office of HWE. Mr. Staples wanted no part of any scheme or effort by HWE to generate revenue to the exclusion of Simmons and have Simmons pay the expenses associated with such efforts or scheme. Such scheme was contrary to the Memorandum of Understating between Simmons and HWE.

14. Following these developments, Walker asked Staples who was telling Simmons not to pay his bills. Staples advised Walker it was him. Staples contends this upset Walker and became a source of motivation for Walker to retaliate against Staples and cause his termination and the other wrongful conduct directed at Mrs. Staples and the Staples' Daughter Blair as set out in the December 21, 2017 Memorandum Exhibit 1.

15. On October 24, 2017 Simmons conducted an internal conference call, inclusive of Mr. Staples, during which concerns related to the RMFS food

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 18 of 63

business were discussed.[11] One of the concerns related to the effort by HWE to expense the Jet Food Waffles. Another dealt with efforts by HWE to employee new sales employees to call on joint customers with Simmons.

16. The next day, on October 25, 2017, David Jackson, the President of Simmons, penned an email to Walker and his lawyer Ron Eisenman which, in part, concerned the submission of invoices by HWE.[12]

17. After receipt of the Jackson email, Walker penned a response to Jackson dated October 26, 2017.[13] Walker represents that the invoices he asked to be paid, per the Carol Walker submissions from the Savanah, Georgia office of HWE, concerned U.S. Foods-not the Jet Foods C-Store scheme. The submission made by Carol Walker attached a bill from Peachtree Packaging which specifically concerned the Jet Food C-Store Retail Waffles.

18. On October 31, 2017 Blanchard email Carol Walker with an explanation Carol Walker was to supply to Carmen Seal the controller of Simmons which inquired of Mr. Staples concerning the Jet Food Retail Waffle expense invoices.[14] The explanation was designed to represent to Simmons that Retails Waffles were not to be sold to Jet Foods but through a different

---

[11] Exhibit 4.
[12] Exhibit 5.
[13] Exhibit 6. Plaintiffs allege that this was an effort by HWE to cover up the Jet Food Waffle scheme from Simmons.
[14] Exhibit 7.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 19 of 63

relationship. Mr. Staples contends that such representations were false and designed to cover up the attempt by HWE to generate revenue outside of the Simmons HWE relationship yet expense the costs of doing so to Simmons.

19. On November 1, 2017, Walker wrote Jackson again concerning a meeting Jackson wanted to have from Jackson's October 25, 2017 email. [15] Walker specifically requested that Mr. Staples not be allowed access to the P and L statements related to the Simmons/HWE/RMFS venture. Jackson replied and indicated that Mr. Staples should continue to receive such reports as a manger of the relationship. These financial statements reflect changes in expenses from the efforts of HWE/RMFS which would be processed by Simmons. Again, Mr. Staples informed Walker that he was the one telling Simmons not to pay certain expenses of HWE submitted by HWE out of the Savanah, Georgia office of HWE. Mr. Staples contends the effort to prevent his knowledge of activities occurring within the P and L statement was related to the efforts by HWE to expense growth of revenue expenses through Simmons while not sharing with Simmons the profits or revenue from such activities.

20. On November 29, 2017, Jackson emailed Walker and outlined the concerns or issues which he wanted to be discussed in the face to face meeting. The termination of Mr. Staples is not mentioned.

[15] Exhibit 8.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 20 of 68

21. On December 12, 2017 Simmons and Walker had a meeting. Blanchard attended the meeting in either her capacity on behalf of HWE or as a co-owner of DSM3 with Mrs. Staples or both. Ron Eisenman, Mrs. Staple's attorney with regarding to the formation of DSM3, was also in attendance.[16]

22. The parties collaborated and planned to terminate Mr. Staples employment with Simmons and end his consulting job with DSM3. They also planned to have Mrs. Staples sign over her interest in DSM3 to Blanchard and end her employment with DSM3. HWE/RMFS requested she give up her 50% ownership interest and her job in exchange for the payment of $10.00 dollars. HWE/RMFS withheld commissions owed to DSM3 until Mrs. Staples gave up her interest.

23. Defendants additionally planned the termination of employment with Simmons of the Staples' Daughter. The plans detailed obtaining liability releases from Mr. Staples, Mrs. Staples, and Blair Staples. Mr. and Mrs. Staples claim that HWE/RMFS retaliated against them due to Mr. Staples

[16] Mrs. Staples contends Blanchard and Eisenman owed her fiduciary duties while participating in the meeting. An attorney is a fiduciary to his client. *Hammon v. State*, 48 Ala. App. 613, 266 So.2d 825 (1972). A business officer and owner owes a fiduciary relationship to co-owners. *Belcher v. Birmingham Trust National Bank*, 348 F.Supp. 61 (N.D. Ala. 1968). The question of whether a person is an agent or not is a jury question. *Cashion v. Ahmadi*, 345 So.2d 268 (1977).

advising the Simmons controller not to pay the Jet Food Retail Waffle expenses.

24. On December 28, 2017 Simmons constructively terminated Mr. Staples when it requested return of his laptop and stopped his access to the Simmons' computer system. Internal documents of Simmons indicate he was terminated for job performance. Simmons has not produced any negative job performance evaluations of Mr. Staples nor any progressive disciple documents leading up to his termination. Mr. Staples claims Simmons did not fulfill its promises related to progressive disciple inclusive of job performance promises.

25. Simmons response to the Arkansas Unemployment Department indicates that he was terminated as the parties were going in different directions. <u>See</u> document attached to Complaints. Simmons believes Mr. Staples agreed to Plan A contained in the December 21, 2017 memorandum of Ron Eisenman which he did not. Mr. Staples never executed a liability release in favor Simmons.

26. Mr. Staples contends that Simmons breached his employment contract or agreement manifested by the multiple promises and assurances made to him that he would be protected from Walker and his job was secure except for

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 22 of 63

cause inclusive of the promises contained in the written rules of Simmons related to retaliation and progressive discipline.

Breach of Promises of Fair Treatment:[17]

In addition to Simmons breaching the express promises made to Mr. Staples related to his employment, Mr. Staples also claims that Simmons breached the provisions related to fair treatment contained in the Simmons' written progressive discipline rules and other written policies about its conduct.

1. In *Crain Indust.* the Arkansas Supreme Court affirmed the jury's determination in that case that certain language contained in written rules and policies of the employer were enough to form the basis of a contract of employment.
2. In reaching its conclusion the Arkansas Court relied upon a Minnesota case, *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 19932), which held that an employer did not follow discharge or disciplinary procedures when it summarily fired one of its employees.

[17] In Arkansas an employer and an employee stand in a fiduciary relationship and are required to meet the standards of fair dealing, good faith, honesty, and loyalty. *Cole v. Lewis*, 349 Ark. 177, 185, 76 S.W.3d 878, 883 (2002). Mr. Staples was obligated to respond truthfully to the inquiry of the Simmons controller regarding the expenses attempted to be submitted by HWE through its Savannah, Georgia office. See Jackson October 25, 2017 email to Walker where Jackson mentioned the expenses being those of HWE.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 23 of 63

3. In *Pine River* the Minnesota Court held that job security provisions were enforceable. In relying on *Pine River* the Arkansas Court held that "when an employer makes definite statements about **what its conduct will be**, an employee has a contractual right to expect the employer to perform as promised." *Crain Indus*., 810 S.W.2d at 915. Mr. Staples contends that Simmons breached these promises when it summarily constructively discharged him and did not honor the promises it made to him.

Simmons Breached the Implied Covenant of Good Faith and Fair Dealing:

1. Under Arkansas law, every employment contract, even one which is alleged to be terminable-at-will, contains "an implied covenant of goof faith and fair dealing, which under limited circumstances may make a discharge actionable." *Smith v. Am. Greetings Corp*., 804 S.W.2d 683, 684, 304 Ark. 596 (1991). Mr. Staples claims that the facts surrounding his discharge show a breach of these implied covenants in addition to breaches of the express promises made to him concerning his employment by Simmons and what Simmons would do.

Simmons Wrongfully Terminated Mr. Staples in Violation of Public Policy:

1. Even an at-will employee in Arkansas has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state. *M.B.M. Co., Inc. v. Counce*, 596 S.W.2d 681, 268 Ark.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 24 of 63

269 (1980); see also, *Sterling Drug*, supra, 743 S.W.2d 380, 294 Ark. 239 (1988). Mr. Staples contends he was discharged in violation of public policy.

a. Exercising a legal right:

1. Mr. Staples claims he was entitled to say no to the attempted expensing of the Jet Food Retail Waffle invoices when asked by the Simmons' controller. He was entitled to refuse to participate in such scheme undertaken by HWE.

2. In *Scholtes v. Signal Delivery Serv., Inc.*, 548 F. Supp. 487 (W.D. Ark. 1982), the Federal District Court, in applying Arkansas law, concluded as follows:

> Arkansas law recognizes at least four exceptions to the at-will doctrine, excluding those of implied contracts and estoppel. These are: (1) cases in which the employee is discharged for refusing to violate a criminal statute; (2) cases in which the employee is discharged for exercising a statutory right; (3) cases in which the employee is discharged for complying with a statutory duty; and (4) cases in which employees are discharged in violation of the general public policy of the state.

*Scholtes* at 494.[18]

[18] Under Arkansas law an employer (Simmons) is estopped from denying an employment contract where the employee detrimentally relies upon the actions, statements, or conduct of the employer (Simmons' assurances to Staples and Simmons' disciplinary rules). *Mansfield v. Am. Tel. & Tel. Corp.*, 747 F.Supp. 1329 (W.D. Ark. 1990). Estoppel further removes an employment contract from the Statute of Frauds meaning it can be created by express oral statements, assurances, or promises. *Country Corner Food & Drug, Inc. v. Reiss*, 737 S.W.2d

3. The public policy of the state is generally found in constitutions and statutes of the State. *Sterling Drug*, supra. Mr. Staples contends his termination by Simmons violated these rules as well as being in violation of express promises and implied covenants.

4. Arkansas law further recognizes a cause of action for wrongful discharge where an employee, even if determined to be at-will, is discharged for reporting violations of a federal or state law. *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078 (8th Cir. 2000). Mr. Staples contends he reported the scheme by HWE to David Jackson and his immediate Simmons' Boss, Chip Miller, during the October 24, 2017 Simmons internal conference call to discuss HWE/RMFS concerns.[19]

<u>The Joint Venture relationship between Simmons and HWE (RMFS) makes each jointly liable for Mr. Staples' wrongful termination:</u>

---

672, 22 Ark. App. 222 (1987); <u>see also</u>, *Van Dyke v. Glover*, 934 S.W.2d 204, 326 Ark. 736 (1996).

[19] Compare to Exhibit 9 where on November 14, 2017 (less than 30 days before the December 12, 2017 meeting between the Defendants where the actions against the Staples were planned out) Walker ask Mr. Staples what he had discussed with his boss, Chip Miller of Simmons, concerning the Waffle being in retail or food service. Compare, further, to the Staples position that HWE attempted to cover up the Jet Food Waffle scheme and expense the costs associated with it to the Simmons/HWE(RMFS) venture. By November 14, 2017 Walker knew what he had represented to Jackson about the expense invoices from his October 26, 2017 email to Jackson.

1. The Memorandum of Understanding between Simmons and HWE shows that each party intended a joint relationship between them for which Mr. Staples was charged with managing since 2009 up until his termination. Mr. Staples claims that Simmons and HWE (RMFS) were engaged in a joint venture or joint enterprises and that as members of the venture or enterprise each of them are jointly and severally liable for his damages due to his wrongful termination. Each Defendant is vicariously responsible for the other Defendant's conduct.
2. Under Arkansas law a joint venture exists if: (1) two or more persons combine in a joint enterprise for their mutual benefit; (2) the management of the venture is shared mutually between them; and (3) there is an express or implied understanding that they are to share in the profits or losses of the venture. *First Nat'l Bank v. Adair*, 42 Ark. App. 84, 854 S.W.2d 358 (1993).
3. Because of the joint enterprise as between Simmons and HWE each is not only responsible for its own wrongful actions against Mr. Staples, but, also are responsible for the others' wrongful actions towards him.

**<u>HWE/RMFS interference with Mr. Staples Employment Contract with Simmons:</u>**

1. After Mr. Staples was hired by Simmons to manage the Walker Foods, LLC venture his employment was <u>modified</u> and he was charged by Simmons to

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 27 of 68

manage the Simmons and HWE venture under the Memorandum of Understanding. For the 8-year period that Mr. Staples managed the venture, he was employed by Simmons- not HWE or RMFS. Defendants themselves recognized this distinction in their December 21, 2017 Memorandum concerning their planned efforts related to the Staples family.

2. As indicated in the December 21, 2017 Memorandum between the Defendants, on December 12, 2017 they intended to end Mr. Staples' employment. Defendants note that he was employed with Simmons. Under Plan A, if he cooperated, he would resign his employment with Simmons. If he did not cooperate, he would be terminated by Simmons. Simmons acquiesced with HWE/RMFS regarding termination of Mr. Staples' employment contract. HWE/RMFS were not parties to the contract itself.
3. Under Arkansas law the conduct of HWE/RMFS must be improper as the factors of the Restatement (Second) of Torts Section 767 are applied to such conduct. *Stewart Title*, supra, and *Baptist Health*, supra. Mr. Staples claims that HWE/RMFS improperly interfered with his employment contract with Simmons as addressed above.

**HWE/RMFS/Simmons interference with Mr. Staples' consulting agreement with DSM3**:

1. After Ron Eisenman formed the LLC DSM3 owned jointly between Mrs. Staples and Ms. Blanchard, DSM3 entered into a consulting contract or

agreement with Mr. Staples. The December 21, 2017 Memorandum as between the Defendants addressed Mr. Staples resigning his role as a consultant under Plan A or, if he did not cooperate, under Plan B HWE/RMFS would end (actually suspend) its separate contract or agreement with DSM3- in essence choking off the source of funds into DSM3 to fund Mr. Staples' consulting job or agreement and interfering with it.

2. Mr. Staples did not agree to either Plan A or B as planned out by the Defendants. HWE/RMFS/Simmons ended his consulting job by temporarily suspending the separate Broker contract with DSM3 and withholding commission earnings flowing into DSM3 for December 2017. Mr. Staples alleges these actions constitute tortious interference under Alabama law.

