FILED
2019 Mar-04  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A-2

1       IN THE UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF ALABAMA

3           WESTERN DIVISION

4

5

6  CIVIL ACTION NUMBER:  7:18-CV-00160-LSC

7

8  KIMBERLY and JOHN STAPLES,

9        Plaintiffs,

10  vs.

11  H. WALKER ENTERPRISES, LLC; RENAISSANCE MAN

12  FOOD SERVICES, LLC; and SIMMONS,

13        Defendants.

14

15

16       DEPOSITION TESTIMONY OF

17        KIMBERLY STAPLES

18

19  NOVEMBER 13, 2018

20  1:50 p.m.

21   Job No. 28915

22  COURT REPORTER:

23  MELANIE L. PETIX, CCR

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kimberly Staples November 13, 2018

Job 28915
Pages 2..5

Page 2

```
1          S T I P U L A T I O N S
2          It is hereby stipulated and
3    agreed, by and between the parties through
4    their counsel, that the deposition of
5    KIMBERLY STAPLES may be taken before Melanie
6    L. Petix, Certified Court Reporter and
7    Notary Public for the State of Alabama at
8    Large, at the offices of Veritext, 2205 4th
9    Street, Tuscaloosa, Alabama on November 13,
10   2018, commencing at 1:50 p.m.
11         It is further stipulated and
12   agreed that the signature to and the reading
13   of the deposition by the witness are waived,
14   the deposition to have the same force and
15   effect as if full compliance had been had
16   with all laws and rules of Court relating to
17   the taking of depositions.
18         It is further stipulated and
19   agreed that it shall not be necessary for
20   any objections to be made by counsel as to
21   any questions except as to form or leading
22   questions, and that counsel for the parties
23   may make objections and assign grounds at
```

Page 3

```
1    the time of trial, or at the time said
2    deposition is offered in evidence, or prior
3    thereto.
4          In accordance with Rule 5(d) of
5    the Alabama Rules of Civil Procedure, as
6    amended, effective May 15, 1988, I, Melanie
7    L. Petix, Certified Court Reporter, am
8    hereby delivering to Michael J. King, the
9    original transcript of the oral testimony
10   taken on November 13, 2018, along with
11   exhibits.
12         Please be advised that this is the
13   same and not retained by the Court Reporter,
14   nor filed with the Court.
15              --oOo--
16
17
18
19
20
21
22
23
```

Page 4

```
1          A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        KERI D. SIMMS, Esq.
5        WEBSTER HENRY
6        2 Perimeter Park South,Suite 445 East
7        Birmingham, Alabama  35243
8
9    FOR THE DEFENDANT:
10       MICHAEL J. KING, Esq.
11       GREENBERG TRAURIG, LLP
12       3333 Piedmont Road, NE, Suite 2500
13       Atlanta, Georgia  30305
14
15       TALLEY R. PARKER, Esq.
16       JACKSON LEWIS, P.C.
17       500 North Akard, Suite 2500
18       Dallas, Texas 75201
19
20   ALSO PRESENT:  John Staples
21                  Julie Blanchard
22                  Herschel Walker
23
```

Page 5

```
1              I N D E X
2    EXAMINATION BY:           PAGE NUMBER:
3    Mr. King                      6
4    Mr. Parker                   53
5    Mr. Simms                    66
6
7
8
9            E X H I B I T S
10   DEFENDANT'S EXHIBIT NO:      PAGE NUMBER:
11   Exhibit 63 - Transcript            26
12   Exhibit 64 - Email                 45
13   Exhibit 65 - Email                 47
14
15
16
17
18
19
20
21
22
23
```

App. 066

Page 6

1      I, Melanie L. Petix, a Certified
2 Court Reporter and Notary Public for the
3 State of Alabama at Large, acting as
4 Commissioner, certify that on this date,
5 pursuant to the Alabama Rules of Civil
6 Procedure, and the foregoing stipulations of
7 counsel, there came before me at the offices
8 of Veritext, 2205 4th Street, Tuscaloosa,
9 Alabama on November 13, 2018, commencing at
10 or about 1:50 p.m., KIMBERLY STAPLES,
11 witness in the above cause, for oral
12 examination, whereupon, the following
13 proceedings were had:
14
15
16          KIMBERLY STAPLES,
17 having been first duly sworn (affirmed), was
18 examined and testified as follows:
19
20 EXAMINATION BY MR. KING:
21    Q.   Please state your full name and
22 address for the record.
23    **A.   Kimberly Faye Staples, 5712 Rice**

Page 7

1 **Mine Road, Northeast, Tuscaloosa, Alabama**
2 **35406.**
3    Q.   Were you formally employed by
4 Diversified Foods Solutions?
5    **A.   Yes.**
6    Q.   In what capacity?
7    **A.   I don't know that I remember a job**
8 **title.**
9    Q.   What did you do?
10    **A.   We sought out the operating**
11 **companies and looked for the center of the**
12 **plate person so that we could start**
13 **contacts.**
14    Q.   What did you do for them?  What
15 did you do for Diversified Food Solutions?
16    **A.   That's what I did.**
17    Q.   Okay.  You used the word we.
18    **A.   Okay.  I called operating**
19 **companies to seek out the center of the**
20 **plate contact.**
21    Q.   Anything else?
22    **A.   General office deals.  I helped**
23 **with Wal-Mart meetings.**

Page 8

1    Q.   Anything else?
2    **A.   I haven't thought back that far,**
3 **but that's pretty much what I did.**
4    Q.   And then you were employed by
5 Diversified Sales & Marketing?
6    **A.   Yes.**
7    Q.   That was until September 30, 2016?
8    **A.   Yes.**
9    Q.   And what did you do for
10 Diversified Sales & Marketing?
11    **A.   Office manager, more of the same,**
12 **paid some of the bills, managed the people**
13 **in the office.**
14    Q.   Where was the office?
15    **A.   In Bentonville.**
16    Q.   Did you have contact with the
17 people at Renaissance Man Food Services
18 which we call Ren Man?
19    **A.   Yes.**
20    Q.   What was the typical type of
21 contact you would have with Ren Man other
22 than being married to its general manager?
23    **A.   We worked side by side with Ren**

Page 9

1 **Man.  It was almost as if we were all one**
2 **company working toward the CATMAN award and**
3 **growing the business.**
4    Q.   And what was your role in
5 communications with Ren Man?
6    **A.   I had a region, and then I had a**
7 **person over me, which it started out as**
8 **Charlie Weaver and moved to Clinton Sledge.**
9 **And we worked closely with our regions to**
10 **grow the business and make sure they were**
11 **buying the products within the CATMAN.**
12    Q.   I forgot to ask you about
13 Diversified Food Solutions, so go back to
14 the first entity we talked about.  Did you
15 have an ownership interest in that company?
16    **A.   Small.**
17    Q.   How small?
18    **A.   I think it was 20 percent, maybe.**
19 **I don't remember.**
20    Q.   Did you pay for that interest?
21    **A.   No.**
22    Q.   What was the consideration for
23 your receiving that interest?

Page 10

1    A.  I don't know that there was one if
2  you're speaking monetary.  Is that what
3  you're asking me?
4    Q.  Well, monetary or nonmonetary, why
5  were you given a percentage interest in the
6  enterprise?
7    A.  Because it was hopefully going to
8  be something we would build.
9    Q.  Were you one of the founders of
10  that company?
11    A.  I would say yes.
12    Q.  Did your interest in that company
13  arise because in part your husband was the
14  general manager of Ren Man?
15    A.  More than likely, yes.
16    Q.  Now, with respect to Diversified
17  Sales & Marketing, you were a founder in
18  that enterprise, correct?
19    A.  Yes.
20    Q.  Did you have an ownership interest
21  in that enterprise?
22    A.  Yes.
23    Q.  And what was your ownership

Page 11

1  interest?
2    A.  It developed into 60 percent.
3    Q.  How were you introduced to Randy
4  Sanders for the purpose of creating
5  Diversified Sales & Marketing?
6    A.  I had met Randy on different
7  occasions, but he was brought in as a
8  prospective leader to help us run DSM.
9    Q.  If he was going to be the leader,
10  why was his -- his interest 40 percent and
11  yours was 60 percent?
12    A.  Well, because he was coming in
13  after we had already established the DSM.
14    Q.  The rest of the people at DSM were
15  not participants in the second Diversified,
16  correct?
17    A.  Who's the rest?
18    Q.  There were five owners, as I
19  understand it, of the original Diversified
20  Food Solutions.  The only person to stay for
21  the second DSM was you, right?
22    A.  Correct.
23    Q.  So the rest were gone?

