FILED

2019 Mar-04  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A-3

1      IN THE UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF ALABAMA

3             WESTERN DIVISION

4

5

6   CIVIL ACTION NUMBER:  7:18-CV-00160-LSC

7

8   KIMBERLY and JOHN STAPLES,

9          Plaintiffs,

10  vs.

11  H. WALKER ENTERPRISES, LLC; RENAISSANCE MAN

12  FOOD SERVICES, LLC; and SIMMONS,

13          Defendants.

14

15

16         DEPOSITION TESTIMONY OF

17             JOHN STAPLES

18

19  NOVEMBER 12, 2018

20  9:08 A.M.

21  Job No. 28914

22  COURT REPORTER:

23  MELANIE L. PETIX, CCR

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
John Staples November 12, 2018

Job 28914
Pages 2..5

Page 2

```
1          S T I P U L A T I O N S
2          It is hereby stipulated and
3   agreed, by and between the parties through
4   their counsel, that the deposition of JOHN
5   STAPLES may be taken before Melanie L.
6   Petix, Certified Court Reporter and Notary
7   Public for the State of Alabama at Large, at
8   the offices of Veritext, 2205 4th Street,
9   Tuscaloosa, Alabama on November 12, 2018,
10  commencing at 9:08 a.m.
11         It is further stipulated and
12  agreed that the signature to and the reading
13  of the deposition by the witness are waived,
14  the deposition to have the same force and
15  effect as if full compliance had been had
16  with all laws and rules of Court relating to
17  the taking of depositions.
18         It is further stipulated and
19  agreed that it shall not be necessary for
20  any objections to be made by counsel as to
21  any questions except as to form or leading
22  questions, and that counsel for the parties
23  may make objections and assign grounds at
```

Page 3

```
1   the time of trial, or at the time said
2   deposition is offered in evidence, or prior
3   thereto.
4          In accordance with Rule 5(d) of
5   the Alabama Rules of Civil Procedure, as
6   amended, effective May 15, 1988, I, Melanie
7   L. Petix, Certified Court Reporter, am
8   hereby delivering to MICHAEL J. KING, Esq.
9   the original transcript of the oral
10  testimony taken on November 12, 2018, along
11  with exhibits.
12         Please be advised that this is the
13  same and not retained by the Court Reporter,
14  nor filed with the Court.
15                --oOo--
16
17
18
19
20
21
22
23
```

Page 4

```
1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4        KERI D. SIMMS, Esq.
5        WEBSTER HENRY
6        2 Perimeter Park South,Suite 445 East
7        Birmingham, Alabama  35243
8
9   FOR THE DEFENDANT:
10       MICHAEL J. KING, Esq.
11       GREENBERG TRAURIG, LLP
12       3333 Piedmont Road, NE, Suite 2500
13       Atlanta, Georgia  30305
14
15       TALLEY R. PARKER, Esq.
16       JACKSON LEWIS, P.C.
17       500 North Akard, Suite 2500
18       Dallas, Texas 75201
19
20  ALSO PRESENT:  Kym Staples
21               Julie Blanchard
22               Herschel Walker
23               Tommy Weir, Videographer
```

Page 5

```
1            I N D E X
2   EXAMINATION BY:         PAGE NUMBER:
3   Mr. King                  12
4   Mr. Parker                326
5   Mr. Simms                 457
6   Mr. Parker                499
7
8
9          E X H I B I T S
10  DEFENDANT'S EXHIBIT NO:     PAGE NUMBER:
11  Exhibit 1 - Complaint                58
12  Exhibit 2 - Answers to Interrogatories  100
13  Exhibit 3 - Letter                   105
14  Exhibit 4 - Email                    107
15  Exhibit 5 - Brokerage Agreement      110
16  Exhibit 6 - Email                    114
17  Exhibit 7 - Email                    115
18  Exhibit 8 - Report                   118
19  Exhibit 9 - E-mail                   119
20  Exhibit 10 - E-mail                  123
21  Exhibit 11 - Contract                126
22  Exhibit 12 - Agreement               139
23  Exhibit 13 - Broker Agreement        133
```

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
John Staples November 12, 2018

Job 28914
Pages 6..9

**Page 6**

EXHIBITS (Continued)

1
2  Exhibit 14 - Text                       141
3  Exhibit 15 - Expense Report             159
4  Exhibit 16 - Expense Report             162
5  Exhibit 17 - Reimbursement              165
6  Exhibit 18 - Email                      167
7  Exhibit 19 - Email                      168
8  Exhibit 20 - Expense Report             170
9  Exhibit 21 - Expense Report             173
10 Exhibit 22 - Expense Report             174
11 Exhibit 23 - Expense Report             179
12 Exhibit 24 - Email                      180
13 Exhibit 25 - Expense Report             182
14 Exhibit 26 - Expense Report             184
15 Exhibit 27 - Expense Report             186
16 Exhibit 28 - E-mail                     188
17 Exhibit 29 - Expense Report             196
18 Exhibit 30 - Document                   200
19 Exhibit 31 - Expense Report             203
20 Exhibit 32 - Expense Report             204
21 Exhibit 33 - Document                   207
22 Exhibit 34 - Text                       208
23 Exhibit 35 - Email                      210

**Page 7**

EXHIBITS (CONTINUED)

1
2  Exhibit 36 - Email                      212
3  Exhibit 37 - Email                      214
4  Exhibit 38 - Email                      217
5  Exhibit 39 - Email                      220
6  Exhibit 40 - Email                      222
7  Exhibit 41 - Photo                      223
8  Exhibit 42 - E-mail                     226
9  Exhibit 43 - Email                      229
10 Exhibit 44 - Email                      231
11 Exhibit 45 - Email                      243
12 Exhibit 46 - Email                      267
13 Exhibit 47 - Email                      268
14 Exhibit 48 - Email                      269
15 Exhibit 49 - Email                      271
16 Exhibit 50 - Email                      277
17 Exhibit 51 - Email                      280
18 Exhibit 52 - (marked confidential and   286
19        retained by counsel)
20 Exhibit 53 - Signature Page             289
21 Exhibit 54 - Confidentiality Agreement  289
22 Exhibit 55 - Document                   291
23 Exhibit 56 - Document                   294

**Page 8**

EXHIBITS (CONTINUED)

1
2  Exhibit 57 - Email                      296
3  Exhibit 58 - Email                      297
4  Exhibit 59 - Letter                     376
5  Exhibit 60 - Email                      411
6  Exhibit 61 - Email                      411
7  Exhibit 62 - 2017 AK Tax Return         419

**Page 9**

1        I, Melanie L. Petix, a Certified
2  Court Reporter and Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to the Alabama Rules of Civil
6  Procedure, and the foregoing stipulations of
7  counsel, there came before me at the offices
8  of Veritext, 2205 4th Street, Tuscaloosa,
9  Alabama on November 12, 2018, commencing at
10 or about 9:08 a.m., JOHN STAPLES, witness in
11 the above cause, for oral examination,
12 whereupon, the following proceedings were
13 had:
14
15        THE VIDEOGRAPHER:  Good morning.
16 We are on record at 9:09 on November 12th,
17 2018.  Please note that the microphones are
18 sensitive and can pick up whispering and
19 cell phones and private conversations.
20 Please turn off the cell phones and place
21 them away from the microphones.  Audio and
22 video recording will continue to take place
23 until all parties agree to go off the

Page 10

1 record.
2        This is Media Unit Number 1 in the
3 video-recorded deposition of John Staples
4 taken by counsel by the defendant in the
5 matter of Staples, et al. versus Walker
6 Enterprises, et al., filed in the U.S.
7 District Court, Northern District of
8 Alabama, Western Division, Case Number
9 7:18-CV-00160-LSC.  This deposition is
10 taking place at Veritext in Tuscaloosa,
11 Alabama.
12        My name is Tommy Weir from the
13 firm Veritext.  The court reporter is
14 Melanie Petix from the firm Veritext.  I am
15 not related to any party in the action nor
16 am I financially interested in the outcome.
17        Counsel and all present in the
18 room and everyone attending shall state
19 their appearances and affiliations for the
20 record.  If there are any objections to
21 proceeding, please state them at the time of
22 your appearance.  Let's begin with the
23 noticing attorney.

Page 11

1        MR. KING:  Michael King with
2 Greenberg, Traurig on behalf of H. Walker
3 Enterprises, LLC and Renaissance Man Food
4 Services, LLC.
5        MR. PARKER:  Talley Parker with
6 Jackson, Lewis on behalf of defendant
7 Simmons Prepared Food, LLC.
8        MS. SIMMS:  Keri Simms.  I
9 represent John and Kimberly Staples.
10        THE VIDEOGRAPHER:  Would the
11 reporter please swear in the witness.
12
13
14        JOHN STAPLES,
15 having been first duly sworn (affirmed), was
16 examined and testified as follows:
17
18        COURT REPORTER:  Usual
19 stipulations?
20        MR. SIMMS:  Except for we are
21 reserving the right to object.
22        MR. KING:  Yes.  All right.  This
23 is the deposition of John Staples taken

Page 12

1 pursuant to notice after being scheduled by
2 the agreement of counsel that it would be
3 taken for all purposes permitted under the
4 Federal Rules of Civil Procedure.
5
6 EXAMINATION BY MR. KING:
7        Q.  Mr. Staples, can you please give
8 me your full name and home address?
9        **A.  John Freeland Staples, 5712 Rice**
10 **Mine Road, Northeast, Tuscaloosa, Alabama**
11 **35406.**
12        Q.  As I understand it, beginning in
13 April of 2009, you became the general
14 manager of Renaissance Man Food Services,
15 LLC; is that correct?
16        **A.  No.  I became the food service**
17 **director, broadline distribution for Simmons**
18 **Foods.**
19        Q.  All right.  Did you have any
20 affiliation with Renaissance Man Food
21 Services, LLC, also known as Ren Man, in
22 April of 2009?
23        **A.  Yes.  I was asked to manage the**

Page 13

1 **Renaissance Man business on behalf of**
2 **Simmons.**
3        Q.  Who asked you to do that?
4        **A.  Chip Miller, David Jackson, Todd**
5 **Simmons.**
6        Q.  Were you recruited for that
7 position?
8        **A.  I was.**
9        Q.  By whom?
10        **A.  Various individuals, Chip Miller,**
11 **David Jackson.**
12        Q.  Where were you working at the
13 time?
14        **A.  Smithfield Foods.**
15        Q.  Where is that located?
16        **A.  The Corporate office is in**
17 **Smithfield, Virginia.**
18        Q.  Is that where you were located?
19        **A.  Not at the time of the -- well,**
20 **the recruitment went on for a year.  So I**
21 **initially was in Arkansas and then I**
22 **relocated to Virginia.**
23        Q.  So in 2009, where did you live?

Page 14

1   A.  Smithfield, Virginia.

2   Q.  And when you were recorded -- when
3  you were recruited, what did you understand
4  that you were being recruited to do?

5   A.  To help Simmons get into the
6  broadline distribution business.  They had
7  not had success there in the past and
8  someone told them that I could help them
9  with that effort.

10   Q.  Did you have any understanding at
11  the time that you would be associated with
12  Ren Man?

13   A.  I understood that there would be
14  an association.  You say at the time, what
15  time are you referring to?

16   Q.  At the time you were being
17  recruited, did you understand that you were
18  going to have some relationship with Ren
19  Man?

20   A.  Have some relationship with Ren
21  Man, yes.

22   Q.  What did you understand that
23  relationship was going to be?

Page 15

1   A.  Similar to the relationship I had
2  with them at Tyson and similar to the
3  relationship I had with them at Smithfield.

4   Q.  Which is what?

5   A.  Help them manage the business.

6   Q.  Help Simmons manage the business?

7   A.  Yes.

8   Q.  Did you understand that you would
9  have a title at Ren Man?

10   A.  I don't know that we discussed the
11  title.  No.

12   Q.  Did you have any meeting with
13  Herschel Walker before you became employed
14  at Simmons?

15   A.  I met Herschel Walker in January
16  of 2001, 2002, I'm not sure.  I met with
17  Herschel Walker many times.

18   Q.  The question is:  As part of the
19  recruitment process, did you meet with
20  Herschel Walker?

21   A.  With Simmons?

22   Q.  No.  The question is:  At the time
23  you were being recruited, did you meet with

Page 16

1  Herschel Walker?

2   A.  Again, the recruitment process
3  went on a year and a half.  When Simmons
4  began aggressively recruiting me, no.
5  Herschel Walker was not part of those
6  conversations.

7   Q.  Before you got hired, did you have
8  a meeting with Herschel Walker?

9   A.  There were several meetings with
10  Herschel Walker prior to the recruitment by
11  Simmons.

12   Q.  I'm not asking you about that.
13  I'm asking you during the recruitment
14  process, did you have a meeting with
15  Herschel Walker?

16   A.  I don't recall.

17   Q.  Do you have any recollection of
18  being told what your job title would be with
19  respect to Ren Man during the recruitment
20  process?

21   A.  I recall being I would be the
22  general manager for Renaissance Man but that
23  I would be employed by Simmons.

Page 17

1   Q.  Was the purpose of your being
2  employed through Simmons a process by which
3  you could obtain benefits through Simmons'
4  various employee benefit programs?

5   A.  That was certainly part of the
6  arrangement.  I would not have gone to work
7  for Renaissance Man.  Simmons understood
8  that.

9   Q.  Did Simmons at the time that you
10  were employed control your work hours?

11   A.  Control my work hours.  I was a
12  management employee, I worked seven days a
13  week, I was on call 24 hours a day, so I
14  didn't have a work schedule, no.

15   Q.  Did Simmons direct you as to what
16  you were supposed to do on a day-to-day
17  basis as general manager of Ren Man?

18   A.  Nobody directed me on a day-to-day
19  basis, but Simmons did give me specific
20  objectives, yes.

21   Q.  What were those objectives?

22   A.  Well, the first objective was
23  to -- when I took employment, the first, had

Page 18

1  a meeting with David Jackson and Chip Miller
2  as I recall in Siloam Springs, they brought
3  me in.  The first objective was to work with
4  Vicky Goodman on a double credit that had
5  been issued to Renaissance Man, and they
6  wanted me to go through the details and
7  confirm that they were correct in that
8  Renaissance Man basically owed a credit of
9  300 and some thousand dollars back to
10 Simmons.  So I spent that time working with
11 Vicky, who was director of customer service,
12 and we determined that yes, in fact, there
13 had been a double credit issued back to
14 Renaissance Man.
15     Q.   What were your duties at Ren Man?
16     A.   To help grow the business.
17     Q.   What did that involve?
18     A.   It involved a lot because there
19 wasn't a lot of business.  Simmons didn't
20 have any broadline distribution business, so
21 my objective, according to Todd Simmons,
22 according to David Jackson, according to
23 Chip Miller in a meeting we had, to be

Page 19

1  perfectly clear, it was to lay the
2  foundation for Simmons to have success in
3  broadline distribution.  And initially that
4  was to be done through the Renaissance Man
5  partnership.  But that would expand from
6  that because everyone was concerned at some
7  point in time the Renaissance Man
8  partnership would be unable to grow beyond a
9  certain point.
10     Q.   So you had an understanding as of
11 April of 2009 that there was a partnership
12 type relationship between Ren Man and
13 Simmons?
14     A.   I really wasn't clear as to what
15 the partnership was but I understood that
16 there was a partnership.  I didn't really
17 understand it until I was employed.
18     Q.   And what did you come to learn
19 about the relationship?
20     A.   Well, I came to learn that the
21 relationship was rocky.  You basically had
22 two parties that couldn't stand each other,
23 and I was stuck in the middle to try to keep

Page 20

1  them both at bay.
2      Q.   Once you were employed, what did
3  you learn about the nature of the
4  partnership relationship between Ren Man and
5  Simmons?
6      A.   I learned that in Simmons' mind,
7  and this came from Todd Simmons' mouth on
8  several occasions, Simmons owned 35 percent
9  of Renaissance Man.  Simmons was to enjoy 35
10 percent of all profit from Renaissance Man.
11 Todd Simmons told me specifically this is a
12 partnership.  In spite of the fact we don't
13 have a signed agreement yet, we are
14 operating this way, and it's your job to
15 make sure that good, bad or indifferent, 35
16 percent, whatever goes through Renaissance
17 Man, Simmons has a piece of that.  It's your
18 job to manage that.
19     Q.   Now, Simmons is engaged in what
20 type of business?
21     A.   They're in pet food, they're in
22 chicken, they sell retail, they sell
23 national accounts in food service.  They

Page 21

1  sell through broadline distribution, but
2  they did not have any broadline distribution
3  business.
4      Q.   As relates to Ren Man, what does
5  Simmons sell?
6      A.   Ren Man -- Ren Man is in fact a
7  broker for Simmons' products and other
8  products.  The idea was that I would go out
9  there, I would be the face to the customers
10 with Herschel, with our employees, we would
11 be the face to the distribution community so
12 that hopefully over time they would look at
13 Renaissance Man as a supplier.
14         We had some success with that, but
15 eventually as things get tight, especially
16 in protein, margins are tight.  It's a
17 commodity business.  You're talking about
18 pennies.  Simmons -- or Sysco, who was at
19 least for the first eight, nine, ten years
20 the exclusive customer of Ren Man, because
21 Sysco got Ren Man into the business, Robert
22 Thurber got Herschel into the business, so
23 for at least the first eight, nine, ten

Page 22

1 years, it was a relationship to where Sysco
2 was willing to play along as if Renaissance
3 Man were a supplier, when in fact
4 Renaissance Man -- and obviously I don't
5 know what they've done since the last year
6 of last year, but the time that I was
7 associated with Renaissance Man, they were a
8 broker. They didn't own any lines, they
9 didn't own any plants. Rarely took
10 possession of inventory, so it basically was
11 a broker.
12     Q.   So is it fair to say that
13 Renaissance Man placed orders for product to
14 be supplied to distribution companies that
15 it represented that were filled through
16 Simmons?
17     A.   No. That's not fair. Renaissance
18 Man placed no orders for products. The
19 products came from Sysco. They came to
20 Simmons. Whether it was Sysco or whoever it
21 was, the orders came to Simmons. The only
22 thing that the Renaissance Man was involved
23 with, and they weren't even involved with

Page 23

1 this, is that Simmons would print the order
2 back or whatever -- the confirmation with
3 Renaissance Man letterhead.
4     Q.   Who would?
5     A.   Simmons would do that.
6     Q.   Okay.
7     A.   But the customers ordered the
8 product from Simmons.
9     Q.   And as part of that arrangement,
10 Simmons would then receive some portion of
11 the profits from those sales?
12     A.   That was my understanding, yes,
13 along with an administrative fee that they
14 would charge Renaissance Man for basically
15 doing all of the work, all of the back of
16 house work, they did all the work.
17     Q.   Now, were you in a supervisory
18 capacity as general manager of Ren Man?
19     A.   As the general manager, I had
20 employees reporting to me, yes, Ren Man
21 employees.
22     Q.   Did you have any Simmons employees
23 reporting to you?

Page 24

1     A.   We had Simmons employees on my
2 team that with respect to the business I was
3 running, they didn't report to me but they
4 had a dotted line to me. Phil Perkins, Matt
5 Free ^ spl, Devon Jackson, just to name a
6 few. With respect to -- with respect to the
7 business that I ran, which was broadline
8 distribution, that was my responsibility, yes.
9 They reported to me.
10     Q.   Did you have any hiring or firing
11 authority with respect to Simmons employees?
12     A.   No.
13     Q.   Did you have any hiring or firing
14 responsibilities as to any employees of Ren
15 Man?
16     A.   Yes.
17     Q.   Was there any person who on a
18 day-to-day basis had oversight authority
19 over your performance at Ren Man?
20     A.   On a day-to-day basis, no.
21     Q.   So you were at the top of the
22 pyramid; is that right?
23     A.   What pyramid are you referring to?

Page 25

1     Q.   You were at the top of the
2 administrative structure of Ren Man; is that
3 right?
4     A.   Herschel Walker -- Renaissance Man
5 is Herschel's company.
6     Q.   At any time were you an employee
7 of H. Walker Enterprises, LLC?
8     A.   No.
9     Q.   At any time were you an officer or
10 director or member or manager of H. Walker
11 Enterprises, LLC?
12     A.   No.
13     Q.   At any time did you have any
14 hiring or firing authority with respect to
15 employees of H. Walker Enterprises, LLC?
16     A.   Authority, no. Influence, yes.
17     Q.   Did you have any responsibility
18 for the management of H. Walker Enterprises,
19 LLC?
20     A.   I did with respect to their
21 interference with the business I was running
22 according to direction given to me by
23 Simmons.

Page 26

1    Q.  I don't understand your answer.
2  What did Simmons say to you?
3      **A.  Simmons was concerned about**
4  **certain H. Walker Enterprises employees**
5  **getting involved in the Renaissance Man**
6  **business, interfering with the Renaissance**
7  **Man business of which they had an ownership**
8  **position in.**
9    Q.  Which employees of H. Walker
10  Enterprises, LLC are you referring to?
11     **A.  Georgie Boston, the fitness twins,**
12  **George Fiorelli ^ spl, Herschel's niece.  I**
13  **don't remember her name.  Telemarketers that**
14  **came in and created disruption, Simmons was**
15  **concerned about that.**
16     Q.  What did you understand the
17  business of HWE, if I can use those
18  initials, what did you understand the
19  business of HWE to be?
20     **A.  Herschel would refer to it as his**
21  **conglomerate of other companies.**
22     Q.  A holding company, right?
23     **A.  I don't know what a -- I don't**

Page 27

1  **know what a holding company is.**
2    Q.  You understood that it was the
3  entity that owned the LLC interest of Ren
4  Man, correct?
5      **A.  No, I didn't understand what H.**
6  **Walker Enterprises was.  According to**
7  **Herschel, it was a conglomerate of hotels**
8  **that he owned.  And these are things he said**
9  **in front of customers.  Told Sysco corporate**
10  **on a number of occasions he owned hotels and**
11  **hospitals so why weren't they buying more of**
12  **his Renaissance Man products for his hotels**
13  **and hospitals.  Understood he owned fitness**
14  **gyms, that why isn't Sysco selling more of**
15  **his products to its fitness gyms.**
16     **I understood that he owned a**
17  **bedspread/curtain company that provided all**
18  **these bedspreads and all these curtains for**
19  **all these hotels across the country, so in a**
20  **meeting with Marriott, he asked why they**
21  **weren't buying more of his bedspreads and**
22  **curtains.**
23     **And then I met a couple of young**

Page 28

1  **ladies that Herschel said worked for 34**
2  **Promotions.  I met them at the grand opening**
3  **of the restaurant in Athens, and which**
4  **promotions, my understanding was that they**
5  **sell -- and Herschel would get mad at me**
6  **every time I would say it this way, but it's**
7  **the only way I know how to say it, is**
8  **trinkets.  You go to a golf tournament and**
9  **they give you tees and pencils and things**
10  **like that.  So these two young ladies, they**
11  **met me at the restaurant at 34, they got to**
12  **talking to me, nice young ladies.  I said,**
13  **I'll help you in any way I can.  They got**
14  **very excited.  I gave them my business card.**
15  **I'm like, I can help you with anything you**
16  **need help with.**
17     **And the next day, Ron called me to**
18  **tell me that Herschel's upset, doesn't want**
19  **me talking to anyone at Famous -- at the**
20  **promotion company and that he's just giving**
21  **me a heads-up because in a couple of hours**
22  **we're going to have a conference call and**
23  **I'm to act like I don't know what the**

Page 29

1  **conference call is about, which is typically**
2  **the way it worked with Ron and Herschel.**
3  **Herschel would get upset and he'd have Ron**
4  **call me, so that's what -- I didn't know**
5  **much about H. Walker Enterprises.**
6    Q.  And you still don't?  As you sit
7  here today, you don't know much about it?
8      **A.  In terms of what they do, I guess**
9  **the one thing I did know about them, I don't**
10  **know where this is in the -- I spent a lot**
11  **of time with Herschel.  But I don't remember**
12  **what year this was, but the most I learned**
13  **about H. Walker Enterprises was in -- we**
14  **were trying to get our burgers into**
15  **Wal-Mart, retail hamburgers under the Famous**
16  **34 brand.  We developed the packaging,**
17  **Wal-Mart liked it.  It just so happened that**
18  **the Wal-Mart buyer was a Georgia fan, so**
19  **they approved the burgers.**
20     **But as you learn and I learned**
21  **with Wal-Mart, you got to go through a**
22  **process.  Simply the buyer approving it is**
23  **not adequate.  You got to go through their**

Page 30

1 process.
2        So as we're going through this
3 process, at some point in the process, which
4 is an online process which I had our broker
5 take us through, and then they reached this
6 point where they hand it over to Dun &
7 Bradstreet and Dun & Bradstreet kicked it
8 out.  They said you're not an approved
9 supplier because you have negative reviews
10 out of the Savannah office.  So, okay, what
11 does that mean?  I didn't know what that
12 meant.
13        So I got with Ron, I got with
14 Georgie.  And I guess the most I learned
15 about H. Walker Enterprises was somehow,
16 someway, Ron got the lady that's Herschel's
17 personal accountant or whatever, Sunny
18 something I think is her name, she was going
19 to fix it with Dun & Bradstreet, you know,
20 that they didn't really understand, they
21 didn't really understand.  She'd fix it.
22        And, you know, and the issue was
23 the credit rating, and the issue with the

Page 31

1 credit rating was that Renaissance Man was,
2 again, a brokerage company that would drain
3 all of the money, the profit at various
4 times during the year so there was no money
5 left on paper, and that's what Dun &
6 Bradstreet looks at, they look on paper at
7 the company.
8        But the bottom line is through all
9 that, this lady is instructed by Ron, put
10 together a summary of H. Walker Enterprises
11 to send to Dun & Bradstreet because they
12 don't understand who we are, that's the way
13 I understood it.  So this lady sent a
14 summary, and it showed the various entities
15 of H. Walker Enterprises, of which
16 Renaissance Man was one.
17        And as I recall, it was
18 Renaissance Man was 90 percent or more of
19 the sales of H. Walker Enterprises and quite
20 a bit more of the profit of H. Walker
21 Enterprises.  As soon as the lady sent -- I
22 hadn't even opened the thing, and Ron calls
23 me and he says, You're supposed to delete

Page 32

1 the email, you're not supposed to see it.
2 So I deleted the email.
3    Q.  So the answer to my question is
4 that all you knew about H. Walker
5 Enterprises was that it owned other
6 companies, right?
7    A.  It owned other LLCs, yes.
8    Q.  And one of them was Ren Man?
9    A.  Uh-huh.
10    Q.  Say yes or no, please.
11    A.  Yes.
12        MR. SIMMS:  John, try to give a
13 verbal response.  Speak out.
14        THE WITNESS:  Okay.
15        MR. SIMMS:  We all do it.
16    Q.  (BY MR. KING:)  At some point in
17 time -- well, let's not go there yet.
18        Did you have a business card with
19 Simmons?
20    A.  Not that I recall.
21    Q.  Did you have a business card with
22 Ren Man?
23    A.  Yes.

Page 33

1    Q.  Did you have a business card for
2 HWE?
3    A.  No.
4    Q.  Did you ever have a contract with
5 HWE?
6    A.  No.
7    Q.  Did you ever receive compensation
8 from HWE?
9    A.  No.
10    Q.  Did you ever receive a bonus from
11 HWE?
12    A.  No.
13    Q.  Did you ever receive property from
14 HWE?
15    A.  No.
16    Q.  At some point in time, did Ren Man
17 reach an agreement with an entity named
18 Diversified Food Solutions?
19    A.  Yes.  We basically had three DSMs.
20 I guess that's the first one.
21    Q.  Okay.  And that was owned in part
22 by Gary Brown, right?
23    A.  Yes.

Page 34

1  Q.  Do you know roughly how long that
2  particular relationship ran?
3      A.  The relationship with Gary
4  Brown or the relationship with Diversified?
5      Q.  Well, the entity Diversified Food
6  Solutions, which was affiliated with Gary
7  Brown?
8      A.  It was -- Diversified Food
9  Solutions was formed after the affiliation
10  with Gary Brown.  Gary Brown was hired.  We
11  had an interest in approaching Burger King.
12  Gary Brown I had met previously because he
13  was the vice-president of sales for OK
14  Foods.
15      And when I left Tyson, Herschel
16  was concerned and wanted to find another
17  supplier partner.  The situation had
18  basically run its course at Tyson, there's
19  very little volume.  He wanted to find
20  another supplier.
21      I was at Smithfield.  Smithfield
22  was selling Renaissance Man a couple of pork
23  products.  My boss really liked Herschel so

Page 35

1  he allowed me to work with Herschel to help
2  him find another supplier.  I didn't really
3  know any other suppliers.  I've been a
4  salesperson.  I'm not -- I didn't grow up in
5  northwest Arkansas where a lot of these
6  suppliers are.
7      I met with Mike Roger, he had been
8  a vice-president at Tyson, he was now in the
9  brokerage business.  I introduced him to
10  Herschel.  Mike Rogers introduced Herschel
11  to OK Foods, Simmons, there may have been a
12  couple of others.
13      But anyway, so because I was still
14  living in Arkansas and because I had been
15  with Herschel basically since day one, since
16  he got into the business, they asked me to
17  sit in on these meetings.  Herschel wanted
18  to know my impression of these -- these
19  different supplier partners.
20      So I met with Mike Rogers, Gary
21  Brown, and Gary Thompson at their
22  Bentonville office to discuss the
23  possibility of OK Foods becoming the

Page 36

1  supplier partner for Renaissance Man.
2  That's when I met Gary Brown.  That may not
3  have been your question.  And Gary Brown
4  left OK Foods.  From what I understood, he
5  went to work for Brooks Food Group.
6      Q.  Let me see if I can get you back.
7  I'm curious about the first Diversified
8  Food --
9      A.  Okay.
10      Q.  -- Enterprise.
11      A.  What are you curious about?
12      Q.  That was associated with Gary
13  Brown, right?
14      A.  Uh-huh.
15      MR. SIMMS:  You're going to have
16  to give a verbal response.  Speak out, try
17  to --
18      THE WITNESS:  Okay.  Yes.
19      MR. SIMMS:  -- not go uh-huh and
20  uh-uh.
21      Q.  (BY MR. KING:)  What was the
22  nature of the relationship between Ren Man
23  and Diversified Food, what was its purpose,

Page 37

1  what was the relationship?
2      A.  Gary Brown, Gary Thompson, Ken
3  Staples, Quinn Eagle ^ spl and Paul Cannon
4  were partners in Diversified Food Solutions.
5      Q.  What were they doing for Ren Man?
6      A.  They were supporting the new
7  category management award.
8      Q.  How?
9      A.  How?
10      Q.  What were they doing?
11      A.  They were supporting the process.
12  When you receive the award from Sysco
13  corporate, which I -- Herschel never chose
14  to understand or accept, because in
15  Herschel's world, nobody works except
16  Herschel.
17      But the fact of the matter is
18  when you receive an award from Sysco
19  corporate -- and I knew this because I had
20  received the first award that Sysco
21  corporate ever gave out when I was at Mrs.
22  Smith's Food Service and we got all their
23  pie business.  So what Gary Brown and his

Page 38

1 team were doing is they were vetting all of
2 the operating companies.  They were getting
3 prepared for when the award started.
4          Diversified Food Solutions is a
5 different model from what Sysco corporate
6 was used to.  Diversified Food Solutions was
7 formed after Mark Scott /E /PHOFP ^ spl and
8 I met with Sysco corporate in late summer of
9 2015.  I don't remember.  It was a ten-month
10 bid process.
11          And when we got the award from
12 Sysco corporate, we went to Houston.  They
13 gave us the award.  We were thrilled.
14 Simmons was thrilled, because the first
15 objective that David Jackson gave me was to
16 exceed five million pounds.
17    Q.  I'm not asking you what --
18    A.  You're asking me how Diversified
19 was formed and I'm trying to tell you how
20 Diversified was formed.
21    Q.  I'm asking you -- I didn't ask you
22 how it was formed.  I asked you what they
23 were supposed to be doing.

Page 39

1    A.  They were supposed to do exactly
2 what they did do, prepare for the bid, then
3 launch the bid, then manage the bid, then
4 grow the bid.  That's what they were
5 supposed to do.
6    Q.  And how were they compensated?
7    A.  They were compensated by
8 Diversified.  They worked for Diversified.
9    Q.  How were they compensated -- how
10 was Diversified compensated by Ren Man?
11    A.  Through brokerage, through
12 commissions.  Initially they were
13 compensated, I don't remember the timing,
14 but in any type of situation, if you want to
15 hire a broker, and there are no commissions,
16 but you expect a broker to work, you pay
17 what you call a retainer.  And then as the
18 broker starts working, the broker receives
19 the retainer, because they've got to pay
20 their employees.  They have bills to pay.
21    Q.  After Diversified Food acted as a
22 broker for Ren Man, was Diversified Sales &
23 Marketing formed?

Page 40

1    A.  Yeah.
2    Q.  Who were the owners of that
3 enterprise?
4    A.  Randy Sanders and Ken Staples.
5    Q.  And how did that entity, which I
6 understand is referred to as -- well, you've
7 been talking about Diversified up until now.
8 Who made the decision to end the
9 relationship between Ren Man and
10 Diversified?
11    A.  Herschel and I.
12    Q.  And what was the reason for making
13 the change?
14    A.  Well, Diversified -- we found that
15 Gary Brown did not understand broadline
16 distribution.  He did -- he did do what he
17 was asked to do before Diversified was ever
18 formed and he got us into Burger King.  And
19 then I negotiated an award with Burger King
20 and then when -- Herschel was never part of
21 the Burger King process other than to say we
22 want to get into Burger King, then we
23 finally did.  Herschel joined me and Gary

Page 41

1 Brown in a meeting in Burger King's
2 corporate office.  They wanted Herschel to
3 sign the documents and do a big hoorah of a
4 new supplier.  And it was in that meeting
5 that Herschel was embarrassed by one of the
6 comments that one of the -- I was
7 embarrassed too, quite frankly.  Do you want
8 me to share that or am I saying too much?
9    Q.  I was just trying to understand
10 why there was a change made, so if this is
11 pertinent to that change --
12    A.  So you want to know why Gary
13 Brown was -- okay.  So in this meeting in
14 the spring, I don't remember the year, but
15 it was the spring before we made the switch
16 to the second Diversified, through this bid
17 process, we went from -- you know, initially
18 Phil Perkins and I went there.  Simmons did
19 not have business with Burger King and were
20 intrigued about the possibility of business
21 with Burger King.  And we had heard through
22 Gary Brown that Burger King really had
23 interest in minority spend, and that the

Page 42

1 other good hurdle with Burger King was that
2 the minority supplier didn't have to own the
3 facility, they didn't have to own anything,
4 it could just be a pass-through. So that
5 fed up well with Renaissance Man.
6       So we met with Burger King. They
7 allowed us to go through the bid process.
8 Like most bid processes, especially in
9 protein, the changes weekly because it's a
10 commodity business, it takes too long. So
11 by the time the bid -- from by the time we
12 met and the bid actually came out, Simmons
13 didn't -- we didn't have product. We didn't
14 have available product so we didn't want to
15 bid on any process.
16       So I reached out to George's,
17 which is another poultry company in
18 Springdale, Arkansas, to see if they had
19 interest in Burger King, would they be
20 willing to bid with us or bid through us to
21 get business at Burger King. They said
22 sure. So we went through the bid process.
23 As I recall, it was a chopped and formed

Page 43

1 chicken patty. Gary Brown took that, got
2 specifications. They -- George's ran the
3 product, sent it in, product looked good,
4 pricing looked good, everything looked good.
5       But then they sent the official
6 specifications. And Gary Brown called me
7 and was freaking out. What's the problem?
8 Well, the official specifications call for,
9 and I don't know the piece of equipment,
10 Formax ^ spl, whatever it is, it's a piece
11 of chicken equipment that squeezes out a
12 chopped and formed product. And there's
13 basically two or three brands. And whatever
14 it was, that the Burger King specification
15 called for a specific brand and Simmons --
16 or George's had the other brand.
17       So Gary Brown said, We can't do
18 this. I know, I know, I know, I know the
19 Burger King people and they'll cut me -- I'm
20 not going to be a part of this unless
21 George's buys this other piece of equipment.
22 So I went to George's, I said, George, you
23 going -- no, they're not going to invest in

Page 44

1 the Burger King -- they're not going to
2 invest in that equipment. Unless
3 Renaissance Man wants to invest in it, we'll
4 invest in it.
5       Herschel and Ron didn't want to
6 invest in it, which I understood that. I go
7 back to Gary Brown. I said, Gary, isn't
8 this like a -- I've been in the chicken
9 business long enough to know, I'm not --
10 isn't this like a Buick and a GMC or a Chevy
11 and a Buick? And he said no.
12       And I may get long-winded, but the
13 answer to your question is, I said it's
14 like -- so I had to call Burger King and say
15 we can't do it. We can't do it with
16 George's. They were upset because they had
17 already announced to their diversity team,
18 to their board of directors that they were
19 forming a new relationship with Renaissance
20 Man Simmons. The lady told me, What are we
21 going to do? I said, I'm sorry, I don't
22 know what they're going to do.
23       But what they ended up doing is

Page 45

1 telling Purdue, who was already making the
2 product for them, they told Purdue to save
3 face, okay, a million pounds of this
4 product, put an H. Walker foods label on it
5 and force it through.
6       The problem that was embarrassing
7 that led to Gary Brown -- and sometimes
8 these answers take time. It's not that I'm
9 trying to be long-winded. The fact of the
10 matter is in the meeting with Burger King
11 corporate, the vice-president of QA looked
12 at Herschel and said, Herschel, I got one
13 question for you. Why did you go from
14 Simmons to George's to Purdue? We awarded
15 you the business at George's. Why did you
16 jump to Purdue? And it was because -- and I
17 spoke up and said, It's because you asked
18 for a different -- you asked for a piece of
19 Formax equipment or whatever. And she said,
20 That's ridiculous.
21       So anyway, that was a mark on Gary
22 Brown. From that day forward, Herschel had
23 reservations about Gary Brown, as I did too.

Page 46

1 Because it appeared to Herschel, as it
2 appeared to me, that Gary Brown was about
3 Gary Brown.  Gary Brown was about protecting
4 his association, his interest with Burger
5 King.
6      Q.   So at that point -- at some point
7 following this Burger King fiasco,
8 Diversified Sales & Marketing was created,
9 right?
10     A.   Several months after that, yes.
11     Q.   And it was created to do brokerage
12 as well, right?
13     A.   Yes.
14     Q.   How did Ms. Staples end up being
15 an owner of Diversified Sales & Marketing?
16     A.   She had been an owner of DSM one,
17 DSM two and DSM three.
18     Q.   Okay.  We just were talking about
19 this Diversified that's associated with Gary
20 Brown, right?
21     A.   Uh-huh.
22     Q.   Did Ms. Staples have an interest
23 in the ownership of that enterprise?

Page 47

1      A.   Yes.
2      Q.   How did she get that?
3      A.   She got it because it was formed.
4 I had a discussion with Herschel and Ron and
5 Simmons, and they understood she would be an
6 owner of Diversified one, two, and three.
7      Q.   What expertise did she bring with
8 respect to brokerage relationships at the
9 time that she became an owner?
10     A.   She brought wonderful expertise.
11 She actually worked for Mike Rogers at his
12 brokerage when Renaissance Man first got
13 into the business.  She worked in his
14 office.  When Renaissance Man got its first
15 award with Sysco owned commodity -- I was
16 working with Smithfield and Kim worked at
17 Mike Rogers' office and supported Ren Man,
18 so she's actually been a part of the
19 brokerage team ever since Herschel partnered
20 with Simmons.
21     Q.   How was Mr. Walker informed that
22 she would be an owner of the first
23 Diversified?

Page 48

1      A.   In a phone conversation.
2      Q.   Between whom?
3      A.   He and I.
4      Q.   How was Simmons informed that Ms.
5 Staples would be an owner in the first
6 Diversified?
7      A.   I suspect in the same way.  I
8 don't recall the meeting but they were
9 informed.
10     Q.   With respect to the creation of
11 the second Diversified, Diversified Sales &
12 Marketing, how was Mr. Walker informed that
13 Ms. Staples would be an owner of that
14 enterprise?
15     A.   In a meeting in Ron's office when
16 we were discussing the termination of
17 Diversified one.
18     Q.   And when you say Ron, you're
19 talking about Ron Eisenmann?
20     A.   Uh-huh.
21          MR. SIMMS:  Can you give a verbal
22 response, please?
23     A.   Ron Eisenmann.

Page 49

1      Q.   How was Simmons informed that Ms.
2 Staples would be an owner of the second
3 Diversified?
4      A.   I informed them, and I suspect
5 Herschel informed them.  I don't know.
6      Q.   How did you inform Simmons?
7      A.   I think I told Chip Miller, Katie
8 Redman ^ spl who paid the commissions.
9      Q.   Now, eventually there came to be a
10 third DSM, and this was called Diversified
11 or DSM Sales & Marketing, LLC, correct?
12     A.   Uh-huh.  Yes.
13     Q.   DSM Sales & Marketing started its
14 relationship with Ren Man on October 1,
15 2016, right?
16     A.   That sounds correct.
17     Q.   Now, what happened to cause the
18 creation and broker relationship with the
19 third DSM?
20     A.   In August of that year, which I
21 guess is 2016, in August of 2016, Sysco
22 corporate had completed the most recent
23 CATMAN process.  It's a ten-month process.

Page 50

1 During the course of that year, I managed --
2 I've always managed the brokers. And I
3 managed them the way I've always managed
4 them, and that's to get the most out of
5 every broker I've ever managed wherever I've
6 been. At Mrs. Smith's, at Tyson, at
7 Smithfield, I managed the brokers.
8        It became obvious to me in 2016
9 that Randy Sanders didn't like to be
10 managed. Randy Sanders would comment we're
11 exceeding category management by 120
12 percent, which is better than anybody else
13 in the category. We're exceeding our job.
14 We're doing more than what we've been asked
15 to do, so why are you managing me in this
16 way? Why are you asking me to bring on
17 additional employees?
18        And you know, the truth of the
19 matter is he had a great argument. DSM one,
20 DSM two, DSM three outperformed every broker
21 in the poultry category at Sysco corporate.
22 I know that because they told me and I saw
23 the numbers. And the other brokers were

Page 51

1 multimillion dollar brokerages, but our
2 process was better and it worked.
3        So anyway, when we got our -- the
4 objective -- when Simmons -- when Simmons
5 and I spoke and Simmons elected in the most
6 recent bid to bid through Renaissance Man
7 one more time, the marching orders I got
8 from Simmons was no more commodity pounds or
9 further process pounds. We're not going to
10 bid on any commodity pounds. These are
11 marching orders I got from Simmons.
12        What that means is commodity
13 pounds require more effort because commodity
14 pounds -- or further process pounds require
15 more effort. Commodity pounds don't require
16 any effort out in the market because it's
17 all based on price. Further process pounds
18 require effort. They require communication.
19        So I got the award. The most
20 recent award was given to us in August of I
21 think 2016. We accomplished the objective,
22 we got more further process pounds than we
23 had ever got. Simmons was excited. I don't

Page 52

1 know if Herschel was excited or not. In all
2 the years I've known Herschel, he's never
3 complimented anybody about anything. I've
4 never gotten any compliments.
5    Q.  That's not a question that I
6 asked. What I asked you was what was the
7 reason that there was a change made from the
8 second --
9    A.  Well, the reason --
10   Q.  -- Diversified to DSM --
11   A.  The reason was we got --
12   Q.  Hold on. You've got to let me
13 finish my question for the record.
14        MR. SIMMS: Let him finish his
15 question. Make sure you listen to the
16 question and then answer it.
17   Q.  What is the reason that DSM, the
18 third one, was formed to take over for the
19 second Diversified?
20   A.  We got more commodity pounds than
21 we ever had. Blane ^ spl Walker and I had a
22 meeting with Randy Sanders at the Courtyard
23 in Hoover, Alabama the Thursday or Friday

Page 53

1 before Labor Day weekend. And I told Randy
2 Sanders he was going to receive more
3 commission under this new award. He needed
4 to hire additional employees.
5    Q.  And he refused?
6    A.  He refused.
7    Q.  That's the reason that you made
8 the change was to get a broker that would
9 hire more employees?
10   A.  No. Let me take that -- he didn't
11 refuse. He said let me chew on it. And
12 then on Labor Day Monday or the day after
13 Labor Day, he sent me an email saying that
14 he had resigned his -- he was resigning but
15 that he wanted to maintain his interest in
16 Diversified but he was resigning.
17   Q.  Do you know who the employers were
18 at the -- who the employees were at the
19 second Diversified as of September of 2016?
20   A.  Barber Humphrey, Christopher
21 Thurber, Ken Staples, Blair Staples, Randy
22 Sanders, Gary Collins was paid through, so
23 on the map they looked as if they were

Page 54

1 employees. Darryl Cargill ^ spl was paid to
2 do certain things. On the map they looked
3 as employees.
4    Q. And it was your -- it was your
5 opinion as of Labor Day of 2016 that that
6 was an insufficient number of employees to
7 broker your new Sysco CATMAN allotment?
8    A. It wasn't necessarily the number.
9 It was the activities that they were
10 involved in, and it was -- it was also
11 asking for actual leadership from Randy
12 Sanders. Randy Sanders was not actively
13 involved. I was disappointed in his lack of
14 leadership.
15    Q. So as of October 1, 2016, you have
16 the new DSM; is that right?
17    A. Yeah, there are some things that
18 occurred, but if you don't want me to bring
19 them up, I won't bring them up. Yes,
20 October 2016.
21    Q. How did the change in structure
22 change the leadership issue that you had
23 identified with Randy Sanders?

Page 55

1    A. Well, Todd Townsend had been
2 briefly employed. He was going to be the
3 new leader of DSM two after Randy Sanders
4 left. And then in the transition, Ron and
5 Herschel agreed to let him be the new leader
6 of DSM three.
7    Q. How long did that last?
8    A. Not long. A couple of weeks.
9    Q. What happened?
10    A. We -- Herschel and Ron and I had a
11 meeting in Ron's office, and they agreed to
12 put together a bonus plan where Todd could
13 make additional money, certain things. And
14 it never came to fruition, so Todd took
15 another job offer from someone else after
16 coming to my house, looking me in the eye
17 and saying he was committed to me.
18    Q. So who filled -- after Todd
19 Townsend left, who filled the leadership
20 role?
21    A. Well, eventually it was going to
22 be -- my understanding was Julie and Kim
23 were going to lead it as a women-owned

Page 56

1 organization, but in the interim, they asked
2 me to be a consultant to provide the
3 leadership.
4    Q. And you had -- so you had a role
5 as a consultant to DSM for which you were
6 compensated?
7    A. Yes.
8    Q. And that compensation was $40,000
9 a year?
10    A. Yes.
11    Q. And you were also the general
12 manager of Ren Man at that time?
13    A. Again, I was director of broadline
14 distribution sales for Simmons with -- the
15 discussion was outside of the building,
16 everybody looked at me as a general manager
17 of Renaissance Man.
18    Q. That's what you called yourself,
19 isn't it?
20    A. Absolutely. I was told to wear
21 the hat and play the part, and that's
22 exactly what I did.
23    Q. So your title and role at Ren Man

Page 57

1 was general manager?
2    A. At Ren Man, with respect to Ren
3 Man, yes.
4    Q. Did you ever have any ownership
5 interest in Ren Man?
6    A. No.
7    Q. Were you ever offered sweat equity
8 interest in Ren Man?
9    A. It was discussed but never --
10 never got anything formally offered, no.
11    Q. Now, did you have a role with any
12 other company -- for the work that you were
13 doing for Simmons, did you have a role with
14 any other company other than DSM and Ren
15 Man?
16    A. No.
17    THE WITNESS: Can I get a water?
18    MR. SIMMS: Can we take a break
19 real quick?
20    MR. KING: Yes, you can take a
21 break at any time.
22    THE VIDEOGRAPHER: We're going to
23 go off the record at 10:03.

Page 58

1          (Short recess.)
2
3          THE VIDEOGRAPHER:  We are on the
4  record at 10:10.
5     Q.  (BY MR. KING:)  I'm handing you
6  what has been marked as Defendant's Exhibit
7  1.
8
9  (Defendant's Exhibit 1 was marked for
10  identification and is attached to the
11  original transcript.)
12
13     Q.  Have you read Exhibit 1 before?
14     A.  So this is the third complaint?
15     Q.  The question is whether you've
16  read it before?
17     A.  And my question is, is this the
18  third amended complaint?
19     Q.  It is styled Plaintiff's Third
20  Consolidated Amended Complaint with the
21  federal court on April 26th, 2018.
22     A.  Yes, I would have read this.
23     Q.  You understand this document

Page 59

1  contains the claims that you've asserted in
2  this litigation, correct?
3     A.  Correct.
4     Q.  Let's go to Page 10.  Count One of
5  this complaint relates to interference with
6  business relationship of Mr. Staples and
7  Simmons, right?
8     A.  Yes.
9     Q.  When you say the relationship with
10  Simmons, what do you mean?
11     A.  Simmons was my employer.
12     Q.  So the claim is that HWE and/or
13  Ren Man interfered with your employment
14  relationship with Simmons; is that correct?
15     A.  Yes.
16     Q.  Now, you understood that Ren Man
17  had a business and partnership relationship
18  with Simmons, correct?
19     A.  Of some type, yes.
20     Q.  And the product was being sold by
21  Simmons in which the invoices were printed
22  on Ren Man invoices, correct?
23     A.  Product was being sold by me and

Page 60

1  Renaissance other -- Renaissance Man
2  employees, but Simmons was actively involved
3  in every part of that process.
4     Q.  And Simmons provided the back
5  office accounting function for Ren Man,
6  right?
7     A.  Yes.
8     Q.  And HWE, we've already discussed,
9  was the owner of Ren Man?
10     A.  The way I understood it, yes.
11     Q.  Now turn to Page 12.  This is
12  Count Two of the complaint which deals with
13  interference with business relationship of
14  Mr. Staples and DSM.  DSM is the third?
15     A.  Uh-huh.
16     Q.  Third enterprise that we just
17  described as broker, right?
18     A.  Yes.
19     Q.  And your relationship with DSM was
20  as a consultant for which you were
21  compensated?
22     A.  Yes.
23     Q.  And you're aware that Ren Man was

Page 61

1  under a written contract with DSM, correct?
2     A.  There was a brokerage agreement,
3  yes.
4     Q.  And is the gist of your complaint
5  that actions taken by HWE and Ren Man
6  affected your ability to obtain a commission
7  from DSM -- excuse me, a -- sorry, let's do
8  that again.
9          Is it your contention that actions
10  taken by HWE and Ren Man interfered with
11  your ability to obtain a consulting fee from
12  DSM?
13     A.  Actions taken by Renaissance Man
14  basically eliminated DSM, so yes, it
15  affected my consulting fee.
16     Q.  Is that what you're asserting here
17  is that you should be paid a consulting fee
18  by DSM but for actions taken by Ren Man and
19  HWE?
20     A.  I'm asserting that Simmons did not
21  do what they had agreed to do and protect me
22  and my family.  Not only did they not
23  protect my consulting fee through DSM three,

Page 62

1 they allowed someone to fire me who I did
2 not work for.
3    Q.  But that's not what you're
4 alleging in Count Two, is it?  Your claim in
5 Count Two was against HWE and Ren Man; isn't
6 that right?
7    A.  Yes.  I mean, actions taken by
8 Renaissance Man and H. Walker Enterprises
9 certainly eliminated my consulting fee at
10 DSM three.
11    Q.  Now, what wrongful act did Ren Man
12 commit interfering with your business
13 relationship with DSM?
14    A.  Well, the first wrongful act is
15 they withheld earned commissions by DSM for
16 the months of December and January,
17 basically.  That's a wrongful act in my
18 opinion.  They withheld -- instructed
19 Simmons to withhold the commissions of which
20 DSM have still not been paid.  So we have
21 DSM employees, including myself, who were
22 still working for DSM consulting, trying to
23 keep the business alive that are owed money.

Page 63

1 So that's a wrongful act to withhold
2 commissions.  It certainly would be by my
3 definition.
4    Q.  Did Ren Man or HWE ever threaten
5 you physically in connection with the
6 termination of your employment?
7    A.  Did they ever threaten me
8 physically?
9    Q.  Yes.
10    A.  No, I've never been threatened
11 physically.
12    Q.  Prior to the time that you were
13 terminated, did Ren Man or HWE liable or
14 slander or otherwise defame you?
15    A.  Prior to the time I was
16 terminated?  It's my understanding, yes.
17 Herschel called Christen and told her I
18 wasn't working and that he was very
19 concerned.  And Christen Caffey^ spl, who
20 was at Sysco corporate, basically led
21 Herschel into the business under the
22 direction of Robert Thurber.
23        But she called me in the fall of

Page 64

1 2017 and said, Herschel says you're not
2 working.  He has concerns about you and is
3 questioning your behavior and ethics, and I
4 simply told him -- Christen said she told
5 him we were both good friends of hers and
6 that she didn't believe any of that.
7    Q.  I need to know the specific
8 statements that you allege are defamatory.
9    A.  That I wasn't working, that I was
10 playing, those are the -- and if you're
11 telling someone at Sysco corporate who has a
12 lot of influence to this day, that's
13 defamatory in my opinion.
14    Q.  So the statement was that you were
15 not working and you were not playing and
16 you're alleging that is defamatory?
17    A.  With respect to who it was said
18 to, yes, that's what I would allege.
19    Q.  Any other statements made prior to
20 the time you were terminated that you
21 consider to be defamatory?
22    A.  Not that I recall.
23    Q.  And did you take those words

Page 65

1 literally that you were not working at all?
2    A.  Based on the way Christen --
3 Christen tried repeatedly to call me, as I
4 recall, and so she took it literally, so
5 yes, I took it literally.
6    Q.  She got you at work, didn't she?
7    A.  She got me on my cell phone which
8 I have at all times.  That's the only work
9 phone I have.
10    Q.  And you were working at the time?
11    A.  I don't remember when -- the call
12 could have been at night or could have been
13 on a Saturday.  I don't remember when the
14 call was.
15    Q.  Well, you told me earlier that you
16 worked seven days a week.
17    A.  I'm on call pretty much, so yeah,
18 that's why I would have taken the call from
19 Christen.
20    Q.  What is defamatory about the use
21 of the word playing?
22    A.  I guess it's in the context in who
23 it was discussed with.  To me, it's

Page 66

1 defamatory.  To you, it may not be.  But
2 when you're telling someone that has
3 influence over what I do, and she certainly
4 does, and she has influence over the poultry
5 department at Sysco this very day,
6 even though she works for Radian ^ spl
7 because she's a Sysco corporate poultry
8 category captain, so if you're trying to
9 hurt me, you talk to someone at Sysco
10 corporate.  You talk to Christen Caffey, you
11 hope to get her in your corner.
12        So whether anybody else takes the
13 word playing as not -- to me in that
14 context, it was defamatory.  I didn't like
15 it.  Because I was working, and I told
16 Christen I was working, and she knew I was
17 working.  And the results showed I was
18 working.
19     Q.  So as a result of the defamatory
20 comments, since she didn't believe them, you
21 weren't harmed, were you?
22     A.  I don't know that I was harmed.  I
23 don't know if Christen discussed that

Page 67

1 information with anybody else at corporate
2 or not.  I don't know.  I feel like she
3 probably has.
4     Q.  You don't know, you don't have any
5 facts to support that statement?
6     A.  I don't have a fact, no.
7     Q.  And you don't have any facts to
8 tell me about how you were specifically
9 harmed by a statement that she didn't
10 believe?
11     A.  No, I don't have any facts.
12     Q.  I want you to go to Page 14,
13 please.
14     A.  (Witness complies.)
15     Q.  Do you see that Count Three
16 asserts a claim against HWE and RMFS for
17 civil conspiracy, do you see that?
18     A.  I do.
19     Q.  Tell me how HWE and Ren Man
20 conspired against you.  Tell me what facts
21 you know of a conspiracy.
22     A.  They conspired by demanding that
23 my wife sell her 50 percent interest to

Page 68

1 Julie Blanchard for ten dollars.
2     Q.  Who at HWE participated -- well,
3 first of all, let's do this.  Count Three of
4 the complaint states that you personally
5 have suffered losses due to the conspiracy
6 with respect to the termination of your
7 employment with Simmons and the termination
8 of your consulting arrangement with DSM.
9 That's what Count Three relates to.  It
10 doesn't relate to your wife.
11        So tell me what facts you are
12 aware of where HWE and Ren Man conspired to
13 interfere with your employment relationship
14 with Simmons and/or your consulting
15 arrangement with DSM.
16     A.  They conspired.  I lost my
17 consulting fee from DSM three.  They
18 conspired to shut down DSM three for a few
19 days and then resurrect it after my wife
20 sold her 50 percent ownership for ten
21 dollars to Julie Blanchard, so I had no
22 income from DSM three.  Somehow, someway,
23 they convinced Simmons to withhold

Page 69

1 commission payments for November, December,
2 and January from DSM three.  They conspired
3 with Simmons.  Simmons would have never in
4 my experience with Simmons withheld
5 commission payments to a broker that had
6 earned them.
7     Q.  Who acted on behalf of HWE during
8 this conspiracy?
9     A.  It was my understanding Julie
10 Blanchard.  She always told us she worked
11 for HWE.  And it was our understanding that
12 she and/or Herschel directed Simmons to
13 withhold the commission payments.
14     Q.  Who in this conspiracy acted on
15 behalf of Ren Man?
16     A.  I guess that would be Herschel.
17     Q.  Are you aware of any
18 communications -- well, can you think of any
19 other person other than Herschel and Julie
20 Blanchard that were involved in this
21 conspiracy?
22     A.  Well, Simmons would have had to
23 have been involved.  They didn't send the

Page 70

1 checks.
2    Q.  No.  The conspiracy is between --
3 as alleged is between HWE and Ren Man.  Are
4 there any other participants on behalf of
5 HWE and Ren Man other than Herschel and
6 Julie?
7    A.  Well, I suspect the main
8 conspirator would have been the attorney Ron
9 Eisenmann, who was actually my wife's
10 attorney, who my wife paid because she owned
11 50 percent of DSM three.  Ron Eisenmann
12 billed -- Ken Staples was Ron Eisenmann's
13 client just as much as Julie Blanchard was.
14 Ron Eisenmann wrote the documents to
15 basically get rid of DSM three for a period
16 of days at which time Julie could take it
17 back over.  So I guess in my mind Ron
18 Eisenmann was part of the conspiracy.
19    Q.  Name one statement that you're
20 aware of between Eisenmann, Blanchard, and
21 Walker that advanced the conspiracy.
22    A.  I wasn't in the room during the
23 conspiracy or the planning so I don't know

Page 71

1 of any statements that were made.  I just
2 know the documents that were sent.
3    Q.  Name one activity committed by HWE
4 that advanced the conspiracy.
5    A.  Again, it was my understanding
6 that Herschel owns HWE, and Julie constantly
7 told us she worked for HWE, refused to even
8 take a DSM email address.  So I guess with
9 respect to HWE, it was Herschel and Julie
10 Blanchard.
11    Q.  Name an action taken by HWE in
12 connection with this conspiracy.  Let me do
13 it this way:  You got fired -- you got your
14 employment terminated by Ren Man, correct?
15    A.  First of all, I didn't work for
16 Ren Man, so yeah, it was surprising when Ren
17 Man attempted to fire me.  My employer has
18 never fired me, never spoken to me about a
19 termination.
20    Q.  We'll talk about that later.  You
21 were told that you were no longer going to
22 act as general manager of Ren Man on the
23 27th of December 2017, right?

Page 72

1    A.  By Herschel.
2    Q.  And he was acting as the owner of
3 Ren Man, correct?
4    A.  Obviously.
5    Q.  You didn't have any employment
6 with HWE or any other contractual
7 relationship, right?
8    A.  No.
9    Q.  Name one action taken by HWE that
10 resulted in your termination -- the
11 termination of your acting as general
12 manager of Ren Man.
13    A.  Again, you don't like my answer,
14 but the answer is Julie Blanchard told us
15 that she worked for HWE.
16    Q.  Did Julie --
17    A.  So when Ron Eisenmann, who I
18 thought was my wife's attorney, asked me to
19 get my wife to sign a document giving Julie
20 Blanchard her 50 percent ownership of DSM
21 three, and Julie Blanchard had always told
22 us she worked for H. Walker Enterprises,
23 that's my answer.  I'm not a lawyer but

Page 73

1 that's my answer.
2    Q.  I'm talking about -- I'm not
3 talking about -- I'm not talking about your
4 wife's interest in DSM.
5    A.  Obviously if DSM no longer exists,
6 I cannot get paid a consulting fee.  And if
7 DSM -- if Julie Blanchard and/or Herschel
8 Walker -- I don't know who instructed
9 Simmons to withhold the commission payments
10 for December and January.  I don't know
11 that.  I just know they were withheld.  And
12 I just know to this day we don't have that
13 money.  And so I know my employees, so
14 naturally -- I haven't been paid my
15 consulting fee, so in my opinion, in my
16 opinion, the conspiracy was between Julie
17 Blanchard and Herschel Walker and Ron
18 Eisenmann.
19    Q.  And I understand that's your
20 opinion.  I'm just trying to identify one
21 fact that you personally are aware of in
22 which you can point to and say HWE did this
23 act to cause interference in a conspiracy

Page 74

1 with your employment or your consulting
2 arrangement.
3      A.  I'd have to look at my documents
4 of which I haven't had the opportunity to
5 look at.  They cut off my email address on
6 the 28th.  I don't have privy to those
7 documents, so I'd need to relook through
8 that to refresh my memory.
9      Q.  The answer is that as you sit here
10 right now at this minute under oath, you
11 can't think of one act committed by HWE to
12 advance a conspiracy to interfere with your
13 employment or your consulting relationship.
14      A.  I guess if you don't consider what
15 I've already said to be a conspiracy, then I
16 guess not.
17      Q.  Take a look at Page 28, please.
18
19          (Discussion off the record.)
20
21      Q.  (BY MR. KING:)  Okay.  I have
22 directed you to Count Nine, which is a
23 conspiracy alleged between HWE, Ren Man,

Page 75

1 and/or Simmons for conspiracy with respect
2 to the wrongful termination of your
3 employment with Simmons.  Do you see that?
4      A.  Uh-huh.
5          MR. SIMMS:  Can you answer out?
6      A.  Yes.
7      Q.  Can you identify one act committed
8 by HWE to advance the civil conspiracy claim
9 for the wrongful termination of your
10 employment with Simmons?
11      A.  I look at HWE and Renaissance Man
12 in the same light.  Herschel Walker owned
13 both companies.  Herschel Walker didn't have
14 the right to fire me.  I wasn't employed by
15 Herschel Walker, whether that was HWE,
16 Renaissance Man or whatnot.
17          I used to receive H. Walker
18 Enterprises bills from Ron Eisenmann of
19 which he would have Simmons pay for H.
20 Walker Enterprises activities, so in my
21 mind, H. Walker Enterprises, Renaissance
22 Man, they're all in the same.  Julie
23 Blanchard told us she worked for H. Walker

Page 76

1 Enterprises.  So the wrongful termination,
2 it was certainly wrong.  There was no
3 justification given.
4          Simmons had promised me I would
5 not be terminated without cause or I never
6 would have gone to work for them.  We can
7 get to that later if you'd would like.  So
8 H. Walker Enterprises, Renaissance Man, as
9 far as I was concerned, that was Herschel
10 Walker and Julie Blanchard.
11      Q.  So as you sit here today, you
12 can't think of one specific action taken by
13 HWE independently that resulted in your
14 wrongful termination?
15      A.  I suspect -- yes, I sure can.  H.
16 Walker Enterprises attempted to bill Simmons
17 for nonRenaissance Man activities.  And I
18 became aware of it after a call from
19 Simmons' controller, and I told her not to
20 pay the bills because I had been told by
21 Herschel and I had been told by Julie that
22 it was to be separate from the arrangement
23 at Simmons and that it was to be sold

Page 77

1 through H. Walker Enterprises.  And I had
2 been told by Todd Simmons that everything
3 that I was involved with, that Simmons was
4 involved with, right, wrong or indifferent,
5 was to flow through the Renaissance
6 Man/Simmons partnership.
7      Q.  So what action was taken by HWE to
8 cause your termination?
9      A.  What action was taken by HWE.
10 Corporations don't take actions.  People do.
11 Herschel Walker and Julie Blanchard fired
12 someone who didn't work for them.
13      Q.  And when you say Herschel and
14 Julie, you are just combining them for
15 purposes of this lawsuit; is that right?
16      A.  No.  I'm combining them because
17 Herschel owns H. Walker Enterprises and
18 Julie constantly told us that she worked for
19 the parent company, H. Walker Enterprises.
20      Q.  And are you aware of one thing
21 that was done by Julie Blanchard to
22 communicate with Simmons to cause your
23 termination?

Page 78

1    A.   That would be unusual for me to be
2  in the room when they're conspiring to
3  terminate me, so I wasn't in the room when
4  those discussions were had, if they were
5  had.
6    Q.   And you're not aware of any action
7  taken by people associated with HWE to cause
8  your termination; is that right?
9    A.   After the fact, Chip Miller placed
10 all the blame on Herschel Walker.
11   Q.   Individually?
12   A.   Renaissance Man, H. Walker
13 Enterprises.  Again, I wasn't in the room
14 when they were planning whatever it is they
15 were planning.
16   Q.   You're the one who's alleged that
17 this conspiracy took place, so I'm asking
18 you what you know personally of your own
19 personal knowledge as to the existence of a
20 conspiracy.
21   A.   What I know that appeared as a
22 conspiracy to me is that I received
23 documentation from Ron Eisenmann telling me

Page 79

1  I must have my wife sign over her interest
2  of DSM three to Julie for ten dollars, in
3  addition to signing a nondefamatory clause
4  against Herschel Walker, in addition to
5  agreeing to a two-year noncompete.  It came
6  from Ron Eisenmann who on many occasions
7  sent me a bill, and the subject line and the
8  actual documentation of the invoice said H.
9  Walker Enterprises.  Wouldn't even say
10 Renaissance Man.  So I wasn't in the
11 meeting, I don't know what was discussed,
12 but to me, that's certainly a conspiracy.
13   Q.   All right.  Let's turn to Page 29,
14 Count Ten.
15   A.   (Complies.)
16   Q.   You made a claim for defamation
17 for acts taken subsequent to the filing of
18 the original complaint in this case, do you
19 see that, Paragraph 97?
20   A.   Uh-huh.
21   Q.   Yes or no?
22   A.   Yes.
23   Q.   You allege that Mr. Walker, quote,

Page 80

1  engaged in communications with third parties
2  inclusive of representatives, agents,
3  servants and/or employees of an entity known
4  as Radian and stated to such parties that
5  Mr. Staples, along with other third parties
6  not -- or third persons not parties to these
7  proceedings had conspired to steal his
8  company.  Additionally, that Mr. Staples had
9  stolen from him and/or his company.  Did I
10 read that correctly?
11   A.   That's the way I read it.
12   Q.   Who are the third parties that are
13 described in Paragraph 97 of the complaint?
14   A.   Christen Caffey is the primary
15 party.
16   Q.   Who else?
17   A.   David Jones.
18   Q.   Who else?
19   A.   Recently, Wade Hopkins.
20   Q.   Anybody else?
21   A.   I don't know of anyone directly,
22 but indirectly I suspect there are others,
23 but those are the ones.

Page 81

1    Q.   I need to know about the people
2  that you know about.
3    A.   Those are the three.
4    Q.   All right.  With respect to
5  Christen Caffey, tell me everything that she
6  -- that you understand was said to her by
7  Mr. Walker.
8    A.   Christen -- I was at the Boston
9  seafood show.  Christen called me several
10 times, I couldn't get ahold of her.  I
11 finally called her, and she said, Herschel's
12 making all types of claims about you, just
13 wanted you to know.  She said she suspected
14 other people in the corporate office had
15 heard this.  She suspected that the
16 information had got back to Sanderson Farms,
17 because I had met with Sanderson Farms about
18 possible employment and all of a sudden they
19 went --
20   Q.   I don't need to hear about
21 Sanderson Farms.  My question was what
22 specific statement --
23   A.   Christen said Herschel said I sent

Page 82

1 70,000 emails during my nine years at
2 Renaissance Man and only 3,000 of them were
3 business related.  She told him -- Herschel
4 told Christen, I know that you like him but
5 he wasn't working.  I really didn't -- I
6 really didn't have anything negative to say
7 about him until I started looking at the
8 emails and none of them were business
9 related, and I found this document that I'm
10 going to text you that shows he was trying
11 to steal my company along with your boss and
12 Robert Thurber.  And Herschel took a video
13 of the document and forwarded it to
14 Christen.
15     Q.  Any other statements --
16     A.  And Christen sent me a screenshot
17 of the document.
18     Q.  Any other statements that you
19 allege were made by Herschel Walker to
20 Christen Caffey that were defamatory?
21     A.  Other than I wasn't working and I
22 was trying to steal his company.  No, those
23 were the ones that stuck with me.

Page 83

1     Q.  Now, we've already talked about
2 this allegation that you weren't working.
3 So we don't need to plow that territory
4 again with respect to defamation.
5     A.  Well, we might, because it was the
6 second time he had since he terminated me,
7 and so then she was questioning whether or
8 not I was working, because she said she
9 thought a lot of Herschel.  She got Herschel
10 in the business.
11     Q.  How is the allegation that you
12 only sent 3,000 emails about business
13 defamatory to you?
14     A.  3,000 out of 70,000 emails, that
15 would pretty much indicate that I wasn't
16 working.  This was the second time Christen
17 had heard it.  Christen was very close with
18 Sanderson Farms.  It was about this same
19 time that Sanderson Farms, who Kim and I met
20 with early on seeking employment, and they
21 were very interested when we met with, it
22 seems as if after this discussion with
23 Christen, whether Christen talked to

Page 84

1 Sanderson Farms, I don't know, but it
2 certainly raised a red flag for Christen.
3 It was a different conversation than we had
4 in the fall.  So she took the second
5 conversation a little more serious than she
6 did the first.
7     Q.  How are the words themselves
8 defamatory?
9     A.  Not working is defamatory.
10     Q.  The question is how are the words
11 that you sent 70,000 emails and only 3,000
12 were business related, how are those
13 specific words defamatory?
14     A.  Well, he led off by saying, again,
15 John wasn't working.  For example, he
16 only -- he sent over 70,000 emails and only
17 3,000 of them were business related.  So if
18 you want to remove the first part of that or
19 if you want to remove the last part of it, I
20 guess it's not defamatory.
21     Q.  But you've got to read them in
22 context.
23     A.  You've got to read them in

Page 85

1 context, so if you tell someone you're not
2 working -- if somebody calls me and says,
3 he's not working, well, what evidence of
4 that is.  Well, he sent 70,000 emails and
5 only 3,000 of them are business related, I
6 would kind of gather that he's not working.
7     Q.  Your complaint doesn't allow or
8 doesn't allege any specific damages that
9 result from the making of that statement.
10 Can you identify specific damages that are
11 attributable to the statement that you
12 weren't making -- for example, you sent
13 70,000 emails?  As you sit here today, how
14 have you been personally damaged in a
15 specific amount as a result of that
16 statement?
17     A.  As I sit here today, for the last
18 11 months, because of statements Herschel
19 has made to Christen Caffey and others, I am
20 yet to find full-time employment where I can
21 take care of my family.  My wife does not
22 have employment.  My daughter, of which
23 Herschel Walker promised employment, a

Page 86

1 single mom, has lost her job. So I can
2 calculate the damages for you, but because
3 of the statements that Herschel Walker has
4 made to Christen Caffey and others, I've had
5 significant damages.
6    Q.   Name one person who's told you
7 that you haven't been offered employment
8 from that entity because of a defamatory
9 statement made by Mr. Walker?
10    A.   First of all, who would say that?
11 I guess the closest it's come to that is
12 Christen said that she's not going to
13 divulge the name, but someone in the Sysco
14 corporate office told Sanderson Farms that
15 my relationship with them is not what it
16 should be, that she assumed that she had
17 talked to Herschel, but I don't have any
18 direct knowledge of that.
19    Q.   Now, with respect to the statement
20 he was trying to steal the company with her
21 boss at Radian and Robert Thurber, I presume
22 that you object to the use of the word steal
23 in that sentence, correct?

Page 87

1    A.   Yes, I do.
2    Q.   That's the word that you think is
3 defamatory?
4    A.   Absolutely.
5    Q.   Now, how would one go about
6 stealing a company?
7    A.   That was the question Kim asked
8 me -- or Christen asked me. Because she was
9 concerned too that if she was associated
10 with a company that was stealing someone
11 else's company, she didn't want to be
12 associated with it, which is why she tried
13 to send me the video of the document that
14 Herschel had -- she tried to send it to me,
15 all I could get was one page. From the
16 text, I thought I recognized the document.
17 There wasn't any effort to steal anything.
18        I told Christen nobody has stolen
19 anything. But Christen is not in the
20 brokerage business. Christen, Christen
21 doesn't understand business, small LLCs,
22 things of that nature, so Christen had
23 concerns, not only about me but about her

Page 88

1 boss, and certainly had never heard anything
2 negative. She thinks the world of Robert
3 Thurber, so if somebody is going to insult
4 Robert Thurber -- because Christen knew what
5 Robert Thurber had done for Herschel his
6 entire career. So it was upsetting to
7 Christen.
8    Q.   You don't take these words to mean
9 that somebody was literally going to walk in
10 and steal the assets of Ren Man, right?
11    A.   Ren Man has no assets, so no, I
12 didn't take it to mean much. And I told
13 Christen that.
14    Q.   You didn't take it to mean that
15 somebody was going to walk in to a Ren Man
16 office and physically take --
17    A.   I didn't know what Herschel meant
18 by someone was trying to steal his company.
19 I don't know what's in Herschel's mind, I
20 don't know that. I told Christen we weren't
21 trying to steal anything. Nobody was trying
22 to do anything other than help Herschel,
23 which is what I've done since the day I met

Page 89

1 him.
2    Q.   So from your perspective, it's
3 Herschel's opinion that you were trying to
4 do something with respect to Ren Man's
5 business; is that right?
6    A.   No. In my opinion, Herschel is
7 trying to hurt me with my customers and
8 people that I rely on to make a living for
9 my family. That's what I take it as.
10    Q.   And your complaint doesn't
11 indicate any specific dollar amount that you
12 have been harmed based upon the making of
13 this statement that you had tried to steal
14 his company.
15    A.   Not in this particular complaint.
16 I don't think there's a dollar amount.
17    Q.   Has anybody told you that based
18 upon this statement you have not been
19 offered employment?
20    A.   Not on this particular statement,
21 no.
22    Q.   Are there any other damages that
23 you would attribute to that particular

Page 90

1 statement?
2     A.  I assume that there are but I
3 don't -- I don't know of any specifically.
4     Q.  Has anybody told you that you have
5 been -- that they have withheld
6 compensation, employment, money, anything --
7     A.  No.
8     Q.  -- as a result of hearing this
9 statement?
10     A.  No one would tell me that, whether
11 it was true or not.
12     Q.  All right.  Tell me about David
13 Jones.  What did he hear?
14     A.  From time to time, I would buy
15 helmets and other merchandise from David
16 Jones.  He was a representative of Shuck.
17 And so I guess it was in April of last year
18 or this year.
19     Q.  Okay.  You're getting ahead of me.
20 I'm still on Paragraph 97.
21     A.  You asked me about David Jones.
22     Q.  Okay.  Well, that's because when I
23 asked you about Paragraph 97, you gave me

Page 91

1 three names; Christen Caffey, David Jones,
2 and Wade Hopkins.
3     A.  What would you like to know about
4 David Jones?
5     Q.  Well, I need to first know whether
6 there's anybody other than Christen Caffey
7 who was told by Herschel Walker that you had
8 tried to steal his company or stolen -- or
9 that you had stolen from Herschel Walker or
10 his company.
11     A.  Not to my knowledge.
12     Q.  All right.  Now go to Paragraph
13 98.  Paragraph 98 alleges that Mr. Walker
14 engaged in communications with
15 representatives, agents, servants and/or
16 employees of helmets and stated to such
17 persons or entity that Mr. Staples operated
18 a secret collections (Capital Football
19 Helmets) company and expensed the cost and
20 expense to RMFS.
21        What representatives, agencies,
22 servants and/or employees told you that?
23     A.  David Jones.

Page 92

1     Q.  What specifically did David Jones
2 say?
3     A.  He said Herschel tried calling him
4 several times, he finally took the call,
5 said Herschel demanded that he send him all
6 invoices of all of my purchases from him
7 over the years.  David said, I'm not
8 authorized to do that.  Mr. Staples used his
9 personal credit card to make the purchases,
10 why would you ask that?  David said Herschel
11 said because Mr. Staples owns a memorabilia
12 collectibles company.  He's charging all of
13 the purchases of your helmets to me.  He's
14 having me sign them, having others sign them
15 and then selling them through his
16 memorabilia company.
17     Q.  Did he say that Mr. Walker said
18 anything else?
19     A.  David said he got agitated when he
20 said I'm not sending you that information
21 without Mr. Staple's approval.
22     Q.  Did Mr. Walker say anything more?
23     A.  Not to my knowledge.

Page 93

1     Q.  All right.  What is defamatory
2 about the statement that you own a
3 collectibles company and you charged
4 collectibles to Ren Man?
5     A.  What's defamatory is that I don't
6 own a collectibles company, and I wasn't
7 selling -- I wasn't expensing Ren Man --
8 anything to Ren Man and then turning around
9 and selling it.
10        And it's also defamatory because
11 David Jones owns a sales and marketing
12 agency of which we had had conversations
13 about attracting suppliers that I would hope
14 to represent to do certain things through
15 his sales and marketing agency.
16     Q.  Have you been damaged in any
17 amount as a result of Mr. Walker's
18 statements to David Jones?
19     A.  I suspect my reputation has been
20 damaged.
21     Q.  Did Mr. Jones tell you that he
22 didn't believe you?
23     A.  No, he knows me.

Page 94

1    Q.   Are you aware of David Jones
2  spreading this statement to any third
3  parties?
4        **A.   No.**
5    Q.   Has Mr. Jones told you personally
6  that he would not associate in business with
7  you because of the statements made by
8  Mr. Walker?
9        **A.   No.**
10   Q.   Has anybody in the community told
11 you that they had lost trust in you as a
12 result of the statements made to Mr. Jones?
13       **A.   No.**
14   Q.   So when you say you suspect your
15 reputation has been damaged, why do you
16 suspect that?
17       **A.   I suspect that if Herschel is**
18 **calling people that I know and they're**
19 **telling me this, he's calling others who are**
20 **not telling me.  I just suspect that.  Do I**
21 **have factual evidence to support that, no.**
22   Q.   Who's Wade Hopkins?
23       **A.   A friend of mine in Arkansas.**

Page 95

1    Q.   And does he fall within --
2        **A.   No, he didn't know about this in**
3  **this suit.**
4    Q.   All right.  So a statement made by
5  him is not contained in the lawsuit?
6        **A.   It's not.**
7    Q.   What did Mr. Hopkins tell you
8  about any communication he's had with
9  Herschel Walker?
10       **A.   He didn't know that it was**
11 **Herschel.  He said he got a call from**
12 **someone, he thought someone said, This is**
13 **Herschel, John told me to call you about**
14 **buying some Herschel memorabilia.**
15   Q.   How is that defamatory?
16       **A.   He continues to perpetrate that**
17 **I'm selling his memorabilia.  I never told**
18 **Wade Hopkins anything about having**
19 **memorabilia.  It may not be defamatory to**
20 **you, but I don't own a memorabilia company.**
21 **I've never sold anything that Herschel**
22 **signed for profit, for personal gain.  So**
23 **I'm tired of these calls being made, whether**

Page 96

1  **it's Herschel or whoever it may be.**
2    Q.   But there was nothing that was
3  defamatory that was said to Wade Hopkins?
4        **A.   Not in that call.  It just to me**
5  **was -- I'm tired of hearing these things,**
6  **so.  But no, it's not contained in the suit,**
7  **and that in itself is not defamatory.**
8    Q.   Is there any other person of whom
9  you are aware who Mr. Walker has talked to
10 and stated something that is defamatory as
11 to you?
12       **A.   Specifically, no.**
13       MR. SIMMS:  Can I ask a question
14 real quick?  I don't mean to interrupt your
15 flow, your deposition.  Are we going to be
16 able to take a lunch break today or --
17       MR. KING:  Sure.
18       MR. SIMMS:  What are your plans?
19 It's 11:10 now.
20       MR. KING:  You tell me when you
21 want to break for lunch.  That's fine.
22       MR. PARKER:  I'm fine.  Whenever
23 you guys want.

Page 97

1        MR. SIMMS:  I say we break at
2  11:30.
3        MR. KING:  That's fine with me.
4        MR. SIMMS:  Is that okay with you?
5        MR. KING:  Yeah.
6        MR. SIMMS:  And then start back --
7  all I need is about 45 minutes.
8        MR. KING:  Good.  11:30 to a
9  quarter after 12.
10       THE VIDEOGRAPHER:  We were going
11 to have to break anyway in the text 10 to 15
12 minutes to change the tape.
13       MR. SIMMS:  When you get to that
14 point, why don't you alert us.  I don't want
15 to interrupt Mr. King's examination, but do
16 that and we'll make that the brake point, if
17 that's okay.
18       MR. KING:  That's fine with me.
19       MR. SIMMS:  Thank you.
20   Q.   (BY MR. KING:)  Let's go to Page
21 32 of the complaint.
22       **A.   (Complies.)**
23   Q.   You've made a tortious

Page 98

1 interference claim with respect to the
2 defamatory statements that you've described.
3 I'm pretty clear at this point that the only
4 defamatory statements that you're aware of
5 that you claim are defamatory were made to
6 Christen Caffey and David Jones, correct?
7    **A.  Correct.**
8    Q.  Christen Caffey works for Radian;
9 is that right?
10   **A.  Well, she has a unique**
11 **relationship.  She's employed by Radian but**
12 **she has offices at Sysco corporate, and she**
13 **is directly involved in the CATMAN process**
14 **in the protein categories.  She's got a**
15 **Sysco corporate email address.**
16   Q.  Have you applied for employment
17 with Radian?
18   **A.  No.**
19   Q.  Have you applied for employment
20 with David Jones?
21   **A.  No.**
22   Q.  And David Jones told you -- didn't
23 tell you that he would not participate with

Page 99

1 you in representing some of his clients in
2 sales based upon the statement that you
3 allege Mr. Walker made, right?
4    **A.  Didn't tell me that directly, no.**
5    Q.  Has he refused to work with you at
6 all concerning the sales and marketing?
7    **A.  We haven't -- there haven't been**
8 **any proposals.**
9    Q.  Have there been any proposals by
10 you?
11   **A.  We've had discussions.  I'm not**
12 **representing suppliers that would have**
13 **interest in what he could do for them.**
14   Q.  Did you make any proposal to
15 Mr. Jones to pursue something to work
16 together?
17   **A.  No.**
18   Q.  So he hasn't turned you down for
19 anything?
20   **A.  No.**
21   Q.  And you didn't seek any employment
22 with Radian?
23   **A.  No.**

Page 100

1
2 (Defendant's Exhibit 2 was marked for
3 identification and is attached to the
4 original transcript.)
5
6    Q.  Okay.  I'm handing you what's been
7 marked as Exhibit 2.  First of all -- I'm
8 sorry.  All right.  First of all, if you
9 would take a look at page, well, this third
10 from the last page, I'll show it to you, is
11 that your signature?
12   **A.  Uh-huh, yes.**
13   Q.  So you've seen these documents --
14 this document before?
15   **A.  There's been a lot of documents so**
16 **I want to look through it.  If I signed it,**
17 **I've seen it.**
18   Q.  Take a look at the third
19 unnumbered page, Paragraph 3.  Read the
20 question and then read the response.
21   **A.  Read the question?**
22   Q.  To yourself, read the question and
23 then read the response so you're familiar

Page 101

1 with what I'm going to ask.
2    **A.  (Complies)  Okay.**
3    Q.  This document was signed by you on
4 July 8th, 2018.  I don't see in the response
5 that you have sought employment with Sysco.
6 Have you?
7    **A.  No.**
8    Q.  And Radian is not listed as an
9 entity that you've tried to be employed by,
10 correct?
11   **A.  Correct.**
12   Q.  And you're not aware of Christen
13 Caffey repeating the statements made by
14 Herschel Walker to any of the entities that
15 you've identified here as being companies
16 that you've talked to about potential
17 employment, right?
18   **A.  I do want -- I do want to amend**
19 **that.  I recall communication with Chris**
20 **from Radian after I had been terminated**
21 **seeing if he had any interest in employment**
22 **or some type of -- and he said he didn't.**
23   Q.  Chris Drazen ^ spl?

App. 115

Page 102

1   A.   Uh-huh.
2        MR. SIMMS:  Can you answer out yes
3   or no?  Yes or no.
4   Q.   I said Chris Drazen?
5   A.   Yes.
6   Q.   Did he tell you the reason that he
7   was not interested?
8   A.   No.
9   Q.   Did he say that he was aware from
10  discussions with Christen Caffey about the
11  comments made by Herschel Walker?
12  A.   No.
13  Q.   Did he attribute to the statements
14  that attributed -- did he attribute his lack
15  of interest in pursuing something with you
16  to comments that he had heard made by
17  Herschel Walker?
18  A.   No.
19  Q.   Have any of the entities that are
20  identified in this response to Paragraph 3
21  in the interrogatories told you that they
22  had heard defamatory comments about you from
23  Herschel Walker?

Page 103

1   A.   Not directly, no.
2   Q.   Has somebody said something to you
3   indirectly?
4   A.   Sanderson Farms mentioned that
5   they had heard about -- they inquired about
6   what went down.  Others not listed here have
7   inquired about what went down.  But nobody
8   here said anything directly about it, no.
9   Q.   About Mr. Walker's comments,
10  right?
11  A.   Correct.
12  Q.   Everybody who is a potential
13  employer is going to be interested to know
14  how your last employment ended, right?
15  A.   I'd be interested in knowing that
16  too, yes.
17  Q.   Are there other potential
18  employers that you have met with since
19  responding to this interrogatory on July 8th
20  who have refused to consider employment for
21  you based upon represent -- or statements
22  attributed to Herschel Walker?
23  A.   By that specific definition, no.

Page 104

1   Q.   You identify in response to
2   Paragraph 3 a company called B & A Food
3   Sales.
4   A.   Uh-huh.
5   Q.   Are you aware that your name and
6   likeness appear on a version of B & A's
7   website?
8   A.   I certainly hope it doesn't any
9   more, but yes, it did at some time.
10  Q.   How did that come to be?
11  A.   I had an affiliation with them.
12  Q.   And what happened?
13  A.   We didn't -- we didn't agree on
14  business practices so we parted ways.
15  Q.   Was that after I took your
16  daughter's deposition in July?
17  A.   Was what after?
18  Q.   You going your separate ways, did
19  you go your separate ways before or after I
20  took your daughter's deposition in July, the
21  end of July?
22  A.   It would have been after.
23

Page 105

1
2   (Defendant's Exhibit 3 was marked for
3   identification and is attached to the
4   original transcript.)
5
6   Q.   All right.  I'm going to hand you
7   what has been marked as Exhibit 3, if I can
8   find my stickers.  They're under there
9   somewhere.  Thank you.
10      Exhibit 3 is -- Exhibit 3 to this
11  deposition is Exhibit 12 to the complaint.
12  So it's attached -- it's attached to a
13  version of the complaint that was filed on
14  April 6th, 2018 in this case.  Can you tell
15  me where you got this document?
16  A.   Where I got the document?
17  Q.   Yeah.  Where did you get it?
18  A.   I either had it in a file or it
19  was in one of my emails.  I don't really
20  recall where I got the document.
21  Q.   Well, you were asked in your
22  interrogatory responses to tell -- to look
23  for and tell us where you found it.  And you

Page 106

1 were also asked to produce any copies of
2 this document that you had.  Do you have any
3 other copies of this document?
4     A.  I suspect I have the original
5 copy.  I don't know.  Was the original
6 copied or did you copy a copy?  I don't
7 know.
8     Q.  Well, most of the documents that
9 are attached are legible copies.  This
10 appears to be a photograph.  Can you tell me
11 why what you have here is a photograph?
12     A.  I may have photographed the
13 document from my phone and sent it to my
14 attorney.  It certainly wasn't a
15 photograph -- I either have it at my house
16 in my files or he has it at his office.  I
17 don't know how the document was submitted.
18 It's certainly a document.  It's not a
19 photograph.
20     Q.  Well, there are outstanding
21 discovery requests with respect to that
22 document, so if you haven't looked for
23 another version, in order to comply with

Page 107

1 your discovery obligations, you should do
2 so.
3     A.  Okay.  My attorney take note of
4 that.
5
6 (Defendant's Exhibit 4 was marked for
7 identification and is attached to the
8 original transcript.)
9
10     Q.  Got it.  Let's move back to DSM,
11 which is the third entity that was created
12 in October 2016.  Now, just before DSM was
13 created, if you look on Page 2, there's an
14 email from you to Randy Sanders dated
15 September 14, 2016.  Do you see that on Page
16 2?
17     A.  Yes, I see it.  I'm reading it.
18     Q.  All right.  The question is about
19 the numbered Paragraph 3 in that email that
20 relates to the purchase of Randy's shares.
21 Are you following me?
22     A.  Uh-huh.
23     Q.  Okay.  What transpired that caused

Page 108

1 there to be an issue about Robert Thurber
2 purchasing Randy's shares to be split
3 between Todd and Christopher, how did that
4 come about?
5     A.  I don't recall specifically how it
6 came about.  I know that Robert and Randy
7 were -- they knew each other and they were
8 friends and they had conversation.  Randy is
9 a big Alabama fan so they -- Randy knew
10 Robert and Robert knew Randy.  I assume
11 Robert knew that Randy's plan from the
12 get-go was to do this for a couple, three
13 years and get out.
14     Q.  Did you have any participation in
15 the discussion about Robert purchasing
16 Mr. Sanders' shares in the second
17 Diversified?
18     A.  The discussion I had with Robert
19 was that he -- he was concerned about
20 Christopher, so that he would loan
21 Christopher and/or Todd Townsend some money
22 if, in fact, Randy Sanders wanted to sell
23 his interest in Diversified.

Page 109

1     Q.  Did you have any discussions with
2 Mr. Walker, Herschel Walker about that
3 issue?
4     A.  That issue?
5     Q.  Yes.  About Robert Thurber paying
6 money to Randy Sanders for interest in
7 Diversified 2?
8     A.  No.  There wasn't any -- it wasn't
9 Mr. Walker's business.  No, I didn't have
10 any discussion with him about it.
11     Q.  You don't think it's any of
12 Mr. Walker's business to know who the
13 ownership parties are to the broker firm
14 that's serving Ren Man?
15     A.  I don't think it's any of his
16 business to know that there are
17 conversations, if and when it would have
18 taken place, of which I didn't expect it to.
19 Certainly I would have had a conversation
20 with Herschel.
21     MR. KING:  Okay.  I think we're at
22 the end, right?
23     THE VIDEOGRAPHER:  Okay.  We're

Page 110

1 going to go off the record at 11:28.

2

3        (Short recess.)

4

5        THE VIDEOGRAPHER:  We are on the

6 record at 12:20.

7    Q.  (BY MR. KING:)  Mr. Staples, I'm

8 going to hand you what's been marked as

9 Exhibit 5.

10

11 (Defendant's Exhibit 5 was marked for

12 identification and is attached to the

13 original transcript.)

14

15        MR. SIMMS:  Are we skipping 4 or

16 do we have a 4?

17        THE REPORTER:  We have a 4.  This

18 is 4.

19        MR. SIMMS:  I'm good.  My bad.

20    Q.  (BY MR. KING:)  Do you recognize

21 Exhibit 5?

22    **A.  It looks like the initial**

23 **brokerage agreement between Renaissance Man**

Page 111

1 and DSM3.

2    Q.  That's dated as of October 1,

3 2016, correct?

4    **A.  The brokerage agreement is, yes.**

5    Q.  It's signed by you and Ms.

6 Staples, correct?

7    **A.  Yes.**

8    Q.  What's the purpose of Exhibit A,

9 the last page, schedule -- the Schedule A

10 and the attached document?

11    **A.  It lists the items and the amount**

12 **of commission to be paid.**

13    Q.  And as you look at the items that

14 are identified on the last page, do those

15 items fall within a particular genre?

16    **A.  You got another word for genre?**

17    Q.  Category.

18    **A.  It list category management items.**

19 **These were Sysco brand and other items sold**

20 **through Sysco.**

21    Q.  What's your definition of category

22 management?

23    **A.  With respect to Sysco, it's their**

Page 112

1 bid process.

2    Q.  And they bid particular types of

3 goods as part of each category; is that

4 right?

5    **A.  Yes.  They tried to copy the**

6 **Wal-Mart model, as they say, and allow**

7 **companies to bid on a national level, which**

8 **really was a significant opportunity for**

9 **Simmons and Renaissance Man because it**

10 **enabled us to bid on a national level at one**

11 **location without having to visit 70 some-odd**

12 **locations.  And I was an expert in that**

13 **process, so it was really a tremendous**

14 **opportunity for us.**

15    Q.  And the category that Ren Man

16 serves is predominately chicken, correct?

17    **A.  Yes.**

18    Q.  So category management for Sysco

19 for beef would be a totally different bid

20 process, totally different category, right?

21    **A.  Yes.**

22    Q.  And the concept is that Sysco and

23 Ren Man are essentially aligned in creating

Page 113

1 profitability for a particular category.

2 Isn't that what category management is?

3    **A.  You would hope that creating**

4 **profitability would be a result of category**

5 **management, yes.**

6    Q.  It's -- the whole concept of

7 category management is for both the supplier

8 and the purchaser to cooperate together as

9 opposed to having adverse relationship as to

10 price, that's the concept, right?

11    **A.  Say that again.**

12    Q.  The concept of category management

13 in general is to create a win-win

14 relationship between the vendor and the

15 supplier so that they are mutually

16 cooperating in order to achieve the best

17 possible result with respect to the goods in

18 the category as opposed to a more

19 traditional vendor/buyer relationship where

20 there's a conflict based upon price?

21    **A.  I don't understand the -- Sysco**

22 **took on category management in part, in**

23 **large part to give smaller suppliers the**

Page 114

1  opportunity to sell their goods through
2  Sysco.  Smaller suppliers had a very
3  difficult time, of which we learned at
4  Renaissance Man as I was involved with that
5  through the years.  It wasn't that Tyson and
6  others weren't trying to sell Renaissance
7  Man products, but the bottom line is it was
8  not an effective means by calling on 70
9  different locations.  So it was an
10  opportunity for Sysco to engage closer with
11  small to mid-size manufacturers that they
12  didn't currently have great relationships or
13  partnerships with.
14      Q.   What was your reason for sending a
15  copy of the broker agreement to people at
16  Simmons?
17      A.   The reason?
18      Q.   Uh-huh.
19      A.   Simmons paid the commission,
20  Simmons managed the broker agreements.
21  Simmons, Simmons handled it.
22
23  (Defendant's Exhibit 6 was marked for

Page 115

1  identification and is attached to the
2  original transcript.)
3      Q.   Next is Exhibit 6.  This is the
4  email that you conveyed to Ron Eisenmann to
5  put what we were just looking at, the last
6  page of the broker agreement, on to the
7  broker agreement; is that right?
8      A.   Yeah, it looks like it was sent
9  the day before.
10
11  (Defendant's Exhibit 7 was marked for
12  identification and is attached to the
13  original transcript.)
14
15      Q.   I'll hand you what's been marked
16  as Exhibit 7.  Specifically as to Number 3,
17  you state that you want to include all sales
18  to PFG Milton's and DSM's commissions
19  effective 11/1.  Do you see that?
20      A.   Uh-huh.
21      Q.   Say yes, please.
22      A.   Yes.
23      Q.   What's PFG Milton's?

Page 116

1      A.   They're based just north of
2  Atlanta.  They're a -- PFG is a competitor
3  of Sysco's.
4      Q.   Why did you want to add PFG
5  Milton's to DSM's commissions?
6      A.   Because Herschel wanted to sell
7  more to PFG Milton's.  We'd been selling
8  them product, and to sell more they needed
9  support from DSM3.  So you don't want to ask
10  a broker to assist a distributor without
11  paying them their resulting commissions.
12  Never done that in 30 years in my business.
13      Q.   I see that you copy -- you sent
14  this email to Katie Redman at Simmons.
15      A.   Uh-huh.
16      Q.   And you copied Ms. Staples.
17      A.   Uh-huh.
18      Q.   Is there any reason that you
19  didn't copy Julie Blanchard?
20      A.   No particular reason.
21      Q.   Is there any reason you didn't
22  copy Mr. Walker?
23      A.   No particular reason.

Page 117

1      Q.   Did anything in the broker
2  agreement that DSM reached with Ren Man
3  authorize the payment of commissions to PFG
4  Milton's?
5      A.   I don't know if Appendix A was
6  ever corrected or not.  I don't recall.
7      Q.   Did anything authorize in
8  agreement --
9      A.   Appendix A authorizes the
10  agreement.  The agreement stipulates that
11  the products paid in Appendix A receive the
12  commission.
13      Q.   And those were all Sysco products,
14  right?
15      A.   Well, they were at the time of the
16  initial agreement, yes.
17      Q.   And the agreement wasn't amended
18  to your knowledge, was it?
19      A.   I don't know if it was or was not.
20      Q.   And you didn't disclose to anybody
21  at Ren Man that you were going to change the
22  commission structure, right?
23      A.   That's not right.  Herschel and

Page 118

1 Julie and everyone knew that PFG Milton's
2 would be paid commissions.
3     Q.   How?
4     A.   We had a discussion.
5     Q.   When?
6     A.   I don't have the date.
7     Q.   Where?
8     A.   It was sometime -- it was about
9 the same time that I was asked to get a
10 meeting with PFG corporate because Herschel
11 wanted to start selling to more PFG
12 corporate locations, that we needed to focus
13 on PFG, US Foods and others.
14     Q.   I will hand you what's been marked
15 as Exhibit 8.
16
17 (Defendant's Exhibit 8 was marked for
18 identification and is attached to the
19 original transcript.)
20
21     Q.   You see you describe -- excuse me,
22 you see that Brook Fowler sends you a report
23 concerning the commissions being paid for

Page 119

1 Sysco and PFG, correct?
2     A.   Uh-huh, yes.
3     Q.   I'm going to hand you what's been
4 marked as Exhibit 9.
5
6 (Defendant's Exhibit 9 was marked for
7 identification and is attached to the
8 original transcript.)
9
10         MR. SIMMS:  Is this my copy?
11         MR. KING:  Yes.
12     Q.   (BY MR. KING:)  This is an email
13 in which you forwarded that same information
14 to Ron Eisenmann, Herschel Walker, Julie
15 Blanchard, correct?
16     A.   Yes.
17     Q.   My question is going back from
18 Exhibit 9 to Exhibit 8.  Why is it that the
19 language that discloses the six cents per
20 pound on PFG Milton information is omitted
21 from the email that you forwarded to
22 Mr. Eisenmann, Mr. Walker, and Ms.
23 Blanchard?

Page 120

1     A.   I also omitted Brook's name.  I
2 would typically, to shorten the length of
3 emails, omit certain information, but I
4 didn't omit the backup that had she looked
5 at it specifically shows payments made to
6 PFG.  And it would have also answered
7 Herschel's concern later about why were we
8 paying US Foods, because that was shown on
9 the attachment as well is my recollection.
10         These type emails when they were
11 sent to me always had an attachment that
12 would show the item, it would show the
13 customer, it would show the amount paid.  I
14 looked through that.  Kim had to have that
15 information because she had to pay Gary
16 Collins.  She had to have that information.
17     Q.   This document doesn't disclose the
18 existence of attachment, does it?
19     A.   I don't know if it does or it
20 doesn't.
21     Q.   Well, you can look at it.  It
22 doesn't show any kind of notation that
23 there's an attachment to the document,

Page 121

1 right?
2     A.   Well, it does say attached and
3 shown below is monthly DSM commission
4 correspondence that we get from Simmons.  I
5 would not have considered this as an
6 attachment.  So I certainly -- because
7 that's not an attachment.  That's not an
8 attachment.  That's on an email.  An
9 attachment is something you have to click on
10 and open.
11     Q.   And you've seen a million emails
12 in which it says attachment to it, right?
13     A.   I've seen a million emails?
14     Q.   You've seen emails that reflect
15 the existence of an attachment just like
16 that (indicating).  That's what appears on
17 an email when you've got an attachment to
18 it, right?
19     A.   And there are times that I don't
20 attach correctly.  I'm not very good with
21 emails, I'm horrible with attachments, but
22 in the verbiage I say attached.  So had
23 there not been an attachment, I would

Page 122

1  suspect there would have been a call saying
2  can you forward the attachment, I didn't
3  receive it.
4      Q.  Because there wasn't an attachment
5  as clearly shown in the document.  So the
6  only question is why did you take the
7  language out that makes a reference to the
8  six cents --
9      A.  More times than not --
10     Q.  You're going to have to wait until
11  I finish my question.  Why did you omit the
12  language in the document that refers to a
13  six cent per pound commission for PFG
14  Milton?
15     A.  Are you finished asking your
16  question?
17     Q.  I did.
18     A.  More times than not I removed
19  whatever language and I removed whoever sent
20  me the email when I forwarded emails.
21  Additionally, I knew that Herschel and Julie
22  and Ron knew we were paying commission on
23  PFG Milton's because we discussed it at the

Page 123

1  same time we discussed my direction to get
2  us a meeting with PFG corporate.
3  (Defendant's Exhibit 10 was marked for
4  identification and is attached to the
5  original transcript.)
6
7      Q.  Take a look at Page 2 of Exhibit
8  10.  If it was agreed, why did you agree in
9  your email of December '14 to remove the
10  year-to-date commissions for USFS and PFG?
11     A.  We were leaving for the holidays.
12  I was concerned about DSM having enough
13  money to make payroll.  Because I suspected
14  what subsequently happened, and that is
15  Julie would drain the account and we
16  wouldn't be able to make payroll.  So
17  Herschel said he did not know about the
18  commission, when in fact I have an email
19  stating that in that email that he did.  And
20  so I also knew that I was going to meet with
21  Simmons and that they would make -- I had
22  full confidence from the day I met with
23  Simmons and I agreed to go to work with

Page 124

1  Simmons that they would do the right thing.
2          So it was only $18,000, that would
3  at least allow DSM to get paid something.
4  And I felt like when Simmons received the
5  explanation that I would give them, they
6  would reimburse the $18,000, but the bottom
7  line is we needed money, Kim was concerned,
8  we were leaving Arkansas.
9          And I also tell Brook Fowler, I
10  know you need Herschel's approval, but I'm
11  preparing you for what's going to happen,
12  because he told me he was going to call
13  Brook and give her approval.  And I had a
14  text message that he deleted several of his
15  text messages.  So I tell Brook and I had a
16  phone conversation, you need to get this
17  paid.  He's going to approve it.
18          And I also know from previous
19  experience the idea that anybody at Simmons
20  would make a payment -- I didn't write a
21  check.  I didn't have check writing
22  abilities.  Simmons audited everything I
23  requested.  And I know from experience

Page 125

1  anything out of the ordinary was not paid by
2  Katie Redman, it was not paid by Brook
3  Fowler, it was not paid by anybody without
4  approval from Simmons' upper management,
5  but --
6      Q.  You agree in this email attached
7  to Exhibit 10 that DSM would not be paid
8  except for sales to Sysco, right?
9      A.  I agreed to get the payment paid.
10     Q.  Doesn't it say effective
11  immediately, DSM will only be paid on RMFS
12  sales --
13     A.  Probably because Herschel gave me
14  that direction at that point in time, but he
15  had not given me that direction until that
16  point in time.
17     Q.  Except in writing that was
18  contained in the broker agreement which said
19  Sysco products only?
20     A.  Which was subsequently amended
21  with his knowledge.
22     Q.  And you said you have an email.
23  Where is that email?

Page 126

1    A.  Well, I don't have access to any
2  of my email and all I can get is the
3  verbiage.
4    Q.  All right.  So you don't have the
5  emails?
6    A.  I don't have it to give you today.
7  Hopefully when I get access.  There's a lot
8  of conversation between emails.  You kind of
9  got to read through all of them before you
10  get the gist of the conversation.
11
12  (Defendant's Exhibit 11 was marked for
13  identification and is attached to the
14  original transcript.)
15
16    Q.  Here's Exhibit 11.  All right.  On
17  November 3, 2017, Mr. Walker writes you that
18  you had mentioned you were going to send
19  your thoughts on how you thought DSM should
20  be restructured.  That's right here.  And
21  you respond, As for DSM, I continue to go
22  back and forth on restructuring ideas.  What
23  was the issue?

Page 127

1    A.  (No response.)
2    Q.  I'm listening.
3    A.  I'm not speaking until I read what
4  was initially put in front of me.  It would
5  kind of help to see the attachment I asked
6  him to review.  Do you have that?
7    Q.  I don't.  Nope.
8      MR. SIMMS:  Did I understand
9  correctly he asked to see the attachment and
10  you said you're not going to allow him to
11  see the attachment?
12      MR. KING:  I don't have it.
13      MR. SIMMS:  Oh, okay.
14      MR. KING:  I've given him an email
15  that doesn't bear an attachment.
16    Q.  (BY MR. KING:)  My question is
17  what are you going back and forth on
18  concerning restructuring?  What's the issue?
19    A.  Without having the attachment,
20  it's hard to answer, but it sounds like
21  Herschel liked the attachment.  He said,
22  It's great to see you thinking about an
23  approach I've been talking about for a long

Page 128

1  time.
2    Q.  In November of 2017, was there an
3  issue about the structure of DSM?
4    A.  The issue about the structure with
5  DSM began shortly after it was formed.  And
6  we had a meeting in Ron's office with
7  Georgie Boston and Herschel and Julie and
8  Kim.  And it was my understanding that Julie
9  was going to be an active participant in DSM
10  and that I would in my consulting role train
11  her, educate her so that she could become a
12  leader of DSM.
13      Georgie Boston instructed that the
14  goal was to get minority certification -- or
15  women-owned certification.  And Georgie
16  instructed Julie and Kim that you would both
17  have to be actively involved, that the
18  certifiers would come to your residence or
19  your office and they would make sure that
20  you were actively involved.  And Julie said
21  that she knew nothing about the business so
22  she would need some time to understand the
23  business.

Page 129

1      And then the real concern occurred
2  shortly thereafter when I said, okay, I'll
3  give you a small region of responsibility,
4  I'll give you the state of Texas which had
5  four or five operating companies.  So you
6  can take that as your region, Julie.  Julie
7  refused.  Again, came back and said I'll
8  work for the parent company H. Walker
9  Enterprises.
10      So the issue at DSM, in spite of
11  what Herschel thought, was that it needed
12  adequate leadership.  And the other thing
13  you need to understand is that my employer
14  never had an issue with DSM.  The customer
15  never had an issue with DSM.  DSM far
16  exceeded its larger competitors in terms of
17  performance.  The process was different.
18      But, you know, again, Herschel had
19  complaints, Herschel always had complaints.
20  Again, there was never anything positive, so
21  whether it was DSM, whether it was Clint
22  can't sell or whatever, Herschel always had
23  complaints.  I don't know particularly what

Page 130

1 his complaint was at this point in time.
2    Q.   But --
3    **A.   But if you had the attachment, I**
4 **could help you better.**
5    Q.   You've read the complaint.  I can
6 get a copy of it back in front of you.  If
7 you will hand me back Exhibit 1, please.
8        Okay.  We didn't look at Count
9 Four earlier.  Count Four relates to Ms.
10 Staples' claim regarding the termination of
11 the DSM contract, correct?
12    **A.   (No response.)**
13    Q.   Correct?
14    **A.   Correct.**
15    Q.   Have you read the allegations in
16 Count Four with respect to those claims?
17    **A.   I mean, I've read them.  I didn't**
18 **read them earlier today.  Which would you**
19 **like me to read?**
20    Q.   Well, I asked you whether you've
21 read them before.  So the question is do you
22 believe that Ms. Staples asserts a valid
23 claim in Count Four?

Page 131

1    **A.   Absolutely.**
2    Q.   Count Four is based upon the
3 termination of the DSM contract, right?
4    **A.   And the withholding of earned**
5 **commissions.**
6    Q.   Ms. Staples is asserting a claim
7 based upon her not receiving her
8 compensation going forward after January --
9 after the contract was terminated, right?
10 That's what the claim is based upon.
11    **A.   She's also asserting that she was**
12 **unable to pay the DSM employees who**
13 **continued to work on behalf of DSM.**
14    Q.   So look again at Exhibit 5.  I'm
15 sorry.  I don't know where the original
16 exhibits are.  Oh, they're right here.
17    **A.   This is Exhibit 5?**
18    Q.   Yep.  Look at Paragraph 11,
19 Section 11 of that agreement.
20    **A.   (Complies.)  Okay.**
21    Q.   Doesn't section 11 provide that no
22 further commissions would be paid on sales
23 that occurred after notice of termination?

Page 132

1    **A.   No.  It says commissions would be**
2 **paid on orders accepted through the date of**
3 **termination.**
4    Q.   And that provision in section 11
5 you just looked at is the same as in Exhibit
6 5 as in Exhibit 12 -- 11.  Exhibit 11 is the
7 old Diversified contract, Exhibit 5 is the
8 DSM contract, both contain section 11 that's
9 identical, right?
10    **A.   I'd have to read.  I don't know**
11 **what you're talking about.**
12    Q.   Please do.
13    **A.   Do you want me to compare what to**
14 **what?  I guess before we jump around, I**
15 **disagree with what you just tried to allude**
16 **to.  The commissions don't stop at day of**
17 **terminations.  They stop after all orders**
18 **accepted through the day of termination are**
19 **paid.**
20        **So if they placed an order on**
21 **December 27th and Simmons accepted the**
22 **order, whenever that bill is paid for that**
23 **particular order, DSM is due those**

Page 133

1 commissions.
2    Q.   Okay.  Let me have your pile here.
3 What is this document here in front of you?
4 Okay.  All right.  Take a look at Exhibit
5 13, Exhibit 11 -- or section 11.
6
7 (Defendant's Exhibit 13 was marked for
8 identification and is attached to the
9 original transcript.)
10
11    **A.   (Complies.)**
12    Q.   The provisions in the old
13 Diversified contract and the DSM contract
14 with respect to duration of agreement is
15 identical, isn't it?
16    **A.   Appears to be so.**
17    Q.   So after the termination of DSM,
18 DSM was not authorized to earn any more
19 commissions by generating new orders after
20 the notice of termination; isn't that right?
21    **A.   Generating new orders -- I don't**
22 **know.**
23    Q.   There's nothing more to be

App. 123

Page 134

1 accepted after DSM's contract is terminated
2 because they don't -- DSM doesn't act on
3 behalf of Ren Man after that date, right?
4 That's what the agreement says.
5     **A.   That particular part of the**
6 **agreement is with respect to orders.  It's**
7 **also common business practice -- I've been**
8 **doing this for 30 years.  As you continue to**
9 **represent, do the best you can to answer**
10 **emails, it's just common, polite business**
11 **practice to continue to act on behalf of the**
12 **manufacturer you are representing or you run**
13 **the risk of them not paying you the**
14 **commission.**
15    Q.   But there's not going to be any
16 commission on any new business after the
17 termination of the agreement; isn't that
18 right?
19    **A.   The commission is paid on the**
20 **orders that had been accepted, received and**
21 **accepted and processed through the date of**
22 **termination.**
23    Q.   Once --

Page 135

1     **A.   And were paid once they were**
2 **shipped and paid for entirely.  You may have**
3 **shipped an order placed on December 26th,**
4 **you may have not shipped it until January**
5 **10th.  It may not have been paid for until**
6 **February 10th.  Whenever it was paid for,**
7 **because the order was placed on December 26,**
8 **DSM gets that -- those resulting**
9 **commissions.**
10    Q.   Once the termination letter has
11 been given, DSM was not authorized to place
12 any new orders, correct?
13    **A.   DSM didn't place orders so I don't**
14 **know.  DSM is a broker, it's a**
15 **representative.  They didn't place orders.**
16 **The operating company, the customer places**
17 **the orders.  DSM is not involved in the**
18 **ordering process, never has been.**
19    Q.   They're not allowed to solicit
20 orders, they're not allowed to receive
21 commissions on new orders, they're not
22 allowed to get any more payment for any
23 sales that are generated after the notice of

Page 136

1 termination; isn't that right?
2     **A.   They're obligated to continue to**
3 **represent the supplier.**
4    Q.   That's not what the question is.
5     **A.   Okay.  They're never allowed --**
6 **no, they've never allowed to place the**
7 **orders, you're right, before or after**
8 **termination.  They don't place orders, they**
9 **have no mechanism by which to do so.**
10    Q.   They're not allowed to solicit
11 business, they're not allowed to get paid on
12 commissions, get paid commissions on orders
13 that are placed after the notice of
14 termination; isn't that right?
15    **A.   You know, it's just a schematics.**
16 **If that makes you feel better, I guess**
17 **that's right.  But are they allowed, they're**
18 **expected.  It's common business practice.**
19 **It's what I've practiced for 30 some-odd**
20 **years that if an operating company of a**
21 **customer sends you an email, especially when**
22 **you haven't done your job as a supplier to**
23 **notify them that you're no longer the**

Page 137

1 broker, then you're supposed to respond
2 back.  It's just common business practice.
3    Q.   This is pretty simple.
4     **A.   I guess I'm just not as**
5 **intelligent.**
6    Q.   Section 11 of both agreements says
7 that the broker is not going to be
8 compensated for orders that are placed and
9 accepted after the termination.
10    **A.   Absolutely.  We agree on that.**
11    Q.   Okay.  So as you look at the
12 claims that are asserted in which Ms.
13 Staples says she is entitled to receive
14 money into the future after the termination,
15 based upon the termination of the DSM
16 contract, what revenues would she possibly
17 be entitled to?
18    **A.   All of the orders placed during**
19 **the month of December, she's entitled to**
20 **commission.**
21    Q.   Did you see the expert report that
22 your expert gave in this case?
23    **A.   Did I see the expert report?**

Page 138

1    Q.   Yes, your expert.
2    **A.   Which expert are you referring to?**
3    Q.   Your damages expert that says that
4  Ms. Staples is entitled to the benefit of
5  the --
6    **A.   Excuse me.**
7    Q.   -- average amount of money that
8  she has received out of DSM going 10 years
9  into the future.  Did you see that?
10   **A.   I did.  I think that relates to**
11 **the fact Ron Eisenmann made it obvious that**
12 **as soon as Kim gave her or sold her 50**
13 **percent interest of ten dollars, that DSM3**
14 **would be reactivated with Julie at the helm.**
15   Q.   There's nothing in the agreement
16 that would permit DSM and, for that matter,
17 Ms. Staples to receive compensation for
18 orders that were placed after the
19 termination on December 30, 2017, right?
20   **A.   You're speaking of Renaissance**
21 **Man.  Our intention, Kim's intention was to**
22 **do what we were asked to do is build DSM3**
23 **into a sales and marketing agency that would**

Page 139

1  **eventually merge within -- into and possibly**
2  **part of Renaissance Man.  It wasn't about**
3  **representing Renaissance Man solely.**
4      **DSM3 employees were in the process**
5  **of discussing commissions from other**
6  **suppliers in the marketplace.  And then when**
7  **Kim's not able to pay them because there is**
8  **no money being paid, it's kind of hard to go**
9  **out and attract without employees.**
10   Q.   All right.  So we'll go to Exhibit
11 12.
12
13 (Defendant's Exhibit 12 was marked for
14 identification and is attached to the
15 original transcript.)
16
17   Q.   In which your -- in which her
18 former partner Randy Sanders made a demand
19 similar for commissions for sales after the
20 termination date.  And you told him he
21 wasn't entitled to anything; isn't that so?
22   **A.   I think what I told him is we will**
23 **certainly follow the agreement.**

Page 140

1    Q.   And if you follow the agreement,
2  your wife ends up in the exact same place as
3  Randy Sanders, which is there aren't any
4  more sales after the termination date so
5  there's no additional commissions from that
6  day forward with respect to sales for --
7  with respect to orders that are placed after
8  the termination date.
9    **A.   My wife is asking for exactly the**
10 **same thing that Randy Sanders asked for and**
11 **received.  Randy Sanders -- DSM2 was paid on**
12 **orders up to the termination date.  They**
13 **were paid on those orders.  The difference**
14 **is DSM3 was not.  We still haven't been.**
15   Q.   Her claim to the extent is for
16 damages.
17   **A.   Can I ask -- I may not be able to**
18 **do this, but can I ask a favor?  Could you**
19 **ask your client to stop making faces at me**
20 **and whispering words and smiling and all**
21 **these other type things?  It's really -- I**
22 **wouldn't do that to him.  I would really**
23 **appreciate it if you'd just stop all the**

Page 141

1  facial expressions.
2    Q.   Okay.  The question --
3    **A.   So you're not going to ask him**
4  **that.**
5    Q.   I think that you just did.
6    **A.   He never listened to me before.**
7    Q.   So to the extent that she has
8  based her claim for a revenue stream that
9  would come from sales after December 30,
10 2017 --
11   **A.   We would never expect Renaissance**
12 **Man to pay us commissions if we weren't**
13 **representing them.**
14   Q.   Thank you.  Now, what was your
15 expectation as to whether DSM should
16 continue in business prior to the
17 termination?
18   **A.   My expectation?**
19   Q.   Yes.
20   **A.   It should certainly continue in**
21 **the business.**
22
23 (Defendant's Exhibit 14 was marked for

Page 142

1  identification and is attached to the
2  original transcript.)
3      Q.  Why did you tell Robert Thurber
4  that you needed a new broker?
5          MR. PARKER:  What are we to, 15?
6          MR. SIMMS:  Is this 15?
7          MR. KING:  Yeah, 14.
8          MR. SIMMS:  14?
9          MR. KING:  Yeah.
10     A.  I don't know.  This is a long --
11  you don't like my long answers, but the fact
12  of the matter is it's a long answer.
13     Q.  (BY MR. KING:)  It's a deposition.
14  Go ahead and give the answer.
15     A.  The answer is Renaissance Man
16  primary customer in the fall of 2015, Sysco
17  Corporation, basically the only distributor
18  that bought into the idea of Renaissance Man
19  being a supplier, because distributors,
20  retail accounts, they want to deal directly
21  with the supplier.  And in their
22  terminology, a supplier owns facilities,
23  produces products, manufactures products.

Page 143

1          So everything changed in the fall
2  of 2015 when Todd Simmons and David Jackson
3  alerted me that we needed to have a meeting
4  in Ron's office with Ron and Herschel.  And
5  they told us that they had been -- they had
6  met privately at Sysco corporate's
7  direction, and Sysco corporate had asked
8  them to bid direct.  Everything changed.
9          A day later I learned that Tip
10  Top, who had been a supplier partner of
11  ours, had also been approached and had met
12  privately with Sysco Corporation to bid
13  direct.  Todd and David, and I don't know if
14  Chip Miller was at the meeting, but they
15  left the meeting, and Ron and Herschel look
16  at me.  And so it's my job to convince
17  Simmons not to bid direct.  Like why
18  would -- what are we going to do?  It's my
19  job, it's always my job to manage the two
20  parties that couldn't discuss anything with
21  each other or get along with each others.
22          So I met with Simmons, and the
23  plan with Simmons, and what Ron knew in a

Page 144

1  phone conversation -- Ron's very good about
2  not having anything documented, but we had
3  phone conversations because we knew that the
4  idea that Renaissance Man is a supplier and
5  this environment would eventually run its
6  course.  So with Sysco, our primary
7  customer, it had run its course, and Sysco
8  pleaded with Simmons to bid them direct.
9  And why would they do that?  To save that
10  money, whatever Renaissance Man was making.
11         And to Simmons' credit, I met with
12  Simmons.  I said, Guys, they're going to
13  start the bid process again.  This is on the
14  most recent CATMAN.  They're going to start
15  this again within a matter of weeks.  We
16  don't have a lot of time.  So my suggestion
17  would be to bid this last time through
18  Renaissance Man.
19         And Simmons was concerned about
20  the amount of margin that Renaissance Man
21  was receiving, because a broker only
22  receives two to three percent.  Renaissance
23  Man was receiving 10 to 15 percent margin,

Page 145

1  30, 40, 50 cents margin.  And so Simmons
2  realized we should probably bid direct.
3          But Todd Simmons, to his credit, I
4  don't know how the decision was made, but
5  Todd basically said, We're going to run this
6  through you, John.  You get us a good award
7  and we'll run it through Renaissance Man
8  this last time.  But you need to go about --
9  now that we know that our number one
10  customer recognizes Renaissance Man as a
11  broker and now that Simmons has
12  investigated, I don't know, 10, 11 years
13  into this company, they invested their
14  people -- you've got to understand when I
15  was first hired, the first direction I got
16  was you need to build the foundation for
17  Simmons as a broadline distribution company.
18  And you will build that initially through
19  Renaissance Man.  That's going to be the
20  avenue by which we build that.
21          But at some point in time, John,
22  we will outgrow that, or maybe the idea that
23  Renaissance Man is a supplier and the

Page 146

1 minority interest if it's there, maybe that
2 runs its course, so we need -- John, you
3 need to teach us and our people the
4 broadline distribution business because
5 we've never had success in that.  Can you do
6 that?  Yeah, I sure can.
7       So anyway, DSM3, Renaissance Man,
8 they were all in the same.  We had so many
9 discussions about we could merge with this,
10 we could merge with that.  Who knows how it
11 would look, but my job was to go out and
12 find out all the different possibilities.
13 And the idea that everybody had with respect
14 to Robert Thurber -- you haven't asked me a
15 question about Robert Thurber, but I'm going
16 to give you an answer.
17    Q.  No, no, no.  You're going to
18 hopefully answer the question that's still
19 on the table.
20    A.  I'm going to answer the question.
21 DSM3, talking about DSM3, DSM3 needed to
22 look different.  It needed to either merge
23 with another company like a Radian or

Page 147

1 Renaissance Man or an FSE who's now their
2 broker, somehow, someway, we needed to take
3 the services and the capabilities and the
4 experiences of DSM3, take those people,
5 somehow use them, have a different look,
6 because if in fact we're a broker, which we
7 are, you're not going to get
8 representative -- you're not going to get
9 other suppliers to pay you commission the
10 way DSM3 looks right now.  You're going to
11 get very few suppliers to pay you commission
12 or to work with you the way Renaissance Man
13 looks right now.  So go out, John, and try
14 to figure out a way to get us a different
15 look, a DSM3, that's what that means.
16    Q.  In other words, DSM as of the time
17 that you wrote this text at the end of 2017,
18 you contemplated that the existing form of
19 DSM upon which Ms. Staples bases her claims
20 in this case was going to change; isn't that
21 right?
22    A.  We knew there was a possibility it
23 was going to change.

Page 148

1    Q.  Well, it's not very equivocal to
2 say you need to get another broker, and you
3 identify brokers as FSE, which is a broker,
4 right?
5    A.  Uh-huh.
6    Q.  Say yes or no, please.
7    A.  Yes.
8    Q.  And Goodman, that's an existing
9 broker, right?
10    A.  He owns an existing broker, yes.
11    Q.  And NUCO ^ spl was something that
12 you were contemplating doing whether it
13 involved Christopher Thurber, Robert
14 Thurber, your wife, somebody, other parties,
15 Radian, somebody, right?
16    A.  It's something Herschel was
17 contemplating with Robert.  It's something
18 any number of us were contemplating with
19 NUCO.
20    Q.  So any long-term existence of DSM
21 as it existed at the end of 2017 is wholly
22 speculative, isn't it?
23    A.  Well, it wasn't until Ron told us

Page 149

1 that after Kim turned over her 50 percent
2 for ten dollars that Julie was going to
3 operate it and they were going to continue
4 to represent Renaissance Man.
5    Q.  And that didn't happen, did it?
6    A.  Kim didn't turn over her ten -- 50
7 percent.
8    Q.  So DSM is not operating right now,
9 right?
10    A.  Well, it hasn't been shut down,
11 but it operated for a few months the best it
12 could.
13    Q.  So based upon this evidence that
14 you've supplied right here, the long-term
15 existence of DSM as a broker for anybody is
16 wholly speculative?
17    A.  I guess anything is speculative.
18 I don't view that as evidence of DSM's
19 demise, no.  If you knew the number of texts
20 and the number of emails and the number of
21 different possibilities I threw out there,
22 I'm a salesperson, I like to negotiate.  I
23 throw any number of possibilities out there.

Page 150

1    My philosophy has always been you
2  need to get offers, you need to get somebody
3  to put something on the table. I've worked
4  that way from day one. Show me an offer,
5  try to stimulate an idea, try to get Robert
6  Thurber who Herschel -- everybody wanted
7  Robert Thurber's influence. And Robert
8  Thurber never did anything but help us, not
9  just me, Herschel. And so no, I don't
10 speculate that that's evidence that DSM3
11 would not exist. No, not at all.
12   Q.  At the end of December 2017, Ms.
13 Staples didn't want to still be in the DSM
14 broker business, did she?
15   A.  I don't know where you get that
16 from.
17   Q.  Do you know otherwise?
18   A.  Did I know otherwise?
19   Q.  Right.
20   A.  She never told me she didn't want
21 to be in the DSM broker business.
22   Q.  Did you ever tell her that her
23 operation -- that the DSM operation and her

Page 151

1  affiliation with it was a cancer for Ren
2  Man?
3    A.  I don't know that I told her --
4  well, I told her that I think I mentioned
5  that to Ron.
6    Q.  So if you thought your wife's own
7  business was a cancer, what long-term chance
8  did it have --
9    A.  You're taking that out of context.
10   Q.  You need to stop interrupting my
11 question for the record, okay?
12   A.  Okay.
13   Q.  If you believed that your wife's
14 association with DSM was a cancer for Ren
15 Man, what was the realistic prospect for it
16 to continue --
17   A.  That's not what I said.
18   Q.  That's the second time you've done
19 it. You need to stop and let me finish my
20 question.
21   A.  Okay. Will you stop pointing at
22 me and I'll stop? I guess not.
23   Q.  I think that you just need to stop

Page 152

1  interrupting so that I can get a question on
2  the record, as is appropriate.
3        If you believed that your wife's
4  association with DSM was a cancer for Ren
5  Man, what legitimate expectation was there
6  that DSM would continue to serve as a broker
7  for Ren Man after the end of 2017? That's
8  the end of my question.
9    A.  I believed my wife's association
10 with Julie Blanchard was a cancer to DSM3.
11 I believed my wife's association with Julie
12 Blanchard was a cancer to my marriage.
13 Because Julie Blanchard never participated,
14 was condescending to my wife, gave us all
15 types of difficulty. Julie Blanchard would
16 not even set up an email account. Julie
17 Blanchard would not even set up a bank
18 account, could not even obtain access to the
19 bank account and would instead ask my wife
20 to take photocopies with her camera of the
21 check ledger. And Kim thought that was
22 ridiculous.
23        I thought Julie Blanchard was a

Page 153

1  cancer to DSM3, to Renaissance Man, and to
2  the whole situation. And I made that
3  perfectly clear to Simmons, my employer.
4  That's what I was referring to with respect
5  to Ron.
6        It wasn't that my wife was going
7  to step out of the business. It wasn't that
8  my wife was going to step away from DSM3.
9  It was that my wife would continue to
10 support Renaissance Man, as she did back to
11 the day that Renaissance Man first got its
12 Sysco award when she worked for Mike Rogers.
13 It is despicable. And I'll say this to
14 Herschel. It is despicable that you would
15 bring into question the integrity of my wife
16 or my daughter or Robert Thurber or myself.
17 Forgive me for being -- but that's
18 despicable.
19   Q.  So the point is that given the
20 state of disrepair within the DSM --
21   A.  Herschel thinks it's funny, this
22 is all funny.
23        MR. WALKER: Let's take a break.

Page 154

1        MR. KING:  I've got to ask one
2   more question.
3        MR. WALKER:  Ask that one.
4   Q.   (BY MR. KING:)  Given that state
5   of the relationships inside of DSM, there
6   was no realistic possibility at the end of
7   2017 that DSM could continue to act as the
8   broker for Ren Man; isn't that right?
9   A.   No, it's not.
10  Q.   And how could it possibly given
11  that level of tension within the
12  organization?
13  A.   Well, if Kim was expected to give
14  up her 50 percent for 10 dollars, maybe
15  Julie would have given up hers for 20.
16  Q.   That's not an answer to my
17  question.  How --
18  A.   Maybe they could have gotten
19  along.  We had a meeting in late December to
20  try to -- and according to Herschel and Ron
21  and everybody there, oh, it's all, you know,
22  everybody talks about their differences and
23  we were going to -- Herschel said his plan

Page 155

1   was to continue.  This was in November.  Had
2   a meeting in Ron's office.  Okay, everybody
3   air their differences.
4        Ron called me and said, I just got
5   through talking to Herschel and he agrees
6   with you that there's -- that there are some
7   things that need to be aired.  And so we met
8   in -- the following Monday and everybody got
9   to air their grievances and differences, and
10  Kim and I left the building thinking, well,
11  we're good to go.  Herschel, Herschel said
12  we'll keep everything in place, I'm glad we
13  got to air the differences, expect everybody
14  to keep their job, their same role, let's
15  rock and roll, let's start planning for
16  2018.  And I actually sent a message to
17  David Jackson saying, I think I had a good
18  meeting here.
19       So yeah, I had every expectation
20  that DSM3 could continue to operate.
21  Q.   Maybe, right?  You said maybe
22  earlier, that maybe they could have
23  continued to get along.

Page 156

1   A.   That's kind of similar to I had
2   every expectation that DSM could continue to
3   operate.  Didn't know for a fact.
4   Q.   All right.  That's fine.
5        MR. SIMMS:  Y'all still taking a
6   break?
7        MR. KING:  Yeah.  That's fine.
8        THE VIDEOGRAPHER:  We are going
9   off the record at 1:25.
10
11            (Short recess.)
12
13       THE VIDEOGRAPHER:  We are back on
14  the record at 1:34.
15  Q.   (BY MR. KING:)  Mr. Staples, are
16  you a collector of sports memorabilia?
17  A.   I have some sports memorabilia,
18  yes.  Not as much a collector as I used to
19  be.
20  Q.   What did you do with your
21  collection?
22  A.   It's in a box or it's displayed in
23  my house.

Page 157

1   Q.   Do you keep any memorabilia
2   elsewhere?
3   A.   Probably some in storage units in
4   Arkansas.
5   Q.   Where are those storage units?
6   A.   Tontitown, Arkansas.
7   Q.   Do you know the name of the
8   storage facility?
9   A.   Tontitown Mini Storage.
10  Q.   And you think you have memorabilia
11  stored in those -- in that storage unit?
12  A.   I'm certain I do.  I was there two
13  weeks ago.
14  Q.   Describe the nature of your
15  collection.
16  A.   Everything ranging from football,
17  baseball, basketball cards that my mom saved
18  from when I was a little boy to autographed
19  photos to footballs, to baseballs to a
20  handful of jerseys, my dad's A Club sweater,
21  helmets.
22  Q.   Have you ever had your collection
23  appraised?

Page 158

1    A.   No.

2    Q.   For insurance purposes, have you
3  discussed a value to your collection?

4    A.   No.

5    Q.   Do you keep a record of what is
6  contained in your collection?

7    A.   No.

8    Q.   Do you trade memorabilia from time
9  to time?

10    A.   I've traded a few items, not from
11  my personal use but I've traded some items.

12    Q.   Have you bought certain items in
13  conjunction with somebody else, shared the
14  cost of an acquisition?

15    A.   Shared a cost of a certain --

16    Q.   Item of sports memorabilia.

17    A.   A single item?

18    Q.   Yes.

19    A.   That I kept for myself?

20    Q.   Shared the cost of an item.

21    A.   I don't know why I would have.  I
22  don't recall having done that.

23    Q.   And there's no written record of

Page 159

1  what's in your collection?

2    A.   No.

3    Q.   Have you ever sold anything that
4  was in your collection?

5    A.   I've sold a handful of things
6  that -- I wouldn't even say a handful.  I've
7  probably sold a couple, three things.

8    Q.   Do you remember what they were?

9    A.   I remember selling a Daniel Moore
10  print of the sack.

11    Q.   Anything else?

12    A.   There may have been something else
13  but I don't recall it, no.

14    Q.   I'm going to go through quickly
15  some things that have come up on your
16  expense accounts from time to time.

17

18  (Defendant's Exhibit 15 was marked for
19  identification and is attached to the
20  original transcript.)

21

22    Q.   Let's see if you can explain what
23  they are.  I'll hand you what's been marked

Page 160

1  as Exhibit 15.  Exhibit 15, I've highlighted
2  it there for you, refers to some framed
3  prints of Herschel -- of HW, which I believe
4  would be Herschel Walker for customers.

5    A.   Uh-huh.

6    Q.   Which customers did you give
7  framed prints to?

8    A.   Well, three of them are still at
9  my house in the box, and I gave one to
10  Herschel and I gave one to Ron Eisenmann.
11  Herschel signed them in Ron Eisenmann's
12  office while they were canvas.  I told him
13  we were going to frame them for customers.
14  He mentioned that he'd like one for his -- I
15  don't know where it is but he got one.  I
16  asked him if we could give Ron one and he
17  said yeah, that would be a good idea.

18    Q.   So the other three, are the
19  three -- they're not framed at this point;
20  is that right?

21    A.   No, they're framed.

22    Q.   Do you intend to give them back to
23  Ren Man?

Page 161

1    A.   You can swing by whenever you'd
2  like and pick them up.

3    Q.   I think maybe I'll ask Keri to
4  swing by.

5        MR. SIMMS:  Can I swing low on a
6  chariot?  Three, we have three Daniel Moore
7  prints that are framed, that's what
8  we're talking about?

9        MR. KING:  No.  Herschel Walker
10  prints.

11        MR. SIMMS:  But Daniel Moore is
12  the -- was it a Daniel Moore painting?  I'm
13  sorry, is that what we're talking about?

14        THE WITNESS:  Yeah, canvasses
15  of -- I guess if we're going to be technical
16  about it, he can pick up the frames because
17  I negotiated the deal for the prints.

18        MR. SIMMS:  What I want to know is
19  who are the prints of?

20        THE WITNESS:  They're of Herschel
21  scoring against Notre Dame.

22        MR. SIMMS:  I thought you said it
23  was the sack.  I'm sorry, I got lost.  Yes,

Page 162

1 okay.  We'll make arrangements with you to
2 accommodate.
3     Q.   (BY MR. KING:)  All right.  And
4 you acknowledge that that expense was
5 reimbursed to you based upon that
6 reimbursement request, right?
7     **A.   Yes.**
8
9 (Defendant's Exhibit 16 was marked for
10 identification and is attached to the
11 original transcript.)
12
13    Q.   Next I'm going to hand you what's
14 marked as Exhibit 16.  There's a charge for
15 $1,375.98 for helmets for gifts for
16 customers, do you see that?
17    **A.   Yes.**
18    Q.   There are 18 Dallas Cowboys
19 replica helmets; is that right?
20    **A.   Uh-huh, uh-huh.**
21    Q.   What happened to those helmets?
22    **A.   They were given to customers, I**
23 **believe Clint may have -- I don't really**

Page 163

1 **know where they are.  I didn't keep track of**
2 **each of them.  I've been buying helmets**
3 **since I met Herschel when I was at Tyson.  I**
4 **never really kept a ledger.**
5     Q.   Who's responsible for handing
6 those out?
7     **A.   Employees.  Simmons request them**
8 **for their customers, I mean, it was never**
9 **anything that was policed or concerned**
10 **about.**
11    Q.   That's not my question.  My
12 question is who was responsible for handing
13 them out?
14    **A.   Various individuals.  They didn't**
15 **always come to me.  I don't know where those**
16 **were shipped.  Maybe that says on here.**
17    Q.   The question is who.
18    **A.   These look like these were shipped**
19 **to me.**
20    Q.   So the question remains --
21    **A.   They would have gone from me to**
22 **whoever has them currently.**
23    Q.   You don't have any at your house?

Page 164

1     **A.   That particular, I may have one or**
2 **two.  I don't know.  We got a big storage**
3 **room in the house.  I haven't been through**
4 **there, can't even walk through there.  But**
5 **if you want any of them that are there,**
6 **you're certainly welcome to take them too,**
7 **Keri.**
8     Q.   What about in the storage facility
9 in Arkansas?
10    **A.   From what I saw, there was nothing**
11 **there that was Renaissance Man paid for.**
12    Q.   And if they weren't at your house
13 and they weren't in the storage unit, when
14 they came in, where were they stored?
15    **A.   When they came in, they were**
16 **stored wherever they were shipped until they**
17 **were given out.**
18    Q.   All right.  Well, these were
19 shipped to your house.
20    **A.   Okay.  And I would get -- I would**
21 **get requests from Blaine Walker, I would get**
22 **requests from Chip Miller, I would get**
23 **requests from Julie Blanchard, I would get**

Page 165

1 **requests from Barbara -- I would get**
2 **requests from everybody associated in any**
3 **way, shape or form from Renaissance Man.**
4 **From the day that Herschel got in the**
5 **business, we would give a helmet, mini**
6 **helmet, large helmet, it was a great way to**
7 **start a conversation with a customer.**
8     Q.   Do you recall specifically any
9 person who received one of the helmets that
10 we were just talking about?
11    **A.   No.  I don't care to speculate.  I**
12 **don't know where the helmets ended up.**
13    Q.   I'll hand you what's been marked
14 as Exhibit 17.
15
16 (Defendant's Exhibit 17 was marked for
17 identification and is attached to the
18 original transcript.)
19
20    Q.   This is a reimbursement that you
21 received for houndstooth replicas and
22 houndstooth desk caddies; is that right?
23    **A.   Uh-huh.**

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
John Staples November 12, 2018

Job 28914
Pages 166..169

Page 166

1    Q.   Houndstooth is an allusion to
2 Coach Bryant; is that right?
3    **A.   Yes, he wore a houndstooth hat.**
4    Q.   So do you remember purchasing
5 these goods in November of 2016?
6    **A.   Yes.**
7    Q.   There are 12 of them; is that
8 right?
9    **A.   12 of the mini desk caddies.**
10    Q.   And what was the other replica?
11    **A.   It was a full-size one.**
12    Q.   What became of those?
13    **A.   The full-size one is still in a**
14 **box in a closet at my house.  The desk**
15 **caddies were given out to certain customers**
16 **and employees of Renaissance Man.**
17    Q.   Why was the large one not given
18 out?
19    **A.   I think I ordered it for a food**
20 **show.  For whatever reason, I didn't use it**
21 **at the food show.**
22    Q.   Is it your intention to return
23 that to Ren Man?

Page 167

1    **A.   Yes.**
2    Q.   Do you know a fellow named Charles
3 Smith?
4    **A.   I met him once.**
5    Q.   Do you have communications other
6 than having met him once?
7    **A.   We've traded emails a few times,**
8 **yes.**
9    Q.   Did you trade some sports
10 memorabilia with him as well?
11    **A.   A few things, yes.**
12
13 (Defendant's Exhibit 18 was marked for
14 identification and is attached to the
15 original transcript.)
16
17    Q.   I'll hand you what's been marked
18 as Exhibit 18.  At the top of the page, you
19 say that you run HW's food company and can
20 get most anything signed from him, right?
21    **A.   Uh-huh.**
22    Q.   And it was your intention that if
23 Mr. Smith could -- requested something from

Page 168

1 you and you could trade something with him,
2 you would do so; isn't that right?
3    **A.   He reached out to me.  I met him**
4 **at a golf tournament I believe where he -- I**
5 **wasn't familiar with the type company that**
6 **he ran.  But he basically runs this type**
7 **company where he comes in and has items and**
8 **you bid on them, and he shares part of the**
9 **proceeds with whatever the charity is that**
10 **he's supporting.  So he reaches out to me.**
11 **I think when I met him, he mentioned that**
12 **he's a big Georgia fan, from Georgia.  So he**
13 **reaches out to me and I said I'm willing to**
14 **trade for items that would be of interest to**
15 **our customers.**
16    Q.   I'll hand you what's marked
17 Exhibit 19.
18
19 (Defendant's Exhibit 19 was marked for
20 identification and is attached to the
21 original transcript.)
22
23    Q.   In this email of October 11, 2015,

Page 169

1 you tell Mr. Smith that you have 20 UGA
2 jerseys; is that right?
3    **A.   Yes.**
4    Q.   Were those UGA jerseys signed by
5 Herschel Walker?
6    **A.   I assume so.**
7    Q.   Do you have any of those jerseys
8 to this day?
9    **A.   No.**
10    Q.   Do you know what happened to them?
11    **A.   Several of them were sent to**
12 **Julie.  She's the one that actually had me**
13 **order the 20 jerseys because I had a**
14 **relationship with the IMG who managed the**
15 **memorabilia.  It's all now these IMG sports**
16 **agencies, they run the -- Herschel couldn't**
17 **even get a jersey, which introduced me to**
18 **IMG, because he was filming a Heisman trophy**
19 **deal in California and he called me and**
20 **said he saw, what's our -- Mark Ingram and**
21 **he's wearing his Alabama jersey.**
22    **But then he told me some story**
23 **about he'd called UGA, I mean he's the**

Page 170

1 greatest player ever to play there, and he
2 wasn't upset, he was just like they won't
3 send me a jersey.  And I say, well, that's
4 because all the marketing is done by IMG.
5 And so I ordered jerseys from IMG.  And
6 Julie also needed some for presents at
7 Christmas as I recall and things of that
8 nature, so that's what these jerseys are.
9     Q.   And you don't have any of them?
10     A.   No.  I'd gladly give them back if
11 I did.
12     Q.   Well, you just referenced the IMG
13 order.
14
15 (Defendant's Exhibit 20 was marked for
16 identification and is attached to the
17 original transcript.)
18
19     Q.   And here it is.  It's marked
20 Exhibit 20.  This was an expense that was
21 paid by Ren Man.  Can you explain why you
22 were offering up to 20 of these jerseys to
23 Charles Smith less than three weeks after

Page 171

1 you ordered them from IMG?
2     A.   Who was this invoice sent to?
3     Q.   It was paid by Ren Man.
4     A.   Paid by Simmons?
5     Q.   It was paid by Ren Man.
6     A.   I wasn't offering 20 jerseys if I
7 didn't have them.  I'm basically telling him
8 I have 20 jerseys.  I can order the helmets,
9 what are you looking for.  If all he had was
10 a couple of three things that my customers
11 may be interested in, obviously I wouldn't
12 have traded him 20 jerseys for three helmets
13 or whatever.
14     Q.   That's the question is why were
15 you offering him jerseys that you had just
16 ordered for the company?  You ordered them
17 for Ren Man, right?  That's what you've
18 testified.
19     A.   That's the truth.
20     Q.   So why were you putting them out
21 and available to Charles Smith if there was
22 a reason that the company Ren Man ordered
23 the jerseys?

Page 172

1     A.   Again, I had 20 jerseys available.
2 My customers, with all due respect, have
3 more interest in current day players,
4 current day coaches, especially in the State
5 of Alabama, than they do Herschel Walker.
6 So as I recollect, Julie had me order some
7 jerseys.  I must have sent her five and I
8 had 20 left.  And so all the conversations
9 with Charles Smith were he had interest in
10 Herschel Walker stuff.  Herschel Walker
11 stuff was not as much interest to my
12 customers as Nick Saban, Julio Jones,
13 current day players.
14          So I was trading -- all the
15 trading I did with Charles Smith was to have
16 a collection of stuff for food shows, for
17 customers, Christmas dinners.  We gave away
18 all kind of stuff to Simmons employees.
19 There was a lot of interest for Tim Tebow,
20 he said he had those things.
21          As I recollect, he sent me a Julio
22 Jones, a jersey.  I got it at the house, you
23 can pick it up.  Never been used.  I don't

Page 173

1 remember what else he may have traded me,
2 but it was either given to a customer or
3 it's sitting in my closet.
4     Q.   Exhibit --
5     A.   I wasn't expecting to get fired by
6 someone who didn't employ me so I didn't
7 gather all this stuff up.
8          MR. SIMMS:  Is this another
9 exhibit?
10     Q.   Yes, Exhibit 21.  It indicates
11 that these helmets were sent to you at your
12 home; isn't that right?
13
14 (Defendant's Exhibit 21 was marked for
15 identification and is attached to the
16 original transcript.)
17
18     Q.   Excuse me, these jerseys.
19     A.   I think these are different
20 jerseys.  These were ordered in -- I think I
21 ordered jerseys more than once from IMG, so
22 I don't know if these are the same jerseys
23 or different jerseys.

Page 174

1  Q.  Do you have other -- do you have
2  other merchandise at home or in your storage
3  units that you received in exchange for
4  jerseys paid for by Ren Man?
5      A.  Not to my knowledge, not that I
6  recall.
7      Q.  I'll hand you what's been marked
8  as Exhibit 22.
9
10  (Defendant's Exhibit 22 was marked for
11  identification and is attached to the
12  original transcript.)
13
14      Q.  What is the Herschel Walker
15  autographed stuff, helmets, mini helmets,
16  Daniel Moore prints, et cetera, that are in
17  your personal collection?
18      THE WITNESS:  I thought you sent
19  them a --
20      MR. SIMMS:  All the stuff you sent
21  me, we haven't responded to their -- they
22  sent a separate request.  We haven't
23  responded yet because it's not due, but you

Page 175

1  can answer.
2      A.  I have a number of items obtained
3  when I was employed by Tyson.  Tyson bought
4  hundreds of helmets, Smithfield bought
5  helmets and jerseys as employees of those
6  companies.  Herschel would sign them and
7  they were given to me, they would be
8  leftovers.  I have a huge Herschel's Famous
9  34 that was in my office at Tyson that when
10  I left there, they let me take.  So I have
11  any number of items obtained before I ever
12  started working with Renaissance Man.
13      Q.  (BY MR. KING:)  Is the --
14      A.  And believe it or not, you know, I
15  was given stuff by Herschel because of the
16  good job that I had done.  Our employees
17  were given autographed helmets from Herschel
18  and jerseys, and we had Christmas parties
19  where Simmons employees were given
20  autographed things.
21      So I have a personal collection of
22  stuff from Herschel that I actually paid for
23  or Tyson or Smithfield or somebody gave to

Page 176

1  me.  I have a helmet that Herschel gave my
2  late father because Herschel and my dad both
3  played for the New York Giants.  And that's
4  kind of special to me because they both
5  played for the Giants, so I've kept that
6  since my dad passed away because I thought
7  he and Herschel had something in common, but
8  evidently not.
9      Q.  Do you have a Daniel Moore print
10  in your personal collection different from
11  the three Daniel Moore prints that we've
12  talked about as being the --
13      A.  I do.
14      Q.  -- framed prints?
15      A.  I do.
16      Q.  You do?  All right.
17      Is there any more or are there any
18  additional items that were paid for by the
19  company that you think you have in your
20  house, in your storage facility, in that
21  storage room at the house, anything like
22  that?
23      A.  There could be.  You're welcome to

Page 177

1  come by and go through it with me.
2      Q.  Well, there's a procedure for
3  using Rule 34 for an inspection, which means
4  that we could bring a court reporter and a
5  videographer to the house and come through
6  and look at it.
7      A.  I mean, I've done a preliminary
8  check.  I have a couple of boxes of -- we
9  made many helmets with the Herschel's Mama's
10  Cooking logo on it and the Herschel's Famous
11  34 logo on it.  I think there's a Georgia
12  helmet.  I don't know if it's signed or not.
13  I think there's a Dallas Cowboy helmet.  I
14  don't recall if it's signed or not.
15      Q.  Okay.
16      MR. KING:  Well, the fact is,
17  Keri, that there's an interrogatory that
18  asks for an identification of all of the
19  sports memorabilia that he has that he
20  acquired either by -- through his own
21  expense account at Ren Man or in trading
22  goods that were procured and then charged to
23  his expense account or paid for by Ren Man.

Page 178

1 So we don't have to do a house inspection if
2 that interrogatory gets responded to.
3        MR. SIMMS:  Sure.  We will -- I'm
4 not agreeing with you that the interrogatory
5 says exactly what you just paraphrased it as
6 saying, but to the extent that he has -- I
7 guess your request relates to any items that
8 were expensed through a Renaissance Man or
9 Simmons I guess.  We'll be glad to gather
10 those and make arrangements to tender those
11 back to you and your clients.  It's my
12 understanding that he also has items that he
13 acquired not in that manner that I believe
14 belong to him, so we need to segregate them,
15 but we are willing to do that.
16        MR. KING:  Okay.  Thank you.
17        MR. SIMMS:  Okay.  I will say for
18 the record too, it's my understanding that
19 some of the continuing ongoing employees of
20 Renaissance Man may have possession of
21 similar items.
22        MR. KING:  Okay.  Thank you.
23        MR. SIMMS:  That Mr. Staples might

Page 179

1 have procured and provided to them, okay?
2        MR. KING:  Yep.
3    Q.  (BY MR. KING:)  All right.  I've
4 handed you Exhibit 23.
5
6 (Defendant's Exhibit 23 was marked for
7 identification and is attached to the
8 original transcript.)
9
10    Q.  Can you tell me what the December
11 31 expense for $300 relating to tickets for
12 Mr. and Ms. John Furlow relate to?
13    **A.  It looks like they relate to two**
14 **Cotton Bowl tickets for the CEO of Guardian**
15 **for Heroes.**
16    Q.  And who asked you to get those
17 tickets?
18    **A.  I don't know that anybody asked me**
19 **to.  We were trying to form a partnership**
20 **with the Guardian for Heros.  General Furlow**
21 **was willing to come to Sysco corporate for a**
22 **meeting.  We felt like Guardian for Heroes**
23 **and the endorsement of them would help us in**

Page 180

1 **our efforts, especially on the retail side.**
2    Q.  I'll hand you Exhibit 24.
3
4 (Defendant's Exhibit 24 was marked for
5 identification and is attached to the
6 original transcript.)
7
8    Q.  Which is an email string with Mark
9 Davis at Sportibles ^ spl.  Do you see that?
10    **A.  Uh-huh.**
11    Q.  And you ask -- you ask in this
12 email whether Mark Davis is willing to cover
13 the cost for General Furlow and his wife to
14 attend; isn't that right?  It's the last --
15 it's the last email on Page 2.
16    **A.  Okay.**
17    Q.  Isn't it -- isn't it accurate to
18 say that in your email, you asked Mr. Davis
19 to cover the cost of General Furlow and his
20 wife to attend the game?  It's the last
21 email on Page 2.
22    **A.  I may have asked him that**
23 **initially, but I wouldn't have expensed it**

Page 181

1 **if that had been the case.**
2    Q.  Well, you did expense it, right?
3    **A.  So it must not have been the case.**
4    Q.  Well, in your December 20 email,
5 you said, Sounds good, I paid with my
6 personal check so make yours addressed to
7 me.  Didn't you say that?
8    **A.  I think initially Mark and his**
9 **wife wanted to attend.  And I'm pretty**
10 **certain that Renaissance Man would have paid**
11 **for the two and maybe Mark paid for mine.  I**
12 **don't recall the specifics.  Things change.**
13 **Initially Mark and his wife were going to**
14 **attend.  As I recall, they decided not to**
15 **attend.**
16    Q.  Didn't you double dip by charging
17 both company --
18    **A.  No.**
19    Q.  -- and getting paid?
20    **A.  No.**
21    Q.  It says you got paid a check or it
22 says you were receiving a check at your
23 home, doesn't it?

Page 182

1    A.   It doesn't say how much the check
2  was.  It doesn't say whether it was for two
3  tickets or four tickets, so if I expensed
4  it, it would have been for two.
5    Q.   Let me ask you this:  Where is
6  Mark Davis located?
7    A.   As I recall, he's somewhere in St.
8  Louis.  I don't really remember.
9    Q.   And what did he do?
10    A.   When I was introduced to him, he
11  had a sports drink company called iXL.
12    Q.   All right.  This is Exhibit 25.
13
14  (Defendant's Exhibit 25 was marked for
15  identification and is attached to the
16  original transcript.)
17
18    Q.   Can you explain to me why you
19  authorized Ren Man to have a $5,000
20  sponsorship to the University of Alabama
21  Celebrity Golf Classic?
22    A.   I don't know that the sponsorship
23  was actually $5,000.  I'd have to see the

Page 183

1  check stub that was sent.
2    Q.   Well, you can accept my word for
3  it or not, but it was $5,000.  Can you tell
4  me why you authorized Ren Man to be a
5  sponsor of this tournament?
6    A.   We sponsored the tournament.
7  Renaissance Man started sponsoring this
8  tournament back to the days that I was
9  employed at Tyson.  Herschel actually showed
10  up several times, two times that I know of
11  specifically as a guest celebrity.
12        Herschel is friends with Kevin
13  Almond who's the associate athletic director
14  at University of Alabama and who was at
15  University of Georgia when Herschel played
16  there.  And so each and every year we would
17  participate in this tournament to various
18  degrees.  Herschel knew we participated.
19        As a matter of fact, one year I
20  believe I was at Smithfield.  Herschel had
21  committed to play in the tournament.  He was
22  not able to attend.  He thought a lot of
23  Kevin Almond, and he basically said, I know

Page 184

1  Mr. Thurber thinks a lot of this tournament
2  so we need to participate in any way, shape
3  or form.
4        The intent, just so you know this,
5  any time in sales when you offer an
6  opportunity to play golf or to do anything
7  with a customer, you've got to make sure you
8  have secured the tickets or the slot or
9  whatever before you go make the offer to the
10  customer.  Sometimes customers would commit
11  to things and then the event would take
12  place and so you've got an opportunity to
13  play and so you fill it with what you can,
14  but at least you've got the goodwill of
15  asking the customer to attend.
16    Q.   I'll hand you what's marked as
17  Exhibit 26.
18
19  (Defendant's Exhibit 26 was marked for
20  identification and is attached to the
21  original transcript.)
22
23    Q.   What's the Rise Center?

Page 185

1    A.   It's a center in Tuscaloosa for
2  kids with special needs.
3    Q.   What was the reason for Ren Man
4  making a $3,500 sponsorship to the golf
5  tournament?
6    A.   As I think we alluded to in our
7  response, you'd really have to ask Blaine
8  Walker, but I'm not a golfer.  Blaine Walker
9  loves playing golf.  Blaine was supposed to
10  find customers.  He was supposed to invite
11  PFG Lester, he was supposed to invite Sysco
12  Nashville.  He was supposed to invite
13  somebody to play in the tournament.  As it
14  turns out, he didn't, or if he did, they
15  didn't choose to play.  So it's another
16  example of committing to something ahead of
17  time and then not being able to fill it with
18  customers.
19    Q.   Why would Mr. Walker commit to
20  this particular tournament?
21    A.   Well, Mr. Walker was --
22    Q.   We're talking about Blaine Walker.
23    A.   Why would he commit to it?

Page 186

1 Q. Why would Blaine Walker choose
2 this particular tournament?
3 **A. Well, for one, I lived in**
4 **Tuscaloosa and I wasn't going to travel**
5 **around to play golf with him, so he kept --**
6 **I said if you want to play golf, sign it up**
7 **and find customers. Do you want to know why**
8 **Herschel Walker committed to it?**
9 Q. Sure.
10 **A. He's very supportive of the Rise**
11 **Foundation, so much so that he met the**
12 **director of Rise, Andi Gillen, at an event,**
13 **a ball game at Clemson in the fall of 2017**
14 **and told her that she put her in touch with**
15 **the Rise school in Athens because he was**
16 **proud of Renaissance Man's support of the**
17 **Rise school.**
18 Q. Next exhibit is Exhibit 27.
19
20 (Defendant's Exhibit 27 was marked for
21 identification and is attached to the
22 original transcript.)
23

Page 187

1 Q. I direct you to this expense that
2 you've been reimbursed for for $484 relating
3 to Patriotic Smooth Natural Bone Russlock.
4 It's a knife, right?
5 **A. Uh-huh.**
6 MR. SIMMS: John, try to give a
7 verbal response when you can, please. Speak
8 out, in other words.
9 **A. Yes.**
10 Q. What happened to those knives?
11 **A. I believe they were eventually**
12 **given out to employees at the Ren Man sales**
13 **meeting in Cape San Blas.**
14 Q. By whom?
15 **A. By me, by Blaine.**
16 Q. It states that they were to be
17 food show prizes, doesn't it?
18 **A. That's what it states. That's not**
19 **accurate.**
20 Q. That's your --
21 **A. There may have been one or two**
22 **given out at the food show.**
23 Q. On Page 2 --

Page 188

1 **A. I saw what it states.**
2 Q. That's your handwriting, isn't it?
3 **A. That is my handwriting.**
4 Q. And it says food show drawing
5 prizes.
6 **A. Uh-huh, I think that was the**
7 **initial intent.**
8 Q. And that didn't happen because you
9 didn't attend that food show, did you?
10 **A. I didn't attend it personally but**
11 **it was attended.**
12 Q. You didn't hand the prizes out,
13 you didn't hand the knives out?
14 **A. Kind of hard to hand them out if**
15 **I'm not there, but it's my understanding**
16 **Blaine was handing them out. They were**
17 **bought before the food show.**
18 Q. Are there any of them at your
19 house?
20 **A. There may -- I don't know. If**
21 **there is, they're in a drawer. I'll go look**
22 **for it. I don't know how many we gave out.**
23

Page 189

1 (Defendant's Exhibit 28 was marked for
2 identification and is attached to the
3 original transcript.)
4 Q. I'll hand you what's been marked
5 as Exhibit 28. Exhibit 28 is an email from
6 you to Brook Fowler at Simmons, right?
7 **A. Yes.**
8 Q. And you state that beginning
9 August 1, you had secured office space for
10 Kim and you at a monthly charge of $1,000,
11 right?
12 **A. Right.**
13 Q. And you were going to pay that and
14 be reimbursed through your T & E account; is
15 that right?
16 **A. Yes.**
17 Q. And T & E is your travel and
18 entertainment account?
19 **A. Uh-huh.**
20 Q. Yes? Yes?
21 **A. Yes.**
22 Q. This charge went through monthly
23 charge to Ren Man, right?

App. 137

Page 190

1    A.   Yeah.  I believe I listed the
2 thousand dollars through Ren Man, and then I
3 was instructing Katie that because Kim --
4 half of the office space was hers, so she
5 paid her half of $500.
6    Q.   Well, DSM paid half of the $500,
7 right?
8    A.   Kim worked for DSM, so yeah, DSM3
9 paid $500.  It was deducted from their
10 commissions.
11    Q.   What's the monthly -- what --
12 where are these offices located?  Where were
13 the offices located?
14    A.   They're located where they are
15 currently.
16    Q.   Which is where?
17    A.   The rental home that we occupy.
18    Q.   What's the monthly rent there?
19    A.   $1,500.
20    Q.   Why are you passing two-thirds of
21 the expense of your rental home on to Ren
22 Man and DSM?
23    A.   Because we never would have lived

Page 191

1 there without the space that it had for the
2 office and the kitchen.  And the plan was to
3 build a house and to maintain the office.
4 It's perfect for a broker.  You've got to
5 have a kitchen, you've got to have storage
6 space.  It has everything that a broker
7 would need.
8    Q.   Did you advise in advance, did you
9 advise anybody at Simmons that this was also
10 your personal residence?
11    A.   I don't know that I did.  I don't
12 recall if I did.
13    Q.   Did you advise anybody at Ren Man
14 that this was your personal residence?
15    A.   I don't recall if I did.
16    Q.   Did you go through any process to
17 determine what the fair value of the portion
18 of the rental home that you occupy as an
19 office relative to what your living space is
20 would be?
21    A.   It's primarily our office.  The
22 plan then and the plan now has changed.
23 It's still my office, and my current

Page 192

1 employee is paying the thousand dollars for
2 office space.
3    Q.   Your current employer is?
4    A.   Yes.
5    Q.   And that's with knowledge prior to
6 the fact, isn't it?
7    A.   Simmons and Herschel had knowledge
8 prior to the fact.  We were instructed by
9 Georgie Boston to get out of the townhome
10 that we were sharing because we would have
11 women-owned business certification people
12 coming to visit us.  And I was working out
13 of the kitchen and Kim was working out of
14 the room next to it.  And Georgie said that
15 wouldn't work.  You can't have somebody from
16 the Georgia or wherever it was, Alabama, we
17 were trying to get women-owned certification
18 for DSM3.  That was the direction I was
19 given.
20         Herschel, Ron, Julie, they wanted
21 to build DSM3.  Simmons wanted to build some
22 way, shape or form DSM3 as it associated
23 with Renaissance Man, so I went out looking

Page 193

1 for office space.  I couldn't find a single
2 office for less than a thousand dollars a
3 month for myself.
4         So I found this office, that in my
5 history with food service and my history
6 with dealing with brokers, it's what the old
7 school brokers used to be, they used to rent
8 old houses because old houses have kitchens.
9 And the other idea, because, again, I had no
10 idea that I was going to get terminated, the
11 other idea was to extend invitations to
12 customers to come stay in our home, in our
13 office because they all have a lot of
14 interest in watching the number one team in
15 the nation play football.
16    Q.   So why didn't you just tell
17 somebody at Ren Man that you were going to
18 expense your personal home and residence to
19 the company?
20    A.   I didn't look at it at the time as
21 my personal home.  I wasn't planning to
22 spend two to three months there.
23    Q.   The condo or the townhome that you

Page 194

1  were living in, you sold, correct?
2     A.  Yes.
3     Q.  And you sold it right before or
4  just after August 1, 2017, right?
5     A.  Yes.
6     Q.  Do you frequently dine out with
7  Ms. Staples and charge it to Ren Man?
8     A.  I don't know about frequent,
9  but --
10    Q.  One, two, three, four, five, six,
11  seven, eight, nine, ten, 11, 12, 13, 14, 15,
12  16, 17, in an eight-month period from
13  January 8 until August 2, that's how many
14  times you dined out with Ms. Staples and
15  charged it to Ren Man.  Can you explain the
16  business purpose of Ren Man for charging
17  those meals?
18    A.  I guess it would depend on who
19  accompanied us on the meal.  Kim worked for
20  our broker.
21    Q.  Most of the time -- most of the
22  time in the numbers I just recited, she's
23  the only person who joined you.

Page 195

1     A.  No.  I mean, I would have to see
2  that.  That would seem unusual.
3     Q.  It is unusual.  I agree with you.
4  Is there any -- would there be any business
5  purpose for Ren Man to pay for a lunch or
6  dinner between you and Ms. Staples?
7     A.  If there hadn't have been, I
8  wouldn't have expensed it.
9     Q.  Well, what would the reason have
10  been?
11    A.  If we discussed our business, if
12  we -- depending upon where we were, I may
13  have been traveling and she may have been
14  with me.  It's no different than when -- I
15  believe when Herschel travels, I believe he
16  expenses Julie's meal.
17    Q.  For expenses that were paid right
18  here in Tuscaloosa, what would the business
19  reason be for you to be dining out with Ms.
20  Staples and charging it to the business?
21    A.  Again, without seeing the specific
22  circumstances, I couldn't answer that
23  question.

Page 196

1     Q.  Can you think of any occasion
2  where you paid for a meal between you and
3  Ms. Staples in Tuscaloosa that had a
4  business purpose?
5     A.  I think if we were with Peco and
6  they covered their charge and I was trying
7  to negotiate a deal with Peco, which I tried
8  to do several times.  I can think of a
9  dinner with Robert Thurber and MSM where
10  everybody paid for their own meal and Kim
11  went to that because she was a member of
12  DSM3.  I can think of a meal in Birmingham
13  when we first introduced the MSM employees
14  to a few DSM3 employees that were expensed.
15    Q.  My question was about here in
16  Tuscaloosa.
17    A.  Okay, you limited it to here in
18  Tuscaloosa.
19    Q.  Yes.  My question was can you
20  think of an occasion --
21    A.  Other than the ones I just gave
22  you, no, I cannot.
23    Q.  I'll hand you what's been marked

Page 197

1  as Exhibit 29.
2
3  (Defendant's Exhibit 29 was marked for
4  identification and is attached to the
5  original transcript.)
6
7     Q.  You've submitted some expenses
8  here related to something called Shoe
9  Science, right?
10    A.  Uh-huh.
11    Q.  Why were these expenses of Ren Man
12  as opposed to DSM, Diversified, Diversified
13  2?
14    A.  Because Shoe Science -- the new
15  CEO or president or whatever he was at Shoe
16  Science knew me from his days of running a
17  buffalo meat company, and he had reached out
18  to me and we had had conversations about
19  Renaissance Man representing his buffalo
20  meat company.  And then when he started
21  running this shoe business, which is a --
22  Shoe Science was created by the inventor of
23  Crocs, and so he reached back out to me to

Page 198

1 see if Renaissance Man would be interested,
2 if Herschel would be interested in
3 representing his shoes.
4    Q.  Isn't it true that these expenses
5 were in connection with Diversified business
6 relating to the issuance of a stock option
7 from SoftScience to Diversified 2.
8    A.  No.  This was sent -- I don't know
9 anything about this, I haven't followed up
10 on it.  I have no idea about it.
11    Q.  So the option date of May 19, 2016
12 is totally coincidental --
13    A.  It is.
14    Q.  -- with the three expenses that
15 were charged the week before to Ren Man?
16    A.  SoftScience had interest in
17 Renaissance Man representing them.  They had
18 no interest in DSM representing them.  The
19 guy flew into Nashville.  He met Randy and
20 I.  I introduced him to Randy.  Kevin Lamar
21 I guess is his name.  Subsequent to the
22 meeting, he didn't really have any interest
23 in Randy or DSM.  His interest was in

Page 199

1 Herschel and his interest was in Renaissance
2 Man.
3    Q.  That's what it became at some
4 point but not as of the time when you had a
5 meeting in connection with Diversified
6 receiving these stock options; isn't that
7 so?
8    A.  I don't really know the timing of
9 the stock options.
10    Q.  I just referred to it.
11    A.  I'm not a real good listener.
12    Q.  It was issued on March 19, 2016,
13 which is between 11 and eight days after the
14 various expenses that were run through Ren
15 Man.
16    A.  Okay.
17    Q.  Just a coincidence; is that right?
18    A.  I didn't sign that document.  It
19 looks like the options were given to Kim and
20 Randy.  I didn't -- I suspect it's similar
21 to the relationship between Simmons and
22 Renaissance Man and DSM in that SoftScience
23 has the supply, they would be sold through

Page 200

1 Renaissance Man, and that Renaissance Man
2 would pay a commission to DSM to help sell
3 the product.  That's what I would speculate.
4    MR. PARKER:  Mike, can we take a
5 five-minute?
6    MR. KING:  I just looked at my
7 phone to see.  Yes.
8    THE VIDEOGRAPHER:  We are going
9 off the record 2:32.
10
11 (Defendant's Exhibit 30 was marked for
12 identification and is attached to the
13 original transcript.)
14
15       (Short recess.)
16
17    THE VIDEOGRAPHER:  We are back on
18 the record at 2:41.
19    Q.  (BY MR. KING:)  Mr. Staples, when
20 did you first become familiar with a company
21 called Grate Chef, G-r-a-t-e, Chef, two
22 words?
23    A.  I believe I first -- I didn't know

Page 201

1 the name of the company, but I knew that
2 Keith Aldridge and Mike Griffin, two guys I
3 worked with at Flowers/Mrs. Smith's were
4 selling something.
5    Q.  When was that?
6    A.  That would have been while I was
7 at Mrs. Smith's which was sometime before --
8 I don't really recall.
9    Q.  Well, when were you at Mrs.
10 Smith's?
11    A.  I was at Flowers/Mrs. Smith's from
12 '85 to February of 2000, I think.  Grate
13 Chef specifically, it was at some point in
14 time I think during DSM2.
15    Q.  Did you come to think that there
16 was a business opportunity with Grate Chef?
17    A.  Mike Griffin contacted me and said
18 that Bill wanted to sell Grate Chef.
19    Q.  Bill?
20    A.  Stringless.
21    Q.  And why did he contact you?
22    A.  Because he had worked for me for
23 several years.

App. 140

Page 202

1    Q.   And did he think that you were a
2  prospective purchaser?
3    **A.   Well, his main interest was in**
4  **Herschel because of the products we sold.**
5  **And Mike's a marketing guy, that's what he**
6  **did for me at Mrs. Smith's and felt like**
7  **Grate Chef or Grill Wipes, which you clean**
8  **off grills, and I think he had learned that**
9  **we were selling some hamburgers in Wal-Mart**
10 **and whatever else, and so if you're selling**
11 **product that get sold on a grill, maybe**
12 **Renaissance Man would be interested.**
13   Q.   You went to a trade show in Las
14 Vegas at some point, correct?
15   **A.   Yes.**
16   Q.   Do you remember when that was?
17   **A.   No.**
18   Q.   Do you think it was in 2016?
19   **A.   If that's what your document says**
20 **it was.**
21   Q.   Well, do you think it was?
22   **A.   You asked me if I remembered when**
23 **it was and I don't, but that sounds correct.**

Page 203

1  **It was in the spring during the time of**
2  **DSM2.**
3    Q.   Here is your reimbursement form,
4  Exhibit 31, that relates to that trip.  Can
5  you tell me what the reason was that Ren Man
6  paid that expense?
7
8
9  (Defendant's Exhibit 31 was marked for
10 identification and is attached to the
11 original transcript.)
12
13   **A.   The day Mike Griffin made me aware**
14 **of Bill's interest in selling Grate Chef, I**
15 **contacted Herschel because Herschel knew**
16 **Bill Stringless from a previous business**
17 **venture they had together.  I remember**
18 **Herschel saying he thought highly of Bill.**
19     **Bill basically taught me food**
20 **service when I went to work for Mrs.**
21 **Smith's, it was Pies, Inc. at the time.  So**
22 **as would typically occur, I'm looking for**
23 **ever sources of -- other sources of income**

Page 204

1  for Renaissance Man.  And there was a
2  hardware show, as I recall, in Vegas and
3  Herschel and Ron, even Julie thought there
4  could be a connection there somehow,
5  someway.  We didn't know what the connection
6  would be, but as I would do with virtually
7  any other supplier of any other product, I
8  would vet, if you will, so I attended the
9  show to see what interest there was in the
10 products.
11
12 (Defendant's Exhibit 32 was marked for
13 identification and is attached to the
14 original transcript.)
15
16   Q.   I'll hand you Exhibit 32.  It's a
17 two-page document.  Did you have any role in
18 the operation of the Grate Chef booth at the
19 Las Vegas show?
20   **A.   I attended the show in their**
21 **booth, and I met with the customers and I**
22 **tried to gauge interest in the Grate Chef**
23 **products.**

Page 205

1    Q.   Did you put together this Grate
2  Chef's, Inc. Herschel Walker football
3  giveaway promotion?
4    **A.   I didn't put together -- that was**
5  **either Mike Griffin or maybe Blair may have**
6  **helped with that.**
7    Q.   Blare Staples?
8    **A.   Blare Staple.  The logo would have**
9  **come from Simmons.  Simmons kept a file of**
10 **all the -- Simmons and Julie provided all**
11 **the logos and photos and things of that**
12 **nature when we'd need them.**
13   Q.   Did you have any conversation with
14 Herschel about this football giveaway or the
15 use of his likeness?
16   **A.   The specific promotion itself, I**
17 **don't recall.**
18   Q.   Well, do you think Herschel
19 authorized this particular promotion?
20   **A.   He had authorized similar**
21 **promotions.  That particular promotion, it**
22 **was never a problem.  He would have signed**
23 **the footballs and I would have told him what**

Page 206

1 they were for.
2    Q.  Do you remember that happening?
3    A.  That particular -- he signed so
4 many things for our customers and for so
5 many -- it was never an issue until after he
6 terminated me.
7    Q.  And the second page of this
8 Exhibit 32 is your expense report for the
9 remainder of that show; isn't that right?
10    A.  Uh-huh.
11    Q.  Say yes or no, please.
12    A.  Yes.
13    Q.  And am I right that you're the
14 person that approved your expense report?
15    A.  Absolutely not.
16    Q.  Okay.  Who -- who approved your
17 expense report?
18    A.  Chip Miller.
19    Q.  Did he have any questions for you
20 from time to time about this type of expense
21 report?
22    A.  This type of expense report?
23    Q.  Sure.  Did he ask you any

Page 207

1 questions about --
2    A.  If he saw something that didn't
3 look familiar or didn't look standard or
4 whatever, yeah, he'd call me and ask me
5 about it.
6    Q.  Did he ask you what Grate Chef was
7 about?
8    A.  I don't recall.
9    Q.  I'm handing you what's been marked
10 as Exhibit 33.
11
12 (Defendant's Exhibit 33 was marked for
13 identification and is attached to the
14 original transcript.)
15
16    Q.  Exhibit 33 contemplates some
17 discussion about your further interest in
18 the acquisition of Grate Chef, right?
19    A.  Yes.
20    Q.  Why is it directed solely to Randy
21 Sanders and you individually?
22    A.  Who else would it have been
23 directed to?

Page 208

1    Q.  Well, is it intentional -- do you
2 think that it doesn't include Herschel
3 Walker?
4    A.  No.
5    Q.  At the time that you received
6 this, was it contemplated that Ren Man or
7 Herschel Walker would have any participation
8 in the acquisition?
9    A.  Yes.
10    Q.  And that was contemplated in whose
11 head?
12    A.  The conversation with Herschel,
13 with Ron and Julie.
14    Q.  As of May 4, 2016?
15    A.  Yes.
16    Q.  If it were contemplated that the
17 Grate Chef deal was going to involve Ren Man
18 and Herschel Walker, please take a look at
19 Exhibit 34 and explain to me why you wrote
20 on April 18 that you anticipated merging DSM
21 and Grate Chef.
22
23 (Defendant's Exhibit 34 was marked for

Page 209

1 identification and is attached to the
2 original transcript.)
3
4    A.  Who's this text from?
5    Q.  This is your text to Robert
6 Thurber on April 18, 2016.
7    A.  Okay.
8    Q.  It's true in point four in that
9 text that you say you want to merge DSM and
10 Grate Chef, right?
11    A.  I was asking for Robert's feedback
12 on that possibility.
13    Q.  You also say in point seven that
14 the ownership percentages are going to
15 involve you and Randy and Christopher and
16 Mike Griffin, right?
17    A.  Uh-huh.
18    Q.  Yes or no?
19    A.  Yes.
20    Q.  You don't say that any percentage
21 ownership of this enterprise is going to
22 involve Herschel Walker or Ren Man, correct?
23    A.  The way the process -- that's

Page 210

1  correct.  That's part of the vetting process
2  that we were familiar with.
3      Q.  I'll hand you Exhibit 35, which is
4  an email from September 29, 2016 from you to
5  Herschel Walker about Grate Chef.
6
7  (Defendant's Exhibit 35 was marked for
8  identification and is attached to the
9  original transcript.)
10
11      Q.  And by this email, this is
12  launched by Randy Sanders' email of
13  September 6th in which he decides to resign
14  from DSM, right?
15      A.  Uh-huh.
16      Q.  Yes or no?
17      A.  Yes.
18      Q.  Randy still viewed himself as
19  potentially being in the Grate Chef deal as
20  of September 6th, 2016, right?
21      A.  He did, yes.
22      Q.  And you didn't, did you?
23      A.  You didn't ask me about me.  I

Page 211

1  said he did.
2      Q.  I just said and you didn't, did
3  you?
4      A.  I didn't really have an opinion at
5  that time.  I had just been stunned by his
6  resignation so I wasn't real sure what the
7  future held.
8      Q.  By September 29, you had figured
9  out what your attitude was, though, right?
10  You said you were not going to do another
11  deal with Randy.
12      A.  That's correct.  I wanted no part
13  of Randy.
14      Q.  So by September 29, 2016, you knew
15  you weren't going to do a deal with Randy
16  through DSM, so the alternative was to work
17  at that point with Herschel, right?
18      A.  No.  That's not at all right.
19      Q.  Tell me what is right.
20      A.  As I've already said, and the
21  truth of the matter is, when I was speaking
22  about myself, I didn't have the money to
23  acquire anything.  And Herschel, we never

Page 212

1  brought anything to Ron because Herschel
2  didn't want Ron involved until I had
3  adequately vetted the process.  Herschel
4  knew about DSM and the opportunity there
5  from the day Bill Stringless called me.
6      Q.  He knew about the opportunity,
7  he --
8      A.  And he expressed interest in
9  either acquiring it or representing the
10  products through Renaissance Man.  He agreed
11  it would be a perfect fit and an opportunity
12  for added commissions for Renaissance Man.
13      And then after Randy left and
14  Julie had 50 percent ownership in DSM3, she
15  took a big liking of it, so much so that I
16  arranged for a plant tour.
17      All these things just didn't
18  happen out of the blue.  Ron Eisenmann asked
19  me for the product specifications for the
20  Grate Chef products.
21      Q.  I'll hand you what's marked
22  Exhibit 36.
23

Page 213

1  (Defendant's Exhibit 36 was marked for
2  identification and is attached to the
3  original transcript.)
4
5      Q.  Can you tell me what Herschel's
6  reaction was to your email to Bill
7  Stringless on November 15, 2016?
8      A.  I don't know that I ever spoke to
9  Herschel about it.  I know that we came up
10  with some dates to tour the plant.  I don't
11  remember if that was previous or -- but they
12  were very much aware that we were going to
13  tour the plant.  I never would have set that
14  up with Bill and/or Mike had they not
15  expressed interest in it.
16      At some point in time, as
17  typically happened, I don't remember
18  specifics, but Ron sent something of his
19  concerns.  And then it just -- I looked like
20  the fool to Bill Stringless because I had an
21  understanding with Herschel that we were
22  going to move forward with this, there was
23  interest, and then I'd have to go back and

Page 214

1 say, well, actually now there's evidently
2 not interest.
3
4
5 (Defendant's Exhibit 37 was marked for
6 identification and is attached to the
7 original transcript.)
8
9    Q.   So take a look at Exhibit 37.  In
10 point two on Exhibit 37, you state, Grate
11 Chef would be acquired by DSM Sales &
12 Marketing, LLC.  Do you see that?
13    A.   I asked for his thoughts on that,
14 yes.
15    Q.   Well, that --
16    A.   I'm fishing for -- and I end it by
17 saying, Your thoughts.  That's a
18 possibility.  That's not necessarily my
19 recommendation.
20    Q.   You said DSM needs a, quote,
21 leader.
22    A.   Uh-huh.
23    Q.   That would be Mike Griffin?

Page 215

1    A.   That was something we discussed.
2    Q.   So as of December 6th, 2016,
3 you're not anticipating that Ren Man would
4 be an acquiring party, right?
5    A.   This was a thought, and I'm asking
6 for his thought.  There were various
7 thoughts, there were various discussions.
8        We also had the conversation
9 several times, especially after learning
10 that Renaissance Man was considered by its
11 largest customer to be a broker, we also had
12 conversations that we needed to build up
13 DSM3 because Julie had 50 percent ownership
14 of DSM3 and so that I needed to do
15 everything I can to build up DSM3 so that it
16 could continue in the event that Renaissance
17 Man lost -- lost a certain amount of
18 commissions.
19    Q.   You intended to get this
20 acquisition done quickly without involving
21 HW's attorney; is that right?
22    A.   Does it say that?
23    Q.   Last paragraph right above your

Page 216

1 thoughts.
2    A.   That was always a go, because the
3 reason we had any -- we failed to have any
4 agreement with basically anyone was because
5 Ron would write agreements that nobody would
6 sign.
7        Case in point, when we were
8 negotiating or Herschel was negotiating with
9 the restaurant, the restaurant almost didn't
10 happen because Ron refused to sign the
11 agreement.  I got ahold of Herschel, he was
12 in Miami, he said leave Ron out of it and
13 send me the document.  I sent it to him and
14 he signed it and the restaurant was built.
15 So yeah, we tried to avoid unnecessary costs
16 all the time.
17    Q.   Did Herschel say anything after
18 December 1, 2016 that indicated that he had
19 any interest through Ren Man or personally
20 in acquiring Grate Chef?
21    A.   Again, I don't remember the
22 timing.  I don't know.  I don't remember the
23 timing of when the whole -- of when the

Page 217

1 whole Grate Chef ended.  We continued to
2 discuss Grate Chef.
3    Q.   Well, you still thought in mid
4 January of 2017, as expressed in Exhibit 38,
5 that the acquiring party would be DSM Sales
6 & Marketing, LLC, didn't you?
7
8 (Defendant's Exhibit 38 was marked for
9 identification and is attached to the
10 original transcript.)
11
12    A.   In my opinion, evidently, that's
13 the best way at the time.  And Herschel had
14 expressed his support of me, of the deal
15 with me verbally.  I wouldn't have said that
16 had he not done that.
17    Q.   That wasn't an expression of
18 support for Ren Man or Mr. Walker to
19 participate in investment in Grate Chef; is
20 that right?
21    A.   Well, as I understood it, Ren Man
22 would receive commission because DSM would
23 now, with respect to Grate Chef, become the

Page 218

1 supplier, the manufacturer.  So it's hard to
2 wear two hats with respect to selling to
3 customers.
4        So DSM, of which Julie owned 50
5 percent, would enjoy the benefit of being
6 the supplier, the manufacturer, because DSM3
7 three, now unlike Renaissance Man, actually
8 owned a production facility.  They actually
9 owned a line which takes you above the
10 broker.
11       So Renaissance Man, because of its
12 relationships and so on and so forth, the
13 largest of which was Grate Chef, was in the
14 process of developing what they thought to
15 be a food service grill wipe, which they had
16 already received rave reviews from, and
17 because of Renaissance Man's relationship
18 with Marriott Corporation, the idea was that
19 Renaissance Man could certainly get the
20 restaurant items through food service
21 distribution.
22    Q.   You mentioned that on the
23 following day, meaning January 17th, 2017,

Page 219

1 you had a meeting scheduled with Herschel
2 and Julie and Ron in Atlanta, right?
3    A.  If that's what I said, that's what
4 I said.
5    Q.  First sentence.
6    A.  Okay.
7    Q.  That meeting wasn't scheduled to
8 talk about Grate Chef, was it?
9    A.  I don't know what the meeting was
10 scheduled about.
11    Q.  You were pretty -- you were
12 disabused on that occasion of any further
13 interest in doing a deal with respect to
14 Grate Chef, correct?
15    A.  Disabused?
16    Q.  Right.  You were told that it
17 wasn't going to happen.
18    A.  I don't recall being told that.
19    Q.  Did you have any expectation after
20 mid January of 2017 that Herschel, Julie,
21 Ren Man, had -- would pursue an equity
22 interest in Grate Chef?
23    A.  I don't have any recollection of

Page 220

1 when -- first of all, I have no recollection
2 of Herschel ever saying he had no interest
3 in Grate Chef.
4    Q.  Do you have any recollection of
5 him saying he was interested --
6    A.  Every time -- my recollection is
7 that every time I spoke to him about it, he
8 did have interest.
9    Q.  After January, mid January 2017?
10    A.  I don't know when the last time I
11 spoke to him about it was.  I know that we
12 talked to Mike Griffin in Ron's office.  I
13 believe it was in the fall of 2017.  And we
14 talked about employing his wife Connie to
15 help us.  It may have been in 2016.  I don't
16 recall.
17    Q.  I'm going to hand you what's
18 marked as Exhibit 39.
19
20 (Defendant's Exhibit 39 was marked for
21 identification and is attached to the
22 original transcript.)
23

Page 221

1    Q.  This is an email from you to your
2 daughter Blair on February 26th, 2017,
3 correct?
4    A.  Yes.
5    Q.  You state that you want a sales
6 sheet announcing that Herschel proudly
7 supports Grate Chef.
8    A.  Uh-huh.
9    Q.  Did Herschel Walker authorize you
10 to make such a statement?
11    A.  He must have, either indirectly or
12 directly.  It was never -- I created all
13 different types of point of sale materials
14 using all different types of images provided
15 by Simmons or Julie or Carol or whoever.
16 There was never an issue.
17       I do know that when I would ask
18 Dave Elsie ^ spl to work on something from
19 previous experience, he would not simply do
20 so without obtaining certain approvals.
21    Q.  Did he get approval from Herschel
22 Walker?
23    A.  I don't know what his process was,

Page 222

1 but I do know he had a process.
2    Q.   I'll hand you what's marked
3 Exhibit 40.
4
5 (Defendant's Exhibit 40 was marked for
6 identification and is attached to the
7 original transcript.)
8
9    Q.   Do you see that you direct your
10 daughter to obtain a photoshop of Herschel
11 Walker for the creation of this picture
12 endorsement of Grate Chef?
13    A.   I don't see the word photoshop.  I
14 said use the phot of Herschel with the ribs
15 and let's get started on the design.
16    Q.   Well, there was no picture of
17 Herschel Walker with a Grate Chef product,
18 right?
19    A.   Not to my knowledge, no.
20    Q.   So you were directing --
21    A.   Oh, I see where she said, I need
22 to photoshop.
23    Q.   Uh-huh.  So you were directing her

Page 223

1 to use a superimposed design for purposes of
2 creating these marketing materials.
3    A.   She didn't have a photoshop image
4 so I was directing her to use the photo of
5 Herschel and the ribs.
6    Q.   Which was a result of the fact
7 that there wasn't a picture in which
8 Herschel Walker had endorsed Grate Chef
9 product, right?
10    A.   Correct.
11
12 (Defendant's Exhibit 41 was marked for
13 identification and is attached to the
14 original transcript.)
15
16    Q.   So your daughter at your direction
17 created what's been marked as Exhibit 41,
18 which is a picture of Herschel Walker
19 holding these grill wipes, supposedly.
20    A.   I don't know that Blair created
21 it.  I think Mike Griffin may have created
22 it.  I don't know who created it.
23    Q.   This was at your direction, right?

Page 224

1    A.   I told her to use the photo of
2 Herschel holding the ribs.
3    Q.   You told her to create the
4 document, right?
5    A.   I didn't tell her to create that
6 specific document.  I don't know how
7 documents are created.
8    Q.   All right.
9    A.   I copied Mike Griffin because he
10 was the one requesting the document.  There
11 wasn't much to what they were trying to do,
12 as I recall.
13        Herschel didn't have a problem
14 with this in the past.  We created a lot of
15 point of sale materials looking for other
16 sources of revenue.  Grate Chef was a
17 possible source of revenue for Renaissance
18 Man and/or DSM3.
19    Q.   As of February or March of 2017,
20 was Ren Man selling any Grate Chef product?
21    A.   No.
22    Q.   Was it marketing any Grate Chef
23 product?

Page 225

1    A.   It depends on how you define
2 marketing.  We obviously used the flyer or
3 whatever at Las Vegas to try to gauge
4 interest to vet the process.
5        The good thing about Grate Chef is
6 that they needed some type of endorser.
7 They needed some type of support.  They were
8 one of the few suppliers that actually had
9 interest in working with Renaissance Man.
10    Q.   There wasn't anything that
11 Herschel did that you're aware of to
12 actually endorse this product or approve
13 this particular point of sale material?
14    A.   He verbally approved an
15 endorsement of Grate Chef to see what we
16 could create in the marketplace, yes.  He
17 trusted Bill Stringless to pay commissions
18 on any resulting sales because he knew Bill
19 Stringless from a previous business
20 relationship.  He also trusted me because he
21 had every reason to.
22    Q.   He trusted you to create documents
23 with his likeness for a product that he

App. 146

Page 226

1 didn't endorse?
2     A.  He certainly had in the past.
3
4
5 (Defendant's Exhibit 42 was marked for
6 identification and is attached to the
7 original transcript.)
8
9     Q.  Isn't it true that your motivation
10 for creating this promotional document is
11 contained in Exhibit 42 which says you were
12 trying to use Herschel's likeness and
13 goodwill and promotion for the purpose of
14 increasing Grate Chef sales?
15     A.  I was certainly motivated to
16 increase Grate Chef sales, because by doing
17 so, Herschel would either own a portion of
18 Grate Chef and/or Renaissance Man would be
19 paid commissions on Grate Chef.
20     Q.  What do you know about what
21 Herschel charges for purposes of obtaining
22 his endorsement of commercial ventures?
23     A.  What do I know?

Page 227

1     Q.  Yes.
2     A.  Well, with respect to certain
3 promotional banners, point of sale
4 materials, things of that nature for Jett
5 Foods, for example, nothing.
6          For packaging and initial
7 promotional materials and design of
8 packaging where Texas Chili was going to use
9 his likeness on a box, nothing.
10          In terms of supporting Guardian
11 for Heros and any company that would be
12 willing to align with them, he was willing
13 to support and endorse any suppliers that
14 aligned there for nothing.
15     Q.  That's a decision that he would
16 make individually, personally?
17     A.  I suspect he would.  I mean, over
18 the years, I became very familiar with what
19 he would and wouldn't do.
20     Q.  Okay.  And he did not personally
21 approve this promotion --
22     A.  I don't recall if -- I don't
23 recall if he did.  Somewhere in the back of

Page 228

1 my mind, I'm thinking Julie or somebody saw
2 it and said his hand is too big, but I don't
3 recall the specifics.
4     Q.  Take a look at that email that
5 we've been looking at, Exhibit 42.  There's
6 a paragraph reference to half of the legal
7 fees.  Do you see that?
8     A.  Uh-huh.
9     Q.  Do you agree that you were the
10 person who owed the legal fees?
11     A.  No.
12     Q.  Who do you think owed the legal
13 fees?
14     A.  I think Renaissance Man owed the
15 legal fees because I was acting on their
16 behalf as I was vetting them.  They showed
17 tremendous interest in acquiring Grate Chef.
18 I was not in a financial position to acquire
19 Grate Chef, so I felt like Renaissance Man
20 was obligated to pay the legal fees.
21     Q.  Who wrote the check for the
22 $2,500?
23     A.  Where's the $2,500?

Page 229

1     Q.  It says, If you make those
2 deductions, that would leave a balance of
3 $2,500.  If this is acceptable, please let
4 me know and we will cut the check.
5     A.  I assume the balance was paid by
6 DSM2.  I'm not sure.  That's who I would
7 suspect should have paid it.
8     Q.  I thought you said Ren Man should
9 pay it.
10     A.  Half of the legal fees -- I don't
11 remember the particulars.  I felt like that
12 Renaissance Man, because of the direction
13 that I had been given, had misled Grate
14 Chef, so Bill Stringless drew up the
15 documents through the acquisition.  I also
16 felt like DSM2 was responsible.  How that
17 all played out, I don't recall.
18     Q.  All right.  I'll hand you what's
19 been marked as Exhibit 43.
20
21 (Defendant's Exhibit 43 was marked for
22 identification and is attached to the
23 original transcript.)

Page 230

1
2    Q.   You're not copied on this email.
3 I presume you've never seen it before.
4    **A.   I have not.**
5    Q.   All right.  I want to direct you
6 to a sentence in the first paragraph.  It's
7 actually two sentences.  John's feedback to
8 our accounting group is he can do what he
9 wants to do.  He wanted to know what
10 busybody is digging into expenses.  Do you
11 see that?
12   **A.   Uh-huh.**
13   Q.   That's dated March 31, 2017.
14   **A.   Uh-huh.**
15   Q.   Do you remember having that
16 specific reaction to somebody at Simmons?
17   **A.   Never had any reaction close to**
18 **that.**
19   Q.   You never used those words?
20   **A.   Absolutely not.**
21   Q.   Do you believe that at some point
22 you told people in the accounting group that
23 you could do what you wanted to do?

Page 231

1    **A.   I know that I did not.**
2    Q.   So if David Jackson says that you
3 did --
4    **A.   He's lying.  And as for the**
5 **airline tickets, I know exactly what he's**
6 **referring to, and Herschel approved it.**
7
8 (Defendant's Exhibit 44 was marked for
9 identification and is attached to the
10 original transcript.)
11
12   Q.   I hand you what's been marked as
13 Exhibit 44, which is a communication from
14 Mark Sterling Gober to Keri Simms.
15      MR. SIMMS:  Don't answer that yet.
16 Where did y'all get this from?
17      MR. KING:  It's a download from
18 ^ ck John Staples at Simfoods.com.
19      MR. SIMMS:  Let me read it.  I'm
20 going to go ahead and interpose an objection
21 to anything Mr. Gober is saying.  But you
22 can ask him about it.
23   Q.   (BY MR. KING:)  Mr. Gober says in

Page 232

1 this email that John is having some problems
2 with Herschel.  He anticipates potential
3 legal issues.  That's dated October 23,
4 2017.  As of October 23, 2017, what
5 potential legal issues did you anticipate?
6      **THE WITNESS:  Are you all right?**
7      MR. SIMMS:  Yeah, I'm fine.
8    **A.   My concern is that -- my concern**
9 **at the time, and it really began in February**
10 **of 2017, June of 2017, I had an agreement**
11 **with Simmons that I would not be fired**
12 **without cause.  I had an understanding from**
13 **Todd Simmons and David Jackson and Chip**
14 **Miller that although they did not offer**
15 **contracts, I would not be fired without**
16 **cause.**
17      **They recruited me on several**
18 **occasions.  Initially it was to work for**
19 **Renaissance Man.  I had a history of**
20 **Renaissance Man.  I wanted nothing to do**
21 **with Renaissance Man.  I would manage the**
22 **Simmons/Renaissance Man relationship, but**
23 **my -- what was intriguing to me was the**

Page 233

1 **opportunity possibly to bring Simmons into**
2 **the food service distribution business.  At**
3 **the time, that was not agreed upon.**
4      **I was still living in Arkansas in**
5 **the spring of 2008.  I was working for**
6 **Smithfield.  Smithfield was selling ribs to**
7 **Renaissance Man.  I had met the Simmons**
8 **people on occasion, didn't know who they**
9 **were.  Mike Rogers introduced me to them at**
10 **some point in time.**
11      **I got a call from Christen Caffey**
12 **because she couldn't get ahold of anyone at**
13 **Simmons and she couldn't get ahold of Mike**
14 **Rogers.  Christen Caffey worked at Sysco**
15 **corporate at the time.**
16      **She was furious.  She wanted to**
17 **end all association between Sysco and**
18 **Herschel.  She had seen -- read the deal**
19 **about the Breaking Free, she had seen the**
20 **CNN interview with Herschel's ex-wife and**
21 **she was furious.  And so she said, I need to**
22 **speak to somebody at Simmons, they won't**
23 **return my call.**

Page 234

1      So as I recall, I got ahold of
2  Chip Miller, I got ahold of David Jackson.
3  I knew nothing about the Breaking Free book.
4  And to be quite honest with you, when I saw
5  the interview with Herschel's ex-wife, I was
6  petrified, as she was.
7      I consider Herschel to be a
8  friend. I've never done anything except try
9  to protect Herschel, to try to support
10  Herschel, but I was concerned.
11    Q.  Where in 2017 --
12    A.  Okay. Well, here's how we get to
13  that. I didn't write the words from Mike,
14  Mark, whatever his name is, he was my
15  neighborhood. I knew he was an attorney and
16  nice guy. We had conversations.
17      And beginning in February of 2017,
18  through the summer of 2017 is the most
19  stressful time of my life. Herschel was
20  going off the deep end, so I was very
21  concerned.
22      I was concerned that David Jackson
23  because of all the -- Simmons is a wonderful

Page 235

1  company. And when they hired me, when they
2  were recruiting me, they showed me a picture
3  of their corporate office, and it's shaped
4  like a cross because they were trying to get
5  me to relocate my family from Virginia to
6  Arkansas. And I had a secure job with
7  Smithfield, a multibillion dollar company.
8  I had a good job with Smithfield. I could
9  have grown with Smithfield.
10      And they recruited me, and they
11  kept recruiting me. And we talked about the
12  Breaking Free incident, and that's when I
13  said, I want nothing to do with this
14  arrangement. And I let it go.
15      And then in January of 2009, it
16  just so happened that the Renaissance Man,
17  Simmons -- there had been phone calls from
18  Simmons trying to recruit me during this
19  time period, didn't want to work for you,
20  because they weren't -- we don't offer
21  contracts, we're not ready to go where
22  you're going.
23    Q.  Mr. Staples, in October of 2017,

Page 236

1  what potential legal issues did you
2  anticipate?
3    A.  I anticipated that David Jackson
4  would throw me under the bus with Herschel
5  when I told him what I had been directed to
6  tell him from day one by Todd Simmons, the
7  owner of the company, that if either side
8  got out of balance, if either side did
9  anything unfair to the other, that he wanted
10  to know about it; that it was my
11  responsibility to tell Simmons about it.
12      And this -- things went perfectly
13  well. We set record sales and profits,
14  wonderful year, never had -- never had a
15  negative conversation with Herschel ever.
16  And then Julie got involved, and Julie felt
17  like the waffles from HartyBake were going
18  to set the world on fire, that they were
19  going to be the best thing since sliced
20  bred.
21      I'm not an arrogant person. I was
22  the vice-president of sales and marketing
23  for Flowers Bakery on their snack cake

Page 237

1  division. I said, Hold off, those aren't
2  going to be that fantastic, let's get it
3  going. Oh, no, they're going to be great.
4      I learned that I couldn't hold
5  Herschel off anymore. Julie was fueling the
6  fire. Simmons had asked me to hold Herschel
7  off because of an incident at Brinker,
8  because of an incident at Burger King,
9  because of what had been said about Pico
10  Foods.
11      Simmons had asked me to keep
12  Herschel away from customers. Ron on
13  several occasions would call me to say, Keep
14  Herschel away from customers. Bring him in
15  when the deal is done. So anyway, in
16  February of 2000 --
17    Q.  October of 2017.
18    A.  February leads to October.
19  Because there's two differences between
20  February and October.
21    Q.  It would be easier if you would
22  answer my question and then you can --
23    A.  It might be easier for you but it

Page 238

1  wouldn't explain the situation.
2      Q.   I'll ask you for an explanation.
3  I want to know what the legal issues were
4  that you anticipated in October of 2017 that
5  you raised with Mr. Gober.
6      A.   All I said to Mr. Gober in October
7  of 2017 is that Herschel Walker is accusing
8  my daughter and my wife of stealing money
9  from a crazy August 10th text message
10  exchange that he subsequently deleted.
11        I was aware that Herschel Walker
12  was upset with me for not approving the sale
13  of certain packaging products for the retail
14  waffles.  I was aware that Herschel Walker
15  told me that somebody at Renaissance Man is
16  informing Simmons not to pay for waffle
17  packaging.  I said, That somebody is me,
18  because you and Julie and Ron told me you
19  were going to sell those through H. Walker
20  Enterprises.  You're not going to sell those
21  through Renaissance Man.
22        Carmen Seal ^ spl, and I told her
23  when she called me -- the controller at

Page 239

1  Simmons called me, as she did from time to
2  time if she got an unusual request to make a
3  payment, she called me.  Carman Seal is the
4  nicest lady on the face of the earth.  She
5  said, John, I got this bill for waffles for
6  displays, should I pay it?  No.
7        Wasn't a few days after that,
8  Herschel called me and said, Somebody is
9  telling Simmons not to pay for waffles.
10  They're supposed to pay everything we send
11  them.  I said, No, Herschel, that's not the
12  way it works.  You wanted to keep the
13  waffles separate.  He got mad.  He said,
14  They're supposed to pay everything we send
15  them.
16      Q.   Okay.  But that's after the
17  question -- the question relates to October
18  23, 2017, you anticipated potential legal
19  issues.  The litigation -- are the legal
20  issues that you're talking about, are they
21  termination, are they contractual in nature,
22  are they business torts, what are they?
23      A.   I don't know what -- I didn't know

Page 240

1  what they would be.  I was concerned.  My
2  friend's an attorney.  He certainly felt
3  like there would be some issues.  He said,
4  You have a problem.
5      Q.   Were they discrimination?
6      A.   Discrimination against a white
7  male?  I don't suspect so.
8      Q.   I'm just trying to figure out what
9  this very innocuous sentence --
10      A.   Innocuous?
11        MR. SIMMS:  And again, just for
12  the record, I know we reserved objections,
13  but this is Mr. Goldberg's language and
14  you're asking him, and it's not his
15  language.  But anyway, I just want the
16  record to be clear of that.
17        MR. KING:  Uh-huh.
18        MR. SIMMS:  But you're free to
19  keep asking him.
20        MR. KING:  Sure.  Thank you.
21      Q.   (BY MR. KING:)  I'm just trying to
22  get a sense of what from a legal
23  standpoint --

Page 241

1      A.   I don't think you are because the
2  answer is I don't know.  And I didn't know
3  if it was going to be related to Renaissance
4  Man, I didn't know if it was going to be
5  related to DSM.  I've never been involved in
6  a legal dispute ever.
7        I got somebody as a friend,
8  they're my friend for life.  I've married
9  one wife.  We made an agreement.  But when
10  my wife and her partner can't even speak to
11  another, my next-door neighbor is saying,
12  well, there are going to be some problems.
13  Low and behold, he was right.
14      Q.   Did you have a meeting the month
15  before this email was sent on September 17,
16  2017 regarding declining sales on the
17  contract management side of the business?
18      A.   If you have it in front of you,
19  I'll look at it.  I don't recall the date.
20      Q.   Do you recall such a meeting at
21  Greenberg Traurig's office with Herschel
22  Walker, Ron Eisenmann, Julie Blanchard?
23      A.   There were several meetings there.

Page 242

1   Q.   To discuss Marriott, Avendra,
2 HMSHost, et cetera?
3   **A.   I don't know.**
4   Q.   No recollection?
5   **A.   I said we had several meetings.**
6 **You asked me on that specific time if that's**
7 **what it says.  It wouldn't surprise me if**
8 **that's what we met about.**
9   Q.   Subsequently on October 21, did
10 you and Herschel have a conference regarding
11 Ren Man's business in CATMAN?
12   **A.   Again, I don't have my calendar.**
13 **I don't know.  We had a lot of discussions.**
14 **What was the point of the discussion?  It's**
15 **going great or what?**
16   Q.   Well, do you remember any such
17 meeting?
18   **A.   I remember that CATMAN was**
19 **tracking at 140 percent of the award, so I**
20 **suspect it would have been positive.**
21   Q.   Because if there was such a
22 meeting, two days later, you were
23 communicating with Mr. Simms about potential

Page 243

1 legal representation.
2        MR. SIMMS:  Whoa, whoa, whoa.  He
3 wasn't communicating with me two days later,
4 was he?
5        MR. KING:  The email says to you,
6 Thanks for the introduction, Keri, let's
7 talk tomorrow.
8        MR. SIMMS:  There's no predicate
9 laid that he talked to me tomorrow, but you
10 can answer.
11        MR. KING:  Communicated,
12 communicated.
13        MR. SIMMS:  He sent an email to me
14 that said --
15   **A.   We never discussed it.**
16   Q.   (BY MR. KING:)  All right.
17   **A.   I don't see how one has to do with**
18 **the other.  It certainly doesn't in my mind.**
19   Q.   Okay.  Let's take a look at
20 Exhibit 45.
21
22 (Defendant's Exhibit 45 was marked for
23 identification and is attached to the

Page 244

1 original transcript.)
2
3   Q.   You set up a telephone call with
4 Chip Miller, David Jackson, David Rose, and
5 Matt Free to take place on October 24, 2017.
6   **A.   I must have.**
7   Q.   Did you participate in such a
8 call?
9   **A.   I suspect I did.**
10   Q.   You suspect or you know?
11   **A.   Sometimes calls get cancelled.  I**
12 **don't have my calendar in front of me so I**
13 **don't know if the call took place or not,**
14 **but I suspect it did.**
15   Q.   Do you remember having a call
16 about October 24, 2017 with those gentlemen?
17   **A.   Yes.**
18   Q.   Did all four of them participate?
19   **A.   I don't remember if David Rose or**
20 **Matt Free participated.**
21   Q.   What was the subject of that call?
22   **A.   I didn't feel like Simmons was**
23 **meeting its obligation to protect me from**

Page 245

1 **Herschel.  A number of things had occurred.**
2 **Again, from the first day I was hired, I was**
3 **asked by the man whose name is on the**
4 **building to make him aware.**
5   Q.   How long did the call go roughly?
6   **A.   I don't remember.**
7   Q.   Give me an example.  Was it an
8 hour long call?
9   **A.   I don't care to speculate.  I**
10 **don't know how long it lasted.  You probably**
11 **know.**
12   Q.   Was it more than an hour?
13   **A.   I don't know how long it lasted.**
14   Q.   Tell me everything you remember
15 about what you said in that call.
16   **A.   Part of this is speculative.  I**
17 **don't know that particular call.**
18   Q.   I'm not asking you to speculate.
19 I'm asking you to tell me everything you
20 remember of the call that we just identified
21 where you remembered at least Chip Miller
22 and David Jackson participating about
23 October 24, 2017.

Page 246

1    A.  Well, I remember Matt Free's issue
2 that -- first of all, prior to the call, I
3 had spoken to Chris -- Chip Miller and/or
4 David Jackson.  David would rarely return my
5 calls.  Chip was very good about returning
6 my calls.  But prior to the call being set
7 up, I would have explained what was going
8 on.  And what was going on --
9    Q.  I didn't ask you what was going on
10 before the call.  I asked you to tell me
11 what you remember you said during this
12 specific call.
13       THE WITNESS:  Should I speculate
14 on what I said?
15       MR. SIMMS:  Just give him your
16 best recollection.  What you can remember,
17 tell him.
18    A.  What I can remember is that --
19 well, first of all, I remembered a
20 discussion I had at Tyson which I had made
21 Simmons aware of during the interview
22 process, which whether it was told to
23 Herschel or not, there was a meeting at

Page 247

1 Tyson where Herschel brought in several
2 people, including Georgie Boston and several
3 other people.  It was held in the Tyson
4 board room.
5       Herschel liked to blame Tyson --
6 again, Herschel likes to blame everybody.
7 The meeting was held in the Tyson board
8 room, and as I recall, it was an opportunity
9 at McDonalds.  And this opportunity that
10 McDonalds wanted to expand their diverse
11 purchases, and there could be an opportunity
12 by working together where Renaissance Man
13 would partner with Tyson at the north Little
14 Rock plant.  And so Herschel brought in a
15 guy that supposedly was going to provide the
16 boxes and another guy that supposedly was
17 going to provide some other things.
18       Georgie Boston, it was my first
19 real interaction with Georgie Boston.  And
20 at the end of the day, the meeting ended, it
21 didn't go well.  Donnie Smith, who later
22 became the CEO of Tyson, called me back down
23 to his office.  And he said, Just so you

Page 248

1 know, for a period of time we'll continue to
2 make products for Herschel, but don't ever
3 bring Georgie Boston or any of those other
4 people into this office.  That was the
5 direction given to me.
6    Q.  Sometime in the early September --
7    A.  During the time I was at Tyson.
8    Q.  Sometime in the 2000s.
9    A.  So Georgie Boston had basically
10 been absent from the Renaissance Man/Simmons
11 partnership.  She became actively involved
12 back when DSM3 was formed because Herschel
13 wanted her involved.  And so she found, as I
14 recall, a Sonic in Detroit that owned two
15 Sonics and they needed halal product.
16       And so, you know, as things would
17 work, they'd bring that to me, it'd go
18 through Blaine.  Well, there's this halal
19 product.  I tell Simmons, You're not
20 making -- they're not going to sell enough
21 to fill the back of a pickup truck.  This is
22 two locations of Sonic.
23       Well, Georgie through Herschel got

Page 249

1 aggressive.  And then Herschel is telling
2 me, You don't like Georgie.  And I had
3 already been told by Simmons we don't want
4 interaction with Georgie, we don't want
5 Georgie talking to our people.
6       The long and short of it is
7 Georgie started contacting the plants
8 directly, started contacting -- it just blew
9 out of proportion.  Blaine Walker is calling
10 me, Clint Sledge -- Blaine Walker works for
11 Renaissance Man.  He's being overwhelmed
12 with his activities.  Now he's having to go
13 to work on this two cases.  It's just
14 ridiculous.
15       Clint Sledge is asked to get
16 involved.  And what really set it off for me
17 is Matt Free calls me to tell me to keep
18 Georgie away.  I said, I can't keep Georgie
19 away.  You need to call Herschel.  Maybe
20 he'll listen to you.  Maybe he'll understand
21 it from you.
22       So my understanding, according to
23 Matt Free, is he talked to Herschel and all

App. 152

Page 250

1 Herschel wanted to talk about, well, if you
2 give this price increase to us, I'm going to
3 stop paying Simmons the 35 percent of
4 profit. So when Matt tells me that, and
5 Matt's furious, that's a problem. Matt also
6 tells me --
7    Q.   Okay. Now, is this -- so all of
8 this was discussed in this telephone call
9 that you had?
10   A.   Absolutely.
11   Q.   Okay. Now --
12   A.   Not all of that. I was like,
13 Georgie Boston is a problem. You need to
14 keep her away from your plants. She's
15 running over your employees. You need to
16 have a conversation with Herschel.
17   Q.   Okay. So that's one --
18   A.   David Jackson.
19   Q.   That's one issue.
20   A.   That's one issue.
21   Q.   What else do you remember being
22 discussed in this conversation?
23   A.   The whole issue about the waffles

Page 251

1 and about how I had learned from Carmen
2 Seal, and I just felt bad about the whole
3 waffle situation. Because Julie, Julie was
4 just emphatic about the PO for the retail
5 waffles needed to be sent from Savannah,
6 that they wanted to keep the retail waffles
7 separate from Simmons, that they -- and it
8 was an H. Walker Enterprise activity.
9         They wanted to keep the waffles,
10 just like they wanted to keep the food
11 service waffles back in February separate
12 from Simmons. Ron sent me several emails,
13 because I'm announcing to everybody the
14 first PFG location has ordered waffles. You
15 don't want to sell them through Simmons.
16 There is no other way to sell them. Well,
17 you don't need to sell them through Simmons.
18 I said okay. Herschel was copied, Julie was
19 copied. Tell me how we're going to sell
20 them if you don't sell them through Simmons.
21 Well, we don't want Simmons to share the
22 profit. That's the refrain from day one.
23         That's the other refrain that we

Page 252

1 discussed on this call was that every time,
2 every product that wasn't produced by
3 Simmons, Renaissance Man, Ron wanted Simmons
4 excluded. And that's exactly the opposite
5 of the direction Todd Simmons gave me when I
6 was hired. Todd Simmons told me on a number
7 of occasions --
8    Q.   I don't want to hear what he told
9 you.
10   A.   So that's the other point is that
11 they wanted to exclude retail waffles from
12 the partnership at Simmons, but I'm
13 concerned, based on a meeting I had in June
14 with Jett Foods with Julie and Herschel, I'm
15 concerned that they're going to try to run
16 the equipment because they wanted to buy all
17 these displays. There's not any money to
18 buy displays. Herschel would say, Don't
19 worry about it, that's not your job to worry
20 about it. I say, Well, Herschel, who's
21 going to pay for it? H. Walker Enterprises.
22        So I was concerned, and then I got
23 in trouble, I was also concerned about --

Page 253

1    Q.   I'm just -- now, remember, we're
2 just talking about what happened in this
3 conversation. So if it happened in this
4 conversation --
5    A.   That happened in the conversation.
6    Q.   Okay. Keep going.
7    A.   Specifically, I was concerned
8 about -- because at that time, there had
9 been film -- if I recall, there had been
10 film ordered for the waffles and other
11 associated expenses. There had been film
12 ordered for the retail waffles. And I
13 expensed it through Simmons, because I
14 thought there's no other way, so Simmons is
15 going to enjoy the resulting profit.
16        And then when we met with Jett
17 Foods, they wanted to change the brand, so
18 they -- they said it's Famous 34 brand, so I
19 had to order additional film.
20        Again, they're telling me it can
21 be sold through H. Walker Enterprises. I
22 said, You don't have a distributor, you
23 don't have any way of picking it up.

Page 254

1      Stewart Candy ^ spl, who you're
2  supposedly going to have it distributed to
3  the Jett Food stores, doesn't have
4  refrigerated or frozen trucks. The shelf
5  life is ten to twelve days. It won't work.
6      So in spite of what they had
7  directed me, just like in spite of what Ron
8  Eisenmann directed me to do in February, I
9  ordered -- I placed the PO through Simmons,
10 I had Simmons place the PO, and I brought
11 the food service waffles to Springdale,
12 Arkansas so that they could ship along with
13 all the other food service products frozen,
14 because that's the only way it would work.
15     So in spite of what they were
16 telling me, I'm going to do the right thing,
17 because I'm the only one that understood the
18 business.
19     The difference is in September,
20 Julie --
21   Q. This is still part of this
22 conversation?
23   A. Absolutely.

Page 255

1   Q. Okay. Keep going.
2   A. In September -- because I said, in
3  February, I handled it, like you've always
4  asked me to handle it. But I'm concerned
5  I'm not going to be able to handle it this
6  time, because Julie is adamant that we're
7  going to sell those waffles through H.
8  Walker Enterprises. I said -- and the
9  reason I was concerned I wasn't going to be
10 able to handle it this time is because
11 Blaine and I are golfing with Tip Top while
12 they're in Hawaii. And Julie must have
13 texted me, I mean, just numerous times,
14 calling me, You got to place the PO with
15 HartyBake, they got to produce the waffles,
16 you got to place the PO with HartyBake.
17     I don't how to place a PO other
18 than to call Dion Bennett and Jennifer
19 Dawson. So I did that and had them place
20 the PO from Simmons, from Renaissance Man,
21 what I was instructed to do.
22     A day or two later, Julie, why did
23 you do that? Julie, really? Your process

Page 256

1  that you're setting up is not going to work.
2  Well, we're going to order those products.
3  We want to keep that separate from Simmons.
4  We don't want Simmons to enjoy the resulting
5  profit of all these great waffles. I said,
6  Guys, you've got to step in.
7      I'm talking specifically to David
8  Jackson because of the men on the
9  conversation, he was the one that had the
10 most authority. He's the one that could do
11 something. It's not surprising to me that
12 he writes some lying email. Everything in
13 that email is a lie to cover his ass.
14 Excuse me. I said you've got to intervene.
15     They're questioning my daughter.
16 They're questioning my wife. They're
17 questioning Barbara Humphrey. They're
18 questioning Christopher Thurber. Herschel
19 sent me texts saying he had spoke -- and I
20 talked about this on the call.
21     On August 10th, Herschel sent me
22 several texts saying someone at DSN is
23 stealing money from HartyBake. No, they're

Page 257

1  not. I happened to have seen their
2  financials. That's a text from him. I've
3  seen their financials. Really? Where did
4  the financials show -- and I made some
5  comment back, Where do the financials show
6  anything about checks being sent to somebody
7  at DSM? Oh, I meant the checkbook, I've
8  seen their checkbook. You've seen their
9  checkbook? I'll call you back later, I'm
10 getting on a plane.
11     So I call Mike Gerhardt, who I'm
12 the one that introduced -- he owns the
13 bakery. I said, Mike, I want to know if
14 anybody has received any compensation. And
15 I gave a list of all the names. He said,
16 John, we haven't sent any compensation to
17 anybody at Renaissance Man or anybody at
18 DSM3. The only time we ever sent any
19 compensation was during a short period of
20 time when Randy Sanders was running your
21 brokerage company. Haven't sent anything to
22 that. Why are you asking? Well, Herschel
23 seems to think that you have. I've never

Page 258

1 met Herschel. I've never spoken to
2 Herschel, so he's obviously got me confused
3 with somebody else.
4        I immediately call Ron Eisenmann
5 at ten o'clock at night his time. I say,
6 Ron, you've got to help out here, this is
7 unraveling. I agree. Herschel's got to
8 stop. Doesn't matter because it's not on
9 record. But the truth, and I'll put it on
10 record, I had several conversations with Ron
11 Eisenmann. The last one --
12    Q.  Are you talking about
13 conversation --
14    A.  Absolutely. Absolutely I brought
15 it up on this. I said, Guys, you've got to
16 get me out of the middle. I've done
17 everything Simmons has asked me to do. I
18 respect Mark Simmons.
19        My first day that I got employed
20 at Simmons, I went to their corporate
21 office, and Mark Simmons came in here and he
22 shook my hand. He's a good Christian man.
23 I respect Todd Simmons. You hold this

Page 259

1 company together.
2        When Sysco met with them
3 privately, I was told we're going to ride
4 this out a little while longer, and who
5 knows how it'll play out with Renaissance
6 Man, but you, John, need to keep building
7 our food service broadline distribution
8 business because you've done a great job.
9 You've already built the foundation. So
10 maybe we can continue the broadline
11 distribution under the Simmons brand, and a
12 certain amount of it where minority
13 ownership or whatever matters, we'll sell
14 that product from Renaissance Man so --
15    Q.  They said that in this
16 conversation?
17    A.  They didn't say that, I said that.
18 They had said that to me previously. That's
19 not the first conversation we had. The game
20 all changed when Sysco met with Simmons
21 privately. That's when everything changed.
22    Q.  Anything else happen in this
23 conversation?

Page 260

1    A.  I don't know. Could have been.
2    Q.  Well, I need you to think about
3 it.
4        MR. SIMMS: Try to remember your
5 conversation on October the 23rd. You
6 requested it --
7    Q.  24th.
8        MR. SIMMS: Was it the 24th? You
9 requested it on the 23rd.
10    A.  There was so much going on, and it
11 continued to go on after October 23rd, so I
12 don't want to be pinned down on the date.
13 But one of the other concerns was that
14 Jennifer Dawson, I was concerned -- Jennifer
15 Dawson was a very good employee for
16 Renaissance Man and that -- again, it was
17 either before this conversation, and we can
18 get the dates, and if it was before this
19 conversation, I certainly spoke about it,
20 because I know I spoke about it when it
21 occurred to Chip Miller and David Jackson.
22        But Jennifer Dawson had a meeting
23 with -- it was either Universal Hotels or

Page 261

1 Swan & Dolphin hotels in Disney to try to
2 get their business. It may have been Loews
3 Hotel, I don't know. She had a meeting with
4 some hotels that in the past I think had
5 done some business with us. And unbeknownst
6 to her, unannounced, Herschel and Julie show
7 up. And this was August 10th, the meeting.
8        Jennifer calls Blaine, she's
9 scared to death. Blaine calls me, Herschel
10 and Julie are going to be at the meeting.
11 She doesn't know what to do. I said okay.
12 Tell her to do what she does.
13    Q.  I'm going to interrupt you just
14 because we're running out of time. So we'll
15 hold that thought while we switch.
16        MR. SIMMS: Can we take a bathroom
17 break while he switches?
18        MR. KING: Yeas, of course.
19        THE VIDEOGRAPHER: We are going
20 off the record at 4:02.
21
22        (Short recess.)
23

Page 262

1        THE VIDEOGRAPHER:  We are on the
2   record at 4:12.
3        MR. SIMMS:  Could you state what
4   you just shared with us about the amount of
5   recording available?
6        THE VIDEOGRAPHER:  I just stated
7   for the record that we have about two and a
8   half hours left on the recording media for
9   the maximum amount today.
10       MR. SIMMS:  And I understand from
11  Mr. King that he will be finished within
12  that allotted time.
13       MR. KING:  Correct.
14       MR. SIMMS:  And that Mr. Parker,
15  who represents the Simmons defendant, will
16  not video tape his portion of Mr. Staples'
17  deposition to start in the morning.
18       MR. PARKER:  That's fine.
19       MR. SIMMS:  Is that correct?
20       MR. KING:  Yes.
21       MR. SIMMS:  Okay.
22       MR. KING:  Everything is right.
23   Q.  (BY MR. KING:)  Mr. Staples, are

Page 263

1   there any subjects from the October 24th
2   conference call with Simmons that we have
3   not talked about?
4       A.  I was concerned about losing
5   Jennifer Dawson.
6       Q.  And I think that's what you had
7   just raised when we had to change tapes,
8   right?
9       A.  Yes.
10      Q.  Anything else that you remember?
11      A.  Well, I got so long-winded, I'm
12  not sure how -- what I recapped.
13      Q.  Well, are there any other subject
14  matters that were brought up at that meeting
15  or on that call?
16      A.  Georgie Boston, Herschel
17  threatening Matt Free that if he followed up
18  with price increases, he would withhold
19  Simmons' 35 percent share.  George Fiorelli
20  showing up unannounced to a big HMAHost
21  meeting.
22          I had another conversation with
23  these folks after this meeting, so it may

Page 264

1   have occurred before or after, I don't know,
2   but whatever the date of the HMSHost meeting
3   was, I would have shared that where George
4   Fiorelli, who worked for H. Walker
5   Enterprises, showed up unannounced to the
6   meeting.  Matt Free was furious, wouldn't
7   let him in the room.  They called me and I
8   said, Let him in the room.  But then George
9   Fiorelli really dropped the ball with our
10  primary customer, HMSHost's boss, because he
11  told her he represented H. Walker
12  Enterprises, and she said, Why are you here,
13  this is a Renaissance Man/Simmons meeting.
14  What do you do?  He says, Well, I work for
15  companies like Delaware North or somebody
16  like that, and the VP said, Well, you might
17  not want to tell us about our competitors,
18  so you basically just need to stand in the
19  back of the room and not do anything.
20          And I learned about this after the
21  meeting.  When I shared it with Herschel, he
22  didn't say anything.  And then a little
23  while later, he sent me a text and he said

Page 265

1   he happens to know that Blaine threw George
2   under the bus at a dinner the night before
3   with Ken Sanzone.  I asked Blaine, and he
4   didn't have dinner with Ken Sanzone the
5   night before.
6          I remembered the reason I didn't
7   attend was because Ken wasn't able to get in
8   in time for a dinner or whatnot, so I
9   believed what Blaine said.  And I responded
10  that back to Herschel on a text, because he
11  wouldn't answer the phone.  And Herschel
12  said, Well, it just so happens that someone
13  saw them together last night.  So I informed
14  of them of that on the call.
15          I also informed them on the call
16  that Herschel claimed that later in the
17  week, he had talked to this lady who was Ken
18  Sanzone's boss and cleared everything up.
19  And then the very next week, Blaine and I
20  are at an HMSHost function and the lady's
21  there, and I said, I want to apologize for
22  whatever occurred last week with George
23  Fiorelli, I said, but I understand you've

Page 266

1 had a conversation with Herschel about it.
2 And she said, I haven't spoken to Herschel
3 in 10 years.
4        So those are basically -- that and
5 the most significant event was that I was
6 concerned based on a conversation that
7 Carmen Seal had, that H. Walker Enterprises
8 was trying to bill Simmons/Ren Man for
9 nonSimmons/Ren Man point of sale materials,
10 displays and things of that nature, and I
11 expected it to get worse.
12    Q.   What did -- what, if anything, did
13 Simmons commit to do in response to your
14 call?
15    A.   David Jackson said, We'll handle
16 it.
17    Q.   Did he say how?
18    A.   First of all, he said that I was
19 right to bring it to their attention, that
20 as far as Todd Simmons was concerned,
21 anything sold through Simmons, that any cost
22 incurred from Simmons for any product,
23 regardless of whether Simmons produced it,

Page 267

1 Simmons expected to receive their 35 percent
2 of profit.
3    Q.   Anything else?
4    A.   No.  I think that was it.
5    Q.   Okay.
6    A.   Thanked me for bringing all this
7 to their attention.  Oh, he did say -- he
8 led off the -- David Jackson specifically
9 led off the conversation by saying, What's
10 the sense of urgency, has Herschel gone
11 crazy again.
12    Q.   Let's take a look at Exhibit 46.
13
14 (Defendant's Exhibit 46 was marked for
15 identification and is attached to the
16 original transcript.)
17
18    Q.   And this doesn't take -- there's
19 not a deep dive on this, but you sent a
20 confidential communication to Chip Miller
21 and David Jackson on October 26th, 2017 in
22 which you say, An example of why we don't
23 need untrained telemarketers contacting our

Page 268

1 customers, right?
2    A.   Uh-huh.
3
4
5 (Defendant's Exhibit 47 was marked for
6 identification and is attached to the
7 original transcript.)
8
9    Q.   This is Exhibit 47.  And in this
10 email, which you send to Julie and Ron
11 Eisenmann and Herschel, you said you're not
12 sure why he has issues with it, meaning
13 telecommunication -- telemarkers, right?
14    A.   I wasn't sure why Jeff or why
15 Blaine, I forget who the message came from
16 initially.
17    Q.   I just don't understand.  It just
18 seems to me to be two different messages
19 sent to two different recipients, one
20 message to Simmons and the other message to
21 Ren Man.  And I'm asking can you explain the
22 apparent inconsistencies of the two
23 messages?

Page 269

1    A.   Jeff and John and Simmons had
2 issue with telemarketers contacting the
3 operating companies.  What I was referring
4 to here is that -- and in the conversation
5 with Jeff, as I recall, this email was sent
6 to UniPro members but he didn't want the
7 telemarketers contacting the operating
8 companies, his operating companies, because
9 it would create mass confusion, of which it
10 did two.  Separate issues.
11    Q.   Okay.  Exhibit 48.
12
13 (Defendant's Exhibit 48 was marked for
14 identification and is attached to the
15 original transcript.)
16
17    Q.   You request on October 30, 2017
18 that, We (Renaissance Man Food Services and
19 H. Walker Enterprises) will be showing a few
20 of our products at the show next week.  What
21 products was H. Walker Enterprises going to
22 show?
23    A.   They were going to show the

Page 270

1 waffles because I had been told they were
2 going to be sold through H. Walker
3 Enterprises.  Julie is the one that asked us
4 to participate in the show.  Jett Foods was
5 also bringing in some chicken products from
6 their delis from the Renaissance Man side.
7     Q.  Well, she responds to you
8 immediately and said, Wouldn't this show
9 just be Renaissance Man?  Not sure what you
10 mean with H. Walker Enterprises too.
11     A.  I'm sure that's convenient, but
12 she knew exactly what I was referring to.
13     Q.  Okay.  So she was manufacturing
14 this issue and this information in
15 October --
16     A.  She knew exactly why --
17     Q.  Let me finish my question, please.
18 You're accusing Julie Blanchard of
19 manufacturing this evidence on October 30,
20 2017?
21     A.  Manufacturing what evidence?  I'm
22 not accusing her of anything.  I'm saying
23 the reason that I requested waffles to be

Page 271

1 shown at the show is because it was my
2 understanding that they wanted them sold
3 through H. Walker Enterprises.
4     Q.  And she corrected you on the very
5 same day, didn't she?
6     A.  She asked me a question.
7     Q.  Meaning --
8     A.  She didn't correct me, but we
9 certainly showed the Famous 34 waffles at
10 the show.  Because by that time, I was still
11 receiving bills that I was forwarding to
12 Julie and whoever else to pay.  I would have
13 loved her to say we're not selling the
14 waffles through H. Walker Enterprises.
15     Q.  Now, I know you testified earlier
16 that you thought that there might be a
17 possibility that DSM could survive at the
18 end of 2017.  Take a look at Exhibit 49,
19 please.  And I'm looking at this section
20 right here, December 7, Thursday, December 7
21 with the fist bump at the end.
22
23 (Defendant's Exhibit 49 was marked for

Page 272

1 identification and is attached to the
2 original transcript.)
3
4     Q.  Is BT Bud Taylor?
5     A.  Uh-huh.
6     Q.  Say yes or no, please.
7     A.  Yes.
8     Q.  Is JG John Goodman?
9     A.  Yes.
10     Q.  Who is the third broker?
11     A.  That'd be FSE, as I recall.
12     Q.  And you met with FSE on December
13 6th?
14     A.  I don't have my calendar in front
15 of me, but I met with them sometime in
16 December.  Blaine and I met with -- met with
17 them.
18     Q.  In connection with that meeting,
19 did you solicit Blaine Walker to leave Ren
20 Man and join you in some new broker
21 arrangement?
22     A.  Not that I recall.  No.
23     Q.  You didn't ask him to join

Page 273

1 something that you were trying to set up,
2 either --
3     A.  Blaine asked me to take care of
4 him.  Blaine was scared to death about
5 losing his job.  Blaine was petrified of
6 Julie.  Blaine wanted nothing to do with
7 Julie.  Blaine wanted nothing to do with
8 Herschel.  Herschel refused to call Blaine
9 by his real name.  That aggravated Blaine.
10 I don't recall.
11         I liked Blaine.  I said, Blaine,
12 I'll do what I can for you.  Blaine's
13 primary goal was to -- all along was to get
14 employed by Simmons, which is why on a
15 couple of occasions I requested Simmons'
16 email addresses for Blaine and they wouldn't
17 do it.
18     Q.  But it is accurate that as of
19 December 7, 2017, you were looking for a
20 different brokerage to represent Ren Man; is
21 that correct?
22     A.  No.
23     Q.  Isn't that -- isn't FSE the

Page 274

1 enterprise that had been identified by
2 Herschel Walker as a potential new broker to
3 take over?
4     **A.   Herschel knew nothing about FSE.**
5 **I knew about FSE because that's Randy**
6 **Sanders' former company.**
7     Q.   You're positive of that?
8     **A.   I mean, I may not be positive if**
9 **he knew about them.   He didn't ask me to --**
10 **I set up the meeting.**
11     Q.   Did you ask either at that meeting
12 or sometime in the month of December 2017 --
13 sorry.   Strike that.
14        Did you tell FSE, either at that
15 meeting or some later time in December 2017,
16 that you could assure them of Ren Man's
17 business if they would hire your daughter
18 and your wife?
19     A.   No.
20     Q.   Are you sure about that?
21     **A.   I'm sure that I couldn't assure**
22 **anything to anybody.**
23     Q.   Well, you're under oath so I want

Page 275

1 the truth.
2     **A.   I don't recall using the word**
3 **assurance.**
4     Q.   Did you imply, indicate that FSE
5 would get Ren Man's business if it hired
6 your wife and your daughter?
7     **A.   My understanding from Herschel and**
8 **Ron and Simmons was that things were going**
9 **well and that we needed to empower, increase**
10 **the services of DSM3 or whoever and that**
11 **everybody would keep their job.   That**
12 **happens all the time in the broker**
13 **community.**
14        **So every broker that I discussed,**
15 **including FSE, I discussed a shared services**
16 **agreement.   I discussed a merger.   I**
17 **discussed a possible accusation -- I can't**
18 **say the word.   I expressed the**
19 **possibility -- is it possible that FSE would**
20 **acquire DSM3 and all of its employees, that**
21 **yes, my wife was an employee, Blare was an**
22 **employee, Christopher was an employee,**
23 **Barbara was an employee, whoever was**

Page 276

1 **employed at DSM3 and I've been told**
2 **everybody keeps their job, I discussed that**
3 **with SFE, yes.**
4        **The one I wasn't as confident**
5 **about was Barbara because Herschel had**
6 **mentioned that he had interest in her**
7 **working directly for Renaissance Man.   So it**
8 **wasn't just Blare and Kym.   We discussed all**
9 **the employees.**
10        **And my understanding from the**
11 **meeting, of which I'm fairly certain I**
12 **communicated to Herschel, that they had no**
13 **interest in that.   And so I said, Well,**
14 **then, DSM3 is not going away.   So do you**
15 **have interest in a shared services**
16 **arrangement with DSM?   They said, Yeah, we**
17 **would have some shared service interest in a**
18 **shared services arrangement, but we'd have**
19 **to see how that all works.**
20     Q.   I want to go back to your earlier
21 testimony about the packaging for the
22 waffles.   I hand you what -- not the
23 packaging of the waffles but the enterprise

Page 277

1 selling the waffles.   I hand you what's been
2 marked as Exhibit 50.
3
4
5 (Defendant's Exhibit 50 was marked for
6 identification and is attached to the
7 original transcript.)
8
9     Q.   Now, you will notice that on
10 September 25th, Julie Blanchard contacts
11 your daughter and asks for a new sheet for
12 Famous 34 waffles.   Do you see that?
13     **A.   Uh-huh.**
14     Q.   And do you see where you direct
15 that Julie's contact information be removed
16 and that H. Walker Enterprises, LLC should
17 be added to the document.   Do you see that,
18 your email of September 28th at 3:49.
19     **A.   Uh-huh.**
20     Q.   It wasn't Julie Blanchard's idea,
21 it was your idea to put H. Walker
22 Enterprises' name on the waffles, isn't it?
23     **A.   No, it's not.   Julie Blanchard**

Page 278

1 changed the PO that I had originally set up
2 to order the waffles from a Simmons invoice
3 to a Savannah invoice.
4    Q.   So why did you -- why were you the
5 person -- if you thought that that was the
6 wrong thing to do, why are you the person
7 who's putting H. Walker Enterprises' name on
8 this POS?
9    A.   Why am I?
10    Q.   Yes.
11    A.   Because that's the right thing to
12 do.  They weren't being sold by Renaissance
13 Man.  They were being sold by H. Walker
14 Enterprises.
15    Q.   Well, you went to -- you went to
16 Simmons and complained about doing this.
17    A.   No, I did not.
18    Q.   Okay.  Why did you ask for Julie's
19 name to be removed?
20    A.   I don't have any recollection.
21 Whose name did I have added?
22    Q.   It doesn't say you added anybody.
23 It says you took her name off.

Page 279

1    A.   I guess because I put the phone
2 number of the Savannah office and I know
3 Julie wouldn't be there to answer the phone.
4    Q.   Why did you do that?
5    A.   Why did I do that?
6    Q.   Yes.
7    A.   To put somebody's name there
8 that's not going to answer the phone?
9    Q.   You had her name taken off.
10    A.   I said remove Julie's contact
11 information.  I guess you're assuming that
12 had her name.  Maybe it did, maybe it
13 didn't.  But the answer is she didn't work
14 out of the Savannah office, and that's where
15 the orders would be going in to to my
16 understanding, and she wasn't there to
17 answer the phone.
18    Q.   If you would have left her contact
19 information, it would have gone to her at
20 her contacts, right?
21    A.   I guess if she wanted people
22 calling her in Dallas to order waffles
23 shipping out of Savannah, I could have done

Page 280

1 that.
2    Q.   You also could have copied her on
3 the email that you sent saying take her name
4 off, right?
5    A.   I could have, but I was concerned
6 that -- because I was already concerned
7 about the packaging not being paid, even
8 though they told me they were going to pay
9 it.  Because I gave them the invoice at a
10 meeting that we had in Ron's office and it
11 still wasn't paid and I continued to get
12 invoices from the manufacturer.  I could
13 have done a lot of things, but I did what I
14 did.
15    Q.   What's Mulberry Farms, Inc.?
16    A.   Did I refer to Mulberry Farms?
17 They provide us hamburgers, or did at some
18 point in time.
19    Q.   Taking a look at Exhibit 51, why
20 did you direct Mulberry Farms to write a
21 check for things supplied by Ren Man to H.
22 Walker Enterprises?
23

Page 281

1 (Defendant's Exhibit 51 was marked for
2 identification and is attached to the
3 original transcript.)
4
5    A.   Renaissance Man was not involved
6 whatsoever with the sale of the hamburgers.
7 Mulberry Farms produces them and distributes
8 them.
9    Q.   Why did you direct a check from
10 Mulberry Farms to be directed to H. Walker
11 Enterprises?
12    A.   Because Simmons was not asked to
13 do anything is my recollection, and that's
14 what Herschel asked me to do.
15    Q.   Did Herschel Walker send that
16 check back to you because it was made out to
17 the wrong person?
18    A.   I don't know if he sent it back to
19 me or he contacted the owner of Mulberry
20 Farms and they contacted me.  I don't
21 remember the specifics.
22       I got out of that, I wasn't part
23 of that.  I introduced Herschel to Mulberry

Page 282

1 Farms.  They produced hamburgers.  I have no
2 idea how many they produced or whether it's
3 still ongoing.
4     Q.   What was the business concept that
5 you envisioned that would involve Radian?
6     A.   Any number of things, a shared
7 services agreement.  Radian expressed
8 interest in acquiring DSM at one point in
9 time.  Christen Caffey works for Radian, so
10 the idea was that because of her
11 relationship with Robert that Robert would
12 endorse the DSM/Radian relationship.  And
13 the DSM/Radian relationship of which
14 Herschel and Julie and all of us would
15 benefit would attract other suppliers with
16 Robert Thurber's endorsement.
17    Q.   What did Herschel know about your
18 discussions with Radian in 2017?
19    A.   I don't recall what he knew.  He
20 knew that -- he knew that I was meeting with
21 them.  He knew that I was discussing shared
22 services arrangement with them.  He knew
23 that that could possibly get the endorsement

Page 283

1 from Robert Thurber, Bud Taylor or John
2 Goodman, because we had yet to be able to
3 get that endorsement.
4     Q.   And that endorsement would
5 accomplish what?
6     A.   The hope was that it would
7 accomplish new commissions for Renaissance
8 Man and/or new commissions for DSM or
9 whatever was formed from that.
10    Q.   You heard during Mr. Thurber's
11 deposition that he was not impressed with
12 Radian, that Bud Taylor was not impressed
13 with Radian, correct?
14    A.   That's correct.
15    Q.   Did you have the same reaction to
16 that meeting?
17    A.   Which meeting?  Had several
18 meetings with Radian.
19    Q.   The meeting that Radian had with
20 Bud Taylor.
21    A.   I still thought there was a
22 possibility of some type of shared services
23 arrangement with Radian.

Page 284

1     Q.   But you knew that it would not
2 involve Bud Taylor?
3     A.   No, I don't know that Bud Taylor
4 ever said it wouldn't involve him.  Bud
5 Taylor said y'all need to go back and put
6 some more things together and maybe merge or
7 get some other employees from some others so
8 that you have more resources to offer
9 suppliers before I'm going to endorse you.
10    Q.   And you heard Robert Thurber say
11 that he wasn't impressed with Radian, right?
12    A.   If that's what he said in his
13 deposition.
14    Q.   He went -- he went to Nashville
15 with you?
16    A.   He drove.  As we left, he was
17 impressed.  What upset Robert was he was not
18 impressed with Chris' responsiveness,
19 because he had offered Chris a couple of
20 tickets to attend the LSU ball game, and
21 Robert prides himself on responsiveness and
22 Chris didn't respond.
23        And then Robert kind of got out of

Page 285

1 it and heard from Bud Taylor they got to do
2 more work.  And as I recall, Robert said you
3 and Herschel need to find somebody else with
4 a little more services or Bud is not going
5 to endorse you.
6     Q.   When you do the CATMAN bids, do
7 you know the pricing that's offered by your
8 competitors?
9     A.   You're given a range as to how
10 close you are and where you need to sharpen
11 your pencil as you go through the process.
12    Q.   In other words, they look at your
13 bid and say you've got to come back with
14 something but they don't tell you what the
15 other people are telling them, right?
16    A.   They don't tell you specifically,
17 but they give you a range to where you can,
18 if you know what you're doing, you can --
19 I've had success with it.
20    Q.   You don't see their bids, they
21 don't see your bids?
22    A.   No.
23    Q.   With the information that you deal

Page 286

1 with concerning pricing, volume, location,
2 would you view that information to be
3 sensitive information to Ren Man's
4 operations?
5     **A.  I would review the specific**
6 **pricing as sensitive.**
7     Q.  What about volume?
8     **A.  Not necessarily, no.**
9     Q.  What about customers,
10 identified -- identified contacts within the
11 client base?
12     **A.  It depends.  I don't know that**
13 **that's entirely sensitive.**
14     Q.  What would you view as sensitive
15 information about Ren Man?
16     **A.  Product specifications, bid**
17 **processes, specific pricing.**
18     Q.  I'm going to hand you what's been
19 marked as Exhibit 52.
20
21 (Defendant's Exhibit 52 was marked for
22 identification and was retained by counsel.)
23

Page 287

1         MR. KING:  And for purposes of the
2 court reporter and for everybody, I'm going
3 to designate this information as
4 confidential with respect to its attachment
5 to --
6         MR. SIMMS:  You've got some notes
7 on that one.  Do you want to give it to me?
8 I'm going to give it back to you after I
9 look at it, because I don't want to have
10 your document that you're deeming
11 confidential.
12         MR. KING:  All right.  Then I will
13 hold -- with everybody's consent, I will
14 hold Exhibit 52 separate from the
15 transcript.  If anybody ever deems it
16 necessary to be added to the transcript, we
17 can talk about it under those circumstances.
18         MR. SIMMS:  That's fine.  Has this
19 been produced before today?
20         MR. KING:  Yeah, it came from
21 Radian.
22         MR. SIMMS:  It was produced by
23 Radian in response to subpoena but it has

Page 288

1 not been produced in another deposition.
2         MR. KING:  Correct.
3         MR. SIMMS:  Okay.
4     Q.  (BY MR. KING:)  Do you view any of
5 the information contained in the processed
6 chicken, new and lost, customers' document
7 to be confidential?  52.
8     **A.  I would view it as -- first of**
9 **all, I'm fairly certain that I signed a**
10 **nondisclosure agreement with Radian.  I know**
11 **they sent me one.  My email has been cut off**
12 **so I don't know if I signed it or sent it**
13 **back.  They sent it, they signed it.**
14     Q.  Well, your wife signed one on
15 behalf of DSM.  Do you know of you
16 separately signing one?
17     **A.  I don't -- I don't recall.  I know**
18 **I received one.**
19     Q.  Do you want to see the one that
20 your wife signed?
21     **A.  Sure.**
22     Q.  I'm going to hand you Exhibit, 53
23 which contains the signature page, and 54 --

Page 289

1         **THE WITNESS:  What's happening?**
2     Q.  -- which contains the original
3 document submitted by Radian.
4
5 (Defendant's Exhibits 53 & 54 were marked
6 for identification and is attached to the
7 original transcript.)
8
9     Q.  Okay.  So here's -- this is the
10 attachment with Radian's proposed
11 confidentiality agreement right there in 54.
12 And in 53 the signature page to that
13 document signed by Radian and Kym Staples on
14 behalf of DSM.
15     **A.  Okay.**
16     Q.  Now, having looked at this
17 confidentiality agreement, are you aware of
18 Ren Man or you on behalf of Ren Man signing
19 anything on behalf of -- signing anything
20 with Radian?
21     **A.  Again, after this, I do know I**
22 **received a nondisclosure agreement from**
23 **Chris.  I don't know whether I signed it or**

Page 290

1 whether we traded it. But I also say after
2 looking at this, you know, if you're going
3 to do business with me, I'm going to be able
4 to trust you. I had every trust in the
5 world for Chris and Radian, because Christen
6 Caffey worked for Radian.
7         I also understood it that -- you
8 understand that Christen Caffey and James
9 Jackson, their role is to assist in not only
10 the bid process, but in the rollout of the
11 bid. And I do know that Radian -- because
12 it was explained to us from Sysco
13 Corporation, as you enter into -- as you
14 enter into this bid process, don't be
15 concerned about anyone from Radian.
16         Because in the first further
17 process CATMAN award, Christen, as I recall,
18 was actually the category captain, and so
19 there were concerns about the category
20 captain working for another company sharing
21 your information with one of the other
22 suppliers.
23         So we were told by Sysco

Page 291

1 Corporation that Radian had signed a
2 confidentiality agreement with Sysco not to
3 share any Sysco information with anyone
4 else.
5         Subsequently, the most recent
6 CATMAN award was managed by Justin Goforth
7 who used to work for me at Tyson, and he
8 shared all types of information. He had
9 information about all of us. So my
10 understanding was that Radian had all this
11 information.
12    Q.  Okay. You also have a
13 nondisclosure agreement with Robert Thurber?
14
15 (Defendant's Exhibit 55 was marked for
16 identification and is attached to the
17 original transcript.)
18
19    A.  No.
20    Q.  I hand you what's been marked as
21 Exhibit 56 [sic]. Can you tell me why you
22 exchanged this information with Robert
23 Thurber?

Page 292

1    A.  Robert Thurber was my mentor, he
2 was Herschel Walker's mentor. He got
3 Herschel in the business, literally. Robert
4 Thurber never did anything at any point in
5 time to do any damage to Herschel Walker.
6         The fact that he was on the board
7 of directors at Tyson, and as if somehow,
8 someway, shape or form that has anything to
9 do with damage to Renaissance Man is
10 ridiculous. I just got through telling you,
11 a Tyson employee is the category captain,
12 knows everything, including pricing about
13 Renaissance Man and Pilgrims and Sanderson
14 Farms, everybody selling chicken, Tyson
15 knows the pricing. Tyson knows the volume.
16 They have an employee that produces their
17 reports.
18         Robert Thurber is the most ethical
19 man I have ever met in my life.
20    THE WITNESS: He has done nothing
21 in every conversation I've ever had but to
22 try to support you, Herschel, and the fact
23 that you would bring him to a deposition and

Page 293

1 accuse him of something is pathetic, much
2 like it's pathetic to accuse me.
3         But no, I didn't have a
4 nondisclosure with Robert Thurber. I had
5 almost 25 years of experience with him when
6 he never did anything for his gain. I had
7 never -- I had nothing to offer Robert
8 Thurber. Herschel had nothing to offer
9 Robert Thurber when he entered into the
10 business and asked him to help to get
11 started.
12         Herschel Walker -- Robert Thurber
13 called Christen Caffey at my request to tell
14 her to let the Breaking Free thing take a
15 rest for a while. Even though Robert
16 Thurber was no longer her boss, Christen
17 Caffey was ready to end the relationship.
18         So no, I don't have a
19 nondisclosure with Robert Thurber. He's one
20 of the most ethical men I've met, so I
21 didn't think I needed it.
22    Q.  Do you think it was a lapse in
23 judgment on your part to put this

Page 294

1  information into the hands of a third party
2  outside the company?
3      A.  No.  Because he had already
4  received very similar information on a
5  conference call when we first had
6  discussions with MSM about them aligning in
7  some way, shape or form with DSM or
8  Renaissance Man.  I don't remember if Robert
9  attended the meeting in Atlanta, but I am
10 certain he was invited to attend the call,
11 and this same type information was discussed
12 and shared.  As a matter of fact, we gave
13 several years' performance and the growth of
14 Renaissance Man.  And there was no objection
15 from anyone.
16
17 (Defendant's Exhibit 56 was marked for
18 identification and is attached to the
19 original transcript.)
20
21     Q.  I have the same question with
22 respect to Exhibit 56.  Did it indicate a
23 lack of judgment on your part to disclose

Page 295

1  the information contained in Exhibit 56 to
2  Robert Thurber?
3      A.  A lack in judgment with respect to
4  Robert Thurber?
5      Q.  On your part.
6      A.  No.
7      Q.  Why?
8      A.  There are certain people I trust
9  like family.  He was one of those people.
10     Q.  Was Ren Man's internal
11 investigation -- was Ren Man's internal
12 information something that in your view you
13 were free to disclose as you chose?
14     A.  No.
15     Q.  But you did in this instance?
16     A.  With Robert Thurber and the fact
17 that Herschel had asked Robert Thurber --
18 everybody wanted Robert Thurber's
19 endorsement.  They wanted Robert Thurber's
20 endorsement of Renaissance Man, they wanted
21 Robert Thurber's endorsement of DSM.  They
22 wanted Robert Thurber to endorse those
23 companies so that they would be attractive

Page 296

1  to suppliers so that if and when Simmons
2  went down the road of bidding direct, that
3  there would be other sources of income to
4  Renaissance Man.  Wouldn't have disclosed
5  that type information had I not understood
6  and had confidence in Robert Thurber.
7      Q.  I'll show you what's been marked
8  as Exhibit 57.
9
10 (Defendant's Exhibit 57 was marked for
11 identification and is attached to the
12 original transcript.)
13
14     Q.  Exhibit 57 is an email chain from
15 October of 2014 which results in Gary Murphy
16 saying at the bottom of Page 1 that he has
17 never been involved in a joint venture where
18 the partners refused to or are too busy to
19 communicate and he thought that the conduct
20 was being disrespectful.  You respond that
21 nobody is being disrespectful.
22         As you have described your
23 relationship with Simmons and Renaissance

Page 297

1  Man, would you expect you to be called
2  disrespectful of Simmons if you acted in a
3  capacity other than general manager of Ren
4  Man?
5      A.  I read these emails and I don't
6  think I was the one being called
7  disrespectful.  He also said Todd has placed
8  at least two, maybe three calls to Herschel,
9  of which none have been returned.
10         My understanding was that Todd on
11 numerous occasions tried to get ahold of
12 Herschel.  And again, I'm the guy in the
13 middle.  I'm told to manage the two parties
14 that won't speak to each other.  Why can't
15 you get a board meeting, why can't you get
16 this done.  So I'm defending -- I was told
17 to wear the Renaissance Man hat.  I fought
18 hard for Renaissance Man even in the Simmons
19 building because that's what I was asked to
20 do.
21         And Gary Murphy was totally, as
22 was David Jackson, frustrated with the fact
23 that Todd allowed all of this to go on.

Page 298

1
2 (Defendant's Exhibit 58 was marked for
3 identification and is attached to the
4 original transcript.)
5    Q.  I hand you what's been marked as
6 Exhibit 58.  I will point you to your email
7 that starts at the bottom of the first page
8 and carries over to the second dated January
9 13 in which you ask Clint Sledge, Can you
10 (quietly) find out how I change my address
11 in the Simmons system without alarming
12 anyone?  What did you mean by that?
13    A.  I don't remember if it was Carmen
14 or Gayla or somebody at Simmons, when they
15 heard word that I may be relocating to --
16 well, I relocated to Alabama as I reply, and
17 so I asked Simmons to change the address in
18 their system.  And they said, well, if
19 you -- if you list it as Alabama, you'll
20 fall out of the Blue Cross-Blue Shield
21 coverage area, so you probably need to find
22 another address in Arkansas and list it as
23 that.

Page 299

1    Q.  So you were trying to fool the
2 insurance company?
3    A.  I wasn't trying to fool anybody.
4 I was doing what Simmons advised me to do.
5    Q.  So Simmons was telling you to try
6 to fool the insurance company?
7    A.  No.  Simmons wasn't telling me to
8 try to fool the insurance company.  Simmons
9 understood that I wanted to keep my
10 benefits.  Everybody understood that I
11 wanted to keep my benefit, they wanted me to
12 keep my benefits.
13       The direction given was that when
14 you have medical procedures or when you use
15 your medical benefits, you need to do them
16 in Arkansas, which we did so they didn't
17 have to pay out-of-pocket expenses.
18    Q.  So what was going to be alarming
19 if you changed your address?
20    A.  What was going to be alarming is
21 that I couldn't receive benefits from
22 Arkansas Blue Cross-Blue Shield.
23    Q.  Well, what was so confidential,

Page 300

1 what was so secret, what was so sensitive
2 that you needed to quietly find out how to
3 change your address?
4    A.  I was a different type employee
5 from Simmons.  They told me that from day
6 one.  They told me several times to keep
7 things quietly.
8       They told me when I was hired that
9 as far anyone else is concerned, you're a
10 Renaissance Man employee, you're to wear the
11 Renaissance Man hat, you're to wear the
12 Renaissance Man shirt, you're to become the
13 Renaissance Man general manager as far as
14 anybody outside of management knows.  You're
15 to keep that quiet because it is different
16 and they didn't want their other employees
17 suggesting, well, why doesn't John have to
18 come into the office.  Why doesn't John have
19 to do certain things.
20       They knew I was moving to Alabama
21 and they knew I needed insurance and they
22 were all a part of that, and they said the
23 best way to keep the insurance is to use an

Page 301

1 Arkansas address.
2    Q.  You had a meeting with Herschel
3 and Julie in Atlanta in November of 2017 in
4 which you called a clear-the-air meeting,
5 right?
6    A.  Uh-huh.
7    Q.  Did you view the air as being
8 cleared between then and 30 days later?
9    A.  I viewed the air being clear until
10 I had a discussion with my wife, because she
11 certainly didn't.  And at the time I had
12 hopes that it was clear, and, you know,
13 Herschel mentioned that we would move
14 forward, everybody would keep their role and
15 we would move forward in 2018.
16    Q.  When was the conversation with
17 your wife?
18    A.  As we drove back to Tuscaloosa.
19    Q.  So she didn't view the air as
20 cleared --
21    A.  No.
22    Q.  -- following that meeting?
23    A.  No.

Page 302

1    Q.   You met then with FSE first week
2  in December concerning potentially using
3  them as a broker, correct?
4    A.   I met with FSE about a shared
5  services possibility, broker, merge,
6  acquisition to gauge their interest.
7    Q.   And the following week, you had a
8  meeting with the folks at Simmons in the
9  Simmons office, right?
10   A.   Yes.
11   Q.   Who was involved in that meeting?
12   A.   David Jackson and Chip Miller.
13   Q.   Tell me everything you remember
14  about that meeting.
15   A.   I knew they were meeting, or I
16  knew at least Herschel was meeting with
17  David in Ron's office the next day.  We were
18  having our Christmas party with Simmons that
19  night, which Herschel rarely attended, and
20  so I talked about that.  I said, Based on
21  the year we're having, the best year we've
22  ever had, it'd be nice if he could show up.
23  It'd be nice if you could show up, David, to

Page 303

1  show our people support.
2        I mentioned that the previous week
3  I had approved the waffle displays because I
4  had talked to Chip and David on three other
5  occasions about those displays, and they
6  both indicated to me that they would not pay
7  for those displays.
8        They both indicated according to
9  Carmen that they told her after I told her
10  not to pay for them.  Carmen called me back
11  to say that David agreed not to pay them.
12        I told them Herschel was furious
13  with me and told me that I didn't need to
14  interfere with anything between Renaissance
15  Man and Simmons.  I said, Jennifer Dawson
16  has left the company.  Now, she went to work
17  for Simmons.  But that was -- that was --
18  that hurt Renaissance Man.
19        I basically said, None of the
20  things that we've talked about have you
21  done.  I said, I got tired of -- I said,
22  Just last week, I received the invoice again
23  on the displays, David, of which you told me

Page 304

1  we were not to pay.  I said, But the people
2  needed to get paid so I forwarded and
3  approved and told them to pay it because
4  I knew I was meeting with you.  I said, So
5  none of the things we've talked about,
6  David, in a confidential -- what I thought
7  to be a confidential conversation.
8        I said, It's obvious from my
9  previous conversation with you, Chip, or you
10  Herschel, or you Chip, or you David about
11  the waffle displays, one of you broke my
12  confidence and told Herschel or either
13  Carmen told.  Because he told me somebody at
14  Renaissance Man is telling Simmons not to
15  pay the bills.  And Simmons is supposed to
16  pay every bill that's sent from Savannah,
17  that's what he told me.
18        Said nobody has talked to him
19  about threatening or that the accusation
20  that Blare or Kym or Christopher is stealing
21  money from HartyBake, y'all didn't talk to
22  him about that, because he brought it up
23  again in a conversation.

Page 305

1        Nobody has talked to him about the
2  damage done to HMSHost and that relationship
3  there and the fact that he still sends
4  George Fiorelli around.  I said, All I want
5  you to do, David Jackson, is you're the
6  president of the company.  The owner of the
7  company has told me to do the right things.
8  The owner of the company is a Christian man.
9  The reason I signed on with Simmons is
10  because I thought you had Christian values.
11  And oh, by the way, the vast majority of the
12  Simmons employees do.
13        I would never have left, never
14  have left Smithfield and the security and
15  the protection.  I knew the owner of
16  Smithfield, Joe Luter.  I trusted him.
17   Q.   You said all of that to David
18  Jackson?
19   A.   I absolutely did.  I was furious.
20  In a confidential conversation and in less
21  than 24 hours, he shares the conversation
22  with Herschel.  And basically two weeks
23  later, I'm terminated by somebody who

Page 306

1  doesn't even -- I don't even work for.  And
2  I'm still in shock.
3        THE WITNESS:  I wanted to scream
4  when you told Robert Thurber, Do you realize
5  that we gave John everything he asked for?
6  Are you kidding me?  I was in shock.  To
7  this day, I'm in shock.  To this day, I'm
8  stunned.
9        I was asked to drive 800 miles two
10 weeks after my first grandson was born at a
11 family Christmas outing.  And what I was
12 told, to introduce through FSE and explain
13 to Herschel what we had agreed upon.
14       I told David Jackson, You've got
15 to protect your employees.  Carmen Seale is
16 a nice lady.  If you want to pay for the
17 waffles, I don't care what you pay for.  No,
18 we don't want to pay for the waffles.  We
19 don't want to pay for anything associated
20 with H. Walker Enterprises.  I said, Well,
21 you might better check into that because you
22 get quite a few bills from Ron Eisenmann
23 that the subject line is H. Walker

Page 307

1  Enterprises, which I told them before I'm
2  concerned about that.  Because the owner of
3  the company told me it was a relationship,
4  it was a partnership between -- from
5  Renaissance Man and Simmons.
6        And I asked for years, as did Gary
7  Murphy -- Gary Murphy wasn't talking about
8  me when he said disrespectful, and it don't
9  take a rocket scientist to read that email
10 to see who he was talking about.
11    Q.  Are we still talking about
12 what you --
13    A.  Absolutely I talked about all
14 that.
15    Q.  This is all in this December 11 --
16    A.  Absolutely, absolutely.
17    Q.  Anything else?
18    A.  There probably was.
19    Q.  Well, then please think about it.
20    A.  The summary of it, guys, was we
21 learned how to build something nice.  You
22 ask me to build something nice.  You asked
23 me to teach Simmons, not just Renaissance

Page 308

1  Man.
2        Renaissance Man was the initial
3  avenue by which Simmons would learn and
4  understand broadline food service
5  distribution, because it was my
6  understanding that they had tried to enter
7  into that marketplace before and had failed
8  miserably.
9        I said we've built quite a
10 company.  It's fantastic.  And it's all
11 spiraling out of control.  Because the
12 issues that we had the first couple of years
13 when after the Brinker meeting -- and I
14 talked about the Brinker meeting because the
15 Brinker meeting was a big deal.  Herschel
16 Walker and George -- Georgie Boston --
17 Brinker was a Simmons customer.  I think
18 they still are.  A good customer.
19       Georgie comes up with the idea,
20 well, Brinker has a diversity department so
21 they need to buy more.  They need to buy
22 diversity products from Renaissance Man.  I
23 went to Chip Miller and he said no.  Y'all

Page 309

1  are not having that meeting, that's our
2  customer.  You ain't going in there.  I'm
3  told by Herschel Walker, yes, you are.  You
4  better get it done.
5        Thankfully Chip, I met with Chip,
6  Chip said, Look, John, you've got to control
7  it.  And I did discuss this in this meeting,
8  maybe not to this detail.  Chip said, You
9  can go, but Matt Free is going to go with
10 you because that's his customer.
11       Had the diversity VP and the buyer
12 who loves Simmons and was responsible, and
13 he led off the meeting by saying forget
14 about the titles, she is the VP.  I'm the
15 buyer.  So what is it that's different?  Why
16 should I buy through Renaissance Man when
17 I'm already buying through Simmons.  Matt,
18 are you willing to pay Renaissance Man the
19 difference in cost, because I'm not willing
20 to give you an increase in cost.  Georgie
21 and Herschel, well, we own plants in Siloam
22 Springs, Arkansas and Fort Smith, Arkansas.
23 They named the Simmons plant, and the guy is

Page 310

1  looking at me like we're crazy.  And I
2  winked at him and he let it go.
3          And I'll never forget.  We got in
4  the car, it was Herschel and Georgie, and I
5  was in the back seat and they were driving
6  me to the airport.  And Georgie, How did
7  that go?  That went great.  I said, Are you
8  kidding me?
9          So anyway, I told them about that
10  because Matt Free resurfaced.  Matt Free
11  became the Simmons -- he became part of the
12  Renaissance Man/Simmons team.
13          And so I also explained to David,
14  David, you have got to get a definitive
15  agreement to protect me, to protect your
16  employees, so that everybody knows whatever
17  it is that Simmons is agreeable to,
18  everybody doesn't get fearful.  I don't get
19  told anything Carol sends to Carmen she's
20  supposed to pay just because.  I said,
21  That's your responsibility as the president.
22          And I said, If you don't follow
23  through with your responsibility, I'm going

Page 311

1  to talk to Mark Simmons, because I know Mark
2  Simmons wants me to do the right thing, and
3  Mark Simmons is the one when it's all said
4  and done, he's the one that convinced me to
5  join Simmons.  Because I did some research
6  on Simmons in the interview process, and I
7  was thoroughly impressed with Simmons.
8      Q.  Anything else come out --
9      A.  No.  That was probably it.
10      Q.  And what did Simmons commit to do
11  in that meeting?
12      A.  What they had always committed to
13  do.  As David said, Well, I'll be meeting
14  with him tomorrow.  I said, Well, you need
15  to keep this conversation confidential
16  because I'm already concerned when I didn't
17  pay the waffle packaging to begin with, and
18  when I told Carmen not to pay it and he
19  called me and said I didn't have that
20  authority, I better pay anything, I'm
21  already concerned.  Told me Jennifer Dawson
22  better not cross Carol again, know how
23  that'll end.

Page 312

1      Q.  So 16 days later you were
2  terminated?
3      A.  By --
4      Q.  By Renaissance?
5      A.  By Renaissance Man.  But within 24
6  hours David Jackson sent me a text
7  confirming that he had broken the
8  confidentiality.
9      Q.  After you were terminated, did you
10  contact Mark Simmons?
11      A.  No.
12      Q.  Why not?
13      A.  I felt like at some point in
14  time -- I don't know, I don't know how these
15  processes work.  I still hold out hope that
16  when Mark Simmons learns the truth, he'll
17  contact me.
18      Q.  All right.
19          MR. KING:  He needs to change the
20  tape, and I'm pretty close.
21          THE VIDEOGRAPHER:  We can go off
22  the record at 5:20.
23

Page 313

1          (Short recess.)
2
3          THE VIDEOGRAPHER:  We are back on
4  the record at 5:29.
5      Q.  (BY MR. KING:)  Mr. Staples, on
6  December 27, 2017, did you have any inkling
7  that Ren Man was going to terminate you that
8  day?
9      A.  No.  I didn't work for Ren Man, so
10  why would they terminate me?
11      Q.  Well, they would terminate you --
12  they could freely terminate you as general
13  manager, correct?
14      A.  I would have expected any kind of
15  termination would have come from my
16  employer.
17      Q.  Was there anything that you're
18  aware of that compelled Ren Man to continue
19  to use you as the general manager?
20      A.  Is there anything I'm aware of?  I
21  guess it would be everything would have
22  compelled them for me to continue as the
23  general manager.

Page 314

1   Q.   Why?

2   A.   Because as of December, it was
3   tracking to be the most profitable year in
4   the company's history.

5   Q.   There was nothing that
6   prevented -- there was no legal impediment
7   to Ren Man refusing to use you as general
8   manager, was there?

9   A.   Again, I didn't work for
10  Renaissance Man.  I was employed and I had
11  an agreement with Simmons that I would not
12  be fired without cause.  So the whole
13  meeting of December 27th was just like a --
14  I was stunned, I was shocked.  I just wanted
15  to leave.

16       I asked if Simmons was in
17  agreement with something as simple as paying
18  the consulting fee that was offered to me,
19  and they said they hadn't discussed it with
20  Simmons.

21  Q.   You asked for an increase in the
22  consulting fee, correct?

23  A.   No.  I think -- I think what I

Page 315

1   asked for was -- again, I was shocked.  I
2   never even understood I was terminated until
3   Herschel said, I've fired employees, I've
4   fired family members.  And I said, I'm
5   fired?  And they said yes.  And I said,
6   You're kidding me.  Does Simmons know about
7   this?  How is the $200,000 going to get
8   paid?

9       My concern there was that this
10  offer really wasn't an offer even if they
11  had been my employer.

12  Q.   What did you think it was?

13  A.   It was a joke that my wife had to
14  sign over 50 percent of her company for ten
15  dollars, that Herschel couldn't even
16  describe what -- what his personal
17  consultant was supposed to do.  His answer
18  was, You won't work more than two to three
19  hours a week.  I said, Simmons willing to
20  pay me how many hours a week I got to work
21  for them?  They only want me involved with
22  you for two or three hours a week, what does
23  that entail?  I don't know, I don't even

Page 316

1   know what it entails was the response.
2   We'll come up with something.

3       I was stunned.  I couldn't
4   breathe.  I'm sitting there -- I'm coming in
5   thinking we're going to have a celebration.
6   I actually came in thinking that there was
7   something urgent.  What was told to me was
8   that it was the only time that FSE could
9   meet.  The only time they can meet is two
10  days after Christmas?  You know I'm going to
11  be in Arkansas, you know I've got a newborn
12  son -- grandson, that's the only time they
13  can meet?  Why can't we meet with them
14  later?

15       Nobody does that.  I've terminated
16  people.  There's a little bit of
17  professionalism in all that.  Simmons would
18  never have done that.

19       Oh, and the other thing is after
20  the fact, Ron added stuff.  Even if I was
21  going to accept it, he added an additional
22  year in the noncompete.  They never got back
23  with me as to whether Simmons agreed until I

Page 317

1   inquired.

2   Q.   Did you tell -- who was in the
3   meeting?

4   A.   Ron and Herschel.

5   Q.   Did you tell them in the meeting
6   that your emphasis on the brokerage had been
7   a mistake?

8   A.   I don't know what I told them in
9   the meeting, to be honest with you.

10  Q.   Well, you remembered the cancer
11  comment earlier.

12  A.   That wasn't in that meeting.

13  Q.   Did you talk about Christopher
14  Thurber?

15  A.   Herschel brought up the fact to
16  Ron and Ron tried to get him to shut up, but
17  Herschel brought up the fact that
18  Christopher never responded when I
19  offered -- or Robert never responded when I
20  offered him ten percent of Renaissance Man,
21  can you believe that, and Ron is over there
22  shaking his head.

23  Q.   Did you complain about Christopher

Page 318

1 Thurber and his work ethic?
2     A.  In that particular meeting?  I
3 don't recall.
4     Q.  Did you have the impression at the
5 time that Christopher Thurber did not have a
6 good work ethic?
7     A.  I wouldn't say work ethic.  I had
8 concern from time to time about Christopher
9 Thurber and Blaine Walker and anybody else.
10 And then I'd be told that his work effort is
11 great, and then I'd be concerned.  And then
12 I'd send him a text at eight o'clock at
13 night or whatever and he'd respond.  I'd
14 send him a text on Saturday and he'd always
15 respond.  I'd send him a text on Sunday and
16 he'd respond.  Christopher was probably the
17 most responsive person we had at either
18 Renaissance Man or DSM.
19     Q.  Did you discuss in that meeting
20 that you thought that Ms. Staples was not
21 interested in continuing with the broker?
22     A.  No.  I think what I discussed is
23 Ms. Staples is probably not interested in

Page 319

1 continuing with Julie, but that she most
2 likely would not sign over her 50 percent
3 for ten dollars.  And I certainly wasn't
4 going to force her to do that.
5     Q.  Didn't you --
6     A.  I was kind of curious as to why
7 they would ask me to commit on behalf of my
8 wife.
9     Q.  Did you negotiate that point by
10 saying that if -- if there was an increase
11 in the amount of your severance that you
12 would throw in the interest with DSM?
13     A.  No, this was not severance.  I
14 know what severance is.  Severance is --
15 I've received severance before.  Severance
16 is a guaranteed document.  Severance does
17 not require that you can't make any
18 disparaging remarks about Herschel Walker or
19 the payments will stop.  Severance doesn't
20 include that.
21         I've been terminated before and I
22 received nine months severance.  And I was
23 given a document guaranteeing me the

Page 320

1 severance.
2     Q.  However you want to describe the
3 payment as to what it was, there was a
4 payment and you negotiated it up from 200
5 to --
6     A.  The way that --
7     Q.  No, no, no, you've got to stop
8 now.  There was a payment that you
9 negotiated that rose from 200,000 to
10 $255,000; isn't that correct?
11     A.  The offer rose from 200 to 255.
12     Q.  And isn't that because you said
13 that for that number, you were all in,
14 including your wife's interest in --
15     A.  No.
16     Q.  -- DSM?
17     A.  No.  No.
18     Q.  You never used the phrase all in?
19     A.  I don't know that I've ever used
20 all in my life.  I was in shock.  Were
21 you there?  I don't remember seeing you
22 there.  Ron and Herschel were there.  I
23 don't remember accepting the offer.  I

Page 321

1 wanted to get out of the room.
2         The 275 came about because I said
3 even if I were to consider this, I'm
4 currently making $200,000.  I'm currently
5 making 40,000 from DSM.  I've got benefits
6 that protect my family.  I've got life
7 insurance.  I've got all these different
8 type things with Simmons.  I'm a management
9 employee with Simmons.  Simmons wouldn't ask
10 me to take less than I'm currently taking
11 now because I've done nothing wrong and
12 they've told me all along the only way I
13 would be terminated is if I did something
14 wrong.  And they have told me all along, you
15 have exceeded our expectations, the
16 performance of Renaissance Man has exceeded
17 our expectations.
18         So the way it got to 255 is I
19 said, you add that up right there, that's
20 275.  Herschel and Ron got up out of the
21 room and went in the next room and I'm
22 starting to breathe.  And they come back in
23 and oh, well, Herschel is so gracious, he's

Page 322

1  willing to pay you 255.  I said, Write it
2  all up, send it to me.
3         And then I'm not -- I'm not one to
4  make a big -- I wanted to get out of the
5  room.  I've never been as stunned in my
6  life.  Thankfully it's just a job.  I have a
7  family.  I want you to hear this,
8  regardless.  I have a family to take care
9  of.
10        And my wife and my daughter did
11  fantastic jobs.  Christopher Thurber did a
12  fantastic job.  I hired Barbara Humphrey and
13  trained her.
14        I learned something early on from
15  my first mentor that always stuck with me,
16  and I use it in my employee/employer
17  relationships, and I believe Simmons does
18  too.  Because short of David Jackson, I
19  don't see Gary Murphy making this decision.
20  I see Gary Murphy stepping in.
21        Gary Murphy is the type of guy --
22  we had several conversations where he'd say
23  this and I'd say, well, but you agreed to

Page 323

1  this or David agreed to this or whoever
2  agreed to this, and he'd say, Well, if we
3  agreed to it, that's what we're are going to
4  do.
5         But what I learned from day one,
6  from my first boss, my first mentor, Gary
7  Harris, and he said, If you have a meeting,
8  a review with an employee, your job as a
9  supervisor is that it should be exactly
10  that.  If it's a review, he should either
11  know if it's going to be a positive review
12  or a negative review.  Shouldn't be a
13  surprise.  If it's a surprise, you haven't
14  done your job as a supervisor.
15        I don't have one write-up in any
16  Simmons file.  David Jackson creates an
17  email.  Wouldn't he have sent that to the HR
18  department?  Wouldn't it have been his
19  responsibility if he's going to accuse me of
20  something I never said?  That's the way I
21  would manage somebody.  I don't tell a third
22  party about my employee.
23        But as the way this played out, my

Page 324

1  daughter loses her job by someone she had
2  never spoken to.  And she loses it -- she's
3  in the office all morning and she walks out,
4  and he sees her walk out and he picks up the
5  phone and calls her on her cell phone.
6         Anyway, I digress.  I got out of
7  the room.  I accepted nothing.  I told them
8  to send me the paperwork.  I had to ask
9  several days later, Did Simmons -- did
10  Simmons approve this process?  Oh, yeah,
11  just spoke to them.
12        Even though the day after when
13  Herschel sends me a text the day after he
14  fires me, sends me a text, Can you send me
15  the contact information with the crazy
16  Italian pizza guys that you negotiated the
17  deal with the wings?  I had just been fired.
18  The type of guy I am, I looked for it to
19  send it to him.  That's when I discovered
20  that my Simmons emails had been cut off.
21        He tells me then in a text, Oh,
22  well, we just told them today.  So when did
23  you tell them, did you tell them on the 28th

Page 325

1  or did you tell them several days later when
2  they finally agreed?  I don't know.
3         It's sad, it's disappointing.  I
4  got a great family.  We got good people.
5  I'm still -- I'm still holding out hope for
6  a call from Mark Simmons or a note from Mark
7  Simmons that says appreciate you doing what
8  you said you were going to do and defending
9  this great company that my dad and I
10  created.
11        MR. KING:  Our time is up.
12        MR. SIMMS:  Are you finished?
13        MR. KING:  I'm not finished but my
14  time is up.
15        MR. SIMMS:  Are you going to ask
16  some more questions in the morning?
17        MR. KING:  No.
18        MR. SIMMS:  So are you finished?
19        MR. KING:  I'm finished.
20        MR. SIMMS:  Okay.  Finally got you
21  to say you're finished after asking you
22  three times.
23        MR. KING:  I'm finished subject of

Page 326

1 course to whatever the judge rules with
2 respect to the motion to compel, but I'm
3 finished.
4         MR. SIMMS:  Okay.  All right.  I
5 got you.
6         MR. PARKER:  I'll ask my questions
7 in the morning.
8         THE VIDEOGRAPHER:  We're going off
9 the record at 5:44.  This now concludes our
10 deposition.
11
12   (Whereupon, a recess was held after which
13   time the following occurred on November 13,
14         2018 at 9:00 a.m.)
15
16         JOHN STAPLES,
17 having been first duly sworn (affirmed), was
18 examined and testified as follows:
19
20 EXAMINATION BY MR. PARKER:
21     Q.   Your name is John Staples,
22 correct, sir?
23     A.   It is.

Page 327

1     Q.   What is your current address?
2     A.   5712 Rice Mine Road, Northeast,
3 Tuscaloosa, Alabama.
4     Q.   How long have you lived there,
5 sir?
6     A.   How long have I been there?
7     Q.   Have you lived there.
8     A.   August of 2017, so whatever that
9 is, 15 months.
10     Q.   And did you testify yesterday that
11 you rent that home?
12     A.   Yes.
13     Q.   Where did you live prior to 5712
14 Rice Mine Road?
15     A.   1701 St. Andrews Drive.
16     Q.   As best you can recall, what dates
17 did you live there?
18     A.   Well, I lived between there and we
19 had a home in Springdale at 9649 Ledge
20 Drive.  Had family, and my daughter and my
21 son are in Northwest Arkansas.  We spend
22 time there.  I'd travel back and forth
23 frequently, but the majority of the time I

Page 328

1 would suspect in 2017 would have been in
2 Alabama.
3     Q.   Was the St. Andrews Drive address,
4 was that a rental property as well?
5     A.   No.
6     Q.   You owned that one?
7     A.   Yes, we owned it.
8     Q.   Do you still own the property in
9 Springdale at Ledge Drive?
10     A.   It's on a lease to purchase
11 arrangement.
12     Q.   Okay.  When would you say that you
13 moved from Arkansas to Alabama?
14     A.   September of -- August, September
15 of 2015.
16     Q.   What was the reason for the move?
17     A.   There were numerous reasons.
18     Q.   What were they?
19     A.   We were trying to establish a
20 relationship with Pico Foods as a potential
21 supplier partner.  I had worked out of my
22 home for the last several years, so it
23 really wasn't a matter of where I lived.

Page 329

1 We'd be closer to Atlanta for meetings with
2 Herschel and Ron in Ron's office.  We'd be
3 closer to Renaissance Man largest region and
4 historically most of the volume.
5     Q.   Any other reasons?
6     A.   And there was an opportunity --
7 well, my daughter had enrolled at the
8 University of Alabama.
9     Q.   And you went to the University of
10 Alabama too, correct?
11     A.   I did.
12     Q.   When did you graduate?
13     A.   I got my bachelor's degree in
14 business management in '84 and my master's
15 degree in human resources management in '85.
16     Q.   It's my understanding you played
17 football at Alabama; is that correct?
18     A.   Play would be a stretch.  I walked
19 on Coach Bryant's last year.
20     Q.   What year was that?
21     A.   He passed away in '83 so it must
22 have been '82.
23     Q.   What was the first poultry company

Page 330

1  that you went to work for?
2      A.  Tyson Foods.
3      Q.  Do you recall when you started at
4  Tyson?
5      A.  I think my official first day was
6  on our anniversary on April 1st.  That would
7  have been 2000.
8      Q.  What was your title at Tyson Foods
9  upon your hire?
10     A.  I don't necessarily remember the
11  title.  My responsibility was Sysco from the
12  corporate office, kind of a liaison between
13  Tyson and the corporate office and the 70
14  some-odd operating companies.
15     Q.  Had you previously worked at
16  Sysco?
17     A.  No.  Worked with Sysco or at
18  Sysco?
19     Q.  At Sysco?
20     A.  No.
21     Q.  Had you previously worked with
22  Sysco prior to you going to work for Tyson
23  in 2000?

Page 331

1      A.  Yes.
2      Q.  Where had you done that?
3      A.  I started with Flowers Industries
4  out of Thomasville, Georgia in January of
5  '86.  They're a retail baking company.  I
6  had various roles with them.  They acquired
7  a company called Pies, Inc.  I'm trying to
8  recall when I went -- I think we moved to
9  Chaska, Minnesota in '96, somewhere around
10  then.  They had acquired Pies, Inc., which
11  was a food service pie facility.
12     Q.  So was your employment at Pies
13  Inc. your first exposure to working with
14  Sysco?
15     A.  Yes.
16     Q.  So just to make sure I understand
17  your employment history, is it correct you
18  started working for Flowers in or around
19  1986?
20     A.  January of '86.
21     Q.  And that you then began working
22  for Pies, Inc., a company that Flowers had
23  acquired in 1996?

Page 332

1      A.  It doesn't seem like that long,
2  but yeah, that was the gap.
3      Q.  Did you work for Pies, Inc. until
4  you joined Tyson in 2000?
5      A.  Well, Pies, Inc. -- Pies, Inc. was
6  never really shown as Pies, Inc.  It was
7  Flowers.  And then Flowers, as I recall,
8  required -- acquired Mrs. Smith's, which was
9  primarily a retail company, but because
10  Pies, Inc. had focused on food service, we
11  changed the name of Pies, Inc. to Mrs.
12  Smith's Food Service.
13     Q.  Did you work for Mrs. Smith's Food
14  Services?
15     A.  I ran Mrs. Smith's Food Services.
16     Q.  And did you run that company until
17  you joined Tyson in 2000?
18     A.  Yes.
19     Q.  And when you joined Tyson in 2000,
20  is that when you moved to Arkansas?
21     A.  Yes.
22     Q.  Who did you report to initially at
23  Tyson?

Page 333

1      A.  Peyton Keel.
2      Q.  Did you remain in the role that
3  you were hired in to at Tyson throughout
4  your employment with that company?
5      A.  No.
6      Q.  If you started in 2000 in this
7  role where you were a liaison between Tyson
8  and Sysco, when as best you can recall did
9  your job duties change?
10     A.  It was a year or two later.  It
11  really occurred after Tyson acquired IBP,
12  and when that occurred, sometime there
13  after, Tyson created a Sysco team.  Sysco
14  was such a large customer of Tyson, they
15  split the food service group into Sysco was
16  one team and everybody else was another
17  team.
18     Q.  And which team did you go on?
19     A.  I was second in command on the
20  Sysco team.
21     Q.  How did your job duties and
22  responsibilities differ after that split
23  occurred from when you were initially hired?

Page 334

1    A.  Well, I was more involved in that
2 I was responsible for all of the local
3 negotiations as well as the corporate
4 negotiations.
5        I created -- we wanted to come up
6 with a template for local spending, things
7 of that nature because the spending had
8 gotten out of hand.  Food service is a
9 complicated business and you can spend a lot
10 of money and not have anything to show for
11 it in terms of promotional activities.
12        And so I learned at Pies, Inc.
13 from my mentor there, Bill Stringless, that
14 you focus on productive promotional
15 activities.  So anyway, we created local
16 marketing -- I created a local marketing
17 template that I would work with the regional
18 managers to develop the business at the
19 local level per se.
20    Q.  Who did you report to in that new
21 role?
22    A.  Charlie /PHASZ take ^ spl.
23    Q.  Did you remain in that role until

Page 335

1 your employment ended or did you have other
2 positions at Tyson?
3    A.  No.  They did that for a few
4 years, I don't know how many, couple or
5 three years, and then somebody else became
6 head of food service and decided that he
7 didn't like the Sysco team and the other
8 team, so put the teams back together.  And I
9 was director of sales for Tyson's largest
10 region, which was the southeast region.
11    Q.  Was that your final position at
12 Tyson?
13    A.  Yes.
14    Q.  Director of sales for the
15 southeast region?
16    A.  Uh-huh.
17    Q.  Who did you report to in that
18 role?
19    A.  I had various people.  At the end
20 I think I reported to Mike Hurton ^ spl.
21    Q.  Did you have any interaction at
22 all with Herschel Walker during your
23 employment with Tyson Foods?

Page 336

1    A.  For most of my employment at
2 Tyson, I had interaction with Herschel.
3    Q.  What would be the nature of those
4 interactions, what would be the reason for
5 them?
6    A.  The reason for them or do you want
7 to go back to the day I met him or whatever?
8    Q.  Let's go back to the day you met
9 him.  When did you first meet him and what
10 was your understanding of why you were
11 meeting him?
12    A.  I don't remember the year.  I
13 think it was 2001 or 2002, but I met him at
14 a dinner at Ruggles Restaurant in Houston,
15 Texas during Sysco's annual merchandising
16 conference.
17    Q.  Had he started Renaissance Man at
18 that time?
19    A.  It was my understanding from
20 Robert Thurber that he met Herschel as --
21 Herschel had been a judge at America's
22 Junior Miss contest of which Robert was a
23 board member.  Robert's wife Julie had won

Page 337

1 so they were actively involved in America's
2 Junior Miss.  It is my understanding that
3 they met Herschel at that event.
4        Herschel expressed a desire to do
5 something different now that his football
6 career had ended, and it was my
7 understanding that Robert introduced him to
8 Jerry Dowd who was the president of
9 Pilgrim's at the time.  May have been
10 Pierce, they got different names.
11        Jerry and Robert were friends.
12 And that Robert also introduced Herschel to
13 David Carrington at Carrington Foods.
14 Introduced Herschel to whoever was running
15 Paul Newman's -- Ventura Foods is the name
16 of a dressing company that the Paul Newman
17 brand.  My understanding they introduced
18 Herschel to Julian Allen who was running a
19 catfish company in Mississippi.
20        And it was my understanding that
21 Herschel -- or Robert gave the project of
22 creating a brand and arranging relationships
23 between Herschel and these other companies,

Page 338

1 primarily Christen Caffey who worked for him
2 at Sysco Corp.  So I don't know where
3 Renaissance Man was in the -- in its life
4 cycle, but I do know that Robert every year
5 at the merchandising conference would have
6 this dinner at Ruggles and he would invite
7 friends and family members and -- well, not
8 family members, friends and acquaintances in
9 the business.
10      It was kind of a big deal because
11 Robert was senior director of merchandising
12 for Sysco or senior vice president.  Robert
13 was a big deal.  Basically if you wanted to
14 do anything with respect to Sysco brand,
15 having a relationship with Robert Thurber
16 was a good relationship to have.
17      Q.  Do you know at the time of that
18 dinner in 2001 or '2 whether Mr. Walker had
19 a supplier for poultry such that he does now
20 with Simmons?
21      A.  Yes, it was Pilgrim's or Pierce.
22 I don't know.  I get confused with their
23 names.

Page 339

1      Q.  When, if you know, did --
2      A.  It may have even been in 2000,
3 because what I don't recall is whether I was
4 still with Mrs. Smith's or whether I was at
5 Tyson.  He can recall that.  I don't
6 remember the date.
7      Q.  When, if you know, did Mr. Walker
8 first enter into a business relationship
9 with Tyson Foods?
10      A.  Again, I don't know the date, but
11 I specifically know where I was.
12      Q.  Okay.
13      A.  So anyway, Herschel, Herschel is
14 aligned with Pilgrim's, Pierce, whatever,
15 and I see him at food shows because I'm at
16 Tyson.  I had met him at Ruggles.
17      I would kid with Herschel about,
18 you know, you're with number two, you're
19 with the number two supplier in the
20 industry, which they may have by then been
21 the number one supplier.  I don't really
22 know how the numbers work.  But I said you
23 need to jump on board with number one.  And

Page 340

1 developed what I thought was a friendship
2 with Herschel.  Really liked Herschel's
3 brother-in-law Bill Richards, so we would
4 kid.  We would see each other at these food
5 shows.
6      And I didn't know anything of it.
7 I thought -- I mean, I didn't know that
8 Herschel was considering Tyson or whatnot.
9 I did know from a friendship that I had with
10 folks at Tyson -- I knew some people at
11 Pilgrim's just because we're in the
12 business.  They didn't seem to think the
13 Renaissance Man, or whatever it was called
14 at the time, business was growing, that
15 there was much opportunity.
16      Of course I knew David Carrington
17 who owned and ran Carrington Seafood.  He
18 used to come to Alabama games all the time.
19 So I knew from him that there really wasn't
20 much happening there.  So maybe that fueled
21 the fire for me to continue to say,
22 Herschel, come on board with number one and
23 maybe we can make some things happen for

Page 341

1 you.
2      Anyway, I did that same thing.  We
3 were at the Newport Beach Marriott for a
4 Sysco western region food show.  And Kym,
5 Kym was with me, and I think the kids were
6 with me at the food show.  And I saw
7 Herschel, and I think Bill was there at
8 their booth, and I kidded with him, Hey,
9 man, you need -- here's my card, you need to
10 call me, we need to get in bed -- you need
11 to get in bed with Tyson.
12      And I'll never forget it because
13 later that day, Kym and I went to the mall
14 or something with the kids and I saw on my
15 cell phone the number I thought to be
16 Herschel's.  And I thought a lot of Herschel
17 at the time.
18      And I was nervous and I showed it
19 to Kym.  Of course Kym at the time wasn't
20 much of a football fan, didn't know
21 Herschel.  She said, well, answer the phone.
22 And so I answered the phone, and I was
23 excited to talk to him.  Like I say, I

Page 342

1 thought a lot about Herschel. More so from
2 the personal side than the football side
3 because I couldn't stand Georgia, especially
4 when he was there, because my roommate in
5 college was a die-hard Georgia fan, and
6 Alabama wasn't as good then. And I was a
7 Florida fan, and they destroyed Florida
8 every year so I couldn't stand Herschel in
9 terms of an athlete at Georgia.
10      Anyway, I was excited to talk to
11 him, and he said, Hey, I want to talk to you
12 about coming on board with Tyson.
13   Q.  So when approximately was that in
14 our timeline?
15   A.  I think he -- I only think he was
16 with Pilgrim's for a year, if that, I don't
17 know. So as far in my timeline, I started
18 with Tyson in February of 2000. So it
19 wasn't long after that that he became
20 aligned with Tyson. I don't know the
21 details of that.
22      I do know I called Robert Thurber
23 to say, Hey, Herschel is -- I don't know if

Page 343

1 Herschel had called him. I don't know how
2 Herschel got it done, but I do know I called
3 Robert Thurber, because Robert Thurber is
4 very good friends with John Tyson.
5      And my concern about getting it
6 done was that Tyson is -- they already are
7 the biggest and the baddest, and if you look
8 at Tyson in terms of having celebrity
9 spokespeople or any type of -- they don't
10 need that. And so I didn't know if that
11 would be a hurdle or not. Anyway, I told
12 Robert, Herschel wants to switch to Tyson,
13 and I don't remember how it all played out,
14 but he became aligned with Tyson.
15   Q.  So after Herschel started
16 purchasing chicken products from Tyson, what
17 was your involvement, if any, with respect
18 to his dealings with Tyson?
19   A.  I was directly involved. It was
20 my responsibility because I was responsible
21 for Sysco. Herschel was exclusive to Sysco.
22 So it was basically my responsible -- I was
23 responsible.

Page 344

1   Q.  Now, we can agree when you were
2 employed by Simmons that you wore dual hats,
3 correct; you were on the one hand Simmons
4 employee --
5   A.  Very similar to every other
6 relationship I had with Herschel. I was
7 responsible for Herschel at Tyson, I was
8 responsible for Herschel at Smithfield, I
9 was responsible for Herschel at Simmons.
10   Q.  Okay. When you were at Simmons,
11 you were the general manager of Ren Man,
12 correct?
13   A.  Uh-huh.
14   Q.  Were you the general manager of
15 Ren Man at Tyson?
16   A.  I don't recall what my title was
17 at Tyson.
18   Q.  Did you have a title when you were
19 at Tyson for Ren Man?
20   A.  I told you what my title was at
21 Tyson.
22   Q.  Did you have a title for Ren Man
23 when you were employed at Tyson?

Page 345

1   A.  I don't recall having a title for
2 Ren Man. I do recall having a business card
3 or point of sale materials or something
4 where -- you understand that Renaissance Man
5 was exclusive to Sysco. And Sysco created
6 an exclusive brand called Herschel's Famous
7 34 for Herschel that Herschel, you know,
8 liked to say was his brand.
9      The reality was it was Sysco's
10 brand, because they're the ones that created
11 it. And they're the ones that advertised it
12 to their operating companies as a Sysco
13 brand, because there are bonuses and
14 incentives and other mechanisms in which
15 they award their people to push Sysco brand.
16   Q.  How did your duties and
17 responsibilities once you became involved
18 with Herschel's business at Tyson differ
19 from the duties that you later performed on
20 behalf of Ren Man during your employment
21 with Simmons?
22   A.  Say that again.
23      MR. PARKER: Would you read the

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
John Staples November 12, 2018

Job 28914
Pages 346..349

Page 346

1 question back for him?
2       (Record read.)
3   **A.  I would say the difference would**
4 **be in the magnitude of the effort.  Tyson**
5 **sells billions of pounds.  I suspect within**
6 **my region, and especially within Sysco, I**
7 **don't know the exact number, but it's**
8 **hundreds of millions of pounds.**
9   Q.  Okay.  During your employment with
10 Simmons, your sole responsibility was for
11 Ren Man, correct?
12   **A.  No, that's not correct.  We've had**
13 **that conversation.**
14   Q.  Why is it --
15   **A.  My responsibility was to develop a**
16 **base of business within broadline**
17 **distribution because Simmons had never**
18 **experienced any success whatsoever.  And the**
19 **first avenue by which they wanted me to**
20 **develop that was through Ren Man.**
21   Q.  How do you define broadline
22 distribution?
23   **A.  A broadline distributor is a**

Page 347

1 **distributor of which Sysco is the largest,**
2 **US Foods, UniPro, PFG.  A broadline**
3 **distributor is a distributor that will**
4 **deliver everything in the restaurant; the**
5 **paper towels, the tables, the lettuce, the**
6 **mayonnaise, the chicken, the steak, so a**
7 **broadline distributor distributes**
8 **everything.**
9       **That's different than a national**
10 **account distributor, because a national**
11 **account only delivers to the accounts they**
12 **own.  Some national accounts have their own**
13 **distribution network.  A specialty**
14 **distributor only distributes -- for example,**
15 **there's a specialty distributor in**
16 **Birmingham that delivers, it's called Evans**
17 **Meats.  They deliver meat to restaurants.**
18       **So a broadline distributor is --**
19 **if you're a broker, which Renaissance Man**
20 **is, you certainly want to align with a**
21 **broadline distributor because that allows**
22 **you to receive commissions from any number**
23 **of manufacturers of any number of products.**

Page 348

1       If you're a broker for a specialty
2 distributor, Evans Meats, if you're selling
3 mayonnaise, you're not going to receive
4 commission to sell to Evans Meats.
5       So a broadline distributor is --
6 Sysco is the biggest.  US Foods may have
7 passed them.  I don't keep up with the
8 numbers, but they're both huge, they're both
9 multibillion dollar distributors.
10   Q.  You worked for Simmons in or about
11 April of 2009 until December of 2017,
12 correct?
13   **A.  You know, I'm not real sure when**
14 **my employment with Simmons ended because I**
15 **never received any type of conversation to**
16 **this day.  Tried numerous times, I don't**
17 **know.  That's the time that they allowed --**
18 **that they didn't protect me from Herschel as**
19 **they agreed to do.  And I lost all the**
20 **security that they had promised to provide**
21 **me when they hired me back in 2009.**
22   Q.  They hired you about April of
23 2009, correct?

Page 349

1   **A.  After some rather lengthy**
2 **discussions, yes.**
3   Q.  Other than working on behalf of
4 Ren Man during your employment with Simmons,
5 what, if anything, did you do to develop a
6 base of business in broadline distribution?
7   **A.  I assisted Phil Perkins on Gordon**
8 **Food Service.  We became aware that Gordon**
9 **Food Service was bidding out their IF breast**
10 **fillet business.  I think I became aware of**
11 **that through Randy Sanders.  He had a good**
12 **relationship with Gordon Food Service.**
13       **So I went to Simmons, and as I**
14 **recall, Phil Perkins assisted us, but Gordon**
15 **Food Service was also his customer.  And I**
16 **said, well, you know, to be fair -- that's**
17 **the other thing everybody needs to**
18 **understand.  I was always fair, because as I**
19 **understood the relationship, if you already**
20 **had business with someone, Simmons already**
21 **had business, then Renaissance Man would**
22 **stay away from them.**
23       **Of course, that was all blown up**

Page 350

1 when Herschel and Georgie -- I'm caught in
2 the middle.  They forced me, we're going to
3 have this meeting with Brinker with or
4 without you, even though Simmons already had
5 the business.  Simmons was always great
6 about it.
7        But anyway, so I went to Phil
8 Perkins, I said, Hey, I understand Gordon
9 Food Service is bidding their IF business.
10 I didn't know Simmons was doing any business
11 with Gordon Food Service.  Herschel and Ron,
12 they became aware of it.  Well, then, they
13 don't have a right to bid it direct.  Again,
14 I'm in the middle, you can't do all that,
15 You know.
16        I learned to listen to what
17 Herschel and Ron would say.
18    Q.  I'm going to stop you there.  I
19 don't care about this.  You're not answering
20 my question.  I want to know what did you do
21 as --
22    A.  I assisted -- I gave Phil Perkins
23 some assistance in the Gordon Food Service

Page 351

1 bid.
2    Q.  When was that?
3    A.  I have no idea.
4    Q.  How long did this go on for?
5    A.  I have no idea.
6    Q.  What percent of your duties and
7 responsibilities as a Simmons employee were
8 on behalf of Ren Man?
9    A.  As it turns out, the majority of
10 it.
11    Q.  Almost a hundred percent, right?
12    A.  No, I wouldn't say a hundred
13 percent.  Avendra is a big customer of Ren
14 Man.  But we didn't know that Ren Man was
15 going to get the business until we went all
16 the way through the process.  And when I
17 left, when I left Renaissance Man, Avendra
18 was about a million pound customer.  And I
19 had no -- I had no idea until the end
20 because Avendra could care less about the
21 diversity part of it.  Do you want me to
22 tell you about that or --
23    Q.  No, I don't.

Page 352

1    A.  -- is that too long?  So no, I
2 wouldn't say almost a hundred percent.
3    Q.  What percent would you say of your
4 duties was devoted to Ren Man?
5    A.  I don't know.  80 to 90 percent.
6    Q.  Okay.  So you work at Tyson, you
7 have a relationship with Herschel Walker
8 during your tenure there that starts about a
9 year into your employment, correct?
10    A.  Sounds correct.
11    Q.  Why did you leave Tyson?
12    A.  Smithfield began recruiting me.
13    Q.  When was that?
14    A.  When did they begin recruiting me?
15    Q.  Yes.
16    A.  I know when I met the guy that
17 hired me.  I think I met him at a Sysco Top
18 100 golf tournament the year before they
19 hired me.
20    Q.  So when would that have been?
21    A.  You know, I'll get to the answers.
22    Q.  My questions are real --
23    A.  No, they're not real simple.

Page 353

1    Q.  You're not in charge of this
2 deposition.  My questions are real simple.
3 I just need dates.
4    A.  I'm in charge of my answers.
5    Q.  You are, but I'll cut you off if
6 you don't answer my question.
7    A.  Okay.  You can cut me off but I'm
8 going to take my time.  Do you remember what
9 you were doing in 2006?
10    Q.  Yeah, I do.  I was in law school
11 first year, Fayetteville, Arkansas.  Thank
12 you.  I want an answer to my question.  When
13 did you start -- when did you --
14    A.  Sometime in 2006.
15        MR. SIMMS:  Let him finish his
16 question.  You make sure you hear the
17 question, you understand it and then answer.
18    A.  Okay.
19    Q.  Did you leave Tyson Foods
20 voluntarily?
21    A.  Yes, I did.
22    Q.  Did you leave Smithfield Foods
23 voluntarily?

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES                Job 28914
John Staples November 12, 2018                              Pages 354..357

Page 354

1   A.  Yes, I did.
2   Q.  Have you ever been terminated from
3 a job?
4   A.  Yes, I have.
5   Q.  Where?
6   A.  Flowers.
7   Q.  Why?
8   A.  There was no real reason given.
9 It was a -- there was no reason given.
10   Q.  They didn't tell you why you were
11 being terminated?
12   A.  They said the division was not
13 performing to their standards.
14   Q.  Is that why you left them and then
15 later went and joined Tyson?
16   A.  Is that why I left them, yeah.
17 They told me the division wasn't performing
18 to standards.  They did offer me another job
19 in another division and I elected not to
20 take that at the advisement of my mentor who
21 was suggesting that I take the severance and
22 move on.
23   Q.  So you start at Smithfield in

Page 355

1 about 2006?
2   A.  I didn't start Smithfield in 2006,
3 I said I began interviewing with Smithfield
4 in 2006.
5   Q.  When did you start working at
6 Smithfield?
7   A.  2007.
8   Q.  What was your initial position at
9 Smithfield?
10   A.  I believe it was similar -- the
11 title was similar to -- I think it was
12 director of food service or region -- it
13 wouldn't have been region manager because I
14 was a director at Tyson.  I think it was
15 director of food service.  Initially, they
16 wanted the focus on Sysco.
17   Q.  At the time you joined Smithfield,
18 do you know whether that company had any
19 relationship with Herschel Walker?
20   A.  The company had a relationship
21 with Herschel, yes.  I don't know if they
22 had it at the time I joined or after.  I
23 think it was probably after I joined.

Page 356

1   Q.  Did you have any involvement in
2 bringing Herschel Walker on to Smithfield?
3   A.  I'm fairly certain I did, yes.
4   Q.  Can you just describe for me what
5 the relationship between Herschel Walker was
6 with Smithfield Foods in terms of what
7 products he was buying?
8   A.  Smithfield was providing Herschel
9 with ribs and pulled pork barbecue, and I
10 think that was the two items.
11   Q.  Were you Herschel's main point of
12 contact at Smithfield Foods?
13   A.  Yes.
14   Q.  Would you say you were Herschel's
15 main point of contact at Tyson Foods?
16   A.  Yes.
17   Q.  And you said you left Smithfield
18 voluntarily, correct?
19   A.  Yes.
20   Q.  When were you first approached by
21 Herschel Walker or representatives from
22 Simmons about going to work for Simmons?
23   A.  Forgive me, I don't have the

Page 357

1 recollection that you evidently have.  But
2 it was at some point after --
3       THE WITNESS:  Am I not speaking
4 loud enough for you to hear me?  You keep
5 leaning over and making those same faces
6 that you made yesterday.  I just think
7 that's rude, but be the way you want to be.
8 I can speak louder if I need to.
9       MR. SIMMS:  Focus on the lawyer
10 and don't focus on Herschel.  Try not to.
11       THE WITNESS:  Okay.  Thank you.
12   Q.  (BY MR. PARKER:)  Do you need me
13 to ask the question again?
14   A.  No, it -- Maybe I do.  I was hired
15 by Smithfield in 2007.  And when Herschel
16 got wind of this -- I mean, Kym didn't even
17 know I was accepting the job at Smithfield
18 so I wouldn't have told anybody else I was
19 accepting it.  Kym has always followed me
20 and supported me wherever I've been.  I
21 don't think Herschel would have known prior
22 to March, April of 2007.  So March, April of
23 2007, I took the job with Smithfield.

Page 358

1    Within a few days, Herschel calls
2 me, he's concerned. I was really -- by the
3 end of Herschel's tenure with Tyson, it was
4 obvious that Tyson wanted out of the
5 relationship. It was obvious to me.
6    The volume, as I recall, was less
7 than a million and a half pounds. There
8 really wasn't anything happening. Herschel
9 had had that disastrous meeting in the board
10 room. You know, things just -- and so when
11 I left Tyson, Herschel called me and said, I
12 got to get out. You got to find me another
13 supplier partner. This isn't working.
14    Well, I didn't really know any
15 other supplier chicken. I knew who they
16 were. I didn't have contacts because they
17 were my competitors.
18    If you're from Northwest Arkansas,
19 you know the poultry world is a small world,
20 and especially if you've grown up there.
21 Everybody knows everybody.
22    And I knew that Mike Rogers who
23 had been a former VP at Tyson was now in the

Page 359

1 brokerage business. And from what I
2 understood, he was struggling, and so I
3 reached out to Mike. I said, Mike, do you
4 know anybody up here that may want to align
5 with Herschel in selling chicken? He said,
6 Yeah, I know of a number of people.
7    And the good news is that my boss
8 at Smithfield, we were not only selling him
9 ribs, he had met Herschel, he likes
10 Herschel, so he said you can be as involved
11 in that as you want to. Help out Herschel
12 as much as you can. So I was somewhat
13 involved in that. And I was still living in
14 Arkansas.
15    And so Mike Rogers I know
16 introduced Herschel to OK Foods because that
17 was the Gary Brown, Gary Thompson meeting I
18 had already talked about yesterday. I was
19 at that meeting. I don't think I was at the
20 meeting when Mike Rogers introduced Herschel
21 to Simmons. But as I remember, so it -- at
22 some point in time, I met Chip Miller, I met
23 David Jackson as I recall. This is in 2007.

Page 360

1 They come to some type of agreement.
2    Kym starts working for Mike
3 Rogers, I think at Rogers Food Solutions was
4 the name of his company, and helping in this
5 process. So you know, Kym was there I think
6 for pretty much the time that Simmons and
7 Ren Man started working together. So I knew
8 about all that.
9    Q. So when did your recruitment by
10 Herschel to go work for Simmons or by
11 Simmons for you to come work for it begin?
12    A. I don't know that Herschel -- I
13 don't ever recall Herschel ever speaking to
14 me directly about employment.
15    Q. With Simmons?
16    A. With him, with -- I don't ever
17 recall Herschel being involved in any
18 recruitment of me. I do recall Mike Rogers
19 and -- so Kym had started working with Mike
20 Rogers. And quite frankly, Kym wasn't
21 comfortable with Mike Rogers.
22    As I'm working with Smithfield, I
23 do remember Herschel not being comfortable

Page 361

1 with Mike Rogers. And then I remember a
2 couple of meetings where I'm showing ribs
3 and Mike Rogers is supposed to come in and
4 show chicken, and Herschel is there and Mike
5 Rogers don't show up. And then I'm starting
6 to hear -- so there were concerns about Mike
7 Rogers.
8    Q. Well, when did you first begin
9 being recruited by Simmons?
10    A. It was sometime between -- it was
11 sometime between I would say the summer
12 of -- it was summer, fall of I would say
13 '07.
14    Q. Okay. And who from Simmons was
15 recruiting you?
16    A. As I recall, it was primarily
17 Chip. It would be discussions, phone calls,
18 primarily discussions.
19    Q. And ultimately, you were made an
20 offer of employment to go work for Simmons,
21 correct?
22    A. After numerous discussions and
23 after an assurance of a number of things.

Page 362

**1 They asked me to fly in to Northwest**
**2 Arkansas. They asked me to meet with them**
**3 at the hangar at Siloam Springs.**
4    Q.   Let me show you Exhibit 1 from
5 yesterday. If you would on Exhibit 1,
6 please go ahead and turn to Page 22.
**7    A.   (Complies.)**
8    Q.   So if you will look at Paragraph
9 67 on Page 22, it notes that, In February of
10 2009, Mr. Staples received a phone call from
11 Chip Miller, a VP for Simmons, and that
12 Mr. Miller asked Mr. Staples if he would be
13 interested in leaving his employment with
14 Smithfield, his and his family's residence
15 in Smithfield, Virginia and relocating to
16 Arkansas and going to work for Simmons to
17 run the special relationship or venture
18 between Simmons and HWE and/or RMFS,
19 correct?
**20    A.   Uh-huh.**
21    Q.   Do you agree with all that?
**22    A.   Uh-huh.**
23    Q.   So is February 2009 then the first

Page 363

1 time that Chip Miller approached you and
2 asked you about coming to Simmons --
**3    A.   No.**
4    Q.   -- to run the joint venture?
**5    A.   No.**
6    Q.   So it's your testimony that
7 discussions similar to those mentioned in
8 Paragraph 67 had occurred prior to February
9 2009?
**10    A.   Yes.**
11    Q.   All right. Now, Paragraph 68 says
12 after the phone call that occurred in
13 February of 2009, Simmons made arrangements
14 and flew you to Northwest Arkansas airport,
15 correct?
**16    A.   That's what I recall. Yes.**
17    Q.   And do you agree that that was
18 after February of 2009?
**19    A.   That's what I recall, yes.**
20    Q.   Did you fly to XNA airport or to
21 Siloam Springs airport?
**22    A.   I remember meeting at Siloam**
**23 Springs airport. I don't really remember.**

Page 364

1    Q.   Who was present at the meeting?
**2    A.   I remember Chip obviously. I**
**3 vaguely recall David stepping his head in.**
**4 Could have been others. I remember Chip.**
5    Q.   Was Chip the one who you were
6 primarily communicating with that day?
**7    A.   Yes.**
8    Q.   All right. Now, in Paragraph 23,
9 sir, you state that, During the meeting,
10 Mr. Miller stated, represented, and promised
11 Mr. Staples that in exchange --
**12    A.   I'm sorry, what page?**
13    Q.   Paragraph -- sorry. Paragraph 69
14 on Page 22.
15        MR. SIMMS: Start right there and
16 read that.
17    Q.   Do you see that, sir?
18        MR. SIMMS: He's asking you about
19 Paragraph 69.
20    Q.   Paragraph 69 at the bottom of Page
21 22 says that during this meeting at the
22 airport with Mr. Miller, Mr. Miller stated,
23 represented, and promised to you that in

Page 365

1 exchange for your promise or agreement to
2 leave your employment with Smithfield and
3 relocate to Arkansas and come work for
4 Simmons and run the special Simmons/HWE
5 and/or RMFS relationship, Simmons would
6 employ you indefinitely except for good
7 cause, correct?
**8    A.   That's correct.**
9    Q.   What do you recall specifically
10 about this conversation as it related to
11 this commitment of Simmons agreeing to
12 continually employ you except for good
13 cause?
**14    A.   Are you going to cut me off,**
**15 because this is a long answer?**
16    Q.   No, that's fine.
**17    A.   There are some defining moments in**
**18 your career and in your life.**
19    Q.   That's fine. I will cut you off
20 here. I want to know what was said during
21 that conversation. I don't need a history
22 of defining moments. What did Chip Miller
23 say?

Page 366

1    A.  Chip Miller said, as we discussed,
2 we're a Christian-based company.  We don't
3 offer contracts.  Yes, this is an at-will
4 state, but no, you will not be fired without
5 cause.
6    Q.  Did he say anything else to you
7 that led you to believe if you joined
8 Simmons you wouldn't be fired unless there
9 was good cause to do so?
10    A.  He'd said previously on numerous
11 occasions -- because that's why it took from
12 2007 where I cut it off after several
13 conversations because I don't think he was
14 willing or able to go to that extent.
15    I had just been fired from Flowers
16 when actually the numbers were good.  And it
17 had nothing to do with the numbers.  It had
18 everything to do with the new boss that I
19 didn't get along with, so I didn't want this
20 to happen again.
21    I had learned in February of 2009
22 that the man who brought this sand back from
23 Iwo Jima and my hero had cancer that spread

Page 367

1 to his bones.
2    Q.  I'm sorry, I'm going to cut you
3 off.
4    A.  He did not want me to work for --
5    Q.  I'm asking you about what people
6 said.  Sir, I'm asking you about what people
7 said.  I don't want to be here all day, I
8 assume you don't either, so please just
9 answer my questions.
10    MR. SIMMS:  He's putting in
11 context --
12    Q.  I don't need context.  I want to
13 know what people said.  If your lawyer wants
14 to give you an opportunity to provide
15 context later, he can and you can talk.  I
16 don't need that.
17    A.  Mr. Miller said he did understand,
18 because I had not agreed to come to work
19 with Simmons when I met with Mr. Miller.  I
20 had not agreed to do anything but get on the
21 plane.  And so Mr. Miller and David Jackson
22 said they did understand.  They were sorry
23 about my father.

Page 368

1    They did understand how another
2 move from a billion dollar company that I
3 had done a good job with was risky.  They
4 did understand that Herschel had some issues
5 and they were going to deal with them.  And
6 they were going to protect me from his
7 issues.  They did understand that I would
8 report directly to Chip Miller.  They did
9 understand that I would submit my expense
10 reports directly to Chip Miller.
11    Q.  What are you talking about?  This
12 is not --
13    A.  You asked me what was discussed.
14 You asked me what they said.
15    Q.  No, I didn't.  I'll start over.
16 That's not what I'm asking you.  That's not
17 what I asked.
18    You testified earlier that Chip
19 Miller told you if you came to work for
20 Simmons you would only be terminated if
21 there was cause to do so, correct?
22    A.  Yes.
23    Q.  And you testified that that

Page 369

1 occurred in this hangar at XNA or in Siloam
2 Springs, correct?
3    A.  It would have had to because I
4 hadn't agreed to the job until then.
5    Q.  Aside from Chip Miller, did any
6 other representative from Simmons tell you
7 that the company would not terminate you
8 except for good cause?
9    A.  I believe David Jackson was in the
10 meeting.
11    Q.  Do you recall David Jackson
12 actually saying that or David Jackson being
13 present?
14    A.  I don't recall.
15    Q.  So other than Chip Miller and
16 possibly David Jackson representing to you
17 that Simmons would only terminate you if
18 there was good cause to do so --
19    A.  I recall after being hired, Todd
20 Simmons and Mark Simmons effectively saying
21 the same thing.
22    Q.  Let me finish my question.  Prior
23 to your hire, Chip Miller and David Jackson

Page 370

1 are the only representatives from Simmons
2 who represented to you that if you joined
3 the company, your employment would only be
4 terminated for good cause, correct?
5     **A.  I don't recall.  I recall meeting**
6 **Todd Simmons at the merchandising conference**
7 **in January of 2009.  Whether he made that**
8 **type of statement, he probably didn't or I**
9 **would have recalled it.**
10    Q.  Are you contending that anyone
11 other than Chip Miller or David Jackson
12 represented to you before you joined Simmons
13 that your employment would only be
14 terminated for cause?
15    **A.  Before joining Simmons, no.**
16    Q.  Now, you were testifying a minute
17 ago that after you joined Simmons certain
18 representatives from the company represented
19 to you that your employment would only be
20 terminated for good cause, correct?
21    **A.  Correct.**
22    Q.  Who are those individuals?
23    **A.  My definition of representative --**

Page 371

1 **represented is after joining Simmons, we had**
2 **a meeting at their corporate office.  As I**
3 **recall, Todd Simmons was in the meeting.  I**
4 **don't remember if that was the moment I met**
5 **Todd or I met Mr. Simmons, Mark Simmons.  I**
6 **met him at some point.**
7         **And I was still very concerned**
8 **about the associated risks with Herschel**
9 **Walker.  I expressed those concerns to Todd**
10 **Simmons, to David Jackson, to Chip Miller.**
11 **I believe Mike Jones was in the meeting.  He**
12 **was the CFO at the time.  I believe the VP**
13 **of human resources, Steve -- I've forgotten**
14 **his last name, I believe he was in the**
15 **meeting.  And I was concerned.  And so to**
16 **me, they represented that they would protect**
17 **me.**
18    Q.  Who is the they?
19    **A.  Todd.**
20    Q.  What did Todd say in the meeting
21 that led you --
22    **A.  He understood --**
23    Q.  Hold on.  Let me finish my

Page 372

1 question.  Don't interrupt.  What did Todd
2 say in the meeting that led you to believe
3 he and Simmons would, in your words, protect
4 you?
5     **A.  He said that Simmons was a family**
6 **owned, family run company with core values.**
7 **Those same core values are listed on your**
8 **website or on the Simmons website today.**
9 **Basically people first, integrity,**
10 **commitment.  We understand your concerns,**
11 **John.  We want you to do a good job for us.**
12 **We don't offer contracts.  You will not be**
13 **fired without cause.**
14    Q.  So you're testifying --
15    **A.  I took that away from that**
16 **meeting --**
17       MR. KING:  Keri, can you please
18 help here?  Our poor court reporter is
19 having to take down this transcript, and
20 these two are talking over each other,
21 particularly because John continues to
22 interrupt as --
23       MR. SIMMS:  I thought the last

Page 373

1 time, Talley was doing the interrupting.
2 I'm going to try to say something.
3       MR. KING:  Thank you.
4     **THE WITNESS:  I'm a grown man, I**
5 **won't interrupt again.  I apologize.**
6       MR. SIMMS:  What you've got to do
7 is don't look anywhere except towards Talley
8 and try to see if he's about to start asking
9 something, but if you haven't finished
10 giving your answer, tell him that, okay?
11 Don't interrupt him.  Try to wait until you
12 get a question and then answer, okay?
13    Q.  (BY MR. PARKER:)  So who at that
14 meeting are you claiming represented to you
15 that your employment would only be
16 terminated for good cause?
17    **A.  For the record, I'm claiming that**
18 **I left that meeting with the same**
19 **understanding that I had from Chip Miller**
20 **before I was hired, that I would not be**
21 **fired from Simmons without cause.  I don't**
22 **know that Todd Simmons said those words**
23 **specifically.  I know that Todd Simmons**

Page 374

1 talked about trust. I know that he talked
2 about commitment. I know that he talked
3 about family.
4     Q. So you left the meeting with the
5 impression that your employment would only
6 be terminated for good cause, but as you sit
7 here today, you're not certain whether
8 anyone in that meeting actually made that
9 statement to you?
10     A. I'm certain that I trusted Simmons
11 to do what they said they were going to do.
12     Q. So you left the meeting with the
13 impression that your employment would only
14 be terminated for good cause --
15     A. That was certainly my impression,
16 yes.
17         MR. PARKER: Keri --
18         MR. SIMMS: He's still talking.
19 You've got to wait until he finishes, then
20 you respond, okay? And it's in your best
21 interest to do so, John.
22         THE WITNESS: Keri, I understand
23 that. I'm not doing it to be argumentative.

Page 375

1 I thought he was finished. I won't say
2 anything.
3     A. Yesterday, I'm -- you know, it's
4 like when I pause, why are you pausing, so
5 I'll have to pause to make sure you're
6 finished with your question.
7         MR. SIMMS: That's what you need
8 to do.
9     Q. (BY MR. PARKER:) So you left this
10 meeting that you've been testifying about
11 with the impression that Simmons would not
12 terminate your employment absent having good
13 cause to do so, but as you sit here today,
14 you don't recall anyone specifically making
15 that statement or representation to you,
16 correct?
17     A. After being hired, that's correct.
18     Q. All right. Just so the record is
19 clear given your caveat right there, your
20 testimony is, though, that prior to your
21 hire, Chip Miller and possibly David Jackson
22 did specifically say to you that your
23 employment with Simmons would not be

Page 376

1 terminated absent the company having good
2 cause, correct?
3     A. Yes.
4     Q. You at no point during your
5 employment with Simmons had an employment
6 contract, correct?
7     A. Not that I recall.
8     Q. Do you recall shortly before you
9 began working for Simmons receiving, signing
10 and returning an offer letter to the
11 company?
12     A. I don't recall. I may have.
13         MR. SIMMS: Are you going to --
14 all right. You've got them already
15 premarked.
16     Q. Please take a look at Exhibit 59.
17
18 (Defendant's Exhibit 59 was marked for
19 identification and is attached to the
20 original transcript.)
21
22     Q. And let me know when you're ready
23 to answer questions about that document.

Page 377

1     A. Okay.
2     Q. Is that your signature on Exhibit
3 59, sir?
4     A. It is.
5     Q. Okay. Did you date the document
6 as well?
7     A. I did.
8     Q. This is a letter that is dated to
9 you March 6th of 2009, correct?
10     A. Correct.
11     Q. And the letter reflects that you
12 signed and dated it on that same date,
13 correct?
14     A. Correct.
15     Q. And this offer letter was offering
16 the position to you at Simmons of director
17 of distribution sales-food service, correct?
18     A. Correct.
19     Q. And it noted that your employer,
20 should you have accepted the offer, would be
21 Simmons Prepared Foods, correct?
22     A. Correct.
23     Q. And your initial compensation at

Page 378

1 Simmons pursuant to this offer letter was a
2 salary in the amount of $160,000, correct?
3     **A.   Correct.**
4     Q.   And that you would have the
5 potential to earn bonuses depending upon the
6 income or revenue of the Ren Man/Simmons
7 partnership, correct?
8         MR. SIMMS:  I'm going to object.
9 I know I reserved, but the document on that
10 paragraph speaks for itself.  I don't think
11 it's limited to the way you stated it, but
12 he can answer the question.
13    Q.   That's fine.  You can answer.
14    **A.   I don't recall that because that**
15 **certainly never occurred.**
16    Q.   Did you at no point during your
17 employment with Simmons --
18    **A.   Receive a bonus, no.**
19    Q.   That's not my question.  Did you
20 at any point at Simmons receive compensation
21 other than your annual salary?
22    **A.   I received 401(k) matches under a**
23 **Simmons executive.  I received -- I don't**

Page 379

1 **know if you define it as compensation but I**
2 **received quite a bit of free life insurance.**
3    Q.   Anything else, sir?
4    **A.   Simmons started a new policy with**
5 **you could trade your vacation in.  I don't**
6 **know when that occurred.  I think I received**
7 **that on one occasion.**
8    Q.   Any other forms of compensation
9 you can recall receiving during your
10 employment with Simmons?
11    **A.   Not that I recall.**
12    Q.   Paragraph 8 of this offer letter
13 states in the last sentence that Simmons had
14 the right to terminate your employment at
15 any time with or without cause, correct?
16    **A.   That's what that states, yes.**
17    Q.   Do you remember discussing the
18 specific language in Paragraph 8 with any
19 representatives from Simmons?
20    **A.   I remember discussing with Chip**
21 **and David that that was a concern.  I knew**
22 **Arkansas was an at-will state.**
23    Q.   Do you recall having conversations

Page 380

1 with Chip or David specifically about
2 Paragraph 8 of this offer letter?
3    **A.   I don't recall.**
4    Q.   Okay.  Now, if you were so
5 concerned about moving from Virginia to
6 Arkansas and worried about Herschel, why
7 then did you sign this document seeing that
8 it contained language saying that your
9 employment could be terminated without
10 cause?
11    **A.   Because I guess I trusted the**
12 **executives to do what they said they would**
13 **do.**
14    Q.   In terms of the timeline here, you
15 confirmed earlier that your complaint is
16 accurate, that in 2009 is when you had this
17 conversation with Chip Miller and that
18 subsequent to that is when you came to the
19 Northwest Arkansas airport or the Siloam
20 Springs airport, correct?
21    **A.   I don't understand the question.**
22    Q.   Sure.  You confirmed earlier that
23 you came to the Northwest Arkansas airport

Page 381

1 or the Siloam Springs airport at some point
2 after February of 2009, correct?
3    **A.   As I recall.**
4    Q.   And it was in the meeting at the
5 airport that you said the representation by
6 Chip Miller or David Jackson was made
7 regarding your employment only being
8 terminated for good cause, correct?
9    **A.   As I recall.**
10    Q.   As you sit here today, is it your
11 belief that that conversation happened
12 before or after you signed Exhibit 59?
13    **A.   I don't really recall the dates of**
14 **2009.  The first detail -- I do recall the**
15 **first detailed conversation I had with Chip**
16 **Miller and David Jackson, and it was at the**
17 **merchandising conference in Sysco at the**
18 **Starbucks desk in the front of the George**
19 **Brown and that would have been in late**
20 **January or early February of 2009.**
21    Q.   So as you sit here today, you
22 can't recall whether you signed Exhibit 59
23 before or after --

App. 185

Page 382

1    A.   The Siloam Springs?
2    Q.   Hold on, hold on, hold on.  You
3  can't recall whether you signed Exhibit 59
4  before or after you met with Chip Miller and
5  David Jackson in either the Northwest
6  Arkansas Regional Airport or the Siloam
7  Springs airport, correct?
8    A.   I don't believe I met with them in
9  the Northwest Arkansas Regional Airport, but
10 no, I don't recall if this was signed before
11 or after.
12   Q.   Did you make any requests to
13 Simmons to be employed by it rather than
14 Renaissance Man Food Services so that you
15 could receive benefits?
16   A.   That was one of the reasons, yes.
17   Q.   When you were initially approached
18 by representatives from Simmons, had they
19 been talking about you coming to work for
20 Renaissance Man directly and that's why you
21 asked for benefits or how did those
22 conversations come to be?
23   A.   The initial most lengthy real

Page 383

1  conversation that I had with Simmons was at
2  the Sysco merchandising conference in either
3  late January, early February of 2009.  Up
4  until that point, it had just been simple
5  conversations of which I repeatedly say no,
6  because they wanted me to enter into a
7  situation similar to the one Mike Rogers
8  had, which to my understanding was an
9  agreement between Mike Rogers and Herschel.
10 And I consistently said no.  I'm not coming
11 to work.  Please stop calling me.  Thanks
12 for the interest.
13       It wasn't until the end of January
14 2009 or the beginning of February, you can
15 easily find the dates of the Sysco
16 merchandising conference.  I'm sorry I don't
17 recall.  But whenever that occurred, the
18 Simmons/Renaissance Man booth was across
19 from the Smithfield booth.  Chip Miller, I
20 believe David Jackson asked to talk to me.
21       So we went out and we had a
22 lengthy discussion in front of the Starbucks
23 in the George Brown Convention Center.  They

Page 384

1  said we really need you to come on board.
2  This is not working out.
3       It was the first time that they
4  said they had actually been in the face of
5  Sysco.  And you have the operating companies
6  coming by and they're complaining about
7  Renaissance Man, they don't know who Mike
8  Rogers is, it's not working.  We want you to
9  come on board, we're willing to hire you.
10 We understand your concerns about Herschel
11 Walker.  We're going to protect you from him
12 because we have those same concerns.
13   Q.   Are you done?
14   A.   This was the first time
15 specifically I was told that they would
16 protect me and that I would only be fired
17 without -- with cause.
18   Q.   So you've added a conversation to
19 the mix now of --
20   A.   Well, you've allowed me to
21 finally.
22   Q.   No, that's not true.  I gave you
23 an opportunity earlier.

Page 385

1       Now I've got to make sure the
2  record is clear.  You're saying now you were
3  told prior to your employment with Simmons
4  that your employment would only be
5  terminated for good cause, both at this
6  Sysco food show and at the Siloam Springs
7  airport hangar by Chip Miller and possibly
8  David Jackson, correct?
9    A.   Correct.
10   Q.   Is there anything else you want to
11 add to that as to other occasions when you
12 claim --
13   A.   If there was another --
14   Q.   Hold on, Mr. Staples.  Hold on.
15 Are there any other occasions you want to
16 add to your testimony of when you claim
17 representatives from Simmons told you that
18 if you joined the company, your employment
19 would only be terminated for good cause?
20   A.   Are you finished with the
21 question?
22   Q.   I am.
23   A.   After starting with Simmons --

Page 386

1    Q.  That's not my question.

2    A.  Yes.  Within two to three years
3  after working with Simmons, Miranda Matthews
4  was fired.  Miranda Matthews was Chip
5  Miller's secretary.  I knew Miranda Matthews
6  did a good job.  I thought a lot of Miranda
7  Matthews.

8    Q.  Are you talking about something
9  before your employment or after your
10  employment?

11    A.  After.

12    Q.  I don't care about that.

13    A.  Oh.

14    Q.  You're not being responsive to my
15  questions, sir?

16    A.  I thought you said was there any
17  time before or after that I was told I
18  wouldn't be fired without cause.

19    Q.  No, that was not my question.

20    A.  Okay, it was just before.

21    Q.  That's right.  Let's do it one
22  more time so you can get your testimony
23  straight.

Page 387

1    A.  My testimony is straight.

2    Q.  You've told me that at Sysco food
3  show representatives from Simmons prior to
4  you joining the company told you that if you
5  did go work for Simmons, your employment
6  would only be terminated for good cause.

7    A.  Yes.

8    Q.  Correct?

9    A.  From the food shows and
10  merchandising conference.

11    Q.  Correct?  That's one occasion,
12  correct?

13    A.  Correct.

14    Q.  You've also told me that at the
15  Siloam Springs airport, Chip Miller and
16  possibly David Jackson told you that if you
17  joined Simmons, your employment would only
18  be terminated for good cause, correct?

19    A.  Correct.

20    Q.  Other than those two instances, as
21  you sit here today, can you recall any other
22  times prior to you joining Simmons where
23  representatives from the company told you

Page 388

1  that if you joined Simmons, your employment
2  would only be terminated for good cause?

3    A.  No.

4    Q.  Okay.  All right.

5        MR. PARKER:  Let's take a break
6  there.

7

8        (Short recess.)

9

10    Q.  (BY MR. PARKER:)  Before we took a
11  break, Mr. Staples, you told me about all of
12  the occasions on which someone from Simmons
13  prior to you joining the company told you
14  that your employment would only be
15  terminated for good cause, correct?

16    A.  I told you there were occasions.

17    Q.  Have you today told me all of the
18  occasions on which prior to you joining the
19  company someone from Simmons told you that
20  your employment would only be terminated for
21  good cause?

22    A.  I don't recall how many I've told
23  you today, but I don't know of any others.

Page 389

1    Q.  All right.  And you told me
2  earlier that after you joined Simmons, you
3  attended this meeting with multiple Simmons
4  employees in which you left the meeting with
5  the impression that your employment would
6  only be terminated for good cause, correct?

7    A.  Yes.

8    Q.  Were you told by -- strike that.

9        I don't want to ask about your --
10  whether you had the impression, that's not
11  what this question is.  My question is after
12  you joined Simmons, did anyone from the
13  company specifically tell you that your
14  employment would only be terminated for good
15  cause?

16    A.  After joining Simmons?

17    Q.  Yes, sir.

18    A.  I recall a specific discussion
19  with Chip Miller whenever Miranda Matthews
20  was terminated, because I considered Miranda
21  Matthews, from what I knew, to be a good
22  employee.  I considered her to have all the
23  core values that Simmons likes to talk

Page 390

1 about.
2        So when she was fired, whenever
3 that was, there had already been several
4 hurdles with Herschel.  And I was repeatedly
5 told by David Jackson, Chip Miller, Gary
6 Murphy, whoever, Todd Simmons to keep things
7 clean between the two parties, make sure
8 both parties understand if either other
9 party gets out of line, and I was concerned
10 from basically the first board meeting
11 because it's hard to keep Herschel in line.
12        And so anyway, when Miranda
13 Matthews was fired, I went to Chip Miller's
14 office.  I said, Was Miranda fired without
15 cause, or something to that effect.  He
16 said, No.  She's a good person, she's a good
17 employee, but we had to fire her.  We don't
18 fire people without cause.  That's the
19 conversation I remember specifically.
20    Q.   Other than that conversation, can
21 you recall any other conversations in which
22 a representative from Simmons told you that
23 your employment would not be terminated or

Page 391

1 that Simmons just generally doesn't
2 terminate employees absent good cause?
3    A.   Are you going to allow me to use
4 the word generally?
5    Q.   Well, did someone tell you in the
6 context of conversation that employment
7 wouldn't be terminated without good cause,
8 not just give you that impression?
9    A.   Using those specific words, I
10 don't recall giving me that impression
11 several times.
12    Q.   I still didn't get an answer to my
13 question.  My question is other than your
14 conversation with Chip Miller regarding
15 Miranda Matthews' termination, did anyone
16 from Simmons after you started working for
17 the company tell you that your employment or
18 any other Simmons employees' employment
19 would not be terminated absent good cause?
20    A.   Not that I recall.
21    Q.   Thank you.  Your employment --
22 strike that.
23        You were I guess relieved of your

Page 392

1 duties with Renaissance Man Food Services by
2 Herschel Walker on December 27th of 2017,
3 correct?
4    A.   I guess I was relieved of my
5 current duties, as he assumed them to be, on
6 the 27th, but then I was given the
7 opportunity to take another role directly
8 with him if Kym would sell her shares for
9 ten dollars and I would sign a
10 nondisparagement agreement, so I'm not sure
11 what the effective date per se would be.
12    Q.   But you were advised in any event
13 on December 27th, 2017 that absent you
14 signing this consulting agreement, you
15 wouldn't be performing any more work for
16 Renaissance Man Food Services, correct?
17    A.   Correct.
18    Q.   Now, you testified yesterday and
19 you mentioned it earlier today that it's
20 your contention that no one from Simmons
21 ever told you that your employment with
22 Simmons was terminated, correct?
23    A.   I don't recall anyone telling me

Page 393

1 that.
2    Q.   You don't recall having a phone
3 conversation with Linda Ross from Simmons a
4 couple of days after this December 27th,
5 2017 meeting in which she confirmed to you
6 that your employment with Simmons was ended?
7    A.   I recall having a phone
8 conversation with Linda.  I wasn't thinking
9 about Linda yesterday.  I don't recall
10 whether she called me or I called her.
11    Q.   Do you recall during that phone
12 conversation, though, with Linda Ross
13 whether she did indeed tell you that your
14 employment with Simmons was terminated?
15    A.   I don't recall she said that
16 specifically.  I think it was rather
17 obvious.  Linda and I had a good discussion.
18 I think she asked me to return the computer.
19    Q.   During that conversation?
20    A.   As I recall.
21    Q.   If you didn't understand that your
22 employment was being terminated, what was
23 your understanding of why Linda Ross on

Page 394

1 behalf of Simmons was requesting that you
2 return your company-issued computer?
3     **A.  I had a pretty good idea that**
4 **Simmons was terminating my employment within**
5 **24 hours when Herschel asked me to give him**
6 **information and I couldn't access my emails.**
7     Q.  Okay.  So my confusion was you
8 understood your employment was being
9 terminated, you just don't recall as you sit
10 here today specifically whether Linda Ross
11 or anyone from Simmons expressly told you
12 your employment had ended, correct?
13     **A.  If anyone specifically told me**
14 **that, it would have been Linda Ross.**
15     Q.  Are you denying that she told you
16 that your employment was terminated or you
17 just don't recall one way or the other
18 whether she told you that during that call?
19     **A.  I'm not denying anything that**
20 **Linda Ross would say.  So if she said she**
21 **told me that, then she probably did.**
22     Q.  Is she generally a trustworthy
23 person?

Page 395

1     **A.  Yes.**
2     Q.  If you would sir, please go to
3 Page 24 of Exhibit 1, which is in front of
4 you.  At the bottom there, it recites Count
5 Eight against Simmons, correct?
6     **A.  Yes.**
7     Q.  And it says with respect to Count
8 Eight, wrongful termination of Mr. Staples
9 for exercising a legal right and/or refusing
10 to violate federal or state law and/or
11 reporting violations of federal or state law
12 public policy exceptions under Arkansas law,
13 correct?
14     **A.  Correct.**
15     Q.  What legal right do you claim you
16 exercised that led to your, as you would
17 call it, wrongful termination from Simmons?
18     **A.  My understanding is there are**
19 **certain legal rights under special**
20 **circumstances that oversee or oversee, I**
21 **don't know what the word is, under certain**
22 **circumstances where you ask someone to go**
23 **across state lines and move and leave the**

Page 396

1 **security of a good family or good company,**
2 **good opportunity and make assurances that**
3 **you won't be fired without cause.  I mean,**
4 **that's my understanding.**
5     Q.  So the legal right that you're
6 claiming you exercised that led to your
7 wrongful termination was you moving from
8 Virginia to Arkansas to work for Simmons in
9 connection with you being told by Simmons
10 that your employment would only be
11 terminated for good cause?
12     **A.  I think that's part of it.**
13     Q.  What else is there?
14     **A.  I think I have a right to**
15 **protection.  I was in effect a**
16 **whistleblower.  I was told to make Simmons**
17 **aware of activities that were not fair, were**
18 **not ethical, were not legal in terms of the**
19 **agreement as I understood it.  So I made**
20 **them aware of those activities, and within a**
21 **couple of weeks, I'm terminated.**
22     Q.  Anything else, sir?
23     **A.  I'm not a lawyer so you can stop**

Page 397

1 **me, even though I understood that we weren't**
2 **stopping each other, but maybe the rules**
3 **changed from yesterday.  But I also suspect**
4 **there's some legal right of protection when**
5 **you're asked to submit expense reports in a**
6 **certain manner and attach receipts and you**
7 **do that for nine years and never have one**
8 **rejected.**
9     **I also expect there's some type of**
10 **legal type of obligation when you ask me to**
11 **manage a company with respect to commissions**
12 **and invoicing and accounts receivable and**
13 **things of that nature and I do that the way**
14 **you've asked me to do it, not the way that**
15 **you're supposed to protect me from asked me**
16 **to do it.  Other than that, I don't really**
17 **know of anything else.**
18     Q.  Count Eight also says, sir, or
19 you're contending in this lawsuit, correct,
20 that you were wrongfully terminated for
21 refusing to violate federal or state law,
22 correct?
23     **A.  If that's what it says, correct.**

App. 189

Page 398

1    Q.   It's your claim, so let me ask
2 you, what federal or state law are you
3 contending you refused to violate which
4 ultimately led to your wrongful termination
5 from Simmons?
6    **A.   I think some of that's spelled out**
7 **in 79.**
8    Q.   In Paragraph 79?
9    **A.   Yes.**
10   Q.   Is there anything other than --
11   **A.   I think it's also spelled out in**
12 **80.**
13   Q.   Paragraph 80, sir?
14   **A.   Yes.**
15   Q.   Is there anything other than what
16 is set forth in Paragraph 79 and 80 of your
17 third amended complaint, which is marked as
18 Exhibit 1, that identifies the federal or
19 state laws that you claim you refused to
20 violate that led to your wrongful
21 termination?
22   **A.   I think it's also spelled out in**
23 **83, Paragraph 83.**

Page 399

1    Q.   Anything else, sir?
2    **A.   I think it's also spelled out in**
3 **Paragraph 81.  I think it's pretty much**
4 **spelled out in all of the subsequent**
5 **paragraphs.**
6    Q.   Anything else?
7    **A.   And you understand when I say**
8 **subsequent paragraphs, there's several**
9 **subsequent paragraphs.**
10   Q.   I understand.
11   **A.   I think one of my biggest**
12 **concerns, and this had to do with my wife,**
13 **but because I was receiving a consulting, I**
14 **feel like Simmons failed to protect my wife**
15 **and I from the actions of her personal**
16 **attorney who subsequently forced the**
17 **shutdown of my wife's business.**
18   Q.   And that all occurred after the
19 December 27th, 2017 meeting that you
20 testified extensively about yesterday,
21 correct?
22   **A.   Actually the withholding of**
23 **commissions occurred prior to the**

Page 400

1 **termination.**
2    Q.   Okay.
3    **A.   I also think they violated --**
4 **there was a violation by withholding earned**
5 **commission payments at the request of**
6 **Herschel Walker in the amount of $18,000**
7 **that had been earned and was never approved**
8 **by Kym Staples, the owner of DSM3.**
9    Q.   We've gotten kind of afar field
10 here, so I want to focus you back.  Aside
11 from the laws identified in Count Eight of
12 your third amended complaint, are there any
13 other federal or state laws that you contend
14 you refused to violate that led to your
15 wrongful termination from Simmons?
16   **A.   I can't think of any or we would**
17 **have probably brought them to your**
18 **attention.**
19   Q.   Aside from the laws that are
20 referenced in Count Eight of your third
21 amended complaint, are you aware of any
22 federal or state laws that you claim you
23 reported violations of that led to your

Page 401

1 wrongful termination from Simmons?
2    **A.   Not at this time.**
3    Q.   Is it -- do you contend that
4 representatives from Simmons were aware
5 during your employment that you were
6 receiving a consulting fee from DSM3?
7    **A.   I don't contend that they know the**
8 **amount.**
9    Q.   Do you contend that
10 representatives from Simmons knew you were
11 receiving a consulting fee --
12   **A.   I suspect that they did.**
13   Q.   Hold on, hold on, hold on.  Do you
14 contend that any representatives from
15 Simmons knew that you were receiving a
16 consulting fee, regardless of the amount,
17 from DSM3 during your employment with
18 Simmons?
19   **A.   Is contend the only word I can**
20 **use?  I don't use the word contend.**
21   Q.   Do you claim?
22   **A.   I feel rather certain they knew I**
23 **was a consultant to DSM3.  I sent emails on**

Page 402

1 Simmons' email addresses where it dictates
2 to Ron and to Herschel from my Simmons email
3 address, of which I understood from time to
4 time from the mouth of Herschel Walker that
5 he understood by communication that I had
6 with Simmons and they understood
7 communication that I had with him regardless
8 of whether they were copied on the emails or
9 not.
10     Q.   Do you recall telling anyone
11 expressly from Simmons that you were
12 receiving a consulting fee in any amount
13 from DSM3 while you were working for
14 Simmons?
15     A.   I don't recall a specific date.
16     Q.   So your contention is the only way
17 representatives from Simmons would know that
18 is if they were either monitoring your
19 emails during your employment and would be
20 reviewing communications that you sent to
21 Herschel or to Ron or if Herschel or Ron
22 advised folks from Simmons that you were
23 receiving the consulting fee, correct?

Page 403

1     A.   As my employer -- again, I don't
2 have a specific date or a specific person.
3 But I never hid anything from Simmons, so I
4 suspect they knew I was receiving a
5 consulting fee.  I don't suspect that I gave
6 them an amount or told them anything with
7 respect to that.
8     Q.   As you sit here today, you can't
9 recall specifically telling anyone from
10 Simmons that you were receiving the
11 consulting fee, correct?
12     A.   We seem to be repeating the same.
13     Q.   Because I think you're vacillating
14 here.  If it's my fault, fine.  I just need
15 to make sure I understand.  As you sit here
16 today, you are not claiming that you told
17 any employee --
18     A.   I don't recall a specific --
19     Q.   Hold on, Mr. Staples.  Please just
20 stop interrupting me, okay?  Stop.
21         As you sit here today, you can't
22 identify anyone from Simmons who you told
23 while you were working for Simmons that

Page 404

1 were receiving a consulting fee from DSM3,
2 correct?
3     A.   Correct.
4     Q.   Now, you testified a minute ago
5 that in your view, Simmons wrongfully
6 withheld commissions owed to DSM3, correct?
7     A.   Correct.
8     Q.   Yesterday you testified that
9 Simmons on behalf of Ren Man did certain
10 back office functions, correct?
11     A.   They did all the back office
12 functions.
13     Q.   And some of those back office
14 functions included paying invoices that had
15 been issued to Ren Man as well as paying
16 commissions that were owed to DSM pursuant
17 to the brokerage agreement between DSM and
18 Ren Man, correct?
19     A.   Correct.
20     Q.   Do you know as you sit here today
21 whether the commissions that Simmons would
22 process under that brokerage agreement
23 between DSM3 and Ren Man came from a Ren Man

Page 405

1 bank account or a Simmons bank account?
2     A.   I know that there was a separate
3 bank account that was set up.
4     Q.   Do you know who was the holder or
5 owner of that bank account for the
6 commissions, sir?
7     A.   I know every time there were
8 questions pertaining to it, I asked Carmen
9 Seale ^ spl and she would provide the
10 information.  No, I don't know.
11     Q.   The brokerage agreement under
12 which commissions would be due from Ren Man,
13 that agreement was between Ren Man and DSM3,
14 correct?
15     A.   Correct.
16     Q.   Simmons wasn't a party to that,
17 correct?
18     A.   They weren't a party to it?
19     Q.   Correct.
20     A.   What do you mean by a party?
21     Q.   Do you recall Mr. King showing you
22 the brokerage agreement yesterday during
23 your deposition?

Page 406

1    A.   I do.
2    Q.   Who do you recall being the
3  signatories or parties to that brokerage
4  agreement?
5    A.   The brokerage agreement was
6  between Ren Man and whoever the broker may
7  be.  But the broker was never paid unless
8  David Murphy and/or Gary Jackson approved it
9  was my understanding, so I assume they were
10  party to it.
11    Q.   I'm handing you what was marked
12  yesterday as Exhibit 13, sir.  And Exhibit
13  13 at the top of Page 1 is entitled
14  Renaissance Man Food Services, LLC Broker
15  Agreement, correct?
16    A.   Correct.
17    Q.   And this agreement which was
18  entered into in October of 2014 reflects in
19  the first paragraph that it was between
20  Renaissance Man Food Services, LLC and
21  Diversified Sales & Marketing, correct?
22    A.   That's correct.
23    Q.   This document, and take the time

Page 407

1  to read through it if you want, it doesn't
2  mention the word Simmons anywhere in it,
3  does it?
4    A.   If you say it doesn't, it doesn't.
5    Q.   Well, I want your testimony, so
6  take the time to read it if you won't agree
7  with me.
8    A.   I agree with you.
9    Q.   And are you aware of a subsequent
10  broker agreement between Renaissance Man
11  Food Services --
12    A.   No.
13    Q.   Hold on.  You don't know what my
14  question is.  Are you aware of a subsequent
15  broker agreement between Renaissance Man
16  Food Services, LLC and DSM Sales &
17  Marketing, LLC?
18    A.   No.
19    Q.   So as you sit here today, you're
20  not aware of any written broker agreement
21  between Renaissance Man Food Services and
22  any DSM entity in which Simmons is also a
23  party, correct?

Page 408

1    A.   And I apologize for frustrating
2  you, that's certainly not my intent, but I'm
3  under oath, and so when you tell me a party
4  to, I don't understand that question.  And
5  maybe if you'll let me answer --
6    Q.   I'll make it simple for you.  The
7  opening paragraph of this document states
8  that it's an agreement between Renaissance
9  Man Food Services and Diversified Sales &
10  Marketing, do you see that, sir?
11    A.   I do.
12    Q.   I would say in my view that the
13  parties to this agreement then are
14  Renaissance Man Food Services and
15  Diversified Sales & Marketing, okay?  With
16  that being my understanding, are you aware
17  of any written agreements for brokers --
18  brokerage between Renaissance Man Food
19  Services and any DSM entity in which Simmons
20  is also a party or signatory?
21    A.   If party does not include the
22  processing, auditing and approval of
23  commission payments, then no, I'm not aware.

Page 409

1    Q.   Are you aware of any written
2  document that discusses the commissions to
3  be due to any DSM entity from Renaissance
4  Man Food Services to which Simmons is a
5  signatory or a party?
6    A.   I'm not aware.
7    Q.   All right.  Why, if you know, are
8  your two wrongful termination claims in your
9  third amended complaint pursued under
10  Arkansas rather than Alabama law?
11    A.   For the majority of the time, I
12  lived in Arkansas I suspect.
13    Q.   Any other reason?
14    A.   My employer was in Arkansas.
15    Q.   Any other reason?
16    A.   I was asked to relocate to
17  Arkansas.
18    Q.   Any other reason?
19    A.   Not that I recall.
20    Q.   You were a resident in the State
21  of Alabama at the time your employment with
22  Simmons ended, correct?
23    A.   Correct.

Page 410

1  Q.  Your wife similarly was a resident
2 of Alabama at the time your employment with
3 Simmons ended, correct?
4  **A.  Correct.**
5  Q.  You confirmed earlier today that
6 you had been a resident of Alabama
7 throughout all of 2017, correct?
8  **A.  If that's what I said, that's**
9 **correct.**
10  Q.  Well, do you agree with that
11 statement?
12  **A.  For all of 2017, I don't know if**
13 **that's correct.**
14  Q.  Did you reside in a state other
15 than Alabama in 2017?
16  **A.  For a period of time, I resided in**
17 **Arkansas.**
18  Q.  What months of 2017 did you reside
19 in Arkansas?  And I'm not talking about
20 visits or trips.
21  **A.  I don't know that it was months at**
22 **a time, but there were issues with our home**
23 **there, so we were there weeks at a time with**

Page 411

1 **respect to the home, that we were there**
2 **weeks at a time with our daughter from**
3 **moving her back and forth.  I don't know**
4 **that I would say it would be months.**
5  Q.  Okay.  Exhibit 60, which I'm
6 handing you, is an email or letter from
7 Randy Sanders, correct?
8
9 (Defendant's Exhibit 60 was marked for
10 identification and is attached to the
11 original transcript.)
12
13  **A.  Correct.**
14  Q.  And the document is dated January
15 14 of 2015, correct?
16  **A.  Correct.**
17  Q.  And in the email or letter,
18 Mr. Sanders is confirming the relocation of
19 your wife, Kym Staples, to Alabama, correct?
20  **A.  Correct.**
21  Q.  I'm going to show you a different
22 version now, sir, of an email that Mr. King
23 showed you yesterday, and I'm marking it as

Page 412

1 Exhibit 61.
2
3 (Defendant's Exhibit 61 was marked for
4 identification and is attached to the
5 original transcript.)
6
7  Q.  Do you recall Mr. King examining
8 you with respect to this document yesterday,
9 sir?
10  **A.  Yes.**
11  Q.  Okay.  I'm not quite sure I
12 understood your testimony on this point so
13 just bear with me, sir.  Why in January of
14 2016 were you asking Clint Sledge to quietly
15 find out how you could change your address
16 in the Simmons system without alarming
17 anyone?
18  **A.  I think I explained that**
19 **yesterday.**
20  Q.  Okay.  Well, I'm asking you the
21 question because I didn't understand your
22 answer.  So please explain to me why on
23 January 13th of 2016 you asked Clint Sledge

Page 413

1 to quietly find out how you could change
2 your address in the Simmons system without
3 alarming anyone.
4  **A.  As I recall, I was alerted by**
5 **someone at Simmons either in the payroll**
6 **department or in -- that if I used the**
7 **Alabama address, I would not be eligible for**
8 **Simmons benefits so that I needed to use an**
9 **Arkansas address to receive the Simmons**
10 **benefits.**
11      **Because I had been asking Herschel**
12 **and I had been asking Gary Murphy on several**
13 **occasions to provide benefits outside of**
14 **the State of Arkansas because they wanted to**
15 **continue to employee me.  They said they**
16 **could not do that because there was a lot**
17 **of -- they said it was costly, even though I**
18 **don't think it was.  And I knew that when**
19 **Charlie Weaver worked for Renaissance Man**
20 **and lived in Georgia, that he received**
21 **benefits, as I recall.  It was a concern of**
22 **Blaine Walker.**
23      **Anyway, it certainly wasn't hiding**

Page 414

1 anything from anyone. And I directed -- I
2 asked Clint if I could use his address to
3 maintain his Arkansas residency so as far as
4 Blue Cross-Blue Shield was concerned, I
5 could maintain my benefits.
6    Q.   Do you recall the identity of the
7 person in the payroll department who you
8 claim told --
9    A.   No.
10    Q.   Let me finish my question. Do you
11 recall the identity of the Simmons employee
12 in the payroll department who told you that
13 if you utilized an Alabama address that you
14 would no longer be eligible to receive
15 Simmons benefits?
16    A.   No.
17    Q.   If, as you say, you needed to have
18 an Arkansas address on file, why upon
19 learning that fact from the person in the
20 payroll department did you not just ask he
21 or she to change your address in the system
22 for you?
23    A.   I don't recall.

Page 415

1    Q.   Now, ultimately on the first page
2 of Exhibit 61, Mr. Sledge tells you that he
3 thinks that you can change your address
4 yourself online in the same place where you
5 change your beneficiary, correct?
6    A.   Uh-huh.
7    Q.   Do you recall you personally or
8 having Clint Sledge or anyone else change
9 your address in Simmons' system to
10 Mr. Sledge's address?
11    A.   I don't recall. It looks like I
12 said I don't know how.
13    Q.   Do you recall taking any further
14 steps after this email chain with Mr. Sledge
15 as it relates to you changing the address on
16 file in Simmons' system for you?
17    A.   I recall someone telling me it had
18 been handled. I don't remember who the
19 someone was.
20    Q.   You told me that St. Andrews Drive
21 address is your first address since you
22 moved to Tuscaloosa, correct?
23    A.   Yes.

Page 416

1    Q.   And from there, you moved to the
2 Rice Mine Road address here in Tuscaloosa,
3 correct?
4    A.   Yes.
5    Q.   And prior to moving to Tuscaloosa,
6 you were residing at the Ledge Drive address
7 in Springdale, Arkansas, correct?
8    A.   We moved so many times, I think
9 that's correct.
10    Q.   Did you at some point in time live
11 at 100 Post Meadows Drive in Rogers,
12 Arkansas?
13    A.   That's Clint's address.
14    Q.   Okay. Did you at some point
15 reside, Mr. Staples, at 100 Post Meadows
16 Drive in Rogers, Arkansas?
17    A.   Not for an extended period of
18 time.
19    Q.   What do you mean -- what's your
20 definition of an extended period of time?
21    A.   Months.
22    Q.   Do you know if the Simmons system
23 at any point in time ever reflected your

Page 417

1 address as 100 Post Meadows Drive, Rogers,
2 Arkansas?
3    A.   I think it did because that's
4 Clint's address.
5    Q.   After your employment with Simmons
6 ended, you filed an application for
7 unemployment insurance benefits, correct?
8    A.   Correct.
9    Q.   Do you recall the address that you
10 put down as the address of your residence on
11 that application?
12    A.   It's whatever the address is on my
13 Simmons Arkansas pay stub.
14    Q.   Do you know if that is the Post
15 Meadow --
16    A.   I don't know.
17    Q.   Hold on, hold on. Do you know if
18 that is the Post Meadows Drive address or
19 the Ledge Drive address?
20    A.   It may have been my daughter's
21 address. I don't know which one it was.
22    Q.   What is her address?
23    A.   Stone Manor, I think.

Page 418

1  Q.  In any event, whatever address you
2  put down on your application for
3  unemployment insurance benefits wasn't the
4  address that you were residing at at the
5  time you submitted the application, correct?
6  **A.  It wasn't my address of residency,**
7  **no.**
8  Q.  Now, in 2017, you filed a state
9  income tax return with the State of
10  Arkansas, correct?
11  **A.  Correct.**
12  Q.  You confirmed earlier that you had
13  moved and were residing in Alabama that
14  year, so my question is why did you file an
15  Arkansas income tax return as opposed to an
16  Alabama income tax return?
17  **A.  I suspect it was because there**
18  **were Arkansas taxes paid.  I didn't file.  I**
19  **have a very good CPA in Bentonville that's**
20  **filed my taxes for years.**
21  Q.  I assume you authorized the filing
22  of those documents, correct?
23  **A.  I would have signed the documents,**

Page 419

1  yes.
2  Q.  In that same year, your wife filed
3  an income tax return in the State of
4  Alabama, didn't she?
5  **A.  She was paying Alabama income**
6  **taxes.**
7  Q.  Why was she paying Alabama income
8  taxes and you paid Arkansas income taxes?
9  **A.  I guess because the company was**
10  **set up in Alabama.  I'm not a tax**
11  **accountant.**
12  Q.  What company?
13  **A.  I guess that would have been DSM3.**
14  **Maybe it would have been DSM2.**
15  Q.  Do you know why your consulting
16  fee from DSM was included on your Arkansas
17  tax return as opposed to being included on
18  an Alabama tax return like your wife's was
19  for her earnings from that company?
20  **A.  I do not.**
21  Q.  I'm going to hand you what I have
22  marked as Exhibit 62.
23

Page 420

1  (Defendant's Exhibit 62 was marked for
2  identification and is attached to the
3  original transcript.)
4
5  Q.  I would direct your attention to
6  the page that at the bottom says Staples
7  1722.  Let me know when you're there, sir.
8  **A.  Okay.**
9  Q.  Okay.  Page 1722 is the -- is an
10  excerpt from your 2017 Arkansas individual
11  income tax return, correct?
12  **A.  Correct.**
13  Q.  And it notes in the top left-hand
14  corner that this is the return for a full
15  year resident, correct?
16  **A.  Correct.**
17  Q.  You confirm you weren't a full
18  year resident in 2017 of Arkansas, correct?
19  **A.  Correct.**
20  Q.  It also notes close to the top of
21  the page that your mailing address was 100
22  Post Meadows Drive, Rogers, Arkansas,
23  correct?

Page 421

1  **A.  Correct.**
2  Q.  And you've confirmed for me that
3  you didn't reside there full time in 2017,
4  correct?
5  **A.  That's correct.**
6  Q.  Are you currently employed, sir?
7  **A.  I am.**
8  Q.  Where are you working?
9  **A.  Custom Craft Poultry.**
10  Q.  What's your position with Custom
11  Craft Poultry?
12  **A.  I think it's sales manager.**
13  Q.  When did you start working for
14  Custom Craft Poultry?
15  **A.  I believe it was February.**
16  Q.  2018?
17  **A.  Yes.**
18  Q.  What's your -- strike that.
19  Do you earn a salary from Custom
20  Craft Poultry?
21  **A.  Yes.**
22  Q.  What is your annual salary?
23  **A.  It's $7,000 a month.**

Page 422

1    Q.  So $84,000 a year?

2    **A.  Correct.**

3    Q.  Are you eligible to earn any other
4  compensation in connection with your
5  employment with Custom Craft Poultry?

6    **A.  I have an office allowance.  I**
7  **don't know if you call that to be**
8  **compensation.**

9    Q.  Do you work out of your home for
10  Custom Craft Poultry?

11    **A.  Yes.**

12    Q.  What is the office allowance given
13  to you?

14    **A.  A thousand a month.**

15    Q.  Can you use that for any purpose?

16    **A.  I can use it for my office.**

17    Q.  Do you receive any other
18  compensation from Custom Craft Poultry?

19    **A.  No.**

20    Q.  Are you eligible to earn any other
21  commissions or other forms of incentive
22  compensation, including bonuses, from Custom
23  Craft Poultry?

Page 423

1    **A.  They don't have that type of**
2  **program.**

3    Q.  Where is Custom Craft Poultry
4  headquartered?

5    **A.  Batesville, Arkansas.**

6    Q.  Who do you report to?

7    **A.  Randy Smith.**

8    Q.  Does anyone report to you?

9    **A.  No.**

10    Q.  What are your duties and
11  responsibilities as sales manager for Custom
12  Craft Poultry?

13    **A.  It's a small company and they**
14  **wanted -- they -- they are a further**
15  **processor of poultry products and only been**
16  **in operation two to three years and they**
17  **primarily co-pack for others.  They wanted**
18  **me to introduce them directly to the food**
19  **service marketplace.**

20    Q.  So what do you do on a day-to-day
21  basis for them?

22    **A.  I communicate with potential food**
23  **service distributor customers like UniPro,**

Page 424

1  **Sysco, PFG and Frosty Acres.**

2    Q.  Are you eligible to receive
3  benefits from Custom Craft Poultry?

4    **A.  I receive health insurance**
5  **benefits.**

6    Q.  Does that include medical, dental,
7  and vision?

8    **A.  Yes.**

9    Q.  Are you eligible to participate in
10  a 401(k) with Custom Craft Poultry?

11    **A.  No.**

12    Q.  No?

13    **A.  No.**

14    Q.  Just so the record is clear, are
15  you saying that you don't have the ability
16  at all to contribute to a 401(k) or just
17  that Custom Craft will not match any
18  contributions you make to that account?

19    **A.  I don't know that they have a**
20  **401(k).**

21    Q.  In any event, you haven't made any
22  contributions to such an account while
23  working there?

Page 425

1    **A.  Not with respect to Custom Craft**
2  **Poultry, no.**

3    Q.  Other than medical, dental, and
4  vision insurance, are you receiving any
5  other benefits from Custom Craft Poultry?

6    **A.  No.**

7    Q.  Is your wife currently employed?

8    **A.  No.**

9    Q.  Has she been employed at any point
10  since her employment with DSM3 ended?

11    **A.  She's -- we have an LLC that we're**
12  **trying to get off the ground, a sales and**
13  **marketing agency.**

14    Q.  What is it called?

15    **A.  It's actually my LLC.  It's Studie**
16  **Sales & Marketing.  Studie, S-t-u-d-i-e.**

17    Q.  What industry will that LLC aim to
18  service?

19    **A.  It's a food service sales and**
20  **marketing agency.  Well, not just food**
21  **service, retail.**

22    Q.  Will it be similar to the various
23  DSM entities that we've discussed the last

Page 426

1 two days?
2     A.  It's more similar to the
3 Renaissance Man brokerage than it is DSM.
4     Q.  Does that entity have any
5 employees?
6     A.  No.
7     Q.  Other than trying to get that LLC
8 off the ground, has your wife worked
9 anywhere since her employment with DSM3
10 ended?
11     A.  She, like Blare and I, appear on B
12 & A Food Sales.  B & A gets real
13 complicated.  B & A is basically a
14 conglomerate of independent brokers of which
15 I learned about in January.
16       A good friend of mine that worked
17 at Renaissance Man for a period of time,
18 Charlie Weaver, is part of the B & A deal,
19 which I didn't really understand.  But I
20 knew -- so anyway, I was aligned, if you
21 will, with B & A because they're a food
22 broker.  And what they do is they like to
23 align with independent, and they help the

Page 427

1 independents gain visibility.
2     Q.  Did you or your wife earn any
3 income from B & A?
4     A.  We earned commission through B & A
5 for a couple, three months.
6     Q.  What's your best estimate as to
7 the amount of commissions that you
8 personally earned from B & A?
9     A.  Commissions were paid to Studie
10 Sales & Marketing, and my best estimate is a
11 couple thousand dollars, maybe three
12 thousand dollars.  I don't recall.
13     Q.  You received unemployment
14 compensation benefits from the State of
15 Arkansas, correct?
16     A.  I did, one week, I think.
17     Q.  Do you recall the total amount of
18 benefits you received from the State of
19 Arkansas?
20     A.  It was in the neighborhood of
21 $400.
22     Q.  Did you stop receiving those
23 benefits because you obtained employment

Page 428

1 with Custom Craft Poultry?
2     A.  Yes.
3     Q.  Other than the money you've earned
4 from Custom Craft Poultry, the money you
5 received in the form of unemployment
6 benefits, and the money your LLC received
7 from B & A Food Sales, have you received any
8 income from any other sources?
9     A.  I've received retainers, monthly
10 retainers from a couple -- well, I
11 haven't -- I received a monthly retainer
12 from Pescanova Seafood.
13     Q.  In which months of 2018 did you
14 receive that retainer?
15     A.  It began -- I think this would be
16 the seventh month.
17     Q.  You're still receiving those
18 monthly retainers?
19     A.  Yes.
20     Q.  What are the amount of the
21 retainers?
22     A.  $2,500 a month.
23     Q.  Is there any expected duration in

Page 429

1 terms of how long you will continue to
2 receive that retainer?
3     A.  The expectation is that they
4 recently offered me a six-month extension.
5     Q.  Okay.  Did you accept that
6 extension?
7     A.  Yes.
8     Q.  You said seven months, so are you
9 recalling that you started --
10     A.  Well, I'm guessing the six months
11 was -- the first six months were month to
12 month.  But then after six months, they were
13 pleased with my performance so they offered
14 me not a month to month but a six month.
15     Q.  And has the amount of the monthly
16 retainer payments at all times been $2,500?
17     A.  Yes.
18     Q.  And will it continue to be $2,500
19 going forward for the next six months?
20     A.  It could be more than that if the
21 commissions exceed the $2,500.
22     Q.  Is that income being received by
23 the LLC that you identified for me earlier?

Page 430

1   A.   Yes.

2   Q.   Aside from your income from Custom
3   Craft Poultry, the money that your LLC has
4   received in the form of a monthly retainer,
5   the money that you or your LLC has received
6   from B & A Food Sales, and the money you
7   received as unemployment compensation, have
8   you received any other earnings since your
9   employment with Simmons ended?

10   A.   Well, if you count -- we have an
11   LLC for property on the Gulf Coast that we
12   rent out.

13   Q.   Did you have that before your
14   employment with Simmons ended?

15   A.   Yes.

16   Q.   Okay.  So other than those forms
17   that I identified, are there any other forms
18   of compensation you received since your
19   employment with Simmons ended?

20   A.   No.

21        I would like to take a break.

22   Q.   Sure.  That's fine.

23

Page 431

1        (Short recess.)

2

3   Q.   (BY MR. PARKER:)  Mr. Staples, are
4   you seeking mental anguish or emotional
5   distress damages from Simmons in connection
6   with your wrongful termination claims?

7   A.   I am.

8   Q.   I'll hand you a document that was
9   marked yesterday as Exhibit 2, which is
10   Plaintiff's Responses to Simmons' First Set
11   of Interrogatories and would ask you to just
12   please turn to Page 6 or to number 6, the
13   pages aren't --

14        MR. SIMMS:  Question number 6?

15        MR. PARKER:  Yes.

16   Q.   (BY MR. PARKER:)  Do you see that,
17   sir?

18   A.   I do.

19   Q.   Okay.  Now, at the time that these
20   interrogatories were served, which was in
21   July of 2018, you had not sought treatment
22   from any healthcare providers for medical,
23   psychological or mental health services,

Page 432

1   diagnosis, counseling or treatment, correct?

2   A.   That's correct.

3   Q.   Since you were served these
4   interrogatories in July of 2018, have you
5   visited any healthcare provider that has
6   provided medical, psychological or mental
7   health services, diagnosis, counseling or
8   treatment?

9   A.   I have not.

10   Q.   Your answer to question number 6
11   states that, in the last sentence, Mr. and
12   Ms. Staples continue to experience worry,
13   anxiety, and stress over their livelihood,
14   correct?

15   A.   That's correct.

16   Q.   Are there -- aside from those
17   symptoms of emotional distress listed in the
18   answer to that interrogatory, are there any
19   other symptoms that you have experienced
20   that you are attributing to your termination
21   from Simmons?

22   A.   In addition to worry, anxiety,
23   stress?

Page 433

1   Q.   Yes, sir.

2   A.   I guess the most serious symptom
3   is intense depression that I have never
4   received before.

5   Q.   Anything else, sir?

6   A.   That would be the most serious.
7   No, there's nothing else.

8   Q.   Have you formally by a healthcare
9   provider been diagnosed with depression
10   since your termination from Simmons?

11   A.   I haven't visited with a
12   healthcare provider since my termination.

13   Q.   So is the answer to my question
14   no?

15   A.   The answer to your question is no.

16   Q.   Have you been prescribed any
17   medication for depression since your
18   employment with Simmons ended?

19   A.   I've been taking over the counter
20   things that I've never taken before.

21   Q.   What?

22   A.   I couldn't tell you.

23   Q.   Are they pills?

Page 434

1    A.   Yes.
2    Q.   How often do you take them?
3    A.   Daily.
4    Q.   How many different pills do you
5  take daily for depression?
6    A.   It's not just pills.  It's oil.
7  My wife is the medical expert so she's
8  bought several things, and I take whatever
9  she recommends.
10   Q.   As you sit here today, can you
11  recall taking almost daily for depression
12  anything other than pills or oil?
13   A.   No.
14   Q.   And are you taking --
15   A.   There's a liquid, I don't really
16  know what the liquid is for, but it helps me
17  sleep.  Take it every night.
18   Q.   Are you taking any other
19  medication for any of the symptoms of mental
20  anguish or emotional distress that you
21  attribute to your termination from Simmons?
22   A.   I guess the prescription that I
23  take is for Imitrex, which is a migraine

Page 435

1  medication.
2    Q.   And that's prescribed to you?
3    A.   Yes.
4    Q.   When did you first begin taking
5  Imitrex?
6    A.   I first began taking it years ago
7  when I was at Tyson.
8    Q.   Have you been taking it since you
9  were initially prescribed it?
10   A.   Not as much as I have in the last
11  six or seven months.  I was actually
12  using -- there were pills left over from the
13  last prescription I obtained at the Simmons
14  Care Clinic.  I don't remember if that was
15  in 2016 or 2017.
16   Q.   How often do you take Imitrex?
17   A.   I would say maybe once a month.
18   Q.   And that's a pill?
19   A.   Uh-huh.
20   Q.   You testified yesterday I believe,
21  correct me if I'm wrong, that after your --
22  after you were advised on December 27th by
23  Herschel Walker that your services from Ren

Page 436

1  Man would no longer be needed that you
2  received a text message from David Jackson.
3  Do I have that right?
4    A.   No.
5    Q.   I do believe that you testified
6  yesterday at some point that you did receive
7  a text message at some point in December
8  2017 from David Jackson in which you said
9  Mr. Jackson violated confidentiality.  Am I
10  right about that?
11   A.   Yes.
12   Q.   And when as best as you can recall
13  in December did you receive that text
14  message from Mr. Jackson?
15   A.   I received it the day after the
16  meeting I had with him.
17   Q.   And do you still have a copy of
18  that text message?
19        MR. SIMMS:  I thought we produced
20  that.
21        MR. PARKER:  I haven't seen it.
22   A.   I believe I do.
23   Q.   (BY MR. PARKER:)  Okay.  As best

Page 437

1  as you can recall, what did Mr. Jackson say
2  in the text message?
3    A.   He admitted to telling Herschel
4  that he had met with me the day before.
5    Q.   Did he in his text message discuss
6  what, if anything, he had told to Herschel
7  about the meeting?
8    A.   He did.  He tried to wiggle out
9  and say he only discussed certain things.
10   Q.   So what leads you to believe in
11  that text message Mr. Jackson was
12  communicating to you that he had shared
13  information that you believe to be
14  confidential with Herschel Walker?
15   A.   Because the whole meeting was
16  supposed to be confidential.
17   Q.   And you just confirmed that he
18  told Mr. Walker that you had met with him,
19  correct?
20   A.   He confirmed in the text message.
21   Q.   Right, but did he share in the
22  text message specifically what information
23  he had related to Mr. Walker about your

Page 438

1 meeting with him?
2      A.  He said he shared certain things.
3 I don't remember what those things are.  I
4 only asked him after Herschel told me that
5 David -- Herschel asked me about my meeting
6 with Chip and David yesterday before I
7 reached out to Chip or David.
8      Q.  And is the confidential
9 information you're claiming Mr. Jackson
10 shared with Herschel Walker related to the
11 invoicing issue with respect to the waffles
12 and HWE that you testified about yesterday?
13      A.  Again, the whole meeting was
14 confidential.  And in terms of stress, other
15 than the loss of my father and my mother,
16 I've never had a stressful day like I had
17 the last two days.
18      David Jackson also told me in the
19 meeting on December 10th that I would not be
20 fired without cause in his office with Chip
21 Miller present because I did not want to
22 explain everything that I knew.  Because I
23 already knew after the same conversation I

Page 439

1 had with David Jackson privately from his
2 cell phone, from his home in October when he
3 answered the phone by saying, What's the
4 sense of urgency, has Herschel gone crazy
5 again?  And I said, Yes, he has.  Do you
6 have my back with what I'm about to tell
7 you?  John, you will not be fired without
8 cause.
9      Q.  So are you now for the first time
10 today testifying --
11      A.  For the first time today, yes, I
12 am.
13      Q.  Let me ask my question.  You are
14 now testifying for the first time today that
15 in October and December of 2017 David
16 Jackson told you that you would not be
17 terminated without cause?
18      A.  Yes.
19      Q.  Okay.  And are you alleging in
20 this lawsuit that you were terminated by
21 Simmons, at least in part, for telling
22 Simmons not to pay certain invoices related
23 to waffle products that had been invoiced by

Page 440

1 HWE?
2      A.  Not waffle products, waffle
3 materials used to sell those products.
4      Q.  Okay.  What I'm struggling with is
5 it seems to me that you're saying that you
6 told Simmons don't pay these invoices which
7 would mean you were essentially trying to
8 save Simmons money.  My confusion is why
9 would Simmons, in your view, terminate you
10 for having done that?  It doesn't make
11 sense.
12      A.  Simmons didn't terminate me.
13 Herschel did when he became aware that I
14 told Simmons not to pay the invoices.  And I
15 also told Simmons other things that had
16 started occurring recently that they had
17 asked me from day one to tell them.
18      Q.  So -- because now your testimony
19 is different than it was earlier.
20      A.  It's not.
21      Q.  It is.
22      MR. SIMMS:  I disagree, for the
23 record.

Page 441

1      MR. PARKER:  That's fine.
2      Q.  (BY MR. PARKER:)  Are you claiming
3 that Herschel Walker terminated you, that
4 Simmons terminated you or that both
5 terminated you?
6      A.  I'm claiming that Herschel Walker
7 tried to terminate me.
8      Q.  Okay.
9      A.  And at some point in time, Simmons
10 fired me without cause, which they had told
11 me on numerous occasions, of which you will
12 learn of additional occasions, so I'm
13 claiming that at some point in time, Simmons
14 allowed Herschel Walker I guess to terminate
15 me.
16      Q.  Now, if you spent, as you
17 testified earlier, about 80 to 90 percent of
18 your duties working for Ren Man and if the
19 owner of Ren Man decided he didn't need you
20 to perform services for that company
21 anymore, why, in your view, would Simmons
22 have had a need to keep you around to
23 continue your employment?

Page 442

1   A.   You seem to be a very intelligent
2 young man.
3   Q.   Thank you.
4   A.   But food service is complicated.
5 My employment with Simmons was to be their
6 food service director as if I was -- and I
7 was introduced as such in a meeting as late
8 as July of 2017 on an org chart that shows
9 me reporting directly to Chip Miller as the
10 director of food service for Simmons.
11      My position with Simmons from day
12 one was the director of food service.  They
13 hired me.  I was the only Renaissance Man
14 employee ever to have a Simmons email
15 address, even though virtually every other
16 Renaissance Man employee wanted one.
17      What I was asked to do is build
18 Renaissance Man to the point to which you
19 could build it no more, at which time we
20 would start building it beyond Renaissance
21 Man.  If you'll build the foundation, which
22 is exactly what I did, at some point in time
23 we'll start selling directly.  It was always

Page 443

1 their intention.
2      At the meeting in December on
3 December 10th, David Jackson told me, John,
4 I'm going to tell Herschel tomorrow that
5 Simmons has every intention of selling to
6 food service distributors directly.  And I
7 had been given every indication by Chip
8 Miller that I would be the person to do
9 that, to lead that effort, because, oh, by
10 the way, that was my title.
11      I was told as far as everyone else
12 in the building is concerned -- because of
13 the unique relationship that we have between
14 because Simmons and Renaissance Man, I was
15 told that as far as everyone else is
16 concerned, including Herschel, if Herschel
17 wants to believe that you work for him, then
18 let him believe that.  If Ron wants to
19 believe that you work for Herschel, let them
20 believe that.  But as far as David Jackson,
21 Todd Simmons, Chip Miller and later Matt
22 Free were concerned, I worked for Simmons.
23      MR. PARKER:  Objection.

Page 444

1 Nonresponsive.
2      MR. SIMMS:  Overruled.
3   Q.   (BY MR. PARKER:)  At the time of
4 your termination from Simmons, did you have
5 an office or a dedicated cube at Simmons'
6 office in Siloam Springs?
7   A.   When -- again, I don't recall -- I
8 guess Linda Ross, the Linda Ross
9 communication to me where she told me I was
10 terminated, no, I didn't have an office at
11 Simmons.
12   Q.   Okay.  How often would you visit
13 Simmons' office in Siloam Springs during the
14 last year of your employment with Simmons?
15   A.   About as much as any other outside
16 sales rep that they had.
17   Q.   Which is how often?
18   A.   Six, seven, eight, nine, ten times
19 a year.
20   Q.   Okay.  Did you receive any written
21 performance reviews or evaluations from
22 Simmons?
23   A.   The first few years I believe I

Page 445

1 did.  There was some peer-review process
2 that we went through, yes.
3   Q.   Do you recall who --
4   A.   No, I do not.
5   Q.   -- was your evaluator?
6      MR. SIMMS:  Try to let him get his
7 question out and then answer, okay?
8   Q.   Are you currently or have you at
9 any point in time since February of this
10 year sought employment with any entity other
11 than the poultry company in Batesville,
12 Arkansas that you told us about earlier?
13   A.   I sought employment with just
14 about anybody I thought may employee me.
15   Q.   Since you obtained employment with
16 the Batesville company?
17   A.   Yes.
18   Q.   Are you still continuing your job
19 search?
20   A.   Not as actively, no.
21   Q.   When did you stop searching as
22 actively for other employment?
23   A.   I don't remember the time.

Page 446

1    Q.  What, if anything, are you doing
2  currently to obtain other employment?
3    **A.  I'm not actively -- I don't know**
4  **how you define actively.  I joined up with**
5  **LinkedIn and they send me -- through that**
6  **you get jobs that you may have interest in,**
7  **and I'll click on them if it's an easy apply**
8  **thing because I'm not good with that whole**
9  **process, and if it looks like something I**
10  **may be interested in, I'll click on it and**
11  **send my resume.**
12    Q.  When is the last time you
13  submitted an application or resume for
14  employment?
15    **A.  It may have been last week or the**
16  **week before, I don't recall.**
17    Q.  Is there a reason why in your
18  interrogatory answers you didn't disclose
19  your employment with the poultry company in
20  Batesville or your affiliation with your
21  LLC?
22    **A.  There shouldn't be any reason.**
23    Q.  Okay.

Page 447

1    **A.  Is there a specific question so we**
2  **can amend that?**
3    Q.  Yeah.  Interrogatory Number 4, as
4  well as Interrogatory Number 5.
5      Do you know, and if you don't,
6  that's fine, why your damages expert in this
7  case does not list any of the earnings
8  you've received since your employment with
9  Simmons ended as interim earnings?
10    **A.  I really know nothing about that.**
11    Q.  Do you know if you supplied any
12  information about the earnings you've
13  received since your employment with Simmons
14  ended to your damages expert in this case,
15  Mr. Steve Richardson?
16    **A.  I believe he asked for several --**
17  **I don't know how many recent year tax**
18  **returns or whatever.  I don't know how many**
19  **years were supplied.**
20    Q.  Right.  But have you provided any
21  information to him about any wages or
22  earnings you've received since your
23  employment with Simmons ended?

Page 448

1    **A.  Not -- no.  I dropped the stuff**
2  **off with him and I haven't responded since.**
3  **I don't think it was in there.**
4    Q.  You don't believe it was in there?
5    **A.  I don't believe it was in there.**
6    Q.  What was your understanding as to
7  the business relationship between Simmons
8  and Renaissance Man during your employment
9  with Simmons?
10    **A.  According to Todd Simmons, it was**
11  **a profit share of partnership.**
12    Q.  Under that profit share of
13  partnership, is it correct that Mr. Walker
14  would receive 65 percent of all of the
15  profits on any of the items sold by
16  Renaissance Man?
17    **A.  After the first $200,000 dollars.**
18    Q.  Okay.  And would the first
19  $200,000, would that be on an annual basis
20  or a one-time basis?
21    **A.  It was my understanding it was**
22  **annual.**
23    Q.  Okay.  And then Simmons would

Page 449

1  receive the remaining 35 percent of the
2  profit after the $200,000 was met?
3    **A.  Yes.**
4    Q.  And did the profit sharing
5  agreement to your knowledge apply to all
6  products sold by Renaissance Man or just
7  those products sold by Renaissance Man that
8  were supplied by Simmons?
9    **A.  Well, again, I'm in the middle.**
10  **It depends on who you asked.  Ron and**
11  **Herschel were adamant that it only applied**
12  **to products that Simmons produced.  Todd**
13  **Simmons, David Jackson, Chip Miller were**
14  **adamant that it applied to every product**
15  **that Simmons touched, flowed through,**
16  **ordered, processed, whatever.**
17    Q.  Despite the parties' competing
18  opinions or interpretations, in practice,
19  from what you saw, how did the profit
20  sharing arrangement work between Simmons
21  and --
22    **A.  It worked as --**
23    Q.  -- Renaissance Man?

Page 450

1    A.   It's what led to Todd Simmons,
2 David Jackson basically telling me to ignore
3 what Herschel's saying.  It's a profit share
4 plan.  The fact that they've been operating
5 under these conditions for several years --
6 which is what David and Gary Murphy often
7 complained about because they wanted Todd to
8 lock down Herschel and Ron in a formalized
9 agreement which would have made it good for
10 all of us.
11       But I was repeatedly told that
12 they would go to Todd and Todd would just --
13 these are -- these are David Jackson's
14 words.  Todd is caught up in the celebrity
15 of Herschel, which I basically saw from day
16 one, so.  But it operated the way that I
17 understood Simmons to want it to operate.
18    Q.   So in practice, what you saw was
19 that regardless of who supplied the products
20 sold by Renaissance Man Food Services,
21 Renaissance Man kept 65 percent of the
22 profits and Simmons kept 35 percent of the
23 profits after $200,000 in profits had been

Page 451

1 generated?
2    A.   They shared the profit.  They also
3 shared the costs.
4    Q.   But is what I said correct?
5    A.   From a profit standpoint, yes.
6    Q.   And Simmons also received some
7 sort of a fee for providing the back office
8 support to Ren Man, correct?
9    A.   Correct.
10    Q.   What was your understanding as to
11 how that fee was determined or calculated?
12    A.   It was my understanding that it
13 was a penny and a half on outside purchases.
14    Q.   Penny and a half per what?
15    A.   Pound.
16    Q.   So for each pound that was sold on
17 products supplied by someone other than
18 Simmons, Renaissance Man was responsible for
19 paying Simmons a penny and a half for
20 providing back office support?
21    A.   That's my understanding, yes.
22    Q.   And was that -- your
23 understanding, was that the arrangement at

Page 452

1 the time your employment ended?
2    A.   I don't know what the -- I would
3 be brought in to -- any time there was a
4 question.  I don't know if it changed or
5 didn't change.  If it changed, nobody
6 notified me.
7       I remember -- one of the most
8 significant moments was when Simmons forgot
9 to charge the penny and a half for the
10 period of a year, year and a half.  And
11 because, again, I'm stuck in the middle, I
12 didn't feel like it was fair to charge
13 Renaissance Man the penny and a half for the
14 year, year and a half when they didn't
15 charge after the fact, and David Jackson
16 basically told me Herschel can stick it up
17 his whatever, we're going to collect the
18 hundred thousand dollars.  I said, Why don't
19 you call him because he's telling me he
20 doesn't think we ought to.  Now, whether
21 they called or not, I don't know.
22    Q.   You're referring to an email
23 exchange you produced in this case, correct?

Page 453

1    A.   I may be, but it was also a phone
2 conversation.
3    Q.   Okay.  If you would, on Exhibit 1,
4 please turn to Page 20.
5       MR. SIMMS:  Exhibit 1?
6       MR. PARKER:  Yes, from yesterday.
7       MR. SIMMS:  Oh, my bad.  I was
8 looking at the small stack and thinking 1?
9 What page?
10       MR. PARKER:  20, at the bottom,
11 and Page 21.
12    Q.   (BY MR. PARKER:)  Mr. Staples, are
13 you alleging in this lawsuit that Simmons
14 and Renaissance Man and HWE conspired to
15 harm you by terminating your employment with
16 Simmons?
17    A.   Is that not what it says in 61?
18 That's what it appears to say, so yes.
19    Q.   Okay.  And do you believe or are
20 you alleging in this lawsuit that Herschel
21 Walker told Simmons that it needed to
22 terminate your employment?
23    A.   Say that again.

Page 454

1    Q.  Are you alleging in this lawsuit
2  that Herschel Walker told Simmons that he
3  wanted it to terminate your employment?
4    **A.  I'm alleging that Simmons failed**
5  **to protect me from someone they knew to have**
6  **crazy behavior and they fired me without**
7  **cause.**
8    Q.  Okay.  And I understand that.
9  We've talked about that.  You have two
10  wrongful termination claims.  This is for
11  conspiracy, so I want to know if you are
12  alleging that Simmons was part of a
13  conspiracy with Herschel Walker and
14  Renaissance Man to terminate your employment
15  and that Simmons, based on an action or plan
16  with HWE and Renaissance Man, sought to do
17  so.  Is that your belief?
18    **A.  You know, Simmons -- and I know**
19  **you don't like me explaining this so you can**
20  **cut me off.  But when you talk about**
21  **Simmons, it's a great company, it's a big**
22  **company.**
23    **I'm alleging that David Jackson**

Page 455

1  **wanted out of the H. Walker agreement**
2  **because he couldn't stand Herschel Walker,**
3  **thought Herschel was crazy, could not**
4  **convince Todd Simmons to formalize an**
5  **agreement.  So I'm alleging that David**
6  **Jackson saw an opportunity to throw me under**
7  **the bus with Herschel so that Herschel would**
8  **fire me.  That's what I'm alleging.**
9    Q.  Okay.  If Herschel hadn't told you
10  that your services with Renaissance Man were
11  no longer needed, do you think Simmons still
12  would have fired you?
13    **A.  Do I think they would have?**
14    Q.  Yes.
15    **A.  I had no reason whatsoever to**
16  **believe they would have.**
17    Q.  Okay.  So it was -- it was
18  Mr. Walker's decision, his decision to no
19  longer retain your services for Renaissance
20  Man that you believe sparked or triggered
21  your termination from Simmons, correct?
22    **A.  I believe David Jackson and**
23  **Herschel Walker conspired against me.**

Page 456

1    Q.  But if Herschel hadn't said, I
2  don't need him working for me anymore --
3    **A.  I believe I would have led their**
4  **broadline distribution business, which they**
5  **told me on December 10th that they had every**
6  **intention of continuing by selling directly.**
7    Q.  Okay.  You cut me off, so let me
8  get my question back out there.  If Herschel
9  hadn't told Simmons that he did not need
10  your services any longer, it's your
11  testimony that you would have remained a
12  Simmons employee, correct?
13    **A.  That's my belief, yes.**
14    Q.  Okay.  And I assume in Paragraph
15  63 there, it's just an oversight where it
16  says Ms. Staples has suffered consequential
17  damages, that that's a --
18    MR. SIMMS:  Is there a question
19  pending?
20    MR. PARKER:  No.
21    MR. SIMMS:  So that question has
22  been stricken?
23    MR. PARKER:  Yes.

Page 457

1    I think I'm done.  Let me just
2  look through here, Keri.
3    MR. SIMMS:  All right.  Are you
4  going to have any more question, Mr. King?
5    MR. KING:  I don't know what
6  you're going to do.
7    MR. SIMMS:  Yeah, I'm going to ask
8  some question, but if you want to come back
9  after me, that's fine.
10    MR. KING:  That's the only
11  circumstances I'll have more.
12    MR. SIMMS:  I was going to give
13  you an opportunity to do it before I
14  started.
15    MR. PARKER:  I don't have any
16  further questions.  I'll pass the witness.
17    MR. SIMMS:  All right.  Can y'all
18  give me -- I didn't see in the stack, it's
19  the March 6th, 2009 offer letter.  Y'all
20  marked it as an exhibit.  It looks like
21  this.
22    MR. KING:  There it is.
23

Page 458

1 EXAMINATION BY MR. SIMMS:
2   Q.  Okay.  John, you gave testimony
3 yesterday from 9 a.m., I think we broke for
4 lunch for about 45 minutes, until about 5:30
5 or 6:00 yesterday; is that correct?
6   **A.  Yes.**
7   Q.  And you've given testimony since
8 nine o'clock today, and now it's five
9 minutes after 1; is that correct?
10   **A.  Yes.**
11   Q.  I want to ask you some questions
12 to clarify some things related to your
13 testimony that's been given so far.  If you
14 would, look at Exhibit Number 59 that
15 Mr. Parker showed you today.  Do you know
16 who at Simmons actually drafted this
17 particular document?
18   **A.  Specifically, no.  I assume it**
19 **came from Chip Miller.  I don't know.**
20   Q.  If you look at it down at the
21 bottom right above your signature -- that is
22 your signature, correct?
23   **A.  Uh-huh.**

Page 459

1   Q.  Is that a yes?
2   **A.  Yes.**
3   Q.  It says, Please return the signed
4 original to the corporate people services
5 director, do you see that?
6   **A.  Yes.**
7   Q.  And then on the second page, it
8 looks like Linda F. Ross is designated as
9 the corporate people services director, do
10 you see that?
11   **A.  Yes.**
12   Q.  Did you have any discussions with
13 Ms. Ross about the recruitment of you to
14 Simmons or anything that was said to you
15 during that process?
16   **A.  I had some discussions with Linda,**
17 **but I had more discussions with Steve**
18 **Gardner.**
19   Q.  Okay.  I'm talking about prior to
20 this document here.  Was Linda involved in
21 your recruitment I guess would be a proper
22 question?
23   **A.  No.**

Page 460

1   Q.  Let's go through this.
2   **A.  Okay.**
3   Q.  Provision number 1 says the
4 position of director of distribution
5 sales-food service, is that the title they
6 were giving you at Simmons?
7   **A.  Yes.**
8   Q.  It doesn't say GM of Ren Man, does
9 it?
10   **A.  No.**
11   Q.  Let's talk about this bonus
12 provision down here in Paragraph 3?
13   **A.  Let's do.**
14   Q.  Did you ever get a bonus --
15   **A.  I did not.**
16   Q.  -- pursuant to Paragraph 3?
17   **A.  I did not.**
18   Q.  So although this is contained in
19 the document, it was never carried out or
20 implemented?
21   **A.  No.**
22   Q.  And it says in here in paragraphs,
23 it says bonus should be based on five

Page 461

1 percent of Walker's net income, up to 50
2 percent of his salary when he moves to
3 Walker Foods.  Tell us about -- what does
4 moving to Walker Foods mean?
5   **A.  I have no idea.**
6   Q.  Did you ever become an employee of
7 Walker Foods?
8   **A.  I didn't know who Walker Foods**
9 **was.**
10   Q.  Were you told by anyone at Simmons
11 that clarified this provision that you were
12 going to be employed by Walker Foods?
13   **A.  No.**
14   Q.  Did you express concerns about
15 being employed by Walker Foods or by any
16 entity owned or operated by Mr. Walker?
17   **A.  On numerous occasions.  I also**
18 **expressed concerns to Chip and Herschel and**
19 **Ron that that was vague, that I did have a**
20 **bonus plan but that I was never paid bonus.**
21 **And I put together every possible bonus,**
22 **because it was my understanding I would get**
23 **paid bonus based on the Simmons salespeople**

Page 462

1 bonus because they had a bonus plan.
2    Q.   Did you ever get Simmons bonus
3 plan, did you ever get a bonus out of their
4 plan?
5    A.   Can I finish?
6    Q.   Sure.  Go ahead.
7    A.   When I was first employed by
8 Simmons, I went to the Simmons sales
9 meetings.  They had several meetings at the
10 corporate office in the auditorium and I was
11 invited as the director of distribution
12 sales.  I went to their sales meeting.
13 Every year they had a sales meeting and they
14 talked about the bonus plan.
15        So I asked Chip Miller, Am I
16 eligible for that bonus plan?  And Chip
17 would say, As far as I'm concerned, you are,
18 but I'm not in authority to do that.  So
19 then I would ask David or Gary Murphy even,
20 Gary, not as much and David, and they would
21 ask me to put together something that
22 Herschel and Ron would accept.
23        And I have numerous -- if and when

Page 463

1 I ever gain access to my emails of which
2 they've seen for 11 months of which I
3 haven't had access to.  I did send a lot of
4 emails, I kept a lot of documents, I kept a
5 lot of files.  I was very organized with
6 respect to that.
7        I can show you multiple, multiple
8 bonus scenarios.  I've been doing this a
9 long time.  You tell me how my bonus is
10 calculated.  And Herschel's response would
11 be, Gary Murphy says you don't -- you
12 haven't earned one.  Gary Murphy says you
13 don't qualify.  Really?  I'm a Simmons
14 employee.  The Simmons sales manager are
15 receiving bonuses.  The group I'm managing
16 is outperforming them in terms of sales
17 increases.  So no, I never received nothing.
18    Q.   So this provision here was never
19 implemented?
20    A.   No.
21    Q.   Okay.  And you were never moved to
22 Walker Foods?
23    A.   No.

Page 464

1    Q.   All right.
2    A.   I also never took 80 hours of
3 vacation.
4    Q.   All right.  What I want to talk
5 about now is all times after you signed this
6 document done on March 6th, 2009 when anyone
7 at Simmons, any other employee of Simmons,
8 made a statement to you that your
9 employment -- you would only be terminated
10 as a Simmons employee for cause, okay?  When
11 do you recall the first incident or event
12 occurring where that came up after March
13 6th, 2009?
14    A.   It was a day or two after the
15 first board meeting that I believe was held
16 in Ron's office with Mike Jones, David
17 Jackson, Todd Simmons, Herschel, and Ron
18 Eisenmann were present.
19    Q.   Now, is this a board meeting that
20 pertained to the Simmons/Renaissance Man
21 relationship?
22    A.   They had hired me as the -- you
23 know --

Page 465

1    Q.   Listen to my question.  Was the
2 board --
3    A.   Yes.
4    Q.   -- dealing with that relationship?
5    A.   Yes.
6    Q.   Were you present in the meeting or
7 the board meeting or were they -- were you
8 invited and left outside and called in when
9 you might be needed?  Did you participate in
10 the entire meeting is what I'm asking?
11    A.   That particular meeting I don't
12 recall.  Every other meeting I was told to
13 wait outside and then they'd call me in.
14    Q.   All right.
15    A.   Because neither side understood
16 the business.
17    Q.   Let's go back to this first board
18 meeting in Ron Eisenmann's law office in
19 Atlanta.  That's what you're talking about,
20 correct?
21    A.   Yes.
22    Q.   What transpired in that meeting
23 that led to anyone at Simmons, an employee

Page 466

1 of Simmons saying to John Staples, your
2 employment -- you will only be terminated at
3 Simmons for cause?
4      A.   It was after the meeting that
5 David Jackson told me that.
6      Q.   Was there something that occurred
7 in the meeting --
8      A.   Absolutely --
9      Q.   -- that brought that subject up?
10     A.   Absolutely.
11     Q.   You're doing me like you did these
12 other lawyers.  Let me ask my question and
13 then answer, okay?  It'll go a lot smoother
14 for everybody.
15         Tell us now what occurred that led
16 to the conversation between you and
17 Mr. Jackson where Mr. Jackson tells you that
18 your employment status at Simmons, you would
19 only be terminated for cause.
20     A.   I'll try not to get long-winded,
21 but it was my major concern about taking
22 this job.
23     Q.   What was that?

Page 467

1      A.   I had nine years history with
2 Herschel.  I liked him, but I was scared to
3 death of his activities.  I already knew
4 that Sysco corporate was on the verge of
5 ending the relationship.  I never would have
6 taken a job based solely on a relationship
7 with Herschel Walker or Renaissance Man.
8 Never.
9         So what led to this board meeting,
10 my first major assignment when I got to
11 Simmons is they asked me to work with Vicky
12 Goodman on a stack of double freight credits
13 that had been issued to Renaissance Man,
14 which -- and to my recollection, it was over
15 $300,000.
16         Vicky Goodman is the director of
17 customer service.  She's as good as it gets.
18 I spent several days with Vicky Goodman.
19 David Jackson is the one that gave me this
20 assignment.  Renaissance Man owes us over
21 $300,000.  Work with Vicky Goodman so that
22 your knowledge, your experience, you're
23 convinced.  If not, tell us.  I was

Page 468

1 convinced.
2         We had the board meeting.  They
3 asked me if I was involved in the process to
4 confirm.  I said absolutely.  I said,
5 Herschel, Renaissance Man owes this
6 $300,000.  Herschel got angry with me, first
7 time Herschel had ever been angry with me.
8 He said, John, you don't know what you're
9 talking about, you weren't here.  I said,
10 What does that have to do with whether I was
11 here or not?  I know this business,
12 broadline distribution.  You asked Vicky
13 Goodman who knows this particular area as
14 good as anybody I've ever worked with.  I
15 don't have to be here to know this is true.
16         David Jackson chimed in.
17 Herschel, you owe us this money.  No.  It
18 got heated.  Todd Simmons took the documents
19 and he did like this (indicating).
20     Q.   Todd Simmons --
21     A.   Todd Simmons took the documents
22 and said, David, we'll deal with this later.
23     Q.   What led to your discussion with

Page 469

1 Mr. --
2      A.   A few days --
3      Q.   Listen to my question.  What led
4 to your discussion with David Jackson about
5 the status of your employment with Simmons
6 subsequent to this event?
7      A.   A few days later, we got to the
8 Simmons office -- I got to the Simmons
9 office.  Davis rarely talked to me, but he
10 was upset with me for not standing up to
11 Herschel.  And he basically alluded to the
12 fact that this is always what happens, from
13 day one, the situation with Wayne Britt, the
14 situation here, the situation there, this is
15 what happens.
16     Q.   Did you and Mr. Jackson --
17     A.   I said, David, you got to be
18 kidding me.  I said, This is what I was
19 worried about, so David and I had a heated
20 discussion.  He said, John, you've got to
21 help us with these type situations.  You'll
22 not be fired without cause.  We're going to
23 protect you.

Page 470

1   Q.   Did anything come up about you
2 moving over to be an employee of Walker
3 Foods at that time?
4   **A.   I never became -- that was never**
5 **even --**
6   Q.   You worked at Simmons from 2009
7 through when you were terminated in December
8 2017?
9   **A.   Yeah, yeah.**
10   Q.   Never were moved over to Walker
11 Foods?
12   **A.   No.**
13   Q.   Was there another incident after
14 that one where the subject of your
15 employment status with Simmons came up?
16   **A.   I don't remember if the Brinker**
17 **incident or the Miranda Matthews**
18 **termination, I don't remember which was**
19 **first.**
20   Q.   Let's talk about the Brinker
21 incident.  I think you testified so far,
22 maybe yesterday, about that incident.  Do
23 you agree?

Page 471

1   **A.   I think I did.**
2   Q.   In brief form, tell us what came
3 out of that incident that brought up the
4 subject of your employment status with
5 Simmons.
6   **A.   Simmons did not want Herschel to**
7 **have the meeting with Brinker, because**
8 **according to them, and what I subsequently**
9 **learned, if either party had an arrangement**
10 **or a customer, they didn't want the other**
11 **party interfering, so you leave that**
12 **customer alone.  That's typical --**
13   Q.   I got you.
14   **A.   -- in brokerages or whatever.**
15 **I'll pay your brokerage here but I ain't**
16 **paying you over here.  So Brinker was a good**
17 **customer of Simmons.  So Herschel calls me,**
18 **you know, Georgie, this expert in diversity,**
19 **she knows the VP of diversity or whatever at**
20 **Brinker and they got us a meeting.  I said,**
21 **Well, Brinker is a good customer of Simmons.**
22 **We're going to the meeting.  I mean, that's**
23 **Herschel, you're going to the meeting.**

Page 472

1       So I went to Chip, Chip's like,
2 No, you're not going to the meeting.  I
3 said, Again, Chip, he wants me to go to the
4 meeting.  Are you going to call him and tell
5 him I'm not going to he meeting or are you
6 going to call him and tell him he's not
7 going to the meeting, is David going to go?
8 Nobody wanted to call him and tell him we're
9 not going to go to the meeting.
10       So I talked to Chip, I said Chip,
11 I'll control it.  I said, I'll control it.
12 I'll even jump in if I have to.  Only if we
13 send Matt Free.  So we go to the meeting.
14 Is this brief enough?
15   Q.   That's fine.  I want to know your
16 inquiry of anybody at Simmons about your
17 employment status and did they make any
18 statement to you about that status.
19   **A.   I wasn't adamant enough yesterday.**
20 **I was very concerned upon returning after**
21 **that meeting.**
22   Q.   About what, concerned about what?
23   **A.   When we got in the car, and I'm in**

Page 473

1 the back seat and they're taking me to the
2 airport, and Herschel said, John, you need
3 to understand you work for me.  Because I
4 tried to correct Georgie when she started
5 going down the road of saying Herschel owns
6 plants.  I said, Well no, he doesn't really
7 owns plant.  He corrects me by saying, Oh,
8 yes, I do, John, you don't know.  That was
9 always the -- even though I did know, I
10 didn't know.  You don't know, John, you
11 don't know.
12       And then Matt Free, the Simmons
13 guy, to his defense, he don't know what to
14 do.  And had I not been sitting across the
15 desk from the Brinker guy, because he's
16 fixing to unload on Herschel and Georgie
17 because he knows they don't own the plants,
18 and he knows they don't own the production
19 lines, and he knows that everything is fine
20 with Simmons, and I winked at him and he
21 winked at me back and the meeting ended.
22   Q.   Who did you discuss the status of
23 your employment with when you got back to

Page 474

1  Simmons?
2      A.  I went back to Simmons.  Matt Free
3  had already contacted -- Matt Free lived in
4  Dallas where Brinker is located, and Matt
5  Free didn't drive with us back to the
6  airport.
7      Q.  Let me stop you right there.  So
8  Matt Free is allowed to live in a different
9  state and work for Simmons?
10     A.  They have several salespeople that
11 live in different states that work for them.
12     Q.  All right.
13     A.  Most of them do.
14     Q.  While we're on that topic, your
15 employment relationship with Simmons, was it
16 in Arkansas?
17     A.  The relationship was, yes.
18     Q.  And when you got paid, Simmons was
19 always paying you from Arkansas?
20     A.  And they deposited it in an
21 Arkansas bank account.
22     Q.  And that was true from 2009
23 through 2017?

Page 475

1      A.  Through the end, yes.
2      Q.  Okay.  Who did you discuss your
3  employment status with at Simmons after this
4  Brinker incident?
5      A.  When I got back -- and it wasn't
6  until I got in the car with these guys that
7  I realized -- because Georgie got in the car
8  and she said how wonderful it was and we got
9  all this new opportunity, and I'm like,
10 there's no opportunity.  There's no
11 opportunity.  And then Herschel, John, you
12 need to understand, you're confused, you
13 work for me.  Why did you -- you don't know
14 what my relationship is with Simmons, when
15 actually I did.
16     Q.  Okay.  Let's get to the --
17     A.  So I'm concerned.  I'm concerned
18 he's going to throw me under the bus.  So
19 the next day, Chip Miller had already heard
20 from Matt Free about this meeting.  He
21 called me into his office.
22     Q.  What did Chip Miller say --
23     A.  Chip --

Page 476

1      Q.  Listen.  What did Chip Miller say
2  to you and what did you say to him?
3      A.  He didn't really have to say much
4  to me.  I said, Chip, Herschel's mad.  Chip
5  said, John, we're a company of our word.
6  You're not going to be fired without cause.
7  What happened?
8      Q.  Did you explain to him what
9  happened?
10     A.  Yes, I explained to him what
11 happened.  And then something else came
12 after that.
13     Q.  What?  What came after that?
14     A.  You've got to learn to keep
15 Herschel away from the customers.  But maybe
16 that's neither here nor there.
17     Q.  Was Mr. Miller your direct
18 supervisor?
19     A.  Yes, yes.
20     Q.  Is there an incident after the
21 Brinker incident that your employment status
22 came up again with Simmons?
23     A.  Yes, it's the one -- I don't know

Page 477

1  if -- he wouldn't let me expand.  But things
2  continued to happen, because, again, I was
3  the one that's supposed to keep him at bay.
4  You can't keep him at bay because he's not
5  going to listen to you.
6          And I would talk to his attorney
7  repeatedly.  You can look through every
8  phone call I made to Ron Eisenmann through
9  the nine years.  Virtually every one was to
10 tell Ron to keep Herschel at bay.
11     Q.  What did -- when was the next
12 incident that you spoke to anyone at
13 Simmons --
14     A.  When Miranda Matthews was fired, I
15 went in Chip Miller's office and I shut the
16 door.  I don't remember what was happening
17 but stuff was always happening, and I was
18 concerned about my job.
19     Q.  And what did Mr. Miller say to
20 you, if anything?
21     A.  And I was -- I didn't want to
22 divulge, I know he wouldn't tell me about
23 the particulars of another employee, but he

Page 478

1 knew what I was dancing.  He said, John, we
2 don't fire people without cause.  You won't
3 be fired without cause.  Miranda was fired
4 with cause.  Trust me.  She was fired with
5 cause.  I know you liked her, which I did.
6     Q.   Were there instances after that
7 that occurred where your employment status
8 would come up with Simmons?  And while I'm
9 on that, who is Mr. Steve Garner?
10    A.   Steve Gardner.
11    Q.   Who is Steve Gardner?
12    A.   He was senior vice-president of
13 human resources for Simmons or something
14 thereabout.
15    Q.   Did you ever have discussions with
16 him about your employment status at Simmons,
17 Steve Gardner?
18    A.   On a weekly basis.
19    Q.   When did he retire?
20    A.   I don't recall.  It was -- it
21 was -- I think he retired while I was still
22 working in the Simmons office, sometime '13,
23 '14, something like that.

Page 479

1     Q.   What would you discuss with the
2 vice-president of human resources Steve
3 Gardner concerning your employment status at
4 Simmons?
5     A.   Well, I guess when I came most
6 comfortable with discussing this type thing
7 with Steve is when -- he was the one that
8 had alerted to me that there was an article
9 in the poultry industry news publication.
10 And so Steve calls me in his office and
11 says, I understand you're our new director
12 of food service or whatever.  He says, Are
13 you aware of this?
14    Q.   This, the article?
15    A.   He shows me the article.  And he
16 says something to the effect of, This is
17 crazy.
18    Q.   What in the article was crazy?
19    A.   That Herschel Walker owned plants
20 in Siloam Springs, Arkansas and Fort Smith,
21 Arkansas and all these other places.
22    Q.   Was that true or untrue?
23    A.   It's untrue.

Page 480

1     Q.   And Mr. Gardner, who's the
2 vice-president of human resources, is
3 discussing this with you?
4     A.   Yes, and he's discussing it with
5 me because he's close friends with Mark,
6 he's close friends with Todd.  Steve tells
7 me that the Simmons family are good people.
8 Steve worked there for a long time.
9     Q.   Did Mr. Gardner say anything to
10 you about your employment status with
11 Simmons?
12    A.   Subsequent to that.
13    Q.   What did he say?
14    A.   Simmons would not fire me without
15 cause.  Simmons did not fire people without
16 cause.
17    Q.   How many times would you say --
18    A.   This is the SVP of human
19 resources.
20    Q.   How many times would you say Mr.
21 Gardner made that statement to you during
22 your course of employment at Simmons until
23 he retired?

Page 481

1     A.   I went to him repeatedly, I don't
2 want to estimate, but basically every time
3 something weird came up and I had -- the
4 message from Steve was that Mark needs to
5 know.
6     Q.   Mark Simmons?
7     A.   Yes.  We all owe it to Mark.  Mark
8 was embarrassed by the article.  I told Ron
9 Mark was embarrassed by the article.  I
10 said, Ron, Herschel is fixing to lose the
11 best thing that's ever happened to him.  I
12 understand.  I'm trying my best.  I'm doing
13 everything I can.  What makes you think he
14 listens to me?  I said, You're his attorney.
15 These were several conversations.
16    Q.   Okay.  Were your conversations
17 with Mr. Gardner, would you say it was more
18 than a hundred where he told you that you
19 would only be terminated at Simmons for
20 cause?
21    A.   I don't know that it was a
22 hundred.
23    Q.   Was it more than 50?

Page 482

1   A.   Somewhere between 25 and 50.
2   Q.   And this is -- are these
3 statements by Mr. Gardner occurring over a
4 period of time?
5   A.   Yes.
6   Q.   A number of years?
7   A.   Yes.
8   Q.   When -- go ahead.
9   A.   We had nicknames.  His nickname
10 for me was Billy Bob, and Steve would say
11 Billy Bob, I've told you repeatedly.
12   Q.   Told you what repeatedly?
13   A.   You're not going to get fired
14 without cause, that's not the type of
15 company we are.  This is the director of --
16 this is the top guy in the human resources
17 department.
18   Q.   When's the next incident, outside
19 of talking to Mr. Gardner and him making
20 those statements to you over a period of
21 years, that your employment status came up
22 from some incident involving the Renaissance
23 Man and Simmons relationship?

Page 483

1   A.   The most recent incident was on a
2 phone call with either David and/or Chip.
3 I'm wanting -- I'm wanting -- when -- I
4 don't get the timing right.  But not only
5 did Carmen Seale call me about this invoice,
6 before all that, before Carmen called me, as
7 I recollect, Dion Bennett asked Blaine
8 Walker, according to Blaine Walker, Why
9 haven't you given me the pricing, the
10 specifications, the information for the
11 retail waffles?
12   Q.   Then what happened?
13   A.   Blaine calls me.  Because Blaine
14 was with me in California when Julie had us
15 change the PO -- or she did it.  I didn't do
16 it.  Julie changed the PO from the one I set
17 up to Simmons orders the product from
18 HartyBake to someone in Savannah ordered the
19 product from HartyBake.  Blaine and I were
20 together.
21   Q.   What did Dion Bennett --
22   A.   I said, Let me tell you something,
23 don't you come near the retail waffles.

Page 484

1 We're not selling them if you're asked the
2 question.  So then a month or so later,
3 maybe less than a month or so later, he's
4 asked the question.
5   Q.   By Dion Bennett?
6   A.   By Dion Bennett.
7   Q.   What was Mr. Bennett inquiring
8 of --
9   A.   She had evidently heard that we
10 were selling retail waffles.  I don't know
11 how that came about.
12   Q.   Is she an employee of Simmons?
13   A.   Yes.  So he calls me and says, Has
14 anything changed?  I said, No.  Blaine's
15 concerned about losing his job.
16   Q.   Why is he concerned?
17   A.   Because he didn't want to turn on
18 Herschel.  He didn't want to turn on Julie.
19 They're all scared to death.
20   Q.   And didn't you get a call from Ms.
21 Carmen Seale?
22   A.   That was later.  After this went
23 down, I called Chip Miller.

Page 485

1   Q.   Okay.  What did you and Mr. Miller
2 discuss?
3   A.   I told Chip Miller what was going
4 on.
5   Q.   What did he say?
6   A.   I said, There's more, but you got
7 to protect me.
8   Q.   How did he respond?
9   A.   Haven't we always protected you?
10 We're not going to fire you without cause.
11 What's the more?  And then I told him about
12 the more.
13   Q.   Then what happens next?
14   A.   Nothing happens.  Carmen Seale
15 calls me.
16   Q.   What did Ms. Seale say?
17   A.   And you would have to ask her,
18 which hopefully I hope you do one day.  I
19 bet she was scared to death about losing her
20 job.  Because she didn't want to have
21 conversations with Herschel.  She didn't
22 want to have conversations with Carol,
23 because every time she did, they would push

Page 486

1 back. And this was the most recent
2 occasion.
3    Q. What did Ms. Seale say to you?
4    A. Are we in the retail waffle
5 business?
6    Q. How did you respond?
7    A. No, why do you ask?
8    Q. What did she say?
9    A. I got a bill for packaging or
10 displays or something. What am I supposed
11 to do with it? I said, Send it back to
12 Savannah.
13    Q. Is Savannah H. Walker Enterprises?
14    A. I don't know what it is. Yeah.
15 They have a Renaissance Man address too.
16    Q. Okay.
17    A. They share that address. It's a
18 Bill Richards State Farm insurance office.
19    Q. What came of your conversation
20 with Ms. Seale on that occasion?
21    A. She called me back about a week
22 later, and as I recall -- I don't remember
23 if I told her to sit on it and talk to

Page 487

1 David, I don't really remember, but there
2 was a subsequent conversation where I'm
3 following up to see if -- because I had
4 talked to Chip and David after talking to
5 her, and my plea to Chip and David was
6 basically you've got to help your employee,
7 she's scared to death that Herschel is going
8 to do what he did to me, you know, because
9 nobody stood up to Herschel. So she was
10 worried about the same things I was worried
11 about.
12    Q. What did Chip and David say to
13 you?
14    A. They said absolutely not. If it's
15 sold, if it's a cost outside of the business
16 relationship, we're not going to pay it, and
17 you should bring these things to our
18 attention. And you don't have to worry
19 about it. We got your back. They repeated
20 that.
21    Q. Did --
22    A. John, you need to keep telling us
23 everything. It's getting to be -- there's

Page 488

1 all types of stuff happening. The things I
2 said were going to happen, happened.
3    Q. Did they make any assurances to
4 you that you would only be terminated for
5 cause in those conversations?
6    A. Chip did again on the call before
7 I shared the other stuff, which would have
8 been before the Carmen call. I don't
9 remember if they did when I called them
10 after the Carmen calls.
11    Q. You saw some documents yesterday
12 where you specifically requested a phone
13 conference with David Jackson for October
14 23rd, 2017, do you recall that?
15    A. Yeah, that was a conference call
16 that involved different people.
17    Q. Were you initiating that, were you
18 requesting to have a conference call?
19    A. I think it was either Matt Free or
20 I.
21    Q. What were your concerns? Why were
22 you wanting to get a conference call with
23 the people involved?

Page 489

1    A. Because to my knowledge, Chip and
2 David hadn't had a conversation with Carmen.
3 I believe I received the bill again.
4    Q. What did you want to talk to Chip
5 and David about?
6    A. You asked me to tell you about
7 these things, you got -- you got an employee
8 that's still scared to death. You haven't
9 helped her out. I don't give a rat's behind
10 if you pay the waffle bills or not. I don't
11 care. I'm doing what you asked me to do,
12 she's doing what you asked her to do.
13       Now you got Matt Free in here.
14 Matt Free wanted to be on the call. Matt
15 Free knew nothing about the 65/35 percent
16 profit share arrangement. That's not
17 something you share with somebody at Matt
18 Free's level. Matt Free knew nothing about
19 65/35 until Herschel called and threatened
20 him that if you propose these price
21 increases on Renaissance Man, I'm not going
22 to pay 35 percent on any of the purchases.
23    Q. Did your employment status and not

Page 490

1  being terminated except for cause come up in
2  that conversation with Chip Miller and David
3  Jackson?
4      A.  In that conversation, I don't
5  recall if it did.
6      Q.  When did it come up again with
7  Chip Miller and David Jackson after that
8  date?
9      A.  It led off the meeting on December
10  10th.
11     Q.  What did they say --
12     A.  That was as concerned as I had
13  ever been.
14     Q.  What did Mr. Miller or Mr. Jackson
15  say to you about your employment status with
16  Simmons and them protecting you and you
17  being terminated for cause on that occasion,
18  December 10th?
19     A.  I was nervous.  David called me
20  into his office.  He wanted to start the
21  meeting without Chip there, because Chip was
22  on the phone or something.  I said, Let's
23  wait until Chip gets here.  Because Chip is

Page 491

1  the one that had told me and Chip's the one
2  I had the most trust in.
3      Q.  Chip was your immediate
4  supervisor?
5      A.  Yes.  He's also the one --
6  compared to David Jackson, I wanted someone
7  I thought I could trust in the room.
8      Q.  What did Mr. Jackson say to you
9  about your employment status on that
10  occasion?
11     A.  I said, Guys, I want to make sure
12  before I open my mouth that you have my
13  back, that you will protect me if Herschel
14  retaliates against me, that you will keep
15  this total conversation confidential.  I
16  want to make sure that I will not be fired
17  without cause.  Herschel is alleging to me
18  all of these things that I've done.  And
19  he's alleging that you, David Jackson, and
20  you, Chip Miller, and Simmons have these
21  concerns, and I want to make sure that you
22  agree these are not with cause because these
23  things have not happened.  I want to explain

Page 492

1  them to you because they're so crazy.
2      Q.  Did you go about explaining them
3  to them?
4      A.  I explained two or three, and I
5  get long-winded and David Jackson said,
6  John, we haven't said anything about any of
7  those things to Herschel Walker.  And no,
8  you're not going to get fired without cause,
9  and we don't consider any of the things
10  you're telling us to be cause.  Do you want
11  me to tell you some of the things I told
12  them?
13     Q.  I think you've already testified
14  about that yesterday.
15     A.  No, I haven't testified about
16  them.
17     Q.  Then testify about it.
18     A.  So at some point in -- at some
19  point in November, late November, early
20  December -- I'm sure when I get my emails I
21  can give you the exact date.  Herschel from
22  day one, because I was not a Simmons
23  employee, and because -- I mean, because I

Page 493

1  was not a Renaissance Man employee, I
2  submitted my expense reports with proper
3  documentation through the Simmons process.
4  Never had an expense report denied, had
5  questions asked if something looked
6  different, I would answer the questions, the
7  expense report would be paid.
8      But I learned -- sometime late
9  November, early December, I get a call from
10  Brook Fowler who's head of financials.  She
11  said, Herschel called me asking for expense
12  reports for all of the Ren Man employees.
13  You know, I don't do expense reports.  Is it
14  okay for me to -- to tell Vicky to send them
15  to him?  I said, Absolutely.  Nothing to
16  hide.  He wants a couple of months.  Okay.
17      The day before I had signed
18  Jennifer Dawson's expense report and sent it
19  in, so I was very familiar with this
20  situation.
21      There's a restaurant in Alma,
22  Arkansas that a buddy of mine owns and
23  operates, and he wanted to buy chicken from

Page 494

1  us for his pizza restaurant, but he couldn't
2  buy enough volume to force it into
3  distribution.
4         So I negotiated an arrangement to
5  have a Renaissance Man employee deliver the
6  chicken once or twice a month, built in
7  enough margin to cover the travel for the
8  employee to drive to the restaurant and
9  back, made everybody at Simmons aware.  He
10  went through all the credit process, so it
11  was a profitable relationship.
12        And so Jennifer Dawson had done
13  that the day before, the week before, so I
14  approved her expense report.
15     Q.  Then what happened?
16     A.  Herschel Walker calls Blaine.
17  Again, every time you call Blaine, he's
18  scared to death he's going to call me.
19  Didn't like Herschel because Herschel could
20  never pronounce his name right.
21        So anyway, Herschel Walker,
22  according to Blaine, Herschel calls Bane and
23  said, Bane, Simmons wants to know when we

Page 495

1  got in the pizza business.  Blaine didn't
2  know we were in the pizza business.  He
3  said, Herschel, we're not in the pizza
4  business as far as I know.  Oh, yes, we are.
5  Well, let me look into it.  I'll get back to
6  you, Herschel.
7         Blaine calls me.  I knew because I
8  had signed it.  I said, We're not in the
9  pizza business, Blaine.  I explained the
10  whole procedure to him.  He calls Herschel,
11  Herschel questions him.  Who's getting that,
12  who's getting that money?  Well, Blaine
13  didn't know, so it was all legitimate.  But
14  Herschel, you know, didn't trust anybody,
15  didn't trust anything.
16        So sub -- so those were one of the
17  things, because Herschel later asked me,
18  When did we get in the pizza business?
19  Well, I knew he had already talked to
20  Blaine.
21     Q.  Is that something you discussed
22  with Chip Miller?
23     A.  Yes, I said, This is one example

Page 496

1  of what's happening.
2     Q.  And how did they respond to you,
3  Mr. Miller or Mr. Jackson?
4     A.  We're going to get a written
5  agreement, we're going to button all this
6  up.  Thank you, John.  All these things, you
7  don't have to tell us any more, I get too
8  long-winded.  We know Herschel's crazy.
9  We're going to start our food service
10  distribution business, we're going to start
11  selling direct.  We're not going to throw
12  you under the bus.  You're not going to get
13  fired without cause.  Is there anything else
14  you'd like to tell us?
15     Q.  Did you have any more discussions
16  with Chip Miller or David Jackson between
17  December 10th and when you got terminated
18  about your employment status?
19     A.  Other than the text message that I
20  sent the next day to both of them.  There
21  may have been other text messages, phone
22  conversations.
23        I know that after the next day,

Page 497

1  Ron, I tried to reach out to him several
2  times on behalf of Kym on a couple of
3  occasions.  Ron told me he was busy with
4  other -- other clients and that he didn't
5  have time.
6         So basically after December 11th,
7  the day that Herschel and David Jackson met
8  in Ron Eisenmann's office, Ron Eisenmann was
9  noncommunicative with Kym or I, David
10  Jackson.  They basically just fell off a
11  cliff.
12     Q.  And then the next thing, you get
13  terminated on December 27th, 2017; is that
14  correct?
15     A.  Well, with respect with Kym, and I
16  was consultant with DSM3, a few days before
17  Christmas when Julie received -- or when Kym
18  received text messages from Julie telling
19  her to send her a check for over a year's
20  worth of expenses, and then told her to send
21  her a check in for the amount of over
22  $140,000, which basically would have drained
23  the DSM3 bank account, and Herschel is

Page 498

1 instructing me through Julie or maybe -- I
2 don't remember, but Herschel is basically
3 saying -- or I think Julie said, Oh, by the
4 way, Herschel thinks the DSM3 should pay the
5 Renaissance Man employees a bonus.  And this
6 is my wife asking me, This makes no sense.
7 We aren't going to have any money in the
8 account.
9        I didn't look at the DSM3 bank
10 account.  Even if I would have wanted to,
11 she ain't letting me.  I said, What do you
12 mean?  I tried to get ahold of Ron.  Ron,
13 the way this works is you don't pay out
14 bonuses, profit until the year ends.  You've
15 got expenses.  This makes no sense.
16        I never had the opportunity to say
17 that to Ron.  And it's one of the things
18 I'll take to my grave.  I told Kym to go
19 ahead and pay -- to pay -- to pay them, to
20 pay over $150,000 before the year ended.
21 Because Kym's attorney, of which she paid
22 bills for over a year --
23    Q.  Mr. Eisenmann?

Page 499

1    A.  Yes.  And even Kym, How can my
2 attorney not return my calls?  How can my
3 attorney not give me direction?  We haven't
4 heard from Ron Eisenmann since, other than
5 him drafting a letter to tell her to sell
6 her 50 percent ownership in her company for
7 10 dollars.  Anyway.
8        MR. SIMMS:  I think that's all
9 I've got.  I'm sure they've got some
10 questions.
11
12 RE-EXAMINATION BY MR. PARKER:
13    Q.  Do you contend, Mr. Staples, that
14 anyone from Simmons knew that you had moved
15 your primary residence from Arkansas to
16 Alabama, and if so, who?
17    A.  I contend that everybody that I
18 dealt with knew.
19    Q.  So it's your testimony that Chip
20 Miller knew prior to your termination that
21 you had moved your primary residence to
22 Alabama?
23    A.  Chip Miller wrote a letter --

Page 500

1    Q.  I'm just asking you, yes or no.
2 I'm trying to help your attorney out here.
3 Yes or no?
4    A.  Yes.
5    Q.  Do you contend that David Jackson
6 was aware of that fact?
7    A.  (No response.)
8    Q.  Yes or no?
9    A.  Yes.
10    Q.  Do you claim that Todd Simmons was
11 aware of that fact prior to your
12 termination?
13    A.  I don't know that Todd Simmons
14 was.
15    Q.  Do you claim that Mark Simmons was
16 aware of that fact prior to your
17 termination?
18    A.  I doubt he was.
19    Q.  Do you claim that Carmen Seale was
20 aware of that fact prior to your
21 termination?
22    A.  Yes.
23    Q.  Do you claim that Linda Ross was

Page 501

1 aware of that fact prior to your
2 termination?
3    A.  At any time prior to the
4 termination?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Do you claim Brook Fowler was
8 aware of that fact prior to your
9 termination?
10    A.  Yes.
11        MR. PARKER:  Okay.  No further
12 questions.
13        MR. KING:  No questions.
14
15        (Further Deponent Saith Not)
16
17        (Whereupon, deposition
18        concluded at 1:46 p.m.)
19
20
21
22
23

Page 502

```
1                    CERTIFICATE
2   STATE OF ALABAMA)
3   JEFFERSON COUNTY)
4
5        I hereby certify that the above and
6   foregoing deposition was taken down by me in
7   stenotype, and the questions and answers
8   thereto were transcribed by means of
9   computer-aided transcription, and that the
10  foregoing represents a true and correct
11  transcript of the testimony given by said
12  witness upon said hearing.
13       I further certify that I am neither of
14  counsel, nor kin to the parties to the
15  action, nor am I in anyway interested in the
16  result of said cause named in said caption.
17
18       Melanie L. Petix
19       MELANIE L. PETIX, CCR
20       License Number:  ACCR-412
21       My Commission expires 10/15/22
22
23
```