FILED

2019 Mar-04  PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A-1

```
                                                      Page 1
 1           IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ALABAMA
 2                     WESTERN DIVISION
 3   KIMBERLY and JOHN STAPLES,
 4          Plaintiffs,
 5   vs.                          No. 7:18-CV-00160-LSC
 6   H. WALKER ENTERPRISES, LLC; RENAISSANCE MAN FOOD SERVICES,
     LLC; and SIMMONS PREPARED FOODS, INC.,
 7
            Defendants.
 8
 9   _____
10              DEPOSITION OF DAVID JACKSON
             TAKEN ON BEHALF OF THE PLAINTIFFS
11       ON JANUARY 14, 2019, BEGINNING AT 8:51 A.M.
                 IN SILOAM SPRINGS, ARKANSAS
12             REPORTED BY KERRI PIANALTO, CCR
13                      APPEARANCES:
14   On behalf of the PLAINTIFFS
15          Mr. Keri Donald Simms
            WEBSTER HENRY LAW FIRM, P.C.
16          Two Perimeter Park South, Suite 445 East
            Birmingham, Alabama 35243
17          205-380-3480
            ksimms@websterhenry.com
18
19   On behalf of the DEFENDANT SIMMONS PREPARED FOODS, INC.
20          Mr. Talley R. Parker
            JACKSON LEWIS, LLP
21          500 North Akard, Suite 2500
            Dallas, Texas 75201
22          214-520-2400
            talley.parker@jacksonlewis.com
23
24
25
```

Page 2

1 On behalf of the DEFENDANTS H. WALKER ENTERPRISES, LLC AND
   RENAISSANCE MAN FOOD SERVICES, LLC
2
       Mr. Michael J. King
3   GREENBERG TRAURIG, LLP
     3333 Piedmont Road, NE, Suite 2500
4   Atlanta, Georgia 30305
     678-553-2410
5   kingm@gtlaw.com
6
   Also present:  Nelson Jackson, Herschel Walker, Julie
7 Blanchard, Kimberly Staples and John Staples
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2                        Page
3 Direct Examination by Mr. Simms        5
4
5              EXHIBITS
6 Number   Description            Page

7 Exhibit 1    Consent Resolutions of the Board of   9
8              Managers of Walker Foods, LLC
9 Exhibit 2    6/12/08 Offer Letter        13
10 Exhibit 3    2/20/09 Offer Letter        14
11 Exhibit 4    3/06/09 Offer Letter        18
12 Exhibit 5    3/09/09 Fax              19
13 Exhibit 6    Memorandum of Understanding     23
14 Exhibit 7    Performance Management       38
15 Exhibit 8    Personnel Action Form        44
16 Exhibit 9    Notice to Last Employer        56
17 Exhibit 10   12/19/16 E-mail          70
18 Exhibit 11   Phone Records           98
19 Exhibit 12   Phone Records           100
20 Exhibit 13   4/3/17 E-mail           101
21 Exhibit 14   Phone Records           103
22 Exhibit 15   4/3/17 E-mail           107
23 Exhibit 16   10/23/17 E-mail          115
24 Exhibit 17   10/24/17 E-mail          123
25

Page 4

1          EXHIBITS (Continued)
2 Exhibit   Description            Page

3 Exhibit 18   10/25/17 E-mail          135
4 Exhibit 19   January 2017 P&L          138
5 Exhibit 20   10/31/17 E-mail          154
6 Exhibit 21   11/27/17 E-mail          157
7 Exhibit 22   11/27/17 E-mail          158
8 Exhibit 23   10/31/17 E-mail          158
9 Exhibit 24   Waffle Advertisement        165
10 Exhibit 25   12/21/17 Memorandum        183

11
12          STIPULATIONS
13       It is stipulated that the deposition of DAVID
14 JACKSON may be taken pursuant to agreement and in
15 accordance with the Federal Rules of Civil Procedure on
16 January 14, 2019, before Kerri Pianalto, CCR.
17
18
19
20
21
22
23
24
25

Page 5

1 WHEREUPON,
2          DAVID JACKSON,
3 after having been first duly sworn, deposes and says in
4 reply to the questions propounded as follows, to-wit:
5       MR. PARKER:  Keri, before we begin, I just want
6 to note on the record we're doing the deposition pursuant
7 to the federal rules.  I do want to interpose objections
8 where necessary and then for the court reporter I do want
9 the witness to have an opportunity to read and sign the
10 transcript.
11       MR. KING:  Before we get started, if I could
12 just mention that it is somewhat difficult to hear down at
13 this end, if everybody could speak up.
14       THE WITNESS:  Okay.
15          DIRECT EXAMINATION
16 BY MR. SIMMS:
17   Q   Yeah, I was going to suggest that as well.  It
18 seems like the -- I don't want to be yelling at you, but I
19 may have to.
20   A   I'll try not to yell back.
21   Q   That's fine if you do.  We'll get through this.
22       Have you sworn him in yet?  You have?  Good.
23       Can you state your full name for the record,
24 please?
25   A   David Glenn Jackson, Jr.

Page 6

1    Q   What's your date of birth, Mr. Jackson?
2    A   August 7, 1968.
3    Q   Have you ever given a deposition on behalf of
4  Simmons before?
5    A   Yes.
6    Q   How many times?
7    A   Once.
8    Q   What type of case was that?
9    A   It was a cardboard price fixing case.
10   Q   Okay.  And just so I can be up to speed, does
11 Simmons have a parent company and then some companies that
12 are subsidiaries of the parent?
13   A   Yes.
14   Q   Okay.  Can you kind of break that down for me?
15   A   There is Simmons Foods, Inc., that would be the
16 parent company, and then under Simmons Foods there are
17 multiple entities.  Simmons Prepared Foods would be the
18 poultry entity that processes and produced, packaged and
19 sold the poultry goods to Renaissance Man Food Service,
20 then there are other multiple entities that do other
21 things.
22   Q   You're currently employed by Simmons Prepared
23 Foods; is that correct?
24   A   I have -- I was during this time.  I have moved
25 to a role under Simmons Foods currently.

Page 7

1    Q   Okay.  All right.  So let's go back.  I think --
2  and we're going to go through all this, but I think we're
3  going to be able to show that Mr. Staples went to work for
4  Simmons Prepared Foods in March of 2009?
5    A   That sounds correct.
6    Q   Up until sometime in December of 2017, correct?
7    A   That sounds correct.
8    Q   All right.  And it's my understanding that you
9  may have been employed by Simmons Prepared Foods back in
10 2009 during the time that Mr. Staples came on board and at
11 some point you may have left that particular entity and
12 went to another Simmons entity.  And if I could, I want
13 you to give me your history so I don't have to ask you a
14 bunch of unnecessary questions is what I'm trying to
15 avoid.
16   A   All right.  I started at Simmons in 1991.  I
17 spent approximately 20 years in the poultry side in
18 prepared foods, left poultry in -- I'm trying to remember
19 when it was, 2012, and then returned to poultry in 2016.
20 When I left poultry, I went to our pet food division.
21   Q   You're using the word poultry to mean Simmons
22 Prepared Foods, Inc.?
23   A   Yes, sir.
24   Q   All right.  So did you say from about 2012 to
25 2016 you were in the pet foods division?

Page 8

1    A   Yes, sir.
2    Q   Okay.  And did you come back to poultry or
3  Simmons Prepared Foods in December of 2016?
4    A   I started transitioning to prepared foods in
5  late September.  I replaced a gentleman who retired in
6  December.
7    Q   That was Gary Murphy?
8    A   Yes.
9    Q   What was Mr. Murphy's position in poultry?  Was
10 he president and COO?
11   A   In my earlier stint before I left for pet food,
12 I was president and COO of prepared foods, Gary was
13 president and COO of, I think technically it's Simmons
14 Poultry Farms and so we had -- we had the poultry division
15 split in half, he had gow out and slaughter international
16 sales, I had further processing, domestic sales and supply
17 chain, so there were two presidents of poultry.  We had
18 the company split in half.  When I left for pet food, Gary
19 assumed responsibility for all the poultry and I assumed
20 responsibility for pet food, both as president and COO.
21   Q   And then when you came back to poultry, was the
22 consolidation still in place?
23   A   Still in place, so I moved back and over all of
24 poultry.
25   Q   What involvement did you have in recruiting Mr.

Page 9

1  Staples to come to work at poultry?
2    A   I was -- I was responsible for that part of
3  poultry that would have -- that interacted with
4  Renaissance Man.  I had had -- had a conversation with
5  John, and John came to us through Herschel as someone that
6  he had confidence in to assume responsibilities for that
7  entity.
8    Q   What entity?
9    A   Renaissance Man Food Service and at the time
10 Walker Foods.
11   Q   Let me show you what's been marked as Simmons'
12 documents.
13       Do you happen to have a stapler?  I don't know
14 if that's going to make it through the day.  Well, look at
15 that.  I couldn't do that again in a million years.
16       All right.  Have you seen Exhibit 1 before?
17       (WHEREUPON, Exhibit 1 was marked for
18 identification.)
19   A   Yes, I have.
20   Q   What is that?
21   A   That was the resolution from -- the board
22 resolution from Walker Foods, LLC recognizing the
23 transition from Mike Rogers to John Staples.
24   Q   And at the third page of it, it's supposed to be
25 -- it looks like it's dated for some time in April 2009,

3 (Pages 6 - 9)

App. 008

Page 10

1 but it does not have a date inserted, does it?
2    A   It does not.
3    Q   Do you know when it was executed in April of
4 2009?
5    A   I do not.
6    Q   Did you sign off on it?
7    A   I did.
8    Q   And who is Mike Jones?
9    A   Mike Jones was the CFO of Simmons Foods at the
10 time.
11   Q   The parent company?
12   A   Yes.
13   Q   Was that document prepared by Mr. Walker's
14 attorneys in Atlanta?
15   A   I do not know who prepared that document.
16   Q   May I see it back, please?  If you could go to
17 paragraph, I think it's the third one from the bottom of
18 the second page that deals with some issues concerning
19 restructuring; is that correct?
20   A   Yes.
21   Q   What was being restructured?
22   A   We were asking John to come into Renaissance Man
23 Food Service/Walker Foods and reestablish the business
24 entity or the business operations.  We had terminated the
25 previous leader of that group, Mike Rogers, and were

Page 11

1 asking John to bring in his expertise, knowledge and get
2 the business back on the right track and he had some -- he
3 had -- we were waiting to get his feedback of how we
4 should be structured.
5    Q   And one of the restructures it references here
6 is sales force and compensation structures; is that
7 correct?
8    A   That's correct.
9        MR. PARKER:  Keri, do you have copies of the
10 exhibits you had planned to use today?
11       MR. SIMMS:  Pardon?
12       MR. PARKER:  Do you have copies --
13       MR. SIMMS:  Yeah.
14       MR. PARKER:  -- of the exhibits you plan to use
15 today?
16       MR. SIMMS:  Tons of them if you want to go
17 through that.
18       MR. PARKER:  Yeah, I suppose.  I suspect Mike's
19 going to want a copy too.  Thank you.
20       MR. SIMMS:  There's one.
21       MR. PARKER:  Okay.  Do you only have one copy?
22       MR. SIMMS:  Apparently.
23       MR. PARKER:  Mike?
24       MR. SIMMS:  I mean, they're your documents.
25       MR. PARKER:  I know, but I don't know what of

Page 12

1 the 3,000 pages that have been produced in this case you
2 decided to bring today.
3        MR. SIMMS:  It's a lot of work to bring -- I
4 thought I made double copies, but we'll see.  I thought I
5 made doubles.  One copy.
6        MR. PARKER:  Huh?
7        MR. SIMMS:  One copy.
8        MR. PARKER:  So when you get -- if you're going
9 to use one, give me a copy.
10       MR. SIMMS:  I'll give you a copy and you all can
11 look at it before I ask questions.
12       MR. PARKER:  Yeah.
13       MR. SIMMS:  How about that?
14       MR. PARKER:  That works.
15   Q   (BY MR. SIMMS)  Have you reviewed H. Walker
16 Enterprises or Renaissance Man responses to
17 interrogatories in this case?
18   A   Yes, I have.
19   Q   Do you recall that it's their position they had
20 no involvement in the hiring of Mr. Staples originally by
21 poultry in March of 2009?
22       MR. KING:  I object to the characterization of
23 the discovery responses, that's not what they say.
24   A   I do not recall that position.
25   Q   (BY MR. SIMMS)  You have seen Exhibit 2 before?

Page 13

1        (WHEREUPON, Exhibit 2 was marked for
2 identification.)
3    A   I have.
4    Q   Does that document reflect an offer of
5 employment with poultry to John Staples?
6    A   It does.
7    Q   And what's the date of it?
8    A   June 12, 2008.
9    Q   Was that offer accepted?
10   A   I don't recall if I saw a signed copy of this.
11 I don't recall if I've seen a signed copy of this specific
12 wording of this offer.  An offer was accepted.
13   Q   Did you have a role in the preparation of
14 Exhibit 2?
15   A   I recall an e-mail where I had approved this
16 offer to be extended.
17   Q   And who was doing the extending, was that
18 Mr. Miller?
19   A   Chip Miller.
20   Q   And what was his position with poultry at the
21 time?
22   A   Vice president of sales.
23   Q   You can keep that one out.
24       MR. PARKER:  Do you have a copy of that one,
25 Mike, just for the record -- or Keri rather?

4 (Pages 10 - 13)

Page 14

1  Q  (BY MR. SIMMS) I've got another copy somewhere.
2  Let me find it.
3      While I am looking for another copy, did
4  Mr. Walker have a role or involvement in the content of
5  that offer?
6  A  I know we agreed on the compensation for the
7  role because it was a -- it was compensation that was
8  going to be borne by Walker Foods, Renaissance Man,
9  however we had it structured.  The balance of the offer
10  was standard for Simmons Foods.
11      MR. PARKER:  Thank you.
12  Q  (BY MR. SIMMS) You are welcome.
13      Do you know why that offer was not accepted by
14  Mr. Staples?
15  A  I don't recall whether the offer was or was not
16  accepted by Mr. Staples.
17  Q  Do you recall when another offer was made to Mr.
18  Staples after that one?
19  A  It would have had to have been prior to
20  April 2009, but immediately prior to that.
21  Q  Let me show you Exhibit 3.
22      (WHEREUPON, Exhibit 3 was marked for
23  identification.)
24      MR. PARKER:  For the record, Exhibit 3 is an
25  offer letter to Mr. Staples not on letterhead dated

Page 15

1  February 20th, 2009.
2  A  Okay.
3  Q  (BY MR. SIMMS) Is that the second offer made to
4  Mr. Staples?
5  A  It is.
6  Q  Any differences between that offer and the first
7  offer?
8  A  The employment date, compensation is $20,000 a
9  year greater, a one time car allowance, relocation expense
10  is in addition.  Okay.
11  Q  Why was the -- those items added the second go
12  around?
13  A  They were John's request in the negotiation of
14  employment.
15  Q  Who on behalf of poultry was in communications
16  with Mr. Staples about these offers?
17  A  I believe Chip Miller was communicating directly
18  with John.
19  Q  Has Mr. Miller indicated any discussions between
20  him and Mr. Staples during that period of time concerning
21  Mr. Staples' concerns about being employed by H. Walker
22  Foods or Renaissance Man Foods or H. Walker Enterprises?
23  A  We have discussed Chip's recollection and I was
24  in discussion with John as well during that time.
25  Q  Was that subject discussed?

Page 16

1  A  He requested that he work for Simmons Foods so
2  that he could obtain or keep the benefits that were
3  offered through Simmons Foods that were not available
4  through Walker Foods or Renaissance Man.
5  Q  Did Mr. Staples also discuss his concerns about
6  being employed by Walker Foods or Walker Enterprises or
7  Renaissance Man?
8  A  He was concerned about the lack of benefits and
9  the entity at the time was very small and so he wanted to
10  be employed by a larger organization to help get that
11  entity up and running.
12  Q  Did he express any concerns that he had about
13  his dealings with H. Walker Enterprises or Renaissance Man
14  Foods while employed by either Smithfield or Tyson?
15  A  Not concerns.  He shared that he had dealt with
16  those entities, but he was coming in as the manager of
17  that, of that enterprise.  So, no, he did not express to
18  me concerns of them being a going concern or that he did
19  not want to work for them.
20  Q  And you have talked to Mr. Miller and did
21  Mr. Miller indicate he had a recollection of Mr. Staples
22  expressing concerns about being employed by those
23  entities?
24  A  Mr. Miller recalled that John wanted to be
25  employed by Simmons to obtain benefits, health insurance,

Page 17

1  401(k), other benefits that we offered as an entity,
2  Simmons offered as an entity that was not available under
3  Walker Foods and Renaissance Man.
4  Q  Did the Walker Foods, LLC entity even enter into
5  discussions with Mr. Staples?
6  A  At the time, yes, because Walker Foods, LLC was
7  a vehicle that we were selling -- that poultry was being
8  sold through that Mr. Staples would manage.
9  Q  But he never did manage through that entity, did
10  he?
11  A  As we made the transition to bring John on, I
12  think John's recommendation was to close Walker Foods
13  because we had too many entities and too little business
14  and it was confusing the customer base, as I recall.
15  Q  Do you know when Walker Foods, LLC was closed?
16  A  I don't recall the date that it -- that the
17  entity was dissolved, but in the transition when John came
18  on we stopped using Walker Foods as a sales vehicle.  So
19  it could have existed for a while as an empty corporation
20  -- or an empty LLC.
21  Q  What was the next sales vehicle besides Walker
22  Foods if it was stopped being used?
23  A  Renaissance Man Food Service.
24  Q  Exhibit 4 is Simmons document 80.  You have seen
25  that document before?

Page 18

1    (WHEREUPON, Exhibit 4 was marked for
2 identification.)
3    A   Yes.
4    Q   What involvement did you have in preparing this
5 particular document?
6    A   I approved the final offer.
7    Q   And was this being put together by Mr. Miller,
8 Mr. Chip Miller?
9    A   Yes.
10    Q   Is his full name Donald L. Miller, Jr.?
11    A   Yes.
12    Q   If I refer to him as Chip Miller, you'll know
13 who I'm talking about?
14    A   Yes.
15    Q   In comparing this March 6, 2009 offer to the
16 other two offers, there are differences, correct?
17    A   Yes.
18    Q   And what's the difference between the March 6,
19 '09 offer and was it February, February the 20th, '09?
20    A   Yes.
21    Q   What's the differences?
22    A   The start date, the bonus is now a sign on bonus
23 and not a car allowance, the bonus is -- it contemplates a
24 five percent bonus of Walker -- Walker's net income and
25 Simmons agreed to pay for relocation.

Page 19

1    Q   The bonus structure that was being offered in
2 the two prior offers pertain to the poultry, Simmons
3 Poultry, was it a profit sharing plan?
4    A   Yes.
5    Q   And then that changed concerning the March 6,
6 2009 offer, correct?
7    A   That's correct.
8    Q   And the March 6, 2009 offer, was it accepted by
9 Mr. Staples?
10    A   It is signed by Mr. Staples.
11    Q   And do you know if he faxed it back in or how
12 poultry received it?
13    A   There is a fax number on the top of this, but I
14 do not know how it was sent back to poultry.
15    Q   All right.  Look at 79.  We'll make that, I
16 guess, Exhibit 5.
17    (WHEREUPON, Exhibit 5 was marked for
18 identification.)
19    A   Okay.
20    Q   Was the position that Mr. Staples was being
21 offered by poultry in all three of the offers director of
22 distribution sales food service?
23    A   That is the position within Simmons, yes.
24    Q   All right.  Why was there a change about the
25 bonus from participation in the Simmons or the poultry

Page 20

1 profit sharing bonus to Mr. Staples' bonus being based on
2 five percent of Walker's net income up to 50 percent of
3 Mr. Staples salary when he moved to Walker Foods?
4    A   Mr. Staples was not -- in the role he would
5 have, he would not have any direct responsibilities for
6 Simmons.  We were hiring him and then contracting him to
7 Walker Foods/Renaissance Man and so the bonus would
8 transition to bonus based on the work that he was
9 responsible for and that Walker Foods was the vehicle we
10 contemplated at the offer time.
11    Q   From March 6, 2009 until the end of
12 December 2017, was Mr. Staples -- did he ever get paid a
13 bonus pursuant to this promise contained in this
14 communication?
15    A   I have seen some documents where there were
16 other arrangements between Mr. Staples and Mr. Walker and
17 Mr. Eisenman where John's compensation was taken care of,
18 bonus compensation was taken care of through Renaissance
19 Man and that was negotiated outside of the arrangement
20 with Simmons.
21    Q   Mr. Staples did not go -- did not move to Walker
22 Foods, he did not manage Walker Foods, LLC, did he?
23    A   He did not.
24    Q   And according to the resolution, the issue of
25 compensation was going to be addressed further down the

Page 21

1 road after March 6, 2009, correct?
2    A   It was to be resolved in April or after April,
3 yes.
4    Q   So this contract of employment was modified
5 after it was accepted, correct?
6    MR. PARKER:  Objection, question calls for a
7 legal conclusion.
8    A   I'm not a lawyer, so I don't know the
9 definition.
10    Q   (BY MR. SIMMS)  Well, did the bonus provision of
11 paragraph three of the March 6, 2009 agreement ever take
12 place?
13    A   No, it did not.
14    Q   It was changed?
15    A   It was changed.
16    Q   Okay.  So this agreement was modified?
17    A   Okay.
18    Q   Do you agree with that?
19    A   I would agree in layman's terms --
20    Q   All right.
21    A   -- that there's no other legal definition of
22 modified.
23    Q   It was changed, the bonus never came to be
24 applied as set out in the agreement, correct?
25    A   That is correct.

Page 22

1    Q   All right.  When was it that -- let me just make
2  sure because I want to get to the chase.  The parent
3  company was not involved in agreements with Walker Foods,
4  LLC or H. Walker Enterprises, LLC or Renaissance Man, it
5  was always the poultry entity?
6    A   Simmons Prepared Foods.
7    Q   Is that correct?
8    A   That's correct.
9    Q   All right.  So I'm going to try to just talk
10  about poultry.  Me and you will know what we're talking
11  about, correct, if I use -- if I say poultry?
12    A   Yes, poultry works.
13    Q   You know I'm talking about Simmons Prepared
14  Foods, Inc.?
15    A   Yes.
16    Q   Okay.  When did poultry enter into a
17  relationship with some entity other than H. Walker Foods
18  after March 6, 2009?
19    A   We had an ongoing relationship with Renaissance
20  Man Food Service and for an extended period of time after
21  John transitioned, we worked through the constructs of a
22  new agreement between Simmons Prepared Foods and
23  Renaissance Man, H. Walker Foods.
24    Q   You have reviewed the documents that poultry
25  produced in this lawsuit, correct?

Page 23

1    A   Many of them.
2    Q   Okay.  And you have seen the agreement?
3    MR. PARKER:  What agreement?
4    Q   (BY MR. SIMMS)  The agreement he's talking
5  about, the new agreement, correct?
6    A   I've reviewed --
7    Q   I am going to show it to you.
8    A   I've reviewed versions of the agreement that was
9  contemplated between Simmons and H. Walker Foods.
10    Q   How many versions were there?
11    A   It was -- we sent versions back and forth over a
12  year period of time.
13    Q   Were those documents always drafted by
14  Mr. Walker's attorneys in Atlanta?
15    A   If it were -- if there were a change on Simmons
16  Prepared Foods' behalf, I would or our Simmons attorney
17  would make those changes and I would send those to
18  Mr. Walker and Mr. Eisenman.  And I'm not certain who
19  would make those changes or how they would come back, but
20  I would get an e-mail from Mr. Eisenman copying Mr. Walker
21  on a return.
22    Q   Exhibit 6 is quite a few pages.  It goes Simmons
23  244 through 257.  Take a moment and review over that and
24  then I'm going to ask you some questions about it.
25    (WHEREUPON, Exhibit 6 was marked for

Page 24

1  identification.)
2    A   Okay.  Okay.
3    Q   All right.  Looking at page 244, which is the
4  number down at the bottom?
5    A   Yes.
6    Q   If you come over to the left-hand side right
7  above the confidential word, there are some numbers there
8  and then there's a V and a four?
9    A   Yes.
10    Q   Do you know if that's the law firm that prepared
11  its way of managing documents by using those letters or
12  numerals?
13    A   I have seen that on documents coming from
14  Mr. Eisenman.  I'm not aware of the coding of how that
15  applies.
16    Q   The V4, do you know if that means version four
17  or do you know one way or the other?
18    A   I can make assumptions, but I don't know for a
19  fact.
20    Q   Is this document -- this document was never
21  actually executed, was it?  When I use the word executed,
22  I mean signed by either poultry or H. Walker Enterprises
23  or Renaissance Man or Walker Foods, LLC?
24    A   It was never executed by both parties.
25    Q   All right.  Why not?

Page 25

1    A   I think we had gone back and forth, Herschel and
2  myself had gone back and forth on negotiating this and as
3  I recall, I had sent a signed copy to Ron, Ron Eisenman
4  and Herschel.  I had not received a signed copy back.  As
5  the person responsible from a Simmons' perspective, it was
6  not a major importance to me because we were operating
7  under the constructs of this agreement and the business
8  operated fine without a signed agreement and we had mutual
9  dependency on each other to do the things that we needed
10  to do, sell through the channels that H. Walker -- or that
11  Renaissance Man was selling and so there really wasn't a
12  need for a signed agreement.
13    Q   And to your knowledge or poultry's knowledge,
14  was that true up until the end of 2017?
15    A   Yes.
16    Q   Because you started demanding a written
17  agreement, didn't you?
18    A   I asked for an update to the agreement and that
19  we should get a signed agreement, yes.
20    Q   What changed?  And what I mean by it is you
21  operated these years without a written agreement and then
22  towards the end of 2017 you wanted a written agreement.
23    A   What changed was feedback from our sales
24  representative, Matt Free, and feedback from Mr. Staples
25  that there was a belief that without a signed agreement

Page 26

1 that anything could be changed at will.  And up until
2 those incidences, I was operating under the belief and the
3 action that even though it wasn't signed, that was how we
4 were behaving and so that is how we would govern the
5 business entity.
6    Q   Looking at 244, the first page, it appears to me
7 in the preamble there, it says that the agreement will be
8 effective as of and it's got a blank 2010?
9    A   Correct.
10    Q   And it indicates that it's going to be an
11 agreement between Walker Enterprises, LLC and Simmons
12 Prepared Foods, which is poultry, correct?
13    A   Correct.
14    Q   And I want to say that Simmons or poultry's
15 position in answers to interrogatories is it never had a
16 relationship with H. Walker Enterprises, LLC.  Do you
17 recall that?
18    A   I do recall -- well, I don't recall that
19 specific answer in the interrogatory.  Yes.
20    Q   This agreement was with H. Walker Enterprises,
21 wasn't it?
22    A   It was never executed.
23    Q   But it was -- the terms of it, the provisions of
24 it were through the course of conduct carried out or put
25 into place; is that correct?

Page 27

1    A   It was, yes.
2    Q   Now, how did poultry -- well, let me back up.
3       Will you agree with me that Mr. Staples never
4 worked for Walker Foods, LLC?
5    A   I don't have the financial records of the very
6 beginning of Mr. Staples' employment.  I'm not sure which
7 entity reimbursed Simmons Foods for his expenses, so I
8 don't know that I can agree with you.
9    Q   Do you know if he ever managed a relationship
10 between poultry and Walker Foods, LLC?
11    A   Walker Foods, LLC was in existence at the time
12 of the transition.  We had some Walker Foods packaging and
13 products in market and I recall it being Mr. Staples'
14 recommendation to consolidate that under Renaissance Man
15 Food Service so there would have been -- so one name to
16 the customer base, so there would have been a time period
17 where Mr. Staples did manage products sold by Walker
18 Foods.  It could have been very short.
19    Q   Do you know if it had ended by the beginning of
20 2010?
21    A   I do not recall the exact date that we stopped
22 selling product through Walker Foods.
23    Q   As of the time of this document, 244, I'll just
24 refer to it as -- what exhibit --
25       MR. PARKER:  You marked it as Exhibit 6.

Page 28

1    Q   (BY MR. SIMMS)  Six.  Did poultry have knowledge
2 that H. Walker, LLC owned 100 percent of Renaissance Man
3 Food Services?
4    A   Yes.
5    Q   And did poultry have knowledge that H. Walker
6 Enterprises was the parent company of Renaissance Man Food
7 Services?
8    A   Yes.
9    Q   All right.  On page 245, which is page two,
10 there appears to be -- well, let me back up.  At the time
11 that Mr. Staples was going to -- was Mr. Staples going to
12 manage the Renaissance Man Food Services?
13    A   Yes.
14    Q   Okay.  He may have managed part of Walker Foods,
15 LLC for a period of time, but then sometime in 2010 up
16 until 2017 he managed Renaissance Man Food Services?
17    A   He was the general manager of Renaissance Man
18 Food Service.
19    Q   Okay.  Still employed as director of sales for
20 food service by Simmons or poultry, correct?
21    A   That is correct.
22    Q   Okay.  With respect to Mr. Staples managing the
23 relationship between poultry and Renaissance Man Food
24 Services or H. Walker Enterprises, what document was he
25 provided that explained the relationship for him to

Page 29

1 manage?
2    A   Mr. Staples managed the day-to-day activity of
3 Renaissance Man Food Service, the sales activity, the
4 interaction with Renaissance Man Food Service's customer
5 base, the expenses, the brokerage agreements, all of the
6 activity of that as a standalone entity, that was his own
7 function.
8    Q   If a conflict developed between poultry and H.
9 Walker or Renaissance Man Food Services, was there a
10 document that Mr. Staples could consult to assist him in
11 resolving the conflict?
12    A   What kind of conflict would you be talking
13 about?
14    Q   Well, the agreement goes in pretty good detail
15 about the relationship, right?
16    A   About the structure, yes.
17    Q   Okay.  And on page two, the agreement addresses
18 the structure beginning in paragraph B, correct?
19    A   Correct.
20    Q   All right.  And it looks like to me that certain
21 food products that were being sold that were not within
22 the relationship were handled one way and then food
23 products that were produced within the relationship were
24 handled another way.  Do you agree with me?
25       MR. KING:  I'm going to make a blanket objection

8 (Pages 26 - 29)
App. 013
Freedom Court Reporting
877-373-3660
A Veritext Company
205-397-2397

Page 30

1 since I'm not being provided copies of the documents, I
2 have no way of knowing what you're talking about. So I'm
3 going to ask that you give me a standing objection to the
4 characterizations you're making of the agreements unless
5 you provide me copies.
6      MR. SIMMS: Did you not bring your copies that
7 you received in discovery with you today?
8      MR. KING: No, I did not.
9      MR. SIMMS: Okay. You certainly had the
10 opportunity to do so, though, correct?
11      MR. KING: If you can take that position, I
12 consider this totally unprofessional.
13      MR. SIMMS: Well, I don't have to --
14      MR. KING: So I'm asking for --
15      MR. SIMMS: I don't have to prepare you for the
16 deposition.
17      MR. KING: I'm asking for a standing objection
18 and I hope you'll give it to me, otherwise I'll make an
19 objection on every question.
20      MR. SIMMS: Okay.
21      MR. KING: And I would prefer not to do that.
22      MR. SIMMS: It's a pretty simple question.
23      MR. KING: No, you haven't given me the answer
24 to whether I've got a standing objection.
25      MR. SIMMS: I don't -- you can have a standing

Page 31

1 objection.
2      MR. KING: Thank you.
3      Q   (BY MR. SIMMS) The structure of the
4 relationship contemplated what would be done with respect
5 to food products sold within the relationship and those
6 sold outside, correct?
7      A   It is my recollection in reading the --
8 rereading the agreement again, the request was to exclude
9 business arrangements that Mr. Walker and Mr. Eisenman had
10 arrived at prior to Simmons interacting direct with
11 Renaissance Man Food Service. So they asked to carve
12 those out and leave those separate from the arrangement
13 and they specified those on page 246.
14      Q   Does poultry consider the relationship that
15 began with Renaissance Man sometime in late 2009 or 2010
16 and H. Walker Enterprises here, is this a joint venture or
17 is this a partnership?
18      A   I don't know that I can define the -- well, I'm
19 not a lawyer, so I don't know the legal definition of the
20 difference between the two.
21      Q   Did poultry consider that it had some ownership
22 interest in Renaissance Man Food Services?
23      A   I think we ultimately agreed that poultry would
24 not have an ownership interest in Renaissance Man Food
25 Service.