3. The legal elements of such tort in Alabama are: (1) the existence of a contract or business relation (the consulting agreement created by Eisenman)[20]; (2) Defendant's knowledge of the contract or business relation (The December 21, 2017 Memorandum clearly shows Defendants' knew of the contract or relation as they planned how to end it); (3) intentional inference by the

[20] As noted Eisenman charged for the creation of the agreement. As 50% owner of the LLC 50% of Eisenman's legal fees were paid by Mrs. Staples since they were passed through to her as 50% owner. Eisenman is also an agent for HWE/RMFS and his knowledge is imputed to HWE/RMFS- inclusive of creation of the various legal documents creating the entities involved in this suit which were sought to be ended by Defendants on December 12, 2017 and as memorialized in the Planning Memorandum of December 21, 2017.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 29 of 68

Defendants (Defendants planned how to end the contract or relation); (4) absence of justification (an affirmative defense of Defendants); and (5) damage to Plaintiff as a result. *Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590, 593 (Ala. 1986).

**<u>Oppression and Breach of Fiduciary Obligations concerning Mrs. Staples' ownership and employment interest with DSM3:</u>**

1. The December 21, 2017 Memorandum sets out Defendants' plans about Mrs. Staples. Under Plan A if Mr. Staples cooperated, Mrs. Staples would resign from DSM3 and sign over all her ownership to Blanchard. If Mr. Staples did not cooperate, then RMFS would terminate its broker agreement with DSM3- again actually suspended it.
2. Mr. Staples did not agree to Plan A. HWE/RMFS thereafter suspended temporarily the broker agreement pending Mrs. Staples' sale of her ownership interest to Blanchard for $10.00 Dollars. HWE/RMFS instructed Simmons and Simmons withheld payment of commissions owed to DSM3. Such actions placed pressure (squeezing) on Mrs. Staples ownership and employment interest.
3. HWE/RMFS stole Alabama employees of DSM3 in violation of employment agreements prepared by Eisenman- 50% of the fees for their creation which were paid by Mrs. Staples. Eisenman and Blanchard participated in the

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 30 of 63

December 12, 2017 meeting where the planning concerning Mrs. Staples was conducted. These actions effectively killed DSM3 and Mrs. Staples' ownership and employment rights and interests therein.

4. Under Alabama law an obligation of fairness rises to the level of a fiduciary duty as between owners of a business. *Burt v. Burt Boiler Works, Inc.*, 360 So.2d 327 (Ala. 1978). Furthermore, one owner cannot avoid a duty to act fairly towards another merely because some action taken is alleged to be legally authorized. *Burt* at 331. See Defendants' claim that the Broker Agreement could be terminated with 30 days' notice.

5. This Court opinioned in its Opinion in *Sirmon v. Wyndham Vacation Resorts*, 710-cv-2717-LSC, that Alabama law recognizes fiduciary relationships in a variety of contexts. "Fiduciary responsibilities are not limited to a confined set of relationships, but rather apply to all persons who occupy a position out of which the duty of good faith ought in equity and good conscious to arise." *Morgan Plan Co. v. Velliantis*, 116 So.2d 600, 603 (Ala. 1959).

6. The Operating Agreement for the LLC did not limit its purpose solely to being in a broker relationship with HWE/RMFS. The agreement further did not limit in any way application of the State of Delaware's (where the entity was formed) (the entity was operated from Alabama) default rules for fiduciary

duties. As such Blanchard and Eisenman as agents for HWE and/or RMFS and/or DSM3 owed Mrs. Staples fiduciary duties of care and loyalty.

7. Under Delaware or Alabama law the elements concerning breach of fiduciary duties are similar. As concerns the duty of care a negligence standard is employed. The elements are: (1) the existence of a fiduciary relationship; (2) a breach of duty; (3) participation in the breach by the Defendants; and (4) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075 (DelSupr. 2001); *Aliant Bank v. Four Star Invs., Inc.*, 244 So.3d 896 (Ala. 2017). Mrs. Staples claims that Eisenmen and Blanchard, inclusive of their agency relationship on behalf of HWE (RMFS) and DSM3, participated in the breaches alleged in this case.

8. Mrs. Staples contends that the actions discussed oppressed and breached her ownership and employment rights in DSM3. Mrs. Staples further claims that the actions were done with a design or purpose to inflict injury upon her as planned out by Defendants-to in essence cause the demise of the Staples' family abilities to earn livings.

9. Mrs. Staples alleges that the actions were done with indifference and to force her sale out to Blanchard of her interest in DSM3 at a low amount for $10.00 Dollars and to end her employment rights. Defendants clearly anticipated

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 32 of 68

obtaining liability releases as part of their collaboration and planning on December 12, 2017 concerning the Staples family.

**<u>Tortious interference with Mrs. Stables Employment with DSM3:</u>**

1. Simmons and HWE had no relationship with DSM3 except Simmons, as part of its administrative functions for the venture as between Simmons and HWE, agreed to process payment of RMFS' broker commissions to its Broker DSM3. Both Defendants were aware of Mrs. Staples' ownership in and employment with DSM3 as reflected by the contents of the December 21, 2017 Memorandum. Defendants planned among them to end her ownership and employment in the LLC entity. Mrs. Staples claims that Defendants intended to interfere with her rights and employment relationship with DSM3 if Mr. Staples did not cooperate under Plan A.

**<u>Defamation by HWE and RMFS of Mr. Staples</u>:**

1. Under Alabama law the essence of an action for Defamation is the protection of a person such as Mr. Staples' interest in his reputation. <u>See</u> *Blevins v. W.F. Barnes Corp*., 768 So.2d 386 (Ala Civ.App. 1999). Alabama law recognizes special protection to a persons' reputation relative to his or her business, profession, or employment. *Gray v. WALA-TV*, 384 So.2d 1062 (Ala. 1980). A Corporation is liable for slanders uttered by its agents. *Cooper v. Alabama Farm Bureau Ins. Co.*, 385 So.2d 630 (1980). HWE (RMFS) is, therefore,

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 33 of 63

subject to liability for the slanderous statements which Walker made concerning Mr. Staples as alleged in this case.

2. The elements of Defamation are: (1) publication or communication to third persons of; (2) statements that are disparaging or defamatory and understood or accepted by the third person to whom made as naturally and probably injurious to the Plaintiff's reputation; (3) containing sufficient specificity to the person made identifying or relating to the Plaintiff; (4) made intentionally or under circumstances where the Defendant should anticipate the statements happening; and (5) damage to Plaintiff which can be presumed. *Blevins*, supra.

3. A guiding principle of Alabama law is that published words made the basis of a defamation action must be construed according to their natural and probable effect upon the mind of the average lay person. A communication is considered defamatory if it tends to harm the reputation of another to lower him in the estimation of the community or deter others from associating with him. *Harris v. School Annual Pub'g Co.,* 466 So.2d 963 (Ala. 1985); *Johnson Pub'g Co. v. Davis*, 271 Ala. 474, 124 So.2d 441 (1960).

4. Certain types of words or communications may be such as to invoke the doctrine of slander *per se*. As concerns Defamation *per se*, a Plaintiff need not prove special harm or special damages for the claim to be actionable. In

*Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085 (Ala. 1988), the Alabama Supreme Court noted as follows:

To establish a prima facie case of Defamation, the Plaintiff must show that the Defendant was at least negligent. (Citations omitted). Spoken words that impute to the person of whom they are spoken the commission of an indictable criminal offense involving infamy or moral turpitude constitute slander actionable *per se*. (Citations omitted). When a defamatory publication is actionable *per se*, the law infers injury to reputation as a natural consequence of the defamation and, as a result, the Plaintiff is entitled to presumed damages. Thus, imputations of indictable criminal offenses are slanderous *per se* and relieve a Plaintiff of the requirement of proving actual harm to reputation or any other damage to recover nominal and compensatory damages.

*Lapeyrouse Grain*, supra.

5. Compensatory damages recoverable are not limited to out-of-pocket losses and Plaintiffs can show mental anguish and suffering, impairment of reputation, and personal humiliation. In fact, personal humiliation is the "more customary type of actual harm inflicted by defamatory falsehoods." C. Gamble, *Alabama Law of Damages*, Sections 36-26 and 36-28 (3d. ed. 1994).

6. Mr. Staples claims that after he refused Plan A of the December 21, 2017 Memorandum of the Defendants and after he and Mrs. Staples filed suit, Walker, as a continuation of wrongful conduct directed against Mr. Staples and to "pile on" and add harms upon harms, defamed him to representatives of Sysco and other food industry persons.

7. Mr. Staples contends that Walker stated to Kristin Caffey, a Sysco Executive and Senior Director of Poultry, that Mr. Staples (1) stole money from him or

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 35 of 63

his companies; (2) had engaged in underhanded conduct with regard to Sysco Corporation; (3) was not a good or ethical person; (4) was doing bad things in the food industry; and (5) had tried to steal his company with other people. Mr. Staples claims these statements were made to harm his reputation in the industry and harm his ability to become employed.

**Civil Conspiracy:**

1. In *Sirmon*, supra, your Honor stated that a civil conspiracy is "a combination of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful end by unlawful means." *McLemore v. Ford Motor Co.*, 628 So.2d 548, 550 (Ala. 1993) (citing *Barber v. Stephenson*, 69 So.2d 251 (1953) and *Edison v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala. 1988). A conspiracy claim, by its nature, is difficult to plead, and courts accordingly allow flexibility and relaxed standards of direct evidence versus circumstantial evidence to show conspiracy.
2. As stated in *Edison*:

A great quantum of detail need not be required to be alleged as to the formation of the conspiracy because of the clandestine nature of the scheme or undertaking engaged in.[21] The existence of the conspiracy must often be inferentially and

[21] The December 21, 2017 Memorandum related to Defendants' collaboration and planning concerning the Staples on December 12, 2017 was produced by them in discovery in the case in late December 2018 or early January 2019 in these proceedings.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 36 of 63

circumstantially derived from the character of the acts done, the relation of the parties, and other facts and circumstances suggestive of concerted action.

527 So.2d at 1285 (quoting *O"Dell v. State*, 117 So.2d 164, 168 (1960)).

3. Mr. and Mrs. Staples claim that Defendants collaborated, planned, and conspired among themselves on December 12, 2017 to end the Staples' families ability to earn livings. To end Mr. Staples' employment with Simmons. To end his consulting agreement with DSM3. To end Mrs. Staples' ownership and employment rights in DSM3. Finally, to carry the demise to its ultimate and final conclusion, to end the Staples' daughter Blair's employment with Simmons also.

4. As further noted in *Sirmon*, while a corporation cannot conspire with itself, it may be found liable for conspiring, through its agents, with another corporate entity or third party. Mr. and Mrs. Staples claim this is exactly what the December 21, 2017 Memorandum memorializing the Defendants' plans shows.

D. Defendants' Contentions:

Simmons:

1. Plaintiffs' Complaint expressly states that this Court has jurisdiction based upon diversity grounds. (Complaint at 10, ¶ 21.)

2. "A federal court sitting in diversity must apply the choice of law rules of the state in which it sits." Terrell v. Damon Motor Coach Corp., No. 6:12-CV-

02390-LSC, 2013 U.S. Dist. LEXIS 164954, at *7 (N.D. Ala. Nov. 20, 2013) (Coogler, J.) (citing U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp., 550 F.3d 1031, 1033 (11th Cir. 2008).

3.  It is well settled that "Alabama law follows the traditional conflict-of-law principles of . . . *lex loci delicti* . . . .  Under the principle of *lex loci delicti*, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." Wingo v. S. Co., No. 2:17-cv-01328-LSC, 2018 U.S. Dist. LEXIS 88938, at *21 (N.D. Ala. May 29, 2018) (Coogler, J.) (citing Precision Gear Co. v. Cont'l Motors, Inc., 135 So. 3d 953, 956 (Ala. 2013)) (quoting Lifestar Response of Alabama, Inc. v. Admiral Ins. Co., 17 So.3d 200, 213 (Ala. 2009).

4.  "Regardless of whether a tort claim arose from a business relationship, it is still treated as a tort claim for purposes of Alabama's conflict-of-law precedent." Wingo, 2018 U.S. Dist. LEXIS 88938, at *21 (citing Batey & Sanders, Inc. v. Dodd, 755 So. 2d 581, 583 (Ala. Civ. App. 1999)).


5.  As Alabama law governs Plaintiffs' claims, the principle of *lex loci delicti* must be applied to this case.

6.  Mr. Staples and Mrs. Staples have resided in Alabama since 2015.

7. Mr. Staples' employment with Simmons was terminated in December 2017 and, as such, his alleged injuries (related to his alleged wrongful termination by Simmons) occurred while he resided in Alabama.

8. Because Mr. Staples was allegedly injured in Alabama and Alabama courts determine the substantive rights of an injured party according to the law of the state where the injury occurred, Mr. Staples' tort claims in Counts VII, VIII and IX against Simmons are governed by Alabama law.

9. Alabama does not recognize Mr. Staples' asserted causes of action for wrongful termination.

10. The Alabama Supreme Court leaves any changes to the "at-will" doctrine, including wrongful termination, to the state legislature.  Wright v. Dothan Chrysler Plymouth Dodge, 658 So. 2d 428, 431 (Ala. 1995).

11. Alabama courts consistently decline to recognize different variations of a wrongful termination tort.  See, e.g., Salter v. Alfa Insurance Co., 561 So.2d 1050, 1051-53 (Ala. 1990) (refusing to create tort for wrongful termination even when the circumstances of the termination were alleged to have violated public policy); Hinrichs v. Tranquilaire Hosp., 352 So. 2d 1130 (Ala. 1977) (affirming judgment for defendant employer where plaintiff alleged that she had been terminated in retaliation for her refusal to perform or condone illegal acts).

12. In Count VII, Plaintiffs allege that Mr. Staples was wrongfully terminated under an implied contract/promissory estoppel theory.  However, this is not a recognized cause of action in Alabama.

13. Alabama courts have "declined to judicially create a public policy exception to the employment 'at-will' doctrine."  Howard v. Wolff Broadcasting Corp., 611 So. 2d 307, 312 (Ala. 1992).

14. Alabama courts have routinely held that an employee may be terminated for "*a good* reason, *a wrong* reason, or *no reason*."  Cunningham v. Dabbs, 703 So. 2d 979, 981 (Ala. Civ. App. 1997) (emphasis in original).

15. In Alabama, employees are precluded from recovering damages under a wrongful termination tort claim even if the termination arguably would give rise to a claim under another law.  See Howard, 611 So. 2d 307 (affirming judgment for employer in wrongful termination suit where employee had been terminated because of her gender).

16. The Alabama Supreme Court has declined to create a public policy exception to the "at-will" doctrine where an employee is terminated because he/she refuses to commit an illegal act.  Wright, 658 So. 2d 428.

17. Given this well-established precedent, which confirms that there is no public policy exception created by Alabama courts, Plaintiffs have not identified a

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 40 of 63

single Alabama statute, case, or other law that would entitle Mr. Staples to any relief based upon his allegations.

18. Plaintiffs cannot bring a claim for wrongful termination in violation of public policy under Alabama law, and Simmons is entitled to summary judgment on Count VIII.