Page 12

1    A.  Correct.
2    Q.  Who found Randy Sanders in order
3  for him to be introduced to you as a
4  potential owner of this enterprise?
5    A.  I would have to say John.
6    Q.  Your husband?
7    A.  Yes.
8    Q.  You didn't go out and recruit
9  Randy --
10    A.  No.
11    Q.  -- Sanders.  Same issue, if you'll
12  wait until I finish asking questions before
13  you answer, okay?  It's just for her sake.
14    A.  (Nods head.)
15    Q.  Then when you created DSM Sales &
16  Marketing, LLC effective October 1, 2016, at
17  that point, you're a partner was Julie
18  Blanchard, right?
19    A.  Yes.
20    Q.  Who brought her to the table?
21    A.  My recollection is John and
22  Herschel.
23    Q.  And that was a 50-50 arrangement,

Page 13

1  right?
2    A.  The second offer was 50-50, yes.
3    Q.  What was the first offer?
4    A.  Ron offered her 70 and me 50 -- I
5  mean me 30.
6    Q.  And who pushed back?
7    A.  We did.
8    Q.  Both of you?
9    A.  Yes.
10    Q.  Both John and you?
11    A.  Yes.
12    Q.  And that ended up being
13  acceptable?
14    A.  Yes.
15    Q.  And DSM served as Ren Man's broker
16  until it received a termination on December
17  30, 2017; is that right?
18    A.  Yes.
19    Q.  And subsequently, you launched the
20  current litigation along with your husband?
21    A.  Yes.
22    Q.  So I'm going --
23       MR. KING:  Keri, can we use

Page 14

1 yesterday's exhibits and just keep running?
2          MR. SIMMS:  That's fine with me.
3     Q.  (BY MR. KING:)  I'm going to hand
4 you what's been marked previously as Exhibit
5 1, which is the third consolidated amended
6 complaint.
7          Now, the first thing I'd like to
8 point you to is the third page.  Paragraph
9 3, there's just a reference to West Alabama
10 Bank.  West Alabama Bank was DSM's bank; is
11 that correct?
12     **A.  Yes.**
13     Q.  And you were responsible for the
14 accounting function for DSM, right?
15     **A.  Yes.**
16     Q.  You've heard your husband say both
17 today and yesterday he was concerned that
18 Julie Blanchard was going to drain DSM's
19 accounts in December of 2017, such that it
20 could not meet payroll.  Have you heard that
21 testimony?
22     **A.  He said she was -- he was**
23 **concerned she would drain it and we would**

Page 15

1 not be able to make payroll, correct.
2     Q.  Did Julie Blanchard have any
3 authority to drain the accounts of DSM that
4 were deposited at the West Alabama Bank?
5     **A.  In the agreement, she was to**
6 **receive $125,000 of profit at year-end.**
7     Q.  That's not my question.  Did
8 Julie --
9     **A.  She had the authority to give --**
10     Q.  Please don't interrupt.
11          MR. SIMMS:  You're going to have
12 to wait until he asks another question.
13          **THE WITNESS:  I thought that was.**
14 **I'm sorry.**
15          MR. SIMMS:  For your own
16 benefit -- it's all going to be okay.  He
17 may ask you a whole different question that
18 second time around, so you need to listen.
19 Get a question, you've got a blank mind like
20 a baby, a newborn baby, formulate a response
21 to that question, then you've got blank
22 slate again and you get another question,
23 okay?

Page 16

1          **THE WITNESS:  Okay.**
2     Q.  (BY MR. KING:)  Did Julie
3 Blanchard have any authority to drain the
4 accounts at West Alabama Bank in December of
5 2017?
6     **A.  No.**
7     Q.  Why is that?
8     **A.  Her name wasn't on the account.**
9     Q.  And at that time, there was
10 sufficient -- towards the end of December,
11 2017, there were sufficient funds to pay
12 payroll, wasn't there?
13     **A.  Yes.**
14     Q.  Where were you on December 27,
15 2017?
16     **A.  In Arkansas.**
17     Q.  When your husband finished his
18 meeting with Herschel Walker and Ron
19 Eisenmann on that day, did he call you?
20     **A.  Yes.**
21     Q.  Did he tell you that he had been
22 offered a package that included an
23 opportunity to continue to work with Ren Man

Page 17

1 as a consultant?
2     **A.  Yes.**
3     Q.  Did he tell you that part of that
4 package included the surrender of your
5 ownership interest in DSM?
6     **A.  Yes.**
7     Q.  And what was your reaction to
8 that?
9     **A.  Absolutely not.**
10     Q.  Did you inform him of that over
11 the telephone?
12     **A.  Absolutely.**
13     Q.  What made you adamant that you
14 would not surrender your interest?
15     **A.  Because we built that company and**
16 **gifted her the 50 percent and that there was**
17 **nothing in the clauses of DSM that kept us**
18 **from moving beyond Renaissance Man.**
19     Q.  If you continued to operate the
20 company outside of Ren Man, you knew that
21 Julie would continue to be a 50 percent
22 owner in your activities, right?
23     **A.  I knew that was a possibility.**

Page 18

1    Q.  And did you also understand that
2  you and she would have to agree as members
3  of the LLC to future business?
4      **A.  Yes.**
5      Q.  If you didn't agree, then you
6  would be deadlocked with respect to new
7  business, right?
8      **A.  Yes.**
9      Q.  And that is, in fact, what has
10  happened?
11     **A.  Yes.**
12     Q.  Did you know -- did Mr. Staples
13  explain to you during the phone conversation
14  that the initial offer that you had been
15  proposed to him was $200,000 as a consulting
16  fee?
17     **A.  Yes.**
18     Q.  Did he tell you that he got the
19  amount increased to $255,000 based upon his
20  agreement that you would surrender your
21  interest in DSM?
22     **A.  No.**
23     Q.  Did he tell you over the course of

Page 19

1  that conversation that went from 200,000 up
2  to $255,000, that he said that would put --
3  that would settle the whole thing, that he
4  was, quote, all in?  Did he tell you that?
5      **A.  No.**
6      Q.  Now, previous to December 27th,
7  you had a meeting with Herschel Walker and
8  with Julie Blanchard and with your husband
9  on November 13, 2017.  Do you remember that?
10     **A.  I don't remember the date, but
11  yes, there was a meeting.**
12     Q.  It was called the clear-the-air
13  meeting, right?
14     **A.  Correct.**
15     Q.  Okay.  So that's the meeting I'm
16  referring to.
17     **A.  Okay.**
18     Q.  During the course of that meeting,
19  did Mr. Walker express that he was that
20  dissatisfied with DSM's business
21  development?
22     **A.  I don't remember there being
23  conversation about business dissatisfaction,**

Page 20

1  **no.**
2      Q.  Did you have any sense from that
3  conversation that Mr. Walker thought that
4  the employees of DSM were being overpaid for
5  what they were doing?
6      **A.  No.**
7      Q.  In the course of that
8  conversation, did your husband say that DSM
9  was of no interest to you?
10     **A.  No.**
11     Q.  In the course of that
12  conversation, did he say that your salary
13  was just actually extra income for John
14  Staples?
15     **A.  No.**
16     Q.  After the December 27 meeting that
17  John Staples had, did he tell you that he
18  said that you had no interest in continuing
19  in a position with DSM?  Did he tell you
20  that?
21     **A.  I'm sorry.  Say that again.**
22     Q.  All right.  Now I'm to the
23  December 27 meeting.  He's calling you after

Page 21

1  that meeting.
2      **A.  Okay.**
3      Q.  Did he tell you at that time that
4  he had said in the meeting that DSM was of
5  no further interest to you?
6      **A.  He did not say that to me.**
7      Q.  Did he tell you that he believed
8  and had said at that meeting that your
9  income from DSM was actually just additional
10  income for him?
11     **A.  No.**
12     Q.  He didn't tell you that?
13     **A.  No.**
14     Q.  Did he tell you that he had said
15  in that meeting that the DSM thing is a
16  cancer, that he agreed with that statement?
17     **A.  No.**
18     Q.  Has he ever told you that he
19  agreed with the thought that the DSM thing
20  is a cancer?
21     **A.  No.**
22     Q.  And has he ever told you that he
23  thought that the money you received from DSM

Page 22

1  was just part of his salary?
2     A.   No.
3     Q.   Did he tell you that in that
4  meeting, he said that you never wanted the
5  role that you were playing at DSM?
6     A.   Did he tell me he said that in the
7  meeting?
8     Q.   Yes.
9     A.   No.
10    Q.   Has he ever told you that he
11 didn't think that you wanted the role with
12 DSM?
13    A.   No.
14    Q.   Did he tell you that in the
15 meeting, he said that what you did for DSM
16 was not an $85,000 a year role?
17    A.   No.
18    Q.   Has he ever said to you that he
19 thought that your salary of $85,000 was
20 above what you should be paid for your role?
21    A.   No.
22    Q.   He just alluded in his closing
23 statement to the fact that you didn't show

Page 23

1  him DSM's books, right?
2     A.   Correct.
3     Q.   Has he expressed to you that he
4  was aggravated by the fact that you wouldn't
5  show the books?
6     A.   He's asked me why.
7     Q.   Has he ever said that he was
8  aggravated by the fact that you wouldn't
9  show him the books?
10    A.   No.
11    Q.   Did he tell you that at the
12 December 27 meeting he had said that he
13 understood why Julie Blanchard could be
14 aggravated with you about the books because
15 he was aggravated that you wouldn't show the
16 books to him?
17    A.   No.
18    Q.   Did he tell you that at the
19 meeting he discussed what the commission
20 should be for the new broker that was going
21 to take over for DSM with respect to Ren
22 Man?
23    A.   No.