Page 32

1      Q   Did H. Walker Enterprises or Renaissance Man
2 have ownership interest in poultry's, for the lack of a
3 word, Simmons' production facilities?
4      A   It did not.
5      Q   Are those owned by poultry or are they owned by
6 the parent, the actual facilities?
7      A   The assets are under Simmons Prepared Foods.
8      Q   Okay. On page 247 which is page four, the
9 agreement deals with -- now, let me make sure I understand
10 this. Poultry was not only going to produce the prepared
11 food products that was sold to Renaissance Man, which
12 Renaissance Man then sold to its customers, I guess?
13      A   Uh-huh.
14      Q   Poultry was also going to perform some
15 administrative functions; is that correct?
16      A   That is correct.
17      Q   All right. And that's set out in the agreement,
18 correct?
19      A   That is correct.
20      Q   And are all the administrative functions set out
21 in this paragraph two on page 247?
22      MR. PARKER: Are you talking about paragraph two
23 under section E beginning on 247 --
24      MR. SIMMS: Yes.
25      MR. PARKER: -- and continuing on to 248?

Page 33

1      MR. SIMMS: Correct. Yes.
2      A   There are administrative functions that are
3 described in paragraph two, E2, and it begins at "such
4 as", so I'm not sure of your definition of all, but it
5 does list multiple activities.
6      Q   (BY MR. SIMMS) All right. One is accounting?
7      A   That's correct.
8      Q   Truck hiring, does that mean hiring
9 transportation to tote the product from points that it
10 needs to be toted to or from?
11      A   Distribution from our warehouse to the finished
12 customer.
13      Q   What was the Sysco incentive payment management?
14      A   It would have been part of a volume agreement
15 between Renaissance Man and Sysco that required tracking
16 of volume and price.
17      Q   Broker payment management?
18      A   That would be paying our brokers based on the
19 brokerage arrangements that were set by the general
20 manager of Renaissance Man Food Service.
21      Q   And when you say broker, is this referring to a
22 food broker?
23      A   Yes.
24      Q   So basically, Simmons was performing these
25 administrative functions because Renaissance Man -- did

App. 014

Freedom Court Reporting
877-373-3660                    A Veritext Company                    205-397-2397

Page 34

1  Renaissance Man even have the capability to perform the
2  administrative functions?
3      A   Prior to us assuming this, yes, they did.
4      Q   Where was that being performed?
5      A   That was in -- I'm trying to remember where
6  Herschel's -- Herschel's sister was doing it in --
7      Q   Savannah, Georgia?
8      A   Savannah, that's correct.
9      Q   With respect to the sales personnel's submission
10 of expense requests in paragraph one on the same page,
11 247, under E it says it will be reviewed and approved by
12 Mr. Staples but also Simmons; is that correct?
13     A   That's correct.
14     Q   And when you use the word Simmons there, we're
15 referring to poultry, correct?
16     A   That's correct.
17     Q   And there would be employees in the accounting
18 department at poultry that would also look at these
19 requests, correct?
20     A   That's correct.
21     Q   Did this agreement contemplate that H. Walker
22 Enterprises would submit certain expenses to poultry for
23 payment?
24     A   I do not recall that specifically being in the
25 agreement.

Page 35

1      Q   Is that something that you addressed towards the
2  end of 2017? We're going to get to it later today, but do
3  you have a recollection of addressing that?
4      A   I recall questions about what were qualified or
5  business-related expenses and what were not.
6      Q   And, in fact, you quoted to an agreement in some
7  of your communications and I know we're going to go over
8  it later today, but is this what you were quoting to?
9      A   Yes.
10     Q   Okay. So in your mind, in poultry's mind, the
11 parameters of the relationship between poultry and H.
12 Walker Enterprises and/or Renaissance Man Food Services
13 was as what's set out in Exhibit 6?
14     A   Yes. There were some modifications as we moved
15 along, but when we -- when I felt like we strayed too far
16 from this original agreement, we tried to pull back to
17 this agreement to reground ourselves to the constructs of
18 this agreement and then reset.
19     Q   So the agreement or the change in relationship
20 would have either happened towards the end of 2009 or the
21 beginning of 2010 and was still in place through the end
22 of 2017, correct?
23     A   That's correct.
24     Q   Subject to modification over time?
25     A   That's correct.

Page 36

1      Q   And we're talking about what, nine years?
2      A   Yes.
3      Q   Eight years, nine. And Mr. Staples was the
4  manager of that relationship that entire time, correct?
5      A   He was the manager of Renaissance Man Food
6  Service, the general manager of Renaissance Man Food
7  Service. The leader of poultry, whether it was myself and
8  Gary Murphy and then back to myself, we would -- it was
9  our responsibility to manage the relationship from a
10 Renaissance Man Food Service -- if there was an entity
11 level issue, we would deal with the CEO of Renaissance Man
12 Food Service, which is Herschel Walker.
13     Q   With respect to the resolution concerning the H.
14 Walker Foods, LLC entity, was it contemplated by poultry
15 that when Mr. Staples began managing whatever the new
16 relationship was going to be, which I think we have now
17 established is according to this Exhibit 6, correct?
18     A   Yes.
19     Q   All right. Was it contemplated by poultry at
20 that time that Mr. Staples would create profit and loss
21 statements related to the relationship?
22     A   There was when he stepped in and we would
23 continue to have balance sheet and income statements for
24 the business arrangement that Mr. Staples was responsible
25 for managing that business relation -- that business

Page 37

1  function. I'm trying to clarify the difference between
2  the relationship and the business function because there
3  were ongoing communications between myself or Mr. Murphy
4  and Mr. Walker. Mr. Walker is viewed as the CEO of
5  Renaissance Man Food Service. Mr. Staples was the general
6  manager who managed the day-to-day business activity of
7  Renaissance Man Food Service.
8      Q   Did Mr. Staples owe an obligation or
9  responsibility to report to poultry matters related to the
10 operation of the relationship?
11     A   Mr. Staples, he interacted with Simmons based on
12 products that were produced and as a general manager he
13 interacted with me as a board member of Renaissance Man
14 Food Service, but he had no specific obligation to
15 circumvent his immediate supervisor and CEO, Mr. Walker.
16     Q   Did Mr. Staples, did he report directly to
17 Mr. Chip Miller?
18     A   He -- Mr. Staples reported to Mr. Miller in our
19 -- in Simmons' organizational structure, but functionally
20 Mr. Staples' responsibility, job action, everything he did
21 was as a general manager of Renaissance Man Food Service.
22         MR. PARKER: Keri, we've been going about an
23 hour.
24         MR. SIMMS: Yeah. We can take a break now.
25         (Short break from 9:56 a.m. to 10:04 a.m.)

10 (Pages 34 - 37)

App. 015

1    Q   (BY MR. SIMMS)  Mr. Jackson, what is Exhibit 7?
2        (WHEREUPON, Exhibit 7 was marked for
3  identification.)
4    A   Exhibit 7 is a form that Simmons Foods used in
5  2009 to outline key performance metrics that were needed
6  by employees of the company.
7    Q   Is this a parent form or is this a poultry form?
8    A   This was used in several entities in Simmons
9  Foods.
10   Q   This one appears to be dated July the 16th,
11 2009; is that correct?
12   A   That is what it's dated.
13   Q   And it reflects that Mr. Staples' immediate
14 manager -- and if I say something that's not correct, you
15 correct me, but it appears that Chip Miller is -- is Chip
16 Miller the one that prepared this document and provided it
17 to Mr. Staples or how would that have occurred?
18   A   The process was to have the employee put
19 together their five to seven things they wanted to achieve
20 that year and then they would go over that with their
21 manager.
22   Q   And I know that Mr. Staples had not become part
23 of the -- an employee of poultry until March of 2009.  Is
24 this procedure that's set out in this document, is it done
25 annually and maybe his was just done because he had only

1  started to work in March or can you explain to me how that
2  would have taken place?
3    A   To my recollection, it was a new procedure that
4  we were rolling out in 2009 and it was asked to be done
5  with everyone.
6    Q   Including Mr. Staples?
7    A   It was asked to be done with everyone, so
8  Mr. Miller must have done it with Mr. Staples.
9    Q   If you will follow along with me, the first
10 paragraph there uses the word transition.  Is that the
11 transition you were talking about earlier or is this more
12 just specific related to the items that are referenced in
13 the transition?
14   A   These are items inside of the -- these are item
15 activity that -- items that were sold by Renaissance Man
16 Food Service to Sysco and Mr. Staples had began a project
17 of transitioning those from a Famous 34 brand to a Sysco
18 Classic brand.
19   Q   Did poultry have an understanding as to who
20 owned the rights to the Famous 34 brand?
21   A   Let me refer to this agreement.
22   Q   In fact, you probably ought to leave that
23 agreement on the table throughout the day.
24   A   I will.  I seem to recall that Mr. Walker
25 retained ownership of Famous 34.

1    Q   All right.  Going on down in document seven, it
2  appears that there are some -- under paragraph -- or
3  section two, there are some targets.  Do you see that?
4    A   Yes.
5    Q   Did you have involvement in setting these
6  targets with Mr. Miller and then Mr. Miller had
7  involvement in setting those with Mr. Staples or how did
8  that work?
9    A   The process was for the employee, so Mr. Staples
10 would set his targets and then cover those with
11 Mr. Miller.
12   Q   All right.  And it appears the use of these
13 numbers here, the million and the six million, is that
14 referring to pounds?
15   A   Number three target is net $1 million the first
16 year and number five is six million pounds the first year.
17   Q   So the number in three is a pure dollar number
18 and then five deals with the poundage of products sold; is
19 that correct?
20   A   That is correct.
21   Q   At then item three, the first topic there is
22 quarterly sales meetings in Siloam Springs, correct?
23   A   That is correct.
24   Q   Was there an issue related to Mike Rogers and
25 the operation of the Walker Foods, LLC entity in not

1  having adequate sales meetings?
2    A   I do not recall an issue of not having adequate
3  sales meetings.
4    Q   Item two is monthly P&L statements reflecting
5  all sales and then it's got the word needed.  Was there an
6  issue with the Mike Rogers run Walker Foods, LLC of not
7  having proper P&L statements on a monthly basis?
8    A   There was some disorganization in the Walker
9  Foods information.
10   Q   And the reason I ask that was to me the word
11 needed indicates that there's been something lacking.
12   A   That is correct.
13   Q   Would poultry agree with what I just said?
14   A   I would agree that it was not as we had -- as we
15 aspired it to be.
16   Q   All right.  Where are Mr. Staples' evaluations
17 for the years 2010 through 2017?
18   A   They did not occur.
19   Q   Why not?
20       MR. PARKER:  I just want to object to the extent
21 you're trying to characterize Exhibit 7, a document wholly
22 created by Mr. Staples, as a performance evaluation.
23   Q   (BY MR. SIMMS)  Well, let me back up.  Was it
24 poultry's rule to have annual evaluations of employees
25 such as Mr. Staples?

Page 42

1    A    It was not.

2    Q    Why not?

3    A    That was -- this performance management five to

4 seven was started in 2009, but it was an effort that did

5 not take hold throughout the company.  Individual managers

6 continued it in places, others did not, but ultimately the

7 performance of Mr. Staples, so there would be a -- this

8 performance management structure would have required a

9 follow-up in -- throughout 2009 where our -- whereas, an

10 employee proceeding along their targets and goals and Mr.

11 Staples really needed to do that with Mr. Walker, not with

12 Mr. Miller.  And these five to seven must dos are

13 activities that are all within Renaissance Man Food

14 Service.  They are not Simmons activities, they're

15 Renaissance Man Food Service activities.

16    Q    The relationship between poultry and H. Walker

17 Enterprises and/or Renaissance Man Food Services, from

18 poultry's standpoint, how did poultry evaluate

19 Mr. Staples' performance in managing that relationship?

20    A    Poultry did not evaluate Mr. Staples'

21 performance in managing the relationship because his

22 function -- Mr. Staples' function was to manage the

23 business activities of Renaissance Man Food Service.

24    Q    Was he like a special employee?

25    A    I'm not sure of your definition of special.

Page 43

1    Q    Did poultry have other joint ventures or

2 partnerships similar to the one with H. Walker Enterprises

3 and/or Renaissance Man Food Services that an employee of

4 poultry managed like Mr. Staples was doing?

5    A    Simmons Prepared Foods had multiple employees

6 that were employed by Simmons and loaned to Renaissance

7 Man Food Service and that was the only entity that that

8 occurred in.

9    Q    H. Walker Enterprises or Renaissance Man Food

10 Services pursuant to the agreement that is Exhibit

11 Number what?

12        MR. PARKER:  Six.

13    A    Six.  And other -- there were other employees

14 that were added to or removed from Renaissance Man Food

15 Service that were other entities that were paid through

16 Simmons Foods, but Simmons Foods was merely a vehicle to

17 provide benefits and payroll to Renaissance Man Food

18 Service.

19    Q    (BY MR. SIMMS)  What was the purpose in poultry

20 entering into this relationship with H. Walker Enterprises

21 or Renaissance Man Food Services, what was the incentive

22 for poultry?

23    A    There is a selling channel in the food business

24 called distributive sales where you sell to the

25 distributive side of Sysco as this agreement contemplated

Page 44

1 where they -- Sysco then sells to -- typically sells to

2 small chain or non-chain accounts like this restaurant.

3 That is a different sales activity than what Simmons Foods

4 is -- Simmons Prepared Foods is structured for and so

5 Renaissance Man Food Service and Walker Foods really

6 focused on selling that sales channel which is a set of

7 customers that Simmons Foods on its own did not sell to.

8    Q    In essence, poultry acquired a customer that it

9 could sell its prepared or finished products to?

10    A    Renaissance Man Food Service is a customer of

11 Simmons Prepared Foods.

12    Q    Have you been able to review Exhibit 8?

13        (WHEREUPON, Exhibit 8 was marked for

14 identification.)

15    A    I have.

16    Q    What is this document?

17    A    It is a personal action form used by Simmons

18 Foods and their entities to make a change to many areas of

19 someone's employment agreement or employment status.

20    Q    This concerned change to Mr. Staples' employment

21 status with Simmons or poultry, correct?

22    A    It does.

23    Q    Who filled this out?

24    A    Ms. Linda Ross, I believe.

25    Q    Did she date it December 29, 2017?

Page 45

1    A    She did.

2    Q    And she indicates that the reason for Mr.

3 Staples' termination from poultry is job performance, did

4 she not?

5    A    She did.

6    Q    Had there been any progressive discipline

7 concerning Mr. Staples up to December 29, 2017 that's

8 documented by poultry related to his job performance?

9    A    There was not, no.

10    Q    Is this a mistake?

11    A    It is not.

12    Q    Why not?

13    A    I'm not sure I understand your question.

14    Q    Well, didn't poultry tell the State of Arkansas

15 unemployment department that Mr. Staples was terminated

16 because the business or the company was moving in a

17 different direction?

18        MR. PARKER:  I'm going to object to the

19 characterization to the company's response.  It's my

20 understanding the company did not contest or respond to

21 Mr. Staples' claim for unemployment benefits.

22    Q    (BY MR. SIMMS)  Why don't you tell me what is

23 poultry's position as to why Mr. Staples was terminated?

24    A    Mr. Staples was terminated because he was no

25 longer needed by -- he had lost the trust of Mr. Walker,

12 (Pages 42 - 45)

1 the CEO of Renaissance Man Food Service, to perform his
2 sole job function which was to act as general manager of
3 Renaissance Man Food Service. When he lost that position
4 and that responsibility, he also lost his role that was
5 being funded by Simmons Foods -- or paid through Simmons
6 Foods but funded by Renaissance Man Food Service.
7     Q   Did poultry agree with the assessment that was
8 made to it by Mr. Walker concerning the so-called loss of
9 trust concerning Mr. Staples?
10    A   Yes.
11    Q   And when was that done?
12    A   At a board meeting in mid-December in Atlanta, a
13 Renaissance Man Food Service board meeting.
14    Q   And Ms. Blanchard was present?
15    A   Yes, Ms. Blanchard was present.
16    Q   And when you got there, what capacity did you
17 understand Ms. Blanchard was attending that board meeting
18 in?
19    A   I never asked what capacity she attended the
20 board meeting in.
21    Q   Did poultry know on that occasion that
22 Ms. Blanchard was an employee of H. Walker Enterprises?
23    A   I had been -- I had been told by Mr. Staples
24 that Ms. Blanchard had business cards with H. Walker
25 Enterprises on them, yes.

1     Q   Was poultry aware that Mrs. Blanchard was a
2 co-owner of the food broker for poultry or the Renaissance
3 Man with Mrs. Staples?
4     A   I was aware that there was a brokerage firm that
5 was created that Mrs. Staples and Ms. Blanchard were
6 equity owners in.
7     Q   Was poultry aware at that meeting in Atlanta
8 that Mr. Eisenman was an attorney of Mrs. Staples?
9         MR. KING:  Objection.
10    A   Poultry, nor I, was privy to attorney-client
11 relationships outside of the ones that we directly
12 interacted with.
13    Q   (BY MR. SIMMS)  Did poultry through you register
14 any objection to Mrs. Blanchard participating in the board
15 meeting on 12/12/17?
16    A   No.
17    Q   Why not?
18    A   Why would I?
19    Q   Well, if she's acting as an employee of H.
20 Walker Enterprises or a representative of the food broker,
21 did you see a conflict in discussing the relationship?
22    A   From poultry's perspective and my perspective,
23 she was and is Herschel's significant other, girlfriend,
24 fiancé and, therefore, was in Herschel's judgment, it was
25 appropriate for her to be there alongside him and as the

1 majority owner of -- as the sole owner of the entity, I
2 saw no reason to object to him bringing her along.
3     Q   Going back to the, I think you called it the
4 five to seven evaluation document?
5     A   Yes.
6         MR. PARKER:  For the record, it's Exhibit 7.
7         MR. KING:  Since you made -- identified it, what
8 was the Simmons number on Exhibit 8?
9         THE WITNESS:  Eight is 32.
10        MR. KING:  Thank you.
11    Q   (BY MR. SIMMS)  We discussed earlier the need to
12 prepare P&Ls monthly related to the relationship, correct?
13    A   Related to the business entity of Renaissance
14 Man Food Service, yes.
15    Q   And from poultry's standpoint, why was it
16 important to have monthly P&L statements?
17    A   Because to manage a business you have to know
18 what your income and what your expenses are and what your
19 revenue is and what the difference is.
20    Q   And if you do it on a monthly basis with respect
21 to expenses, if the P&L for one month shows an expense
22 compared to the next month, you can make comparisons,
23 correct?
24    A   I would agree with that, yes.
25    Q   And a person in a management position sees the

1 changes, could then begin inquiring why there was a
2 decrease or increase, you agree?
3     A   I agree.
4     Q   And at some point in December of 2017 or late
5 November of 2017, did Mr. Walker instruct you to not allow
6 Mr. Staples to have access to P&Ls anymore concerning this
7 relationship?
8     A   Mr. Walker requested that information -- that
9 Mr. Staples be removed from information or reports that
10 were being sent, yes.
11    Q   And was that request by Mr. Walker prior to the,
12 you called it the board meeting on December the 12th,
13 2017?
14    A   Yes, sir.
15    Q   And what was yours or poultry's response to that
16 request by Mr. Walker?
17    A   My response was I strongly advocated that as a
18 board member that we not withhold that information from
19 Mr. Staples, that either he is the general manager and he
20 has all the information he needs to have to continue to be
21 the general manager or we need to deal with things
22 otherwise.
23    Q   Did Mr. Walker indicate to you at any time,
24 inclusive of the board meeting on December the 12th, 2017,
25 as to why, what his motive was in requesting that Mr.

1 Staples not be provided access to the P&L statements
2 anymore?
3      A   I did not inquire from Mr. Walker why.  I had
4 heard Mr. Staples tell stories and events from his
5 perception of his side of the relationship between he and
6 Mr. Walker, so I was aware of Mr. Staples' version of
7 events.
8      Q   What was Mr. Staples' version of events?
9      A   Mr. Staples presented to me that he -- he
10 believed that Ms. Blanchard -- there was a greater
11 conspiracy that food was going to be sold outside of
12 Renaissance Man Food Service and it would be sold directly
13 through H. Walker Enterprises and by doing so the
14 relationship that Simmons Foods had in the business that
15 John was managing would -- could be evaporated or closed
16 up because the food sales would move to another entity.
17      Q   And if Mr. Staples was policing expenses related
18 to that event, that could be reflected in a change in the
19 P&L statements, correct?
20      A   What event are you talking about?
21      Q   If H. Walker Enterprises intended to sell food
22 products and not share the revenue from those sales with
23 poultry but expensed the cost of doing that to poultry,
24 that could be reflected in the P&L statement, correct?
25          MR. PARKER:  Are you asking if it would affect

1 the overall profitability of the venture?
2      Q   (BY MR. SIMMS)  No, the P&L statement.  The
3 question is about the P&L statement.
4      A   I want to be -- I need to clarify, no expenses
5 were made to poultry.  All the expenses were held within
6 Renaissance Man Food Service.  That is a separate business
7 entity, it has its own P&L, it has its own balance sheet
8 and all of that is managed independent of Simmons Foods.
9 That is a completely different organization.  Simmons
10 merely acted as the accountant or as the business office
11 function no different than were you to hire an uninvolved
12 third party to perform those business functions.
13      Q   Going back to late 2009 or early 2010, the
14 memorandum of understanding agreement, did poultry have an
15 understanding as to what H. Walker Enterprises, LLC's
16 source of revenue were?
17      A   Other than the carveouts that were contemplated
18 in here, poultry did not have a full scope of
19 understanding of the --
20      Q   And with respect to the carveouts, was poultry
21 going to expense the cost of selling food items through
22 the carveouts under this relationship?
23      A   Again, poultry didn't do anything other than
24 sell product to H. Walker -- Renaissance Man Food Service.
25 Poultry -- Simmons Foods' sole function as Simmons Foods

1 was to sell product to Renaissance Man Food Service.
2      Q   But poultry also expected to participate in net
3 profit from the relationship, correct?
4      A   Simmons Prepared Foods did share in the profit
5 at the end of the year or through the year of Renaissance
6 Man Food Service of which John was the general manager.
7      Q   And if food products were sold through a
8 carveout and the expenses were processed through the
9 relationship, would that not adversely affect Simmons'
10 participation in net profits?
11      A   It would impact the profit sharing of Simmons
12 Prepared Foods.
13      Q   And as a business, poultry would have expected
14 Mr. Staples, if that was occurring, to bring that to the
15 attention of poultry, correct?
16      A   As a business with Simmons Prepared Foods acting
17 as a contractor for the accounting, Simmons Foods would
18 have seen that activity independent of Mr. Staples.
19      Q   And, in fact, did Carmen Seal see that in this
20 case?
21      A   Yes, Ms. Seal did see that.
22      Q   And do you know if she called Mr. Staples about
23 it?
24      A   She saw something that was different and so she
25 called Mr. Staples as the general manager asking about an

1 expense that was not normal.
2      Q   What was the expense related to?
3      A   Promotional material, I believe, in regards to
4 some waffles that were being sold.
5      Q   I read somewhere where you were asked about Mr.
6 Staples' application for unemployment compensation in
7 Arkansas?
8      A   Yes.
9      Q   Do you recall that?
10      A   I do recall that.
11      Q   And you indicated to -- who -- was that Ms. Ross
12 that made that communication to you or who was it?
13      A   It was someone within our HR department, human
14 resource department.  I do not recall which -- which
15 person received the filing.
16      Q   And did you instruct those persons not to
17 contest the request by Mr. Staples?
18      A   After conferring with another individual within
19 our HR department, yes, I did -- I did instruct them to
20 not spend the additional resources to contest.
21      Q   Have you seen the document or documented
22 response by poultry to the Arkansas Department of
23 Unemployment Compensation?
24      A   I do not recall seeing that document.
25      Q   The March 6, 2009 employment letter, Mr. Staples

Page 54

1 faxed that back to poultry in Arkansas; is that correct?
2        MR. PARKER: I think the witness already
3 testified he didn't know if the letter was faxed back or
4 not.
5    A    The fax sheet, the cover fax sheet indicates
6 that, yes, it was sent to Veronica and Linda Ross in
7 Arkansas.
8    Q    (BY MR. SIMMS) And poultry accepted that signed
9 letter and made the acceptance in Arkansas; is that
10 correct?
11   A    Poultry received the fax in Arkansas.  I'm not
12 sure to the legal designation of where it was accepted.
13   Q    And then poultry went about making a resolution
14 to terminate Mr. Rogers and employ Mr. Staples, correct?
15   A    Walker Foods make the resolution codifying the
16 termination of Mr. Rogers.  The actual termination of
17 Mr. Rogers had happened prior to that.
18   Q    But it was contemplated by poultry that
19 Mr. Staples after he had sent in his contract letter on
20 March 6, 2009, he would be employed in the state of
21 Arkansas?
22        MR. PARKER: Object to the characterization of
23 Mr. Staples' offer letter as a contract.  You can answer.
24   A    It was Simmons Foods' understanding that Mr.
25 Staples would be an employee in Arkansas.

Page 55

1    Q    (BY MR. SIMMS) And he was allowed to work from
2 home until the transition back to moving back to Arkansas,
3 correct?
4    A    I don't recall, but I would -- he began before
5 he moved, so he would have to -- logically, he would have
6 to work from home for a bit.
7    Q    That was okay by poultry?
8    A    That was -- again, Simmons Foods did not manage
9 the direct day to day activities of Mr. Staples so that
10 was okay from Mr. Walker so that was okay -- that was
11 okay.
12   Q    Poultry considered the March 6, 2009 letter to
13 be an offer of employment to Mr. Staples, did it not?
14   A    Yes, it was an offer of employment.
15   Q    And when Mr. Staples sent it back in, that was
16 his acceptance of it, correct?
17   A    That's my understanding how that works, yes.
18   Q    And then he was employed by Simmons beginning in
19 March of 2009 until the end of December of 2017, correct?
20   A    That is correct.
21   Q    Did Mr. Staples fill out an application for
22 employment with Simmons?
23   A    The normal process would be for him to fill one
24 out.  I don't recall seeing one.
25   Q    Poultry, that's a big corporation, isn't it?

Page 56

1    A    I don't know how you define big.
2    Q    All right.  Here's where I'm going.  Is it
3 poultry's position to not have signed documents?
4    A    The desire is to have a signed document, but
5 they don't always get signed, no, sir.
6    Q    And that's a course of dealing by poultry,
7 correct?
8    A    That would be a course of dealing by -- that's
9 just been my experience, yes.
10   Q    Inclusive of the agreement with H. Walker
11 Enterprises and Renaissance Man?
12   A    The signed -- the agreement did not get signed
13 with H. Walker Enterprises and Renaissance Man.
14        MR. SIMMS: Hey, are we going to take a break
15 for lunch?  Can we get something to eat here if we do?
16 I'm just asking.
17        MR. PARKER: I don't think here, but there's
18 other restaurants nearby.  They're closed today.
19   Q    (BY MR. SIMMS) I'm going to need to eat.
20        What is Exhibit 9?
21        (WHEREUPON, Exhibit 9 was marked for
22 identification.)
23        MR. KING: What number is that?
24        MR. PARKER: Nine.
25        MR. KING: And the Simmons number is?

Page 57

1        MR. PARKER: 40.  The question he's asked is
2 what is that document?
3    A    It appears to be a document from the Arkansas
4 unemployment office.
5    Q    (BY MR. SIMMS) And was this a document that
6 poultry or it's got Simmons Prepared Foods, Inc. up there,
7 is this a document that poultry received from the Arkansas
8 Department of Unemployment?
9    A    It appears to be, yes.
10   Q    And would this have been a document that poultry
11 prepared and sent back to that department?
12   A    Yes.
13   Q    And it indicates the date that Mr. Simmons was
14 -- when Mr. Staples was last employed was December 28,
15 2017, correct?
16   A    That's correct.
17   Q    And it indicates that he was a full-time
18 employee?
19   A    It does.
20   Q    And it indicates that he's not separating, he's
21 been discharged, correct?
22   A    That is correct.
23   Q    And the reason for separation or discharge says
24 general; is that correct?
25   A    That is correct.

15 (Pages 54 - 57)

Page 58

1    Q    Why not job performance?

2    A    I am not aware of who within Simmons Prepared

3 Foods filled this out, so I can't answer that, why they

4 chose general.

5    Q    Did poultry ever learn that Mr. Staples had not

6 accepted either plan A or plan B that was discussed during

7 the board meeting of December the 12th, 2017?

8    A    Yes, I was informed of that.

9    Q    When did poultry learn that?

10    A    It would have been mid -- early to mid January,

11 within the first two weeks of January.

12    Q    And what was the source of poultry learning

13 that?

14    A    Mr. Walker.

15    Q    Tell me specifically what Mr. Walker said.

16    A    Mr. Walker said he had offered a severance

17 agreement, discussed it with Mr. Staples.  Mr. Staples had

18 asked -- negotiated and agreed upon a separation

19 compensation.  Mr. Walker had proceeded to have it

20 documented and then Mr. Staples was -- had gone silent and

21 refused to communicate with Mr. Walker, and then

22 Mr. Walker had given Mr. Staples additional time and then

23 finally had set a deadline that if he hadn't heard back

24 from him that he would withdraw that offer of severance.