19. However, even if Arkansas law applies to Mr. Staples' wrongful termination claims, which it does not, Mr. Staples was not wrongfully terminated.

20. Simmons terminated Mr. Staples' employment for legitimate and non-retaliatory reasons.

21. While technically employed by Simmons, Mr. Staples was functionally expected to manage the business operation of RMFS as the General Manager of RMFS.

22. During his employment with Simmons, the vast majority of Mr. Staples' job duties were in furtherance of his position as the General Manager of RMFS.

23. It is undisputed that during his employment with Simmons, at least 80-90% of Mr. Staples' job duties were in furtherance of his position as the General Manager of RMFS.

24. It is also undisputed that Mr. Staples was relieved of his duties as the General Manager of RMFS on December 27, 2017, and that due to his removal as General Manager, he was no longer permitted to perform work for RMFS.

25. Because at least 80-90% of Mr. Staples' job duties involved tasks for RMFS, Simmons terminated Mr. Staples as Simmons had no further need for his services.

26. As Simmons terminated Mr. Staples after his position was essentially eliminated, it is clear that Simmons terminated Mr. Staples for good cause.

27. Simmons did not intentionally or unlawfully interfere with Mrs. Staples' membership interest in DSM.

28. The tort of intentional interference with contractual or business relations is well-established under Alabama law, and the essential elements include: "(1) the existence of a protectable business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." Ex parte Hugine, No. 1130428, 2017 Ala. LEXIS 26, at *66-67 (Ala. Mar. 17, 2017) (citing White Sands Grp., L.L.C. v. PRS II, LLC, 32 So. 3d 5, 14 (Ala. 2009)).

29. Simmons is initially entitled to summary judgment on Ms. Staples' claim for intentional interference with the business relationship and employment of

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 42 of 63

Mrs. Staples as managing member of DSM (Count IV) because Simmons cannot be defined as a "stranger" to Mrs. Staples and DSM's relationship under clearly established precedent.

30. Under Alabama law, a defendant "is not a 'stranger' to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations." Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1156 (Ala. 2003) (emphasis added).

31. Plaintiffs bear the burden of proving that Simmons is a stranger to the agreement between DSM and Mrs. Staples. See Fitzpatrick v. Hoehn, No. 1160348, 2018 Ala. LEXIS 22, at *29 (Ala. Mar. 2, 2018).

32. Plaintiffs cannot prove that Simmons is a stranger to the business relationship between Mrs. Staples and DSM for multiple reasons.

33. Simmons was not a party to the brokerage agreement between DSM and RMFS, and Simmons did not sign such agreement (nor is its name even mentioned in the agreement).

34. It is illogical and inconsistent to assert that Mrs. Staples was harmed because Simmons failed to pay commission payments to DSM, yet simultaneously reason that Simmons is a stranger to that very relationship.

35. As Simmons was responsible for sending commission payments owed to DSM pursuant to a contractual agreement between itself and RMFS and in furtherance of a contractual agreement between RMFS and DSM, it is evident that Mrs. Staples' alleged injury caused by the withholding of such payments is "inextricably a part of or dependent upon the defendant's contractual or business relations." See Waddell & Reed, Inc., 875 So. 2d at 1156.

36. "If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract." Walter Energy, Inc. v. Audley Capital Advisors LLP, 176 So. 3d 821, 829 (Ala. 2015); see also Waddell & Reed, Inc., 875 So. 2d at 1157 ("One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract").

37. Simmons derived an economic benefit from DSM and was invested in the success of DSM's operations, which was tied to its own revenue.

38. As Simmons and RMFS had a profit sharing agreement, Simmons necessarily stood to benefit for any sales made by DSM.

39. Simmons was an essential entity to the relationship between Mrs. Staples and DSM as Simmons was responsible for sending commission payments owed to DSM pursuant to a contractual agreement between itself and RMFS and in furtherance of a contractual agreement between RMFS and DSM.

40. DSM was created, at least in part, for the purpose of allowing Simmons to transact business, and Simmons must therefore be seen as a participant in a business relationship between DSM and Mrs. Staples, instead of as a stranger to it. See Tom's Foods, Inc. v. Carn, 896 So. 2d 443, 455 (Ala. 2004) (holding that the defendant was not a stranger to the business relationship between the other parties because the defendant "was involved in creating that relationship"); BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So. 2d 203, 214 (Ala. 2001) (holding that where a contract would not have been consummated without the participation of a certain party, that party is "anything but a stranger to the relationship").

41. DSM is the individual/entity that allegedly suffered harm by Simmons' alleged withholding of commission payments (on behalf of RMFS). (See e.g., Complaint at 9, ¶ 20)

42. Simmons did not intentionally interfere with Mrs. Staples, as Simmons only had an indirect business relationship with DSM (through its commission payments on behalf of RMFS), and had no business relationship with Mrs. Staples, as Simmons is not alleged to have withheld commission payments from Mrs. Staples.

43. Mrs. Staples testified during her deposition that Simmons did not do anything to directly interfere with her status as a fifty percent manager or member of DSM.  (K. Staples Dep. at 59:15-19.)

44. Mrs. Staples acknowledged during her deposition that RMFS had the right to terminate the broker agreement between DSM and RMFS for any reason.  (K. Staples Dep. at 25:10-13.)

45. As RMFS was the entity that terminated the broker agreement between itself and DSM, and as RMFS was a party to the brokerage agreement (and Simmons was not a party to such agreement), it is clear that Simmons did not intentionally interfere with Mrs. Staples.

46. Mrs. Staples admitted during her deposition that Mr. Staples' termination did not directly impact her employment with DSM.  (K. Staples Dep. at 54:15-21.)

47. Plaintiffs allege that Simmons civilly conspired against Mrs. Staples with HWE and RMFS (Count VI), and civilly conspired with HWE and/or RMFS

against Mr. Staples with regard to his alleged wrongful termination (Count IX).

48. It is well established under Alabama law that "[c]onspiracy is not an independent cause of action; therefore, when alleging conspiracy, a plaintiff must have a viable underlying cause of action." Drill Parts & Serv. Co. v. Joy Mfg. Co., 619 So. 2d 1280, 1290 (Ala. 1993); Catlin Syndicate Ltd. v. Ramuji, LLC, No. 4:16-cv-1331-VEH, 2017 U.S. Dist. LEXIS 132018, at *28 (N.D. Ala. Aug. 18, 2017).

49. Plaintiffs' civil conspiracy claims against Simmons lack merit because there are no grounding causes of action for these claims.

50. Because Plaintiffs cannot prevail on Count IV against Simmons (Mrs. Staples' intentional interference claim), and as Simmons is not named as a defendant in Count V (breach of fiduciary duty against HWE and/or RMFS), the civil conspiracy claim against Simmons in Count VI necessarily fails as a matter of law as there is no underlying tort claim upon which it can be based.


51. Where there is no actionable cause of action underlying a conspiracy claim, the conspiracy claim cannot stand under Alabama law. Goolesby v. Koch Farms, LLC, 955 So. 2d 422, 430 (Ala. 2006); Southland Health Servs., Inc. v. Bank of Vernon, 887 F. Supp. 2d 1158, 1181 (N.D. Ala. Aug. 9, 2012)

(Coogler, J.) (finding that "[w]ithout other independent claims on which to base it, the conspiracy claim fails as a matter of law; [a] civil conspiracy cannot exist in the absence of an underlying tort") (internal quotations omitted).

52. By law, Simmons cannot conspire with itself. United States v. Arbane, 446 F.3d 1223, 1228 (11th Cir. 2006) (finding that it is "axiomatic that you cannot have a conspiracy without an agreement between two or more culpable conspirators").

53. Because Simmons is the only defendant to Count VII (wrongful termination of Mr. Staples based on an implied contract/promissory estoppel theory under Arkansas law) and Count VIII (wrongful termination of Mr. Staples based upon public policy exceptions under Arkansas law), Count IX (civil conspiracy) must be dismissed against Simmons as a matter of law as there are no alleged co-conspirators to the underlying torts, precluding a conspiracy claim.

HWE and RMFS:

**1.     Tortious Interference**

This Court's decision in Nimbus Technologies, Inc v. SunnData Products, Inc., 2005 W.L. 6133373 (N.D. Ala. Dec. 7, 2005) (Coogler, J.) sets out the relevant tests for a claim of tortious interference as follows:

The elements of a claim for interference with contractual or business relations are: "1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification or the defendant's interference; and 5) damage to the plaintiff as a result of the interference." See Ex parte Awtrey Realty Co., Inc., 827 So. 2d 104, 108—9 (Ala. 2001) (quoting Soap Co. v. Ecolab, Inc., 646 So. 2d 1366, 1371 (Ala. 1994)). Additionally, a plaintiff must produce "some evidence of fraud, force, or coercion [ ] on the defendant's part." Joe Cooper & Assocs., Inc. v. Cent. Life Assurance Co., 614 So. 2d 982, 986 (Ala. 1992) (citing Griese-Traylor Corp. v. First Nat. Bank of Birmingham, 572 F.2d 1039, 1045 (5th Cir. 1978)). It is clear that under Alabama law, "an affirmative or threatened act of interference, as distinguished from a refusal or failure to carry out a particular promise, if an essential element of a cause of action for tortious interference with business relations." Griese-Traylor Corp., 572 F.2d at 1045 (citing Alabama Power Co. v. Thompson, 178 So. 2d 525, 528 (Ala. 1965)). Moreover, the plaintiff must establish that the defendant is a "stranger to the contract with which [he] allegedly interfered." Tom's Foods, Inc. v.

Carn, 896 So. 2d 443, 454 (Ala. 2004) (quoting Atlanta Market Ctr.
Management Co. v. McLane, 503 S.E. 2d 278, 282 (Ga. 1998)).  This
is the case because a party to a contract cannot be held liable for
tortiously interfering with that contract. Id. (quoting Lolley v Howell,
504 So. 2d 253, 255 (Ala. 1987)).  A defendant is considered to be a
"party in interest" to a contractual relationship if the defendant may
claim "any beneficial or economic interest in, or control over, that
relationship."  Id. (quoting McLane, 503 S.E. 2d at 282.)

2.     In Count One of the Complaint, John Staples alleges that HWE and RMFS
tortiously interfered with his business relationship with Simmons.  HWE and RMFS
are not strangers to that business relationship and they therefore cannot tortiously
interfere with it.  A third party cannot be a stranger to a business relationship when
"the defendant and the plaintiff are parties to a comprehensive interwoven set of
contracts or relations."  Waddell & Reed, Inc. v. United Investors Life Insurance
Co., 875 So. 2d 1143, 1156 (Ala. 2003).  A defendant also cannot be a stranger if it
is essential to the business relationship or would benefit economically from the
alleged injured relations.  Id.

3.     Although HWE and Simmons never executed the memorandum of
understanding regarding RMFS (Walker Depn., Ex. 8), they have nevertheless lived
under certain aspects of that arrangement.  Simmons and HWE therefore have a

contractual relationship with respect to RMFS.  Simmons in turn employed John Staples.  Simmons loaned John Staples to RMFS to act as the general manager of RMFS.  In return, RMFS paid Simmons for all salary and benefits received by John Staples.  John Staples therefore had an employment contract with Simmons, a business relationship with RMFS, and RMFS had a contractual understanding with Simmons about the payment of his salary and benefits.  This set of comprehensive, interwoven contracts and relations defeats any claim for tortious interference.

4.      In addition, HWE and RMFS are essential to the business relationship and benefit economically from John Staples' employment relationship with Simmons. The business of RMFS was to sell chicken.  John Staples was responsible for running the operation for the sale of RMFS's products.  RMFS was therefore essential to the relationship, because absent its need for a general manager, Simmons would not have loaned John Staples to RMFS.  Similarly, as the owner of RMFS, HWE benefited from the sales activities of RMFS.  For that reason, HWE and RMFS cannot be liable for tortious interference with John Staples' employment relationship with Simmons.

5.      Count Two of the Complaint alleges that HWE and RMFS tortiously interfered with John Staples' business relationship with DSM.  John Staples acted as a consultant to DSM.  DSM in turn acted as the broker for RMFS.  John Staples' consultancy with DSM was designed to assist DSM in the sale of RMFS' products.

RMFS was therefore not a stranger to the consultancy relationship between John Staples and DSM. HWE, as the owner of RMFS, was also not a stranger. Carn, 896 So. 2d at 454 (control over the business relationship is enough to show that a party is not a stranger to the agreement).

6.      Count Four of the Complaint alleges tortious interference by HWE and RMFS with Kym Staples' employment with DSM. Kym Staples was an owner of DSM pursuant to an operating agreement. Kym Staples also signed the brokerage agreement with RMFS on behalf of DSM. The purpose of Kym Staples' employment with DSM was to sell chicken on behalf of RMFS. Kym Staples met with representative of RMFS from time to time to discuss issues relating to the sale of RMFS' products. RMFS was therefore not a stranger to the relationship between Kym Staples and DSM. HWE, as the owner of RMFS, was likewise not a stranger to the relationship.

**7.      Breach of Fiduciary Duty**

Count Five alleges that HWE and RMFS breached their fiduciary duty to Kym Staples. No such fiduciary duty exists.

8.      "The elements of a breach-of-fiduciary-duty claim are the existence of a fiduciary duty, a breach of that duty, and damage suffered as a result of that breach. Regions Bank v. Lowrey, 101 So. 3d 210, 219 (Ala. 2012)." Aliant Bank v. Four Star Investments, Inc., 244 So. 3d 896, 907 (2017).

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 52 of 63

9. “The determination whether a duty exists is generally a question of law for the court to decide. Ex parte BASF Constr. Chems., LLC, 153 So. 3d 793, 801–02 (Ala. 2013).” Id. 908.

> “In Alabama, a fiduciary or confidential relationship [has been] defined [as follows]:
>
> “ ‘ “ ‘A confidential relationship is one in which one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other’s interests, or when one person has gained the confidence of another and purports to act or advise with the other’s interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.’ ” ’ DGB, LLC v. Hinds, 55 So. 3d 218, 233 (Ala. 2010) (quoting Bank of Red Bay v. King, 482 So. 2d 274, 284 (Ala. 1985),

quoting in turn 15A C.J.S. Confidential (1967))."

"Further, a fiduciary relationship is defined as:

" '[a] relationship in which one person is under a duty to act for the benefit of another on matters within the scope of the relationship .... Fiduciary relationships usually arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer.' Swann v. Regions Bank, 17 So. 3d 1180, 1193 (Ala. Civ. App. 2008) (quoting Black's Law Dictionary, 1315 (8th. 2004))."

Id. at 916

10. Kym Staples had no such relationship with HWE and RMFS. Kym Staples was an employee and owner of DSM, the broker from RMFS. HWE and RMFS had no ownership with DSM. There is no evidence that would support a duty to Kym Staples.