Page 24

1     Q.   Did he tell you that at the
2  meeting, he suggested that Blare Staples,
3  Christopher Thurber, and Barbara would be
4  the only persons who should be transferred
5  from DSM to the new broker?
6     A.   No.
7     Q.   Did he tell you then or afterwards
8  that he did not see you in a role -- playing
9  a role with the new broker that would serve
10 Ren Man?
11    A.   No.
12    Q.   Did he tell you that he talked at
13 the meeting about the new broker not being
14 DSM?
15    A.   No.
16    Q.   Between December 27 and December
17 30 of 2017, did he tell you that he did not
18 think -- or that he thought that DSM's
19 broker agreement with Ren Man was going to
20 be terminated?
21    A.   Did he tell -- just say that
22 again.
23    Q.   Sure, I'll do it again.  Did he

Page 25

1  tell you between December 27 and December 30
2  of 2017 that he thought DSM's broker
3  agreement with Ren Man would be terminated?
4     A.   He did in the fact that if he
5  signed the agreement that they sent him.
6     Q.   Only if he signed it?
7     A.   (Nods head.)
8     MR. SIMMS:  Answer out.
9     A.   Yes.
10    Q.   Did you know prior to December 30,
11 2017 that Ren Man had the right to terminate
12 the broker agreement for any reason?
13    A.   Of course.
14    Q.   And, in fact, the two prior
15 brokers with which you had worked serving
16 Ren Man had had their contracts terminated?
17    A.   Correct.
18    Q.   Under the same provision?
19    A.   Correct.
20    Q.   I'll mark this.
21    MR. SIMMS:  You want that marked
22 with notes on it?
23    MR. KING:  We're going to mark

Page 26

1 that with -- we're up to Exhibit 63.

2

3 (Defendant's Exhibit 63 was marked for
4 identification and is attached to the
5 original transcript.)

6

7    Q.   (BY MR. KING:)  I've marked the
8 pages.

9    **A.   For me?**

10   Q.   Yes.

11   **A.   Okay.**

12       MR. KING:  And this is going to be
13 a little bit unwieldily, Keri, because the
14 pages on this transcript are not numbered.
15 But I'm going to do my best to get you to
16 the right place.

17   Q.   So the first tab, the first tab is
18 Page 4 of this document, which means the
19 first tab right there.

20   **A.   Okay.**

21   Q.   And at the end of the paragraph at
22 the top of the page, do you see where
23 Mr. Staples says, The DSM thing I think,

Page 27

1 Ron, you may have even said it, it's a
2 cancer, I agree with that.  Do you see where
3 it says that?

4    **A.   Uh-huh.**

5    Q.   And is it true -- is it true that
6 Mr. Staples never told you that that was his
7 feeling?

8    **A.   That is true.**

9    Q.   Now, go to the bottom of the page
10 where Mr. Eisenman at line 23 says, We
11 viewed the money that Kym made as part of
12 your salary and your husband says it should
13 be, it should be.  Did your husband ever
14 tell you that he felt that that was the
15 case?

16   **A.   He didn't say that specifically,**
17 **but what comes in the home does belong to**
18 **both of us, so correct.**

19   Q.   All right.  We'll go to the next
20 tab, which is at Page 8.

21       Looking at line 21, Mr. Staples
22 says, Kym never wanted the role that I put
23 her in.  She does not want that role.  Do

Page 28

1 you see that?

2    **A.   Uh-huh.**

3    Q.   Had he ever said that to you?

4    **A.   No.  I've said that to him.**

5    Q.   If Mr. Staples had that view of
6 the situation in 2017, whether he stayed or
7 not, was it reasonable to think that DSM had
8 a future with Ren Man given his sentiment?

9    **A.   Say that again.  I'm sorry.**

10   Q.   Given the sentiment expressed by
11 Mr. Staples that both the DSM thing is a
12 cancer and that you never wanted the role
13 and did not want the role, is it reasonable
14 to infer that there was no future for DSM in
15 association with Ren Man?

16   **A.   Perhaps in association with Ren**
17 **Man, yes.**

18   Q.   If you'll turn to the next page,
19 which is Page 9, you'll notice that
20 beginning at line 7, Mr. Staples says that
21 your role is not an $85,000 role.  Do you
22 see that?

23   **A.   Yes.**

Page 29

1    Q.   And I understand that Mr. Staples
2 had not expressed that position to you
3 before; is that right?

4    **A.   Correct.**

5    Q.   All right.  Next, the next tab
6 should be at Page 16.  All right.  At Page
7 16 beginning at line 22 -- I should actually
8 direct you to line 21 because 21 and 22,
9 he's very complimentary of you and your role
10 in his life.  But he does say it aggravates
11 him that you don't show him the books,
12 right?

13   **A.   Is that what he's talking about**
14 **here, the books?**

15   Q.   Yes.  21 to 23.  You'll notice
16 that he says he understands how it would
17 frustrate Julie as well.  Are you with me,
18 right there at line 25?

19   **A.   I see it.  I'm just trying to find**
20 **out where it's referring to the books.**

21   Q.   Well, it says at line 23, She
22 won't let me look in the dad gum books.

23   **A.   Okay.**

Page 30

1    Q.  But that was not a sentiment that
2  he had expressed to you before; is that
3  right?
4    **A.  We've probably had two**
5  **conversations about it because I wasn't**
6  **going to give on that.  He didn't even know**
7  **where I kept them.**
8    Q.  But he hasn't shared the sentiment
9  that he could understand why Julie was
10  frustrated with you about the books?
11    **A.  In that clear-the-air meeting, he**
12  **said that to her, from my recollection.**
13    Q.  Okay.
14    **A.  Or something in that regard.**
15    Q.  All right.  Skip the one at 28 and
16  we'll just go to line -- the one at 32 where
17  you see Mr. Staples uses the expression in
18  response to an offer of -- he says, 255,
19  255, all in.  Line 11?
20    **A.  All right.**
21    Q.  Did he tell you after this meeting
22  that he had actually accepted the offer for
23  you to turn over your interest in DSM?

Page 31

1    **A.  No.  He said he would be receiving**
2  **an offer in writing from Ron.**
3    Q.  All right.  I'm going to skip
4  through a couple of others and go straight
5  to 48.  You'll see in line 3, Mr. Staples
6  suggests that Christopher, Barbara, and
7  Blare be considered for the new broker.  If
8  you need to go back and look starting at 47
9  in order to get the context, that's fine.
10    **A.  (Complies.)**
11    Q.  Are you ready?
12    **A.  I think so.**
13    Q.  Okay.  Do you have any idea why
14  Mr. Staples wouldn't suggest that you be one
15  of the participants that should be
16  considered to work for the new broker?
17    **A.  My only thought would be that the**
18  **people he mentioned needed that job and**
19  **wouldn't have one without it and that he**
20  **would be taking care of me and we would work**
21  **it out.**
22    Q.  All right.  I want you to stay on
23  that page, but also I want you to take a

Page 32

1  look at -- in Exhibit 1, which is the
2  complaint, go to Page 9.
3    MR. SIMMS:  Are we on a different
4  document now?
5    MR. KING:  We're going to look at
6  both.
7    Q.  (BY MR. KING:)  All right.  You
8  recognize this as your complaint?
9    **A.  Yes.**
10    Q.  In this case?
11    **A.  Yes.**
12    Q.  All right.  Look at paragraph 20,
13  subparagraph 5.  Do you see the part of the
14  allegation is that Humphrey is using
15  property of DSM in violation of her Alabama
16  employment contract, do you see that?
17    **A.  Yes.**
18    Q.  All right.  Take a look now at the
19  transcript at Page 48, line 16 in which
20  Mr. Staples says, Barbara needs to be
21  working, representing more than Ren Man.
22    **A.  Okay.**
23    Q.  So did Mr. Staples ever express to

Page 33

1  you that he thought that Barbara Humphrey
2  should expand out of her position at DSM in
3  order to represent other people?
4    **A.  Yes.**
5    Q.  Take a look at Page 50, line 19.
6  Did I not have the tab there?
7    **A.  No, that's fine.**
8    MR. SIMMS:  No, you only numbered
9  the pages I think where you want to ask
10  something, is what it looks like.
11    Q.  Okay.  Yeah.  If you'll look at
12  19, Mr. Staples said, Barbara does not need
13  to be at DSM.  Had Mr. Staples previously
14  expressed that opinion to you?
15    **A.  That she didn't need to be at DSM?**
16    Q.  Yes.
17    **A.  No.**
18    Q.  All right.  We're done with that
19  exhibit.  We're going to stay with the
20  complaint, however.
21    MR. SIMMS:  Can we take a quick
22  break?
23    MR. KING:  Sure.

Page 34

1          (Short recess.)

2

3      Q.   (BY MR. KING:)  I direct you to

4  paragraph 19 on Page 8 of the complaint

5  which refers to an effort to force you to

6  give up your membership in DSM for ten

7  dollars.  Did you understand that the ten

8  dollars that was identified in the proposed

9  agreement for you to surrender your LLC

10 interest was in conjunction with the overall

11 resolution of compensation for your husband

12 as a result of his dismissal as the general

13 manager of Ren Man?

14     **A.   I think I understood that unless**

15 **both of us signed both documents, that**

16 **nothing was going forward.**

17     Q.   So it was a package, right?

18     **A.   It was a package deal.**

19     Q.   Paragraph 20 on the next page says

20 you refused to do that deal?