25    Q    What date did poultry cut off Mr. Staples'

Page 59

1 access to poultry's e-mail system?

2    A    Our policy would be the date of separation.

3    Q    And according to this document here that we just

4 looked at, the date of separation was the 28th of

5 December, 2017?

6    A    That is correct.

7    Q    Is that the date that his access, being Mr.

8 Staples, was cut off e-mail-wise?

9    A    That would be our normal policy and that is my

10 belief, yes.

11    Q    That's your recollection?

12    A    That is my belief and recollection, yes, sir.

13    Q    So would you agree with me that poultry cut off

14 Mr. Staples' access to poultry's e-mail system before Mr.

15 Staples had agreed to either plan A or plan B that was

16 discussed at the board meeting on December the 12th, 2017?

17    A    I would disagree because at that point of time

18 it is my recollection that Mr. Walker had informed me that

19 he and Mr. Staples had come to an agreement and that they

20 were getting it papered to be finalized.

21    Q    When you were at the board meeting on the 12th

22 of December, 2017, and we're going to get into the

23 specifics later today, but was it discussed what legal

24 effect the termination of Mr. Staples would have on his

25 employment by DSM3 or the broker as a consultant?

Page 60

1    MR. KING:  Object to the characterization of

2 employment of a consultant.

3    A    I do not believe that I was aware that there was

4 a consulting arrangement with Mr. Staples and DSM.

5    Q    (BY MR. SIMMS) Was Mrs. Staples' ownership

6 interest in DSM3 or the broker at the time, was the effect

7 the termination of Mr. Staples would have on her ownership

8 interest in that entity discussed at that board meeting?

9    A    I'm trying to recall.  I don't recall the

10 ownership -- let me think through.  The ownership was --

11 the ownership structure was discussed at the board

12 meeting.  I don't recall the effect of that ownership

13 structure.  I know part of the -- I do recall that part of

14 the separation agreement offer would be to come to an

15 arrangement with Mr. Staples on how that would go on from

16 an ongoing standpoint.

17    Q    During the board meeting on the 12th of

18 December, 2017, was Mrs. Staples' employment by DSM3, the

19 broker, discussed and what effect the termination of Mr.

20 Staples would have on her employment status with that

21 entity?

22    A    I was not aware that Mrs. Staples was an

23 employee of DSM.  I knew she was an equity owner,

24 owner/operator, but Simmons was unaware of her employment

25 status, so to speak.

Page 61

1    Q    Well, wasn't poultry aware of her employment

2 status by interacting with her related to the function it

3 was performing as the administrative functions of

4 processing the brokerage?

5    A    Well, we were aware that she was an

6 owner/operator.  I was unaware of how she -- her

7 employment status because I knew that she owned -- she had

8 equity ownership in it and she was active in the

9 day-to-day business activity, but I don't know -- didn't

10 know whether that was as an owner or what that arrangement

11 was.

12    Q    And there was no discussion in the board meeting

13 about the effect terminating Mr. Staples would have on

14 Mrs. Staples' equity interest in the brokerage; is that

15 what you're telling me?

16    A    There was discussion about the brokerage -- I'm

17 trying to recall correctly.  There was discussion about

18 the brokerage entity and there was discussion about what

19 ongoing broker that we would use post that separation, we

20 being Renaissance Man Food Service.

21    Q    Was Blair Staples' employment by poultry

22 discussed in the December 12, 2017 meeting and what effect

23 the termination of Mr. Staples may have on Blair Staples'

24 employment by poultry?

25    A    The entirety of DSM's business activities was

16 (Pages 58 - 61)

App. 021

Page 62

1 not discussed in the board meeting to my recollection.
2 Blair Staples was hired at John Staples' request by
3 Simmons Foods and lent to DSM and then DSM funded Blair
4 Staples' expenses very identical to how John Staples was
5 employed, but as a supplier to Renaissance Man and as a
6 board member of Renaissance Man Food Service, I was not
7 privy to the business functions of DSM, their sources of
8 revenue and their ability to cover expenses.
9    Q    Had Simmons taken progressive discipline towards
10 Blair Staples prior to the end of December 2017 for any
11 reason?
12   A    Simmons Foods did not directly manage Blair
13 Staples other than be a vehicle for her -- to provide her
14 benefits.
15   Q    Had not disciplined her in any way?
16   A    Simmons was not in a position to discipline her.
17 She was managed by her -- by DSM, whoever the managers
18 were of DSM.
19   Q    Same question with respect to Mrs. Staples, had
20 poultry expressed to anyone inclusive of Mr. Walker or H.
21 Walker Enterprises or Renaissance Man Food Services any
22 displeasure or discipline that needed to be taken with
23 respect to Ms. Kim Staples?
24   A    Simmons Prepared Foods had no interaction with
25 Ms. Kim Staples. Ms. Kim Staples worked solely within the

Page 63

1 relationship of Renaissance Man Food Service and DSM.
2    Q    During the board meeting on December the 12th,
3 was it discussed that as part of Mr. Staples' termination
4 that a release from liability for Simmons and/or H. Walker
5 Enterprises and/or Renaissance Man Food Services would
6 need to be obtained from Ms. Kim Staples with respect to
7 her equity ownership in DSM3 and/or her employment status
8 with DSM3?
9    A    I do not recall any release of liability from
10 Mrs. Kim Staples to Simmons Foods or Simmons Prepared
11 Foods because there was no relationship between Mrs. Kim
12 Staples and Simmons Foods and Simmons Prepared Foods.
13   Q    Same question with respect to obtaining a
14 release from Ms. Blair Staples, that discussed?
15   A    I do not recall any release being discussed with
16 Ms. Blair Staples.
17   Q    What about with respect to Mr. Staples?
18   A    As the general manager, so as a senior level
19 manager within an entity, there was discussion that it is
20 desirable to fund a separation agreement and with that
21 have a noncompete, non-disparagement and a liability
22 release for such separation payment.
23   Q    Do you know if -- what was discussed with Mr.
24 Staples on December the 27th by Mr. Eisenman and/or
25 Mr. Walker, what the length of the noncompete would be?

Page 64

1    A    There is a -- I read the transcript of that
2 agreement. I do not recall the exact length. I do recall
3 in the meeting that we would -- the plan was to retain
4 John as a consultant for a year.
5    Q    Do you know if the actual agreement that was
6 drafted by Mr. Eisenman changed that to a period other
7 than a year?
8    A    I do not recall whether that changed or not.
9    Q    Is it your understanding that there was a plan A
10 and a plan B discussed concerning the termination of Mr.
11 Staples and the effect that that would have on the
12 consulting with DSM3, Mrs. Staples' equity and employment
13 status with DSM3 and then Blair Staples' employment with
14 Simmons during the December 12, 2017 board meeting?
15   A    In the board meeting what was discussed was the
16 decision was made to terminate Mr. Staples' employment and
17 subsequent to that the decision was made to give notice to
18 DSM that they would give the required notice period, that
19 they would no longer be used as the broker for Renaissance
20 Man Food Service and that that was the extent of other
21 impact. Because again, I had no -- I was not privy to the
22 revenue sources or expenses of DSM, that entity was
23 outside of anything that Simmons Foods was privy to.
24   Q    I guess my question really dealt with why is
25 there a plan A and a plan B?

Page 65

1    A    Plan A was to -- which is our desired way for it
2 to progress. The plan A was to offer Mr. Staples a
3 severance, negotiate something that was workable for both
4 parties and then separate voluntarily where both could --
5 we could sign releases and Mr. Staples could pursue other
6 employment, you know, by -- or pursue his career outside
7 of Renaissance Man Food Service. Plan B was if he refused
8 to do that, then it was how it -- what would the -- what
9 action would need to be taken by Renaissance Man Food
10 Service to complete that separation.
11   Q    So plan A was contingent on Mr. Staples'
12 cooperation and plan B was not?
13   A    Plan A was finding a -- negotiating an agreeable
14 separation, plan B was a termination without a separation
15 agreement.
16   Q    And again, was the difference between plan A and
17 plan B contingent on Mr. Staples's cooperation with plan
18 A?
19   A    It would be his successful negotiation with
20 Mr. Walker.
21   Q    Was it dependent or contingent on him
22 cooperating with the terms of plan A?
23   A    The terms of plan A were left open to be
24 negotiated between Mr. Staples and Mr. Walker. So I don't
25 agree with the word cooperation because they were -- the

17 (Pages 62 - 65)

1 terms were not hard fast. They were, in general, from
2 leaving the board meeting, they were left in the hands of
3 Mr. Walker to negotiate with Mr. Staples.
4     Q    You received a memorandum prepared by
5 Mr. Eisenman that set out what was discussed concerning
6 plan A and plan B, correct?
7     A    I did, yes.
8     Q    And you received that in your capacity and
9 president or COO of poultry, correct?
10    A    I did as a board member of Renaissance Man Food
11 Service.
12    Q    And as also your capacity as an employee of
13 poultry?
14    A    I was -- I served on that board as a -- because
15 of my capacity in poultry.
16    Q    And you received that on when, December the 21st
17 of 2017?
18    A    That sounds about right.
19    Q    And you knew from reading it that the
20 cooperation was the contingent part between plan A and
21 plan B, correct?
22    A    The agreement by Mr. Staples that he had arrived
23 at some arrangement that he could accept, yes, is the
24 difference.
25    Q    But on December 21, 2017, Mr. Staples hadn't

1 even been made aware that he was being terminated yet, had
2 he?
3     A    He had not.
4     Q    And Mr. Eisenman uses the words in that
5 agreement, you looked at it, cooperation, correct?
6     A    I don't recall the specific word that he used.
7     Q    If Mr. Staples was an at-will employee of
8 poultry, why was his cooperation needed for anything?
9     A    The asked at the board meeting was to separate
10 without contention so that we can come to an arrangement
11 and move forward without that separation resulting in
12 litigation such as the reason we are here as they
13 sometimes do when you have individuals who are
14 contentious. And that -- so what I advocated for as a
15 manager over many individuals that it would be in all of
16 our best interest to find an arrangement that Mr. Staples
17 could feel good about, good enough about that he would
18 sign a release.
19    Q    And not only avoid litigation related to Mr.
20 Staples' termination of his employment relationship, but
21 litigation related to the interest of Mrs. Staples as an
22 equity owner of the broker and her employment with the
23 broker, correct?
24    A    My focus, sole focus, was on Mr. Staples'
25 arrangement with Renaissance Man Food Service.

1     Q    You would agree with me that part of the plan A
2 to seek Mr. Staples' cooperation tied in what to do with
3 respect to Mrs. Kim Staples and what to do with respect to
4 Mrs. Blair Staples, correct?
5     A    I'm trying to recall. The transcript that was
6 discussed, I don't recall whether that was in
7 Mr. Eisenman's proposal or not, but from Simmons Foods and
8 from my perspective as a board member of Renaissance Man,
9 the focus was Mr. John Staples.
10    Q    Poultry did not even have the transcript of the
11 December 27th meeting with Mr. Staples until this lawsuit
12 -- until after this lawsuit was filed, correct?
13    A    That's correct.
14    Q    The knowledge of poultry is what you had from
15 the December 12th meeting and then what you got in the
16 proposal that was prepared by Mr. Eisenman?
17    A    That's correct.
18    Q    Okay. So my question doesn't deal with what you
19 read in the transcript.
20    A    Okay.
21    Q    I want to know what the knowledge of poultry was
22 from the December 12th meeting and/or receiving the
23 communication where Mr. Eisenman has memorialized plan A
24 and plan B, okay?
25    A    Okay.

1     Q    You would agree with me that plan A dealt with
2 the cooperation by Mr. Staples and it tied in the equity
3 -- the equity ownership and the employment status of
4 Mrs. Kim Staples with the broker, DSM3, correct?
5     A    Do you have a copy of that?
6     Q    We can go over it later.
7     A    Okay.
8     Q    You don't have a specific recollection without
9 looking at the document?
10    A    I do not.
11    Q    So as you sit here today, in order to recall
12 exactly what took place during the board meeting on
13 December the 12th, 2017, you'll have to read
14 Mr. Eisenman's proposal?
15         MR. KING: Objection, mischaracterizes
16 testimony. You've already been through what he remembers
17 of the meeting. Now you're trying to characterize what he
18 remembers of the memo.
19    A    I would agree with that objection. I am -- you
20 were asking -- I am hearing you ask me what specifically
21 is in that memo and the exact wording of that memo and I
22 do not recall the exact wording of that memorandum from
23 Mr. Eisenman.
24         MR. SIMMS: It's probably a good time to try to
25 take a lunch break. I'm going to be gone maybe 45 minutes

1 and get back and keep rolling.

2      THE WITNESS:  Okay.

3      (Short break from 11:05 a.m. to 12:00 p.m.)

4      Q    (BY MR. SIMMS)  Mr. Jackson, are you ready to

5 keep going?

6      A    I am.  I would like to clarify one thing after

7 getting some more information.  On the -- let me find the

8 exhibit.  Yeah, on Exhibit 9, after studying this some

9 more of the top section that is filled out, it is filled

10 out by the person filing the unemployment claim, the

11 bottom section is filled out by the company.

12      Q    I gotcha.

13      A    So the top section would have been filled out by

14 Mr. Staples.  Since Simmons did not object to the claim,

15 there was no response from the employer.

16      Q    So there is no document showing poultry's

17 response to the unemployment claim made by Mr. Staples?

18      A    There was no -- there was no response other than

19 a decision not to object to it.

20      Q    All right.

21      A    Thank you.

22      Q    I will show you Exhibit 10.  It's Simmons 137.

23      (WHEREUPON, Exhibit 10 was marked for

24 identification.)

25      MR. PARKER:  Do you have the other portions of

1 this e-mail thread?

2      MR. SIMMS:  Yes, sir, we do, somewhere.  Is it

3 138 and 139, does that complete it?

4      MR. PARKER:  I'd have to see the pages to know.

5 I believe that's right and I do just want to also note for

6 the record that the e-mails in this thread, the way they

7 print out for whatever reason are not necessarily in

8 chronological order.  For example, the e-mail that begins

9 the chain which you would believe to be the original

10 message is actually the most recent message.  I'm going to

11 show those to Mr. King before showing them to the witness.

12      MR. KING:  So the exhibit is now all three

13 pages, right?

14      MR. PARKER:  Correct.  Do you want to staple it

15 too, Keri?

16      MR. SIMMS:  Yeah.

17      THE WITNESS:  Thank you.

18      MR. PARKER:  Did you see what I meant about how

19 the e-mail is?

20      THE WITNESS:  Yes.  Okay.

21      Q    (BY MR. SIMMS)  Does the e-mail start on page

22 137?

23      A    It is odd, isn't it?  Yes.

24      Q    Okay.

25      A    I believe so.

1      Q    Well, if you look at page 137 at the top where

2 it says Simmons RMFS administrative fee, under it says

3 four messages.  It looks like between pages 137 and 139

4 there are four messages.

5      A    That's correct.

6      Q    Okay.  The first e-mail is dated Monday,

7 December 19, 2016, correct?

8      A    Correct.

9      Q    Had you or Mr. Todd Simmons spoken with

10 Mr. Herschel Walker before receiving this e-mail about the

11 content of this e-mail?

12      A    I do not recall a prior conversation, no.

13      Q    It looks like to me it starts off, "Hello,

14 David."  It's almost like it's a first communication

15 instead of a follow-up to some prior communication.

16      A    There were continuing communications through the

17 relationship through the -- in operation of the

18 Renaissance Man group.

19      Q    And here's where I'm going.

20      A    All right.

21      Q    I've seen a press release that poultry released

22 or Simmons, the parent, released that indicated you had

23 become the president and chief operating officer for

24 poultry again effective as of December the 16th, 2016.

25 Disagree that you took back over working for poultry as

1 the president and COO around that period of time?

2      A    Sounds about right.

3      Q    And then three days later you get this e-mail

4 from Mr. Walker?

5      A    Okay.

6      Q    Do you have a recollection of you or Mr. Todd

7 Simmons having discussed the poultry Renaissance Man

8 administrative fee at any time in recent memory prior to

9 receiving this December 19th communication?

10      A    I do not.

11      Q    And, in fact, you had been away from poultry for

12 how many years before you came back up in mid

13 December 2016?

14      A    Almost five years.

15      Q    All right.  And this communication from

16 Mr. Walker says that he wanted to connect with you

17 regarding the outstanding administrative fee of 90,000 to

18 $95,000.  Is that what it says?

19      A    It does.

20      Q    Tell me what your understanding is to

21 outstanding administrative fee?  What's he talking about

22 there?

23      A    In the original agreement of the back office --

24 the cost for the back office, the accounting, the

25 administration of the truck hire, all of that activity,

1 that does consume time and resources. We agreed, Herschel
2 and I had agreed that Simmons would provide that free of
3 charge as part of the ownership for the volume of product
4 that Simmons sold Renaissance Man Food Service, and for
5 the product that Simmons did not sell Renaissance Man Food
6 Service, there would be a penny and a half per pound fee
7 that would be applied to that from Simmons to Renaissance
8 Man Food Service to cover the administrative cost for
9 handling those products that we did not produce or sell,
10 that Simmons did not produce or sell.
11    Q    And would it be fair to say that from whenever
12 in 2009 or 2010 the Renaissance Man/H. Walker
13 Enterprises/poultry relationship developed up until this
14 December 19, 2016 e-mail, Renaissance Man or H. Walker
15 Enterprises had no logistic services, didn't have any
16 production facilities, so with respect to product that was
17 sold by it that was not produced by Simmons, Simmons was
18 providing those type distribution support; would that be
19 fair to say?
20    A    Renaissance Man Food Service did have a
21 third-party cold storage freezer account so they could put
22 and did buy product from other suppliers and place into
23 their account and they used that third-party freezer as
24 their distribution point.
25    Q    Was that the freezer store here in Arkansas?

1    A    To my knowledge, yes.
2    Q    And there's an inventory agreement between
3 poultry, and we can look at it, H. Walker Enterprises or
4 Renaissance Man related to the Simmons product?
5    A    Yes.
6    Q    But not the third-party product?
7    A    The third-party product was under the direction
8 of the general manager, Mr. Staples. It was where he
9 arranged to buy that product and place it in Renaissance
10 Man Food Service's account and held the inventories in
11 Renaissance Man Food Service's working capital.
12    Q    I gotcha. And would there be times when
13 transport from the frozen inventory that may contain
14 Simmons product might have some non-Simmons produced
15 product that arrives on it?
16    A    Absolutely.
17    Q    And if there's a cost associated with that, that
18 would fall under this penny and a half?
19    A    It would not.
20    Q    Okay. How would that be captured?
21    A    That would be billed as freight in the invoice
22 from Renaissance Man to the -- to the customer.
23    Q    All right. So had there been a fee generated
24 that was outstanding that's being discussed in this
25 e-mail?

1    A    We calculated that fee annually and so this was
2 coming towards the end of the year and it would be the
3 appropriate time that you would look at the scope of that
4 fee.
5    Q    Was this related to non-produced product or was
6 it related to produced product by poultry?
7    A    That fee is for the non-Simmons produced
8 product.
9    Q    All right. And it appears that Mr. Walker's
10 saying that for 2014 and 2015, Simmons or poultry had
11 received $795,000 of revenue on non-Simmons products?
12    A    That is what the e-mail says.
13    Q    Now, had the outstanding fee also been discussed
14 between you and Mr. Staples? Is that the John that
15 Mr. Walker is referring to?
16    A    The John is Mr. Staples, the $795,000 of
17 revenue, by the way, was incorrect.
18    Q    Okay. What was correct about that?
19    A    It was incorrect.
20    Q    So the total was 795 or what is incorrect, is it
21 the number that's incorrect or just that complete
22 statement?
23    A    The -- well, both are incorrect. The agreement
24 is for a penny and a half, 1.5 cents per pound. This
25 statement said it was for 1.5 -- or .015 percent, so the

1 way to calculate the administrative fee is incorrect in
2 that statement and Simmons did not receive $795,000 of
3 revenue. The administrative fee ran somewhere in that 80
4 to $90,000 a year towards the end of 2016 and '17 and it
5 grew from -- when we started and put the agreement
6 together, it was in the three to $5,000 a year, so that
7 amount grew considerably over the length of time that
8 Renaissance Man Food Service existed.
9    Q    I gotcha. Was there a similar fee charged with
10 respect to the poultry H. Walker Foods, LLC relationship?
11    A    There was no poultry H. Walker Foods, LLC --
12    Q    The Mike Rogers relationship?
13    A    The Mike Rogers relationship was between Walker
14 Foods and Renaissance Man Food Service and to my
15 knowledge, I don't recall -- well, at that point, Simmons
16 Foods was not doing the back office. The back office was
17 being performed in Savannah by staff for H. Walker Foods.
18    Q    When Mr. Staples came on board and during the
19 transition in 2009, was there an incident that came up of
20 a -- concerning a credit of about $300,000 for a double
21 credit situation concerning a relationship with H. Walker
22 Enterprises, H. Walker Foods, LLC or Renaissance Man with
23 poultry?
24    A    I don't recall an incident and I have asked
25 Todd. He did not recall an incident that happened in that

**20 (Pages 74 - 77)**

App. 025

1 time frame.
2    Q   Who is Vickie Goodman?
3    A   Vickie is our -- she leads our customer service
4 representatives, manages our customer service
5 representatives.
6    Q   Would she have worked on something like that
7 from an accounting standpoint with Mr. Staples when he
8 first came on board?
9    A   She would have -- she manages order entry and
10 collections of invoices for products sold.
11    Q   But as far as you can recall or poultry recalls,
12 there was no incident during a board meeting where
13 Mr. Walker or one of his entities was asked about this
14 double credit that had been provided?
15    A   I don't recall that and neither did Todd.  If it
16 did occur, again, I don't -- I don't recall, it wasn't a
17 memorable issue.
18    Q   The outstanding administrative fee issue is
19 coming up again here in this e-mail, correct?
20    A   It is.
21    Q   And do you know why it's being brought up with
22 you now getting back in work for poultry?
23    A   It is -- it's a fee that in different points in
24 time through the relationship that was brought into
25 question that Simmons was perceived as double dipping

1 that we -- that Simmons was, by Herschel, and I think it
2 was because we didn't have clarity of discussion of what
3 did that fee cover.  The perception was that John or
4 Renaissance Man Food Service and Herschel and his
5 activities were selling product not produced by Simmons,
6 but Simmons was collecting a fee on that and there was
7 question of why that was.  And then Simmons would share in
8 35 percent of the profit from the sale of that product and
9 there was question of why Simmons would get both.
10    Q   Is that what you took Mr. Walker to be
11 indicating as double dipping?
12    A   That is.
13    Q   Getting a fee for providing administrative
14 functions and then also sharing in the profit?
15    A   That is correct.
16    Q   What was poultry's position with respect to the
17 allegation of double dipping?
18    A   I took it as there was a -- again, there was a
19 misunderstanding of what those monies covered and I took
20 it as my responsibility to help clarify why the charges
21 were in place the way they were.
22    Q   Mr. Walker says in here too since the start of
23 your partnership.  Again, was this a venture or was this a
24 partnership?
25        MR. PARKER:  I'm going to object to the extent

1 the question calls for a legal conclusion.
2    A   I would say the partnership is in parentheses
3 because it's not a legal definition, it's a layman's term
4 and it -- any time two individuals work together and
5 operate a business, in layman's terms I would say you're
6 partners.  I believe Mr. Walker would say you're partners.
7    Q   (BY MR. SIMMS)  It goes on to say that
8 Renaissance Man had had tremendous growth resulting in
9 significant profits for both parties.  Would poultry agree
10 with that statement?
11    A   Yes.
12    Q   And what would poultry's position be with
13 respect to Mr. Staples, did he assist in that tremendous
14 growth and those significant profits for both parties
15 during that time period?
16    A   Yes.  He was general manager over Renaissance
17 Man Food Service and it did see a significant shift from a
18 loss in P&L when he started to a significant profit on the
19 P&L.
20    Q   And then on down this page 137, is that your
21 response on the same day at 3:44 p.m.?
22    A   It is.
23    Q   You say looking back you could tell there's
24 growth, good growth in Renaissance Man, correct?
25    A   That is correct.

1    Q   And you say that is great progress towards what
2 had been originally contemplated.  What had been
3 originally contemplated?
4    A   The original plan was to grow Renaissance Man
5 Food Service into a standalone functioning business and to
6 grow it well beyond where it was when we made the
7 transition from Walker Foods to Renaissance Man.  At that
8 point it was a small entity that it took Simmons funds to
9 make it cash flow.
10    Q   And Mr. Staples was the person who managed that;
11 is that correct?
12    A   Mr. Staples was the general manager over that
13 time, yes.
14    Q   And according to the documents we've seen,
15 Mr. Miller gave instructions to Mr. Staples about what
16 poultry would like to see that relationship become,
17 correct, in the five, seven document?
18    A   In the five to seven, Mr. Miller worked with Mr.
19 Staples to help him lay out objectives that he set out for
20 himself to achieve as general manager of Renaissance Man
21 Food Service.
22    Q   And you say that the agreement was is that
23 Renaissance Man would pay Simmons for product not produced
24 by Simmons at the rate that you set out, correct?
25    A   At a penny and a half per pound, yes, sir.

1    Q    And are you referring back to causes or
2 agreements set forth in the memorandum of understanding
3 that was never signed and we have marked as, I want to say
4 it's Exhibit 6?
5        MR. PARKER:  Six.
6    A    Yes.  I cut a snippet of that agreement and put
7 it in my response so that --
8    Q    (BY MR. SIMMS)  Right.
9    A    -- there would be -- again, this memorandum
10 provided us a place to go back to when we started
11 questioning what we were doing.
12    Q    And on the second page which is 138, that's the
13 snippet that you took out of section two under the E
14 administrative section that we talked about earlier today?
15    A    That is correct.
16    Q    You also set forth the distribution of profits
17 section, correct?
18    A    Yes, I did.
19    Q    And you recommended a meeting to discuss changes
20 to the operating agreement, right?
21    A    I did.
22    Q    Modify, change it, revise it, correct?
23    A    Change any -- what I recommended was if there
24 were questions about and perceptions that the operating
25 agreement was not fair to both parties, that we should sit

1 down and discuss it, come up to an arrangement that we
2 both agreed worked fair.
3    Q    And when you're talking about operating
4 agreement, are you referring to Exhibit 6?
5    A    I am.
6    Q    Okay.
7    A    And the modified version of Exhibit 6 as we had
8 evolved.
9    Q    Did you have discussions with Mr. Staples at the
10 time about changes, modifications or revisions to the
11 operating agreement that needed to be addressed going
12 forward after this date?
13    A    The conversations I had with Mr. Staples was
14 more around addressing the implications that Mr. Staples
15 had conveyed to me that Herschel had desired to -- had a
16 desire to work Renaissance Man out of the -- out of --
17 John expressed that he perceived there was a desire from
18 Herschel to move the volume to H. Walker Enterprises and
19 out of Renaissance Man, diminish the volume of Renaissance
20 Man Food Service.
21    Q    Do you know what was motivating that change as
22 expressed to you by Mr. Staples?
23    A    I know Mr. Staples' perception.  I -- after the
24 board meeting and then discussions after the board meeting
25 with Mr. Walker, I do not believe there was any grand

1 conspiracy to do that, but I do know that that was
2 Mr. Staples' perception that that was what was occurring.
3    Q    And this goes back to the end of 2016, correct?
4    A    No, I misspoke.  That was in 2017.
5    Q    Well, we're talking about 2016 right now.
6    A    I know, I know, my mistake.
7    Q    Okay.  Well, tell me what you discussed with Mr.
8 Staples in 2016 about changes to the operating agreement.
9 If he's the general manager, I'm assuming that you would
10 want the general manager to know what changes needed to be
11 addressed?
12    A    I don't recall the exact changes that John and I
13 discussed because we -- we did not make any changes in
14 2016.
15    Q    Well, the next sentence you use here says, "The
16 feedback I'm hearing is there are perceptions on both
17 sides, Simmons and Renaissance Man, that there are
18 conflicts in how we are going about business."  Did I read
19 that sentence correctly?
20    A    You did.
21    Q    What feedback, what feedback and who was the
22 source of the feedback?
23    A    Mr. Herschel Walker in the original e-mail where
24 he suggests that Simmons is double dipping and that it did
25 not -- that it seemed unfair to Renaissance Man is the

1 feedback I was referring to.
2    Q    Were you getting any feedback from anyone other
3 than Mr. Walker at the time?
4    A    John may have conveyed the double dipping
5 concern as well.  I don't specifically recall, but usually
6 John, because John interacted with Herschel a lot and John
7 may have conveyed that as well as the general manager of
8 Renaissance Man that there was concern of Simmons trying
9 to double dip.
10    Q    Was there -- and I don't guess you would have
11 been involved because you were still at the pet company,
12 but was there a meeting in 2015 where anyone at poultry
13 communicated to Renaissance Man or H. Walker Enterprises
14 that they had been approached by Sysco to bid direct?
15    A    I will have to confer --
16        MR. PARKER:  Just answer if you know.
17    A    Yeah, I do not know directly, no.
18    Q (BY MR. SIMMS)  Is it possible that what you said
19 earlier did, in fact, you learn of in 2016 that
20 Mr. Staples indicated that H. Walker Enterprises was
21 trying to grow its business and reduce Renaissance Man?
22    A    No, the first I heard of that was in 2017.
23    Q    And you were wanting a meeting, correct?
24    A    Yes.
25    Q    Did a meeting take place?