11.   Conspiracy

Counts Three, Six and Nine allege that HWE and RMFS participated in a conspiracy to harm John and Kym Staples.  As shown above, the tort claims asserted by Mr. and Mrs. Staples lack merit.  Conspiracy itself furnishes no civil cause of action."  Triple J Cattle, Inc., v. Chambers, 621 So. 2d 1221, 1225 (1993).  Absent a cognizable tort, Plaintiffs' conspiracy claims all fail as well.

12.   Defamation

Count Ten alleges that HWE and RMFS defamed John Staples.  He, however, has not presented any admissible evidence that any defamatory statements were made.  John Staples has also failed to allege or prove special damages.

13.   Tortious Interference Post Employment

Count Eleven of the Complaint asserts that HWE and RMFS, in defaming him, also tortiously interfered with his business relationships to earn a living.  Mr. Staples has since testified that he knows of no business relationship that has been affected by any conduct of HWE or RMFS.

14.   Objections to Plaintiffs' Contentions:

August 1, 2018 was the last day to offer amendments to the pleadings pursuant to this Court's Scheduling Order of May 15, 2018.  The Third Amended Complaint (Dkt. 038) is Plaintiffs' last and governing pleading.

Plaintiffs' Contentions nevertheless attempt to amend the pleadings by adding or changing their theories of the case. For instance, Ms. Staples claims that two non-parties owed her a fiduciary duty. ¶ 21. Plaintiffs then assert for the first time that RMFS is a joint venture, a position that is wrong as a matter of fact (it is an LLC) and not asserted in the Third Amended Complaint. p. 26, ¶ 1-3.

Plaintiffs also introduce the concept of a principal's liability for the actions of an agent for the first time at p. 31, ¶ 6. Claims of Agency and the principal's liability for acts of alleged agents are not part of this case.

In their discussion about defamation, ¶ 7, Plaintiffs totally contradict the testimony given by John Staples at his deposition that there were only two statements made by Walker to Caffey that he considered defamatory.

HWE and RMFS object to all attempts by Plaintiffs to amend the pleadings in this fashion.

## RMFS' Counterclaim Contentions

1.

J. Staples was the general manager of RMFS.

2.

RMFS is in the food service business.

3.

As general manager, J. Staples was responsible for the day to day operations of RMFS, including dealings with Simmons.

4.

RMFS reposed great trust and confidence in J. Staples.

5.

Because he ran the day to day operations, supervised its employees, negotiated with suppliers and customers, and ran the relationship with brokers, Staples exercised a controlling influence over RMFS' business activities and conduct.

6.

J. Staples has violated that trust by approving unauthorized commission payments for his benefit and the benefit of his wife (K. Staples) and daughter (Blair Staples) and obtaining reimbursement for business expenses that were not incurred for the benefit of RMFS, including expenses that were for the benefit of DSM.

7.

In addition, J. Staples violated his trust when on December 16, 2017, J. Staples sent an email to Robert Thurber (a board member of Tyson) containing RMFS confidential information concerning its sales volume and revenue. Staples provided

similar confidential information to a company called Radian that he wanted to do business with.

**DSM**

8.

Sometime in 2014, J. Staples fired the existing brokers and hired Diversified Food Solutions ("DFS"), for the sale of some of RMFS' food products.

9.

J. Staples did not inform Walker prior to firing the existing brokers and hiring DFS.

10.

J. Staples did not disclose to Walker at such time that his wife, K. Staples, was one of the owners of DFS.

11.

J. Staples created and oversaw the RMFS relationship with DFS.

12.

J. Staples eventually disclosed to Walker that RMFS was using DFS as a broker after Walker was informed about it by a third party.

13.

DFS was only supposed to receive commissions on Category Management (CAT-MAN) products sold to Sysco.

14.

Instead, J. Staples approved commissions for sales of Contract Management (CON-MAN) products and sales to other distributors.

15.

Based upon her ownership interest in DFS, K. Staples received a share of the inflated profits of DFS in addition to her salary.

16.

J. Staples caused RMFS to enter into a new broker arrangement with Diversified Sales & Marketing ("Diversified") as of October 27, 2014.

17.

In an effort to increase the amount of profits distributed to K. Staples, J. Staples continued to approve the payment of commissions to Diversified on non-CATMAN product lines.

18.

Not until 2016 did Walker learn that K. Staples owned a 60% majority equity stake in Diversified when J. Staples informed Walker of his intent to sell the other

40% to Robert Thurber, which Walker opposed (for reasons including Thurber's affiliation with an RMFS competitor).

19.

Diversified was terminated as of September 30, 2016 and was replaced as broker by DSM Sales and Marketing, LLC ("DSM") as of October 1, 2016.

20.

The members of DSM were K. Staples and Julie Blanchard with equal shares.

21.

In a continued effort to increase the amount of profits distributed to K. Staples, J. Staples continued to approve the payment of commissions to DSM on non-CATMAN product lines.

22.

These payments were not for the benefit of RMFS and were paid solely to increase DSM's profits, of which K. Staples received at least 50%.

23.

J. Staples was able to avoid detection because the back office function for the payment of commissions was performed by Simmons, and J. Staples either (i) did not provide commission reports to Walker and Blanchard, or (ii) altered Simmons'

commission reports when he received them from Simmons before forwarding them to Walker and Blanchard.

24.

In all, the excess commissions amounted to $284,777.

25.

Beginning in mid-2017, Walker repeatedly informed J. Staples that DSM was not meeting the needs of RMFS.

26.

Prior to that time, Walker informed J. Staples that he was not satisfied with J. Staples' performance as general manager and had lost trust in J. Staples' ability to lead RMFS because of his family trying to act as RMFS' broker.

27.

Prior to November 2017, Walker informed J. Staples that he was going to transition from using DSM as a broker.

28.

Armed with that information, J. Staples sought to find a new broker to work with RMFS that would employ his wife and daughter.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 61 of 63

29.

J. Staples also spoke with Robert Thurber about setting up a new broker in which J. Staples or K. Staples, or both would own equity.

30.

At a meeting in December 2017 with Eric Martin and Chris Craddock of FSE (a broker), as a quid pro quo for giving the prospective broker RMFS' business, J. Staples asked that the broker hire K. Staples and Blair Staples as employees, contrary to Walker's plans for new brokers (of which plans J. Staples was aware).

**Expenses**

31.

As general manager, J. Staples approved business expenses incurred by employees, including himself, that were paid by RMFS.

32.

Unbeknownst to RMFS, J. Staples approved expense reimbursement for personal expenses and expenses of DSM that were paid out of RMFS' funds.

33.

J. Staples did not want Walker to see the expense reports.

34.

J. Staples again avoided detection because the back office accounting function for the payment of expenses was performed by Simmons, which in turn was relying on J. Staples' approval of the expense reports.

35.

The improper expenses charged to RMFS included meals J. Staples had with his wife, family and friends, unauthorized office expenses, a $10,000 contribution to the University of Alabama, money contributed to his granddaughter's school, sporting event tickets, sports memorabilia, gift cards, personal merchandise, travel costs for personal, family and business travel unrelated to RMFS, numerous unauthorized add on retainers and commissions, and DSM incurred expenses. These expenses amount to $70,076. Included in this amount are charges related to Grate Chef.

36.

In 2016, J. Staples became interested in having DSM acquire a grilling equipment company called Grate Chef.

37.

In May 2016, J. Staples traveled to a trade convention called The National Hardware Show in Las Vegas.

38.

That trade show had nothing to do with RMFS' business.

39.

J. Staples nevertheless charged all of his travel expenses related to the trade show to RMFS.

40.

At the time, J. Staples had in his possession autographed sports memorabilia signed by Walker, a Heisman Trophy winner, pro football player, Olympic athlete and sports personality.

41.

The memorabilia was paid for by RMFS and intended to be used for RMFS' customers and business development.

42.

Instead, without authorization, J. Staples used Walker's name, likeness, signature and sports memorabilia to attract patrons to the Grate Chef booth at the trade show.

43.

In March 2017, J. Staples had his daughter Blair photoshop an image of Walker as part of a Grate Chef promotional advertisement, an endorsement Walker did not authorize.

**(Breach of Fiduciary Duty – J. Staples)**

44.

As general manager, J. Staples owed RMFS fiduciary duties of care and loyalty.

45.

J. Staples used his position of authority to enrich himself and his family members at the expense of RMFS' interests.

46.

By his acts and omissions, including the self-dealing and use of RMFS' funds and property for personal purposes without authorization, J. Staples breached the fiduciary duties he owed to RMFS.

47.

RMFS has been damaged by this breach in the amount of $354,777.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 65 of 83

48.

J. Staples' misappropriation and waste of RMFS' funds shows willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences.

49.

J. Staples is therefore liable for punitive damages in an amount to be determined by the enlightened conscience of the jury.

**(Aiding and Abetting Breach of Fiduciary Duty – K. Staples)**

50.

K. Staples knew that J. Staples owed a duty of loyalty and duty of care to RMFS.

51.

K. Staples nevertheless assisted her husband in violating those duties in order to enrich herself.

52.

K. Staples received profits from unauthorized commissions charged by DFS, Diversified and DSM, and meals, trips, travel amenities, sporting event tickets, gifts and other benefits charged to RMFS, directly and indirectly, as a result of J. Staples' breaches of fiduciary duty.

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 66 of 68

53.

K. Staples thus aided and abetted J. Staples' breach of fiduciary duty.

54.

K. Staples is liable to RMFS for damages resulting from the breaches of fiduciary duty in the amount of $354,777.

55.

K. Staples' interference with J. Staples' fiduciary duty shows willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences.

56.

K. Staples is therefore liable for punitive damages in an amount to be determined by the enlightened conscience of the jury.

<u>Mr. and Mrs. Staples Response to RMFS Counterclaim</u>;

1. Mr. and Mrs. Staples deny the counterclaim allegations and demand strict proof which they contend there is none concerning their alleged activities.

Respectfully submitted,

/S/ Keri Donald Simms (ASB-9801-M63K)(SIM042)
Attorney for Mr. and Mrs. Staples
Webster Henry Firm, P.C.
Suite 445 East
Two Perimeter Park South
Birmingham, Alabama 35243


/s/ Michael J. King Michael J. King
Attorney for HWE and RMFS
GREENBERG TRAURIG, LLP
 Terminus 200 3333 Piedmont Road
NE Suite 2500 Atlanta, Georgia 30305


/S/George Valton Walker, III (WAL097)
Attorney for HWE and RMFS
THE FINLEY FIRM, P.C.
P.O. Box 3596 (36831)
611 E Glenn Ave. Auburn, AL 36830


/S/Mr. Talley R. Parker
/S/ Mr. Ethan Davis
/S/ Thomas Davis
Attorneys for Simmons
JACKSON LEWIS
15 500 North Akard
Suite 2500
Dallas, Texas 75201

Case 7:18-cv-00160-LSC Document 66 Filed 02/04/19 Page 68 of 68



Case 7:18-cv-00160-LSC Document 66-1 Filed 02/04/19 Page 1 of 3

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

## December 21, 2017 Memorandum



**Memorandum** **Privileged and Confidential**

**TO:** Herschel Walker

**FROM:** Ronald Eisenman

**DATE:** December 21, 2017

**RE:** Proposals related to John Staples, Kym Staples, Blair Staples and DSM Sales and Marketing, LLC ("DSM")

---

Proposal A and Proposal B were discussed with David Jackson at the meeting in Atlanta on December 12, 2017:

Proposal A:

John:

- John to terminate his employment as General Manager of RMFS (Simmons is John's official employer) and his role as a paid consultant to DSM.
- John to sign a 1 year Consultant Agreement with RMFS to provide consulting services as requested by Herschel. (Herschel to closely supervise). John will perform no further work with DSM.

Consulting Pay: RMFS to pay John a consulting fee of $200,000 for the year (payable in monthly installments (John likely needs monthly payments for living expenses) assuming John does not violate the consulting agreement (this consulting fee could be increased if Herschel agreed—maybe to $240,000 to cover his prior $40,000 DSM consulting fee).

The Consultant Agreement will include a (i) non-disparagement provision so that John will not say anything negative about RMFS or Simmons, for 2 years etc. (the consulting year plus 1 more), (ii) a non-solicitation provision so that John will not recruit employees from RMFS or Simmons for 2 years (the consulting year plus 1 more) and (iii) a release of any other liability.

Kym:

- Kym will resign from DSM and sign over all of her 50% ownership in DSM to Julie. Kym will get her 50% share of DSM profits, if any, through December 31, 2017. After that, Kym will not be paid anything. Kym will agree to a (i) non-disparagement provision so that she will not say anything negative about RMFS, DSM or Simmons, for 2 years etc., (ii) a non-solicitation provision so that she will not recruit employees from RMFS or DSM for 2 years and (iii) a release of any other liability.

*ATL 22548376v1*

To: Herschel Walker
From: Ronald Eisenman
Date: December 21, 2017
Re: Proposals related to John Staples, Kym Staples, Blair Staples and DSM Sales and Marketing, LLC ("DSM")

Blair:

- Blair's employment by DSM (through Simmons) will terminate. (Herschel/Julie: you may want to give Blair 2 months severance to give John extra incentive to cooperate in which event Blair will agree to a (I) non-disparagement provision so that she will not say anything negative about RMFS, DSM or Simmons, for 2 years etc., (ii) a non-solicitation provision so that she will not recruit employees from RMFS or DSM for 2 years) and (iii) a release of any other liability.

<u>Proposal B (if John refuses to cooperate):</u>

John:

- John to be terminated by Simmons in his employment as General Manager of RMFS (Simmons is John's official employer). No severance except as Simmons normally provides.

- RMFS to give 30 day notice to DSM terminating DSM as its broker.

Kym: DSM will end after the brokerage agreement with RMFS ends and any profit after expenses will be split per the current agreement.

Blair:

- Blair's employment by DSM (through Simmons) will terminate (Simmons will terminate her employment). Blair to only get what severance, if any, Simmons provides.

Case 7:18-cv-00160-LSC Document 66-2 Filed 02/04/19 Page 1 of 15

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 2

# Memorandum of Understanding Between

# Simmons and HWE

Case 7:18-cv-00160-LSC Document 66-2 Filed 02/04/19 Page 2 of 15

Execution Copy

**THIS MEMORANDUM OF UNDERSTANDING** (this "Memorandum") is effective as of __________, 2010, between H. Walker Enterprises, LLC ("Walker") and Simmons Prepared Food, Inc. ("Simmons").