21     **A.   Correct.**

22     Q.   Who did you refuse -- in other

23 words, who did you convey your refusal to?

Page 35

1      **A.   My husband, John.**

2      Q.   Did you convey it to anyone at Ren

3  Man?

4      **A.   No, I had no contact with anyone**

5  **at Ren Man.**

6      Q.   Did you have any contact with

7  Mr. Eisenmann with respect to this refusal?

8      **A.   No.**

9      Q.   Did you have any questions about

10 the proposed agreement to surrender your LLC

11 interest that you talked to Mr. Eisenmann

12 about?

13     **A.   No.**

14     Q.   Let's move to Page 15.  Count Four

15 of the complaint is a complaint for

16 intentional interference with business

17 relationship and employment of Ms. Staples

18 as managing member of DSM.

19         My first question is do you

20 have -- did you as of December 30, 2017 have

21 any knowledge of the business activities of

22 H. Walker Enterprises, LLC?

23     **A.   No.**

Page 36

1      Q.   And I'll refer to that as HWE

2  going forward.  In your role with any of the

3  brokers that you had been involved with in

4  servicing Ren Man, did you have any contact

5  with HWE?

6      **A.   No.**

7      Q.   Did you have any knowledge of who

8  was employed by HWE in any capacity?

9      **A.   Other than Herschel being owner**

10 **and Julie telling me she worked for HWE, no.**

11     Q.   Do you have any knowledge of a

12 role played by HWE in terminating DSM's

13 broker agreement with Ren Man?

14     **A.   No.**

15     Q.   Do you think that anything

16 precluded Ren Man from terminating that

17 broker agreement?

18     **A.   Do I think anything precluded Ren**

19 **Man from terminating?**

20     Q.   Correct.

21     **A.   I would to say no.  They had a**

22 **30-day right.**

23     Q.   Do you personally have any

Page 37

1  contractual relationship with Ren Man?

2      **A.   Not at this time.**

3      Q.   Personally, have you ever had a

4  personal contractual relationship with Ren

5  Man?  If I'm not being clear --

6      **A.   Yeah, you're not.**

7      Q.   Okay.  Do you, Kym Staples, have

8  you individually ever had a contractual

9  relationship with Ren Man?

10     **A.   Not other than Kym Staples 50**

11 **percent owner of DSM, no.**

12     Q.   I'm talking about a direct

13 contractual relationship between you

14 individually and Ren Man.

15     **A.   No.**

16     Q.   Have you individually ever had a

17 contractual relationship with HWE?

18     **A.   No.**

19     Q.   Have you ever proposed a trust,

20 meaning that you rely based upon a special

21 relationship between you and Ren Man, such

22 that you confided and reposed trust in Ren

23 Man to protect you in some fashion?

Page 38

1    A.  Myself, personally?
2    Q.  Personally.
3    A.  It's hard not to mingle it in with
4  DSM. I don't know who the person at Ren Man
5  would be that I would have a contractual, so
6  no.
7    Q.  Individually, you personally, have
8  you bestowed property to Ren Man for it to
9  protect -- for it to hold on your behalf?
10       So let me do it this way:  Have
11  you personally entrusted property that you
12  own, money, real estate, other property to
13  Ren Man to hold on your behalf?
14    A.  To hold as in how?
15    Q.  To hold for your benefit as
16  trustee, as advisor, as confidant, anything
17  like that?
18    A.  Not to my knowledge.
19    Q.  Have you ever entrusted your
20  personal financial affairs or property
21  affairs to Ren Man?
22    A.  Not until we submitted our taxes
23  in this lawsuit.

Page 39

1    Q.  Oh, I understand, as a document
2  production?
3    A.  Uh-huh.
4    Q.  The questions that I have just
5  asked you about trust and submitting your
6  property and money in the like, is the same
7  answer no as to HWE?
8    A.  Correct.
9    Q.  Did anyone affiliated with HWE or
10  Ren Man or Simmons ever threaten you
11  personally with physical violence in order
12  to affect your employment relationship with
13  DSM?
14    A.  No.
15    Q.  Did anybody affiliated with HWE or
16  Ren Man or Simmons ever liable you, slander
17  you, defame you in order to adversely affect
18  your business relationship and employment
19  with DSM?
20    A.  Not to my knowledge.
21    Q.  Did anybody at HWE or Ren Man or
22  Simmons ever attempt by physical or economic
23  intimidation to affect your business

Page 40

1  relationship and employment with DSM?
2    A.  Absolutely.
3    Q.  How?
4    A.  By not paying commissions,
5  therefore trying to squeeze me out.  If
6  there was no money, there was no business,
7  and there was no agreement on the other side
8  to do any further business or pay employees
9  what they were due.
10    Q.  Has anyone at HWE or Ren Man or
11  Simmons defrauded you in order to adversely
12  affect your business relationship and
13  employment with DSM?
14    A.  I would say yes, again, for the
15  same reason.
16    Q.  All right.  Other than that
17  reason, is there any other indication that
18  you're aware of of fraud being used against
19  you personally?
20    A.  That's probably the biggest
21  reason, to stop the ongoing of DSM, along
22  with the help of my partner and to withhold
23  commissions so that the business would have

Page 41

1  to be shut down.  It would be completely
2  squeezed out.
3    Q.  I understand.  Thank you.
4       With respect to Page 20, Count Six
5  on conspiracy, are you aware of any acts
6  taken by HWE, Ren Man, and Simmons in
7  conspiracy to adversely affect your
8  relationship with DSM?
9    A.  Well, there again, when you
10  withhold the commissions of a company that
11  relies on it with the help of your partner,
12  that is squeezing you out.  That is shutting
13  you down, and your employees go without
14  their pay.
15    Q.  We're done with that.  You can
16  hand it back.
17       I'll hand you what has been
18  previously marked as Exhibit 7.  I'll draw
19  your attention to the numbered line 3.
20       Do you know why sales to PFG
21  Milton's were being added to DSM's
22  commissions effective November 1st, 2016?
23    A.  Because Ren Man was using DSM's

Page 42

1 people to further these sales and to go to
2 food shows and cuttings, and DSM was paying
3 their expenses.
4    Q.   Was the -- did the contract, the
5 broker agreement between DSM and Ren Man
6 provide for commissions for those PFG Milton
7 sales?
8    A.   It wasn't specifically in the
9 first, but there was also a clause that says
10 other entities through discussion or
11 something to that regard.  I don't know of
12 the exact verbiage.
13    Q.   I'm going to hand you --
14    A.   But yes, there could have been
15 added.
16    Q.   I'm going to hand you what's been
17 marked as Exhibit 5, which is the broker
18 agreement.  If you would, point me to the
19 language that you're talking about.
20    A.   This says, Any exception to the
21 above will be agreed upon in writing by
22 Renaissance Man and the broker.
23    Q.   Any exception to the above, right?

Page 43

1 It doesn't say any addition to, does it?
2    A.   Well, exception to me means that
3 you can make those changes if you both agree
4 to it and know about it.
5    Q.   All right.  If you'll hand me
6 those back, we'll keep them in the stack.
7       I'm handing you what's previously
8 been marked as Exhibit 37.
9       I didn't mean to give you that.
10 I'm sorry.  That's not necessary?
11      I'll hand you what's been marked
12 as Exhibit 10.  Did you receive that
13 communication from Herschel Walker
14 explaining why the PFG Milton commissions
15 were not due?
16    A.   Ask the question again, please.
17    Q.   Did you receive that email that
18 explains why the PFG Milton's commissions
19 were not due?
20    A.   Yeah.  Apparently January 5th.
21    Q.   Did you respond to that email?
22    A.   I don't remember if I did or not.
23    Q.   Did you ask -- if you'll notice on

Page 44

1 the second page, there's a reference to a
2 prior email that your husband sent out that
3 said that there was a refund being made as
4 to -- or not a refund but a reduction being
5 made with respect to PFG Milton's
6 commissions, right?
7    A.   It doesn't say who it's from
8 but --
9    Q.   You can see it at the bottom.
10    A.   Oh, okay.  And I can see what?
11    Q.   You can see that your husband
12 agreed that there would be no payment
13 afterwards of commissions with respect to
14 anything other than Sysco products.
15    A.   I see that, yes.
16    Q.   Did you talk to him about why he
17 had made that agreement?
18    A.   Yes.
19    Q.   And what did he tell you?
20    A.   Because Herschel was going nuts
21 again.  He just needed things to be calm for
22 Christmas.
23    Q.   Okay.  And that was the end of

Page 45

1 that discussion?
2    A.   Pretty much.
3    Q.   I'll hand you what has been marked
4 Exhibit 64.
5
6 (Defendant's Exhibit 64 was marked for
7 identification and is attached to the
8 original transcript.)
9
10    Q.   Specifically, I'm curious about
11 the $3,500 a month retainer that's included
12 in this email from your husband to people at
13 HartyBake.  Was that commission payable --
14 excuse me, was that retainer payable to the
15 second Diversified entity with which you
16 worked?
17    A.   Yes.
18    Q.   Do you know why your husband is
19 the one who is negotiating the retainer on
20 behalf of DSM?
21    A.   He knew Kane (phonetic) previously
22 and brought the business to Randy Sanders.
23    Q.   And did you have any role in