Page 86

1    A   I don't recall if we had a board meeting at the
2  end of '16 or beginning of '17.  I would have to refer to
3  my -- refer to my calendar.
4    Q   And it looks like to me Mr. Walker's response on
5  the 20th, the next day in the morning, and it appears that
6  that is the first time he copies his lawyer, Mr. Eisenman,
7  in this chain of e-mails.  Does that appear to be correct?
8    A   He did add Mr. Eisenman on the 20th, yes.
9    Q   And he says he was not aware of the conflict
10  that you mentioned.
11    A   Okay.
12    Q   And he would like to get together.
13        MR. PARKER:  Is there a question?
14    Q   (BY MR. SIMMS)  Was there a meeting after that?
15    A   I will have to refer to my calendar.  I do not
16  recall whether we got together in person or not.
17    Q   All right.  Down at the bottom it looks like you
18  and Mr. Todd Simmons communicate internally with one
19  another about this communication.  Would that be a fair
20  reading of the fourth e-mail in this chain?
21    A   That would be.
22    Q   And it looks like Mr. Simmons is responding to
23  you?
24    A   He is.
25    Q   And it says, "Oh, man, when can we talk double

Page 87

1  dipping?  Grrr.  And creditworthiness and back office
2  support, et cetera, et cetera."  Did I read that
3  correctly?
4    A   You did.
5    Q   Can you expand on this and tell me what
6  Mr. Simmons is referring to?
7        MR. PARKER:  Only if you know.  You don't have
8  to speculate.
9    A   He was referring to the original e-mail that was
10  sent on December 19th at 10:28 a.m. about the question of
11  double dipping and whether those fees should be paid to
12  Simmons Foods from Renaissance Man.
13    Q   (BY MR. SIMMS)  Did you have separate
14  communication with Mr. Simmons about this other than what
15  he says in his e-mail response here?
16    A   He is my immediate supervisor and friend and we
17  did as part of ongoing business of Simmons Foods, I did
18  keep him apprised as to what was going on with Renaissance
19  Man.
20    Q   What did you all discuss?
21    A   I told him that I would take care of it, that it
22  seemed to me that there was, again, a lack of
23  communication of what that fee covered and why and that I
24  would make sure that we were clear on why it was
25  reasonable and not double dipping to have a fee to process

Page 88

1  all the support for product that Simmons did not produce
2  as well as being a partner in the entire entity to share
3  in some of the profits.
4    Q   Did you and Mr. Simmons discuss any incident
5  regarding an outstanding administrative fee or credits
6  that go back to the time period prior to 2009 involving H.
7  Walker Foods?
8    A   I don't recall that.
9    Q   Did any discussions -- in any discussions with
10  you and Mr. Simmons was there reference to any other
11  outstanding administrative fees other than the 90 to
12  95,000 one that was referenced by Mr. Walker in the
13  beginning e-mail?
14    A   I know this administrative fee has come up on
15  multiple occasions over the time of the contract.  I know
16  there was a period of time where we, through a change in
17  staffing, Simmons Foods did not compile the administrative
18  fee one year and we had to do a catch up of two years fees
19  in one year and there was conversation around that.
20    Q   Was Mr. Walker agreeable to paying that?
21    A   Not in the beginning, but once we explained we
22  agreed that it was owed and paid.
23    Q   All right.  Was there a meeting about this topic
24  at the end of 2016 or the beginning of 2017?
25    A   I do not recall whether we had a physical

Page 89

1  meeting or not about that time.
2    Q   Was there a board meeting in the end of 2016 or
3  the beginning of 2017?
4    A   I do not recall having one.  Since I -- I only
5  recall having one board meeting when I came back from
6  poultry to -- from pet food to poultry, so I don't believe
7  that there was a board meeting at that time.
8    Q   It sounds like to me the next board meeting was
9  when you discussed termination of Mr. Staples on
10  December the 12th, 2017.  If I'm wrong, tell me when the
11  meeting was.
12    A   Well, I think that was -- that is correct.  I
13  think that is the only board meeting that I had during
14  that time.
15    Q   Was this issue over this outstanding
16  administrative fee up in the air at the time you all met
17  on December the 12th, 2017?
18    A   It was not.
19    Q   When had it been resolved?
20    A   It would have been resolved over -- it would
21  have been resolved by year end because we would have made
22  a payment of that administrative fee at year end.
23    Q   Simmons would've paid itself from Renaissance
24  Man's funds?
25    A   Renaissance Man would have paid Simmons as part

23 (Pages 86 - 89)

1 of the activity of managing the books of Renaissance Man
2 and paying the invoices too.
3    Q   So it was the position of poultry that there was
4 no double dipping?
5    A   It is the position of poultry that both -- they
6 are separate and distinct charges for services or for
7 ownership share -- or profit sharing per our agreement.
8    Q   And going forward into 2017, it would have been
9 poultry's position that it was entitled to 35 percent of
10 non-produced food items sold through Renaissance Man that
11 it handled the support for and it was entitled to charge
12 this administrative fee related to that; is that correct?
13    A   That is correct.
14    Q   Do you know if at any time in the early part of
15 2017 H. Walker Enterprises and/or Renaissance Man began
16 efforts to circumvent application of the two provisions
17 that you have cited from the operating agreement, or
18 Exhibit 6, as contained in this Exhibit Number 10?
19    A   Can you ask that question again?
20    Q   Are you aware of any instances where H. Walker
21 Enterprises or Renaissance Man undertook efforts to avoid
22 these provisions that you cite or set forth in Exhibit 10
23 from the operating agreement that's Exhibit 6?
24    A   As of what point in time?
25    Q   Are you aware of Mr. Eisenman instructing Mr.

1 Staples that with respect to certain items that these
2 provisions were to be avoided?
3    A   I have seen an e-mail chain that came out in
4 discovery, but until that point in time, no, I was not
5 aware of it.
6    Q   What's poultry's feelings about that?
7    A   That ultimately it takes a sales structure and a
8 back office structure to sell and ship and collect for
9 product sold and that it would be difficult to run that
10 through H. Walker Enterprises as I understand how it
11 exists today.  So after reading that, I still kind of
12 dismiss that it was a real issue.
13    Q   And if that was being brought to the attention
14 of Mr. Staples, did poultry have expectations that he
15 would report that to poultry and, in particular, his
16 immediate supervisor, Mr. Miller?
17    A   As a general manager who's judged on
18 performance, Renaissance Man Food Service if it were
19 taking product -- taking revenue and income out of
20 Renaissance Man Food Service and putting it somewhere
21 else, I would expect Mr. Staples to be concerned about
22 that for his own performance, but he had no individual --
23 no obligation to come to Simmons and say this is -- that
24 he had concerns over it.
25    Q   Well, as general manager of the relationship,

1 what were the expectations that poultry had that Mr.
2 Staples was to protect poultry's interest as set out in
3 Exhibit 6 and as you bring up again in Exhibit 10?
4        MR. PARKER:  I'm going to object to the
5 continued mischaracterization of Mr. Staples' role as the
6 general manager in relationship to testimony from the
7 witness has been Mr. Staples' role was general manager of
8 Renaissance Man Food Services only.
9    A   And I would concur.  Mr. Staples' responsibility
10 was the general manager of the business unit Renaissance
11 Man Food Service.  As president and chief operating
12 officer of Simmons Prepared Foods, it was my
13 responsibility for the relationship, with Simmons' side of
14 the relationship with Mr. Walker, who was CEO of
15 Renaissance Man Food Service and owner on that side.  So
16 the relationship was between the two of us.  Mr. Staples'
17 job function was to manage the business operation of
18 Renaissance Man Food Service.
19    Q   (BY MR. SIMMS)  In poultry's mind, it had a
20 35 percent equity ownership in Renaissance Man Food
21 Services?
22    A   That is incorrect.
23        MR. PARKER:  Objection, that's not what he
24 testified to.
25    Q   (BY MR. SIMMS)  It was entitled to 35 percent of

1 the profits from the sale of Simmons produced products and
2 the sale of non-produced products unless it was carved out
3 under the agreement; is that correct?
4    A   It is poultry's understanding -- poultry's
5 belief and operating under that we -- that poultry
6 received a 35 percent profit share at the end of the year
7 for the net income of Renaissance Man Food Service except
8 for anything that was in existence before Simmons stepped
9 into it that was in that carveout and all that was
10 excluded from Renaissance Man Food Service early in the
11 time.  So the income statement that created a profit and
12 loss, we use that to judge what -- how much profit or loss
13 there was for the entity and we share that after expenses
14 65-35.
15    Q   Did poultry expect Mr. Staples to communicate
16 with it any efforts by H. Walker Enterprises or
17 Renaissance Man Food Services to circumvent the provisions
18 of the agreement that you set out in Exhibit 10?
19    A   I had no expectation of Mr. Staples and poultry
20 had no expectation of Mr. Staples to manage this
21 agreement.  The expectation was for Mr. Staples to manage
22 the business unit Renaissance Man Food Service.
23    Q   If in his management he was being asked to do
24 things that were detrimental to poultry, did poultry
25 expect him to report that to poultry?

24 (Pages 90 - 93)

Page 94

1    A    No, we did not.
2    Q    Who was looking out for the best interest of
3 poultry day to day?
4    A    Poultry had two parts in this relationship; one,
5 we were suppliers and Chip Miller and his team set pricing
6 for product sold to Renaissance Man Food Service and
7 poultry priced it at a -- at a price that they were --
8 that they found acceptable and market competitive and then
9 I, as a board member, or Gary Murphy, as a board member,
10 representing poultry's business looked at the other
11 activities around Renaissance Man Food Service.
12    Q    Including the sharing of profit of non-produced
13 poultry products and application of the administrative
14 fee?
15    A    Yes, that is correct.
16    Q    And when you say on page two getting feedback
17 about conflicts and how we're going about the business,
18 you're not referring to anything that you're learning from
19 Mr. Staples?
20        MR. PARKER: I'm going to object to
21 mischaracterizes his testimony. He already answered this
22 question. He said it's possible that Mr. Staples might
23 have been providing him feedback along the way.
24    A    I don't recall a specific conversation with Mr.
25 Staples, but it is highly likely that he conveyed a

Page 95

1 similar message to Mr. Walker that there was a perception
2 of double dipping and that poultry was being unfair and
3 that is in my mind a conflict and that is a conflict that
4 needed to be resolved because our business functioned on
5 trust and when you believe you're being treated unfair,
6 that's a violation of trust and we needed to resolve that.
7    Q    (BY MR. SIMMS) That was important enough for
8 you to put it in this e-mail, correct?
9    A    Yes, sir.
10    Q    And you were suggesting that you want to have a
11 face-to-face meeting, but you didn't have one?
12        MR. PARKER: Objection, mischaracterizes his
13 testimony. He said he's not sure whether they had a
14 meeting. He said he had to look at his calendars to
15 confirm whether he had one.
16    A    As I think through the time when I came back to
17 poultry through the end of '17, I had one meeting with
18 Mr. Walker in Atlanta. So we did not have a face-to-face
19 meeting to resolve this. I recall a phone call with
20 Mr. Walker to talk through it after sending this and we
21 agreed that it was resolved.
22    Q    (BY MR. SIMMS) What was resolved?
23    A    The clarity of why there was an administrative
24 fee and why the 35 percent ownership -- profit sharing,
25 not ownership, but profit sharing of the entire

Page 96

1 Renaissance Man Food Service income statement was
2 appropriate for Simmons Foods whether it included -- and
3 our position was it should include all activity on behalf
4 of Renaissance Man Food Service.
5    Q    When was the next time you became aware of any
6 conflict that dealt with H. Walker Enterprises or
7 Renaissance Man Food Services perhaps bypassing the
8 provisions that you set forth in Exhibit 10?
9    A    After -- after December 20, 2016?
10    Q    Yes, sir.
11    A    I believe it was when the question about the
12 payment for waffles -- waffle packaging and promotional
13 activity.
14    Q    That would be in the fall of 2017?
15    A    '17, that's correct.
16    Q    Do you recall having a cell phone call with Mr.
17 Staples on October the 18th, 2017?
18    A    I don't remember the exact date, but I did talk
19 to John on the phone.
20    Q    What -- did you call him or did he call you?
21    A    If I had called him, it was returning a call.
22    Q    Do you know how long you all talked that day?
23    A    I do not.
24    Q    What did you all talk about?
25    A    I don't remember that specific conversation.

Page 97

1    Q    Do you recall that Mr. Staples expressed some
2 concerns to you about the activities of H. Walker
3 Enterprises and/or Renaissance Man Food Services?
4    A    I do recall that John conveyed concern on
5 multiple occasions about activities of H. Walker Foods and
6 Renaissance Man Food Service.
7    Q    When you say H. Walker Foods, are you referring
8 to H. Walker Enterprises?
9    A    Enterprises, excuse me, H. Walker Enterprises.
10    Q    All right. And I'm not trying to be difficult,
11 but I think we need to keep it separate because we now
12 know there's an H. Walker Foods, LLC.
13        MR. PARKER: For the record, it's Walker Foods,
14 LLC.
15    Q    (BY MR. SIMMS) Walker Foods, I'm sorry.
16    A    Walker Foods went away, so that -- that died
17 right after -- for all intents and purposes, it died right
18 after Mike Rogers was separated and John was hired.
19    Q    All right. What concerns was Mr. Staples
20 expressing? Can you be specific about the concern, the
21 nature of the concern?
22    A    He expressed concern of Ms. Blanchard becoming
23 involved in the sale of product of waffles and that -- and
24 that she had some business cards printed that showed her
25 representing H. Walker Enterprises, not Renaissance Man

25 (Pages 94 - 97)

1 Food Service and he believed that that was the first of
2 many things to come where sales would start occurring
3 through H. Walker Enterprises and not Renaissance Man Food
4 Service. Okay.
5    Q   Is there -- I may be able to look at it. That's
6 Simmons -- excuse me, Staples document 4176. At the
7 bottom it looks like it's called number 217. It's on a
8 Wednesday, October the 18th, 2017. It's a (479)427-0620
9 number. Is that your number?
10    A   That is my cell phone, yes.
11    Q   All right.
12        MR. PARKER: For the record, we're looking at
13 Exhibit 11.
14        (WHEREUPON, Exhibit 11 was marked for
15 identification.)
16    Q   (BY MR. SIMMS) I'm sorry. That is Exhibit 11.
17        Do you recall having any cell phone
18 conversations with Mr. Staples before October 18, 2017
19 where the topic was concerns related to activities of H.
20 Walker Enterprises and/or Renaissance Man?
21    A   I don't recall any specific cell phone
22 conversation, no.
23    Q   Did you have any more conversations with him by
24 phone after October 18, 2017?
25    A   I seem to recall a phone call in my office on my

1 landline after the cell phone conversation.
2    Q   What is your recollection is the nature of that
3 call or the substance of it?
4    A   Reiteration of the concerns of the waffle sale
5 and the payment of $7,200 or the dollar amount of the
6 packaging and promotional material.
7    Q   Had you had any communications around
8 October the 18th, 2017 with Ms. Carmen Seal related to any
9 request from Ms. Carol Walker in the Savannah office for
10 payment of film or display racks or other items related to
11 the sale of retail waffles?
12    A   I had. Mr. Miller had brought it to my
13 attention and Mr. Miller and I both had spoken with
14 Ms. Seal.
15    Q   When was that that Mr. Miller brought it to your
16 attention?
17    A   It would have been somewhere right in there. It
18 was -- I learned from Mr. Miller and Ms. Seal first and
19 then from Mr. Staples.
20    Q   Do you see on there any phone calls between Mr.
21 Staples and Mrs. Seal and/or Mr. Miller?
22    A   I am not certain of whose phone number the 215
23 Siloam Springs number is. I believe it's Ms. Seal. I
24 will have to look and see who 356 is. Would you like me
25 to refer to my phone or do you have that information?

1    Q   Let me show you Exhibit 12 which is Staples
2 4175.
3        (WHEREUPON, Exhibit 12 was marked for
4 identification.)
5        MR. PARKER: Mike, it's more phone records from
6 October 9, 2017 to October 13, 2017.
7    Q   (BY MR. SIMMS) Are you familiar with Ms. Carmen
8 Seal's phone number?
9    A   I am not.
10    Q   Not being familiar with her phone number, you
11 couldn't tell me if that record indicates a phone call
12 either to her or from her with Mr. Staples or not; is that
13 correct?
14    A   That is correct.
15    Q   Okay. Does poultry have any evidence to suggest
16 that Ms. Seal did not speak by phone with Mr. Staples
17 during that time period that would be reflected on
18 Exhibit 12?
19    A   To the contrary, Ms. Seal conveyed to me that
20 she did speak with Mr. Staples.
21    Q   Did. Did she initiate the phone call or did he?
22    A   She conveyed to me that she initiated a phone
23 call inquiring about an expense.
24    Q   If poultry didn't expect Mr. Staples to look out
25 for its best interest, why would Ms. Seal be contacting

1 Mr. Staples?
2    A   Because Ms. Seal saw an invoice for product that
3 she did not see any other expenses around, so it was
4 normal for Renaissance Man to buy product from someone
5 else and then sell it and there would be expenses
6 associated with it. She saw promotional material and
7 needed to attach that expense to a finished good that was
8 being sold and she could not find a finished good that was
9 -- that would attach to that promotional material so she
10 called Mr. Staples as the general manager to ask what
11 finished goods that product needed to be attached to.
12    Q   And what did Mrs. Seal say to you that Mr.
13 Staples said to her?
14    A   That that was not a Renaissance Man Food Service
15 expense, that that was a H. Walker Enterprise expense and
16 that it did not need to be paid.
17    Q   To poultry's knowledge, did Mrs. Seal carry that
18 out and not pay that expense?
19    A   Ms. Seal then brought it to Chip Miller's
20 attention who brought it to mine and we discussed it
21 together and we agreed that we would not process the
22 payment until we reached clarity of what it was.
23    Q   Let me show you Exhibit 13. It's Simmons 153.
24        (WHEREUPON, Exhibit 13 was marked for
25 identification.)

26 (Pages 98 - 101)

1    MR. PARKER: Do you have the other pages of
2 this?
3    MR. SIMMS: Well, we can get them. I'm not
4 going to ask him about any of that. There's only one
5 thing I really wanted to ask him about.
6    MR. PARKER: Well, depending on what you ask --
7    MR. SIMMS: We can all agree whatever the chain
8 is.
9    MR. PARKER: Yeah, I know, but depending on what
10 you ask him, I may have --
11    MR. SIMMS: Okay.
12    MR. PARKER: -- him hold his answer if I think
13 --
14    MR. SIMMS: That's fine. Let's see if we can
15 cut through it and if we can't, we'll come back and go at
16 it that way.
17    A   Okay.
18    Q   (BY MR. SIMMS) If you look at the -- and I know
19 this is Mr. Walker responding to the question concerning
20 the expense for some airfare related to, I think, a sales
21 meeting, but what I really wanted to ask you about is in
22 Mr. Walker's response here, the second paragraph. He
23 starts out by saying that he wanted to say that you hit on
24 other things in your e-mail which confused him. It says
25 they're different from his understanding of the current

1 relationship between Simmons and Renaissance Man. Over
2 nine years Renaissance Man has grown tremendously and
3 could not have done this without the help of Simmons.
4 Said he would love to see this to continue to grow in the
5 food service arena. Says he spoke to Todd earlier this
6 year and they talked about getting together to go over the
7 relationship if you guys can get some dates that would
8 work, you and Todd in the next couple of months. And my
9 question really is, did you or Todd schedule a
10 face-to-face meeting after April 3, 2017?
11    A   We did not until the December meeting.
12    Q   Okay.
13    MR. PARKER: Keri, we've been going again about
14 another hour. Can we just take five?
15    MR. SIMMS: Sure, that's fine.
16    (Short break from 1:00 p.m. to 1:10 p.m.)
17    MR. SIMMS: Let me show you Exhibit 14. This is
18 going to be another of Mr. Staples' cell phone record. Do
19 you recognize any phone calls concerning Mr. Chip Miller
20 in that record?
21    (WHEREUPON, Exhibit 14 was marked for
22 identification.)
23    A   I do not, but I don't call Chip at his office.
24    Q   May I see it? Do you know if Mr. Miller's
25 number at his work office is (479)215-22 --

1    MR. PARKER: No, it's 2356.
2    Q   (BY MR. SIMMS) Oh, excuse me. It's what now?
3    MR. PARKER: It's 2356.
4    Q   (BY MR. SIMMS) Is it -- do you recognize
5 (479)215-2356 as being his number?
6    A   I do not. I have a button on my phone.
7    Q   I gotcha. All right. Have you spoken to
8 Mr. Miller about a phone call he had for 19 minutes with
9 Mr. Staples on October the 5th, 2017?
10    A   I've spoken to Mr. Miller about his
11 conversations with Mr. Staples, but he did not describe
12 that specific phone call.
13    Q   Have you discussed with Mr. Miller an incident
14 concerning Jennifer Dawson in and around October, the
15 early part of October 2017?
16    A   I know Jennifer Dawson. I do not recall an
17 incident around Jennifer Dawson.
18    Q   Were you aware that in October of 2017
19 Ms. Dawson was a Renaissance Man employee working in
20 Arkansas?
21    A   Yes.
22    Q   And is she an employee of Simmons or poultry
23 today?
24    A   She is.
25    Q   When did she make the transition?

1    A   I will have to look at the hire date. I do not
2 recall.
3    Q   Have you or anyone else at poultry discussed
4 with Mr. Chip Miller around the early parts of
5 October 2017 that Mr. Walker had indicated that if
6 Ms. Dawson talked down to Carol Walker again it would not
7 end well for Ms. Dawson?
8    A   I'm not aware of that.
9    Q   Do you know if anyone at poultry is aware of
10 that?
11    A   I have not had conversations with anyone at
12 poultry around that.
13    Q   If Mr. Staples' testimony is is that he
14 discussed that issue with Mr. Miller around October the
15 5th, 2017, does poultry have any evidence that would
16 dispute that?
17    A   I do not.
18    Q   Have you spoken to Mr. Miller about any
19 conversations between him and Mr. Staples regarding the
20 waffle expenses in and around the early part of
21 October 2017?
22    A   I have.
23    Q   What did Mr. Miller say to you about that topic?
24    A   He said Mr. Staples had conveyed that, again,
25 there were waffle expenses, promotional expenses, other

1 expenses that were around a product that was not sold or
2 to be sold by Renaissance Man Food Service and should not
3 be expensed under Renaissance Man Food Service.
4  Q   Who is -- is it Dion Bennett?
5  A   It's Dion Bennett, yes.
6  Q   What's Mr. Bennett's role with poultry?
7  A   Ms. Bennett.
8  Q   Excuse me, Miss.  I apologize.
9  A   Ms. Bennett does order entry for Simmons.
10  Q   Do you know if she had communications with Mr.
11 Staples about these waffles that came to light in the
12 early part of October 2017?
13  A   I have not spoken to Dion about her conversation
14 with Mr. Staples about waffles.
15  Q   Is Vickie Goodman the supervisor of Ms. Bennett?
16  A   She is.
17  Q   Do you recognize any phone calls on Exhibit 14
18 between Ms. Vickie Goodman and Mr. Staples?
19  A   I do not know Ms. Vickie's phone number.  Again,
20 it's a small office.  I will walk to her office.
21  Q   Assume for me that Ms. Goodman's number is
22 (479)215-2296.  There appear to be three phone calls with
23 Mr. Staples in the early part of October 2017 as reflected
24 in the exhibit, assuming that's her number.  Do you agree
25 with that?

1  A   I will take your information that that is her
2 number.
3  Q   Has poultry spoken with Ms. Vickie about her
4 conversations with Mr. Staples regarding the waffles?
5  A   I've not spoken to Vickie directly about her
6 conversations around the waffles.
7  Q   All right.  Exhibit 15, and the same thing,
8 there could be a string related to that, but I'm only
9 going to ask him about one particular section.  And while
10 we're looking at that, when poultry hired Ms. Dawson, did
11 they inquire as to why she was leaving Renaissance Man?
12  (WHEREUPON, Exhibit 15 was marked for
13 identification.)
14  A   It was conveyed to me that she left because she
15 wanted a job with benefits and she wanted a job with a
16 larger company that she had upward mobility and she went
17 on a completely different career path.  She services
18 chickens for us, so she is outside and interacts with
19 growers and she felt like that was a better career path
20 for her.
21  Q   Did it come up that she had been threatened by
22 Mr. Walker concerning an e-mail she had sent to Ms. Carol
23 Walker trying explain what aged accounts receivable meant
24 versus aged inventory?
25  A   I was not made aware of any -- any concern like

1 that, no.
2  Q   Okay.  You all finished looking at the exhibit?
3  MR. PARKER:  For the record, Exhibit 15 is an
4 incomplete e-mail thread I'm going to hand the witness in
5 addition to the one page that's been marked as Exhibit 15.
6  MR. SIMMS:  153?
7  MR. PARKER:  I'm going to hand him 153 which was
8 previously marked as Exhibit 13 which still does not
9 complete the exhibit but will allow the witness to have
10 more context what's being discussed.  I'm showing you both
11 of these, but he's going to focus your attention on the
12 second page which is Exhibit 15.
13  THE WITNESS:  Okay.
14  Q   (BY MR. SIMMS)  It's going to be the second
15 paragraph under the section number one from the operating
16 agreement or Exhibit 6.
17  A   Okay.
18  Q   It looks like to me in this exhibit or this
19 e-mail you drafted you now are citing another provision
20 from the memorandum of understanding or Exhibit 6,
21 correct?
22  A   Let me make sure that's Exhibit 6.  Yes, E1 of
23 Exhibit 6.
24  Q   Then I really want to ask you about the second
25 paragraph here.

1  A   Okay.
2  Q   It says, "I've been out of the business for a
3 while," that's what we discussed about when you went to
4 pet, you went to the pet division, then you come back to
5 poultry, correct?
6  A   That's correct.
7  Q   "There seems to have been several shifts in our
8 business practices."  That's what I want to ask you about.
9 What -- can you expand on what several shifts in the
10 business practices you're referring to?
11  A   There were shifts in expense reimbursement.  It
12 had got -- we had tried to -- when I was involved in the
13 business prior, we had followed the Simmons policy on it
14 with -- where there had to be exceptions approved and it
15 seemed to be looser on what was being submitted and
16 approved to be paid.  There were shifts that I was
17 learning about broker representation where there were
18 related parties, multiple related parties in the brokerage
19 and how that was getting handled and I can't remember what
20 else there was.  I think there was something else.  It was
21 -- but it was really around those, those two were concerns
22 of mine at the time.  And shifts in, you know, how people
23 were treating folks within Simmons from Renaissance Man
24 Food Service and whether that was acceptable or not.
25  Q   And that kind of goes back to the e-mails that

Page 110

1 led into this?

2    A    Yes.

3    Q    Okay.  Now, with respect to the broker shift
4 that you just mentioned, does poultry understand that
5 Julie Blanchard owned 50 percent of DSM3?

6    A    I had a thirdhand understanding of that but not
7 firsthand.

8    Q    Did poultry understand that she got the first, I
9 think it was $125,000 money made by the broker before any
10 went to Ms. Staples as an owner?

11    A    I have no knowledge of any expenses or external
12 revenue other than what Ren Man paid the brokerage firm.

13    Q    Back to the memorandum of understanding,
14 Exhibit 6?

15    A    Uh-huh.

16    Q    Did Mr. Herschel Walker get paid the first
17 $200,000 of monies before there was the distribution of
18 profit calculation between poultry and H. Walker
19 Enterprises and/or Renaissance Man Food Services?

20    A    Both the back office fee and Mr. Walker's fee
21 were paid prior to any distribution and the distribution
22 of the profit was net of those expenses.

23    Q    And what was Mr. Walker -- what function was he
24 performing related to his 200,000?

25    A    He was Mr. Staples' direct supervisor, he was

Page 111

1 CEO of the company, he was active, at least when I was
2 involved prior and still coming back, he was active in
3 sales of product.  He went to food shows early on and
4 spent a tremendous amount of time helping build the brand,
5 the business brand, went on multiple customer calls.  He
6 was a very active member of the management team.

7    Q    Poultry would not know what Julie Blanchard was
8 doing with respect to her $125,000, correct?

9    A    Poultry had no interaction with DSM.

10    Q    Going on, this paragraph here you say, "As an
11 equity partner" --

12        MR. PARKER:  Are you referring to the paragraph
13 that begins, "I've been out of the business" on
14 Exhibit 15?

15    Q    (BY MR. SIMMS)  Yes, right.  It looks like it's
16 the third sentence.  "As an equity partner," do you see
17 that?

18    A    That was a misstatement.

19    Q    Okay.  What's the misstatement about that?

20    A    We did not own any equity in Renaissance Man
21 Food Service.  We shared profit, we did not own equity.

22    Q    How could you make that mistake?

23    A    I was writing this from recollection and I'd
24 been out of the business five years and after I went back
25 and reviewed the memorandum of understanding I clarified

Page 112

1 my recollection and we are not equity partners, we're
2 profit sharing partners.

3    Q    And so that statement there you realized was
4 incorrect after you reviewed the memorandum of
5 understanding?

6    A    Yes, sir.

7    Q    I don't necessarily care to mark this as an
8 exhibit, but I'll show it to you.  It's 155 and 156 and it
9 deals with me asking the questions about having a meeting
10 and I think you told me that there was no meeting until
11 December the 12th, 2017?

12        MR. PARKER:  You're not marking this as an
13 exhibit?

14        MR. SIMMS:  No.

15    A    Unless Herschel came to town, I do not have any
16 recollection of going to Atlanta, Dallas or -- Atlanta or
17 Dallas --

18    Q    (BY MR. SIMMS)  I take it --

19    A    -- but I can't recall.

20    Q    I'm sorry, I didn't mean to interrupt.  I take
21 it that Ms. Kimmy is Mr. Todd Simmons' administrative
22 assistant?

23    A    Yes, she is.

24    Q    She was working to try to schedule some meeting
25 times it appears from this document, but that never took

Page 113

1 place as far as you recall?

2    A    They may have.  I do not recall that meeting
3 taking place.

4    Q    All right.  Would it be fair to say that after
5 you came back on board in mid December 2016, you began
6 communicating with Mr. Walker in writing that we have gone
7 through?  Whatever issues you wanted to address, they were
8 not as significant at that point in time to force a
9 meeting until December 12, 2017?

10    A    It would be fair, yes, that would be -- that
11 would be accurate.

12    Q    And would the concerns that Mr. Staples began
13 bringing to the attention of poultry in October of 2017
14 expedite the need for a meeting between poultry with H.
15 Walker Enterprises and/or Renaissance Man?

16    A    The behavior and the description of the
17 interaction between Mr. Staples and Mr. Walker from Mr.
18 Staples was the impetus for the meeting in December of
19 2017.

20    Q    All right.

21    A    Not necessarily the subject matter, but the way
22 he described their relationship sourly.

23    Q    Let's talk about the October, I want to say it
24 was October 23rd or 24th, you schedule a meeting or
25 conference call and you did it through your computer

1 system, correct, the meeting?

2    A    Correct.

3    Q    What necessitated you doing that?

4    A    There was a request from Mr. Staples for

5 follow-up on the waffle issue, if I recall correctly, and

6 other general business issues between poultry and

7 Renaissance Man Food Service.

8    Q    I know there's a document that deals with that

9 and I'm going to find it, but what is your recollection as

10 to who all was invited to that meeting or conference call?

11    A    I will have to review that document.

12    Q    All right.  That's fine.

13    A    I know there was one phone call with Chip and

14 myself and another one included Matt.

15    Q    While I'm looking, did you initiate that meeting

16 or did Matt Free initiate that meeting?

17    A    Matt Free requested that a meeting occur after

18 conversations with Mr. Staples.

19    Q    What is -- what was Mr. Free's position with the

20 company at the time?

21    A    He is a -- what you call a salesperson, but he's

22 a national sales account -- or director of national

23 accounts manager.  He's a salesperson for us.