The purpose of this Memorandum is to set forth the understanding of Walker and Simmons with respect to the operation of the RMFS food business (the "Food Business") as a joint venture (the "Venture") between Walker and Simmons. The parties will rely on the commitments described in this Memorandum in moving ahead with RMFS, provided that it is the parties' intent that each appropriate commitment described herein is to be evidenced and documented by definitive written agreements of an appropriate nature, reasonably satisfactory to both parties and their respective counsel, which will supersede this Memorandum, including an Amended and Restated Limited Liability Company Agreement for RMFS (the "Definitive Agreements"). (Minority certification requires RMFS to have a new LLC Operating Agreement to reflect this deal.) This Memorandum represents the understanding and agreement of the parties on the date hereof, and will be supplemented, modified or amended by the Definitive Agreements (especially an Amended and Restated Limited Liability Company Agreement for RMFS).

A. Purposes of RMFS.

In order to understand the underlying purposes of RMFS, the parties recognize the strengths that Herschel Walker and Simmons provide:

1. Herschel Walker Strengths:

(a) Herschel's vision, drive, and business relationships (including Sysco); the "Herschel Walker" brand and its ability to enhance the RMFS brand;

(b) RMFS' certified MBE status, which permits RMFS to sell through the diversity programs of major customers and to offer customers the opportunity to satisfy their internal diversity supply chain goals (this opens the relationship with the customer which RMFS can then actively work to maximize beyond diversity purchases); and

(c) major companies want to do business with RMFS (Herschel) (including Sodexho, Aramark, Brinkers and QSRs such as McDonalds).

2. Simmons Strengths:

(a) financial strength and administrative infrastructure to allow RMFS to take advantage of its strengths (as mentioned above);

(b) sales and R & D support infrastructure; and

(c) extensive production capability and capacity.



3. Purposes. Building upon these strengths, the purposes of this venture are, among other things, to:

(a) provide top quality customer service to RMFS customers to retain and grow their business;

(b) increase sales of sourced products to the Sysco OpCos;

(c) increase categories of sourced products (especially higher margin products) sold to Sysco and the Sysco OpCos;

(d) increase sales of non-sourced products to Sysco and the Sysco OpCos;

(e) bring in significant new customers for RMFS products;

(f) assist in determining/developing new products for RMFS to sell and producing sales of such new products (under RMFS trademarks or using the Sysco house brands)—innovation to meet or to anticipate customer needs; and

(g) significantly increase the profitability of RMFS, by means of the above.

4. Packing Facility.

It is anticipated that RMFS and Simmons may discuss establishing a new entity (not RMFS) to acquire a further processing plant. This new entity will likely be used to produce chicken products for the QSR industry (including McDonald's). It is further anticipated that both Herschel (or Walker) and Simmons will own equity in this new entity (at levels within the guidelines for certification as a minority business). For avoidance of doubt, this Memorandum does not apply to, or reflect the arrangement that would apply with respect to, any such plant entity.

B. Structure of RMFS. In terms of the Walker/Simmons deal, the venture will relate to chicken, beef, pork (and biscuit) products sold by RMFS to (i) Sysco (including under the Sysco Classic brand, other Sysco brands or any RMFS brand), and (ii) to other distributors under their respective brands or any RMFS brand.

(1) Walker and Simmons will share ownership of RMFS as of _________, 2010.

(2) The ownership shall be Walker 65% - Simmons 35%.

(3) It is anticipated that Simmons will be given the first opportunity to bid on supplying chicken products to RMFS. While Simmons will have a favored supplier position, RMFS will not be required to purchase chicken products from Simmons. Final supplier decisions by RMFS will depend upon pricing and other relevant business factors.

(4) RMFS and Walker/Herschel Walker matters that are excluded from the Walker/Simmons RMFS venture ("Excluded Matters") include:

(a) the "Herschel's Tailback Grill" license arrangement with Fieldale Farms (pursuant to which the Herschel's Tailback Grill trademark is licensed to Fieldale Farms for a licensing fee);

(b) deals with several Sysco OpCos (such as the "Detroit" model) through which RMFS sells Sysco products to casinos and others (for avoidance of doubt, RMFS will include and Simmons will share in profits from the sale of RMFS food products to Sysco, but it will not share in the 2% - 4% fee that RMFS receives for selling Sysco distributed products from Sysco to the casinos);

(c) a deal among RMFS, Sodexho and Sysco San Francisco for Sysco products sold to PG&E (for avoidance of doubt, RMFS will include and Simmons will share in profits from the sale of RMFS food products to Sysco, but it will not share in the 4% fee that RMFS receives for selling Sysco distributed products to PG&E); and

(d) personal promotional deals involving Herschel Walker (or the use of his name and/or likeness) or deals involving Herschel Walker as a performer, commentator, actor, athlete (or former athlete), author, etc. (for example, book deals, appearances on Celebrity Apprentice or other TV shows, paid speaking or promotional engagements, and sports commentary).

(5) For avoidance of doubt, the 65%-35% arrangement will not involve the Excluded Matters and Walker will receive the revenues and pay the expenses of the Excluded Matters. While some of these Excluded Matters will not involve RMFS (they will involve Herschel Walker or Walker), some may be inside RMFS for minority business reasons.

(6) It is anticipated that Simmons will not compete with RMFS by pursuing directly or indirectly "any food service distributor street accounts" with Sysco or other, mutually agreed upon, food service distributors. Walker intends to bring food service opportunities to RMFS and if Simmons agrees, the deal will be within the venture (although depending on the specific deal, Walker and Simmons may have to agree on certain details). If Simmons does not want to pursue the deal inside the venture, then Walker will want to retain the right to pursue the deal outside the venture.

C. Distribution of Profits.

RMFS Profits (definition TBD) shall be distributed to the members by motion of the Board of Directors taking into consideration the anticipated cash flow needs of RMFS (distributions may be made quarterly, semi-annually or annually, as approved by the Board). Distributions shall be made based on the ownership percentages of RMFS which are currently allocated 65% Walker and 35% Simmons. Distributions will be made after initial compensation is paid to Herschel Walker for his efforts as CEO of RMFS and the special $0.015 per lb limited fee to Simmons. See section E.6.

D. Management of RMFS.

1. Herschel Walker will be CEO of RMFS.

2. RMFS will establish a new Board with 5 votes. The Board will oversee and set policy for the RMFS Food Business. Herschel Walker (and/or his appointees) will have 3 votes out of 5 votes and Simmons representatives (such as Todd Simmons and David Jackson) will be on the Board having 2 votes out of 5 votes. It is anticipated that the Board will hold regular quarterly meetings (either in person or via conference call as the Board may determine for each meeting).

3. John Staples will be General Manager of RMFS and report to Herschel Walker (as CEO) and the Board.

E. Sales and Administrative Functions:

1. Sales personnel will work directly for RMFS (e.g. Mark Scatamacchia and Charles Vincent) or for Simmons and be "loaned" to RMFS (John Staples and Charlie Weaver). RMFS will pay the costs for these sales personnel. RMFS will reimburse Simmons for the actual compensation and benefit costs of John and Charlie. In addition to the T&E expenses for sales personnel, RMFS will pay that portion of Herschel's annual T&E expense related to RMFS. RMFS revenues will not be used to pay for Herschel's T&E expenses not related to RMFS. T&E expense reimbursement requests by sales personnel must be made pursuant to the RMFS T&E reimbursement policies (which are the Simmons policies) (including submitting appropriate receipts and documentation). Reimbursement requests for sales personnel will be reviewed and approved by John Staples and Simmons prior to payment.

2. Back-office functions such as order entry, accounting, truck hiring, Sysco incentive payment management, broker payment management, T & E tracking and reporting, margin reporting, cash management, etc. shall be performed by Simmons for RMFS. In order to offset the cost of providing these back office services related to non-Simmons products, Simmons will charge RMFS a fee of $0.015 per pound of non-Simmons products sold through RMFS and for which Simmons provides back office services. Simmons will provide the "back-office functions" to RMFS for no fee on lbs sold that are produced by Simmons. The $0.015 per pound fee described in this section

will be payable to Simmons: (a) only out of RMFS Profits and after Herschel is paid his $200,000 per year compensation (section E.6) (although at the end of 2011 (for 2012 and thereafter) Walker and Simmons shall review and adjust, as necessary, the order of payment of Herschel's $200,000 "compensation" and Simmons' administration fee on non-Simmons products); and (b) will not exceed an aggregate of $200,000 per year (Walker and Simmons shall review and adjust the fee, as necessary, when, and if, sales of non-Simmons products exceed 13,333,000 lbs.)

3. Banking for RMFS will be structured such that Simmons maintains the check writing responsibility for, and on behalf of, RMFS with the main operating account. Designated RMFS employees and owners will have bank account and password access to the main operating account checking account for monitoring purposes. Additional accounts for expenses incurred and processed at the RMFS office in Savannah will be funded through a transfer request submitted to accounting personnel at Simmons. Board approval is required for opening of any new bank or financial accounts. John Staples (or other Board designee) will approve expenses paid out of the RMFS accounts. For avoidance of doubt, this will not apply to Excluded Matters.

4. Payments from Sysco (corporate and OpCos) for RMFS food sales to Sysco will be directed to the RMFS operating bank account. (This will exclude the 2% - 4% payments from the distribution side of the "Detroit" model and other Excluded Matters)

5. RMFS will have appropriate sales and financial reporting on a weekly (no more than 1 week after actual performance), monthly (no later than 2 weeks after the end of the month) and annual (no later than __ weeks after the end of the year) basis. [RMFS tax returns will be prepared by RMFS' outside accountants (currently Smith & Howard, P.C. but subject to change at the discretion of the Board). ] RMFS will also elect to be taxed as a partnership instead of a C corporation.

6. Herschel will be paid compensation for his services to RMFS out of RMFS Profits, beginning as of May 1, 2009. Herschel shall receive $200,000 per year to be paid out of the initial earnings of RMFS. After Herschel receives such amount, Simmons will then be paid its $0.015 per lb fee on non-Simmons products (see section E. 2). Profits in excess of Herschel's compensation and Simmons' fee will be distributed (at the discretion of the Board and subject to any reserves to be maintained at the Board's discretion) to Members based on their ownership share (i.e. Walker 65%, Simmons 35%). Herschel's compensation shall be equal to the Profit for RMFS for any given year that Profit is less than or equal to $200,000. For avoidance of doubt, amounts that belong to Walker on Excluded Matters are disregarded for these purposes. For further avoidance of doubt, (a) at the end of 2011 (for 2012 and thereafter) Walker and Simmons shall review and adjust, as necessary, the order of payment of Herschel's $200,000 "compensation" and Simmons' administration fee on non-Simmons products; and (b) Walker and Simmons shall review and adjust the fee, as necessary, when, and if, sales of non-Simmons products exceed 13,333,000 lbs.

7. The parties intend that RMFS will quickly generate sufficient revenues to cover compensation for all RMFS sales personnel, Herschel Walker's compensation and the $0.015 per lb fee to Simmons (see section E. 2) and payments to suppliers, including Simmons. However, the compensation payable to Herschel Walker and the reimbursement to Simmons for its administrative costs will be subject to Profit and cash flow availability. Priority of cash flow availability will be for employee compensation (John, Mark, Charlie, Charles, Carol, etc), office rent (Savannah), and payments to Simmons for Simmons products sold by RMFS (payments by RMFS to Simmons for Simmons products will be payable only from invoice payments received from Sysco or other customers of RMFS for such products) and payments to other suppliers. If a situation arises where a receivable from Sysco arrives after a payroll or other due date, RMFS and Simmons will discuss Simmons covering such payroll or other expense which advance will then be repaid as soon as cash flow is available.

8. The Board will closely oversee RMFS's Food Business and RMFS Board will act as needed to reduce expenses if RMFS is not generating sufficient revenues to meet its expenses or if expenses exceed the applicable budget. The budget for each year will be prepared by the General Manager and be reviewed, amended and ultimately approved by the Board.

9. In order to have financial matters, such as Herschel's compensation and Simmons' back office fee on non-Simmons products, be on the calendar year (to match RMFS' tax year), the Board may, in its discretion, pro rate all of such items to reflect a May 1 – December 31, 2009 partial year (i.e. 75% proration).

F. Definitive Agreement. RMFS and Simmons shall use reasonable efforts to agree upon and have prepared as quickly as possible, the Definitive Agreement embodying the above terms and conditions and such other terms and conditions as the parties shall agree. Among other matters, the definitive agreement(s) will address any tax issues related to this deal. Other matters that will be addressed in the definitive agreement include exit strategies (for example, what happens if (i) Simmons no longer wishes to participate in the venture in order to focus on other businesses; (ii) Herschel is unable to continue to participate in the venture (possibly due to illness or injury) or (iii) Simmons and Herschel have different visions for RMFS?) (including potentially buying life and/or disability insurance on Herschel).

G. Prior Operations. The terms described in this Memorandum will apply to RMFS food sales on or after May 1, 2009.

Neither party may transfer or assign this Memorandum without the other party's prior written approval. This Memorandum will be interpreted, construed, and enforced in accordance with the laws of the State of Georgia without regard to its conflict of laws principles.

Case 7:18-cv-00160-LSC Document 66-2 Filed 02/04/19 Page 8 of 15

This Memorandum of Understanding is executed by the parties as of _____, 2010.

H. Walker Enterprises, LLC

By: ____________________
Herschel Walker, CEO

Simmons Prepared Foods, Inc.

By: ____________________
David Jackson, President

**THIS MEMORANDUM OF UNDERSTANDING** (this "Memorandum") is effective as of May 1, 2009, between ~~Renaissance Man Food Services, LLC ("RMFS")~~Herschel Walker and Simmons Prepared Food, Inc. ("Simmons").

The purpose of this Memorandum is to set forth the understanding of RMFS and Simmons with respect to the operation of the RMFS food business (the "Food Business") as a joint venture (the "Venture") between ~~RMFS~~ Herschel Walker and Simmons. The parties will rely on the commitments described in this Memorandum in moving ahead with ~~the Venture~~RMFS, provided that it is the parties' intent that each appropriate commitment described herein is to be evidenced and documented by definitive written agreements of an appropriate nature, reasonably satisfactory to both parties and their respective counsel, which will supersede this Memorandum (the "Definitive Agreements"). This Memorandum represents the understanding and agreement of the parties on the date hereof, and may be supplemented, modified or amended by the Definitive Agreements.

A. Purposes of ~~Venture~~RMFS.

In order to understand the underlying purposes of ~~the Venture~~RMFS, the parties recognize the strengths that ~~RMFS~~ Herschel Walker and Simmons provide:

1. RMFS Strengths:

(a) Herschel's vision, drive, and business relationships (including Sysco); the "Herschel Walker" brand and its ability to enhance the RMFS brand;

(b) RMFS' certified MBE status, which permits RMFS to sell through the diversity programs of major customers and to offer customers the opportunity to satisfy their internal diversity supply chain goals (this opens the relationship with the customer which RMFS can then actively work to maximize beyond diversity purchases); and

(c) major companies want to do business with RMFS (Herschel) (including Sodexho, Aramark, Brinkers and QSRs such as McDonalds).