Page 46

1 setting that retainer?
2     A.   Setting the retainer?
3     Q.   Yes.
4     A.   No.
5     Q.   Did you have any role in
6 performing work with respect to HartyBake?
7     A.   Went to a cutting, but other than
8 that, most of the work was done with Blare
9 Staples.
10    Q.   Do you know how long DSM received
11 the monthly retainer?
12    A.   Two, three months.  I don't know.
13 I didn't keep the books at this time.  Randy
14 Sanders was in charge.
15    Q.   Do you remember whether
16 HartyBake -- after this iteration of DSM,
17 which was the second, do you know whether
18 any retainer was ever paid to the third DSM,
19 the one formed in October 2016?
20    A.   No.
21    Q.   You don't know?
22    A.   No.  There was not.
23    Q.   Okay.  I'll hand you what has been

Page 47

1 marked as Exhibit 65, which is an email from
2 you to Blaine Walker dated November 14th,
3 2017.  Are you familiar with that email?
4
5 (Defendant's Exhibit 65 was marked for
6 identification and is attached to the
7 original transcript.)
8
9     A.   Am I familiar with this, yes.
10    Q.   Now, what is it that Blaine
11 Walker in his email to you and others of
12 November 7, 2017 was asking you to do?
13    A.   They were going to a Sysco
14 corporate meeting and he wanted from each
15 region information that they could provide
16 with Sysco.
17    Q.   And your response was that you
18 honestly have no answer for these questions,
19 is that what you said?
20    A.   That's correct.
21    Q.   Why did you not have any answer
22 for those questions?
23    A.   Because my particular region had

Page 48

1 bought all they were going to at the level
2 that they were going to, and they had
3 stopped responding in regard to CATMAN
4 unless they have a problem, found a bone,
5 whatever, customer, then they would
6 communicate.  But for sales that we would
7 send them POSs, we would try and drive
8 through, so you've been buying this, why
9 don't you add this, this is selling good in
10 your area, you should bring it on board,
11 that sort of thing.  No response.
12    Q.   And how long had that been a
13 problem for you prior to this November 14th
14 email?
15    A.   I don't really know.  I don't have
16 a timeframe.
17    Q.   Did you raise this as an issue
18 with anybody prior to November 14th, 2017?
19    A.   Yes.
20    Q.   Who?
21    A.   Blaine, my husband.
22    Q.   And what did anybody encourage you
23 to do about it?

Page 49

1     A.   Just keep plugging it, just keep
2 throwing it out there.
3     Q.   Meaning what?
4     A.   Meaning continue to show them the
5 new items that would come up, send them the
6 new POSs, ask them can we send them samples,
7 could they just give it a shot, we know it's
8 not on your CATMAN award but it's a great
9 item.
10    Q.   When you talk about being a
11 broker, how do you -- in this industry, how
12 do you define that term?
13    A.   Broker, for what I've done, is
14 about finding the right fit for a
15 manufacturer and getting them in the door.
16    Q.   So specifically as to Ren Man, how
17 did you view what a broker should do?
18    A.   Well, what, what was created --
19    Q.   I'm beyond this particular
20 exhibit, by the way.
21    A.   Okay.
22    Q.   As a general matter, what should
23 the broker for Ren Man have been doing

Page 50

1 during the time that you were employed in
2 that role?
3    **A.  We were employed to push the**
4 **CATMAN to its fullest potential, which we**
5 **did, and then to continue to offer them**
6 **other items that we were allowed to sell to**
7 **Sysco.**
8    Q.   And how does the broker benefit
9 from successfully performing those tasks?
10    **A.   Because of that co-buy, then we**
11 **get a percentage of the commission.**
12    Q.   And can you tell me what the
13 procedure was for DSM at the end, the final
14 DSM, what was the procedure for DSM
15 receiving commissions?  Within the system,
16 how did that happen?
17    **A.   When you said at the end, that**
18 **threw me.**
19    Q.   The final DSM.
20    **A.  I'm confused.  State the question**
21 **again.**
22    Q.   The third DSM, what was the
23 process for it receiving commissions?  How

Page 51

1 did that practically happen?
2    **A.  Through Simmons.  Simmons would**
3 **break it all down to -- they could do**
4 **customer, they could do however you wanted**
5 **it, then they would send it to John.  He**
6 **would approve the commissions and then it**
7 **would be forwarded to me.  Simmons would**
8 **send DSM Sales & Marketing a check which I**
9 **deposited in the DSM account.**
10    Q.   Now, the third DSM paid John an
11 annual stipend for consulting of $40,000?
12    **A.   Monthly, yeah.  Yes.  Annual you**
13 **said, okay.  Yes.**
14    Q.   Did he also receive such a
15 consulting fee in the prior iteration?
16    **A.   No.**
17    Q.   So it was only the third?
18    **A.   Yes, because he became the leader.**
19    Q.   The leader?
20    **A.   The acting leader.  We didn't have**
21 **a leader involved.**
22    Q.   Explain to me why there wasn't a
23 leader.  What leadership role was unfilled?

Page 52

1    **A.   Randy Sanders had resigned, Todd**
2 **Townsend had resigned, we were left with no**
3 **one.  We needed someone experienced in the**
4 **business because we were new, and that's**
5 **where that came in.**
6    Q.   Were you qualified?
7    **A.  I was not qualified myself at all.**
8    Q.   As a potential leader?
9    **A.   No.**
10    Q.   And why not?
11    **A.  I didn't have 30 years experience**
12 **in food service.**
13    Q.   How many years had you been
14 performing brokerage tasks for Ren Man as of
15 the end of 2017?
16    **A.   For Ren Man, probably four.**
17       MR. KING:  Okay.  Can you
18 surrender the room for five minutes so we
19 can talk?
20       MR. SIMMS:  Because you may be
21 finished?
22       MR. KING:  Well, I'm getting
23 close.

Page 53

1       MR. SIMMS:  Yeah, that's fine.
2
3       (Short recess.)
4
5       MR. KING:  I have no further
6 questions at this point.
7
8 EXAMINATION BY MR. PARKER:
9    Q.   Good afternoon, Ms. Staples.  For
10 the record, do you spell your name K-i-m or
11 K-y-m?
12    **A.   Legally K-i.**
13    Q.   Okay.  Do you at other times spell
14 it K-y-m?
15    **A.   Absolutely.**
16    Q.   What do you go by?
17    **A.   K-y-m.**
18    Q.   Thank you.  What's your date of
19 birth?
20    **A.   September 16th, 1964.**
21    Q.   Do you know your husband's date of
22 birth?
23    **A.   February 10th, 1962.**

Page 54

1   Q.   Okay.  Will you just tell me all
2  of the ways in which you claim that my
3  client Simmons intentionally interfered with
4  your business relationship and employment
5  with DSM?
6      A.   They withheld commissions.  They
7  participated in withholding commissions
8  which eventually froze us.
9      Q.   Is there anything else that my
10 client Simmons did that you claim
11 intentionally interfered with your business
12 relationship and employment with DSM?
13     A.   They participated in firing my
14 husband, I assume.
15     Q.   But that didn't impact your
16 business relationship and employment with
17 DSM, did it?
18     A.   The ripple effect.
19     Q.   But it didn't directly affect it,
20 did it?
21     A.   I guess not.
22     Q.   So other than withholding
23 commissions, is there anything else that

Page 55

1  Simmons directly did that you contend
2  intentionally interfered with your business
3  relationship and employment with DSM?
4      A.   Not that I'm thinking of right
5  now, no.
6      Q.   And with respect to commissions,
7  you would receive -- as a member manager of
8  DSM, you would receive a check representing
9  the amount of commissions that were due
10 pursuant to the brokerage agreement between
11 DSM and Ren Man, correct?
12     A.   Correct.
13     Q.   And I asked your husband some
14 questions about whether Simmons was a party
15 to that agreement.  You heard those
16 questions, correct?
17     A.   Correct.
18     Q.   Do you understand what it means to
19 be a party to a contract or an agreement?
20     A.   I think so.
21     Q.   Okay.  Exhibit 5, which I'll hand
22 to you, that's the brokerage agreement
23 between what we've been referring to as DSM3

Page 56

1  and Ren Man, correct?
2      A.   Correct.
3      Q.   And Simmons was not a party to
4  that contract, correct?
5      A.   Correct.
6      Q.   Is that right, ma'am?
7      A.   It appears, yes.
8      Q.   Simmons didn't sign that document,
9  did they?
10     A.   No.
11     Q.   Simmons' name isn't mentioned in
12 that document?
13     A.   No.
14     Q.   When you would receive commissions
15 that were due pursuant to that document, I
16 understand that those commissions came from
17 Simmons, correct?
18     A.   Correct.
19     Q.   Did you take possession of a
20 physical check for the commissions or were
21 they direct deposited into an account?
22     A.   It was a physical check to my
23 home.

Page 57

1      Q.   Do you know as you sit here today
2  whether the checks that the commissions were
3  being paid on was in the name of Simmons or
4  Ren Man?
5      A.   I don't.
6      Q.   Do you still have copies or the
7  ability to obtain copies of the various
8  commission checks that you received on
9  behalf of DSM3?
10     A.   Yes.
11     Q.   Just so I'm clear, do you have
12 those checks already or would you need to go
13 to your bank account and get copies of them?
14     A.   I have the deposit slips and --
15 they came perforated so I would have that
16 section.  The bank would have the actual
17 check, is that what you're asking, the
18 actual check?
19     Q.   Yes, ma'am.  Do you know if you've
20 given the checks or the perforated section
21 that you referred to to your lawyer in this
22 case?
23     A.   I don't think so.