24    Q    Does he report to Chris -- I mean Chip Miller?

25    A    He does.

1    Q    Okay.  Had either Mr. Free or Mr. Miller or Mr.

2 Staples brought to your attention prior to the

3 October 23rd or 24th, we're going to find it in a minute,

4 conference call an incident involving HM Host?

5    A    I remember vague discussions around HM Host, but

6 I do not -- I don't recall the specifics.

7    Q    Was HM Host a customer of Simmons?

8    A    I don't recall.

9    Q    Does poultry have knowledge that there was a

10 meeting, a sales meeting being attended by Mr. Free when

11 an employee of H. Walker Enterprises by the name of George

12 Fiorelli showed up at the meeting?

13    A    I do recall that being conveyed.

14    Q    Do you know how Mr. Fiorelli was being paid as

15 an employee of H. Walker Enterprises?

16    A    I do not.

17    Q    Did Mr. Free or Mr. Staples or Mr. Miller convey

18 to you what happened when Mr. Fiorelli showed up at that

19 meeting with HM Host?

20    A    They conveyed there was some confusion that was

21 added to the meeting, but I don't recall any specifics

22 beyond that.

23    Q    All right.  123, Exhibit 16.

24       (WHEREUPON, Exhibit 16 was marked for

25 identification.)

1    A    Okay.

2    Q    All right.  This starts off, this document --

3 have you had a chance to look at it?

4    A    I have.

5    Q    All right.  It's an invitation and it says,

6 "Call in to discuss Ren Man concerns."  It appears -- did

7 you create this or did Mr. Chip Miller initiate the

8 invitation?

9    A    My name is in parentheses, so I would have

10 created it.

11    Q    All right.  And it looks like you invited

12 certain persons to participate in that call, correct?

13    A    I take this back, Chip Miller -- under the --

14 Chip Miller is the organizer, so the parentheses was it

15 was printed from my e-mail, so Chip created it.

16    Q    And he created it on October 23, 2017 at 5 p.m.

17 in the afternoon?

18    A    That's what it appears, yes.

19    Q    It looks like he's using Google or calendar to

20 --

21    A    He is.

22    Q    -- create that, correct?

23    A    Yes.

24    Q    Okay.  And the people who are invited are you,

25 Mr. Miller, David Rose, John Staples and Matt Free; is

1 that correct?

2    A    That's correct.

3    Q    And then it also indicates that Mr. Miller is

4 the organizer?

5    A    Yes.

6    Q    Okay.  Who is David Rose?

7    A    He's our vice president of marketing.

8    Q    And why was he being included in this conference

9 call?

10    A    Because Chip and David both are routinely

11 engaged with sales issues of product being sold from

12 Simmons to a customer.

13    Q    And is Matt Free being included for what reason?

14    A    Matt was the salesperson from Simmons that was

15 given the responsibility to represent Simmons to

16 Renaissance Man and work with Mr. Staples.

17    Q    All right.  Up here at the top, the word

18 concerns is plural and my question to you is what were the

19 concerns to be discussed?

20    A    I do not recall the exact concerns of this

21 meeting.

22    Q    Do you recall if Mr. Matt Free expressed concern

23 related to the George Fiorelli incident with HM Host?

24    A    I do recall Matt conveying a sales call where

25 there was confusion.  That's really the extent of it that

1 I recall.

2    Q    Was the issue of telemarketers being hired and

3 working for H. Walker Enterprises brought up as a concern

4 for this conference call?

5    A    I do now -- since you brought it up, I do recall

6 Mr. Staples conveying concerns that in his mind

7 individuals who were not qualified to conduct

8 telemarketing were being employed to do so.

9    Q    And was there a concern brought up concerning

10 Mr. Herschel Walker's niece working as an employee of H.

11 Walker Enterprises and calling on customers?

12    A    I don't specifically recall that.

13    Q    Was there a concern brought up that H. Walker

14 Enterprises was trying to expand its revenue base or

15 revenue stream and decrease the revenue platform or

16 revenue streams for Renaissance Man?

17    A    Mr. Staples expressed that concern and I believe

18 it was in this phone call, yes.  As I previously testified

19 to, he did express concern that he thought there was a

20 broader plan to move volume from H. Walker -- I mean, from

21 Renaissance Man Food Service into H. Walker Enterprises.

22    Q    Did Mr. Staples raise a concern that was

23 discussed during this conference call that he had been

24 being pressured by Mr. Eisenman and Mr. Walker to expand

25 H. Walker Enterprises?

1 this is being expressed to poultry?

2    A    Yes, that there was activity and it was creating

3 confusion.

4    Q    And it's not only being brought to the attention

5 of poultry by Mr. Staples, it's being brought by Mr. Matt

6 Free, correct?

7    A    Mr. Matt Free was conveying that it was creating

8 confusion among the customer base not dissimilar to the

9 Walker Foods/Renaissance Man that we had early on with

10 Mr. Rogers that we ended up consolidating so that we had

11 clarity.

12    Q    Had, prior to October 24, 2017, had Mr. Jeff

13 Pearce with Sysco made complaint to either Mr. Staples or

14 Mr. Free or to Mr. Blaine Walker or Renaissance Man

15 concerning being contacted by someone saying they were

16 acting on behalf of H. Walker Enterprises, LLC?

17    A    Mr. Staples did share an e-mail from Mr. Pearce

18 asking or questioning what that contact about and

19 Mr. Staples had a response of that that was why this type

20 of thing shouldn't happen.

21    Q    What other concerns were there to be discussed

22 other than what we have talked about so far?

23    A    That -- that is all that I recall.

24    Q    What about the waffles?

25    A    I'll have to look at the -- go back and review

1    A    I don't recall Mr. Staples ever conveying that

2 he was active in trying to expand H. Walker Enterprises.

3    Q    Or that he had been instructed or directed by

4 Mr. Eisenman or Mr. Walker to find other revenue sources

5 for H. Walker Enterprises?

6    A    I have no recollection of Mr. Staples ever

7 conveying that.

8    Q    All right.  Would the involvement of George -- I

9 can't even pronounce his name, Fiorelli, the presence of

10 telemarketers and the niece and now the involvement of

11 Julie Blanchard be consistent with the expansion of H.

12 Walker Enterprises?

13    A    I don't -- frankly, I don't know because I

14 didn't know as Simmons Prepared Foods, I had no knowledge

15 of the scope or size of H. Walker Enterprises or the

16 activity of it prior to that meeting or post that meeting.

17    Q    Had -- is this the first time in October of 2017

18 that Matt Free and/or Mr. Staples began raising concerns

19 involving people acting or seeking to act on behalf of H.

20 Walker Enterprises starting to interact with the customers

21 of the relationship between poultry and H. Walker

22 Enterprises and/or Renaissance Man Food Services?

23    A    To my recollection, this is the first time that

24 Mr. Staples brought that to our attention.

25    Q    So there's obviously some activity going on and

1 my notes of the timing of when the waffle came out.  This

2 was post the waffle -- the waffle -- John brought up the

3 waffle deal every time I spoke with him after Carmen had

4 brought it to our attention.

5    Q    It didn't come up again during this discussion?

6    A    No, John did bring it up every time I spoke with

7 him.  He told the story every time.

8    Q    All right.  I gotcha.  Having heard about George

9 -- I can't pronounce his name, Fiorelli, the

10 telemarketers, the niece, did poultry do an investigation

11 to see if the Savannah office had submitted a request for

12 monies that might have related to funding of the salaries

13 or compensation of these individuals to poultry?

14    A    Well, one, poultry would not be funding it.

15 They would be a Renaissance Man Food Service expense which

16 is not a poultry expense, it's a Renaissance Man expense.

17 And I am unaware of any investigation.  If John, as the

18 general manager, felt like he was being burdened with

19 expenses that were not commensurate with his sales

20 activity, then he could have asked us as a back office to

21 detail that, but I don't -- I don't know of any

22 investigation, no.

23    Q    All right.  Since January the 1st of 2018, has

24 poultry conducted an investigation to see if H. Walker

25 Enterprises and/or Renaissance Man has submitted any

31 (Pages 118 - 121)

Page 122

1  requests for payments or reimbursement of monies related
2  to the hiring of employees of H. Walker Enterprises?
3      A   I'm not aware of any detailed investigation nor
4  am I aware of any expenses.
5      Q   All right.  So can you recall everything that
6  was discussed during the conference call on October 24,
7  2017?
8      A   I do not have notes of every detail that was
9  discussed, but to the best of my recollection, we've
10  covered it.
11      Q   From what you had learned either in speaking
12  with Mr. Staples, we've established you and he had some
13  phone calls, you spoke to Ms. Carmen Seal, you spoke to
14  Mr. Chip Miller, you may or may not have spoken with
15  Ms. Dion Bennett and/or Ms. Vickie Goodman, but you
16  certainly had spoken with Mr. Free and Mr. Staples and
17  Mr. Miller as of October 24, 2017, correct?
18      A   Correct.
19      Q   Did you then take those concerns and place those
20  in a communication to Mr. Walker?
21      A   From this meeting and in this meeting, I
22  conveyed to Mr. Staples that I would reach out to
23  Mr. Walker and try to gain some clarity of what activity
24  should be occurring, where they should be occurring and
25  how we should go about doing it, and I had made a list of

Page 123

1  things that we would try to resolve, which then I wrote an
2  e-mail to Mr. Walker requesting a meeting and focusing on
3  those issues.
4      Q   Before we get into that, let me show you
5  documents Simmons 124 and 125 which will be Exhibit 17.
6  Have you had an opportunity to review the document?
7      (WHEREUPON, Exhibit 17 was marked for
8  identification.)
9      A   I have.
10      Q   It looks like at the bottom, it looks like this
11  is two e-mails.  The first one appears to be from Mr. Matt
12  Free.  Down at the bottom of page 124, it starts there.
13  Parts of it looks like are over on 125.  It looks like
14  that e-mail is dated October 23rd at 5:46 in the afternoon
15  and it's addressed to Mr. Staples, to Blaine Walker at
16  Renaissance Man, Davaughn Jackson and Tracie McEachern?
17      A   McEachern.
18      Q   McEachern, I'm sorry.  My eyesight's not too
19  good.  That is an r-n, okay.  And then the top one
20  is Mr. Free forwarding some stuff on again to Mr. Miller,
21  David Rose and Mr. Jackson and you, correct?
22      A   Correct.
23      Q   All right.  The e-mail that Mr. Free sends on
24  the 23rd, that's the day prior to the scheduling of the
25  concern regarding Renaissance Man of October 24, 2017,

Page 124

1  correct?
2      A   That is correct.
3      Q   And Mr. Free identifies himself as being
4  director of new business development?
5      A   Okay.
6      Q   Is that his position?
7      A   We retitled some people in that transition
8  period when I was out of poultry, so if that's what he's
9  got on his e-mail, that is his title.
10      Q   All right.  And it looks like he e-mails
11  Mr. Staples and Mr. Blaine Walker and gives them an
12  updated pricing for bone-in wings and when that may take
13  effect; is that correct?
14      A   That's correct.
15      Q   Who is Davaughn Jackson?
16      A   He works in marketing under Tracie, who works
17  under David Rose, and he is assigned to the Renaissance
18  Man Food Service account supporting Matt Free.
19      Q   And Tracie?
20      A   Tracie is Davaughn's manager.
21      Q   Is she related to the in-house lawyer for
22  poultry or Simmons Foods?
23      A   That is his wife.
24      Q   Okay.  Your family members work for the company?
25      A   My son interns.

Page 125

1      Q   Okay.
2      A   At 18, yes.
3      Q   All right.  It looks like when Mr. Free sends
4  the e-mail at the top and it's only to Mr. Miller,
5  Mr. Rose and you, it doesn't include Mr. Staples or
6  Mr. Blaine Walker, correct?
7      A   Correct.
8      Q   It comes on the evening after the October 24,
9  2017 phone conference regarding concerns regarding
10  Renaissance Man, correct?
11      A   Correct.
12      Q   And he starts it off by saying, "Well," and to me
13  I read the word well is like look what just happened that
14  we've been discussing things about today.  Do you
15  interpret that the same way?
16      A   Not necessarily if you know Matt.
17      Q   All right.  He says, "Well, I just received a
18  call from Herschel in reference to this newly updated
19  pricing."  Is that what he says?
20      A   It is.
21      Q   So would you take that to mean that someone had
22  forwarded his, being Mr. Free's communication from the day
23  before, to Mr. Walker?
24      A   Yes.
25      Q   Or has discussed that with him?

Freedom Court Reporting
877-373-3660          A Veritext Company          205-397-2397

1    A   I took it that as well.

2    Q   All right.  And then he says, "He kindly

3  informed."  Why does he quantify how he was informed --

4        MR. PARKER:  Objection, calls for speculation.

5    Q   (BY MR. SIMMS) -- by "kindly"?

6    A   If you knew Matt, that is how he talks.

7    Q   Okay.

8    A   So it's not out of the norm.

9    Q   He says, "He," referring to Mr. Walker, "kindly

10  informed him that we have an arrangement contract in place

11  where we," RMFS, maybe that should have been Simmons,

12  "share in the profits and if we're," Simmons, "is going to

13  raise this pricing, then we," maybe he's quoting what

14  Mr. Walker is saying, "Renaissance Man will need to stop

15  sharing the profits with Simmons."  So Mr. Free is

16  informing you, Mr. Miller and Mr. Rose that Mr. Walker

17  indicates that if you all increase these costs, he's going

18  to do away with the profit sharing agreement on that

19  memorandum of understanding which is Exhibit Number 6,

20  correct?

21    A   That is what it says.

22    Q   That's a threat, isn't it?

23    A   I took it as Mr. Walker expressing concern about

24  the price increase and frustration about how it was

25  conveyed and what was conveyed to him.

1    Q   You didn't take it as a threat?

2    A   I didn't take it as a threat.

3    Q   Okay.  So now, was this pricing discussed during

4  the conference on the 24th or is this something new

5  regarding concern related to Renaissance Man and/or H.

6  Walker Enterprises?

7    A   I don't recall whether it specifically came up.

8  If it did, it would have been Matt would have mentioned it

9  that he had passed along the price increase.

10    Q   Right.

11    A   That was during a period of time where we,

12  Simmons Foods, was reviewing pricing for all customers,

13  benchmarking them to external sources and adjusting

14  pricing to all customers to make sure we were market

15  competitive.

16    Q   I'm getting there, but you did send an e-mail to

17  Mr. Walker on October the, was it the 25th, the next day

18  after the conference call on the 24th?

19    A   That seems about right.  Yes, I did send a

20  follow-up as I discussed in that call.

21    Q   Did you make separate notes related to that

22  call?

23    A   If I did on a notepad, it has long been

24  disposed.

25    Q   All right.  What was your purpose in sending the

1  e-mail to Mr. Walker the day after the conference call?

2    A   Because Mr. Staples had expressed concern about

3  the ongoing business activities of Renaissance Man and how

4  it was structured between Simmons and Renaissance Man,

5  which was what he was managing, the Renaissance Man Food

6  Service, and I had committed to follow up with Mr. Walker

7  and reach clarity of those issues that were causing

8  contention between -- potential contention between Simmons

9  and Renaissance Man, as well as trying to address the

10  souring relationship between Mr. Staples and Mr. Walker

11  which was equally concerning for the business from an

12  ongoing perspective.

13    Q   Did Mr. Staples share with you in the early part

14  of October up to October 24, 2017 that he had participated

15  and had been requested by Ms. Blanchard and/or Mr. Walker

16  to make a presentation to Jett Food convenience stores in

17  the state of Georgia regarding waffles?

18    A   He did convey the waffle -- the potential sale

19  to Jett Foods.

20    Q   Did he share with you or anyone to your

21  knowledge at poultry that after meeting with David Ursary

22  of Jett Foods in the state of Georgia that outside of

23  Mr. Walker and/or Ms. Blanchard expressed displeasure with

24  Mr. Staples regarding what he had presented to Jett Foods?

25    A   Can you rephrase or clarify what you asked?

1    Q   That -- I'm trying to think of another way I can

2  ask it.  Did Mr. Staples convey or communicate to you or

3  to Mr. Miller that you learned about or anyone else at

4  poultry that after making the presentation to the

5  representative, Mr. Ursary for Jett Foods, that outside in

6  his yard Mr. Walker and Ms. Blanchard had, for lack of a

7  better word, chastised Mr. Staples related to that

8  presentation?

9    A   I don't recall that specific conversation, but

10  there was a -- like I said, there were a multitude of

11  stories that Mr. Staples conveyed around waffles and they

12  repeated themselves and so I can't tell you whether I

13  heard every word that he said.

14    Q   Did Mr. Staples or from any source you learn

15  from anyone else at poultry express that it had become

16  apparent with respect to the Jett Foods waffles that

17  Mr. Walker realized that Mr. Staples would no longer allow

18  H. Walker Enterprises or Renaissance Man to expense things

19  to poultry and not share with them the profit of the

20  product?

21    A   Again, there was no expense to poultry, so as

22  you worded the question, there was never an expense to

23  poultry.  The expenses all went to Renaissance Man Food

24  Service.

25    Q   But there was an attempt, were there not, sir,

1 by H. Walker Enterprises and/or Renaissance Man to expense
2 the promotional items related to the Jett Food waffles to
3 poultry?
4   A   No, sir, there was never an attempt to submit it
5 to poultry.
6   Q   Didn't Carol Walker submit to Carmen Seal a
7 request for monies and the backup included the Jet Food
8 displays and promotional items?
9   A   She did, she submitted that to Carmen to pay on
10 behalf of Renaissance Man Food Service.
11   Q   And it was stopped?
12   A   But it was never submitted to poultry.
13   Q   But if it had been paid, that's less profit that
14 would have gone to poultry to share in?
15   A   It was $7,200, and had that been paid,
16 35 percent of the $7,200 would have -- the profit sharing
17 would have been reduced by 35 percent of $7,200.
18   Q   But it was also consistent with concerns that
19 Mr. Staples was making related to what he was seeing, a
20 change in H. Walker Enterprises increasing its volume and
21 decreasing its volume with Renaissance Man, correct?
22   A   That was the perception that Mr. Staples
23 conveyed in our discussions.
24   Q   And that's also occurring consistent with George
25 Fiorelli appearing in an event on behalf of H. Walker

1 Enterprises, correct?
2   A   It was never strung together like that, but,
3 okay, in my presence.
4   Q   It was around the end of 2017 it was happening,
5 right?
6   A   It was.
7   Q   The niece of Mr. Walker is calling on Sysco as a
8 representative of H. Walker Enterprises, correct?
9   A   Yes, so you conveyed.  I don't recall the niece
10 discussions.
11   Q   The telemarketers?
12   A   Yes.
13   Q   That happened in 2017, correct?
14   A   Correct.
15   Q   And at some point in time, Ms. Blanchard gets
16 involved and is acting on behalf of H. Walker Enterprises,
17 correct?
18   A   Correct.
19   Q   And that's all in 2017?
20   A   It is.  But I don't know the extent of H. Walker
21 Enterprises and what other business activities that
22 Mr. Walker has.
23   Q   And poultry didn't know what percentage
24 Renaissance Man made of the revenue for H. Walker
25 Enterprises either; is that correct?

1   A   Poultry didn't know the percentage of revenue --
2   Q   That Renaissance Man contributed as a subsidiary
3 owned 100 percent by H. Walker Enterprises to the revenue
4 of H. Walker Enterprises?
5   A   Yeah, I have no knowledge of what -- I have
6 knowledge of Renaissance Man Food Service.  I have no
7 knowledge of the size or scope of H. Walker Enterprises or
8 any other activities of H. Walker Enterprises.
9   Q   And if in 2015 it was communicated by poultry to
10 Mr. Walker that poultry in the future may bid direct with
11 Sysco, that would put an end to Renaissance Man, correct?
12   A   That is incorrect.  There are -- Renaissance Man
13 existed prior to the relationship with Simmons.  It
14 existed under Tyson Foods and Tyson Foods sold direct and
15 Mr. Staples managed for Tyson Foods and Tyson sold direct
16 to Sysco and there were sales under Renaissance Man to
17 Sysco so it would not necessarily put an end to
18 Renaissance Man Food Service.
19   Q   Does poultry know what was motivating Mr. Walker
20 to increase the volume in H. Walker Enterprises, decrease
21 the volume in Renaissance Man?
22       MR. KING:  Objection.
23       MR. PARKER:  You're assuming facts not in
24 evidence.
25       MR. KING:  Thank you.

1   A   I have yet to see any evidence that there was
2 any decrease in volume in Renaissance Man Food Service.
3 All that has been presented to me was an increase of sales
4 of waffles which is in addition to activity that existed
5 within Renaissance Man Food Service that was happening
6 under H. Walker Enterprises which is new business and a
7 new product line in a different entity.
8   Q   (BY MR. SIMMS)  You read the transcript of the
9 meeting of December 27th with Mr. Staples and you are
10 aware that Mr. Walker had offered Robert Thurber's son an
11 ownership interest in Renaissance Man if Mr. Thurber could
12 get minority business through Tyson, correct?
13   A   I did read that, yes.
14   Q   Would that be an expansion?
15   A   That would have been an expansion and a
16 significant change to our memorandum of understanding.
17   Q   What about with respect to selling to US Foods,
18 would that have been in violation of the memorandum of
19 understanding?
20   A   It depends on the product that was sold.
21   Q   What if it was a Sysco brand, a Famous 34
22 product?
23   A   Of poultry, pork?
24   Q   Waffle?
25   A   Waffle?

34 (Pages 130 - 133)

Page 134

1    Q    Anything under Famous 34?
2    A    This venture was really focused on selling
3  poultry and other proteins and then there was a side
4  business of biscuits that really didn't amount to much,
5  but this entity was really set up around the proteins.  If
6  Mr. Walker and Mr. Staples wanted to expand the offering
7  of this business and leverage the infrastructure that's
8  already in place, then great.  If they chose to create
9  another business to handle those other activities, that
10  was his right.
11    Q    US Foods is a competitor of Sysco?
12    A    It is.
13    Q    To poultry's knowledge, did Sysco consider the
14  Famous 34 brand to be unique or exclusive to Sysco?
15    A    I don't -- I'm not aware that they viewed it as
16  exclusive, especially after we transitioned that product
17  to Sysco Classic.
18    Q    All right.  157.
19        MR. PARKER:  I just want to note this appears to
20  be an incomplete e-mail chain, that there are messages not
21  included with it.
22        MR. SIMMS:  Do you know what document those are
23  on?
24        MR. PARKER:  I do not.
25        MR. SIMMS:  It looks like here, I guess it goes

Page 135

1  through 161.  Do you want to add those to it?
2        MR. PARKER:  I think it's still not complete,
3  though.
4        MR. SIMMS:  What do you think is after that?
5        MR. PARKER:  It shows at the bottom of this
6  there's a message from Herschel to David Jackson on
7  November 29th, but then we don't have the text of that
8  message.
9        MR. SIMMS:  That's 161 and here's 162, tell me
10  if it matches up with it.
11        MR. PARKER:  Okay.  It must just be as produced
12  that the entire chain isn't complete then.
13        MR. SIMMS:  I mean, I looked at it before I
14  handed it to you because this didn't look like it went
15  with it.  You tell me.
16        MR. PARKER:  Let me see your stapler.  Remember
17  these go in reverse order.
18        THE WITNESS:  And it will put the signature
19  sometimes at the bottom of everything.
20        MR. PARKER:  For the record, Exhibit 18 now
21  consists of Simmons 157 through 161.
22        (WHEREUPON, Exhibit 18 was marked for
23  identification.)
24        MR. SIMMS:  I'm going to run to the men's room
25  since that's quite a few documents maybe for you to look

Page 136

1  at.  It might be a good time to do that.
2        (Short break from 2:09 p.m. to 2:21 p.m.)
3    Q    (BY MR. SIMMS)  All right.  Mr. Jackson, Exhibit
4  -- did we make an exhibit number already?
5    A    18.
6    Q    All right.  This appears to start off with your
7  October 25th, 2017 e-mail to Mr. Walker and to his
8  attorney, Mr. Eisenman, correct?
9    A    That is correct.
10    Q    All right.  You wrote this the day after the
11  October 24, 2017 conference call meeting, correct?
12    A    That is correct.
13    Q    And it starts out, it deals with Renaissance Man
14  board meeting and it's from you, it's to Mr. Herschel
15  Walker, his attorney, you copy Simmons' attorney, correct?
16    A    That is correct.
17    Q    All right.  You talk about being back in poultry
18  and then really I want to ask you mostly about the second
19  paragraph.  It says, "There are concerning comments,
20  though I'm hearing secondhand about the desire to continue
21  our arrangement (or if there truly is an arrangement)."
22  Who are the comments coming from that you say you've
23  learned secondhand?
24    A    It was from the e-mail and the conversations
25  with Matt Free on October 24th referring to that he had

Page 137

1  received a phone call from Herschel, that Herschel felt
2  like he could change the profit sharing based on a price
3  increase and that would have been a material change in our
4  agreement and if I recall in the verbal conversation with
5  Matt, he also conveyed that there was a comment made about
6  the agreement not being signed so it was not in force so
7  it could be changed at will.
8    Q    Then you have another paragraph here, "In
9  addition, there are invoices being submitted from other
10  entities (H.W. Foods), expenses to RMFS to pay for items
11  RMFS does not support."  What do you mean by that?
12    A    That was the -- the promotional material and
13  other things for the waffles, the $7,200 that's been in --
14  that we have discussed repeatedly.
15    Q    Any other invoices being submitted?
16    A    None that I'm aware of.
17    Q    When you say invoices being submitted, are you
18  referring to Carol Walker in the Savannah office
19  submitting some type of request to Carmen Seal with
20  poultry?
21    A    Yes, an invoice was submitted to Carmen to pay
22  on behalf of Renaissance Man Food Service.
23    Q    And when you use the words H.W. Foods, are you
24  meaning to refer to H. Walker Enterprises, LLC?
25    A    That's correct.

35 (Pages 134 - 137)
**App. 040**

1   Q   Okay.  It says, "These are both very concerning
2  to hear, raise questions about how the business is being
3  operated."  Okay.  Do you know if after Mr. Walker
4  received his e-mail, if he inquired of Mr. Staples about
5  who was sharing information with poultry regarding the
6  submission of invoices?
7   A   I did get a text from John asking about the --
8  saying that Herschel had texted him asking about the
9  meeting.  I don't recall the invoice -- there was a
10  question about the invoice, but it was submitted to Carmen
11  to pay so we would have known it by the mere fact that we
12  questioned it when it was submitted, we did know it.
13   Q   Let me show you what I'm going to mark as
14  Exhibit 19.  This has not been produced yet, but it's
15  being produced today.  It's a P&L for January of 2017.
16       (WHEREUPON, Exhibit 19 was marked for
17  identification.)
18   A   Okay.
19   Q   It is six pages long.
20       MR. PARKER:  This is a P&L for Ren Man?
21   Q   (BY MR. SIMMS) Yes.  We asked for them in
22  discovery, but we didn't get them.
23       Do you recognize -- do you recognize that
24  exhibit as an exemplar P&L for Renaissance Man related to
25  the poultry Renaissance Man/H. Walker Enterprise

1  relationship as memorialized in Exhibit 6?
2   A   This is a -- this appears to be -- I'm assuming
3  it came from Simmons, correct?
4       MR. PARKER:  This comes from them.
5   Q   (BY MR. SIMMS) We produced it today.
6   A   You produced it today.  It is consistent with --
7  so I don't -- I don't know the numbers, but it is
8  consistent format with the reporting that would be
9  generated by the Oracle system that Simmons used to manage
10  the Renaissance Man Food Service financial information.
11   Q   And was that system, is that something that
12  Blair Staples and Jennifer Dawson would come in and input
13  data into from time to time?
14   A   I am unfamiliar with what they did.
15   Q   All right.  Does that system require the entry
16  of data?
17   A   It does from an accounting perspective.  It was
18  my understanding that Simmons staff did most of that.
19   Q   What about from a sales standpoint?
20   A   Those were -- that sales data is generated when
21  the product is shipped and invoiced and that was done by
22  Simmons personnel.
23   Q   Do you know if that was done by Jennifer Dawson
24  or Blair Staples?
25   A   I do not know.

1   Q   All right.  Would this document be reflective in
2  an exemplar of the P&L that Mr. Staples began creating as
3  part of the five, seven document we looked at earlier
4  today when he began managing the relationship between
5  poultry and H. Walker Enterprises or Renaissance Man?
6       MR. PARKER:  I'm just going to again object to
7  the misclarification of the witness' testimony.  He's
8  clarified a couple of times now that Mr. Staples did not
9  manage the relationship between Simmons Prepared Foods and
10  Renaissance.  His testimony has been consistent that Mr.
11  Staples' position was to serve as the general manager of
12  Renaissance.  He's testified that he, himself, as the
13  board member from Simmons Prepared Foods and as the
14  president of Simmons Prepared Foods managed that
15  relationship.  Subject to that objection, you can answer.
16   A   This document and other documents like that were
17  generated by the accounting staff at Simmons Prepared
18  Foods for Renaissance Man Food Service staff and
19  leadership to help them understand what -- how the
20  business was functioning.
21   Q   (BY MR. SIMMS) And is the document broken into
22  three parts, one is a total and then it's broken down by
23  Simmons produced product and then non-Simmons produced
24  product?
25   A   That is correct.

1   Q   And if there had been expenses expensed related
2  to non-product that were correctly accounted for and went
3  into a report, a manager could look at the document and if
4  there's a change in expenses might inquire as to what the
5  change was associated with?
6   A   The intention of the report is to help show
7  changes and then to flag that a general manager or other,
8  whoever is designated, should dig into the detail to
9  understand why there was a change in expense versus
10  revenue.
11   Q   All right.  We'll come back to that document in
12  a moment.  Let's keep going through Exhibit --
13       MR. PARKER:  18.
14   Q   (BY MR. SIMMS) Is it 18?
15   A   18.
16   Q   All right.  You say from your perspective, are
17  you really meaning poultry's perspective?  You're speaking
18  on behalf of Simmons' Prepared Foods, correct?
19   A   Correct.
20   Q   Simmons, and you really mean poultry; you don't
21  mean Simmons, the parent, do you?
22   A   And I need to clarify.  Nelson helped me recall
23  we don't have a parent company, we have individual
24  companies.  We operate as a parent leadership, but
25  technically Simmons Foods, Simmons Prepared Foods, Simmons

1 Pet Foods, they're all --

2 Q   Standalone --

3 A   -- they're not --

4 Q   -- corporations?

5 A   Standalone corporations, right.

6 Q   You don't have consolidated tax documents?

7 A   They're somewhat related.  Can I defer to

8 Nelson?

9       MR. PARKER:  He's not testifying.

10 Q   (BY MR. SIMMS)  You can tell -- you can tell me

11 later.