2. Simmons Strengths:

(a) financial strength and administrative infrastructure to allow RMFS to take advantage of its strengths (as mentioned above);

(b) sales and R & D support infrastructure; and

(c) extensive production capability and capacity.

3. Purposes. Building upon these strengths, the purposes of this ~~Venture~~RMFS are, among other things, to:

(a) provide top quality customer service to RMFS customers to retain and grow their business;

(b) increase sales of sourced products to the Sysco OpCos;

(c) increase categories of sourced products (especially higher margin products) sold to Sysco and the Sysco OpCos;

(d) increase sales of non-sourced products to Sysco and the Sysco OpCos;

(e) bring in significant new customers for RMFS products;

(f) assist in determining/developing new products for RMFS to sell and producing sales of such new products (under RMFS trademarks or using the Sysco house brands)—innovation to meet or to anticipate customer needs; and

(g) significantly increase the profitability of RMFS, by means of the above.

4. Packing Facility.

It is anticipated that RMFS and Simmons will establish a new entity (not RMFS) to acquire a further processing plant. This new entity will likely be used to produce chicken products for the QSR industry. It is further anticipated that both Herschel and Simmons will own equity in this new entity (at levels within the guidelines for certification as a minority business). For avoidance of doubt, this Memorandum does not reflect the arrangement that would apply with respect to any such plant entity.

B. Structure of ~~the Venture~~RMFS.

(1) ~~RMFS (Herschel Walker)~~ and Simmons will share ownership of ~~net profits attributable to Food Business food sales made beginning~~ RMFS as of May 1, 2009. These sales include food products (chicken, pork, and beef), sold by RMFS to (i) Sysco (including under the Sysco Classic brand, other Sysco brands or any RMFS brand), and (ii) to other distributors under their respective brands or any RMFS brand.

(2) The ~~profit sharing split will take into account the fact that Simmons will make profits as a supplier, so the profit sharing split should~~ownership shall be HW ~~[(70)]%~~60% - Simmons ~~[(30)]~~40%% ~~(with this percentage to be re-addressed annually depending upon Simmons' pricing and on the amount of sales of non-Simmons~~

~~products—including chicken products that Simmons does not produce or beef and pork products). Insofar as almost all food sales are currently chicken products produced by Simmons (and such is likely the expectation for 2010 as well), the 70/30 split may be appropriate for 2009 and 2010).~~

(3) It is anticipated that Simmons will be given the first opportunity to bid on supplying chicken products to RMFS. While Simmons will have a favored supplier position, RMFS will not be required to purchase chicken products from Simmons. Final supplier decisions by RMFS will depend upon pricing and other relevant business factors.

(4) RMFS and Herschel Walker matters that are excluded from ~~the Venture~~RMFS include:

(a) the "Herschel's Tailback Grill" license arrangement with Fieldale Farms (pursuant to which the Herschel's Tailback Grill trademark is licensed to Fieldale Farms for a licensing fee);

(b) deals with several Sysco OpCos (such as the "Detroit" model) through which RMFS sells Sysco products to casinos and others (for avoidance of doubt, ~~the Venture~~RMFS will include and Simmons will share in profits from the sale of RMFS food products to Sysco, but it will not share in the 2% - 4% fee that RMFS receives for selling Sysco distributed products from Sysco to the casinos);

(c) a deal among RMFS, Sodexho and Sysco San Francisco for Sysco products sold to PG&E (for avoidance of doubt, ~~the Venture~~RMFS will include and Simmons will share in profits from the sale of RMFS food products to Sysco, but it will not share in the 4% fee that RMFS receives for selling Sysco distributed products to PG&E); and

(d) personal promotional deals involving Herschel Walker (or the use of his name and/or likeness) or deals involving Herschel Walker as a performer, commentator, actor, athlete (or former athlete), author, etc. (for example, book deals, appearances on Celebrity Apprentice or other TV shows, paid speaking or promotional engagements, and sports commentary).

(5) For avoidance of doubt, the profit-sharing arrangement will not involve Simmons receiving equity member ownership in RMFS or H. Walker Enterprises, LLC (avoiding any affect on RMFS' minority business certification). However, ~~the Venture~~RMFS will be within RMFS so that all customers will be doing business with RMFS.

(6) It is anticipated that Simmons will not compete with RMFS in the food service products through sales to Sysco or other food service distributors who become customers of RMFS.

C. Distribution of Profits.

~~Depending upon the amount of net profits, net profits from the Venture may be distributed to RMFS (Herschel) and Simmons annually (or more frequently). The parties intend that as profitability stabilizes, quarterly profit distributions may be made to RMFS (Herschel Walker) and Simmons. Net profits will be in addition to (1) profits realized by Simmons as a product supplier to the Venture and (2) the compensation paid to Herschel Walker (described below) for his work as CEO.~~Profits (Retained Earnings prior to distribution) shall be distributed to the shareholders by motion of the Board of Directors taking into consideration the cash flow needs of RMFS. Distributions shall be made based on the ownership percentages of RMFS which are currently allocated 60% Herschel Walker and 40% Simmons Prepared Foods. Distributions will be made after initial compensation is paid to Herschel Walker for his efforts as CEO of RMFS. See section E.6.

D. Management of ~~the Venture~~RMFS.

1. Herschel Walker will be CEO of RMFS.~~, and of the Venture.~~

2. RMFS will establish a new ~~Joint Venture~~ Board ~~(the "JV Board")~~ with 5 votes. The ~~JV~~ Board will oversee and set policy for the ~~Venture's~~ RMFS's Food Business. Herschel Walker (and/or his appointees) will have 3 votes out of 5 votes and Simmons representatives (such as Todd Simmons and David Jackson) will be on the ~~JV~~ Board having 2 votes out of 5 votes. It is anticipated that the JV Board will hold regular quarterly meetings (either in person or via conference call as the ~~JV~~ Board may determine for each meeting).

3. John Staples will be General Manager of ~~the Venture~~RMFS and report to Herschel Walker (as CEO) and the ~~JV~~ Board.

E. Sales and Administrative Functions:

1. Sales personnel will work directly for RMFS (e.g. Mark Scatamacchia and Charles Vincent) or for Simmons and be "loaned" to RMFS (John Staples and Charlie Weaver). ~~The Venture~~RMFS will pay the costs for these sales personnel. ~~The Venture~~RMFS will reimburse Simmons for the compensation and benefit costs of John and Charlie. In addition to the T&E expenses for sales personnel, ~~the Venture~~RMFS will pay that portion of Herschel's annual T&E expense related to ~~the Venture~~RMFS. ~~Venture~~ RMFS revenues will not be used to pay for Herschel's T&E expenses not related to ~~the Venture~~RMFS. T&E expense reimbursement requests by sales personnel must be made pursuant to the Simmons T&E reimbursement policies (including submitting appropriate receipts and documentation). Reimbursement requests for sales personnel will be reviewed and approved by John Staples and Simmons prior to payment.

2. ~~Administrative Functions will be divided between the Savannah office (Carol, Veronica, etc.) and Simmons personnel in Arkansas. The expenses related to performing these functions will be an expense of the Venture. The costs charged by~~

~~Simmons to the Venture will reflect that it is using existing Simmons personnel and offices, so the marginal cost incurred by Simmons should be nominal (and will be paid subject to available Venture cash flow). The method for billing for these expenses and the amounts will be set forth in the Definitive Agreements (the old Management Services Agreement between Simmons and Walker Foods, LLC is ended).~~Back-office functions such as order entry, accounting, truck hiring, Sysco incentive payment management, broker payment management, T & E tracking and reporting, margin reporting, cash management, etc. shall be performed by Simmons Prepared Foods for RMFS. Simmons Prepared Foods will charge RMFS a fee of $0.015 per non-Simmons Prepared Foods pounds sold through RMFS. Simmons Prepared Foods will provide the "back-office functions" to RMFS for no fee on lbs sold that are produced by Simmons Prepared Foods.

3. Banking will be ~~simplified so that the Venture's revenues can be easily moved on-line to an RMFS account from the Venture's bank account (to allow RMFS to pay Venture related bills such as compensation for Mark, Charles and Carol and Savannah office bills). Both Simmons and RMFS will have on-line access to the Venture's accounts. Simmons personnel and Savannah will work out allocation of invoicing responsibilities. All invoicing will be in the name of RMFS. Accounts receivable and accounts payable functions for the Venture will be handled by Simmons.~~structured such that Simmons Prepared Foods maintains the check writing responsibility for RMFS with the main operating account. RMFS employees and Owners will have bank account and password access to the main operating account checking account for monitoring purposes. Additional accounts for expenses incurred and processed at the RMFS office in Savannah will be funded through a transfer request submitted to accounting personnel at Simmons Prepared Foods.

4. Payments from Sysco (corporate and OpCos) for RMFS food sales to Sysco will be directed to ~~the new Venture bank~~ account.

5. RMFS will have ~~direct access to a dedicated area of the Simmons computer network so that the Savannah office will have real-time access to RMFS sales and financial information. This will be a high priority item for the Venture.~~appropriate sales and financial reporting on a weekly (no more than 1 week after actual performance) and monthly (no later than 2 weeks after the end of the month) basis.

6. Herschel will be paid compensation for his services to ~~the Venture~~RMFS out of Net Profit, beginning as of May 1, 2009. ~~This compensation will be linked to the Venture's gross profit (sales revenues less CGS) with an annual fee cap (e.g. $500,000). Herschel's compensation should be payable quarterly (beginning June 30 or September 30, 2009), subject to available cash flow in the Venture. Unearned fee amounts for any year will not be accrued for payment in future years (only unpaid earned fees for one year will be accrued and payable, as cash flow permits, in a subsequent year). For example, if Herschel is entitled to a fee of $100,000 in a given year, based upon the Venture's gross profit for such year, he will be paid the $100,000. If the Venture is unable to pay the entire $100,000 amount due to cash flow shortfalls, the unpaid portion of the $100,000~~

~~will be accrued and owed to Herschel in a subsequent year, when cash flow is available. This compensation could be based upon an escalating percentage up to the annual cap. Although this compensation will be set forth in the Definitive Agreement, it is suggested that Herschel's annual compensation for his services to the Venture might be calculated as follows:~~

~~4% of the first $1,500,000 (food sales gross profit)~~
~~8% from $1,500,000 - $2,500,000~~
~~10% from $2,500,000 - $3,500,000~~
~~20% above $3,500,000 (until the cap is reached at $6,100,000)~~

~~Under David Jackson's 3 budget scenarios from the April 15 Board meeting:~~

| ~~Scenario~~ | ~~Gross Revenue per Budget~~ | ~~Total Expense per Budget~~ | ~~HW Fee~~ |
|---|---|---|---|
| ~~1~~ | ~~$1,640,000~~ | ~~$1,521,000~~ | ~~$ 61,680~~ |
| ~~2.~~ | ~~$1,800,000~~ | ~~$1,571,000~~ | ~~$ 84,000~~ |
| ~~3.~~ | ~~$3,000,000~~ | ~~$1,971,000~~ | ~~$190,000~~ |

Herschel shall receive $200,000 per year to be paid out of the initial earnings of RMFS. Earnings in excess of $200,000 will be distributed (at the discretion of the board) to shareholders based on their ownership share (HW 60%, SPF 40%). Herschel's compensation shall be equal to the Net Profit for RMFS for any given year that Net Profit is less than $200,000 and retained earnings shall maintain a positive amount to allow for compensation to occur.

7. The parties intend that ~~the Venture~~RMFS will quickly generate sufficient revenues to cover compensation for all sales personnel, Herschel Walker's compensation and the administrative costs incurred by Simmons for ~~the Venture~~RMFS (and payments to suppliers, including Simmons). However, the quarterly compensation payable to Herschel Walker and the reimbursement to Simmons for its administrative costs will be subject to cash flow availability. Priority of cash flow availability will be for employee compensation (John, Mark, Charlie, Charles, Carol, etc), office rent (Savannah), and payments to Simmons for Simmons products sold by ~~the Venture~~RMFS (payments by ~~the Venture~~RMFS to Simmons for Simmons products will be payable only from invoice payments received from Sysco or other customers of ~~the Venture~~RMFS for such products). If a situation arises where a receivable from Sysco arrives after a payroll or other due date, RMFS and Simmons will discuss Simmons covering such payroll or other expense which advance will then be repaid as soon as cash flow is available.

8. The ~~JV~~ Board will closely oversee ~~the Venture~~RMFS's Food Business and ~~the Venture~~RMFS Board will act as needed to reduce expenses if ~~the Venture~~RMFS is not generating sufficient revenues to meet its expenses or if expenses exceed the applicable budget.

F. Definitive Agreement. RMFS and Simmons shall use reasonable efforts to agree upon and have prepared as quickly as possible, the Definitive Agreement

embodying the above terms and conditions and such other terms and conditions as the parties shall agree.

G. Prior Operations; Termination. This Memorandum will apply to RMFS food sales on or after May 1, 2009. Pre-May 1, 2009 operations under the prior structure will need to be reviewed and "cleaned up." ~~The Venture~~RMFS will remain in effect unless or until it is terminated (1) by mutual agreement by RMFS and Simmons; (2) by either party on at least [90] days prior written notice; (3) upon a change in control of either party (whether by sale of over 50% of the equity, by a merger or as a result of a sale of most or all of the party's operating assets).

Neither party may transfer or assign this Memorandum without the other party's prior written approval. This Memorandum will be interpreted, construed, and enforced in accordance with the laws of the State of Georgia without regard to its conflict of laws principles. This Memorandum constitutes the entire agreement of the parties with respect to the subject matter hereof.

This Memorandum of Understanding is executed by the parties as of _____, 2009.

RMFS

By: ___________________
Herschel Walker, CEO

Simmons

By: ___________________
David Jackson, President

CONFIDENTIAL

Simmons 000257

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 3

## Simmons Written Policies and Rules

1. **Employee Fair Treatment**

2. **Disciplinary Actions**

3. **Retaliation Policy**

4. **Equal Employment**

| Employee Fair Treatment | Section: | VII. Rules of Conduct |
|---|---|---|
| | Revision Date: | 01-01-15 |
| | Supersedes Policy Dates: | 01-01-08 |
| | Approved By: | |
| | Title | CEO |
| Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

**PURPOSE:**
To provide a way for each employee to have the fullest opportunity to bring concerns and issues to the attention of Simmons Leadership, with the assurance that each employee will receive a fair hearing and fair treatment.

Definition:

Unfair treatment: Any action that an employee feels is unjust, not fair, is a hindrance to effective operation of the Company or department, or creates a problem.