Page 58

1    MR. PARKER:  Okay.  To the extent
2 those haven't been produced, I don't think
3 they have, I would just request that they be
4 produced.  And I don't need all of them.  I
5 just need documents sufficient to show
6 who -- what bank account the checks were
7 drawn on that were issued to DSM3 for
8 commissions.
9    MR. SIMMS:  Can I ask a question?
10 Do you not have documents -- Simmons doesn't
11 have documents that show that?  Do they not
12 have an image or something of the check?
13    MR. PARKER:  I don't know.  And if
14 it came from Ren Man, which I suspect it
15 did, Simmons wouldn't have the authority on
16 its own to release those documents or
17 utilize those documents.
18    MR. SIMMS:  I understand.  I'm
19 just saying why put the burden on me if
20 you've already got the information.
21    MR. PARKER:  I don't know that I
22 do.
23    MR. SIMMS:  I know, but that's

Page 59

1 been my only concern.
2    MR. PARKER:  Sure.
3    MR. SIMMS:  Yeah, if you don't
4 have them and if it was generated by
5 Renaissance Man and Simmons didn't get
6 copied and they don't have anything, we
7 don't have a problem looking at that.  But
8 if you've got that information, it's equally
9 available to you as it is to us is all I'm
10 saying.
11    Q.  (BY MR. PARKER:)  Simmons did not
12 directly do anything to terminate your
13 employment relationship with DSM, correct?
14    **A.  Not directly, no.**
15    Q.  Simmons did not directly do
16 anything to interfere with your status as a
17 50 percent member or manager of DSM,
18 correct?
19    **A.  Not directly, no.**
20    Q.  And when you say not directly,
21 that implies they did something indirectly.
22 What are you claiming that Simmons, if
23 anything, did indirectly to interfere with

Page 60

1 your employment relationship with DSM?
2    **A.  I feel that they partnered with**
3 **Herschel and Julie in that regard.**
4    Q.  And there, are you there referring
5 to the relationship between Simmons and Ren
6 Man?
7    **A.  Yes.**
8    Q.  Okay.  Is there anything else that
9 Simmons did in your view indirectly that
10 intentionally interviewed with your
11 employment relationship with DSM?
12    **A.  Say that again.  I'm sorry.**
13    Q.  Sure.  Is there anything else that
14 Simmons did indirectly that in your view
15 intentionally interviewed with your
16 employment relationship with DSM?
17    **A.  Not that I can think of.**
18    Q.  Is there anything that you contend
19 that Simmons did indirectly that
20 intentionally interfered with your
21 membership or manager status in DSM3?
22    **A.  Not that I can think of.**
23    Q.  Do you know as you sit here today

Page 61

1 the amount of commissions that you and your
2 husband contend have wrongfully been
3 withheld from you as a member manager of
4 DSM?
5    **A.  I don't know the amount, no.**
6    Q.  Do you have any order of magnitude
7 as to what that number might be?
8    **A.  It would be around 50, that was**
9 **the norm, 50 or more thousand.**
10    Q.  Around 50,000?
11    **A.  Uh-huh.**
12    Q.  Dollars?
13    **A.  Uh-huh.  But they would send a**
14 **breakout to let us know exactly what it was,**
15 **because I also had to calculate what our**
16 **broker in California was to receive from**
17 **those.**
18    Q.  And do you know as you sit here
19 today the period of time in which those
20 commissions would have been earned by DSM?
21 In other words, were those commissions
22 earned in October 2017, November of 2017,
23 when were they earned, if you know?

Page 62

1    A.  I'm not sure I understand your
2  question.  But the commissions were paid --
3  like for the month of November, they were --
4  the commissions for November were usually
5  paid around -- between December 5th and
6  10th-ish.  So commissions for December, the
7  month -- the last month we worked would have
8  come in January 5th.
9    Q.  And it's those commissions that
10 you're claiming were wrongfully withheld?
11   A.  Uh-huh.
12   Q.  So the commissions for November
13 were paid to DSM3, correct?
14   A.  Minus the -- yes.
15   Q.  What were you going to say, minus
16 the what?
17   A.  Minus the 18,000 that was
18 retracted.
19   Q.  Refresh my recollection, what is
20 the 18,000 in commissions you were --
21   A.  That was what --
22   Q.  -- referring to?
23   A.  -- Herschel -- I'm sorry.  Were

Page 63

1  you finished?
2    Q.  Yes.
3    A.  That was what Herschel demanded be
4  returned from the PFG.
5    Q.  So the outstanding commissions are
6  the commissions for December 2017 as well as
7  the $18,000 that you just testified about?
8    A.  And then whatever was due in
9  January.
10   Q.  Okay.  Well, were there any sales
11 in January for which commissions would have
12 been earned?
13   A.  We wouldn't know.  That would come
14 from Simmons.
15   Q.  As you sit here today, are you
16 aware of any orders or sales made by DSM3 in
17 January 2018 that in your view would have
18 generated commissions pursuant to the
19 brokerage agreement with Ren Man?
20   A.  I would feel certain there were
21 because they were on track.  It wasn't --
22   Q.  But as you sit here today, are you
23 aware of any specific sales or orders that

Page 64

1  would have generated commissions?
2    A.  No, I didn't -- I didn't handle
3  the POs.
4    Q.  Okay.  Now, other than Simmons and
5  Ren Man ending its relationship with your
6  husband Mr. Staples, is there anything that
7  you're alleging that Simmons and Ren Man did
8  to conspire against you for the purpose of
9  interfering with your business relationship
10 and employment with DSM?
11   A.  Okay.  That was long.  Say it
12 again.
13   Q.  Sure.  It was a bad question.  I
14 guess aside from not paying commissions and
15 terminating your husband, is there anything
16 else that Simmons did that you contend was
17 part of a conspiracy amongst Simmons, HWE,
18 and Ren Man that harmed you?
19   A.  Not that I can think of.
20   Q.  I asked your husband questions
21 earlier about when you all relocated to
22 Alabama.  And I showed him a document that
23 Randy Sanders had generated in January of

Page 65

1  2015 noting that that is when you moved to
2  Alabama.  Have you seen that document
3  before?
4    A.  Yes.
5    Q.  Okay.  When is your best
6  recollection as to when you did first move
7  to Alabama?
8    A.  It was '15.  It was May, I want to
9  say.  I'm not sure.
10   Q.  Other than going back and forth to
11 visit family and friends that are in
12 Arkansas, did you at any point since then
13 move out of the State of Alabama?
14   A.  No.
15   Q.  Did your husband John Staples move
16 or relocate to Alabama at or about the same
17 time that you did in 2015?
18   A.  He came back and forth, but I was
19 there pretty much permanent.
20   Q.  Okay.  When would you say that
21 your husband John Staples, in your words,
22 came to Alabama permanently?
23   A.  I don't want to speculate.  I'm

Page 66

1 sorry.
2  Q.  Okay.  Well --
3  A.  I honestly don't have a date.
4  Q.  You were a full-time resident of
5 Alabama as of the date of your husband's
6 separation from Simmons and Ren Man,
7 correct?
8  A.  Uh-huh, yes.
9  Q.  And your husband similarly was a
10 full-time resident of Alabama at the time of
11 his separation from Simmons and Ren Man,
12 correct?
13  A.  Yes, yes.
14  MR. PARKER:  No further questions.
15  MR. KING:  None.
16  MR. SIMMS:  I have some questions.
17
18 EXAMINATION BY MR. SIMMS:
19  Q.  DSM3 we've been referring to it.
20 Is it called -- what is it called, what is
21 its full name?
22  A.  Well, it's DSM but it stands for
23 Diversified Sales & Marketing.