12 A   Anyway, they're --

13 Q   For my purposes, when you're using certain

14 words, I want to make sure who you're referring to.

15 A   The only activity between Renaissance Man and a

16 Simmons entity was with Simmons Prepared Foods.

17 Q   Okay.

18 A   I can clarify that.

19 Q   I gotcha.  You say Simmons and Herschel entered

20 into an agreement, then you say in parentheses, which was

21 signed by you but not by Herschel and that Simmons has

22 acted in accordance to that agreement for several years.

23 Would it be that Simmons has acted in accordance with that

24 agreement since sometime in late 2009, early 2010 up until

25 the time you write this e-mail on October 25, 2017?

1       MR. KING:  Objection.  He's answered that

2 question in a different fashion, but go ahead.

3 A   That is we have operated under the general

4 assumptions of this agreement subject to slight

5 modifications over time and used this as a reference

6 document to pull back to how we set up the business when

7 there were questions on either side.

8 Q   (BY MR. SIMMS)  Then you say that agreement,

9 you're referring to Exhibit 6, correct?

10 A   I am referring to Exhibit 6.

11 Q   States that both Herschel -- and when you refer

12 to Herschel, are you referring to Renaissance Man or to H.

13 Walker Enterprises?

14 A   In my mind, it is Herschel Walker and however he

15 -- whatever structure he's got it set up.

16 Q   All right.  And Simmons are equity partners in

17 Renaissance Man Food Services.  There you go again, using

18 that word equity partners.

19 A   And that was a mistake.

20 Q   Okay.  All right.  What should it have said?

21 A   That we have a profit sharing agreement.

22 Q   Is that the 65-35?

23 A   That is correct.

24 Q   All right.  For 2018 and after, you -- I, you

25 say I, would like absolute clarity on the agreement of

1 behaviors for both parties so Simmons can continue to

2 build and execute our business plan for producing and

3 selling chicken in the food service distributive and

4 retail segments."  Is that what you said?

5 A   It is.

6 Q   You say, "I'm certain both parties have

7 adjustments they would like to see in an updated

8 agreement."  Did I read that correctly?

9 A   You did.

10 Q   Then you say, "Please let me know if you would

11 like to propose adjustments to the agreement or would like

12 for us to do so."  Now, when you say adjustments to the

13 agreement, are you referring to Exhibit 6?

14 A   Modifications to Exhibit 6.

15 Q   Okay.  Then you say, "Ron," so now you're

16 specifically addressing Mr. Eisenman who you know is the

17 attorney for Mr. Walker and, again, is it your belief or

18 poultry's belief that Mr. Eisenman prepared Exhibit 6?

19 A   He and I had negotiated back and forth on --

20 with Mr. Walker being copied, but we had spent 12, 18

21 months going back and forth on that.

22 Q   All right.  You say, "Please forward me the

23 foundation agreement you would like for us to begin with."

24 Are you seeking a new, different agreement or are you

25 referring back to perhaps that one?

1 A   There were multiple versions of this memorandum

2 of understanding and because we had gone back and forth

3 and so I was asking for Mr. Eisenman to forward me the

4 agreement that he wanted me to start with so that we both

5 could modify from the same agreement.

6 Q   Then you say -- then you provide dates you're

7 available to meet; is that correct?

8 A   That is correct.

9 Q   And then you inform Mr. Eisenman and Mr. Walker

10 that you are copying Andrew, who's the internal corporate

11 counsel for Simmons, and you tell them what he manages,

12 correct?

13 A   That's correct.

14 Q   All right.

15 A   I normally would not copy Andrew on

16 communications, so I wanted to explain why.

17 Q   I gotcha.  Your intentions were to have a new

18 contract signed and executed in place for 2018?

19 A   It was.

20 Q   Nowhere in this e-mail do I see any reference

21 about the employment status of Mr. Staples?

22 A   That was not contemplated.

23 Q   At that time?

24 A   At that time it was my -- my belief is that we

25 would, because of the feedback I had gotten back from

Page 146

1 John, that he and Herschel had cleared the air, I believe
2 was the term he had used, and they were getting back on
3 track, that we were going to continue operating as we had
4 but resolving the conflict and the other issues that were
5 going on.
6    Q    Going on with this document, at the bottom it
7 looks like you FYI Chip Miller?
8    A    I did.
9    Q    Okay.  What -- did you just forward your e-mail
10 to him or what was that you did?
11    A    I forwarded my e-mail to Chip.
12    Q    Okay.  All right.  Then is the next document
13 Mr. Herschel Walker's response?
14    A    It is.
15    Q    And he sends that at 9:59 a.m. on October 26th,
16 the next day?
17    A    That is correct.
18    Q    Says he tried to call you a couple times to keep
19 you informed of what had been going on, but you had not
20 called him back.  Is that correct?
21    A    I believe that is correct.
22    Q    Then he says he's taking a more active role to
23 grow Renaissance Man.  Is that what he says?
24    A    It is.
25    Q    Then he starts talking about H. Walker Foods is

Page 147

1 a brand of Renaissance Man that Simmons invoices.  Is that
2 correct?
3    A    We have a branded product and I do believe it
4 says H. Walker Foods on it that is represented by
5 Renaissance Man Food Service.
6    Q    Then it says, "H. Walker Foods was created
7 because of Marriott and US Foods as Sysco was tied in so
8 tight with Renaissance Man through the CatMan."  Do you
9 know what he's talking about here?
10    A    That, as with many customers, when you have a
11 significant amount of product with a label on it, a brand
12 on it whether it's exclusive or not, sometimes they
13 believe that it's exclusive, so it's easier to create
14 another label to sell to a competitor instead of that same
15 label going to a competitor.
16    Q    It says, "I've started trying to build a
17 stronger relationship with US Foods similar to the one he
18 has with Sysco."  Do you know if the relationship with US
19 Foods was being built through what entity?
20    A    It was my understanding it was through
21 Renaissance Man Food Service.
22    Q    Not H. Walker Enterprises?
23    A    Not H. Walker Enterprises.
24    Q    It says, "Along with the chicken, we're now
25 selling waffles to US Foods."  Is that what it says?

Page 148

1    A    It is.
2    Q    Do you know if that was true or not at the time
3 that statement was made?
4    A    I did not verify that.
5    Q    It says, "The first couple of waffles produced
6 went to restaurants in Alabama."  Did I read that
7 correctly?
8    A    You did.
9    Q    And they were invoiced through Simmons?
10    A    Yes.
11    Q    In preparation for US Foods' entry, we created a
12 retail package film, display bins because things were
13 happening so fast and those are the invoices I was asking
14 to be paid."  Did I read that correctly?
15    A    You did.
16    Q    Was that true?
17    A    I took it at face value.
18    Q    Well, the invoices that Carol had submitted to
19 Carmen dealt with waffles being sold retail through
20 convenience stores with Jett Foods, correct?
21        MR. KING:  Objection, assumes facts not in
22 evidence.
23    A    I do not have firsthand knowledge of what they
24 were for.  I just know that I was told that they were not
25 for product sold by Renaissance Man Food Service.

Page 149

1    Q    (BY MR. SIMMS)  Through its relationship with
2 poultry?
3    A    Renaissance Man -- any sales through Renaissance
4 Man Food Service which John was the general manager would
5 have been captured inside of that entity and it would have
6 had the administrative fee and the 65-35 split and the
7 back office expense would have been borne by or provided
8 by Simmons.  If there were sales that happened outside of
9 that entity and they were invoiced outside of that entity
10 and they were represented outside of that entity, I have
11 no knowledge of that.  And that's what I -- what was
12 presented to me was the invoice to be submitted and paid
13 by Renaissance Man Food Service was for activity outside
14 of Renaissance Man Food Service.
15    Q    After receiving this e-mail, did you inquire of
16 Carmen Seal for the backup that was supplied by Carol
17 Walker related to the request concerning the displays and
18 other expenses concerning the sale of retail waffles?
19    A    I did not.
20    Q    Do you know if you would have looked at that if
21 you could have told who the entities were producing the
22 film and producing the displays and what that entity may
23 be reflecting it related to?
24    A    I do not.  Again, it was $7,200.
25    Q    I understand.

Page 150

A It was not a significant expense.
Q My question to you and I'm trying to find out is do you know if what is stated here to be true or not?
A I took it at face value to be true.
Q And would it be true also that if these expenses were being processed outside the poultry and H.W. Enterprises/Renaissance Man relationship, they would not be reflected in the P&L?
A If the sales did not pass through Renaissance Man, then they would not be reflected in the P&L.
Q And if a manager was looking at the P&L and saw an increase in expenses, they may question what those were related to and whether they were within the relationship or not; is that fair?
A That is fair.
Q It says we finally got to the right people at US Foods. Do you know if there had even been a meeting set up with US Foods on October 26, 2017?
A I took what he said to be at face value.
Q All right. And have a very large meeting in November to kick off the new relationship. Then he says he would like -- he would love to go into 2018 with Simmons feeling comfortable with what he's trying to do with Renaissance Man. Says I'm being told no on many things and gotten different answers and I thought I was

Page 151

the CEO of Renaissance Man. Do you know what Mr. Walker is referring to about being told no on many things or gotten different answers and he thought he was the CEO, what he's referring to specifically?
A I assumed it was on the issue with Matt and wing pricing and on payment of the invoices for the $7,200 related to the waffles, that as CEO he would have said -- if he had said pay it, that it should have been paid.
Q Without being questioned?
A That's what I read into this. I did not have a specific conversation with Mr. Walker about that specific comment.
Q Do you know if Mr. Walker is referring to Mr. Staples' policing with respect to the waffle invoice expense submission and telling Ms. Carmen Seal, no, don't pay it?
A I don't know that. I do know that had Mr. Staples said pay it, Ms. Seal would have still brought it to Mr. Miller and myself saying I don't understand why I'm being told to pay this because that is the -- that is her job function, part of it, to make sure things tick and tie out.
Q Certainly Mr. Staples saying no could be what Mr. Walker is referring to, correct?
A It could have been. I can't speculate, though,

Page 152

because I don't know.
Q Did you call Mr. Walker and ask him specifically what he was referring to?
A I did not.
Q You can't rule out that he was referring to the behavior of Mr. Staples?
A I can't comment to --
Q Don't know one way or the other; is that fair?
A That is fair.
Q Did you take this sentence to indicate that Mr. Walker was not happy with being told no?
A I did take it that he was -- again, there was contention in the relationship and it added to the cadence of concern of things going on around Renaissance Man Food Service, the relationship between Simmons and Mr. Walker, the relationship between Mr. Staples and Mr. Walker's relationship between Mr. Staples and Simmons and all kinds of uncertainty that a face-to-face meeting needed to occur to resolve.
Q Then it looks like in this communication the next thing you do is you forward Mr. Walker's e-mail response to Mr. Chip Miller?
A I did.
Q Why are you forwarding that to Mr. Miller?
A Mr. Miller is my vice president -- senior vice

Page 153

president of sales and Renaissance Man Food Service is a customer of Simmons Prepared Foods so he would help from that perspective manage the relationship.
Q You had also forwarded your e-mail to Mr. Eisenman and to Andrew and to Mr. Walker and to Mr. Miller, correct, and now you're forwarding to him the response you got to your e-mail?
A I forwarded to Mr. Miller the response to the e-mail, yes.
Q And Mr. Miller was Mr. Staples' supervisor with poultry?
A Mr. Miller was the -- is the senior VP of sales for Simmons.
Q And in the chain of command, Mr. Staples would be reporting to him as his supervisor?
A In the organizational structure, yes. In reality, there was nothing about that organizational structure that really mattered.
Q Going on -- let me ask you this. We produced documents today and don't the personnel records of poultry indicate that Mr. Miller is Mr. Staples' supervisor?
A On paper, yes.
Q All right.
A Just as Mr. Miller would have been Mr. Rogers', Mike Rogers', supervisor in the previous arrangement.

1    Q   It looks like on November the 1st you receive
2  another e-mail from Mr. Walker, Mr. Eisenman, is copied,
3  Andrew is copied and now Julie Blanchard is copied at her
4  address at H. Walker Enterprises.  Do you see that?
5    A   I do.
6    Q   Do you know why Julie Blanchard was being copied
7  at H. Walker Enterprises and in what capacity was she
8  being copied in?
9    A   I do -- I do not.
10   Q   Are you aware or is poultry aware that
11 Ms. Blanchard had penned an e-mail to Carol in Savannah
12 prior to November the 1st, 2017 related to the waffle
13 incident?
14   A   I am not.
15   Q   Well, let's look at them.  Renaissance Man
16 document 303.  Are we on Exhibit 20?
17       (WHEREUPON, Exhibit 20 was marked for
18 identification.)
19       MR. KING:  We are.
20   Q   (BY MR. SIMMS)  While we're looking for an extra
21 copy, you can look at it.  Have you ever seen that
22 document before, Mr. Jackson?
23   A   I don't recall reading this specific e-mail.  I
24 do not recall reading this specific e-mail.
25   Q   Would that copy of that e-mail have been in

1  poultry's possession, because was that sent to Ms. Seal?
2    A   It is addressed to Ms. Seal.  I do not see a
3  letter in the e-mail where it was ever sent to Ms. Seal.
4    Q   And it looks like the document indicates that on
5  January the 3rd of this year, which today is the 14th,
6  Ms. Walker forwarded this e-mail to Mr. Herschel Walker
7  and to Ms. Julie Blanchard.  Do you see that?
8    A   I do.
9    Q   Do you -- and you don't know if -- I'm trying to
10 make sure I understand now whether the e-mail of
11 October 31, 2017 was ever sent to Ms. Carmen Seal at
12 poultry?
13       MR. PARKER:  He already said he doesn't know
14 that.
15   A   I've never seen this and I see nothing here to
16 show that it was ever sent.
17   Q   (BY MR. SIMMS)  I gotcha.  Now, this e-mail is
18 referring to display bins related to Peachtree Packaging.
19 Do you see that?
20   A   I do.
21   Q   Do you know if the backup that Ms. Carol Walker
22 provided to Carmen Seal back in early October 2017
23 included invoicing from Peachtree Packaging?
24   A   My understanding that it was for display bins
25 for the waffles.  So I do not recall the vendor, but that

1  would be consistent with my understanding.
2    Q   Do you know if those were for the waffles for
3  Jett Foods?
4    A   That is my understanding.
5    Q   And it goes on to say that Herschel has had
6  correspondence with you explaining that H. Walker is a
7  brand of Renaissance Man and not a new company?
8    A   Yes.
9    Q   Why would poultry need to be told that?
10   A   Only there was discussion about -- again, I've
11 not seen this, but there was discussion around H. Walker
12 Enterprises selling product independent of Renaissance Man
13 Food Service and I would presume it's to clarify or try to
14 clear up some confusion of the H. Walker brand versus an
15 H. Walker Enterprise sale and whether the confusion of who
16 owns -- who owed what was based on that terminology
17 because there was a lot of H. Walker things that go on in
18 discussion.
19   Q   And then Ms. Carol Walker asked to Ms. Carmen,
20 it was never -- it doesn't show it was sent or received by
21 poultry?
22   A   Right.
23   Q   "Please let me know if this is what you are
24 wanting and if it doesn't show the forwarding."  Do you
25 know what that's talking about?

1    A   I know Ms. Carmen Seal asked for backup
2  documentation for the sale if -- and what she needed was
3  invoiced product out of Renaissance Man Food Service for
4  that product, for those waffles, and if they were going to
5  those customers and those bins were used, then that was a
6  Renaissance Man expense and income or loss.  It could have
7  been a loss.
8    Q   Have you seen Exhibit 21 which is Renaissance
9  Man 304?  Actually, to be fair, it says 312.
10       (WHEREUPON, Exhibit 21 was marked for
11 identification.)
12       MR. SIMMS:  Do you want to staple these
13 together?  Actually, if you want to, you can take 20 and
14 staple all those to it and then share it with Mr. King so
15 he can look at it before I start asking questions.  It
16 looks like this is all together.
17       MR. PARKER:  I actually think it's a couple of
18 different e-mail chains.
19       MR. SIMMS:  Are they?
20       MR. PARKER:  Yeah, these first three pages you
21 can see it ends at the top there.
22       MR. SIMMS:  Okay.  Then --
23       MR. PARKER:  Do you still want to mark it all
24 together?
25       MR. SIMMS:  No, you can separate it and then

Page 158

1 we'll put the sticker on the next version. Did I pull one
2 off in there. Did I put a sticker on that, 21?
3     THE WITNESS: You did.
4     MR. SIMMS: And then Exhibit 22 is going to be
5 the next set.
6     (WHEREUPON, Exhibit 22 was marked for
7 identification.)
8     MR. PARKER: Yeah, and that still doesn't get us
9 through the whole batch. We'll need another exhibit. Do
10 you want to mark that one and then I'll show it to Mr.
11 King?
12     MR. SIMMS: That's 22?
13     MR. PARKER: That will be 22.
14     MR. SIMMS: All right.
15     MR. PARKER: That will be Exhibit 23 and then
16 this will be Exhibit 24.
17     (WHEREUPON, Exhibit 23 was marked for
18 identification.)
19     MR. SIMMS: Thank you. All right.
20     MR. PARKER: Hold on. Hold on.
21     MR. SIMMS: I'm sorry.
22     MR. PARKER: You actually had some duplicates in
23 there, so what we've done is we've got Exhibit 21 which is
24 RMFS304 through 306, Exhibit 22 is RMFS310 to 311 and
25 Exhibit 23 is RMFS312.

Page 159

1     MR. SIMMS: What happened to 307?
2     MR. PARKER: I gave that back to you. That was
3 a duplicate of what is Exhibit 21.
4     MR. SIMMS: Okay. All right. Okay.
5     MR. KING: So we're up to Exhibit 23 at this
6 point, right?
7     MR. PARKER: We're through 23.
8     MR. SIMMS: What's the first one I showed you
9 that you have never seen before, what exhibit number was
10 it?
11     MR. PARKER: That was Exhibit 20.
12     Q   (BY MR. SIMMS) And that's the document 303,
13 correct, Renaissance Man 303?
14     A   That's correct.
15     Q   All right. Document 304 through 3 what is
16 Exhibit 20 --
17     A   21 is 303 through 306 -- 304 through 306. 304,
18 5 and 6.
19     Q   Has -- have you seen these documents before
20 today?
21     A   I have not.
22     Q   Now, it appears that 304 contains a
23 communication from Ms. Carmen Seal to Ms. Carol Walker on
24 November 27th, 2017 and then you have Ms. Walker's
25 response to herself at the top. Do you see that?

Page 160

1     A   Yes.
2     Q   All right. So on November 27th, Carmen Seal,
3 and she's referencing ACH. What does ATH stand for? Is
4 that a clearing account?
5     A   Yes.
6     Q   Does it deal with the poultry and H. Walker
7 Enterprises/Renaissance Man pursuant to rule -- I mean the
8 Exhibit Number 6?
9     A   That would be how she would send funds,
10 Renaissance Man funds to the Savannah office or to Carol.
11     Q   All right. So Carmen is telling Ms. Carol that
12 she sent her money on November the 8th for Peachtree
13 Packaging invoices as Herschel had said that he was going
14 to pay us, being poultry, back for those; is that correct?
15     A   That's incorrect.
16     Q   Okay.
17     A   Herschel said he would pay Renaissance Man Food
18 Service, not poultry.
19     Q   Okay. But is that what Ms. Carmen Seal is
20 saying?
21     A   She is saying that Herschel agreed to deduct the
22 value of that invoice from his year end distribution so
23 that that invoice would go ahead and get paid.
24     Q   And then she says, "Did you just hold the money
25 and send Herschel's check to Peachtree? If that is the

Page 161

1 case and you sent Herschel's check to Peachtree, I would
2 delete the money I show he owes Renaissance Man and will
3 not need to send you an ACH yet until we use up the
4 credit." Did I read that correctly?
5     A   That's correct.
6     Q   And then it looks like Ms. Walker responds at
7 1:26 and says she wasn't aware that Ms. Seal sent
8 anything, correct?
9     A   That's correct.
10     Q   All right. And then about four minutes later,
11 Ms. Walker appears to e-mail herself and says, "Carmen,
12 can you please tell me what extra money I have? I'm not
13 aware of any extra. Everything I e-mail you was for the
14 invoices, but I will check all checks and see what posted
15 and see if I can see the deposit." Did I read that
16 correctly?
17     A   Yes.
18     Q   But there's no indication that Ms. Carmen Seal
19 received that, correct?
20     A   I'm looking for a later response from Ms. Seal.
21 There's no indication on that in that chain.
22     Q   All right. Then going to page 305, that is a
23 breakdown of Ms. Carol Walker's request to Ms. Carmen Seal
24 where she breaks down what the $12,138.76 request pertains
25 to, correct?

Freedom Court Reporting
877-373-3660                    A Veritext Company                    205-397-2397

Page 162

1    A    Correct.
2    Q    And there's a reimbursement for Herschel for
3  $7,095, and is that related or identified as paying
4  Peachtree Packaging?
5    A    That was the invoice for Peachtree, the invoice
6  that was -- been in question.
7    Q    All right.  Now, Ms. Walker indicates that she
8  works for Renaissance Man Food Services and H. Walker
9  Enterprises, LLC in the body of her e-mail, correct, or
10 her e-mail signature?
11   A    That is what her signature says.
12   Q    All right.  Let's go to 307.
13       MR. PARKER:  We don't have a 307 in front of us.
14   A    So 307, 8 and 9 should be a repeat of --
15   Q    (BY MR. SIMMS)  Yeah, that's what it is.
16   A    304, 5 and 6.
17   Q    Okay.  Have you got 311?
18       MR. PARKER:  No.
19   A    I have a 310 and 11, yes.
20   Q    (BY MR. SIMMS)  You have 11?
21   A    I do.
22   Q    Is that -- is that an indication that it is by
23 fax?  It's kind of upside down numbers, but do you know
24 what that (912)961-0012, would that be --
25   A    I would say that is a fax of the check.

Page 163

1    Q    Okay.  Do you know if that check was ever
2  actually ever presented to Peachtree or not?  It just
3  shows the front of it, it doesn't show if it was processed
4  or not.
5    A    I do not.
6    Q    It references invoice numbers 11990-112343,
7  correct?
8    A    Correct.
9    Q    Do you have 312?
10   A    I do.
11   Q    All right.  And 312 --
12       MR. PARKER:  Which for the record is Exhibit 23.
13   Q    (BY MR. SIMMS)  I'm sorry, 23.  It appears to be
14 an e-mail that Ms. Blanchard prepares to Carol Walker on
15 October 31, 2017 at 6:44 a.m.  Do you see that?
16   A    I do.
17   Q    And she is providing details to Ms. Carol for
18 Ms. Carol to provide to Carmen to clarify confusion caused
19 by the error made in the PO to Peachtree Packaging for the
20 Famous 34 waffle display bins; is that correct?
21   A    That's correct.
22   Q    And then she says that RMFS has been selling
23 Food Service waffles and in addition they've launched
24 Famous 34 retail waffle to be distributed through US
25 Foods.  Is that what she says?

Page 164

1    A    It is.
2    Q    Do you know if at the time this was penned on
3  October 31, 2017 if H. Walker Enterprises or Renaissance
4  Man even had a meeting with US Foods to discuss the sale
5  of waffles?
6    A    I have no idea.
7    Q    And that these are being marketed under the H.
8  Walker Foods brand, that's what Ms. Blanchard is telling
9  Ms. Carol to tell to Ms. Carmen; is that correct?
10   A    That's correct.
11   Q    There is no mention in this communication that
12 Ms. Carol Walker is to send to Ms. Carmen Seal about Jett
13 Foods, is there?
14   A    I do not see anything from -- I do not see Jett
15 Foods specifically mentioned.
16   Q    Right.  Do you know if Carol Walker sent this
17 communication to Carmen Seal?
18   A    I have never seen this and I've not had any
19 communication with Carmen that it was sent to her.
20   Q    All right.  Let me show you what is Renaissance
21 Man 25.
22       THE COURT REPORTER:  We skipped 24.
23       MR. KING:  No, it's Ren Man 25 is Exhibit 24.
24       MR. SIMMS:  It's what?
25       MR. PARKER:  No, no, we've skipped Exhibit 24.

Page 165

1        MR. SIMMS:  Okay.  I'm sorry, I was thinking
2  that was --
3        THE WITNESS:  This is 23 here.
4        MR. SIMMS:  This is 24?
5        MR. PARKER:  No, it's 23.
6        MR. SIMMS:  Have we not gone over this?  Oh, we
7  haven't gone over 24.
8        MR. PARKER:  We're saying we need to mark this
9  one in your hand Exhibit 24 rather than 25.
10   Q    (BY MR. SIMMS)  We changed it on the numbering.
11 I gotcha.  I appreciate that.  Have you ever seen this
12 before, Exhibit 24?
13       (WHEREUPON, Exhibit 24 was marked for
14 identification.)
15   A    I don't recall seeing it.
16   Q    Down at the bottom it indicates to contact Julie
17 Blanchard and gives her e-mail address as an H. Walker
18 Enterprise e-mail address, correct?
19   A    Correct.
20   Q    Did poultry buy the explanations provided by Ms.
21 Blanchard or Mr. Herschel Walker or Ms. Carol Walker about
22 the sale of the waffles and the invoicing that was
23 associated with it?
24       MR. PARKER:  Object to the form of the question.
25 You can answer.

Page 166

1    A   The only facts that mattered were, A, were there
2   product codes in Renaissance Man Food Service for the
3   waffles in question, did sales occur or attempts for sales
4   occur for those waffles using those display bins, and if
5   they did, that would have been a Renaissance Man Food
6   Service business activity.  If there was no invoicing or
7   activity around the sale through Renaissance Man, then it
8   would not be Renaissance Man expense.
9    Q   And it would be improper to submit that for
10   payment?
11    A   Or an error.  It wouldn't have been a payment
12   that Renaissance Man Food Service should be paying if the
13   -- if the revenue and the product aren't run through
14   Renaissance Man.
15    Q   I guess what I'm getting to is this -- did
16   poultry investigate to determine if the explanations being
17   offered by Ms. Blanchard or Mr. Walker or Ms. Carol Walker
18   were truthful?
19    A   There was no investigation.  It took -- again, I
20   took them both at their word.  It was 72 -- $7,300, so it
21   was a minor expense, a lot of activity, a lot of things
22   going on at the time and to me it was more indicative of
23   the nature of the relationship between Mr. Staples and
24   Mr. Walker and Mr. Staples and Mrs. Blanchard and the
25   status of how well they were or were not getting along

Page 167

1   than it was the specifics about that product being sold or
2   that $7,300 invoice.
3    Q   All right.  You would agree with me that these
4   communications and documents I just showed you occurred
5   prior to Mr. Walker's November 1, 2017 e-mail to you
6   that's in an exhibit?  You'll have to find Simmons 159.
7    MR. PARKER:  First of all, look at those.
8    A   Okay.  So what would you like to know?
9    Q   (BY MR. SIMMS)  The communications that I just
10   showed you or the documents from Renaissance Man predate
11   Mr. Walker's e-mail to you contained on page 159 of the
12   Simmons produced document that's an Exhibit.
13    And what exhibit number is that, Talley?
14    MR. PARKER:  Exhibit 18.
15    MR. SIMMS:  Okay.
16    MR. PARKER:  For the record, the e-mail you're
17   referring to is part of a larger e-mail thread that spans
18   Simmons 157 through Simmons 161.
19    Q   (BY MR. SIMMS)  You need to go to 159.
20    A   Okay.
21    Q   Look at the top.  This is Mr. Walker
22   communicating with you again on November the 1st, correct?
23    A   Yes, 10:33 a.m.
24    Q   And that's what, one or two days after Ms.
25   Blanchard sends a full-blown explanation to Carol Walker

Page 168

1   to provide to Carmen seal?
2    MR. PARKER:  Object to the form of the question.
3   You can answer.
4    A   The dates are two days apart, yes.
5    Q   (BY MR. SIMMS)  You keep trying to make light of
6   the waffle expense, that it's only $7,200?
7    A   I'm not making light of it, it was not a
8   significant business issue.
9    Q   Why did Mr. Walker and Mrs. Blanchard go to the
10   extremes to explain all this if it was not important?
11    MR. PARKER:  Objection, calls for speculation.
12   You can answer if you know.
13    A   It was my perception that there were -- it was a
14   lot of noise in the relationship between Mrs. Blanchard
15   and Mr. Staples, between Mr. Walker and Mr. Staples,
16   between Simmons and Mr. Walker, and Simmons and Mr.
17   Staples and issues that came up then, they felt an
18   obligation to explain and overexplain, but that, again,
19   was indicative of the relationship not being where it
20   needed to be to operate right as a business, which they
21   called for the board meeting and face-to-face discussion
22   to try to resolve those.
23    Q   (BY MR. SIMMS)  And one of the issues too was,
24   and we already documented this, Mr. -- and you agreed with
25   me that Mr. Walker does not like -- he doesn't like being

Page 169

1   told no?
2    MR. PARKER:  Objection, that mischaracterizes
3   his testimony.  He didn't say that.
4    A   I did not say he did not like being told no.  I
5   acknowledged in his e-mail that he addressed that he
6   didn't -- he was concerned about being CEO and not having
7   things executed as he had instructed.
8    Q   (BY MR. SIMMS)  And on December 12, 2017, did
9   you and Mr. Walker discuss that Mr. Walker did not like
10   his expenses that he submitted to poultry being paid when
11   Mr. Staples was told not to pay them?
12    A   When did you ask that would have --
13    Q   December the 12th meeting, the board meeting.
14   Did Mr. Walker indicate displeasure or that he was angry
15   with Mr. Staples because Mr. Staples was saying no to the
16   submission of expenses?
17    A   The waffle discussion at the board meeting did
18   not occur until the very end of the board meeting and it
19   was in a conversation between myself and Ms. Blanchard,
20   not with Mr. Walker.
21    Q   And the termination of Mr. Staples did not occur
22   until the end of that meeting either, correct?
23    A   Mr. Walker led the board meeting with an opinion
24   that Mr. Staples needed to be terminated.
25    Q   Okay.  Have you read Mrs. Blanchard's notes from

Freedom Court Reporting
877-373-3660                    A Veritext Company                    205-397-2397

1 that meeting?

2  A  I have not.

3  Q  Okay.  All right.  Let's get back to page 159

4 here.  Mr. Walker is giving dates to meet, correct?

5  A  Correct.

6  Q  And then it goes a step further and he says he

7 wanted to see if you, David Jackson, could change the

8 RMFS/Simmons report that John, is he referring to Mr.

9 Staples?

10  A  He is.

11  Q  Has access.  Then it says to view only the

12 margins with pounds sold and not the actual P&L.  That's

13 what he asked of you in this e-mail; is that correct?