**POLICY:**
Job related issues are to be taken seriously. These issues, should be solved in a step by step method as described in the procedure below. The facility Human Resources Manager may participate at any stage of this procedure, either upon his/her own initiative or at the request of the employee. Written records should be kept of all meetings

**PROCEDURE:**
**Step 1.1 - Discussion Between Employee, Supervisor and Human Resources Representative**

An employee who feels that they have been treated unfairly in the workplace may request a meeting within five (5) days of the event, to include the employee, their Supervisor and the Human Resources Representative. Together they will work to identify the problem, discuss alternative solutions, and arrive at a mutually agreeable solution. Within two (2) working days of this meeting, the Supervisor will give a verbal response to the employee.

**Step 1.2 – Discussion between Employee, Facility Operations Manager and Human Resources Manager**

If the employee is not satisfied with the Supervisor's response from Step 1.1, they may request a meeting with the facility Operations Manager and facility Human Resources Manager. Together they will discuss the problem and review the decision that was made in Step 1.1. Within three (3) working days of this meeting, the Human Resources Manager will prepare a written response to the employee.

**Step 2 - Discussion Between Employee and the Regional Human Resources Manager**

If the employee is not satisfied with the response in Step 1.2, they may request a meeting with the Regional Human Resources Manager. Within two working days, the facility Human Resources Manager will assist the employee in preparing a written statement, which will be sent to the Regional Human Resources Manager.

Electronic version of policy is the only official version of this policy.

Case 7:18-cv-00160-LSC Document 66-3 Filed 02/04/19 Page 9 of 121

| Employee Fair Treatment | Section: | VII. Rules of Conduct |
|---|---|---|
| | Revision Date: | 01-01-15 |
| | Supersedes Policy Dates: | 01-01-08 |
| | Approved By: | |
| | Title | CEO |
| Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

The employee's statement should include statements of what the employee felt was unfair treatment and what the employee is asking for as a resolution to the problem.

**Step 3 - Discussion Between Employee and the Director of Human Resources**

If the employee is not satisfied with the decision of the Regional Human Resources Manager, they may request a meeting with the Director of Human Resources to discuss the problem and present their written statement. The Director of Human Resources will give a final response to the employee within three (3) working days

Case 7:18-cv-00160-LSC Document 66-3 Filed 02/04/19 Page 4 of 12

| Employee Fair Treatment | Section: | VII. Rules of Conduct |
|---|---|---|
| | Revision Date: | 01-01-15 |
| | Supersedes Policy Dates: | 01-01-08 |
| | Approved By: | |
| | Title | CEO |

**Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries**

Page 3 of 5
Simmons 000207

Electronic version of policy is the only official version of this policy.

| Disciplinary Actions | Section: | VII. Rules of Conduct |
|---|---|---|
| | Revision Date: | 01-01-15 |
| | Supersedes Policy Dates: | 01-01-08 |
| | Approved By: | |
| | Title | CEO |
| Applies to all employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

**PURPOSE:**

To establish a fair, consistent and equitable means of communicating unsatisfactory job performance, behavior, or violation of Company policy.

**Policy:**

Unsatisfactory job performance, behavior, or violation of Company policy can be addressed through a variety of disciplinary actions. These actions include: verbal warnings, written warnings, suspension, or termination of employment. The proper disciplinary action to use is dependent on the seriousness, cost, potential cost, safety factor, and the number of times of the infraction. The goal is to change unacceptable behavior or performance to positive results.

**Procedure:**

**Verbal Warning:** The employee will be given a reason for discipline and expectations for future performance. A record of the verbal warning will be maintained in the employee's personnel file.

**Written Warning:** The supervisor will give the employee a detailed explanation of the reason(s) for the warning and expectations for future performance. A signed copy will be given to the employee upon request and the original placed in the employee's personnel file.

**Final Written Warning (May Include Suspension):** Final Written Warnings are used for more serious infractions and may include suspension. . The counseling statement must include the reason, and length of suspension. A Human Resources Representative must be present and/or involved in all suspensions.

**Dismissal:** Prior to termination, Human Resources will review the situation and approve the decision to terminate.

The following examples could lead to immediate termination.

a. Insubordination or refusal to perform or attempt to perform a job.
b. Fighting on company property.
c. Unauthorized removal of company property or stealing.
d. Illegal drugs on company premises.
e. Weapons on premises.
f. Possession of alcohol or use of illegal drugs on the job, or being under the influence on company property.

Case 7:18-cv-00160-LSC Document 66-3 Filed 02/04/19 Page 8 of 12

| Disciplinary Actions | Section: | VII. Rules of Conduct |
|---|---|---|
| | Revision Date: | 01-01-15 |
| | Supersedes Policy Dates: | 01-01-08 |
| | Approved By: | |
| | Title | CEO |
| Applies to all employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

g. Excessive tardiness and/or absenteeism.
h. Walking off the job.
i. Three consecutive days no call-no show.
j. Willful destruction of company property.
k. Unauthorized removal of USDA (hold) tags.
l. Falsifying payroll, personnel, or company records, including employment application.
m. Releasing confidential information to unauthorized persons.
n. Disregard for known safety policies and safe behavior.
o. Sexual harassment or creating a hostile working environment.
p. Sleeping on the job.

| Harassment, Anti-Discrimination and Retaliation Policy | Section: | I. Administration |
|---|---|---|
| | Revision Date: | 11-3-16 |
| | Supersedes Policy Dates: | N/A |
| | Approved By: | |
| | Title | CEO |
| "This Policy applies to all employees of Simmons Foods, Inc., its Affiliates and Subsidiaries" | | |

**PURPOSE:**

Simmons is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including harassment.

Simmons has developed this policy to ensure that all its employees can work in an environment free from unlawful harassment, discrimination and retaliation. Simmons will make every reasonable effort to ensure that all employees are familiar with these policies and are aware that any complaint in violation of such policies will be investigated and resolved appropriately.

These policies should not, and may not, be used as a basis for excluding or separating individuals of a particular gender, or any other protected class, from participating in business or work-related social activities or discussions. In other words, no one should make the mistake of engaging in discrimination or exclusion to avoid allegations of harassment. The law and the policies of Simmons prohibit disparate treatment on the basis of sex or any other protected class, with regard to terms, conditions, and privileges of employment. The prohibitions against harassment, discrimination and retaliation are intended to complement and further those policies, not to form the basis of an exception to them.

**Equal Employment Opportunity**

It is the policy of Simmons to ensure equal employment opportunity without discrimination or harassment on the basis of race, color, religion, sex, sexual orientation, gender identity or expression, age, disability, marital status, citizenship, genetic information, or any other class protected by law. Simmons prohibits any such discrimination or harassment.

**Harassment**

Harassment is strictly prohibited. Under this policy, harassment is verbal, written or physical conduct that denigrates or shows hostility or aversion toward an individual and

- has the purpose or effect of creating an intimidating, hostile or offensive work environment,
- has the purpose or effect of unreasonably interfering with an individual's work performance.

Harassing conduct includes epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group that is placed on walls or elsewhere on the employer's premises or circulated in the workplace, on company time or using company equipment by e-mail, phone (including voice messages), text messages, social networking sites or other means.

| Harassment, Anti-Discrimination and Retaliation Policy | Section: | I. Administration |
|---|---|---|
| | Revision Date: | 11-3-16 |
| | Supersedes Policy Dates: | N/A |
| | Approved By: | |
| | Title | CEO |
| "This Policy applies to all employees of Simmons Foods, Inc., its Affiliates and Subsidiaries" | | |

**Reporting an Incident of Harassment, Discrimination or Retaliation**
Simmons encourages individuals who believe they are being subjected to such conduct to promptly advise the offender that his or her behavior is unwelcome and to request that the action cease. Often this action alone will resolve the problem. Simmons recognizes, however, that an individual may prefer to pursue the matter through complaint procedures.

Simmons encourages reporting of all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position. Any employee who has a complaint can notify their supervisor of the problem if they are comfortable doing so. However, the employee must report the complaint to either their Human Resources Manager, Regional Human Resources Manager and/or the Director of Human Resources regardless of whether they notify their direct supervisor or not. If the employee notifies a supervisor, the supervisor must report the incident to Human Resources immediately.

**Retaliation**
Confidentiality will be maintained throughout the investigatory process to the extent consistent with adequate investigation and appropriate corrective action. Simmons prohibits retaliation of any kind by any person, managerial or non-managerial, against any person who files a complaint of discrimination, including harassment, or who participates in an investigation relating to a complaint of discrimination, including harassment. Any person who is determined to have engaged in any retaliatory or harassing conduct will be subject to disciplinary action up to and including termination.

Any individual who believes that he or she has been subjected to retaliatory conduct should notify the facility's Human Resources Representative, Regional Human Resources Manager or Director of Human Resources.

| Equal Employment | Section: | I. Administration |
|---|---|---|
| | Revision Date: | 01-01-15 |
| | Supersedes Policy Dates: | |
| | Approved By: | |
| | Title | CEO |
| Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

**SIMMONS FOODS POLICY ON EQUAL EMPLOYMENT**

Simmons is an Equal Opportunity Employer. It is and shall be the Company's objective: to obtain qualified employees consistent with position requirements; to seek, employ, promote and treat all employees and applicants for employment without discrimination with regard to race, color, religion, sex, national origin, age, handicap or veteran's status.

All employment practices will insure that all individuals are recruited, employed, assigned, promoted, compensated and retained on the basis of their qualifications, and treated equally in these and all other respects.

Simmons recognizes that the effective application of a policy of merit employment involves more than just a policy statement and will therefore undertake a program of action to make known that equal employment opportunity is available on the basis of individual merit and to encourage people to seek employment with Simmons and to strive for advancement on this basis.

All members of management are responsible for the implementation of this policy.

All employees responsible for hiring new employees will take all necessary action to eliminate possible discrimination toward employees and applicants for employment with the Company and its subsidiaries.

Human Resources will be responsible for monitoring, the appropriate interpretation and implementation of this policy. Issues associated with discriminatory charges will also be handled by Human Resources.

| Affirmative Action and Equal Employment Opportunity Policy | Section: | I. Administrative |
|---|---|---|
| | Revision Date: | 09-01-16 |
| | Supersedes Policy Dates: | N/A |
| | Approved By: | |
| | Title | CEO |
| Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

Simmons Foods, Inc., and Affiliates (Simmons) will not discriminate against any employee or applicant for employment because of race, age, color, religion, sex, sexual orientation, gender identity, national origin, disability or protected veteran status. Simmons will take affirmative action to ensure that applicants are employed, and the employees are treated during employment, without regard to their race, age, color, religion, sex, sexual orientation, gender identity, national origin, disability or protected veteran status. Such action shall include, but not be limited to the following: employment, promotion, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training. Simmons agrees to post in conspicuous places, available to employees and applicants for employment, this Affirmative Action and EEO Policy.

Simmons will not discharge or in any other manner discriminate against employees or applicants because they have inquired about, discussed, or disclosed their own pay or the pay of another employee or applicant. However, employees who have access to the compensation information of other employees or applicants as a part of their essential job functions cannot disclose the pay of other employees or applicants to individuals who do not otherwise have access to compensation information, unless the disclosure is (a) in response to a formal complaint or charge, (b) in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or (c) consistent with the contractor's legal duty to furnish information.

Simmons will, in all solicitations or advancements for employees placed by or on behalf of Simmons, state that all qualified applicants will receive consideration for employment without regard to race, age, color, religion, sex, sexual orientation, gender identity, national origin, disability or protected veteran status.

Simmons shall base employment decisions on the principles of equal employment opportunity and with the intent to further Simmons' commitment to affirmative action and equal employment. At no time will any covered employee, or covered applicant for employment, who exercises his/her rights pursuant to Simmons Affirmative Action program be subject to discipline, or have his/her opportunities for employment adversely affected.

Employees and applicants are invited to identify their race and gender, as well as to identify as an individual with a disability, disabled veteran or protected veteran. This self-identification is strictly voluntary and confidential, and will not result in retaliation of any sort.

Case 7:18-cv-00160-LSC Document 68-3 Filed 02/04/19 Page 11 of 12

| Affirmative Action and Equal Employment Opportunity Policy | Section: | I. Administrative |
|---|---|---|
| | Revision Date: | 09-01-16 |
| | Supersedes Policy Dates: | N/A |
| | Approved By: | |
| | Title | CEO |
| **Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries** | | |

Simmons Foods, Inc. y Affiliates (Simmons) no discriminarán a ningún empleado o solicitante por empleo debido a raza, edad, color, religión, sexo, orientación sexual, identidad de género, origen nacional, discapacidad o estado veterano protegido. Simmons tomará medidas afirmativas para asegurar que los solicitantes estén empleados, y los empleados sean tratados durante el empleo, independientemente de su raza, edad, color, religión, sexo, orientación sexual, identidad de género, origen nacional, discapacidad o estado veterano protegido. Dicha acción incluirá, pero no se limitará a lo siguiente: empleo, promoción, degradación o transferencia; Publicidad de reclutamiento o reclutamiento; Despido o terminación; Tasas de remuneración u otras formas de compensación; y selección para el entrenamiento. Simmons se compromete a publicar en lugares llamativos, a disposición de los empleados y solicitantes de empleo, esta Acción Afirmativa y la Política de EEO.

Simmons no descartará o de ni de ninguna otra manera discriminará a los empleados o solicitantes porque han preguntado acerca de, discutido o revelado su propio salario o el salario de otro empleado o solicitante. Sin embargo, los empleados que tienen acceso a la información de compensación de otros empleados o solicitantes como parte de sus funciones esenciales de trabajo, no pueden revelar el salario de otros empleados o solicitantes a individuos que no tienen acceso a información de compensación, ) En respuesta a una queja o cargo formal, (b) en el desarrollo de una investigación, procedimiento, audiencia o acción, incluyendo una investigación realizada por el empleador, o (c) consistente con la obligación legal del contratista de proporcionar información.

Simmons, en todas las solicitudes o avances para los empleados colocados por o en nombre de Simmons, declarará que todos los solicitantes calificados recibirán consideración por el empleo sin consideración de raza, edad, color, religión, sexo, orientación sexual, identidad de género, discapacidad o estatus de veterano protegido.

Simmons basará las decisiones de empleo en los principios de la igualdad de oportunidades de empleo y con la intención de fomentar el compromiso de Simmons con la acción afirmativa y la igualdad de empleo. En ningún momento un empleado cubierto, o un solicitante cubierto de empleo, que ejerza sus derechos conforme al programa de Acción Afirmativa de Simmons, estarán sujeto a disciplina o tendrá sus oportunidades de empleo perjudicadas.