Page 67

1  Q.  LLC?
2  A.  LLC, yes.
3  Q.  When was that LLC entity formed?
4  A.  The third one was formed -- I
5 believe the date, the actual date was
6 October 1, 2016.
7  Q.  Who formed it?
8  A.  Ron Eisenmann.
9  Q.  At the time Mr. Eisenmann formed
10 it, did Mr. Eisenmann have you sign any
11 written document where you waived a
12 lawyer/client relationship with him or his
13 law firm?
14  A.  No.
15  Q.  Did Mr. Eisenmann at the time he
16 formed the LLC have you sign a written
17 document where you waived any conflict of
18 interest of his law firm related to that
19 formation of that LLC?
20  A.  No.
21  Q.  Did Mr. Eisenmann at the time of
22 the formation have you execute a written
23 document where you waived any violations of

Page 68

1 the professional rules of conduct for an
2 attorney?
3  A.  No.
4  Q.  You were a member of the LLC?
5  A.  Yes.
6  Q.  And what was your ownership
7 percentage?
8  A.  50.
9  Q.  And Julie Blanchard was the other
10 member?
11  A.  Yes.
12  Q.  Did you loan money to the LLC when
13 it was formed?
14  A.  Yes.
15  Q.  How much money did you loan to the
16 LLC?
17  A.  30,000.
18  Q.  Who drew up the loan documents
19 related to that transaction?
20  A.  Ron Eisenmann.
21  Q.  At the time Mr. Eisenmann drafted
22 up those documents, did he have you execute
23 a written document waiving any lawyer/client

Page 69

1 relationship with you?
2  A.  No.
3  Q.  Did he have you sign a written
4 document waiving any conflict of interest
5 professional lawyer rule at the time he
6 drafted the loan documents?
7  A.  No.
8  Q.  Did he have you sign a written
9 agreement waiving violations of professional
10 rules of conduct as a lawyer related to the
11 drafting of that agreement?
12  A.  No.
13  Q.  Was it your understanding that the
14 LLC would be a passthrough entity, that the
15 expenses would pass through to you?
16  A.  Yes.
17  Q.  Individually?
18  A.  Yes.
19  Q.  And you would be responsible for
20 what percentage?
21  A.  50.
22  Q.  Did Mr. Eisenmann bill DSM3 for
23 his legal fees associated in the formation

Page 70

1 of the LLC?
2    A.  Yes.
3    Q.  Do you consider that you
4 individually paid 50 percent of those fees?
5    A.  Yes.
6    Q.  Did Mr. Eisenmann bill the DSM for
7 the drafting of the loan documents related
8 to your loan of money to the LLC?
9    A.  Yes.
10    Q.  Did you -- was that bill paid?
11    A.  Yes.
12    Q.  Do you consider that you paid 50
13 percent of that bill?
14    A.  Yes.
15    Q.  Were there other bills over time
16 until the end of December of 2017 that Mr.
17 Eisenmann billed to DSM3?
18    A.  Yes.
19    Q.  What was that related to?
20    A.  Meetings in his office or any type
21 of discussion.
22    Q.  Do you know if you were recorded
23 during those meetings?

Page 71

1    A.  I have no idea.
2    Q.  You don't know if your lawyer was
3 recording them secretly?
4    A.  To my knowledge, we were not.
5    Q.  Were you ever told you were being
6 secretly recorded or agreed to being
7 recorded?
8    A.  No.
9    Q.  Did DSM3 pay those bills?
10    A.  Yes.
11    Q.  Do you consider that you paid 50
12 percent of them individually?
13    A.  Yes.
14    Q.  During those time periods, did Mr.
15 Eisenmann ever -- let me just ask you this:
16 From October when the entity was formed
17 until the end of December 2017, did Mr.
18 Eisenmann ever have you execute a written
19 document waiving any lawyer/client
20 relationship with you?
21    A.  No.
22    Q.  Did he ever have you -- same
23 period:  Ever have you sign a document

Page 72

1 waiving any conflict of interest?
2    A.  No.
3    Q.  Same question:  Did he ever during
4 that time period have you execute a document
5 waiving any violations of the professional
6 rules of conduct that pertain to an
7 attorney?
8    A.  No.
9    Q.  You received -- what's your
10 understanding as to -- there was a document
11 prepared by Mr. Eisenmann giving up --
12 related to your transfer of your ownership
13 interest to Ms. Blanchard, correct?
14    A.  Correct.
15    Q.  And that came after John Staples
16 had been terminated?
17    A.  Correct.
18    Q.  Do you recall anywhere in that
19 document that Mr. Eisenmann referred to any
20 provisions of the operating agreement
21 related to the formation of the LLC in any
22 way, shape, form or fashion?
23    A.  Say that again.  Sorry.

Page 73

1    Q.  Do you recall in the agreement
2 that Mr. Eisenmann sent related to you
3 selling your ownership interest, if Mr.
4 Eisenmann referred to the operating
5 agreement in any way?
6    A.  From what I remember, other than
7 saying giving up my 50 percent, no.
8    Q.  For ten dollars?
9    A.  For ten dollars, correct.
10    Q.  You've read the operating
11 agreement, correct?
12    A.  Not in whole, but yes.
13    Q.  Was the business purpose of DSM3
14 restricted to solely doing business with
15 Renaissance Man?
16    A.  Absolutely not.
17    Q.  So as of December 30th, 2017, is
18 it your understanding that DSM3 as a legal
19 entity could continue into the future?
20    A.  We could.
21    Q.  And if it continued into the
22 future, you would enjoy 50 percent ownership
23 from whatever those operations may have

App. 083

Page 74

1 undertook or occurred?

2    **A. Correct.**

3    Q. You also received a letter from
4 Mr. King at some point too, correct?

5    **A. Correct.**

6    Q. Did Mr. King's letter refer to the
7 operating agreement in any way?

8    **A. In regard to this case or the one**
9 **Julie filed?**

10    Q. Either one.

11    **A. I honestly can't remember. It's**
12 **been ten months.**

13    Q. We could take those documents and
14 compare them to the operating agreement to
15 see if there were references, correct?

16    **A. Correct.**

17    Q. You were asked some questions by
18 Mr. King concerning the commissions that
19 were retracted, the $18,000 commissions that
20 were retracted?

21    **A. Yes.**

22    Q. Did those commissions pertain to a
23 particular supplier?

Page 75

1    **A. Yes.**

2    Q. And what was that supplier?

3    **A. PFG, I want to say US Foods, if I**
4 **remember correctly. I'm not positive.**

5    Q. Did DSM3 pay any expenses related
6 to any sales that pertained to those
7 commissions that we're talking about?

8    **A. Yes.**

9    Q. So did you pay 50 percent of those
10 expenses?

11    **A. I did.**

12    Q. So DSM3 paid expenses for sales
13 that generated commissions that Mr. Walker
14 later would not allow to be paid to DSM3?

15    **A. Correct.**

16    Q. Is that similar to what happened
17 with respect to the waffles? In other
18 words, an entity owned by Mr. Walker is
19 receiving the revenue but shifting or
20 putting on some other entity the expenses
21 associated with the sales of that product?

22    **A. Correct.**

23    Q. Similar behavior?

Page 76

1    **A. Similar behavior.**

2    Q. Did DSM3 pay Mr. Gary Collins
3 related to PFG?

4    **A. We did.**

5    Q. And had that been done at
6 Mr. Walker's request?

7    **A. To my knowledge, yes.**

8    Q. Was Mr. Walker requesting that
9 Mr. Collins be involved with PFG?

10    **A. Yes.**

11    Q. Was Mr. Walker -- was Mr. Collins
12 working on a bid by Renaissance Man related
13 to PFG?

14    **A. It was Restaurant Depot.**

15    Q. Tell me about Restaurant Depot.

16    **A. I don't know specifics of**
17 **Restaurant Depot, but I know that we were**
18 **going to release Gary Collins, and**
19 **Mr. Walker sent an email saying not to do**
20 **that, that Gary was working on a deal or a**
21 **plan with Restaurant Depot and he wanted to**
22 **keep him on.**

23    Q. Did you attend the meeting with

Page 77

1 PFG corporate in the early part of 2016?

2    **A. I did not.**

3    Q. Did John to your knowledge?

4    **A. Yes.**

5    Q. And did Herschel attend to your
6 knowledge?

7    **A. To my knowledge.**

8    Q. What about Ms. Blanchard?

9    **A. To my knowledge, yes.**

10    Q. And do you know what the purpose
11 of attending that was?

12    **A. They wanted to expand business.**

13    Q. And get business related to PFG?

14    **A. Correct.**

15    Q. Was the intentions that DSM3
16 support those -- that endeavor?

17    **A. It ended up that way.**

18    Q. But Mr. Walker won't pay for the
19 commissions?

20    **A. Correct.**

21    Q. You were shown the broker
22 agreement between DSM3 and Renaissance Man,
23 have you seen that?

Page 78

1   A.   Yes.
2     Q.   Would that document to your
3   knowledge have been provided by anyone to
4   Simmons?
5   A.   I would hope.
6     Q.   And the reason I ask that question
7   is how would Simmons internally know how to
8   calculate the commissions related to that
9   arrangement if they did not have that
10   document?
11   A.   They wouldn't.  That's the chart
12   they go -- that's probably not the right
13   word, but that's the commission breakdown
14   that they -- the price per pound.
15     Q.   And to your knowledge, you
16   received some of those reports from Simmons?
17   A.   Monthly.
18     Q.   After October 1st, 2016, correct?
19   A.   Yes.
20     Q.   And is your recollection that the
21   breakdown was consistent with the
22   commissions set forth in the broker
23   agreement?

Page 79

1   A.   Yes.
2     Q.   Okay.  Was DSM3 paying some
3   commissions to Gary Collins related to US
4   Foods?
5   A.   Yes.
6     Q.   Do you know if Mr. Walker or Ms.
7   Blanchard were aware of that?
8   A.   I don't know.
9     Q.   Tell me about that.  Why was that
10   being done?
11   A.   That was happening when I took
12   over the books, and it was two items that he
13   was able to get good volume on.  So I don't
14   know the details.
15     Q.   Were you ever instructed by
16   Mr. Walker or anyone else at HWE or
17   Renaissance Man not to pay Gary Collins?
18   A.   No.
19     Q.   By the way, after October 1st,
20   2016, what were different tasks or roles or
21   responsibilities did you have at DSM3 and
22   that you performed on an ongoing basis?
23   A.   I ended up taking over the books,

Page 80

1   making all the payments, doing the expense
2   reports, working with the payroll company,
3   working with the accountant, getting the
4   taxes filed, getting the workmen's comp
5   insurance taken care of, just anything that
6   came up in the office management part.
7     Q.   At some point, did Mr. Eisenmann
8   assist DSM3 and you in registering DSM3 with
9   the State of Alabama?
10   A.   Yes.
11     Q.   Was there a time he also assisted
12   with the registration in Florida?
13   A.   Yes.
14     Q.   Did he bill DSM3 for that?
15   A.   Yes.
16     Q.   Did Kimberly Staples consider she
17   paid 50 percent of that legal bill?
18   A.   Yes.
19     Q.   Now, you had a region as well as
20   the other tasks you were performing for
21   DSM3; is that correct?
22   A.   Correct.
23     Q.   To your knowledge, would Ms.