14  A  He did.

15  Q  Did you and Mr. Walker discuss why he did not

16 want Mr. Staples to have access to the profit and loss

17 statements on this relationship anymore?

18  A  We did not.

19  Q  Do you know if it was because Mr. Staples could

20 act as policeman and question expenses being submitted to

21 Simmons?

22      MR. PARKER:  Objection, calls for speculation.

23 He just said they didn't have this conversation.

24  A  I don't know what Mr. Walker, his motivation.  I

25 do know that it did not surprise me that there would be a

1 request something of that nature because the relationship

2 between Mr. Staples and Mr. Walker had severely

3 deteriorated.

4  Q  (BY MR. SIMMS)  And Mr. Walker is not wanting

5 Mr. Staples to have access to information, one of which

6 contains expenses, correct?

7  A  Margins would show what you made on an

8 individual product and the expense would be associated

9 with that.

10  Q  But the P&L would show the expenses?

11  A  P&L would show line item expenses, yes.

12  Q  Mr. Walker is saying it's okay for him to look

13 at the margins on the pounds, but I don't want him seeing

14 the actual P&L; isn't that what he's saying?

15  A  That is what he requested.

16  Q  Then he goes on to start talking about hiring

17 people; is that right?

18  A  It is.

19  Q  And that's one of the concerns you had raised

20 before.  Do you know if this concern pertained to the

21 George -- to George and to the niece and to the

22 telemarketers?

23  A  He did not detail who those people were.

24  Q  Did he indicate that Julie Blanchard was a

25 person hired in this e-mail?

1  A  He did not.

2  Q  And now he says he has closed a big deal with US

3 Foods.  And, again, do you know if they'd even met with US

4 Foods on November 1st, 2017?

5  A  I took him at his word.

6  Q  Okay.  Then you reply; is that correct?

7  A  I did.

8  Q  And do you include -- you begin including Julie,

9 Ms. Blanchard, at H. Walker Enterprises and why did you

10 include her in your reply?

11  A  Because she was in the e-mail that was sent to

12 me.

13  Q  Okay.

14  A  I replied to all.

15  Q  You tell Mr. Herschel Walker that your

16 experience has shown that removing information from or

17 isolating a leader instead of resolving the differences

18 will cause more damage to the organization.  We can do as

19 you wish, but I believe it will drive John to be less

20 productive for Renaissance Man Food Services.  Are you

21 referring to the request that Mr. Staples not be given

22 access to the profit and loss statements anymore?

23  A  I am.

24  Q  And what -- can you expand on what you're trying

25 to indicate here?

1  A  I sensed from the request that Mr. Walker was

2 extremely frustrated with Mr. Staples and his approach to

3 address that frustration was to remove information from

4 Mr. Staples' purview and I was trying to communicate that

5 if there was a true performance issue that that needed to

6 be addressed, it didn't need to be to isolate someone or

7 to take away their access to information and leave them

8 working in the organization because they would serve to

9 poison the organization.

10  Q  Well, what performance issue had Mr. Walker

11 raised to you before November 1st, 2017 concerning John

12 Staples?

13  A  I don't know that Mr. Walker had conveyed a

14 performance issue.  I know that I had in my knowledge Mr.

15 Staples' description of events and interaction with

16 Mr. Walker and Ms. Blanchard and I think I had that in my

17 mind as I was responding to this and having that context

18 in my mind.

19  Q  So it wasn't performance based, it was

20 disagreement over what's taking place or what activities

21 or how the business is being run?

22  A  If I am CEO and I strongly disagree with my

23 general manager and want to reduce access to the P&L, I

24 would lump that into performance.  There is something

25 about how he is performing or she is performing her job

Page 174

1 that I no longer find acceptable and I need to take
2 action.
3    Q    If that issue was tattle-taling or policing you
4 for doing something improper, that wouldn't have anything
5 to do with performance, would it?
6        MR. PARKER: Objection, form.
7    A    I don't know what that issue was.  I just know
8 that there were issues.  As a general manager managing an
9 entity solely owned by an individual, your job is to
10 manage that entity and make sure that you've got -- manage
11 the entity and make sure that the ownership is satisfied
12 with how you're doing that, that is performance.
13    Q    And within days of this e-mail, you received one
14 from Mr. Walker where he saw fit to put in writing that he
15 didn't like being told no?
16    A    Okay.
17        MR. PARKER: Objection --
18    Q    (BY MR. SIMMS)  Correct?
19        MR. PARKER: Objection, mischaracterizes his
20 testimony.
21    A    He did not --
22    Q    (BY MR. SIMMS)  I mean, it says what it says,
23 correct?
24    A    It says what it says, but again, I saw that as
25 just more -- I would call them red flags that the

Page 175

1 relationship is sour and that it needed to be resolved.
2    Q    And the way it got resolved was Mr. Staples lost
3 his employment?
4    A    Well, the intention was to -- my intention to go
5 to the board meeting and discuss what -- whatever the
6 surface, whatever those issues were and try to figure out
7 how we're going to resolve those, but all the while I had
8 a growing concern of how the relationship was evolving,
9 John's interest and his concern over operating Renaissance
10 Man Food Service versus the brokerage firm.  There was all
11 kinds of noise going on about where John's interests lie
12 and what his motivation was.
13    Q    And you had interest in having a written
14 agreement with Renaissance Man and/or H. Walker
15 Enterprises that would clearly define how expenses were
16 being submitted to be paid for and processed by poultry,
17 correct?
18    A    Not by poultry, what it's --
19    Q    On behalf of Renaissance Man?
20    A    What expenses were legitimate for Renaissance
21 Man Food Service.  I am a strong believer in organization,
22 there should be rules and structure and we should follow
23 those and that creates clarity and then it keeps you from
24 getting in those issues.
25    Q    And in your mind, there was clarity in Exhibit 6

Page 176

1 on that exact issue, correct?
2    A    Yes.
3    Q    And do you know if Mr. Staples had been provided
4 a copy of Exhibit 6 so he would have clarity in his mind
5 on how to handle situations related to the submission of
6 expenses by Renaissance Man and/or H. Walker Enterprises?
7    A    I'm unaware if he had received a copy of that or
8 not.
9    Q    I mean, isn't the bottom line that Mr. Staples
10 was following the rule regarding the retail waffles with
11 Jett Foods and that angered Mr. Walker and he terminated
12 him?
13    A    I do not believe that Mr. Staples was terminated
14 over a $7,300 invoice for display bins, I do not.  In my
15 mind, he was terminated over a failure to manage the
16 relationship between Mr. Walker and Renaissance Man Food
17 Service because he -- as he told me, he tried to elbow out
18 Mrs. Blanchard from being involved in Renaissance Man Food
19 Service, didn't like her getting involved in selling
20 product and that he seemed to be more focused on revenue
21 that he was steering towards himself and his -- I didn't
22 know himself, but his family through the brokerage firm
23 with his wife and daughter than he was in trying to manage
24 the Renaissance Man Food Service enterprise which is what
25 he was hired to do.

Page 177

1    Q    Well, he was managing the enterprise because
2 Carmen Seal calls him, he takes her phone call, she asked
3 him and inquires of him about what the rules are about
4 these waffle invoice expenses, correct?
5    A    Correct.
6    Q    And he responds to and he correctly follows the
7 rule and he tells her do not pay that?
8    A    He did.
9    Q    And poultry would agree that that's what the
10 rule was and that's what he should have done, correct?
11    A    I would agree from any business structure that
12 you don't have expenses in one entity and revenue in the
13 other, that's not --
14    Q    And that is explained and set forth in the rules
15 in Exhibit C -- I mean, excuse me, Exhibit 6, correct?
16    A    I don't know that I can find an exact paragraph,
17 but I think that is the nature of the business and how we
18 have conducted it over the time of the partnership or the
19 agreement.
20    Q    You did not agree with Mr. Walker that Mr.
21 Staples should be denied access to the profit and loss
22 documents?
23    A    I did not.
24    Q    And as of November the 1st, 2017, did you or
25 poultry know that Mr. Staples was being contemplated by

1 Mr. Walker or H. Walker Enterprises or Renaissance Man

2 that Mr. Staples will be terminated?

3        MR. PARKER: Objection, assumes facts not in

4 evidence. You can answer.

5      A   I did not -- I was not aware of an intent to

6 terminate until it was discussed in the board meeting.

7      Q   (BY MR. SIMMS) On this same document, 159, you

8 get a response from Mr. Chip Miller to you. I didn't see

9 him copied, but you get one and it's not until

10 November the 15th; is that correct?

11     A   That's correct.

12     Q   It says, "Matt Free mentioned you have an

13 upcoming meeting with Herschel and Mr. Miller wants to

14 know do you need anything for the meeting?" Is that

15 correct?

16     A   That's correct.

17     Q   What were you and Mr. Miller discussing that you

18 would need?

19     A   In prior and subsequent meetings, we -- I would

20 bring to the board meeting sales data, profit and loss

21 statements, balance sheets, other information that we

22 would go over to discuss how the business is being

23 conducted and Mr. Miller would help put that information

24 together.

25     Q   It looks like on page 160, is that part of the

1 exhibit?

2      A   It is.

3      Q   The date of November -- excuse me, December the

4 12th is not decided until the end of November and on

5 November the 27th, 2017; is that correct?

6      A   That is correct.

7      Q   Then you respond on page 161 with the topics you

8 want to discuss at the board meeting on December the 12th,

9 correct?

10     A   That is correct.

11     Q   Do you list a category of the termination of Mr.

12 Staples?

13     A   I did not.

14     Q   All right. Then you've got paragraph three, and

15 by the way, were you ranking these in importance or any

16 rhyme or reason to how you ranked them?

17     A   No. They were just issues that I would like to

18 have discussed.

19     Q   Number three is, "Segregation of business

20 expenses of H. Walker Foods versus Renaissance Man." Did

21 I read that correctly?

22     A   That is correct.

23     Q   When you say H. Walker Foods, do you mean H.

24 Walker Enterprises, LLC?

25     A   I did.

1      Q   Does this relate back to the waffle matter?

2      A   It did.

3      Q   Any other expenses besides the waffle matter?

4      A   It was an effort to put a structure in place so

5 any future expenses could be clearly defined.

6      Q   You are wanting a signed agreement, correct?

7      A   I am. It really was in response to the

8 conversation that Matt had conveyed he had with Herschel

9 around the -- saying that the agreement hadn't been signed

10 so it wasn't in force.

11     Q   All right. You have a meeting with Mr. Staples

12 on December the 11th; is that right?

13     A   I did.

14     Q   Who all was present in that meeting?

15     A   I'll have to review that, the invitation.

16     Q   Was that an in-person meeting or was it a

17 conference call?

18     A   I believe Mr. Staples came by my office.

19     Q   Do you recall who was present besides you or

20 him?

21     A   I believe Mr. Miller and Mr. Rose.

22     Q   If it was an in-person meeting, is there

23 documentation showing that the meeting was set up?

24     A   There was an invite, if I recall correctly. I

25 try to keep everything on my calendar.

1      Q   What was discussed during that meeting?

2      A   The waffle incident, again, was described in

3 detail, the list of things I discussed with Mr. Staples,

4 the list of things that I would try to resolve and bring

5 clarity to at the board meeting so that we would have --

6 we would have it in writing so that we could move forward

7 without an opportunity for a misunderstanding.

8      Q   Anything else?

9      A   Nothing else that I can recall.

10     Q   During that meeting with Mr. Staples on

11 December 11th, did the Mr. Staples indicate that he needed

12 poultry to protect him with respect to Mr. Walker?

13     A   It was my recollection that Mr. Staples conveyed

14 that if he thought Mr. Walker was doing something illegal

15 with the waffles or that he was trying to do something

16 that was wrong that he wanted to know if -- where Simmons

17 would stand on that.

18     Q   I'm sorry, say that again.

19     A   He wanted to know where Simmons would stand.

20     Q   And what was the response by Simmons?

21     A   I'm trying to make sure I recall exactly what I

22 would've said to him, that if we had done -- if he is

23 acting in an ethical manner and is doing nothing wrong and

24 calling out or raising an issue that was unethical,

25 that -- I'm trying to recall exactly what I said,

1 something to the effect that we would treat him right.

2   Q   Did you go review any policies or rules of

3 Simmons in responding to Mr. Staples?

4   A   I did not.

5   Q   Now, would it be poultry's position that if an

6 employee sensed that something was taking place that was

7 unethical, to report it immediately and not wait for an

8 extended period of time before reporting it?

9   A   It would be.

10   Q   And why would that be the rule?

11   A   So we could understand what was happening and

12 address it immediately.

13   Q   And did Mr. Staples report the situation

14 revolving around the waffles and the submission of the

15 expense around the time it happened?

16   A   Ms. Seal reported it and then Mr. Staples

17 followed up with what -- confirming and repeating what was

18 already told to us by Ms. Seal.

19   Q   And I know that poultry may not have been privy

20 to it, but do you know if from maybe learning from Mr.

21 Staples or Mr. Walker that Mr. Walker asked Mr. Staples

22 who was telling Simmons not to pay expenses and Mr.

23 Staples informed Mr. Walker that it was him?

24   A   I don't recall exactly whether John had made

25 that statement.

1   Q   And does poultry know if that communication

2 between Mr. Walker and Mr. Staples occurred prior to the

3 date Mr. Walker put in his e-mail that he was CEO and the

4 reference about being told no?

5       MR. PARKER:  I'm going to object because he just

6 said he doesn't know if the conversation occurred.

7   A   I can't answer that.

8       MR. SIMMS:  Okay.  I'm going to take a quick

9 break.  I may be getting close to being finished.

10      (Short break from 3:39 p.m. to 3:49 p.m.)

11      MR. SIMMS:  We are on Exhibit 25; is that

12 correct?

13      MR. PARKER:  The next exhibit would be

14 Exhibit 25.

15   Q   (BY MR. SIMMS)  Let me show you Exhibit 25.

16      (WHEREUPON, Exhibit 25 was marked for

17 identification.)

18   A   Okay.

19   Q   All right.  So you received this particular

20 document by e-mail from Mr. Walker on December 21, 2017 or

21 when?

22      MR. PARKER:  There should be an e-mail showing

23 this is an attachment.

24   Q   (BY MR. SIMMS)  So whatever that e-mail shows is

25 when you received it; is that correct?

1   A   That is correct.

2   Q   Is there anyone else in poultry that this

3 document 107 and 108 was sent to at poultry besides you?

4   A   I do not believe so, no.

5   Q   Did you forward it to anyone at poultry after

6 you received it?

7   A   I do not recall forwarding it to anybody.

8   Q   Before you received it on whatever date that

9 document shows you received it by e-mail, had you

10 discussed with Mr. Chip Miller what was going to take

11 place as set out in this document?

12   A   I recall returning from the board meeting and

13 then having a discussion with Mr. Miller of what we would

14 do.

15   Q   What did you tell him you would do?  Was that in

16 writing or was that oral?

17   A   That would be a verbal conversation.

18   Q   Okay.  Tell me what you told Mr. Miller was

19 going to be done.

20   A   That we were going to transition the leadership

21 of Renaissance Man Food Service from Mr. Staples to

22 Mr. Blaine Walker.

23   Q   Did you tell Mr. Miller that Ms. Kim Staples

24 would no longer have any ownership interest in the food

25 broker business and that her employment with the food

1 broker business would be over with?

2   A   That was not an issue that would have been of

3 concern to Chip and it was not discussed with Chip.

4   Q   Same with respect to Blair Staples?

5   A   That is correct.

6   Q   But ultimately, Mr. Miller is the one who

7 terminated Ms. Blair Staples, correct?

8   A   He did.

9   Q   But you didn't discuss it with him until the day

10 he terminated her?

11   A   After -- at some point I did discuss it, but I

12 don't recall doing that immediately after the board

13 meeting.  I think it was after this document came out,

14 sometime between here and year end.

15   Q   What did Mr. Miller say?

16   A   Okay.

17   Q   All right.  He didn't question or think it was

18 fair or anything like that?

19   A   He thought it was fair and time to make the

20 transition.

21   Q   All right.  Now, let's get back to this

22 document.  Did you respond in any way to what is set out

23 on pages 107 and 108 in any way in writing to Mr. Walker

24 or to Mr. Eisenman and clarify anything, correct anything?

25   A   I don't recall whether I sent an acknowledgment

Page 186

1 or not, but I don't -- I do not recall any correction or
2 change.
3    Q   All right.  Do you agree that the proposals that
4 were discussed on December the 12th not only concerned
5 termination of John Staples as general manager of
6 Renaissance Man, but also what to do with Kim Staples and
7 Blair Staples and the food broker DSM Sales & Marketing?
8    A   It does discuss -- it does contemplate those
9 which are all the loose ends that needed to be tied up.
10    Q   And ends that needed to be dealt with so there
11 would be no legal liability with respect to claims by Kim
12 Staples or Blair Staples or DSM Sales & Marketing,
13 correct?
14    A   I don't agree with that statement because I
15 don't know of any legal liability that was -- that did or
16 does exist.
17    Q   All right.  Proposal A, specifically under the
18 Proposal A there's a proposal dealing with John Staples,
19 there's a proposal dealing with Kim Staples and there's a
20 proposal dealing with Blair Staples, correct?
21    A   That is correct.
22    Q   So John -- under Proposal A, John was to
23 terminate his employment as general manager of Renaissance
24 Man Food Services (Simmons is John's official employer) in
25 his role as a paid consultant to DSM, correct?

Page 187

1    A   That is correct.
2    Q   So at least on December 21, 2017 or whenever you
3 received this proposal, if you had not already discussed
4 this on December the 12th, 2017, you knew and poultry knew
5 through you Mr. Staples had a consultant relationship with
6 DSM Sales & Marketing?
7    A   That is correct.
8    Q   All right.  Now, under Proposal A, was John
9 going to resign instead of being terminated by Simmons?
10    A   That is a matter of semantics.  His employment
11 would end.
12    Q   Was it -- go ahead.
13    A   And he would receive a severance for that -- for
14 that end of employment.
15    Q   All right.  So under John, under provision --
16 and it doesn't have a number, but it's the first little
17 dot there, two things were going to happen, John was to
18 terminate his employment as general manager of RMFS and
19 his role with respect to DSM as a paid consultant, two
20 things, correct?
21    A   That's correct.
22    Q   Okay.  Then under that, "John was to sign a one
23 year consulting agreement with RMFS to provide consulting
24 services as requested by Mr. Walker, Mr. Walker to closely
25 supervise.  John will perform no further work with DSM."

Page 188

1 Did I read that correctly?
2    A   That is what it says.
3    Q   All right.  Then under that regarding consulting
4 pay, and this consulting pay relates to this new
5 consulting agreement with RMFS; is that your
6 understanding?
7    A   This was the method that we would pay -- that we
8 contemplated paying John severance.
9    Q   All right.  Why did you include the we, was that
10 money to fund that severance or that consulting agreement
11 coming from --
12    A   We as the board of Renaissance Man Food Service.
13    Q   Okay.  Now, it says that if John does not
14 violate the consulting agreement.  Do you know what would
15 happen if John violated the consulting agreement?
16    A   I would -- I presumed it would be like any other
17 agreement that we would have put in -- Simmons would put
18 in place with a separation, violation of the agreement
19 would end the payments.
20    Q   Terminate the agreement?
21    A   It would terminate the agreement.
22    Q   And one basis for terminating the agreement
23 would be if Mr. Staples said anything negative or deemed
24 negative by Renaissance Man or Simmons?  Disparagement,
25 did I read that correctly?

Page 189

1    A   That is -- that was the request.
2    Q   So if Mr. Staples signed this consulting
3 agreement on January the 1st, 2018 and on January the 2nd,
4 2018 Renaissance Man said that he made a disparaging
5 remark, they could terminate the agreement?
6    A   A non-disparagement clause is a fairly typical
7 clause in a severance agreement.  Non-disparagement,
8 nonsolicitation, those are pretty typical.
9    Q   He could not say anything negative about RMFS or
10 Simmons for two years; is that correct?
11    A   That's correct.
12    Q   So he worked for a year, but then he's
13 prohibited from saying anything negative about Renaissance
14 Man Food Services or Simmons for another year afterwards;
15 am I reading that correct?
16    A   That was the ask.
17    Q   And a nonsolicitation provision so that John
18 would not recruit employees from Renaissance Man Food
19 Services or Simmons for two years, the consulting year
20 plus one more.  If Mr. Staples is consulting for
21 Renaissance Man, why would he be soliciting or recruiting
22 employees from Renaissance Man or Simmons?
23    A   Because Herschel had discussed at the board
24 meeting John -- that John had expressed a desire to form
25 his own brokerage company and wanted to go into business

48 (Pages 186 - 189)
App. 053

1 for himself with other partners that ultimately would be
2 competing with what we were doing.
3    Q    That's what Mr. Walker said?
4    A    That's what Mr. Walker had shared at the board
5 meeting after we were discussing the arrangements of the
6 termination.
7    Q    And poultry did not know what directions or
8 pressure was being placed on Mr. Staples by Mr. Eisenman
9 or Mr. Walker to generate different revenues for H. Walker
10 Enterprises or Renaissance Man or what the brokerage would
11 look like with shared services or with other entities?
12        MR. PARKER:  Objection --
13        MR. KING:  Objection to the form of the
14 question.
15        MR. PARKER:  -- it assumes facts not in
16 evidence.
17        MR. SIMMS:   Well, they're in evidence, they're
18 all in the records of --
19        MR. PARKER:  I'm not going to argue with you.
20 He can answer the question.
21    Q    (BY MR. SIMMS)  -- the lawyers that represented
22 Ms. Staples at the meeting.
23        MR. KING:  That's a really compound question.
24    A    Can you break that into smaller pieces?  I'm
25 having a hard time following.

1    Q    (BY MR. SIMMS)  Well, let me -- let me back up.
2 The legal bills for Mr. Walker's attorney, Mr. Eisenman,
3 were submitted to Simmons for the year 2017 and were paid
4 and processed by Simmons as part of expenses of
5 Renaissance Man, correct?
6        MR. PARKER:  Objection, assumes facts not in
7 evidence.
8    A    There were invoices submitted to Renaissance Man
9 to be paid by Renaissance Man that was work on behalf of
10 Renaissance Man from Mr. Eisenman.  I do not know if that
11 was his entire billing or not.
12    Q    And certainly within the purview or the access
13 of poultry would be copies of those legal bills and
14 poultry could read the descriptions to see what
15 Mr. Eisenman was billing for, correct?
16    A    That is correct.
17    Q    And so that knowledge could be imputed to
18 poultry by having possession of those legal bills, do you
19 agree?
20        MR. PARKER:  Objection, calls for a legal
21 conclusion.
22    A    I don't know that poultry could ascertain if
23 that was his entire scope of work or not.  All we could do
24 would be review those and say whether they were around Ren
25 Man, but, again, that would also be the purview of the

1 general manager of Renaissance Man to say is this legal
2 bill applicable to Renaissance Man activity.
3    Q    (BY MR. SIMMS)  The third item under the
4 Proposal A concerning John Staples was that he would
5 provide a release of any liability.  Did I read that
6 correctly?
7    A    That's correct.
8    Q    Was there a discussion during the December 12th
9 meeting that his release that he would give would be to
10 the favor of poultry, Renaissance Man, and H. Walker
11 Enterprises and concern and relate to his employment as
12 general manager of Renaissance Man and his relationship
13 with DSM as a paid consultant?
14    A    The release of liability would be a standard
15 request as part of a standard severance agreement, that
16 would be the reason for giving a severance would be to
17 avoid having to take the organization through a procedure
18 such as this.  The non-disparagement and nonsolicitation
19 are standard as well for someone in the position that John
20 was in.
21    Q    Would you agree with me that with respect to
22 John the Proposal A wanted to deal with his status as an
23 employee of Simmons and his status as a paid consultant
24 with respect to DSM, both of those statuses?
25    A    He would continue to -- well, he would be a paid

1 consultant of Renaissance Man Food Service, yes.  I agree
2 that it did end his employment at Simmons and whatever he
3 was being paid from DSM.
4    Q    So any rights he had as an employee of Simmons
5 or rights he had as a paid consultant to DSM3 would be
6 extinguished if he accepted Proposal A?
7    A    That would be what he would give up for the
8 payment that was offered.
9    Q    For one year that might start and then be ended
10 the next day if he made some kind of alleged negative
11 statement about RMFS or Simmons?
12        MR. PARKER:  Objection, that's not what the
13 document says.  That's not what the agreement that was
14 ultimately presented to Mr. Staples says.  You're
15 mischaracterizing both documents.
16    A    It is my belief there is a standard of
17 disparagement that would be considered common that would
18 cover that.
19    Q    (BY MR. SIMMS)  Let's go to Ms. Staples now.  It
20 says she's going to resign from DSM and sign over all of
21 her 50 percent ownership interest in DSM to Julie.  Did I
22 read that correctly?
23    A    That's what it says.
24    Q    All right.  And Ms. Blanchard was a participant
25 in the December 12th meeting, correct?

Page 194

1    A    That is correct.

2    Q    So under Proposal A, it looks like Mrs. Staples

3 is going to do something voluntarily and that means resign

4 and Mr. John Staples is going to do something voluntarily

5 and he's going to resign as general manager of RMFS and

6 with respect to his status as a paid consultant to DSM.

7 Did I read that correctly?

8    A    That is correct.

9    Q    And under Proposal A, Mrs. Staples in giving up

10 her ownership interest in DSM is going to execute a

11 release of all other liability, right?

12    A    That is what it says.

13    Q    And she's also going to forfeit or give up her

14 employment status because it says after she distributes

15 any profits under the operating agreement for that entity

16 she will not be paid anything else; is that correct?

17    A    That's correct.

18    Q    And then Blair Staples is referenced next under

19 Proposal A, correct?

20    A    That is correct.

21    Q    And that her employment by DSM through Simmons

22 would be terminated.  Did I read that correctly?

23    A    That's correct.

24    Q    And then it's got in parentheses,

25 "Herschel/Julie, you may want to give Blair two months

Page 195

1 severance to give John extra incentive to cooperate in

2 which event Blair will agree to a non-disparagement

3 provision, a nonsolicitation provision and a release of

4 other liability."  Did I read that correctly?

5    A    You did.

6    Q    And how was Herschel Walker going to give Blair

7 Staples anything if she was employed as an employee of DSM

8 in which he had no ownership interest or through her

9 employment with Simmons where he had no -- he was not

10 employing her in any capacity?

11    A    I believe it says Herschel/Julie.

12    Q    To the knowledge of poultry, did either Herschel

13 or Julie offer any type of severance concerning Blair

14 Staples?

15    A    I seem to recall something in the transcript of

16 the phone conversation between -- or the conversation

17 between Herschel and John Staples about the termination

18 agreement.  It was that Julie -- or Blair's employment was

19 -- was discussed.

20    Q    And then the proposal here goes on to have a

21 Plan B or Proposal B, correct?

22    A    That's correct.

23    Q    All right.  So we've got an A and we've got a B?

24    A    That's correct.

25    Q    A lot of planning going on December the 12th,

Page 196

1 2017, do you agree?

2        MR. PARKER:  Object to the side bar.

3    A    I don't -- I disagree.

4    Q    (BY MR. SIMMS)  Was there collaboration going on

5 between you on behalf of poultry and Herschel Walker in

6 whatever capacity he was acting in and Julie Blanchard in

7 whatever capacity she was attending the meeting in?

8    A    I -- again, I'm not a lawyer, so I don't know

9 what --

10    Q    I'm not asking for a legal opinion.

11    A    -- collaboration --

12    Q    I'm asking for whatever you call it,

13 collaboration, discussions amongst each other, making

14 decisions, coming up with these plans.

15    A    There were decisions that were made.  First --

16 the first decision was Proposal B.  Herschel opened the

17 meeting fully stating that he wanted to terminate the

18 agreement with John Staples, an acknowledgment that John

19 was employed at will and that we could make that

20 termination, acknowledging that RMFS had a 30 day notice

21 clause with their broker of record, DSM, and that they had

22 every right to terminate that agreement with 30 days

23 notice and that they had the right to do that, Renaissance

24 Man had the right to take that action and that was what

25 Herschel was advocating that we do.

Page 197

1        As a manager for the organization from Simmons

2 and looking at the situation and John's personality, it is

3 -- it was my belief that John would be contentious over

4 this and he tends to be a bully in how he deals with

5 issues.  It was my belief that we would be best served to

6 invest some funds, make this issue resolved and take it

7 through what we ended up taking it through because it

8 would be worse for all parties involved and so I advocated

9 hard that we develop proposal -- a proposal that we could

10 settle this with so that all parties could move on with

11 their lives and restart with new leadership and John would

12 have funds to restart a career.  So that's why we had

13 Proposal A and Proposal B, and Proposal A was the -- what

14 we finally agreed to was the preferred way that we end the

15 relationship.

16    Q    Under Proposal B, it says, "If John refuses to

17 cooperate."  So the difference between B and A hinged or

18 was contingent on Mr. Staples' cooperation?

19    A    Cooperation, agreement, whatever word you

20 choose.

21    Q    So under Proposal B with respect to John

22 Staples, "Mr. Staples is not going to voluntarily resign,

23 he's going to be terminated by Simmons in his employment

24 as general manager of Renaissance Man Food Services.

25 (Simmons is John's official employer.)"  Did I read that

1 correctly?

2    A    That is correct.

3    Q    And no severance except as Simmons normally

4 provides. Did poultry or Simmons agree that there would

5 be a severance provided under its rules with its

6 employees?

7    A    We don't have a rule for severance for

8 termination.

9    Q    Then why was this even mentioned under Proposal

10 B?

11    A    That was -- you'll have to ask Mr. Eisenman.

12    Q    Was it discussed in the December 12th meeting

13 that you attended based on your recollection?

14    A    I do not recall -- no, I did not offer any

15 severance for Mr. Staples.

16    Q    Did you say that Mr. Staples was an at will

17 employee at Simmons?

18    A    Yes.

19    Q    Did you discuss that the contract of employment

20 with Mr. Staples had been modified after he went to work

21 for Simmons?

22        MR. PARKER: Objection to the form the question.

23    Q    (BY MR. SIMMS) Had it been expressly modified

24 since March the 6th, 2009?

25        MR. PARKER: Objection again to the form of the

1 question referring to the offer letter as an employment

2 contract. You can answer.

3    A    From my perspective, all employees at Simmons

4 are at will.

5    Q    (BY MR. SIMMS) Are you at will?

6    A    I am. There are only two people in the

7 organization that aren't and they both own it.

8    Q    If Mr. Staples was an at will employee, why is

9 his cooperation needed?

10    A    To agree for the liability release, the

11 non-disparagement, the nonsolicitation so that, again, we

12 would spend funds that -- it is a business judgment of how

13 much are you going to spend trying to fight an issue

14 versus what can you offer to avoid the whole other legal

15 expenses that we could see how this would end up and it

16 did.