Los empleados y los solicitantes están invitados a identificar su raza y género, así como a identificar como un individuo con una discapacidad, un veterano discapacitado o un veterano protegido. Este auto identificación es estrictamente voluntaria y confidencial, y no dará lugar a represalias de ningún tipo.

Case 7:18-cv-00160-LSC Document 66-3 Filed 02/04/19 Page 12 of 12

| Affirmative Action and Equal Employment Opportunity Policy | Section: | I. Administrative |
|---|---|---|
| | Revision Date: | 09-01-16 |
| | Supersedes Policy Dates: | N/A |
| | Approved By: | |
| | Title | CEO |
| Applies to all U.S.-based employees of Simmons Foods, Inc., its Affiliates and Subsidiaries | | |

Electronic version of policy is the only official version of this policy.


FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 4

## October 24, 2017 Internal Simmons Conference Call to Discuss Ren Man Concerns

David Jackson <david.jackson@simfoods.com>

---

**Invitation: Call In to Discuss Ren Man Concerns @ Tue Oct 24, 2017 8:30am - 9am (david.jackson@simfoods.com)**
1 message

---

**Chip Miller** <chip.miller@simfoods.com> Mon, Oct 23, 2017 at 5:00 PM
Reply-To: Chip Miller <chip.miller@simfoods.com>
To: david.jackson@simfoods.com, david.rose@simfoods.com, john.staples@simfoods.com, matt.free@simfoods.com

**Call In to Discuss Ren Man Concerns** more details »

When Tue Oct 24, 2017 8:30am – 9am Central Time

Where Call in using 1-866-590-3642 *5214965* (map)

Video call https://plus.google.com/hangouts/_/simfoods.com/call-in-to

Calendar david.jackson@simfoods.com

Who
- chip.miller@simfoods.com - organizer
- david.rose@simfoods.com
- john.staples@simfoods.com
- david.jackson@simfoods.com
- matt.free@simfoods.com

Going? Yes - Maybe - No more options »

Invitation from Google Calendar

You are receiving this email at the account david.jackson@simfoods.com because you are subscribed for invitations on calendar david.jackson@simfoods.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More.

---

invite.ics
3K



Case 7:18-cv-00160-LSC Document 66-5 Filed 02/04/19 Page 1 of 2

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Exhibit 5**

**October 25, 2017 RMFS Board Meeting Request**



Case 7:18-cv-00160-LSC Document 66-5 Filed 02/04/19 Page 2 of 2

David Jackson <david.jackson@simfoods.com>

## RMFS Board Meeting

12 messages

**David Jackson** <david.jackson@simfoods.com> Wed, Oct 25, 2017 at 12:09 PM
To: Herschel Walker <c93099@aol.com>, Ron Eisenman <EisenmanR@gtlaw.com>
Cc: Andrew McEachern <andrew.mceachern@simfoods.com>

Herschel and Ron,

I have been back in poultry for about 12 months now and it seems it is time for Simmons and RMFS to have a discussion about the current state of business and how we plan to proceed from here. It in the 5 years I was out of poultry, RMFS has become a successful business. This was due to great work on the part of many people within RMFS and those who support them.

There are concerning comments, though, I am hearing second hand about the desire to continue our arrangement (or if there truly is an arrangement). In addition, there are invoices being submitted for other entities (HW Foods) expenses to RMFS to pay for items RMFS does not support. These are both very concerning to hear and raise questions about how the business is being operated.

From my perspective, Simmons and Herschel entered into an agreement (which was signed by me but not by Herschel) and Simmons has acted in accordance to that agreement for several years. That agreement states that both Herschel and Simmons are equity partners in RMFS. For 2018 and after, I would like absolute clarity on the agreement of behaviors (for both parties) so Simmons can continue to build and execute our business plans for producing and selling chicken in the food service, distributive, and retail segments.

I am certain both parties have adjustments they would like to see in an updated agreement. Please let me know if you would like to propose adjustments to the agreement or you would like for us to do so. Ron, please forward me the foundation agreement you would like us to begin with (assuming you would like an agreement) so we are starting with the same document.

I am available 11/8. 11/13, 11/20, 11/28, and 12/5 if any of those dates are available for you.

I have copied Andrew McEachern on this e-mail. Andrew manages the Simmons in-house legal team who will be assisting in the contract review.

Sincerely,
--
**David Jackson**
President/COO Simmons Prepared Foods, Inc.

E david.jackson@simfoods.com | O 479.215.2299 | C 479.427.0620
Simmons Foods | 601 North Hico Street | Siloam Springs, AR 72761 | simmonsfoods.com

Please consider the environment before printing. This transmission, including its attachments, may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, any disclosure, copying, distribution, or use of the information contained herein, including any reliance thereon, is strictly prohibited. If you received this transmission in error, immediately notify the sender and destroy the material in its entirety whether in electronic or hard copy format.

Thank you.

**David Jackson** <david.jackson@simfoods.com> Wed, Oct 25, 2017 at 12:10 PM
To: Chip Miller <chip.miller@simfoods.com>

FYI
[Quoted text hidden]

EXHIBIT 18

Case 7:18-cv-00160-LSC Document 66-6 Filed 02/04/19 Page 1 of 2

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 6

## October 26, 2017 Walker response to Jackson October 25, 2017 RMFS Board Meeting request

Case 7:18-cv-00160-LSC Document 66-6 Filed 02/04/19 Page 2 of 2

**Herschel Walker** <c93099@aol.com> Thu, Oct 26, 2017 at 9:59 AM
To: david.jackson@simfoods.com, EisenmanR@gtlaw.com
Cc: andrew.mceachern@simfoods.com, julie@hwalkerenterprises.com

Hello David~

Thanks for your letter. I had tried to call you a couple of times to keep you informed of what has been going on but did not get a call back. Todd did reach out to me and shared what has been going on with him personally so I am sending prayers out to he and his family during this difficult time.

I am taking even more active role to grow RMFS (even more than before). I very much agree the Simmons/RMFS arrangement has been successful and hope it to be bigger. Through the many years, I have never put my business travel expenses on the books and have paid 100% which was to Simmons benefit. H. Walker Foods is a brand of RMFS that Simmons does invoice. H Walker Foods was created because of Marriott and US Foods as Sysco was tied in so tight with Renaissance Man through the CatMan.

I have started trying to build a stronger relationship with US Foods similar to the one we have with Sysco. Along with the Chicken, we are now selling Waffles to US Foods. The first couple of Waffles produced went to restaurants in Alabama and were invoiced through Simmons. In preparation for the US Foods entry, we created retail package film, Display Bins etc because things were happening so fast and those are the invoices I was asking to be paid. We finally got to the right people at US Foods and have a very large meeting in November to kick off our new relationship

I would love to go into 2018 with Simmons feeling comfortable with what I am trying to do with RMFS. I am being told no on many things or gotten different answers and I thought I was the CEO of RMFS. My only goal is to grow and build RMFS to an even bigger company and I think it can be done with Simmons help and support.

RMFS and Simmons getting together is a wonderful idea to have both sides comfortable and on the same page for a WIN-WIN for both parties. I will be back in touch with dates ASAP

Thanks, Herschel

**Herschel Walker**
President/CEO
Renaissance Man Food Services
22 East Montgomery Crossroads
Savannah, GA 31406

-----Original Message-----
From: David Jackson <david.jackson@simfoods.com>
To: Herschel Walker <c93099@aol.com>; Ron Eisenman <EisenmanR@gtlaw.com>
Cc: Andrew McEachern <andrew.mceachern@simfoods.com>
[Quoted text hidden]

---

**David Jackson** <david.jackson@simfoods.com> Thu, Oct 26, 2017 at 10:01 AM
To: Chip Miller <chip.miller@simfoods.com>

FYI

---------- Forwarded message ----------
From: Herschel Walker <c93099@aol.com>
Date: Thu, Oct 26, 2017 at 9:59 AM
Subject: RMFS Board Meeting
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Herschel Walker** <c93099@aol.com> Wed, Nov 1, 2017 at 10:33 AM
To: c93099@aol.com, david.jackson@simfoods.com, EisenmanR@gtlaw.com
Cc: andrew.mceachern@simfoods.com, julie@hwalkerenterprises.com

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 7

## Blanchard October 31, 2017 email to Carol Walker

## Peachtree Packaging Explanation to Simmons

**From:** JULIE BLANCHARD julia88@mac.com
**Subject:** Peachtree Packaging PO error
**Date:** October 31, 2017 at 6:44 AM
**To:** Carol Walker cj@renmanfoods.com

Hello Carol~

Here are some details for Carmen to clarify any confusion caused by the error made in the PO to Peachtree Packaging for the Famous34 Waffle Display Bins.

RMFS has been selling Food Service Waffles- Bulk & Pre Sliced. In addition, we have now launched a Famous 34 retail waffle that will be distributed through US Foods and hopefully Sysco by year end. These will be marketed under the *H.Walker Foods* Brand like the Simmons Chicken products, the Whole Hog Sausage from Swaggerty and the Poultry Items done by Tip Top Poultry all which Simmons invoice.

The Famous 34 Waffle (item#RM21041) is on the last page on the attached set of H Walker POS Sheets. Our first big sale with the F34 Waffles will be through US Foods which is now distributing to C-Stores as well as various "Grab-n-Go" concepts one being at the University of Georgia. The Famous 34 Bins we ordered from Peachtree Packaging are POS Floor Displays to hold the Waffles and generate increased sales at these C-Store accounts.

In order to meet production deadlines, I personally expedited and created the PO to Peachtree Packaging and made the mistake of using the "H Walker Foods" Brand name when in fact it should have been issued from RMFS.

We can either reissue the PO from REN MAN or Herschel can pay Peachtree Packaging direct and submit the invoice for reimbursement. We want to get this invoice paid as it is now past due.

Please let me know if you have any questions. Sorry for the confusion caused!!

Thanks, Julie

RenMan_US Foods.pdf

Julie Blanchard
**H. Walker Enterprises**
2210 King Fisher Drive
Westlake, TX 76262
P - 404.375.6286
F - 817.337.9090
Julia88@mac.com

Case 7:18-cv-00160-LSC Document 66-8 Filed 02/04/19 Page 1 of 2

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 8

## Walker request that Mr. Staples be denied access to Profit and Loss Statement Information

Hi David,

I wanted to check on the following dates and see if they work for you guys:

12/11, 12/12 or 12/13

Also,I wanted to see if you could change the RMFS/Simmons report John has access .....to viewing only the margins with pounds sold and not the actual P&L??

I also wanted you to make you aware we are hiring a few more people to give us a lmore face time with customers because we have closed a big deal with US Foods. At this point, they will be part time independent contractors until we evaluate the needs of the US Foods business.

Thanks, Herschel

**Herschel Walker**
President/CEO
Renaissance Man Food Services
22 East Montgomery Crossroads
Savannah, GA 31406

[Quoted text hidden]

---

**David Jackson** <david.jackson@simfoods.com> — Wed, Nov 1, 2017 at 11:13 AM
To: Herschel Walker <c93099@aol.com>
Cc: Ron Eisenman <EisenmanR@gtlaw.com>, Andrew McEachern <andrew.mceachern@simfoods.com>, julie@hwalkerenterprises.com

Herschel,

12/12 works best for me. Would you prefer Atlanta, Dallas, or Siloam Springs?

As for John, I understand there are differences of opinion of how the business will operate. My experience has shown me that removing information from or isolating a leader instead of resolving the differences will cause more damage to the organization. We can do as you wish, but, I believe it will drive John to be less productive for RMFS.

Please let me know if you believe we (Simmons Foods and HW Foods) are still operating under the contract we negotiated when Simmons originally started doing business with RMFS. If so, please send us a copy of the contract. Our time will be more productive if we have a framework to begin our discussions.

Please let me know what you want to do with John's access.

Thank you.
[Quoted text hidden]

---

**Chip Miller** <chip.miller@simfoods.com> — Wed, Nov 15, 2017 at 5:48 AM
To: David Jackson <david.jackson@simfoods.com>

Matt Free mentioned you have an upcoming meeting with Herschel? Are you going to need anything for the meeting?
[Quoted text hidden]
--

---

**Chip Miller**
SVP US and Int'l Poultry Sales

E chip.miller@simfoods.com | O 479.215.2356 | C 479.427.0279
Simmons Prepared Foods | 601 North Hico St | Siloam Springs, AR, 72761 | simmonsfoods.com

FILED
2019 Feb-04 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Exhibit 9**

**Walker November 14, 2017 inquiry to Mr. Staples concerning what Mr. Staples discussed with Chip Miller regarding Waffles being Retail or Food Service**

Case 7:18-cv-00160-LSC Document 66-9 Filed 02/04/19 Page 2 of 2

From: John Staples john.staples@simfoods.com
Subject: Re: Meeting Monday in Atlanta
Date: November 14, 2017 at 10:50 AM
To: Herschel Walker c93099@aol.com
Cc: EisenmanR@gtlaw.com, Julie Blanchard julia88@mac.com, Kym Staples kyms@dsmsalesmarketing.com

Yes, you will be a part of the discussions. I merely asked Chris to keep 12/12 & 12/13 "open" on his calendar in the event that we can meet with him and his team. I have not spoken to Chip about the waffles but can do so if that is what you want me to do - to be clear, we will sell all waffles(retail & foodservice) through RMFS(Simmons) unless there are unusual circumstances(like Jet Foods)?

The meeting is tomorrow from 1-3 at SYSCO Corporate. I will look for meeting invite from Jeff and forward it to you, if I still have it.

Thanks.

On Tue, Nov 14, 2017 at 10:30 AM, Herschel Walker <c93099@aol.com> wrote:

That is great John, not putting up a road block here but I need to be apart of those talks before they we get too far along. I also wanted to ask if you spoke with Chip about the Waffle being in retail or foodservice? I wanted to also check , the meeting with Sysco is tomorrom at 1 cause I never received an email regarding this meeting?

**Herschel Walker**
President/CEO
Renaissance Man Food Services
22 East Montgomery Crossroads
Savannah, GA 31406

-----Original Message-----
From: John Staples <john.staples@simfoods.com>
To: Herschel Walker <c93099@aol.com>
Cc: EisenmanR <EisenmanR@GTLAW.com>; julia88 <julia88@mac.com>; kyms <kyms@dsmsalesmarketing.com>
Sent: Tue, Nov 14, 2017 8:13 am
Subject: Re: Meeting Monday in Atlanta

Good morning.

Thanks again to everyone for taking the time to meet yesterday. Kym & I are excited about the future possibilities! I've already been in contact with Radian/Magnify(Chris Drazak) and he is working on a "shared services" proposal for DSM. As we discussed, the primary purpose of obtaining additional services is to assist RMFS with; 1. additional CATMAN slots at OC level, 2. additional distributor partnerships with USFS, UNIPRO & PFG, & 3. additional operator relationships to support "pull-through" strategy.