Page 81

1   Blanchard, would she ever take a region?
2   A.   No.
3     Q.   What was her response when she was
4   asked to take a region, to your knowledge?
5   A.   To my knowledge, she stated she
6   worked for the parent company, for H. Walker
7   Enterprises.  It appeared she had no
8   interest in helping out with DSM or being
9   involved in the business.
10     Q.   And at some point, did you offer
11   her to have access to the GoDaddy email
12   accounts for DSM3?
13   A.   I did.
14     Q.   Did she ever sign up for that,
15   that being Ms. Blanchard?
16   A.   She did not.
17     Q.   Did you offer to Ms. Blanchard
18   that she have access to the bank account at
19   West Alabama Bank for DSM3?
20   A.   I did.
21     Q.   Would Ron Eisenmann be aware that
22   there was a bank account created for DSM3 at
23   West Alabama Bank?

Page 82

1   A.  Yes.
2   Q.  Did either Mr. Eisenmann or Ms.
3  Blanchard ever request access to that bank
4  account until they sued you in Georgia?
5   **A.  I don't remember a request, but I**
6  **did relate to Julie how she could be partner**
7  **or registered with the bank.  And she wanted**
8  **to have the whole bank account moved into**
9  **one of Herschel's banks out of Alabama.**
10   Q.  When did that take place?
11   **A.  Honestly, I don't know.  One of**
12  **the meetings in Atlanta.  And Georgie Boston**
13  **was in there.  It must have been when we**
14  **were working on getting it Lumion (phonetic)**
15  **certified, because Georgie was saying**
16  **something about how antiquated it was to**
17  **actually get a check, a paper check, that it**
18  **should be automatically deposited, and I**
19  **understood all of that.**
20   Q.  To your knowledge --
21   **A.  Nothing ever came of fruition,**
22  **nothing came from that.  To my knowledge,**
23  **she never pursued getting on board with the**

Page 83

1  bank.
2   Q.  To your knowledge, did Ms.
3  Blanchard participate in the request by Ms.
4  Boston related to the women-owned aspects of
5  DSM3?
6   **A.  Not to my knowledge.**
7   Q.  She did not or did not
8  participate?
9   **A.  She did not participate.**
10   Q.  Did the women-owned ever come to
11  be?
12   **A.  Absolutely not.**
13   Q.  Why were y'all wanting to do
14  women-owned?
15   **A.  You just got more recognition.  It**
16  **appeared you could get your foot in the door**
17  **in places, because it was obviously**
18  **something that other businesses were looking**
19  **heavily at and participating in.**
20   Q.  Thinking they would open doors to
21  suppliers?
22   **A.  It would open doors to suppliers**
23  **and just as it did for Ren Man for being**

Page 84

1  minority owned.  It was the same deal.
2   Q.  I want to talk about the December
3  27th day.  You've been asked a lot of
4  questions about that today.
5   **A.  Okay.**
6   Q.  What was John's demeanor when you
7  were talking to him on the phone that day
8  following him leaving Atlanta?
9   **A.  (No response.)**
10   Q.  Are you okay, do you need to take
11  a break?
12   **A.  He was devastated, as I was.  To**
13  **think how hard he worked to put together**
14  **something and make Herschel and Simmons that**
15  **kind of money, it's just not fun to go**
16  **through.  And it was wrong.**
17   Q.  In your conversations with him
18  that day, did he express his state of being
19  or --
20   **A.  Yeah.**
21   Q.  -- or what his mental status was
22  while he was in the meeting?
23   **A.  He just said it was like the**

Page 85

1  **twilight zone.  He felt like he was**
2  **literally hovering above the room, like this**
3  **was not -- this was not happening, this was**
4  **not happening.  And when he called me, he**
5  **could barely breathe.  He could barely put**
6  **two words together, not because he was**
7  **crying, because he was in shock and couldn't**
8  **even make heads or tails out of what had**
9  **just happened.**
10   **And the fact that they had called**
11  **this big important meeting, it wasn't just**
12  **about being two days after Christmas, John**
13  **left us on the 26th because he was in**
14  **Arkansas and drove.**
15   Q.  Drove to Atlanta for the meeting?
16   **A.  Drove to Atlanta for the meeting**
17  **at the request.  So again, you just can't**
18  **believe the hard and cruelty of that**
19  **situation, you just -- and it turned out**
20  **that it was a push because they were on a**
21  **timeline to take over January 1st.  That was**
22  **their timeline.**
23   Q.  You told us earlier you had been

Page 86

1  to some meetings at your lawyer's office in
2  Atlanta, Ron Eisenmann's before.
3      **A.  Correct.**
4      Q.  And you weren't aware on any of
5  those occasions of being recorded?
6      **A.  Absolutely not.**
7      Q.  You were shown a transcript today
8  that someone put together of a recording of
9  the December 27th, 2017 meeting.  It
10  incorrectly refers to it as occurring in
11  2018, but you've seen that, correct?
12      **A.  Correct.**
13      Q.  Do you know from that recording if
14  it was started after Mr. Eisenmann or
15  Mr. Walker had realized that Mr. Staples had
16  become stunned or shocked?
17      **A.  I didn't look through the whole**
18  **thing, so no, I don't know when it started.**
19      Q.  Did Mr. Staples say to you during
20  the phone conversation when he left Atlanta
21  on the 27th that he had been told by Mr.
22  Eisenmann or Mr. Walker that he was being
23  recorded?

Page 87

1      **A.  Said nothing to me in that regard.**
2      Q.  You received a communication from
3  Mr. Eisenmann that the broker agreement was
4  being temporarily suspended, not terminated;
5  is that correct?
6      **A.  Correct.**
7      Q.  And the temporary suspension
8  related to what event to take place?
9      **A.  When I signed it over and Julie**
10  **took it over fully a hundred percent that**
11  **she would start it back up.**
12      Q.  So as of that communication from
13  Mr. Eisenmann that the broker agreement is
14  going to be temporarily suspended in
15  exchange for you selling out your 50 percent
16  interest for ten dollars to Ms. Blanchard,
17  once that took place, Ms. Blanchard was
18  going to own a hundred percent of DSM3?
19      **A.  Correct.**
20      Q.  And that that entity would
21  continue on into the future?
22      **A.  Correct.**
23      Q.  And that the broker agreement

Page 88

1  would be reinstated, is that your
2  understanding?
3      **A.  Correct.**
4      MR. SIMMS:  I don't have any
5  further questions.
6      MR. KING:  No questions.
7      MR. PARKER:  No questions.
8
9      (Short recess.)
10
11      MR. SIMMS:  And Mr. Staples may
12  need to speak to this, but it's my
13  understanding that Mr. Staples had a, what
14  was it, New Jersey Generals?
15      MR. STAPLES:  New Jersey Generals
16  jersey.
17      MR. SIMMS:  He had a New Jersey
18  Generals jersey that he owned, and I think
19  Julie or Herschel wanted it because they
20  were doing something with The Apprentice --
21      MR. KING:  Stop.
22      MR. SIMMS:  Let's don't do that.
23  And I'm going to do the same on my side.

Page 89

1      I was trying to say what it was.
2  It's my understanding that Mr. Staples
3  provided this New Jersey Generals jersey, it
4  was either one or two Mr. Staples recalls he
5  provided to Mr. Walker or to Ms. Blanchard
6  doing something with The Apprentice, and
7  Donald Trump was going to sign those.  And
8  somehow he would like to have those back.
9  They never made them back to him.  So could
10  you look into that for us?
11      MR. KING:  I will look into that.
12      MR. SIMMS:  Okay.
13      MR. KING:  Thank you.
14
15      (Further Deponent Saith Not)
16
17      (Whereupon, deposition
18      concluded at 4:25 p.m.)
19
20
21
22
23

Page 90

```
 1              CERTIFICATE

 2   STATE OF ALABAMA)

 3   JEFFERSON COUNTY)

 4

 5       I hereby certify that the above and

 6   foregoing deposition was taken down by me in

 7   stenotype, and the questions and answers

 8   thereto were transcribed by means of

 9   computer-aided transcription, and that the

10   foregoing represents a true and correct

11   transcript of the testimony given by said

12   witness upon said hearing.

13       I further certify that I am neither of

14   counsel, nor kin to the parties to the

15   action, nor am I in anyway interested in the

16   result of said cause named in said caption.

17

18         Melanie L. Petix

19       MELANIE L. PETIX, CCR

20       License Number:  ACCR-412

21       My Commission expires 10/15/22

22

23
```