17    Q    Would you agree with me that Mrs. Kim Staples'

18 ownership interest in DSM is not at will?

19        MR. PARKER: Objection, calls for a legal

20 conclusion.

21    A    I have no -- I have no idea on how Mrs. Staples'

22 ownership structure is. What I do know is that

23 Renaissance Man Food Service has a 30 day notice clause

24 for all brokers and executed that 30 day notice to end the

25 brokerage relationship and that is similar to what Simmons

1 has with all its workers as well.

2    Q    (BY MR. SIMMS) You did know and poultry did

3 know, at least on December 21, 2017 or whenever you

4 received this proposal, that there was an operating

5 agreement concerning Kim Staples because in page 107 it

6 says -- well, excuse me, page 108 under Kim it says that

7 any profit after expenses will be split per the current

8 agreement.

9        MR. PARKER: Objection, form.

10    Q    (BY MR. SIMMS) And what I want to know from you

11 is on December the 12th, 2017, was the operating agreement

12 where Mrs. Blanchard and Mrs. Staples were owners of DSM3

13 discussed and consulted as the coming up of these

14 proposals and these plans?

15        MR. KING: Objection to the form of the question

16 and asked and answered.

17    A    I have no knowledge of any operating agreement

18 or how it was structured, nor did I as a Simmons Foods

19 representative have any real interest in that operating

20 agreement. That was separate and aside from any

21 activities Simmons Foods had.

22    Q    (BY MR. SIMMS) But you knew on December the

23 12th that these proposals were tying all of these claims

24 together as it related to the termination of Mr. Staples,

25 correct?

1        MR. KING: Objection, misstates his testimony.

2        MR. PARKER: You can answer.

3    A    I did know that there were multiple issues

4 because of the interweaving of the relationships that were

5 -- that had been created over time by Mr. Staples and that

6 his termination had to unwind all those complicated

7 relationships that he'd built into Renaissance Man, DSM,

8 employment of his spouse, employment of his daughter.

9    Q    (BY MR. SIMMS) And with respect to the entity

10 DSM, my question to you is knowing that that would have to

11 be unwound, did the topic come up during the December 12th

12 meeting to refer to the operating agreement with respect

13 to what to do with the ownership interest of Mrs. Staples?

14    A    I do not recall the operating agreement being

15 referred to in the discussion.

16    Q    Were you aware and did it come up on

17 December 12, 2017 that the intentions of Ms. Blanchard

18 and/or Mr. Walker were to suspend the broker agreement

19 with DSM in exchange for Mrs. Staples giving up her

20 ownership interest for the sum of $10? Was that

21 discussed?

22    A    I don't recall the dollar amount that would be

23 offered for the DSM entity. Again, I have no knowledge of

24 the revenues and expenses of DSM, the magnitude of

25 business they might or might not have.

Page 202

1    Q   Was it discussed on December 12, 2017 that if
2 the operating agreement for DSM was followed that
3 Mrs. Staples' ownership interest was in excess of $10?
4    A   The operating agreement, I don't have any
5 recollection of the operating agreement being discussed,
6 so, no, it was not.
7    Q   And if Mrs. Staples' ownership interest was to
8 be determined by an operating agreement that she had paid
9 legal expenses to the law firm that prepared this
10 document, prepared, had to be determined by that
11 agreement, is that the reason that John Staples'
12 cooperation was needed?
13       MR. KING:  Objection to the form of the question
14 and the fact that you just made a total misrepresentation.
15    A   Again, I have never seen that operating
16 agreement, I have no knowledge of the operating agreement.
17 I do know that the cooperation that was asked of John was
18 to avoid -- to make a payment above and beyond what was
19 necessary, but it was a business judgment to avoid the
20 expense of litigation which we could foresee coming from
21 John.  Regardless of the facts, just his demeanor and
22 behavior, you could easily predict that we would end up
23 here were it not for an amicable separation.
24    Q   (BY MR. SIMMS)  Well, was it discussed that we
25 could end up here because Mrs. Staples had an ownership

Page 203

1 interest in an entity whose purpose from day one was to go
2 beyond its relationship with Renaissance Man and grow and
3 expand and that her expectations as an owner was greater
4 than Renaissance Man and to avoid having to deal with her
5 and resolve her ownership interest in that entity under an
6 operating agreement, it was crafted that that could be
7 avoided by seeking Mr. Staples' cooperation?
8       MR. PARKER:  Objection, form.  I don't know if
9 that's a speech or a question.  He said there is no
10 knowledge of an operating agreement, he's got none.  Stop
11 asking questions about it.
12       MR. SIMMS:  I'm asking if it came up during the
13 meeting.
14    A   I do not recall that --
15       MR. PARKER:  He said he didn't.  He's mentioned
16 --
17    A   -- coming up --
18       MR. SIMMS:  You're not testifying now, are you?
19       MR. PARKER:  I'll tell -- fine.  Don't answer
20 any more questions about an operating agreement.  I'll
21 short circuit it.
22    A   Okay.
23    Q   (BY MR. SIMMS)  When you received this, you were
24 aware that there was reference to a current agreement
25 concerning DSM, correct?

Page 204

1    A   When I received what?
2    Q   This proposal sometime on or after December 21,
3 2017?
4    A   What was I aware of?
5    Q   Under Kim Staples, under Proposal B, it says any
6 profit after expenses will be split per the current
7 agreement.  You were aware that that was being talked
8 about, a current agreement?
9    A   I presumed that they had some agreement of how
10 they split funds out of -- or disbursed out of DSM.
11    Q   If the discussion about what that agreement was
12 did not come up on December the 12th, after receiving this
13 document on or about December 21, 2017, did you call
14 Mr. Eisenman or Mr. Walker or Ms. Blanchard or consult
15 anybody in poultry including your internal lawyers about
16 what that meant and the outcome of that operating
17 agreement or current agreement?
18    A   I did not because it was not of concern to me
19 from poultry.
20    Q   But -- go ahead.
21    A   The action we were taking was trying to wind
22 that up or to give a 30 day notice and the activity
23 relating to Renaissance Man Food Service ended, so the
24 revenue and the activity, the expenses they were incurring
25 was coming to an end one way or the other in 30 days.

Page 205

1    Q   Have you seen the communication from
2 Mr. Eisenman at the time he formed DSM3 related to the
3 business expectations to go beyond the relationship that
4 entity was having with Renaissance Man?
5    A   I have seen no -- no, I have not.
6    Q   All right.  Was it discussed during the
7 December 12, 2017 meeting that the expectations of DSM3 or
8 DSM Sales & Marketing from day one was to be beyond the
9 relationship with Renaissance Man Food Services?
10    A   I do not recall that being part of that board
11 meeting discussion.
12    Q   Do you know if Mr. Eisenman billed for preparing
13 a long form operating agreement and submitted that legal
14 bill to DSM3, 50 percent of which was paid by Mrs.
15 Staples?
16       MR. KING:  Objection to the form of that
17 question --
18    Q   (BY MR. SIMMS)  Do you know?
19    A   No.
20       MR. KING:  -- and the representation which is
21 wrong.
22       MR. SIMMS:  It's correct, absolutely correct.
23 You know it.  You know it.
24       MR. PARKER:  He said no.
25    Q   (BY MR. SIMMS)  Poultry was not aware of that?

52 (Pages 202 - 205)

Page 206

1    A    Poultry had nothing to do with DSM.
2    Q    And it was not discussed on December the 12th,
3 2017?
4    A    It was not.
5    Q    And then with respect to Blair Staples under
6 Proposal B, her employment by DSM through Simmons would
7 terminate, and then it says in parentheses, "Simmons will
8 terminate her employment."  Did I read that correctly?
9    A    That is correct.
10    Q    And that she would get a severance, if any, that
11 Simmons provided.  And is your answer going to be the
12 same, that Simmons did not provide a severance in such a
13 situation?
14    A    That is correct.
15    Q    With respect to Blair Staples, who terminated
16 her?
17    A    Chip Miller.
18    Q    At your direction?
19    A    Yes.
20    Q    Do you know when that took place?
21    A    I will have to look at the date.  I'm sure
22 there's paperwork on it.  I don't recall the exact date.
23 But again, we were terminating her being paid through
24 Simmons and being reimbursed from DSM so I have no
25 knowledge of her continuing employment under DSM, however

Page 207

1 it continued to exist, but Simmons would no longer be the
2 channel to employ Ms. Blair Staples.
3    Q    And I think I may have asked you this earlier
4 today, but I want to be sure because I traveled a long
5 distance and I slept in a hard bed.  When did you learn
6 that Proposal A and Proposal B had not been accepted by
7 Mr. Staples?
8    A    I received an e-mail or text, something from
9 Mr. Walker after the phone call he had had with Mr.
10 Staples saying that they had come to an agreement, that it
11 was more than what we had originally contemplated, but it
12 was acceptable to both sides and then I received two, I
13 believe, subsequent communications that, one, Mr. Staples
14 had gone quiet and then, two, that Mr. Walker was getting
15 frustrated that Mr. Staples would not respond to him and
16 he was going to put a date that he would withdraw that
17 offer and I agreed that that should happen and a final one
18 saying he had withdrawn the offer.
19    Q    Did you also learn that Mr. Walker and/or
20 Mr. Eisenman had instructed Mr. Staples to appear in the
21 lawyer's office in Atlanta on December the 27th?
22    A    I don't know where the discussion occurred
23 around Mr. Staples' termination.  I don't know if that was
24 in person or by phone or where it was.
25    Q    All right.  When you left the December 12th

Page 208

1 meeting and you received this document here on or around
2 December 21, 2017, did you inquire of Mr. Walker or
3 Mr. Eisenman as to when what was set out in this document
4 would be put to Mr. Staples?
5    A    The understanding that it would be before the
6 31st.
7    Q    Of December 2017?
8    A    So that we would have -- we would have this
9 resolved by year end.
10    Q    And do you know anything about what was
11 communicated to Mr. Staples to get him to Atlanta on
12 December the 27th, 2017?
13    A    I do not.
14    Q    You know that was two days after Christmas?  The
15 25th is Christmas, the 27th is two days later, right?
16    A    Okay.
17    Q    You agree with me?
18    A    I agree that the 27th is two days after the
19 25th.
20    Q    And do you know when Mr. Walker said he was
21 withdrawing the Proposal A from Mr. Staples, what day it
22 would be withdrawn if not accepted by the close of
23 business?
24    A    I do not recall.  It was sometime early January
25 or mid January.

Page 209

1    Q    Did poultry send a letter of termination to Mr.
2 Staples?
3    A    I'm not certain.  I know Mr. Miller communicated
4 with Mr. Staples.  I'm not certain how that was done.
5    Q    Do you know when Mr. Staples' access to the
6 Simmons e-mail system was shut down, prevented, cut off?
7       MR. PARKER:  Objection, asked and answered.
8    Q    (BY MR. SIMMS)  Do you know what day that was?
9    A    It was the date of termination and his e-mails
10 were made available to me from there forward.
11    Q    And at some point did all of Mr. Staples'
12 e-mails be made available to Mrs. Blanchard or Mr. Walker?
13    A    As part of the due diligence in defending the
14 litigation, yes, they were made available.
15    Q    Has the same been provided to Mr. Staples and
16 his counsel so they could access the e-mails?
17    A    I'm not aware -- I don't know.
18    Q    You don't know?
19    A    I don't know.
20    Q    When Mr. Staples was cut off with regard to his
21 e-mail, what was his basis of earnings, was it salary,
22 bonus, what?
23    A    I don't know the full extent of Mr. Staples'
24 earnings.  I know what he was paid through Simmons, but I
25 don't know -- I wasn't privy to the rest of his

Page 210

1  compensation or other earnings and where they came from.
2       Q   I'm just talking about what poultry knows.
3  Would it be in the W-2 document that we have, would that
4  be his salary, his earnings?
5       A   That would be his earnings.
6       Q   What other benefits did he have?
7       A   Any of the benefits that we offer, 401(k),
8  healthcare, supplemental life if he chose, eye care,
9  dental care.  We have a cafeteria plan that whatever Mr.
10 Staples chose to subscribe to.
11      MR. KING:  Let the record reflect that during
12 the course of the last answer, Mr. Staples has left.
13      Q   (BY MR. SIMMS)  Mr. Staples had to leave to try
14 to go make a living, so he had to leave, which I told him
15 he could do.
16          Was Mr. Staples' level of employment with
17 poultry in a level that entitled him to certain benefits
18 that other employees who may not be in that level could
19 not enjoy or participate in?
20      A   I do not believe so.
21      Q   I saw in the early documents concerning Mr.
22 Staples' hiring in something called a 360.  Do you know
23 what I'm talking about?
24      A   Yes.  That is a -- that was a tool that we use
25 occasionally to ask peers, subordinates and superiors to

Page 211

1  provide feedback to the employee about their behaviors and
2  how they go about conducting their business.
3       Q   Didn't have anything to do with a particular
4  level that you were employed at and what you could receive
5  benefit-wise?
6       A   It was a tool to manage performance.
7       Q   Have you read Mr. Staples' deposition?
8       A   I have not.
9       Q   So if I ask you questions about incidences that
10 occurred after March 6, 2009 where Mr. Staples says that
11 representatives and agents of poultry indicated to him
12 that he would be protected and his job was secure and he
13 could only be terminated for cause, you have not
14 investigated to see if those incidences took place or
15 not; is that correct?
16      A   I have been made aware of his assertions and I
17 have asked those that were -- those current and former
18 employees or agents of Simmons have asked former employees
19 of those alleged conversations.
20      Q   And what has been the response?
21      A   Unequivocably, that they are fabrication from
22 Mr. Staples, they did not occur.
23      Q   Are you aware that Mr. Walker penned a book
24 called Breaking Free?
25      A   I am.

Page 212

1       Q   Do you know what year that book came out?
2       A   I do not recall.
3       Q   Do you know that -- do you know who Kristin
4  Kathy is?
5       A   Kristin Kathy, yes.
6       Q   She worked at Sysco at some point in time,
7  correct?
8       A   She did.
9       Q   Have you investigated a conversation she had
10 with Mr. Chip Miller that she was concerned about the
11 contents of the book that Mr. Walker had penned?
12      A   I know that after the book came out there were a
13 few people that expressed concern, as you would probably
14 expect when someone said they had multiple personalities.
15      Q   Did Mr. Staples express concerns to anyone at
16 poultry regarding how he was being treated concerning
17 Mr. Walker at any time after March 6, 2009?
18      A   He did not.
19      Q   But he was certain that he was not going to be
20 employed by Renaissance Man or H. Walker Enterprises,
21 correct?
22      A   Mr. Staples came to us as a -- as an advocate
23 and a trusted associate of Mr. Walker.  He was put in that
24 position because they had a prior relationship where they
25 had developed that trust and mutual admiration, shared a

Page 213

1  football background and Mr. Staples always presented
2  himself to me as a confidante of Mr. Walker and that he
3  had his trust and that he had firsthand knowledge and the
4  confidence of Mr. Walker to act on his behalf.
5       Q   When did poultry decide to terminate Mike
6  Rogers?
7       A   I made that decision with Mr. Walker in -- I
8  will have to look.  It was in -- it was prior to this
9  agreement.  It was in 2009.
10      Q   And prior to that, poultry had approached Mr.
11 Staples in July of 2008 and offered him employment,
12 correct?
13      A   Correct.
14      Q   He didn't accept it and then there was another
15 offer made to him in February of 2009, correct?
16      A   Correct.
17      Q   And the offer was sweetened between July of 2008
18 and February 2009, correct?
19      A   Correct.
20      Q   And then another offer was made to him on March
21 the 6th, 2009 and it had been sweetened, correct?
22      A   Yes, it had been.
23      Q   And, in fact, it included a provision that Mr.
24 Staples would be paid a bonus of five percent of the net
25 income when he was moved to Walker Foods up to 50 percent

54 (Pages 210 - 213)

1 of his salary, correct?

2    A  That's correct.

3    Q  That never occurred, did it?

4    A  I don't know what was paid to Mr. Staples out of

5 Renaissance Man expense, if there were things -- if there

6 were expenses paid directly to him, no.

7    Q  Are you telling me that the application of that

8 paragraph three, I believe it is, of the March 6, 2009

9 employment offer was to be administered by Mr. Walker?

10    A  I am telling you that 100 percent of Mr.

11 Staples' expenses were passed through to Renaissance Man

12 and that if there were any additional compensation paid,

13 that would have been a Renaissance Man expense.

14    Q  And are you aware that Mr. Walker says he had no

15 involvement whatsoever in preparing paragraph three of the

16 March 6, 2009 offer letter?

17    A  Okay.

18    Q  So my question to you is how is poultry making

19 promises to Mr. Staples as part of his employment for

20 something that Mr. Walker would have to fulfill the

21 promise and Mr. Walker was not even involved at any time

22 prior to the promise being made?

23    A  At the time this was done there were two classes

24 of shares of Walker Foods and Simmons Foods had an

25 ownership of the class B shares of Walker Foods and this

1 would have been a sharing of the distribution from those

2 shares somehow. This was not a -- this was not a well

3 thought out offer on the bonus. It was more of a how do

4 we align John's interest with his performance and his

5 compensation with his performance.

6    Q  Was Mr. Staples told at the time paragraph three

7 was communicated to him that him moving to Walker Foods

8 may not occur in any particular way?

9    A  There was no -- at that time, we did not

10 contemplate ending Walker Foods, but I believe it was Mr.

11 Staples' recommendation that we consolidate everything.

12 We had Renaissance Man Food Service with the minority

13 business enterprise certification. Walker Foods was not a

14 minority business enterprise certified entity and the

15 recommendation by Mr. Staples was to consolidate all that

16 within Renaissance Man Food Service and end the use of

17 Walker Foods, so that would have changed the whole scope

18 of the bonus compensation.

19    Q  And is that why in the resolution that was done

20 after March 6, 2009 further discussions regarding

21 compensation was referenced?

22    A  Yes.

23    Q  What further discussions were had with Mr.

24 Staples after the Walker Foods, LLC resolution took place

25 concerning his bonus?

1    A  I know there -- I have seen some documentation

2 that was between Mr. Walker, Mr. Staples and Mr. Eisenman.

3 I do not know of any firsthand discussions, nor did I ever

4 have Mr. Staples bring up the question to me, and I

5 verified it with Mr. Miller, any question or any issue

6 over that entire tenure over a bonus payment.

7    Q  The documents you say you've seen with respect

8 communications with Mr. Walker, Mr. Eisenman and Mr.

9 Staples regarding Mr. Staples' bonus, have those been

10 produced in the case?

11      MR. PARKER:  You produced them.

12    Q  (BY MR. SIMMS)  I produced them.  Okay.

13      If Mr. Staples spoke with Mr. Miller about his

14 bonus and participation in bonus, if he was told that he

15 did not qualify to participate in the poultry profit

16 sharing, that would be true, correct?

17    A  That is.  He did not qualify.

18    Q  And, in fact, that's not what was agreed to on

19 March the 6th, 2009, correct?

20    A  That is -- that did change after that offer was

21 extended.

22    Q  And in the first offer in July of '08 and the

23 second offer in February of 2009, Mr. Staples was being

24 told that he could participate in the poultry profit

25 sharing plan, correct?

1    A  They were because that was a standard offer that

2 would have been for the position that we had plugged Mr.

3 Staples into within poultry to employ him through poultry.

4    Q  And I may have asked, but I want to be sure, why

5 was that eliminated from the March 6th offer, the poultry

6 plan versus participating in the net income of Walker

7 Foods when he moves over to Walker Foods?

8    A  Because Mr. Staples' job was to manage Walker

9 Foods and then ultimately Renaissance Man Food Service.

10 He negotiated on behalf of Renaissance Man Food Service

11 with Simmons Foods over the price of product paid by

12 Renaissance Man to Simmons Foods and his interest, his

13 sole interest was on creating margin within Renaissance

14 Man Food Service and he did not need a conflict of being

15 bonused by Simmons Prepared Foods, his supplier.

16    Q  Are you telling me that with respect to the

17 bonus that's in paragraph three I need to talk to or I

18 need to consult documents or communications between Mr.

19 Staples and Mr. Walker or Mr. Eisenman?

20    A  I have no knowledge of a bonus that eventually

21 was or was not agreed to with Mr. Staples.

22    Q  If this was a provision in an offer made to Mr.

23 Staples, what did poultry do to make sure that the promise

24 that was set out in there was complied with or carried

25 out?

Page 218

1     A   Other than being available and having multiple
2  conversations with Mr. Staples over the entire duration of
3  his employment and never having it come up, I don't -- I
4  don't know of any interaction.
5     Q   That's certainly a provision of the content of
6  the March 6th, '09 letter that was changed and never
7  carried out or put into place, correct?
8     A   It was a provision that altered when the
9  decision was made to end Walker Foods.
10    Q   Mr. Staples didn't participate in that because
11 he didn't represent either entity, did he?
12    A   He did.  He was part of the entity when we
13 began.  When he -- when we transitioned -- we terminated
14 Mr. Rogers for starting a brokerage company and having a
15 conflict of interest and trying to operate a brokerage
16 company and manage Walker Foods.  We clearly described to
17 John that was a conflict of interest.  It was unacceptable
18 for Mr. Rogers to be out trying to solicit business
19 outside of his responsibilities for Walker Foods, so we
20 terminated him, brought John in, said there's an entity
21 here that needs to be managed, we've got lots of things
22 going on, how do you recommend cleaning that up and making
23 it function as a business and his recommendation, to my
24 recollection, was to clean up the entities, not have all
25 these multiple brands and focus on Renaissance Man Food

Page 219

1  Service and subsequently the Sysco Classic business.
2     Q   The materials that you reviewed where Mr.
3  Staples discussed bonus with Mr. Walker or Mr. Eisenman,
4  do they indicate that Mr. Staples was asking about that
5  from those gentlemen?
6     A   I would have to review those again, what that
7  said.
8     Q   And that's based on documents we produced,
9  correct?
10    A   That's correct.
11    Q   All right.  Let me ask this question.  When Mr.
12 Staples approached Mr. Miller about his bonus, what would
13 Mr. Miller tell him as instructed by poultry?
14        MR. PARKER:  Objection, calls for speculation.
15        MR. KING:  Now?
16    Q   (BY MR. SIMMS)  At any time after March 6, 2009.
17    A   I have questioned Mr. Miller if there were any
18 conversations about bonus from Mr. Staples to Mr. Miller
19 and there were none.
20    Q   None?
21    A   None.
22        MR. SIMMS:  All right.  Let me consult with
23 Mrs. Staples and I may be about finished subject to you
24 being asked any questions by the other lawyers and I may
25 have some follow-up.

Page 220

1        (Short break from 4:49 p.m. to 4:54 p.m.)
2     Q   (BY MR. SIMMS)  I think I'm about finished.  Mr.
3  Jackson, what is Consolidated Broker Management, LLC?
4     A   I am not familiar with Consolidated Broker
5  Management, LLC.
6     Q   I think in some discovery responses it was
7  indicated, and I would have to look, that that is the
8  current broker for the ongoing poultry and HWE/Renaissance
9  Man relationship?
10        MR. PARKER:  Just answer if you know.
11    A   Poultry doesn't have a brokerage agreement, that
12 agreement is between Renaissance Man Food Service and
13 their customer, Sysco.
14    Q   (BY MR. SIMMS)  All right, let me back up.  Has
15 there been a new agreement executed between the parties?
16    A   I have been made aware by Mr. Walker that there
17 is a new brokerage arrangement representing Renaissance
18 Man Food Service with Sysco.
19    Q   Okay.  I guess what I was getting to is there a
20 new written agreement between poultry and H. Walker
21 Enterprises and/or Renaissance Man Food Services that
22 replaces Exhibit 6?
23    A   There has not been.
24    Q   Okay.  And so if you go back to Exhibit 6, is it
25 poultry's position that that agreement is continuing to

Page 221

1  govern the continued relationship between the parties?
2  And when I say the parties, I'm not talking about a broker
3  right now.
4     A   Between Simmons and Renaissance Man Food
5  Service, that is the context that we're operating under.
6     Q   All right.  And you recall in there that poultry
7  had agreed to administer the brokerage aspect if there was
8  one involved, correct?
9     A   That is correct.
10    Q   And I think that it has been the policy of
11 poultry to request whatever broker agreement exists
12 between Renaissance Man and whatever broker, food broker,
13 its using at the time to facilitate the processing of
14 commissions and things of that nature and carry out that
15 function that's addressed in Exhibit 6?
16    A   The percentage brokerage payment or the means in
17 which the brokerage payment was calculated was disclosed
18 through Simmons.
19    Q   And that's the reason I ask the question about
20 this Consolidated Management.  I would have thought that
21 if there was a broker agreement with Renaissance Man, that
22 would have been provided to poultry.  You just -- you just
23 don't know the content of what that entity is or anything?
24    A   I don't know the content of it.
25        MR. PARKER:  And I'll represent that we have

56 (Pages 218 - 221)
App. 061

Page 222

1 searched for such an agreement and Simmons does not
2 possess one.
3        MR. SIMMS:  The broker agreement with this new
4 entity?
5        MR. PARKER:  Correct.
6    Q   (BY MR. SIMMS) To your knowledge, does that
7 entity, that broker entity have ownership interest from
8 Mr. Walker or Mrs. Blanchard?
9    A   I do not have knowledge of the ownership of that
10 entity.
11   Q   All right.  I think I'm about done.  With
12 respect to the Walker Foods, LLC, was there ownership
13 interest in that entity by Renaissance Man Food Services
14 or H. Walker Enterprises, LLC to the knowledge of poultry?
15   A   There were class A shares that were owned by an
16 entity and I do not recall which Herschel Walker entity
17 owned those shares.
18       MR. SIMMS:  I don't have any further questions
19 unless somebody has some that I need to ask some about.
20       MR. KING:  No questions.
21       MR. PARKER:  Simmons Prepared Foods will reserve
22 its questions.
23        (DEPOSITION CONCLUDED AT 4:59 P.M.)
24
25

Page 224

1          JURAT
2    STAPLES VS. H. WALKER ENTERPRISES, LLC, et al.
3       I, DAVID JACKSON, do hereby state under oath
4 that I have read the above and foregoing deposition in its
5 entirety and that the same is a full, true and correct
6 transcription of my testimony so given at said time and
7 place.
8
9
10   _____
11   Signature of Witness
12
13
14       Subscribed and sworn to before me, the
15 undersigned Notary Public in and for the State of Arkansas
16 by said witness, DAVID JACKSON, on this _____day
17 of_____, 2019.
18
19
20
21   _____
22   NOTARY PUBLIC
23   MY COMMISSION EXPIRES:_____
24   JOB NO. 135900
25

Page 223

1        ERRATA SHEET
2    STAPLES VS. H. WALKER ENTERPRISES, LLC, et al.
3    DEPOSITION OF DAVID JACKSON
4    REPORTED BY: KERRI PIANALTO, CCR
5    DATE DEPOSITION TAKEN: JANUARY 14, 2019
6        JOB NO. 135900
7 PAGE LINE IS          SHOULD BE
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 225

1        C E R T I F I C A T E
2
3    I, Kerri Pianalto, Certified Court Reporter,
  do hereby certify that the above-named DAVID JACKSON was
4 by me first duly sworn to testify the truth, the whole truth,
  and nothing but the truth, in the case aforesaid; that the
5 above and foregoing deposition was by me taken and transcribed
6 pursuant to agreement, and under the stipulations
7 hereinbefore set out; and that I am not an attorney for
8 nor relative of any of said parties or otherwise
9 interested in the event of said action.
10
11    IN WITNESS WHEREOF, I have hereunto set my hand
12 and official seal this 21st day of January, 2019.
13
14
15
16
17
18
19    _____
20    KERRI PIANALTO, CCR
21    State of Arkansas, No. 651
22
23
24
25

57 (Pages 222 - 225)

Freedom Court Reporting
877-373-3660        A Veritext Company        205-397-2397

Page 226

1  1   To: David Jackson
2  2   Re: Signature of Deponent David Jackson
3  3   Date Errata due back at our offices: 02/21/2019
4  4
5  5   Greetings:
6  6   This deposition has been requested for read and sign by
       the deponent.  It is the deponent's responsibility to
7  7   review the transcript, noting any changes or corrections
       on the attached PDF Errata.  The deponent may fill
8  8   out the Errata electronically or print and fill out
       manually.
9  9
10 10  Once the Errata is signed by the deponent and notarized,
       please mail it to the offices of Veritext (below).
11 11
12 12  When the signed Errata is returned to us, we will seal
       and forward to the taking attorney to file with the
13 13  original transcript.  We will also send copies of the
       Errata to all ordering parties.
14 14
15 15  If the signed Errata is not returned within the time
       above, the original transcript may be filed with the
16 16  court without the signature of the deponent.
17 17
18 18  Please Email the completed errata/witness cert page
       to readandsign@veritext.com
19 19  or mail to
20 20  Veritext Production Facility
21 21  2031 Shady Crest Drive
22 22  Hoover, AL 35216
23 23  205-397-2397
24
25  1  ERRATA for ASSIGNMENT #3186238

Page 227

1  2   I, the undersigned, do hereby certify that I have read the
       transcript of my testimony, and that
2  3
3  4   ___ There are no changes noted.
4  5   ___ The following changes are noted:
5  6
       Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
6  7   Procedure and/or OCGA 9-11-30(e), any changes in form or
       substance which you desire to make to your testimony shall
7  8   be entered upon the deposition with a statement of the
       reasons given for making them.  To assist you in making any
8  9   such corrections, please use the form below.  If additional
       pages are necessary, please furnish same and attach.
9  10
10 11  Page _____ Line _____ Change _____
11 12  _____
12 13  Reason for change _____
13 14  Page _____ Line _____ Change _____
14 15  _____
15 16  Reason for change _____
16 17  Page _____ Line _____ Change _____
17 18  _____
18 19  Reason for change _____
19 20  Page _____ Line _____ Change _____
20 21  _____
21 22  Reason for change _____
22 23  Page _____ Line _____ Change _____
23  1  Page _____ Line _____ Change _____
24  2  _____
25  3  Reason for change _____
    4  Page _____ Line _____ Change _____

Page 228

1  5   _____
2  6   Reason for change _____
3  7   Page _____ Line _____ Change _____
4  8   _____
5  9   Reason for change _____
6  10  Page _____ Line _____ Change _____
7  11  _____
8  12  Reason for change _____
9  13  Page _____ Line _____ Change _____
10 14  _____
11 15  Reason for change _____
12 16
13 17
14
15 18       _____
16         DEPONENT'S SIGNATURE
17 19
18     Sworn to and subscribed before me this ___ day of
19 20
20     _____, _____.
21 21
22
23 22  _____
24
25 23  NOTARY PUBLIC / My Commission Expires:_____

Freedom Court Reporting
A Veritext Company

877-373-3660                                        205-397-2397

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.