FILED

2019 Mar-04  PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A-6

Page 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF ALABAMA

2                    WESTERN DIVISION

3    KIMBERLY AND JOHN STAPLES,     )

4          Plaintiffs              )

5                                   )

6    VS.                     )CIVIL ACTION

7                            )NO. 7:18-cv-00160-LSC

8    H. WALKER ENTERPRISES, LLC,    )

9    RENAISSANCE MAN FOOD SERVICES,)

10   LLC, AND SIMMONS PREPARED      )

11   FOODS, INC.,                   )

12         Defendant              )

13        ------------------------------------------

14              ORAL DEPOSITION OF

15               HERSCHEL WALKER

16        PERSONALLY AND AS 30(b)(6) CORPORATE

17   REPRESENTATIVE OF H. WALKER ENTERPRISES, LLC

18               JANUARY 18, 2019

19        ------------------------------------------

20

21

22

23

24

25

Page 2

1         ORAL DEPOSITION OF HERSCHEL WALKER, produced as

2   a witness at the instance of the PLAINTIFFS, and duly

3   sworn, was taken in the above-styled and numbered cause

4   on the 18th day of January, 2019, from 9:02 a.m. to

5   5:19 p.m., before Kathryn R. Baker, CSR, RPR, in and for

6   the State of Texas, reported by machine shorthand, at the

7   offices of Greenberg Traurig, 2200 Ross Avenue, Suite

8   5200, in the City of Dallas, State of Texas, pursuant to

9   the Federal Rules of Civil Procedure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 3

1       A P P E A R A N C E S
2   FOR THE PLAINTIFFS:
    Mr. Keri Donald Simms
3   WEBSTER HENRY LAW FIRM, P.C.
    Two Perimeter Park South
4   Suite 445 East
    Birmingham, Alabama 35243
5   205-380-3480
    ksimms@websterhenry.com
6
7   FOR THE DEFENDANTS, H. WALKER ENTERPRISES, LLC, AND
    RENAISSANCE MAN FOOD SERVICES:
8   Mr. Michael J. King
    GREENBERG TRAURIG, LLP
9   Terminus 200
    3333 Piedmont Road NE
10  Suite 2500
    Atlanta, Georgia 30305
11  678-553-2100
    kingm@gtlaw.com
12
13  FOR THE DEFENDANT, SIMMONS PREPARED FOODS, INC.:
    Mr. Talley R. Parker
14  Mr. Ethan Davis
    JACKSON LEWIS
15  500 North Akard
    Suite 2500
16  Dallas, Texas 75201
    talley.parker@jacksonlewis.com
17  ethan.davis@jacksonlewis.com
18
    ALSO PRESENT:
19  Mr. John Staples
    Mrs. Kim Staples
20  Mr. Michael Shin
    Ms. Julie Blanchard
21
22
23
24
25

---

Page 4

1                   INDEX
2   Appearances. . . . . . . . .          2
3   Stipulations . . . . . . . .          7
4   HERSCHEL WALKER
5       Examination by Mr. Simms . . .        7
6   Signature and Changes. . . . .       286
7   Reporter's Certification . . .       288
8
9               EXHIBITS
10  NO./DESCRIPTION                  PAGE
11  Exhibit 1.......................        9
        Limited Liability Company Agreement of
12      H. Walker Enterprises, LLC, Dated as of:
        March 20, 2002
13      RMFS 000335-369
        Exhibit 2.......................        10
14      Limited Liability Company Agreement of
        Walker Foods, LLC
15      RMFS 000370-417
        Exhibit 3.......................       18
16      Consent Resolution of the Board of Managers
        of Walker Foods, LLC
17      Simmons 000555-557
        ****CONFIDENTIAL****
18  Exhibit 4.......................       24
        June 12, 2008, Letter to Mr. John Staples
19      Simmons 000065
        Exhibit 5.......................       28
20      February 20, 2009, Letter to Mr. John Staples
        Simmons 000098
21  Exhibit 6.......................       29
        March 6, 2009, Letter to Mr. John Staples
22      Simmons 000080
        Exhibit 7.......................       36
23      Limited Liability Company Agreement of
        Renaissance Man Food Services, LLC, Dated
24      as of: April 26, 2002
        RMFS 000418-451
25

---

Page 5

1                   INDEX
2               (CONTINUED)
3               EXHIBITS
4   NO./DESCRIPTION                  PAGE
5   Exhibit 8.......................       39
        Memorandum of Understanding
6       Simmons 000244-257
        ****CONFIDENTIAL****
7   Exhibit 9.......................       68
        Inventory Agreement
8       Simmons 000258-260
        ****CONFIDENTIAL****
9   Exhibit 10.......................      109
        September 30, 2016, E-mail with Attachment
10      RMFS 000034-94
        Exhibit 11.......................     152
11      E-mail Chain
        Simmons 000126-128
12      ****CONFIDENTIAL****
        Exhibit 12.......................     155
13      E-mail Chain
        Simmons 000124-125
14      ****CONFIDENTIAL****
        Exhibit 13.......................     157
15      E-mail Chain
        RMFS 000257-260
16  Exhibit 14.......................      174
        October 31, 2017, E-mail
17      RMFS 000303
        Exhibit 15.......................     177
18      E-mail Chain
        RMFS 000304-305
19  Exhibit 16.......................      181
        Photocopy of Check
20      RMFS 000311
        Exhibit 17.......................     182
21      October 31, 2017, E-mail
        RMFS 000312
22  Exhibit 18.......................      188
        H. Walker Foods Sweet Southern Waffle
23      Brochure
        RMFS 000325
24  Exhibit 19.......................      202
        December 21, 2017, E-mail with Attachment
25      RMFS 000106-108

2 (Pages 2 - 5)

App. 207

Page 6

1              INDEX
2            (CONTINUED)
3            EXHIBITS
4 NO./DESCRIPTION                    PAGE
5 Exhibit 20....................................  236
       December 28, 2017, E-mail
6    RMFS 000118-119
  Exhibit 21....................................  260
7    E-mail Chain
     RMFS 000111
8 Exhibit 22....................................  269
     E-mail Chain
9    Simmons 000167
     ****CONFIDENTIAL****
10 Exhibit 23...................................  283
     Membership Interest Purchase Agreement
11   RMFS 000096-105
12
13      REQUESTED DOCUMENTS/INFORMATION
14              (NONE)
15
16        CERTIFIED QUESTIONS
17              (NONE)
18
19
20
21
22
23
24
25

Page 7

1        P R O C E E D I N G S
2        THE REPORTER:  Any agreements for the
3 record?
4        MR. KING:  No.
5        MR. SIMMS:  No.
6            HERSCHEL WALKER,
7 having been first duly sworn, testified as follows:
8            EXAMINATION
9 BY MR. SIMMS:
10   Q.  State your full name for the record, please,
11 sir.
12   A.  Herschel Junior Walker.
13   Q.  Mr. Walker, my name is Keri Simms.  We met on
14 some prior occasions.  And I'm here today to take your
15 deposition.
16        Have you ever given a deposition before?
17   A.  No.
18   Q.  All right.  This is your first time?
19   A.  Yes.
20   Q.  At any time you don't hear me or understand the
21 question, you tell me.  I'll try to speak louder.  I don't
22 want to yell at you, but I'll try to speak louder.
23   A.  Okay.
24   Q.  If you don't understand a question, tell me.
25 I'll try to ask it so that you understand it.

Page 8

1        Any time you need to take a break, you tell
2 me, and we'll take a break.
3   A.  Yes.
4   Q.  Do you understand that today you're giving
5 testimony on behalf of yourself?
6   A.  Yes.
7   Q.  And on behalf of your business H. Walker
8 Enterprises, LLC?
9   A.  Yes.
10   Q.  And Renaissance Man Food Services, LLC?
11   A.  Yes.
12   Q.  What I'll try to do is, if I'm asking you
13 something that pertains to you individually --
14   A.  Yes.
15   Q.  -- I'll try to ask it that way.  Otherwise, I'll
16 try to also make a distinction and ask you, and you'll be
17 testifying on behalf of the two companies, H. Walker
18 Enterprises or Renaissance Man.
19        Is that okay with you?
20   A.  Yes, sir.
21        MR. KING:  Keri, I don't think that there's
22 a notice for 30(b)(6) of Renaissance Man.
23        MR. SIMMS:  It was just H. Walker?
24        MR. KING:  But I'm happy for it to be
25 covered by both as long as we're talking about the same

Page 9

1 list of items that's attached.
2        MR. SIMMS:  That's fine.
3        Anything else?
4        MR. KING:  No.
5        MR. SIMMS:  Okay.
6   Q.  (BY MR. SIMMS)  Exhibit 1 appears to be the
7 creation or formation document that concerns H. Walker
8 Enterprises, LLC.
9        Have you ever seen this before?
10        (Exhibit 1 marked.)
11        MR. KING:  RMFS 335.
12   A.  (Witness reviews document.)
13        I hate to look through all the pages,
14 but...
15   Q.  (BY MR. SIMMS)  Well, let me ask you this --
16   A.  Yes.
17   Q.  -- do you know when H. Walker Enterprises, LLC,
18 was formed?  It says March 20th, 2002.
19   A.  Yes, that's around the time.
20   Q.  All right.  And if you look at the page -- I'm
21 going to refer down to the bottom, the bottom numbers,
22 RMFS document 366 and 367.
23   A.  (Witness reviews document.)
24        Okay.
25   Q.  On RMFS 367, which is page 32 of the document --

Page 10

1    A. Yes.
2    Q. -- it indicates that you own 100 percent of
3 H. Walker Enterprises, LLC.
4       Do you see that?
5    A. Yes, sir.
6    Q. Has that been true since 2002 up until today
7 that you own 100 percent of that LLC?
8    A. Yes, sir.
9    Q. Other than yourself as a member, are there any
10 other members of the LLC, to your knowledge?
11   A. No, sir.
12   Q. Okay. You're the only one?
13   A. Yes, sir.
14   Q. And you've always been the only one since the
15 formation of the LLC on March 20th, 2002, up until today?
16   A. Yes, sir.
17      (Exhibit 2 marked.)
18   Q. (BY MR. SIMMS)  All right. I'm going to show
19 you what is RMFS 370 through 557.
20      THE WITNESS: You want to tell me what it
21 is?
22      MR. KING: Just wait on the question.
23      THE WITNESS: Okay.
24   A. Is there a certain page you want me to look at
25 or look at it all?

Page 11

1    Q. (BY MR. SIMMS)  You can start with the
2 beginning page. I'm representing to you that that's a
3 document that deals with the creation of an LLC called
4 Walker Foods.
5    A. Okay.
6       (Witness reviews document.)
7       Yes.
8    Q. All right. If you would -- page 370, which is
9 down at the bottom under RMFS, if you could go to that
10 page.
11   A. 37?
12   Q. 370 at the bottom. It will be the second -- I
13 think it's the second page from where you're looking at
14 right now.
15      MR. KING: First page.
16   Q. (BY MR. SIMMS)  First page, but go to -- it's
17 370 to -- did it not have a 369 on it?
18   A. (Indicating.)
19   Q. Okay. I'm sorry; my bad. I had an extra page
20 here.
21   A. You want to give me that?
22   Q. I don't think we need to talk about it.
23   A. Okay.
24   Q. At the top, it indicates that this agreement of
25 Walker Foods, LLC, was entered into on September 1st,

Page 12

1 2007.
2       Is that your recollection as to when that
3 entity, Walker Foods, LLC, was formed?
4    A. Yes, it was about that time.
5    Q. Okay. And if we go to page 42 of the document
6 or RMFS 411.
7    A. (Witness complies.)
8       Okay.
9    Q. It sets forth there -- and I wanted to ask you
10 some questions about this.
11   A. Okay.
12   Q. It has members, and the first one is H. Walker
13 Enterprises, LLC.
14      Do you see that?
15   A. Yes, sir.
16   Q. So H. Walker Enterprises was a member of Walker
17 Foods, LLC; is that your understanding?
18   A. No. H. Walker Enterprises owns H. Walker;
19 H. Walker Enterprises, it was a member of -- say that
20 again.
21   Q. Okay. The first document I gave you today was
22 the creation of H. Walker Enterprises, LLC.
23   A. Right.
24   Q. Okay. And now this document deals with Walker
25 Foods, LLC.

Page 13

1    A. Foods, LLC, right.
2    Q. And according to page 42, or RMFS 411, there
3 appear to be three members.
4    A. Right.
5    Q. The first member appears to be H. Walker
6 Enterprises, LLC; is that correct?
7    A. Right.
8    Q. The second member appears to be Simmons Prepared
9 Foods, Inc.; is that correct?
10   A. Right.
11   Q. And the third was a gentleman by the name of
12 Mike Rogers?
13   A. Right.
14   Q. Okay. And then if you go to the next page,
15 which is RMFS 412.
16   A. (Witness complies.)
17      Okay.
18   Q. It indicates that H. Walker Enterprises --
19   A. Right.
20   Q. -- owned 51 percent --
21   A. Right.
22   Q. -- of Walker Foods, LLC?
23   A. Right.
24   Q. And Simmons Prepared Foods owned 39 percent?
25   A. Right.

Page 14

1    Q.   Okay.  And Michael Rogers owned 10 percent?
2    A.   Yes, sir.
3    Q.   Okay.  What was the -- why was Walker Foods,
4 LLC, formed in September of 2007?
5    A.   Because that was a entity that was formed that
6 Mike Rogers could have a piece of it.  I owned H. Walker
7 Enterprises 100 percent, so no one was ever going to get a
8 piece of that because that's boiled down to a lot of other
9 things rather than just food.  So I do a lot more than
10 just food stuff.
11       So if I made him a part of H. Walker
12 Enterprises, that meant he would have had a piece of that,
13 so that's why the food thing was created, because it dealt
14 with what Mike Rogers and Simmons was going to be doing in
15 the entity.
16    Q.   What was Simmons and Mike Rogers going to be
17 doing?
18    A.   Doing the food service side of the company that
19 I started.
20    Q.   Okay.  What company was that?
21    A.   Which is now Renaissance Man, which is a food
22 service company.
23    Q.   Okay.  I have read through Exhibit 2, which is
24 the formation documents concerning Walker Foods, and I did
25 not see reference to Renaissance Man.

Page 15

1    A.   You may not, but that's what it was.
2    Q.   Okay.  If you would go to page 379, which is
3 page 10 of Document 2.
4    A.   (Witness complies.)
5         Okay.
6    Q.   With respect to Walker Foods, LLC --
7    A.   Okay.
8    Q.   -- it talks about it having a principal office
9 location, but it doesn't say where.
10        And my question to you is:  Where was the
11 office of Walker Foods, LLC, located?
12    A.   At that time, it was in Savannah, Georgia.
13    Q.   Did it move to some other location at some point
14 in time?
15    A.   Some of the back office stuff moved when we
16 moved it to Simmons, but it was started in Savannah,
17 Georgia.
18    Q.   Okay.  Did Mike Rogers have a separate office
19 location in Arkansas somewhere?
20    A.   Yes, he did.
21    Q.   Where was that located?
22    A.   Oh, I'm not sure.  I'm not sure where he's at.
23    Q.   Was Mr. Rogers, with respect to Walker Foods,
24 was he operating Walker Foods at that location?
25    A.   He was -- yeah.

Page 16

1    Q.   And I'm sorry; let me try to finish.
2    A.   Okay.
3    Q.   I'm from Alabama, and I may have some pauses
4 along the way.
5    A.   That's cool.
6    Q.   So if you want to, let me finish, and then you
7 can answer.  It will probably help you and me and
8 everybody out.
9    A.   Okay.
10    Q.   I'm not telling you what to do, but I'm sure
11 that's what Mr. King would want you to do as well.
12        What I'm trying to find out is:  Did
13 Mr. Rogers -- whatever he did for Walker Foods, did he do
14 it out of some office location in Arkansas at some point
15 in time?
16    A.   Yes.
17    Q.   Okay.  And where was that located?
18    A.   I'm not sure.
19    Q.   All right.  What role was Mr. Rogers performing
20 for Walker Foods?
21    A.   He was going to be general manager.
22    Q.   Okay.  And what was Simmons Prepared Foods; what
23 was its role in this LLC Walker Foods?
24    A.   They were manufacturing the product that we were
25 going to sell.

Page 17

1    Q.   And what were those products?
2    A.   Chicken products from -- any chicken product
3 sold.  They were going to give H. Walker Enterprises or
4 Renaissance Man the product to become a fully integrated
5 food company like most of your big poultry companies out
6 there.
7    Q.   All right.
8    A.   Because they didn't have a food service arm, so
9 I was going to be the food service arm for them because I
10 already had clients.
11    Q.   All right.  And under this agreement, which is
12 Exhibit 2, which is the Walker Foods, LLC, corporate
13 documents, did H. Walker Enterprises acquire ownership
14 interest in the production facilities of Simmons Prepared
15 Foods?
16    A.   No.
17    Q.   Okay.  At some point, did the operations of
18 Walker Foods, LLC, cease or end?
19    A.   Oh, yes.  Yes.
20    Q.   When was that, Mr. Walker?
21    A.   Sometime in 2009, I thought.
22    Q.   Okay.
23    A.   I assume.  I'm not sure.
24    Q.   All right.  May I see Document 2 back?  I may
25 have added something to that that may need to be

5 (Pages 14 - 17)

Page 18

1  separated.
2      A.  (Witness hands attorney document.)
3          MR. SIMMS:  I did; sorry about that.  I
4  removed RMFS 555.  It got accidentally stapled to it, and
5  556 and 557.
6          (Exhibit 3 marked.)
7      Q.  (BY MR. SIMMS)  Exhibit 3.
8          MR. KING:  Simmons 555.
9      A.  Okay.
10     Q.  (BY MR. SIMMS)  This appears -- have you seen
11 this document?
12     A.  A long time ago, I have.
13     Q.  It appears to be a resolution of the board of
14 managers of Walker Foods, LLC.  If you look at page 3,
15 which is 557, RMFS 557?
16     A.  (Witness complies.)
17         Yes.
18     Q.  Is that your signature?
19     A.  Yes.
20     Q.  And it's got David Jackson.
21         Do you recognize that as Mr. Jackson's
22 signature?
23     A.  I wouldn't know what his signature looked like.
24     Q.  I gotcha.
25         And Michael Jones.

Page 19

1      A.  I don't know what it looked like.
2      Q.  Who is Michael Jones?
3      A.  At that time, he was like one of the top guys at
4  Simmons.  I think Mike Jones was one of the top guys at
5  Simmons.  I'm not sure what position he held at that time.
6      Q.  Was he at Simmons, Inc., or Simmons Prepared
7  Foods?
8      A.  I wouldn't be able to tell you that.
9      Q.  All right.  Looking at page 3, it looks like the
10 resolution is dated April something 2009, but there's not
11 a day of the week filled in the blank.
12         Do you see that?
13     A.  Yes.
14     Q.  Is it your recollection that this document is
15 executed in April of 2009?
16     A.  It could have been.  Like I said, 2009 is nine
17 years ago.  I don't remember yesterday.
18     Q.  Yes, sir.  I gotcha.
19         Do you have any reason to believe that this
20 document was not executed in April of 2009?
21     A.  No.
22     Q.  So would it be fair for me to believe that
23 Walker Foods, LLC, was operational, with respect to
24 Mr. Mike Rogers being involved, for about two years or
25 less than two years?

Page 20

1      A.  Mike Rogers wasn't involved that long.
2      Q.  How long was he involved?
3      A.  That, I couldn't be able to tell you.  But he
4  did some unsavory things, as well.  So I'm not sure how
5  long he was involved, but he wasn't involved that long.
6      Q.  What unsavory things was he doing?
7      A.  Well, sort of like what we're here fighting
8  about with your client, and also he had affairs that I
9  have e-mails from some women who wrote that he was having
10 affairs and stuff and so -- things like that, I don't put
11 up with.  So he had to go as well.
12     Q.  Okay.  All right.  Did him going have anything
13 to do with the profitability of the venture of Walker
14 Foods, LLC?
15     A.  Profitability?
16     Q.  Yeah.
17     A.  Explain to me, sir.
18     Q.  Well, it's my understanding that H. Walker
19 Enterprises and Simmons Prepared Foods and Mike Rogers
20 entered into an agreement to sell some food products that
21 Simmons was producing.
22     A.  Right.  But I was selling before we entered into
23 it, so it was already going.
24     Q.  But as far as that entity, the Walker Foods --
25     A.  I brought my entity into it, so it was -- I

Page 21

1  brought items into that entity.  So Mike just came in as a
2  general manager.  I needed a general manager.  And we
3  thought -- well, he was introduced to me by John, and so
4  he came in because of that.  Everyone said I needed a
5  general manager.  And I brought that -- what I had into
6  this entity, and Simmons gave me an opportunity at that
7  time that I can expand and become like a food service arm
8  where I can compete with the "big boys," as I called it,
9  the Tysons, the Purdues, the Pilgrims, and all those guys.
10 So that's what Simmons gave me an opportunity to do there.
11     Q.  What I'm getting to is, was -- do you know how
12 much -- let me ask you this:  Was the Walker Foods, LLC,
13 entity's operations, as managed by Mike Rogers, was it
14 successful?
15     A.  To me, it was.
16     Q.  Okay.
17     A.  I think any time you make money, it's
18 successful.  And we were making money before I entered
19 into it.  But it's a point of how much you're making.
20 Some people say it's a lot, but I always say it was fine
21 what I was doing.  So it's caught on what you consider
22 successful is.
23     Q.  Let's get back to Exhibit 3 here.
24         This resolution, did you have discussions
25 with representatives of Simmons and/or Simmons Prepared

Page 22

1 Foods that led up to this resolution?
2    A.  That, I can't recall.  I couldn't recall.
3    Q.  All right.  And if you --
4    A.  Like I say, it was 2009.
5    Q.  Mr. Rogers was being terminated, right?
6    A.  Here (indicating)?
7    Q.  Yes, sir, in this resolution.
8    A.  Yes.  Oh, no, he -- yes.
9    Q.  Okay.  And under the paragraph on the first
10 page, which is Simmons 555, the board authorized
11 John Staples as an employee of Simmons to act as general
12 manager of the company --
13    A.  Right.
14    Q.  -- on an at-will basis and subject to discretion
15 of the board as general manager of the company, and he
16 shall report to the company's chief executive officer and
17 the board.
18        Did Mr. Staples ever become the general
19 manager of Walker Foods, LLC?
20    A.  No.
21    Q.  Okay.  Now, did you have a role in recruiting
22 Mr. Staples?
23    A.  Yes, sir.
24    Q.  All right.  Did you have a role in preparing
25 offers of employment that Simmons Prepared Foods had made

Page 23

1 to Mr. Staples?
2    A.  No, sir.
3    Q.  Okay.  And my question to you is:  If
4 Mr. Staples -- excuse me -- Mr. Staples was to become the
5 general manager of Walker Foods, LLC, and replace
6 Mike Rogers, how come you did not play a role in making
7 those employment offers that Simmons made to -- let me
8 finish my question -- Simmons made to Mr. Staples?
9    A.  I didn't need to.
10    Q.  Why not?
11    A.  Because Simmons had experience in doing the
12 offers, whereas I didn't have that experience.  John
13 wanted to come from Virginia.  He hated Virginia.  He was
14 a friend at that time.  He hated Virginia, wanted to get
15 out of Virginia, so I brought him to Simmons.  And he went
16 and started doing negotiation with Simmons.  And I didn't
17 need to play a role; that wasn't my forte.  Sort of like
18 I'm a running back.  You have quarterbacks, you have
19 running backs, you have different people that play a role,
20 and that wasn't my role.
21    Q.  Was it your understanding that initially
22 Mr. Staples was to replace Mike Rogers and become the
23 general manager of Walker Foods, LLC?
24    A.  No, sir.
25    Q.  What was your understanding --

Page 24

1    A.  He was to going to be --
2    Q.  -- what Mr. Staples was going to be doing?
3    A.  Oh, he was going to become the general manager
4 of the food service entity, whatever it was, because at
5 that time, Mr. Staples was one of the ones that went and
6 said that Walker Foods has a bad reputation because of
7 what Mike Rogers did.  And the way he was -- sort of like
8 what I said with your client, was taking -- doing these
9 sort of like, you pay me a fee, we'll sell your food.  And
10 he thought it was a bad reputation.  So he decided that we
11 needed to change from Walker Foods, and so that's why
12 Walker Foods, the company itself, went away.
13        (Exhibit 4 marked.)
14    Q.  (BY MR. SIMMS)  Exhibit 4 is a Simmons-produced
15 document, Simmons 65.
16        MR. KING:  65.
17    A.  Yes, sir.
18    Q.  (BY MR. SIMMS)  Have you ever seen that
19 document until this lawsuit, Mr. Walker?
20    A.  (Witness reviews document.)
21        No, sir, I have never seen it.
22    Q.  And I think you've indicated that neither you
23 personally, nor anyone, to your knowledge, on behalf of
24 H. Walker Enterprises or Renaissance Man Food Services
25 played any role in the offer that's memorialized in this

Page 25

1 document that Simmons Prepared Foods made to Mr. Staples;
2 is that correct?
3    A.  That's correct.
4    Q.  All right.  Now, this document is dated
5 June 12th, 2008.
6    A.  Okay.
7    Q.  All right.  At that time, had there been a
8 problem with Mike Rogers prior to June 12th, 2008?
9    A.  Yes, sir.
10    Q.  Okay.  And had there been discussions between
11 H. Walker Enterprises, Simmons Foods and/or Simmons
12 Prepared Foods about replacing Mr. Rogers with Mr. Staples
13 prior to June 12th, 2008?
14    A.  Yes, sir.  Well, I don't know whether it was
15 going to replace him with John or who we were going to
16 replace him with, but it was get rid of Mike Rogers.
17    Q.  All right.
18    A.  But at that time, I don't know whether it was
19 going to be John or whoever.  I'm not sure when John
20 started telling me he hated Virginia.  I'm not sure when
21 that time was.
22    Q.  Let's go through Exhibit 4 here, if we could.
23        This document is dated June 12th, 2008, and
24 it appears that Simmons Foods is making an offer of
25 employment to Mr. Staples.

Page 26

1    A.  Uh-huh.
2    Q.  Is that correct?
3    A.  Yes, sir.
4    Q.  And the position that they're hiring him is
5  Director of Distribution Sales-Food Services?
6    A.  Yes, sir.
7    Q.  To your knowledge, did Simmons Prepared Foods
8  have a director of distribution sales-food service prior
9  to Mr. Staples?
10    A.  No, I don't think they did, because that was one
11  reason my company came in.  They didn't have the success
12  at food service.  I was bringing that food service arm in.
13  That's the reason they hired John is to run the food
14  service side because I was the one who thought John could
15  run the food service side.  They didn't know who -- I
16  don't know if they knew John Staples, but they didn't know
17  John.  I'm the one that introduced John Staples to
18  Simmons.
19    Q.  Okay.  Do you have knowledge, either personally
20  or on behalf of H. Walker Enterprises or Renaissance Man
21  Food Services, of communications or discussions between
22  anyone at Simmons Prepared Foods and Mr. Staples that led
23  up to the creation and this offer that was made on
24  June 12th, 2008?
25    A.  No, sir.

Page 27

1    Q.  Okay.  So sounds like to me that you may have
2  introduced Mr. Staples to Simmons, but you didn't play any
3  more role in the negotiations about employment?
4    A.  The only thing that -- the role that I played is
5  John wanted insurance.  And I didn't have insurance
6  because we had a small company.  So the only role that I
7  played is he got to negotiate the thing with Simmons
8  because they were going to cover his insurance, and they
9  knew about what a general manager or whatever this
10  position he was going to have, what it would be because I
11  had no idea what you pay someone at that price.  So they
12  had more expertise at that than I did.
13        So sort of like they have more expertise at
14  manufacturing chicken than I do, so that's the role
15  they're going to play; but I can sell, so that's the role
16  I played.
17    Q.  All right.  Did you play any role in Item 2
18  regarding the compensation for Mr. Staples in this offer?
19    A.  No, sir.
20    Q.  All right.  And did you play any role in
21  Mr. Staples participating in the Simmons profit sharing
22  plan?
23    A.  No, sir.
24    Q.  All right.  And -- all right.
25        Do you have knowledge, or does H. Walker

Page 28

1  Enterprises or Renaissance Man have knowledge whether or
2  not this particular offer of employment that was made to
3  Mr. Staples in June of 2008 was accepted or not accepted?
4    A.  No, sir, I don't.
5        (Exhibit 5 marked.)
6    Q.  (BY MR. SIMMS)  Let me show you Exhibit 5.
7  This is Simmons 98.
8    A.  All right.
9        (Witness reviews document.)
10        Okay.
11    Q.  (BY MR. SIMMS)  Have you seen that document
12  before this lawsuit?
13    A.  No, sir.
14    Q.  Did you or -- either personally or on behalf of
15  H. Walker Enterprises or Renaissance Man Food Services
16  play any role in the offer that's shown in Exhibit
17  Number 5?
18    A.  No, sir.
19    Q.  You had an opportunity to look at Exhibit 5?
20    A.  Yes, sir.
21    Q.  Played no role with respect to Exhibit 5?
22    A.  No, sir.
23    Q.  Have any discussions with Mr. Staples or anyone
24  at Simmons Prepared Foods with respect to or leading up to
25  exhibit -- the creation of Exhibit 5?

Page 29

1    A.  No, sir.
2    Q.  Assume for me that the offer in Exhibit 5,
3  compared to the offer that was in Exhibit 4, had been
4  changed.
5        Did you play any role in making any of the
6  changes?
7    A.  No, sir.
8    Q.  Do you know specifically the date and time that
9  Mike Rogers left his role at Walker Foods?
10    A.  No, sir.
11    Q.  Was he still at Walker Foods on February 20th,
12  2009?
13    A.  I have no idea.  I know he wasn't work -- he
14  wasn't doing too much for me because I couldn't trust him
15  to save my life.
16    Q.  Okay.
17        (Exhibit 6 marked.)
18    Q.  (BY MR. SIMMS)  Exhibit 6 is Simmons 80.
19    A.  (Witness reviews document.)
20        Okay.
21    Q.  Did you have any involvement in the creation of
22  the offer that's embodied in Exhibit 6, which is
23  Simmons 80?
24    A.  No, sir.
25    Q.  Okay.  Now, it appears to me that the bonus that

8 (Pages 26 - 29)

1 had been contained in Exhibits 4 and 5 and Exhibit 6 has
2 been changed, and it talks about -- it goes from
3 participation of Mr. Staples in the Simmons Prepared Foods
4 pool or plan, to 5 percent of Walker's net income up to
5 50 percent of Mr. Staples' salary when he moves to Walker
6 Foods.
7    A.  Yes, sir.
8    Q.  Did you have any discussions with anyone at
9 Simmons Prepared Foods about that change?
10    A.  No, sir.
11    Q.  And did you have any discussion with Mr. Staples
12 about that?
13    A.  No, sir.
14    Q.  And would it be fair to say that Mr. Staples
15 never became an employee of Walker Foods, LLC?
16    A.  That, like I say, I have no idea.  When I left
17 John, all I knew, he was going to be working for -- coming
18 back to Arkansas, working for me.  Whether these contract
19 things was going to be worked out by Simmons, I had no
20 clue of what they were doing.  So Walker Foods,
21 Renaissance Man, or whoever, I just knew he was going to
22 be working for me.
23    Q.  Was going to be performing what role for you?
24    A.  Well, there's general manager, head of
25 distribution, or working in the food service side, is what

1 I -- what my business was.
2    Q.  Was he going to be working for H. Walker
3 Enterprises --
4    A.  No.
5    Q.  -- or Renaissance Man?
6    A.  It was Renaissance -- whatever was going to be
7 Renaissance Man at that time.
8    Q.  Okay.  As far as you know, Mr. Staples never
9 went to work for Walker Foods, LLC?
10    A.  As far as I know.  I'm not sure.  Like I said, I
11 know John was one of the people that wanted to change
12 Walker Foods because he said it had a terrible name
13 because of what Mike Rogers did.  So that's all I know.
14 And Renaissance Man came out.
15    Q.  All right.  And did Mr. Staples ever act as
16 general manager for Walker Foods, LLC, to your knowledge?
17    A.  To my knowledge -- there's an e-text -- there's
18 an e-mail where John -- let me think.  I don't
19 know whether it was John or -- but I don't know what -- I
20 don't know -- one of the things I always say is I don't
21 believe in titles.  I never have.  And that's why I said
22 wherever John would work, I thought he was just working.
23        But there's an e-mail where John was
24 negotiating a deal where Mike Rogers had taken money from
25 a company.  And I'm not sure whether John has signed any

1 of these papers here, but he was negotiating a deal with
2 someone that Mike Rogers had taken like $25,000 a month --
3 it may have -- I'm not sure of the amount.  I'm not sure
4 whether he was working for who at that time.  So that's
5 why I say that's so long ago.  I don't know what time is
6 what.
7    Q.  What I'm trying to find out today is, to your
8 knowledge -- I know you're having to go back to 2009, but
9 did Mr. Staples ever manage Walker Foods, LLC?
10    A.  To my knowledge, I don't know.
11    Q.  You don't know?
12    A.  Yeah, I don't know.  That's what I'm saying.
13    Q.  All right.
14    A.  Like I say, it could have been, could not have
15 been.  I don't know.
16    Q.  Okay.
17    A.  But if he did, it was a short period of time.
18    Q.  All right.  Let's go back to the resolution
19 document.
20        MR. KING:  Simmons 555?
21        MR. SIMMS:  Yeah, starts with 555.  What
22 number was that?
23        MR. KING:  Exhibit 3.
24        MR. SIMMS:  All right.
25    Q.  (BY MR. SIMMS)  Page 2, it says that, The board

1 authorizes the company, and I'm guessing Walker Foods,
2 LLC, as soon as practical, to cease using office space at
3 124 West Meadow, Fayetteville, Arkansas.
4        Do you see that?
5    A.  Yes.
6    Q.  Was that Mr. Mike Rogers' office?
7    A.  It could have been.  Like I said, I don't know.
8    Q.  And to move the administrative functions to the
9 Savannah office of Renaissance Man or to the Simmons
10 offices?
11    A.  Yes.
12    Q.  Okay.  Now, did the administrative functions of
13 Walker Foods, LLC, get moved to the Savannah office of
14 Renaissance Man Food Services?
15    A.  It was in the Savannah office.  Mike never did
16 any billing or anything.  Carol did all that.  Mike Rogers
17 may have ordered items, but Mike Rogers never did any
18 billing.  It was done out of the Savannah office the whole
19 time.  He may have worked out of that office, but he never
20 done any billing out of that.
21    Q.  No billing?
22    A.  Billing, yes, B-I-L-L-I-N-G.
23    Q.  I gotcha.
24    A.  Yeah, just making sure.
25    Q.  Okay, yeah.  We'll get on the same page.

Page 34

1    My question to you is:  What's your
2 recollection as to what took place with respect to the
3 administrative functions of Walker Foods, LLC, as
4 referenced in this paragraph on page 2 of Simmons 556?
5    A.  I can't recall.  Maybe because of the unsavory
6 things he was doing, they didn't want him to have anything
7 to do with our entity anymore because -- like I say, I
8 have no clue.
9    Q.  All right.  What I want to know is:  Did the
10 administrative functions continue to be operated going
11 forward into the future after --
12    A.  Administrative function to what?
13    Q.  -- April of 2009, of Walker Foods, LLC?
14    Were they carried out at the offices of
15 Renaissance Man or was that done inside Simmons?
16    A.  In 2000 --
17    Q.  April of 2009.
18    A.  That may have been moved to Simmons at that
19 time, I'm thinking.
20    Q.  Okay.  Then it says that, The board will have a
21 meeting on or after April 15th, 2009, to include
22 Mr. Staples.  And for matters related to the relationship
23 between the company, Walker Foods, and Renaissance Man,
24 and a restructuring of the company's business operations,
25 including without limitation a restructuring of the

Page 35

1 company --
2    A.  Now, wait.  Read that again where you see Walker
3 Foods.
4    Q.  Okay.
5    A.  I just see, Between the company and Renaissance
6 Man.  It doesn't say, Walker Foods.
7    Q.  Let's back up.
8    Do you see where it says, Resolved that the
9 board should have a meeting on or before April 15th, 2009?
10    A.  Yes, right, to include John Staples to address
11 various business matters including matters related to the
12 relationship between the company and Renaissance Man?
13    Q.  Yes, sir.
14    And to me, the "company" is referring to
15 Walker Foods, LLC.
16    A.  Okay.
17    Q.  All right.
18    A.  Yes.
19    Q.  And a restructuring of the company is Walker
20 Foods' business operations --
21    A.  Yes, sir.
22    Q.  -- including, without limitation, a
23 restructuring of the company, Walker Foods, LLC --
24    A.  Right.
25    Q.  -- and Renaissance Man Food Services sales force

Page 36

1 and compensation structure.
2    Did I read that correctly?
3    A.  Right.  Yes, sir.
4    Q.  Was there a meeting before April 15th, 2009?
5    A.  I don't recall.  There could have been but, like
6 I said, I don't recall.
7    Q.  Would you agree with me at some point,
8 Mr. Staples did not operate or manage Walker Foods, LLC?
9    A.  No, I couldn't agree with you there.
10    Q.  Do you know one way or the other?
11    A.  That's why I was saying, I couldn't agree;
12 that's why I'm not agreeing.
13    Q.  Okay.
14    A.  Yes.
15    Q.  Could you tell me when he first started managing
16 Renaissance Man Food Services?
17    A.  No.  No.
18    Q.  Okay.
19    (Exhibit 7 marked.)
20    Q.  (BY MR. SIMMS)  Let me show you Exhibit 7,
21 which is RMFS 418 through 451.
22    A.  Okay.
23    Q.  And take a moment and read over those.  I'm
24 going to ask you some questions.
25    A.  Okay.

Page 37

1    (Witness reviews document.)
2    You can go ahead and ask.
3    Q.  Okay.  This document, which is Exhibit 7,
4 appears to be the corporate formation documents related to
5 Renaissance Man Food Services, LLC.
6    A.  Yes.
7    Q.  And it appears that that entity was formed on
8 April 26th, 2002.
9    A.  Right.
10    Q.  And then if you go to page 32, which is
11 RMFS 450.
12    A.  (Witness complies.)
13    432?
14    Q.  450, page 32, which is -- but it's also stamped
15 450.
16    A.  Oh, okay.
17    Q.  According to that page, the only member of
18 Renaissance Man Food Services is H. Walker Enterprises,
19 LLC; is that correct?
20    A.  Right, that's correct.
21    Q.  It's not you individually?
22    A.  No.
23    Q.  And H. Walker Enterprises, LLC, owns 100 percent
24 of Renaissance Man?
25    A.  Right.

Page 38

1    Q.   Is that correct?

2    A.   Yes, sir.

3    Q.   And the page before, which is page 31, you
4  signed the formation documents on behalf of H. Walker
5  Enterprises, LLC, correct?

6    A.   Yes, sir.

7    Q.   Going back to Exhibit 6, the bonus -- about when
8  Mr. Staples goes to Walker Foods?

9    A.   Yes, sir.

10   Q.   To your knowledge, that never occurred, did it?

11   A.   I didn't know anything about the bonus, so I
12 expect not.  That, I don't know, because I never had
13 anything to do with that.

14   Q.   Okay.  And as far as you know, Mr. Staples never
15 moved to Walker Foods, either employed by Walker Foods,
16 LLC, or managed that operation at all?

17   A.   Like what I said, I couldn't tell you.  I don't
18 know.

19   Q.   Okay.  But at some point, Mr. Staples became the
20 general manager of Renaissance Man?

21   A.   Yes, sir.

22   Q.   All right.  And do you know what document
23 addresses that?

24   A.   There's something I've seen where it said John
25 would become general manager of Renaissance Man and

Page 39

1  answer -- I'm not sure what document it is, but I've seen
2  something that states that somewhere.

3    Q.   Do you know if it's this Memorandum of
4  Understanding, which I'm going to mark as Exhibit 8, which
5  is Simmons 244.

6         (Exhibit 8 marked.)

7    A.   Let's see.  Did you see it somewhere?

8    Q.   (BY MR. SIMMS)  I'm going to get to it I think.
9  I just wanted to --

10   A.   If you tell me, I can look for it.

11   Q.   Have you seen that document before?

12   A.   This one right here (indicating)?

13   Q.   Yes, sir.

14   A.   (Witness reviews document.)

15        Memorandum of Understanding, yes, sir, I've
16 seen this before.

17   Q.   All right.  Looking at -- it's my
18 understanding -- and you correct me if I'm wrong, but that
19 document that's Exhibit 8, that's never been signed, has
20 it?

21   A.   No, sir.

22   Q.   And let's look at the top of it.

23   A.   Okay.

24   Q.   And I'm on page Simmons 244.

25   A.   All right.

Page 40

1    Q.   And it says, This Memorandum of Understanding is
2  effective as of "blank" day 2010, between H. Walker
3  Enterprises, LLC, and Simmons Prepared Food, Inc.

4         Did I read that correctly?

5    A.   Yes, sir.

6    Q.   This looks like this was -- down at the
7  bottom --

8    A.   Yes.

9    Q.   -- you see, right above the word "confidential"
10 there's some numbers and then a v4?

11   A.   Oh, yes, the numbers and then the v4, yes, sir.

12   Q.   Do you know if that means this was Version 4 of
13 this agreement?

14   A.   No, sir.  I don't know what that means.

15   Q.   All right.  Other than this Exhibit 8,
16 Mr. Walker, are you aware of any documents, either
17 personally or on behalf of H. Walker Enterprises or
18 Renaissance Man Food Services, that deals with Mr. Staples
19 becoming general manager of Renaissance Man Food Services?

20   A.   There was a lot of different like memorandum
21 going back and forth.  And so that would have been a lot
22 of different things that had been written going back and
23 forth and stuff.  I know that.

24   Q.   So you -- go ahead.

25   A.   No, that's -- that's what -- I just know that.

Page 41

1    Q.   You attended David Jackson's deposition Monday?

2    A.   Yes, sir.

3    Q.   And you recall Mr. Jackson has referred to and
4  quoted certain provisions that Simmons takes the position
5  that controls the relationship between it and/or H. Walker
6  Enterprises or Renaissance Man Food Services, correct?

7    A.   You'll probably have to explain that to me
8  again.

9    Q.   Okay.  I think Mr. Jackson was quoting from this
10 Exhibit 8.

11   A.   Quoting what now?

12   Q.   We'll get to that later today.

13        But you attended the deposition; you
14 remember he was saying, This is -- this provision controls
15 our relationship?

16   A.   Yes.

17   Q.   When he's talking about relationship, he's
18 talking about the relationship between Simmons Prepared
19 Foods and H. Walker Enterprises, LLC, and/or Renaissance
20 Man Food Services, correct?

21   A.   Yeah.  I assume that's what he was talking
22 about.

23   Q.   All right.  Was this document, Exhibit 8, ever
24 signed, Mr. Walker?

25   A.   No.

Page 42

1    Q.  Why not?
2    A.  Because there was still some questions about it,
3  so I probably never signed.
4    Q.  What questions did you have about it?
5    A.  Well, if you look in there, you see where it
6  says, Ownership of 65/35.
7    Q.  Okay.  What question do you have about that?
8    A.  They didn't own any of the Renaissance -- they
9  didn't own any of it.  They were going to get a profit
10  share, not a ownership.
11    Q.  All right.  Did they have ownership in Walker
12  Foods, LLC?
13    A.  They were going to get ownership in that, yes.
14    Q.  39 percent?
15    A.  Yes, sir.
16    Q.  They had 39 percent ownership of it?
17    A.  Yes, sir, that's right.
18    Q.  And tell me, before the creation of this
19  Memorandum of Understanding, what your understanding was,
20  if you have one, either personally or on behalf of
21  H. Walker Enterprises, LLC, or Renaissance Man Food
22  Services, as to what the relationship was going to be
23  between Simmons Prepared Foods and H. Walker Enterprises,
24  LLC, and/or Renaissance Man Food Services, going forward
25  if it was not being done under Walker Foods, LLC?

Page 43

1    A.  Walker Foods -- at that time, I started
2  Renaissance Man.  I built Renaissance Man.  I sold
3  Renaissance Man.  And I decided to let people talk me into
4  bringing in someone else, who totally showed me that they
5  were an a-hole, as I will say.
6        And I said, Wait a minute, I'm not going to
7  give a company up for somebody to be a jerk.  So at that
8  time, I said, I'd rather give you profit sharing.  And in
9  the contract, it talks about ownership, and I -- that's
10  the reason probably it was never signed.  It's not
11  ownership; it's profit sharing.
12        But because Simmons is such a great
13  company, they have been a man of their word with me, just
14  we never signed, but we lived by our understanding, and
15  it's sort of like they lived by their profit share, and
16  they never really said they have had any ownership in it.
17  So to me, there was no need to sign it.
18    Q.  All right.  So let me make sure I understand
19  what you're saying.
20        You're saying the reason you did not sign
21  Exhibit 8 is because it references ownership?
22    A.  Right.
23    Q.  Okay.  But are you saying that after April of
24  2009, going forward with respect to any relationships
25  between Simmons Prepared Foods and H. Walker Enterprises

Page 44

1  and/or Renaissance Man Food Services, that the parties,
2  course of business between them, was as reflected in this
3  agreement?
4    A.  Explain it.
5    Q.  With respect to profit share and the other
6  provisions of the agreement?
7    A.  Well, we talked about profit sharing.  Like I
8  said, that was so many different things growing up, and I
9  wanted profit sharing, and somebody might have said
10  ownership.  So when I saw "ownership," I wasn't going to
11  sign that because I wasn't going to give up any ownership
12  of H. Walker or Renaissance Man or any of it to anybody.
13    Q.  All right.  I guess my question to you is:  Is
14  there any other -- besides the ownership, 65/35, anything
15  else you objected to --
16    A.  Well, I --
17    Q.  Let me finish my question -- that caused you not
18  to sign the agreement, Exhibit 8?
19    A.  Well, if I looked through it, it may be, but I
20  think that the ownership was the most important thing to
21  me.  I wasn't going to give it up after watching what
22  they -- what somebody done that I put trust in that
23  handled my company.
24    Q.  You're talking about Mike Rogers?
25    A.  Yes.

Page 45

1    Q.  Okay.  Now, going forward after April
2  the -- April of 2009 --
3    A.  Yes.
4    Q.  -- as between Simmons Prepared Foods and
5  H. Walker Enterprises and/or Renaissance Man Food
6  Services, what is set out in this exhibit, other than
7  ownership, the course of dealings between the parties?
8        MR. KING:  Oh, geez, you need to look at
9  it.
10        THE WITNESS:  I've got to look at all of it
11  now.
12        Are you going to let me look at all of it?
13        MR. SIMMS:  Why don't you take a moment,
14  and I'll run to the restroom while you look through it
15  all.
16        (Recess in the proceedings from 9:57
17        to 10:06 a.m.)
18        THE WITNESS:  Will you repeat your
19  question?
20    Q.  (BY MR. SIMMS)  Yes, sir.  I think I was asking
21  you some questions about Exhibit 8.
22    A.  Yes.
23    Q.  And I know you told me that the reason it was
24  not executed from your standpoint or on your behalf for
25  H. Walker Enterprises, LLC, or Renaissance Man is because

1 of the ownership --

2   A.  That was it, yes.

3   Q.  -- provision.

4         Other than that particular provision, do

5 you have a recollection -- and I know you may need to read

6 through the whole document again -- that you objected to

7 as to why -- there would be a basis why you did not

8 execute the agreement?

9   A.  Well, ownership is going to be the biggest

10 thing.  And then I also felt that -- which is what your

11 client mentioned also in his testimony, said Brinker's was

12 Simmons' client, and Brinker's was mine because it shows

13 it here (indicating).  And I didn't think that we should

14 be putting who's going to be what client because in my

15 field, in the food service, it could be a wide range, and

16 I didn't want to narrow that field down to this person or

17 that person.

18         And also, we talked about U.S. Foods -- not

19 U.S. Foods -- we talked about Sysco, where my vision is

20 everybody, not just narrowing it down to one.  So that was

21 it.  So I just thought that we needed to talk over all of

22 that stuff again.  But the ownership was the most

23 important thing.

24   Q.  All right.  And this agreement appears that it

25 came to be sometime either in 2009 or 2010?

1   A.  Right.

2   Q.  It was never executed?

3   A.  No, sir.

4   Q.  For the -- since that time, it's never been

5 executed?

6   A.  No, sir.

7   Q.  All right.  And had it ever been changed to

8 reflect what you just mentioned and proposed to Simmons

9 Prepared Foods to be executed and changed?

10   A.  No, no, Simmons and I almost always trusted each

11 other except at certain times.  We may have had some

12 flare-ups, but we trusted each other.  Like I said,

13 they've been very good to me and to Renaissance Man.  I

14 think they're the best thing that could have happened for

15 me to be able to compete.

16   Q.  Other than the things that you've mentioned so

17 far, and again, with the agreement that you may need to

18 read through the entire document, other than those items,

19 would -- are we in agreement that as concerns the

20 relationship between Simmons Prepared Foods and H. Walker

21 Enterprises and Renaissance Man, this document was --

22 embodied or contained the agreement between the parties

23 going forward?

24   A.  Well, I think we -- well, I'm trying to think

25 how I would say this -- I think we lived -- we went

1 by -- we went by it and, as you said, if you remember

2 David's testimony, he even mentioned the profit sharing

3 over the ownership.  And this document talks about

4 ownership.

5         Well, you can tell that this document had

6 more changes to it.  So -- because he now knows it was

7 profit sharing, not ownership.  So we talked about certain

8 things within it at certain times; we just never wrote it

9 down.  So I think the answer to that is there always was

10 some changes in this document.  That's all the stuff I can

11 say.

12   Q.  All right.  If you could go back to Exhibit 3,

13 which is the resolution pertaining to Walker Foods, LLC.

14         MR. KING:  Simmons 555.

15   Q.  (BY MR. SIMMS)  Page 2, I asked you about this,

16 but I need to follow up on it.

17   A.  (Witness complies.)

18         Okay.

19   Q.  It's the provision that deals with the meeting

20 before April 15th, 2009.

21   A.  Yes, sir.

22   Q.  My question to you is:  And I apologize if I

23 asked you earlier, but do you have a recollection that

24 there was a meeting, and these matters addressed and a

25 resolution were discussed at the meeting?

1   A.  Like I said, I can't recall.  It could have

2 been, could not.  I'm just saying I don't recall.

3   Q.  Do you know if Document 8, which is the

4 Memorandum of Understanding, came out of the resolution

5 that's referenced on page 2 of Exhibit 3?

6   A.  Say that again.

7   Q.  Did the Memorandum of Understanding, which is

8 Exhibit 8, come into being as what was referenced in

9 Exhibit 3 on page 2 about having a meeting to deal with

10 the restructuring of either Walker Foods, LLC, and/or the

11 Renaissance Man business?

12   A.  I have -- I can't even recall.  I have no clue.

13   Q.  Okay.  Now, Exhibit 3, when it talks about

14 having this meeting, it talks about restructuring of

15 Walker Foods, LLC, and with respect to Renaissance Man

16 sales force and compensation structures.

17   A.  Right.

18   Q.  If Mr. Staples' bonus in the March 6th, 2009,

19 employment offer made to him by Simmons did not occur

20 because he never moved to Walker Foods, LLC, my question

21 to you is:  Was there further discussions about

22 Mr. Staples' compensation structure with respect to him

23 becoming the general manager of Renaissance Man Food

24 Services?

25   A.  No.  If that was the case, John would have

1  mentioned it by now, and he drew up so many different
2  bonuses things.  He drew them up, so I figured -- well, I
3  just knew about this bonus during the case.  That's the
4  first time I ever heard of what you're talking about.
5      Q.  Okay.  You don't have a recollection of there
6  being a meeting where Mr. Staples' compensation was
7  discussed?
8      A.  No.
9      Q.  All right.  Now, with respect to Mr. Staples and
10 his being general manager of Renaissance Man, is that
11 referenced in Exhibit 8, which is the Memorandum of
12 Understanding?
13     A.  I just -- I did see it somewhere.
14         (Witness reviews document.)
15     Q.  Okay.  I think it's on page 4.
16     A.  Oh, if you knew where it was, why did you ask me
17 to look for it?
18     Q.  I was getting there myself.
19     A.  Yes, sir.
20     Q.  All right.  Before we talk about that, let's go
21 back to page 1, which is 244.
22     A.  (Witness complies.)
23         Okay.
24     Q.  It says -- right after the beginning, or the
25 "preamble" we call it, it says, The purpose of this

1  memorandum.
2          Do you see that section?
3      A.  Purpose of -- yes.
4      Q.  Is to set forth the understanding of Walker and
5  Simmons.  And I want to kind of stop there and ask you a
6  question.
7          When the document is referring to Walker,
8  do you know if that -- that is referring to H. Walker
9  Enterprises, LLC; is it not?
10     A.  Yes, sir.
11     Q.  Okay.  So this is an agreement between H. Walker
12 Enterprises, LLC, and Simmons Prepared Foods, correct?
13     A.  Yes, sir.
14     Q.  All right.  And it deals with the operation of
15 the Renaissance Man Food business, correct?
16     A.  Yes, sir.
17     Q.  And it refers to this relationship as a "joint
18 venture," correct?
19     A.  Yes, sir.
20     Q.  And it says, The parties will rely on the
21 commitments described in this Memorandum in moving ahead
22 with RMFS.
23         Did I read that correctly?
24     A.  Yes, sir.
25     Q.  So would it be fair to say that prior to this

1  agreement, the relationship between Simmons Prepared Foods
2  and H. Walker Enterprises was the Walker Foods, LLC?
3      A.  No, sir.
4      Q.  Okay.  Had there been a prior relationship
5  between Simmons Prepared Foods and Renaissance Man?
6      A.  Has there been a prior relationship between
7  Simmons Prepared and Renaissance Man?
8      Q.  Yes, sir.
9      A.  No, sir.
10     Q.  Okay.  Because from the documents I've read, the
11 relationship prior to this Memorandum of Understanding
12 dealt with a relationship where H. Walker Enterprises
13 owned 51 percent of Walker Foods.
14     A.  Right.
15     Q.  Simmons Prepared Foods owned 39 percent.
16     A.  Right.
17     Q.  And the balance was owned by Mike Rogers.
18     A.  Right.
19     Q.  Okay.  And that relationship -- that company or
20 that entity or that relationship ended.
21         And was it being replaced with a
22 relationship between Simmons Prepared Foods and H. Walker
23 Enterprises that concerned Renaissance Man Food Services?
24     A.  Okay.  Say that again.
25         MR. KING:  Let me try.  I think what he

1  wants to know is whether Simmons had a relationship with
2  Ren Man separate and apart from the Walker Foods, LLC --
3         THE WITNESS:  No, not at first.
4         MR. KING:  -- prior to 2009.
5      A.  No, no, no.
6      Q.  (BY MR. SIMMS)  All right.
7         MR. KING:  So the second question then was,
8  was it the intention in 2009 to form a relationship with
9  Ren Man and Simmons that would replace the prior
10 relationship that existed between Walker Foods and
11 Simmons --
12     A.  Before?  You're talking about when we first
13 started?
14     Q.  (BY MR. SIMMS)  I'm just trying to use the
15 documents to figure out --
16     A.  Well, that's the reason I think the document was
17 never signed; it needed to be straightened out some.  And
18 that's what the deal is.  It needed to be straightened out
19 a lot.
20         But, see, I think you may be confusing
21 Renaissance Man.  This entity was not started with just
22 food with -- the beginning of this.  Renaissance Man was
23 going and selling before this whole entity started.
24     Q.  Okay.  Was Simmons --
25     A.  Prepared.

1    Q.  -- Prepared Foods supplying product to
2  Renaissance Man outside of the Walker Foods entity and/or
3  what was contemplated by the Memorandum of Understanding?
4    A.  No, sir.
5    Q.  Okay.  Would you agree with me that the offer of
6  employment made by Simmons to Mr. Staples prior to the
7  Memorandum of Understanding was changed?
8    A.  Was it changed -- his deal he was trying to do,
9  changed from this here (indicating)?
10    Q.  Would you agree with me that the original offer,
11  the March 6th, 2009, offer with Walker Foods --
12    A.  $140,000.  You talking about $140,000.  There
13  was $140,000 and $160,000.
14        MR. KING:  Wait.  Let him ask his question.
15        THE WITNESS:  Oh, that was my fault.
16        MR. KING:  All right.
17    Q.  (BY MR. SIMMS)  Here's what I'm getting to.
18    A.  Okay.
19    Q.  We looked at the March 6th, 2009, employment
20  offer.
21    A.  Okay.
22    Q.  And Paragraph 3, as part of Mr. Staples'
23  compensation, dealt with a bonus that related to Walker
24  Foods.
25    A.  Right.

1    Q.  You see that?
2    A.  Right.
3    Q.  And I think you've told me that Mr. Staples, as
4  far as you recall, never went to work for nor managed
5  Walker Foods, LLC?
6    A.  No, I said I wasn't sure.
7        MR. PARKER:  Objection, mischaracterizes
8  his testimony.
9    A.  I said I wasn't sure if he did.
10    Q.  (BY MR. SIMMS)  All right.
11    A.  I never said he didn't do it.  I said, no, I'm
12  not sure he ever did.  And that's what it was.
13    Q.  Okay.  And I thought I asked you this, but I
14  want to make sure.
15        This Memorandum of Understanding that deals
16  with Renaissance Man --
17    A.  Right.
18    Q.  -- it's not -- this agreement is not dealing
19  with Walker Foods, LLC, at all, is it?
20    A.  No.
21    Q.  Okay.  And is that because of the resolution
22  dealing with Walker Foods had put an end to that entity?
23    A.  Yes.  That was the end to it at that time.
24    Q.  All right.  And let me ask you this:  You were
25  getting $100,000 from Walker Foods, LLC, off the top,

1  correct?
2    A.  Oh, I have no clue.
3    Q.  We could go back and look at the --
4    A.  You may need to go back and look at --
5    Q.  -- at the LLC?
6    A.  That may be good to look at.  I have no clue.  I
7  get so much.
8    Q.  I believe the evidence in the case so far is
9  that that entity was actually dissolved in 2015.
10    A.  What entity?
11    Q.  Walker Foods, LLC.
12    A.  And I was getting $100,000 from Walker Foods?
13    Q.  That's what I wanted to ask you.
14    A.  No, I never got $100,000, 2015.  If I was,
15  somebody owed me some money.
16    Q.  Okay.  So in your mind, was Walker Foods, LLC,
17  over with concerning the resolution dealing with
18  Mike Rogers?
19    A.  Yes, sir.
20    Q.  All right.  And Mr. Staples never had anything
21  to do with Walker Foods, LLC?
22    A.  No, not true.
23    Q.  Okay.  What did he have to do --
24    A.  I said I'm not sure because he negotiated a deal
25  to end Mike Rogers.  And that's why I said, I'm not sure

1  whether he worked for or not.  I'm not sure what time it
2  was.
3        He negotiated a deal to end Mike Rogers.
4  And I'm not sure whether Walker Foods or what happened at
5  that time.  As I said, it's 2009.  I wish I could
6  remember, but I don't remember 2009.  I don't remember --
7  like I said, yesterday pretty good, but he negotiated that
8  deal with Walker Foods, whatever -- it was a beef company
9  or something that he was doing.
10    Q.  All right.  Under Walker Foods, there were three
11  members?
12    A.  Yes.
13    Q.  There was H. Walker Enterprises, owned
14  51 percent of Walker Foods?
15    A.  Yes.
16    Q.  And if Mr. Staples was given directions by
17  someone on behalf of H. Walker Enterprises, who would that
18  person have been?
19    A.  If Mr. Staples was given direction by H. Walker
20  Enterprises, who would that person --
21    Q.  Concerning Walker Foods.
22    A.  That would have been me.
23    Q.  Okay.  Did you provide instructions to
24  Mr. Staples about the content of the resolution dealing
25  with Mike Rogers and --

Page 58

1    A.  No.
2    Q.  You gave no directions?
3    A.  No.  The direction Mr. Staples had is we were
4  friends.  Mr. Staples brought Mike Rogers, the unsavory
5  bum, to me, and he felt guilty so he got involved.  It had
6  nothing to do -- so he got involved with it.
7        And like I said, there's an e-mail where
8  he's negotiating some -- whatever the deal, and I've seen
9  this e-mail before, that he negotiated a deal.  And it's
10  around 2009/2008 or something.  I'm not sure when it is,
11  but I've seen an e-mail.
12    Q.  If Mr. Staples received instructions or
13  directions related to the Walker Foods, the resolution
14  matters concerning Mike Rogers from Simmons Prepared
15  Foods, do you know who it would have been in Simmons
16  Prepared Foods?
17    A.  No, sir.
18    Q.  You agree they were the other 39 percent owner
19  of Walker Foods?
20    A.  Yes, I owned 51 percent, which I'm the majority.
21    Q.  Right.
22    A.  Right.
23    Q.  Okay.  And I want to make sure I understand
24  because I'm trying to move forward here.
25        When Mr. Staples did not go to Walker

Page 59

1  Foods, LLC, but began being the general manager of
2  Renaissance Man, other than Document 8, which is a
3  Memorandum of Understanding, are there any other documents
4  that concerned his role as general manager of Renaissance
5  Man Food Services?
6    A.  No.  I think I've seen things that talk about
7  John being Renaissance Man for -- being general manager of
8  Renaissance Man, but I don't think -- I haven't seen any
9  documents like this.
10    Q.  All right.  Now, if you go to page 4 of
11  Exhibit 8.
12    A.  (Witness complies.)
13        Okay.  Yes, sir.
14    Q.  That has the section that deals with
15  distribution of profits.
16        And does that concern the going forward
17  with the operations of Renaissance Man Food Services?
18    A.  Yes, sir.
19    Q.  All right.  And it's 65 percent to Walker and
20  35 percent to Simmons, correct?
21    A.  Yes, sir.
22    Q.  And Walker is defined in this document as
23  H. Walker Enterprises, LLC, correct?
24    A.  Yes, sir.
25    Q.  And beginning -- let's talk about the year 2010.

Page 60

1        Had Mr. Staples, based on your
2  recollection, began acting as general manager for
3  Renaissance Man Food Services in 2010?
4    A.  2010?  I couldn't be 100 percent.  When I talked
5  to John -- like I said, you're saying "general manager."
6  It says general manager here.  When I talked to John when
7  he wanted to leave Virginia, and he agreed, and I gave him
8  a job in Virginia, I thought he was working for me.
9        And when he went to negotiate, I know
10  nothing about his negotiation of what was going on there.
11  He was working for me at that time.  So I don't know
12  whether it was 8, 9, 10; he was working for Renaissance
13  Man, whoever it was, Walker Foods or whoever it was at
14  that time.
15    Q.  What's your best recollection as to when
16  Mr. Staples actually began acting as general manager for
17  Renaissance Man Food Services?
18    A.  End of -- when Mike Rogers left in 2008/2009.
19    Q.  All right.  Would you have to refresh your
20  recollection by looking at these documents that we've been
21  going over?
22    A.  That's not going to help me.  I've refreshed
23  from something I may have somewhere.  I don't know.  Like
24  I said, I have no clue.
25    Q.  Okay.  Now, under Distribution of Profits, when

Page 61

1  the profits would be distributed -- let me ask you this:
2  Was there a profit distribution made in 2010?
3    A.  I have no clue.
4    Q.  Do you believe that there have been profit
5  distributions for each year after 2010 up through 2017?
6    A.  Like I said, I have no clue.  It could be or
7  not.  Like I said, I have no clue.
8    Q.  Here's what I'm trying to find out is if there
9  was profit distributed, and Walker is H. Walker
10  Enterprises, LLC, would Simmons Prepared Foods send a
11  check that represented H. Walker Foods -- I mean,
12  H. Walker Enterprises' share of profits to it?
13    A.  See, that's the problem; I think you're
14  confusing yourself because remember I said that this
15  wasn't signed.  That was a problem that was with this
16  contract.  It wasn't 100 percent correct.  So that's why I
17  never signed it.  That's why I never signed.  They had to
18  correct everything.
19        So that's probably what it was.  That's
20  probably where you're confusing yourself, but I know where
21  you're trying to go.
22    Q.  Where am I trying to go?
23    A.  You're trying to make H. Walker Enterprises on
24  here, which is what your client kept doing.  So if I were
25  you, I'd get it straight.

16 (Pages 58 - 61)

1    Q.   Okay.

2    A.   Okay.

3    Q.   I'm not sure that's what I'm trying to do.  I'm
4 just asking questions.

5          I'm reading this Memorandum of
6 Understanding as being between what it says here,
7 H. Walker Enterprises and Simmons Prepared Foods.

8    A.   That's correct, but it's not signed.  That's
9 what I keep telling you.

10    Q.   Irrespective of it being signed, was it the
11 commitments and the references here, the course of
12 dealings since 2010, between Simmons Prepared Foods,
13 H. Walker Enterprises and/or Renaissance Man?

14    A.   Renaissance Man, some of it was and some of it
15 wasn't.  That's why I said this wasn't signed because it
16 had to be corrected, and that's the reason it was never
17 signed.

18    Q.   Okay.  With respect to the distribution of
19 profits under the agreement, did Simmons send those
20 profits to H. Walker Enterprises or to Renaissance Man?

21    A.   I -- now that, I would assume it was Renaissance
22 Man because I don't know if they ever sent anything to
23 H. Walker Enterprises.

24    Q.   All right.  It says, These distributions will be
25 made after the initial compensation is paid to

1 Herschel Walker, for your efforts as CEO of Renaissance
2 Man Food Services, and then a special point -- I guess
3 that's 15 cents per pound fee to Simmons.

4          MR. KING:  No, it's one-and-a-half cents.

5    Q.   (BY MR. SIMMS)  One-and-a-half; I'm sorry.

6    A.   Yeah.

7    Q.   You got the first $200,000?

8    A.   Yes, sir.

9    Q.   Has that always been the agreement?

10    A.   Yes, sir.

11    Q.   And Simmons was entitled to a half-cent per
12 pound of what?

13    A.   Administration fees of -- all of the
14 administration fees of non-Simmons items.

15    Q.   Going on down here, it talks about, Management
16 of RMFS.

17          Do you see that?

18    A.   (Witness reviews document.)

19          Yes.

20    Q.   All right.  It says, Going to form a new board
21 of five votes.

22    A.   Yes.

23    Q.   Did that happen?

24    A.   No -- well, we went by like it happened, but we
25 never -- I don't remember us ever getting together and

1 doing this.

2    Q.   It says, That board will oversee and set policy
3 for Renaissance Man Food business.

4    A.   Right.

5    Q.   And that board was to be made up of you or your
6 appointee, and you had three out of five votes, and
7 Simmons representatives, such as Todd Simmons or
8 David Jackson, would be on the board having two of the
9 five votes.

10    A.   Yes, sir.

11    Q.   Is that the way it took place?

12    A.   That's what it says, but like I said, this was
13 never signed, and I think that's the thing is we went
14 by -- certain things in here we went by, but because it
15 was never signed, there were certain things we never went
16 by.  So I -- whether I had five, they had two, we just
17 made things work.

18    Q.   And at some point, David Jackson, he left
19 Simmons Prepared Foods, went to the pet food division --

20    A.   Yes, sir.

21    Q.   -- and did Mr. Gary Murphy oversee or be the
22 Simmons Prepared Food person that dealt with this venture
23 with Renaissance Man or H. Walker Enterprises?

24    A.   Yes, sir.

25    Q.   Okay.  It says, John Staples will be the general

1 manager of Renaissance Man Food Services; is that correct?

2    A.   Yes, sir.

3    Q.   And report to you and the board?

4    A.   Yes, sir.

5    Q.   And reporting to you, self-explanatory.

6          But reporting to the board, do you know who
7 on the board he would report to?

8    A.   The majority shareholder, me.

9    Q.   No, sir.  When it talks about the board, who on
10 the board?

11    A.   I'm the board.  I'm the majority of the board.
12 You told me I had three votes.  And remember I said that
13 we really didn't go by -- I don't know whether we went by
14 this 100 percent.  So that's why I keep saying it's great
15 to have it and go by certain things; went by certain
16 things and we didn't.  But he reported to me most of the
17 time.

18    Q.   This agreement contemplated that Mr. Staples
19 would also report to the other members of the board,
20 including you.

21    A.   Yes.

22    Q.   And my request to you is:  Do you know who
23 Mr. Staples was instructed by Simmons Prepared Foods to
24 report to with respect to Todd Simmons and/or
25 David Jackson, who made up the other two-fifths of the

Page 66

1 board?
2          MR. KING:  Objection, mischaracterizes his
3 testimony.
4     Q.  (BY MR. SIMMS)   All I want to know is:  If
5 Mr. Staples was instructed by Simmons in terms of
6 reporting to their participation on the board, who was it
7 he would report to?
8          MR. KING:  I am going to object again as
9 assuming facts that are not in evidence.
10    Q.  (BY MR. SIMMS)  Do you know if Mr. Staples
11 reported to anyone at Simmons Prepared Foods with respect
12 to this venture?
13    A.  No, just what I've heard.
14    Q.  What have you heard?
15    A.  It was -- well, now I got to think of his name
16 again.
17    Q.  Mr. Miller?
18    A.  Yeah, Chip Miller.
19    Q.  Okay.
20    A.  Yes.
21    Q.  All right.  Then it goes down to and it has a
22 Sales and Administration Function section.
23          Do you see that?
24    A.  Yes.
25    Q.  All right.  It says, Sales personnel will work

Page 67

1 directly for Renaissance Man or for Simmons.
2    A.  Yes.
3    Q.  And belong to Renaissance Man.  And it's got in
4 parentheses, John Staples and Charlie Weaver.
5          Did I read that correctly?
6    A.  Yes, sir.
7    Q.  Is it your understanding that with respect to
8 this venture that Mr. Staples, as general manager of the
9 venture, was loaned from Simmons to Renaissance Man?
10    A.  Yes, if you can call it that.
11    Q.  Was there a Borrowed Employee or Loaned Employee
12 contract document created between Simmons Prepared Foods
13 and H. Walker Enterprises and/or Renaissance Man Food
14 Services that concerned the loaning or borrowing of
15 Mr. Staples to Renaissance Man Food Services?
16    A.  No, sir, there is no document.
17    Q.  No document.
18          Now, if Mr. Staples was working directly
19 for Simmons, because it uses the word "or," do you know
20 how he was instructed by Simmons to manage the venture?
21    A.  Well, I know for a fact he wasn't working for
22 Simmons, that he was working for me.  He got all his
23 instructions from me.  And working for Chip Miller is --
24 only when he needed something like an item or whatever.
25 As far as I know, all his instructions of running general

Page 68

1 manager of Renaissance Man came from me.
2    Q.  Do you know if someone at Simmons prepared a
3 copy of this Memorandum of Understanding and provided it
4 to Mr. Staples to be his source to go to in terms of
5 managing the venture?
6    A.  No, sir.
7    Q.  You don't know that?
8    A.  No.
9    Q.  Did there come a time when Simmons Prepared
10 Foods requested that this document be executed and it
11 scratched through the name of David Jackson and put in the
12 name of Gary Murphy on the document?
13    A.  Not that I know of.
14          (Exhibit 9 marked.)
15    Q.  (BY MR. SIMMS)   What is Exhibit 9?  It starts
16 Simmons 258 and then however many pages after that.
17    A.  (Witness reviews document.)
18          This is like the inventory we have.  That's
19 what this is, an inventory agreement.
20    Q.  This appears to be -- have you seen this before?
21    A.  No.
22    Q.  Were you aware that Simmons Prepared Foods and
23 Renaissance Man entered an inventory agreement on the 10th
24 day of August 2015?
25    A.  No.  It's signed by John, which he never gave me

Page 69

1 this here (indicating).
2    Q.  You've never seen this before?
3    A.  No, sir.
4    Q.  It looks like it's signed by Mr. Staples and
5 Gary Murphy.
6    A.  Right.
7    Q.  Looking down at -- actually, Paragraphs 1 and 2
8 deal with what's called "aged inventory."
9          Do you see that?
10    A.  Right.  Yes, sir.
11    Q.  Was there an issue that came up in the fall of
12 2017 concerning Jennifer Dawson and Carol dealing with
13 aged receivables?
14    A.  Aged receivables?
15          MR. KING:  He's on a different page.
16    Q.  (BY MR. SIMMS)  Yes.
17    A.  Oh, no, I know.  I remember -- I'm trying to
18 think.  You said an "incident."  I remember something that
19 Carol was getting letters on aged inventory.
20    Q.  Was it information related to aged inventory or
21 aged receivables?
22    A.  Aged inventory, I thought.  The amount that was
23 in the warehouse that had age on it.  I thought that's
24 what it was.
25    Q.  Do you know the difference between aged

Page 70

1 inventory and aged receivables?

2    A.  Yes, sir.

3    Q.  Explain to me what the difference is.

4    A.  Well, a receivable is if the billing has been

5 delayed and stuff.  And inventory is the items you have in

6 the storage that's aged that sometimes you get to the

7 point where you have to sell it on a fire sale to get rid

8 of it.  Receivable is going to be receivables that we can

9 get penalized for; it's paying late.

10    Q.  Now, was the incident that arose between

11 Carol Walker and/or Jennifer Dawson in the fall of 2015,

12 did it deal with -- excuse me -- 2017, did it deal with

13 the aging of accounts receivable or aging inventory?

14    A.  That, I just know it was aging something.  I

15 don't know what it was.

16    Q.  Did you get involved in the communications

17 between Jennifer Dawson and Carol Walker where Ms. Dawson

18 is trying to explain the aging accounts receivable to

19 Ms. Walker?

20    A.  No.

21    Q.  Do you know if Mr. Staples got involved?

22    A.  He probably did.

23    Q.  Did Mr. Staples try to provide an explanation to

24 Ms. Walker about what Ms. Dawson was talking about in

25 terms of aging of accounts receivable?

Page 71

1    A.  Like I say, he probably got involved.  I don't

2 know if he did or not, so that, I wouldn't know.

3    Q.  Do you recall having communications with

4 Mr. Staples where you indicated to Mr. Staples that if

5 Jennifer Dawson spoke to Carol Walker the way she did

6 again, it would not end well for Ms. Dawson?

7    A.  I would never say anything like that.

8    Q.  Would not --

9    A.  That's another one of your client's embellishing

10 statements.

11    Q.  Ms. Dawson left employment at Renaissance Man

12 Food Services in the fall of 2017, did she not?

13    A.  Yes, sir.

14    Q.  Went to work for Simmons Prepared Foods?

15    A.  Yes, sir.

16    Q.  Why did she change?

17    A.  You want my explanation?

18    Q.  Yes, sir.

19    A.  Well, she wanted to do something that -- she

20 wanted to be outdoors, from what she told me.  And since

21 she was at the Christmas party this past Christmas, that I

22 was there, and also she was treated a little bit different

23 than your client's daughter, who she was doing most of the

24 work and your client's daughter was making more money than

25 she was.  So that's from what I heard.  That, I don't know

Page 72

1 why she left.

2    Q.  Was the work that Blair Staples and Ms. Dawson

3 were doing, did it involve inputting data into the Oracle

4 system at Simmons Prepared Foods?

5    A.  I think so.  That was part of it.

6    Q.  Did you and Mrs. Blanchard show up down in

7 Orlando or Tampa in an event that Ms. Dawson was attending

8 in around August of 2017?

9    A.  Yes, sir.

10    Q.  And what was the purpose in doing that?

11    A.  Me showing up at an event?

12    Q.  Yes, sir.

13    A.  I sell.

14    Q.  Okay.

15    A.  And as a matter of fact, there's an e-mail where

16 I was the one that scheduled the event.  So your client

17 told you another one on that.

18    Q.  Okay.

19    A.  I'm the one that scheduled the event to go, and

20 I invited Jennifer to come down because that was her

21 thing.  So I'm the one who scheduled the event.

22    Q.  Did you and/or Mrs. Blanchard speak to

23 Ms. Dawson and accuse Blair Staples of being paid under

24 the table by HartyBake?

25    A.  No, sir.

Page 73

1    Q.  That didn't happen?

2    A.  No, sir, not like that.

3    Q.  Ms. Dawson didn't get upset --

4    A.  Not that I know of.

5    Q.  -- at any time when you-all were in Florida?

6    A.  No, sir, not that I know of.

7    Q.  Has there been an issue within Simmons Prepared

8 Foods and Renaissance Man regarding this aged inventory

9 agreement?

10    A.  Yes, there's been some problems on the aged

11 inventory.

12    Q.  What were the problems?

13    A.  That we got to be responsible for it, that -- we

14 got to be responsible for the aged inventory from what I

15 know.

16    Q.  Down here at the bottom of Paragraph 3, do you

17 see that (indicating)?

18    A.  (Witness reviews document.)

19       Yes, sir.

20    Q.  It talks about "printing plates."

21       Do you see that?

22    A.  Yes, sir.

23    Q.  Do you know what printing plates are?

24    A.  Printing plates?

25    Q.  Yes, sir, printing plates.

19 (Pages 70 - 73)

Page 74

1    A.  Well, I assume printing plates is going to be
2  plates that they're going to make a certain box or certain
3  item; they're going to print the plates for that.  And
4  they're going to make like -- you recognize them --
5  there's a Sysco classic.  They're going to have to print a
6  plate to make the Sysco classic label.  That's what I
7  assume it is.
8    Q.  And the label deals with the packaging?
9    A.  That's what I assume printing plates are.  It
10 could be printing plates for something else, as well, so
11 that's printing plates -- I assume that's what it is.
12   Q.  Okay.  Moving on along.
13       Wayne Britt, who is Mr. Wayne Britt?
14   A.  Wayne Britt brought me to Simmons when I first
15 was introduced to Simmons.
16   Q.  Did Mr. Britt get paid some fees under the
17 Walker Foods operation?
18   A.  Yes, sir.
19   Q.  And what service was Mr. Britt providing that
20 called for him to get some fees?
21   A.  Just the introduction.
22   Q.  All right.  Going back to the Walker Foods and
23 H. Walker Enterprises was 51 percent owner, correct?
24   A.  Okay, yes, sir.
25   Q.  And we know that H. Walker Enterprises owned

Page 75

1  100 percent of Renaissance Man, correct?
2    A.  Yes, sir.
3    Q.  In 2009, other than Walker Foods or Renaissance
4  Man, what other sources of income did H. Walker
5  Enterprises have at the time?
6    A.  Oh, gee, had a lot.
7        MR. KING:  Objection.  We have already said
8  we're not going to provide information relative to the
9  income that's received by H. Walker Enterprises because
10 that's irrelevant to this case, and it's not likely to
11 lead to the discovery of admissible evidence.
12       So I am not going to permit him to testify
13 about numbers or compensation or percentages of income.
14 If you'd like to know in general what type of businesses
15 H. Walker Enterprises is involved in, I will permit him to
16 answer that question.
17       MR. SIMMS:  For the record, would you agree
18 that one of your defenses you've raised in this case is
19 that H. Walker Enterprises is not subject to jurisdiction
20 in this lawsuit in Alabama?
21       MR. KING:  Yes, that's one of the defenses.
22       MR. SIMMS:  And I say that this --
23 discovery questions I'm asking deal with concepts of
24 liability between parent and subsidiary corporations.  And
25 it also goes to motive, knowledge, notice, things of that

Page 76

1  nature that I'm asking to try to defeat defenses that have
2  been raised concerning H. Walker Enterprises.
3        So on those bases, I'm asking that the
4  witness be allowed to testify.
5        MR. KING:  He's not going to testify about
6  numbers.  You can ask the questions that I just said he
7  will be permitted to answer.
8    Q.  (BY MR. SIMMS)  Well, let me ask this question,
9  Mr. Walker:  Other than Renaissance Man and/or Walker
10 Foods in 2009, what other businesses did H. Walker
11 Enterprises have an ownership interest in at that time?
12   A.  Best Fred Draperies, a casino business,
13 appearances, a book, probably a few more things.
14   Q.  Can you put in terms of percentages how much of
15 the revenue for H. Walker Enterprises from Walker Foods or
16 Renaissance Man were compared to the other businesses you
17 say were -- that H. Walker Enterprises had ownership in?
18       MR. KING:  I'm going to restate the same
19 objection, which is he's not going to discuss that number.
20 It doesn't have any connection to jurisdiction.
21 Jurisdiction is going to be related to H. Walker
22 Enterprises, as of the date of the filing of the
23 complaint, which is in -- started 2018.
24       If you want to ask questions about whether
25 H. Walker Enterprises was involved in anything in Alabama

Page 77

1  in 2018 at the time of the filing of the complaint, you
2  can ask that.
3        MR. SIMMS:  I think I'm entitled to get
4  into the parent/subsidiary liability concepts, and these
5  questions deal with that.  It goes to knowledge, notice,
6  motive, those type things, for that conduct that we say
7  H. Walker Enterprises, which owns 100 percent of
8  Renaissance Man Food Services, is responsible for from a
9  legal liability standpoint.  So that's the basis for my
10 questioning, in addition to jurisdiction, and jurisdiction
11 could pertain to the acts that occur prior to the filing
12 of the complaint in 2018.
13       Are you still instructing Mr. Walker not to
14 answer those questions?
15       MR. KING:  I am.
16   Q.  (BY MR. SIMMS)  Did you say earlier that after
17 Mr. Staples became the general manager for Renaissance
18 Man, he brought up the subject of a bonus, and if so, how
19 many times did he bring that subject up with you?
20   A.  No, I never said he brought up the subject of a
21 bonus.  I said he gave me a lot of different bonuses --
22 scenarios, like all types of bonus scenarios.  He would
23 just send me some bonus ideas that he had and stuff, which
24 was kind of unusual because he was mostly taking money
25 from a brokerage thing, which you don't want to do that.

20 (Pages 74 - 77)

1 So he sent me a lot of different bonus scenarios.

2    Q.   Did you, on behalf of H. Walker Enterprises or

3 Renaissance Man Food Services, ever agree to pay

4 Mr. Staples any type of bonus after 2010?

5    A.   No, because I gave him raises.

6    Q.   You only gave raises?

7    A.   I gave him good raises, and that's what he

8 wanted.  He was happy with it because the way he was

9 structuring the bonus stuff, I thought it was ridiculous.

10    Q.   Other than you and I discussing the difference

11 between Paragraph 3 of the March 6th, 2009, employment

12 offer made to Mr. Staples by Simmons, are you aware of

13 Mr. Staples' employment status with Simmons changing in

14 any other ways after March 6th, 2009?

15    A.   Okay.  Repeat that again now.  Repeat that

16 again.

17    Q.   Are you aware of Mr. Staples' employment -- the

18 terms of Mr. Staples' employment with Simmons Prepared

19 Foods, other than what we've discussed concerning the

20 bonus in Paragraph 3, about him moving to Walker Foods,

21 changing in any other way since then?

22    A.   Like Simmons drawing up some new form or --

23    Q.   Any terms of his employment with Simmons

24 changing in any other way.

25    A.   No, sir.

1    Q.   You're not aware of any other changes?

2    A.   Of him with Simmons?

3    Q.   Yes, sir.

4    A.   No, sir.

5    Q.   All right.  Did the Walker Foods operation lose

6 money before Mr. Staples became the general manager of

7 Renaissance Man?

8    A.   No, sir.

9    Q.   And I guess to truly answer that question, we'd

10 need the financials from that venture.

11    A.   No, you don't.

12    Q.   We don't?

13    A.   No.

14    Q.   What do I need?

15    A.   Me telling you what it was because I started the

16 company.  So if I started the company, you started at

17 zero, so if you make a dollar, you made a profit.

18         Is that not correct?

19    Q.   You explained it to me.

20    A.   Okay.  And we made more than a dollar.

21    Q.   Would you agree with me that for the -- that

22 Mr. Staples was the general manager of Renaissance Man

23 Food Services for either sometime in 2009 or 2010 up until

24 the end of 2017?

25    A.   Yes, sir.

1    Q.   And during that period of time, do you know what

2 the net profit was -- generated between Simmons and

3 H. Walker Enterprises and/or Renaissance Man was?

4    A.   We had some good growth.

5    Q.   Would $14 million be fair?

6    A.   That could be fair, but it had nothing to do

7 with Mr. Staples.

8    Q.   Mr. Staples overseeing the management didn't

9 have anything to do with it?

10    A.   It was part.  It was a part of it, because Sysco

11 also changed the way they were doing things had a big part

12 to do with it.

13    Q.   What was that change?

14    A.   They changed, started doing Cat Man, which is

15 they started bidding out.  And that's what changed and

16 made a big difference for Renaissance Man, which Staples

17 had nothing to do with that.

18         That was Sysco; they gave me an opportunity

19 to bid because I had been with Sysco for so long, and they

20 were looking for a minority player to be there as well.

21 So he just happened to be there representing Renaissance

22 Man.  So if my dog, Cheerio, was there, he could have made

23 a profit.  My thing was that spanned farther than that,

24 which he didn't do.  Sorry to say that.

25    Q.   So are you saying that Mr. Staples' efforts as

1 general manager for Renaissance Man did not have anything

2 positive on the net profit that was earned by Renaissance

3 Man and/or Simmons under this venture?

4    A.   No, he did a good job for the first couple of

5 years, but he wasn't a key to all the profit.  The key to

6 the profit came with the bidding of Sysco.  That's made a

7 big difference.

8         But, yes, for the first four years, we

9 chugged along and did well.  We did more than what we was

10 doing before.  But when the big bang came is when we got

11 into the bid process, to Cat Man, which was in 2014.

12 That's when the big bang came.  They started bidding

13 things out.  And that's when all the trouble started too.

14    Q.   What trouble?

15    A.   The trouble of family coming into it, and

16 Mr. Staples losing his way then.

17    Q.   Well, has your family been involved in the

18 business?

19    A.   My family is my family.  I own the company.

20 That's a little bit different.  And my family was working.

21 And the ones that wasn't working, I got rid of them.

22    Q.   And Simmons has family members that worked in

23 his business too, right?

24    A.   And they worked.  Their family worked, which is

25 a totally different thing.

1   Q.   You don't think Mr. Staples or Mrs. Staples or
2   their daughter Blair worked?
3       A.   Well, I hate to tell you, you heard Blair.  In
4   her statement, she said she didn't even know her mother
5   was working.  And I have -- you've got an e-mail over
6   there that Kim said she hadn't heard from nobody in a
7   year.  So you haven't heard from nobody in a year, that
8   means you do no work.  That ain't me; that's her.  And her
9   own daughter said it.
10          And he said it, that that's not her thing.
11  She looks good, but that's what he said.  He said that.  I
12  didn't say that.  I said, I'm not running a beauty
13  pageant.  I'm not running a mother's dance studio.  I'm
14  running a chicken business.  People got to work.  Sorry to
15  tell you that, but that's what happens.  You've got the
16  e-mail.
17      Q.   Okay.  So you were upset that they were not
18  working?
19      A.   Oh, yes, sir.  I work.
20      Q.   Were you upset that the Staples family was not
21  working?
22      A.   Yes, sir.
23      Q.   And I know I asked this, and I need to ask this
24  question.
25          The accounting firm for you personally, as

1   for the H. Walker Enterprises and Renaissance Man, is that
2   Smith and Howard in Atlanta?
3       A.   Yes, sir.
4       Q.   Are the accounting for H. Walker Enterprises
5   combined with Renaissance Man?
6       A.   No, sir.  It combined at the end because it used
7   to be a -- it's a Subchapter S now.  But eventually, we
8   combined.  We were just not combined at first.
9   Renaissance Man is its own entity, and then at the end, it
10  comes back to me.  I pay the tax on all of it.
11      Q.   Because it's a pass-through, and you're the only
12  member of --
13      A.   Subchapter S.
14      Q.   -- of H. Walker Enterprises?
15      A.   Yes, sir.
16      Q.   Do you pay taxes through Renaissance Man as
17  well?
18      A.   No, sir.  Renaissance Man pays its own taxes and
19  stuff because it's an entity, but I pay the taxes on all
20  of it.
21      Q.   But Renaissance Man was not paying taxes until
22  it became a Subchapter S?
23      A.   No, it was paying taxes before, as well.
24      Q.   But it wasn't --
25      A.   I was paying it.

1       Q.   It was being passed through to you?
2       A.   Yes, sir.
3       Q.   Because you were the only member?
4       A.   Yes, sir.
5       Q.   I thought we read the formation documents that
6   the only member of Renaissance Man was H. Walker
7   Enterprises.
8       A.   H. Walker Enterprises is me.
9       Q.   Okay.  So here's what I'm trying to get to:  Was
10  the pass-through to you solely through H. Walker
11  Enterprises?
12      A.   Explain yourself.
13      Q.   According to the Renaissance Man documents,
14  you're not a member of Renaissance business; it was
15  H. Walker Enterprises.
16      A.   Right.
17      Q.   Okay.  And you're the sole member of H. Walker
18  Enterprises?
19      A.   Right.
20      Q.   So with respect to Renaissance Man, its
21  pass-through goes to H. Walker Enterprises, which then
22  passes through to you?
23      A.   It doesn't matter.  I'm the only one.  That's
24  why they go from Renaissance Man to H. Walker Enterprises;
25  it's Herschel that's going to end up paying the taxes.

1       Q.   And I'm guessing -- I'm asking:  Is the taxes on
2   the accounting for H. Walker Enterprises with respect to
3   Renaissance Man all combined?
4       A.   I think eventually it probably will combine it.
5   But, eventually, they probably will combine them.
6       Q.   Was there a time when Carmen Seal at Simmons
7   Prepared Foods complained that Simmons was paying for
8   Smith and Howard's accounting bills that related to
9   H. Walker Enterprises as opposed to Renaissance Man?
10      A.   I never heard that.
11      Q.   Never heard that?
12      A.   No, sir.
13      Q.   That didn't upset you?
14      A.   I never heard it.
15      Q.   All right.  In 2015, was there a meeting at your
16  lawyer's office in Atlanta where -- that was attended by
17  representatives of Simmons, Mr. David Jackson and/or
18  Mr. Todd Simmons, and the subject dealt with discussions
19  between Sysco and Simmons that Simmons was going to begin
20  bidding direct to Sysco?
21      A.   No.
22      Q.   That did not happen?
23      A.   No, I don't remember Sysco bidding direct.  The
24  direct thing was -- when I found out was in Arkansas, I
25  think.

1   Q.   Did you learn sometime in 2015 that Sysco,
2   through Mr. Neil Theise, Clay Mullins and Jeff Pierce had
3   met privately with Todd Simmons and Gary Murphy and Chip
4   Miller about bidding direct and not involving Renaissance
5   Man or H. Walker Enterprises going forward?
6   A.   I found that out through John.
7   Q.   What did Mr. Staples say about that?
8   A.   That Simmons wanted to bid direct.
9   Q.   When in 2015 did you learn that from
10  Mr. Staples?
11  A.   I have no clue.
12  Q.   Did you also learn that Sysco had met with
13  Tip Top?
14  A.   No.  I found that out through John.
15  Q.   In 2015, did Tip Top bid direct regarding the
16  Sysco Cat Man process?
17  A.   They may have tried.  They still do bid.  I
18  think they still do bid.  But what's so important with
19  that whole statement, both companies find out it's better
20  to go through me.
21          THE WITNESS:  Right, John?
22  Q.   (BY MR. SIMMS)  At that time, did
23  Mr. Simmons -- I mean, Mr. Staples work to convince
24  Simmons to bid through Renaissance Man one more time --
25  A.   No.

1   Q.   -- and focus entirely on further processed
2   poultry?
3   A.   No.
4   Q.   That did not happen?
5   A.   I do not know whether he worked directly with
6   Simmons to tell them.  I think what happened was Simmons
7   found out that it would be easier and better to bid
8   through me.  I don't know whether it was John or by them
9   talking to Sysco.  They found out that the pay and all of
10  that would be a little bit different going through me, and
11  they figured I'd be -- easier to go through me.
12  Q.   Was there a meeting with Ron Eisenman and
13  yourself and Mr. Staples where you-all discussed the
14  ramifications of what Sysco was doing in terms of
15  Renaissance Man not being viewed as the supplier anymore,
16  but was being viewed as a broker?
17  A.   That has never happened.
18  Q.   Never happened?
19  A.   No, sir.
20  Q.   And you and Mr. Eisenman did not realize that
21  the clock was ticking with respect to Renaissance Man
22  being viewed as a supplier?
23  A.   Like I said, that never happened.
24          But what year was that?
25  Q.   2015.

1   A.   And this is 2018?
2          MR. KING:  '19.
3   A.   '19.  And I'm still the supplier, so you know
4   that never happened.
5   Q.   (BY MR. SIMMS)  Well, you got a bid in 2016,
6   correct?
7   A.   '14.
8   Q.   I thought there was one redone in 2016?
9   A.   We do it every year, but I got a bid in '14 --
10  yeah I think '14 and '16, yes.
11  Q.   The bid in 2016, was that further processed?
12  A.   Yes.
13  Q.   Did it also involve the commodity?
14  A.   Well, I think we may have lost the commodity at
15  that time.
16  Q.   Was there a meeting between Mr. Eisenman and
17  yourself and Mr. Staples where either Mr. Eisenman or you
18  instructed Mr. Staples to begin looking for additional
19  sources of income for Renaissance Man?
20  A.   No.  How would he look for -- I'm the one that
21  does that.
22  Q.   And did Renaissance Man get the further process
23  award from Sysco in August of 2016?
24  A.   I'm not sure when it was, but I know we got one.
25  Q.   And following that award, did Mr. Staples meet

1   with Randy Sanders and indicate to him that because of
2   that award, that DSM-2 needed to hire more employees?
3   A.   He never met with Randy Sanders about that.
4   Q.   And Blaine Walker wasn't in that meeting?
5   A.   He never met with him about adding employees; I
6   can tell you that.  Blaine would testify to that as well.
7   I wanted to add employees.  That's the reason; that's the
8   reason that -- but we never done it, but John never wanted
9   to add employees.
10  Q.   Are you saying that Blaine Walker and
11  Mr. Staples did not meet with Randy Sanders at
12  Hoover Courtyard in Birmingham and indicate to Mr. Sanders
13  that additional employees needed to be hired by
14  Renaissance -- excuse me -- by DSM-2 to manage the new
15  Cat Man award?
16  A.   No.  I'm saying that John never said about
17  hiring new employees.  They may have met, but it wasn't
18  about hiring new employees.
19  Q.   Okay.
20  A.   Hiring more employees.
21  Q.   After -- did Randy Sanders resign at some point?
22  A.   Yes, sir.
23  Q.   And was there an effort to hire Todd Townsend?
24  A.   Yes.  I know they talked about that.
25  Q.   And Mr. Townsend, did he end up not working very

1 long?
2    A.   That -- let me see; that's his broker.  I heard
3 that from John, but like I said, at that time I had
4 nothing to do with the brokerage company.  I was not
5 involved in that.
6    Q.   Was there a written agreement where Mr. Staples
7 became a consultant to DSM-3?
8    A.   I assume there was.  I assume when he became a
9 consultant.
10    Q.   Was that following the Todd Townsend not
11 becoming the leader of DSM-2?
12    A.   Now, see, I don't know that much about DSM-2.  I
13 know that Randy Sanders had it, and whatever happened to
14 trying to sell it and all this stuff.  So I don't know
15 about whether he became a consultant then.  I thought he
16 became a consultant in DSM-3.  I thought.
17    Q.   I'm trying to find out when, to your knowledge,
18 did Mr. Staples become a consultant for DSM-3?
19    A.   DSM-3?
20    Q.   Yes, sir.
21    A.   See, that's when I thought he became a
22 consultant.  You said DSM-2.
23    Q.   The question was:  Did he become a consultant
24 for DSM-3 after DSM-2 was no longer being a broker?
25    A.   Yeah, I think that's when he became a

1 consultant.
2    Q.   All right.  Let's talk about DSM-3 for a moment.
3         MR. KING:  Can we take a break at this
4 point?
5         MR. SIMMS:  Sure.
6         MR. KING:  Thank you.
7         (Recess in the proceedings from 11:04 to
8         11:17 a.m.)
9    Q.   (BY MR. SIMMS)  In October of 2016 -- or maybe
10 it was September of 2016, did you request to see the
11 financial records of DSM-2?
12    A.   Yes, sir.
13    Q.   Why were you asking to see those records?
14    A.   Because I thought at that time -- one of the
15 things that John and I said was that he wanted a brokerage
16 company.  It wasn't going to be a profit center.  He
17 didn't want to hire anyone, and I knew it became a profit
18 center.  They were going to start DSM-3.
19         And I said, Let me see what you-all are not
20 doing at DSM-3 and DSM-2 because I knew that they made a
21 lot of profit.  And I think -- I think they made profit
22 when we're trying to hire people and owners making
23 $300-some-thousand, and we need people to work, I thought
24 was ridiculous.
25    Q.   Was the owner Randy Sanders?

1    A.   And Kim Staples, who owned 60 percent of that
2 brokerage company.
3    Q.   After those financials were received, did
4 Mr. Eisenman suggest creation of what we called DSM-3?
5    A.   No, sir, because the financial was never
6 received.
7    Q.   Irrespective of that, at some point did
8 Mr. Eisenman create DSM-3?
9    A.   No, sir.  I know you're shaking your head.  May
10 I help you with it a little bit?
11    Q.   Sure.
12         When was DSM-3 created?
13    A.   When we were in a meeting, and I found out that
14 Kim owned 60 percent of DSM-2, and John was talking about
15 Robert Thurber was going to buy the other 40 percent,
16 which is the first time I ever heard of that.  And I sit
17 there saying, Wait a minute.  Wait, wait, wait.  No, no,
18 no.  That's not going to happen.  And I said, That's not
19 going to happen there.
20         And that's when I said, Give it to
21 Christian.  Then I -- give it to Julie.  She's right here.
22 She knew how to sell.  And John, I think, he was nervous
23 then.  He said, Oh, okay, okay, okay.  So that's when
24 DSM-3 was formed at that time.
25    Q.   And with respect to DSM-3, Mrs. Blanchard got

1 the first $125,000?
2    A.   No, sir.  What it was was a match from Sarah,
3 Kim at 85 and John 40, which made 125.  Mrs. Blanchard
4 didn't get paid for 15 months after the company started,
5 where they had already paid yours $85,000 and John $40,000
6 was already paid.  And Julie ended up getting paid 15
7 months later.
8    Q.   Did Mr. and/or Mrs. Staples invest some money
9 into DSM-3?
10    A.   That's what John said.
11    Q.   Do you dispute that?
12    A.   Yes, sir.  Because they made over
13 $300-some-thousand in DSM-2.  And I said, Guys, I can't
14 believe this is a profit center, so you're investing into
15 what?  What are you investing into, the money you made
16 that's supposed to be for the employees?  So he put the
17 money right back in.  So the money was supposed to be for
18 brokers, which he didn't use it for brokers.  So that was
19 a problem I had.
20    Q.   All right.  If you had a problem, did you
21 instruct Mr. Eisenman not to draft agreements where DSM-3
22 would pay back Mrs. Staples or Mr. Staples --
23    A.   No.
24    Q.   -- any monies they loaned to DSM-3?
25    A.   No, because I had nothing to do with the broker.

1 And I said, That is fine. The only time I jumped into the
2 broker was when I heard that Robert Thurber was going to
3 buy a certain amount in the thing for Christopher Thurber.
4 That's when I jumped into the broker thing.
5     Q. That never happened, did it?
6     A. I know because --
7         MR. KING: Hold on. He's got to ask the
8 question.
9         THE WITNESS: Oh, okay, I'm sorry.
10        MR. KING: This is not a discussion.
11        THE WITNESS: Oh, I'm getting mad at you.
12    Q. (BY MR. SIMMS) You're getting mad at Mr. --
13    A. Yeah, I'm getting mad at him.
14    Q. All right. Robert Thurber never bought any
15 interest in DSM-2 -- that never happened, did it?
16    A. Because I stopped it from happening.
17    Q. All right. Let's talk about Mr. Thurber for a
18 moment.
19    A. Okay.
20    Q. When did you first meet Mr. Thurber?
21    A. Oh, geez. Years, years ago. Probably before
22 2002/2001. I met him through his wife, Julie.
23    Q. Was that with the America's -- is it Miss
24 Pageant?
25    A. Junior Miss.

1     Q. Junior Miss?
2     A. Yes, sir.
3     Q. And at that time, was Mr. Thurber, was he
4 working for Sysco?
5     A. Yes, sir.
6     Q. And did Mr. Thurber -- what involvement did he
7 have in getting you in the food business?
8     A. He helped me. He introduced me to people. He
9 helped me to maneuver through Sysco.
10    Q. All right. And in fact, the name
11 Renaissance Man, was that suggested by either Mr. Thurber
12 or someone that worked for him?
13    A. No.
14    Q. Did they assist you in coming up with that name?
15    A. No.
16    Q. You came up with that name?
17    A. Yes, I'm the Renaissance Man. I don't know
18 where you get that from.
19    Q. Mr. Thurber nor his staff or assistants played
20 any role in creating the name Renaissance Man?
21    A. I have no clue where it came from.
22    Q. Okay. Did Sysco play a role in developing
23 Famous 34?
24    A. I don't know what you mean by "play a role."
25 They helped me with Famous 34. So that was a thing that

1 they considered like their brand, because when I came in,
2 it was Famous 34. Renaissance Man, Famous 34, and all
3 that came from Jerry Dowell. God bless him. He passed
4 away, from Conagra, which is where I started at. So Jerry
5 Dowell played a big role in me starting Renaissance Man,
6 Famous 34. When I brought it to Sysco, and Sysco was my
7 only client, Sysco just took Famous 34 as almost like, oh,
8 we're going -- you know, we were selling it under the
9 Famous 34 brand.
10    Q. Did Sysco consider that brand exclusive to them?
11    A. No.
12    Q. No, okay.
13        Other than what you have said so far, any
14 other role that Mr. Thurber played in getting you in the
15 food business?
16    A. Like I said, he helped introduce me to people.
17 When I was at food shows, he came by and introduced me.
18 He was a great help. Like I said, I knew his wife, Julie.
19 Julie was the one that I had a relationship with because
20 we were on a board together.
21        So she introduced me to Robert when Jerry
22 Dowell had came to me talking about a food service thing.
23 And Robert helped to maneuver me through Sysco. Sysco is
24 a huge, huge company. So for a person like myself to
25 maneuver through a big company like that, you're going to

1 have to have help.
2     Q. And I know your career had been playing sports.
3     A. Yes.
4     Q. Then getting into the food business was
5 something that you probably didn't have much experience
6 with back at the time.
7     A. That's correct.
8     Q. Is that fair?
9     A. Yes, sir.
10    Q. And did you look to Robert Thurber as a mentor
11 with respect to getting involved in food business?
12    A. No. No, sir.
13    Q. Okay. Who did you -- did you look to
14 Mr. Eisenman in that regard?
15    A. No, sir.
16    Q. Okay. How did you go about doing it then?
17    A. Going to food shows, working my tail off. I
18 don't look at anyone as mentors, except the Lord Jesus and
19 my parents. Nobody is mentors to me.
20    Q. You didn't consider Robert Thurber a mentor?
21    A. No, sir. And the thing about puppies, John may
22 be a puppy. I'm a big dog. I don't play with puppies.
23    Q. All right. Well, I think Mr. Thurber was
24 referring to that as people he wanted to see succeed in
25 life and he may have mentored them.

Page 98

1    A.  Oh, no, like I said, he helped me out a lot.
2  But I never looked at Robert as a mentor.  Like I say, he
3  did a lot of great things for me.  He helped me out a lot.
4  I'm not going to deny that.  But I didn't look to him as a
5  mentor or anything like that.  I was at the food shows or
6  whatever.
7    Q.  Did you ever call Mr. Thurber up and ask his
8  advice on business in general?
9    A.  Business in general?
10    Q.  Yeah, about what you should do or how you should
11  go about doing things a certain way.
12    A.  May have called Robert and say, How do I get
13  through something with a food thing, yes.  But I also
14  called up John McIntire, another guy.  I called up someone
15  else and asked them how to do certain things.
16    Q.  Okay.  The "Cat Man," is that just a acronym or
17  word that means "Category Management"?
18    A.  Yes, sir.
19    Q.  And what categories are we talking about?  Is it
20  certain food product categories?
21    A.  Protein, like chicken.  More of your protein
22  items that I was involved in.
23    Q.  And did Sysco require suppliers of products,
24  food products in Category Management to have a broker?
25    A.  John told me they require you to have a broker.

Page 99

1  Once they started the bid, John said that they require you
2  to have a broker.  And so I'm taking his word for that.
3    But remember, I had a couple of brokers at
4  that time.  Renaissance had a few brokers at that time.
5  Whether they were any good, I had brokers at that time.
6    Q.  Who were they?
7    A.  I don't remember who they were, but I had
8  brokers, and John let them all go when he brought in the
9  brokerage company with the Gary Brown situation.  I think
10  he said there was five of them that owned it:  Kim, Gary
11  Brown, and three other people.
12    Q.  Now, the broker companies, what role are they
13  supposed to play with respect to dealing with Sysco?
14    A.  The broker company tries to go out and sell the
15  product.  They go and meet with Sysco because they're good
16  to have faces there at the house trying to introduce new
17  product to new customers.  Go out see new customers.  Put
18  more -- well, in reference to Category Management, you
19  want your broker to go out and meet street people, meaning
20  Category Management.
21    Sysco is going to order chicken breasts.
22  Like if I bid on chicken breasts, Sysco is going to order
23  these chicken breasts.  But I want my broker not just to
24  sell chicken breasts to Sysco, who Sysco is ordering that
25  through the bid.  I want them to go sell a wing maybe to

Page 100

1  another customer.  I want them to go out and sell some of
2  the -- broker try to help you doing something like that,
3  help you to advertise and different things like that.
4    Q.  All right.  With respect to the Category
5  Management, while Mr. Staples was acting as general
6  manager for Renaissance Man, do you know what percentage
7  of sales were acquired with respect to Sysco?
8    A.  What percentage of sales --
9    Q.  Was it over 100 percent?
10    A.  That we were selling to Sysco?
11    Q.  Yes, sir.
12    A.  At what time now?
13    Q.  At any time while Mr. Staples was there.
14    A.  Oh, no, it wasn't 100 percent.  That we -- just
15  to Sysco?
16    Q.  Yes.
17    A.  No, it wasn't 100 percent.
18    Q.  Out of the award is what I'm talking about.
19    What percentage of the award was being
20  done?
21    A.  What percentage of the award was being done?
22  Well, John would use the term 140 percent.  And let me
23  break you off some of that.
24    Q.  Okay.
25    A.  He was wrong.

Page 101

1    Q.  Explain that to me.
2    A.  Let me explain this to you.
3    Q.  That's kind of where I was going.
4    A.  You are going to understand this, that he needed
5  to explain to you.
6    We order -- let's say we have five orders.
7  We want -- no, let's do two.  We want chicken breasts and
8  wings, right?  We're the only one doing chicken breasts
9  and we're doing wings over here.  And we have -- out of
10  the two of these, we have five million pounds, right?
11  Two-and-a-half here and two-and-a-half here, right?
12    Well, John assumed because they're only
13  selling five million pounds -- well, let's say four
14  million pounds here and one million pounds over here, that
15  is good.  But that's not, because they show you're doing
16  100-and-something percent, but you're really not because
17  you're not selling the wings.  So it shows that you're
18  doing 100-and-whatever percent, but you're really not
19  doing that because you're only selling that item.
20    We had 19 private label items, where only
21  11 of them were doing okay.  My thing is if you're the
22  only one in the desert that got water, people are going to
23  come buy it from you.  Is that not correct?
24    Well, certain item at Sysco, we were the
25  only one doing it, so they had to buy that item.  But

26 (Pages 98 - 101)

1 there was other items that we were awarded, too, that was
2 dogs, that they didn't want to sell. So that's the
3 problem right there. You got to sell all of it, not just
4 that one, because we were awarded all of it, not just that
5 one item. It's easy to sell something everybody needs.
6          Does that help?
7     Q.   Was that something that was upsetting you with
8 respect to what Mr. Staples was doing or the brokers for
9 Renaissance Man were doing?
10     A.   I had a lot of problem with that all the time.
11 That's what I used to say all the time. They used the
12 term 114 percent, 120 percent, hundred and this,
13 hundred -- we were never at 100 percent. If we had
14 100 percent, that means that every award you won of
15 selling the amount you wanted it for.
16          Meaning that wing that was that 2.4 million
17 pounds, you sold 2.4 million. This at 2.4; you sold 2.4.
18 This at 3; you sold that. That's 100 percent. Not when
19 you're just taking one item, and you're selling over that,
20 that you have 100 percent. Because all of it is supposed
21 to be sold. That's what you want.
22          Is that good?
23     Q.   Is that the -- your interpretation of what the
24 140 percent was --
25     A.   No, not my interpretation. That's what it was.

1     Q.   That was upsetting to you?
2     A.   Yes.
3     Q.   And how were you communicating your displeasure
4 or upsetment (sic) to Mr. Staples?
5     A.   I told him 100 times. I said, John, we got to
6 sell more than just this. We got to get into faces
7 because John, remember, he mentioned in his thing that he
8 worked at Tyson when I started out in this business. And
9 I remember John coming to my booth all the time saying,
10 Herschel, the reason you guys are not moving -- because
11 he's with the big dog now, he's with Tyson -- you-all need
12 brokers. You got to get brokers. You got to get faces in
13 front of these people. You got to get them in front of
14 these people. That's when you're going to sell.
15          Well, I didn't have any resources then to
16 get in front of people. Only it was me. So I was doing
17 what I could at these little houses. Like I say, I'm
18 doing okay. But to get to the big picture, you had to get
19 in front of faces. Where now, we got an opportunity from
20 the resources of getting this bid and from what John said,
21 there's a percentage now that pay to brokers. Get in this
22 bid. Now, we can pay brokers to get in front of the Sysco
23 people, to get in front of the street business. Because
24 you can use that money now to pay brokers to go do that,
25 but we didn't do it. And that's why I kept saying, Why

1 are we not doing it? And I said, We can do this now.
2     Q.   Who was instrumental in getting Herschel Walker
3 in front of Sysco?
4     A.   Jerry Dowell.
5     Q.   What about Mr. Thurber?
6     A.   I was already in front of Sysco before
7 Mr. Thurber came in. Mr. Thurber helped me to maneuver
8 through it. Jerry Dowell got me into Sysco. It was at
9 Conagra.
10     Q.   All right. With respect to DSM-3, did it first
11 start out that Mrs. Blanchard was to own 70 percent and
12 Mrs. Staples to own 30 percent?
13     A.   That never, never happened. In the meeting, the
14 meeting was Kim had 60 percent; Renaissance had 40.
15 They've got it down to 42. Robert -- or I said, No, that
16 ain't going to happen because now it's like nobody is
17 doing anything. And I said, Wait, give it to this -- I
18 said, No, give it to Julie. And I just said that. I
19 didn't mean it. I just was frustrated that we're not
20 moving. Somebody got all nervous, okay, okay, okay, and
21 agreed. And Julie got the 50 percent. That's how that
22 happened. That's all that happened.
23     Q.   Now, was the vision for DSM-3 at the beginning
24 of the entity to be a female or woman-owned business?
25     A.   They had mentioned that.

1     Q.   And Georgia Boston, who is she?
2     A.   Georgia Boston, she's been working for me for
3 longer than probably anyone. One of my longest employees.
4     Q.   Is she an employee of H. Walker Enterprises,
5 LLC?
6     A.   No, sir. She's her own entity. I pays her
7 through -- she does her own thing. She's a private
8 contractor.
9     Q.   Does she have a H. Walker Enterprises e-mail?
10     A.   Yes, sir.
11     Q.   Okay. And what entity pays Ms. Boston as an
12 independent contractor for her services?
13     A.   The casino business.
14     Q.   What's the casino business?
15     A.   I get two percent of casino business, but I'm
16 their broker -- not their broker, but I'm the distributor
17 of casinos in Detroit and other areas that -- John will
18 probably tell you about that. But I do that.
19     Q.   So Ms. Boston is paid by the casino business,
20 which is under the H. Walker Enterprises umbrella?
21     A.   Yes, sir.
22     Q.   Getting back to her, was she asked by you to
23 guide Mrs. Blanchard and Mrs. Staples towards getting the
24 woman-owned certification for DSM-3?
25     A.   Yes, sir.

1   Q.   Did that ever occur?

2   A.   No, sir.

3   Q.   Why not?

4   A.   Kim didn't want to give her financials because

5   it requires you to give your -- three years of your

6   financials to -- don't ask me why, but that's a

7   requirement of getting certified. You have to give your

8   financials. And I think there may be e-mails in there, as

9   well, that she's asking for that.

10   Q.   Also have to have an office location?

11   A.   Yes, sir.

12   Q.   Going back to the events of 2015 and prior to

13   the Cat Man award from Sysco in August of 2016, was there

14   a time when Tip Top did, in fact, bid direct with Sysco?

15   A.   I think Tip Top was bidding directly before I

16   came in. You know, Tip Top is very unique because they

17   have a product that a lot of the chicken companies don't

18   do. So they were a very unique company. So I think they

19   was bidding direct before I came in.

20   Q.   Who is Southern Hens?

21   A.   Southern Hens? Do they do Southern Hens? I'm

22   not sure what company that is.

23   Q.   Did Mr. Staples use Southern Hens at some point

24   to supply product that related to the Cat Man process of

25   Sysco?

1   A.   Well, what's interesting I never -- I heard of

2   George's and Tip Top and -- but I never heard of Southern

3   Hens.

4   Q.   And I'm not sure I understood this, but do you

5   know why Todd Townsend never took off as working for

6   DSM-2?

7   A.   That was a John thing. I have no clue.

8   Q.   Did Mr. Eisenman prepare an employment agreement

9   for Mr. Townsend?

10   A.   He may have. John may have asked him to. I

11   have no clue.

12   Q.   Now, I think you said somewhere in some of your

13   responses to some questions we had that the reason

14   Mr. Staples became a consultant for DSM-3 was to give him

15   more compensation.

16      Do you recall that?

17   A.   Yes, sir.

18   Q.   It had nothing to do with trying to provide some

19   leadership for that entity because Mr. Townsend never came

20   onboard?

21   A.   No, sir, not that I know of because he kept

22   saying they need leadership. And, you know, and

23   John -- the reason you said give him more compensation had

24   nothing to do with what I said. It had to do with what

25   John said. Because John said he counted his salary along

1   with Kim as what he should be making. So that's him

2   saying that. That didn't come from me. I may have said

3   it, but that's what he said. I'm going by what he said.

4   It gives him more compensation.

5   Q.   It didn't have anything to do with providing

6   some leadership for DMS-3?

7   A.   He said that they needed leadership, and they

8   did. And if he wasn't a leader, he kept saying that he

9   needed leadership. So that's on him there.

10   Q.   Was it contemplated when DSM-3 was created that

11   Mrs. Blanchard would -- what was her role going to be in

12   the DSM-3?

13   A.   Well, when I suggested Julie Blanchard to be in

14   DSM-3, it was an opportunity that I wanted to see some

15   sales. And I give her that this lady can sell. She ran a

16   $40-some-million company in Georgia. She ran people. So

17   she can sell, so I knew some sales were going to happen.

18      So that's the reason I suggested her to do

19   it because I knew she can sell. So it had nothing to do

20   with anything else. So that's why I asked. That's what

21   it was. I knew she could sell. It had nothing to do with

22   leadership. I knew she could sell and move some product.

23   Q.   Was there a time when Mr. Staples went about

24   assigning some regions to certain employees of either

25   DSM-3 or Renaissance Man sales teams or salespeople under

1   DSM-3, giving them regions?

2   A.   I hope he was doing that. I reckon. I hope he

3   was doing that.

4   Q.   Did Mr. Staples ask Mrs. Blanchard to take on a

5   region?

6   A.   I heard he did, yes.

7   Q.   And was that region in Texas or Dallas?

8   A.   I have no idea where the region was at. But I

9   told him, She don't need to take on a region because she

10   work on a national, bigger program than just a region,

11   which is what she does. She worked on something a lot

12   bigger than just a little area. And I know she can sell

13   and move big, big money, which is what I wanted her to do.

14   Q.   And you-all were living in Dallas at the time?

15   A.   Yes, sir.

16      MR. SIMMS: Actually, this is probably a

17   good time sort of in my outline to take a break. I know

18   it's a little earlier than we mentioned. We can come back

19   early.

20      MR. KING: Okay.

21      (Recess in the proceedings from 11:41 to

22      12:37 p.m.)

23      (Exhibit 10 marked.)

24   Q.   (BY MR. SIMMS) Let me show you Exhibit 10,

25   Mr. Walker.

Page 110

1          MR. KING:  Document number?

2          MR. SIMMS:  It starts with RMFS 34 and I

3    think it goes through -- whatever's the last page.  It

4    looks like it's 105 perhaps.  Yeah, 105.

5     A.  Okay.

6     Q.  (BY MR. SIMMS)  Okay.  On Document 34,

7    Renaissance Man 34 there, this is an e-mail from

8    Mr. Eisenman to you, Mr. Staples and Mrs. Blanchard.

9     A.  Yes.

10    Q.  And it appears that Ms. Blanchard's e-mail

11   address at the time is at mac.com, correct?

12    A.  Yes, sir.

13    Q.  And this concerns the LLC agreement for the new

14   DSM sales and marketing.  And I think in this case, we

15   refer to that entity from time to time as "DSM-3" just for

16   the sake of not having to say the name over and over and

17   over.

18    A.  Yes, sir.

19    Q.  Have you seen this document before?

20    A.  (Witness reviews document.)

21         Yes, I think I have.

22    Q.  All right.  And it says -- there's a memo also

23   attached, which summarizes the main terms related to the

24   formation of DSM-3; is that correct?

25    A.  Can you tell me what page?

Page 111

1     Q.  No.  If you're looking at this document where it

2    says, Attached is a draft, and the next sentence says, A

3    memo summarizing the main terms is also attached.

4     A.  Yes, sir.

5     Q.  Okay.  And now Mr. Eisenman says that,

6    Hopefully, DSM-3 will grow into a thriving business well

7    beyond just RMFS?

8     A.  Yes.

9     Q.  Is that what he says?

10    A.  Yes sir.

11    Q.  So would you agree that at the time, on

12   September 30th, 2016, concerning the formation of DSM-3,

13   that the parties to DSM-3 anticipated that it would grow

14   beyond just having a relationship with Renaissance Man

15   Food Services?

16    A.  Yes, sir.

17    Q.  Would you agree with me that it would be fair

18   that Mrs. Staples' expectations of the business would be

19   that it could go beyond having a relationship with

20   Renaissance Man Food Services?

21    A.  You say you'll agree to that?

22    Q.  Yeah, will you agree with me that if she read

23   this, she would have expectations that DSM-3 was

24   contemplated to have a business and grow beyond just a

25   relationship with the Renaissance Man?

Page 112

1     A.  Well, I probably wouldn't agree with it because

2    they've had three years to do it, and they didn't do it.

3     Q.  Okay.  Well, what I'm talking about is at the

4    formation of it back on September 30th, 2016, would you

5    agree with me that if she read this, her expectations of

6    DSM-3 would be that it could grow into a business beyond

7    just this relationship with Renaissance Man?

8     A.  Ron wrote that.  Kim didn't write it.

9     Q.  Okay.

10    A.  And I'm not saying she wouldn't.  I'm just

11   saying I don't know.  I just go by what the past was.

12   That's all I'm saying.

13    Q.  Well, that's at least what Mr. Eisenman is

14   saying, isn't it?

15    A.  That's what he hoped it would, yes.

16    Q.  Okay.  Let's go to page 2, which is Renaissance

17   Man 35.

18    A.  (Witness complies.)

19    Q.  And this appears to be Mr. Eisenman's memorandum

20   concerning creation of DSM-3.

21         Do you agree?

22    A.  Yes, sir.

23    Q.  All right.  If you look under, "Initial

24   Ownership."

25    A.  (Witness complies.)

Page 113

1         Yes, sir.

2     Q.  Under Paragraph 2.

3     A.  Yes, sir.

4     Q.  It says, Kim and Julie will be issued both

5    Class A membership units and Class B membership units to

6    facilitate future gifts of the Class B membership units to

7    family members.

8         Did I read that correctly?

9     A.  Yes, sir.

10    Q.  Would you agree with me that it was contemplated

11   on September 30th, 2016, that DSM-3 was going to be

12   created and formed in such a way that additional ownership

13   or member units could be given to family members beyond

14   just Kim and Julie?

15    A.  Well, I'm not trying to be argumentative, but

16   I'm just trying to be correct, that Ron wrote this,

17   assuming that that's what it was.  Now, I hope that's what

18   they -- do you see what I'm talking about?  Ron wrote it.

19   I assume that's what he's talking about.

20    Q.  Well, the point I want to get to is isn't it

21   true that when DSM-3 was formed, it was anticipated and

22   provision was made that the owners or members of the LLC

23   could give membership or ownership interest in the LLC to

24   other family members besides Mrs. Staples and

25   Mrs. Blanchard?

29 (Pages 110 - 113)

Page 114

1    A.  Was anticipated?

2    Q.  Yes, sir.

3    A.  I have no clue.  That's what Ron wrote he would

4  like to see it done.

5    Q.  Well, he didn't say anything about liking to see

6  it done.  It says --

7    A.  You keep saying "he," and I have no clue what he

8  was looking for.  I'm talking me; I have no clue.

9    Q.  Here's what I'm trying to get to:  Do you have a

10  recollection of being involved in the formation of DSM-3

11  where that topic, and the topic is giving future gifts of

12  Class Member B units to family members?

13    A.  My involvement was they're going to be 50

14  percent owners.  And after that, I think John, Kim, Julie

15  and I left it up to however they were going to do it.  I

16  never was involved in crafting any of this here.

17    Q.  My question is not whether you were involved in

18  crafting it.

19         My question is:  What knowledge did you

20  have back on September 30th, 2016, that provision was

21  being made with regard to DSM-3 that future ownership or

22  membership interest in the LLC could be gifted by either

23  Kim Staples or Julie Blanchard to family members?

24    A.  I had no knowledge of any of that.  Only thing I

25  wanted them to do is sell some chicken for Renaissance

Page 115

1  Man.  I didn't care whether they gave it to family

2  members, gave it to -- and I'm not trying to be

3  argumentative.  I'm just saying I didn't really care that

4  much about DSM-1, 2, 3, whatever they were.  I cared about

5  selling chicken.

6    Q.  All right.  Do you even have a recollection that

7  the ability to give ownership or membership interest to

8  family members was discussed?

9    A.  No, sir.  I don't think that was discussed at

10  all.  I don't think now.

11    Q.  Now, was the purpose of Mr. Eisenman doing this

12  memo to memorialize what had been discussed about how DSM

13  was being formed and structured?

14    A.  I don't think they even knew what it was.  So

15  that's what I'm saying; in the meeting, I think they

16  wanted him to draw up a contract.  And to be honest with

17  you, this looked like a great contract.  So it would have

18  been great if that's what happened.  I think it would have

19  been wonderful.

20         But my -- you asked me my recollection, and

21  my recollection is they was 50 percent owners, and they

22  were going to go out and sell chicken, and I was excited

23  about that.  That's my recollection of that.

24    Q.  You don't have a recollection that the formation

25  would allow the gifting of membership interests, although

Page 116

1  it may be a Class B, to family members in the future?

2    A.  No.  Wait, now, I remember one thing that was

3  said and it's -- wait, wait.  And no, I'm not going to say

4  it because I don't know whether that was in this or

5  something else so -- but I don't remember anything talking

6  about giving to family members unless you die, I reckon,

7  but I don't remember anything said about that.

8         That's what I'm saying; I don't recall any

9  of that.  All I remember is creating DSM-3 and 50 percent

10  ownership, and now we're going to get going, and do what

11  we got to get done.  That's it.

12    Q.  Then let's keep going, okay?  It says, Although

13  you will not be granting actual equity ownership, and I'm

14  going to keep going with that sentence, but I want to stop

15  right there.

16         Is the "you" referring to Mrs. Staples and

17  Mrs. Blanchard?

18    A.  Which one are you looking at?

19    Q.  Where it says, Although you will not be granting

20  actual equity ownership, is the "you" referring to

21  Mrs. Staples and Mrs. Blanchard?

22    A.  (Witness reviews document.)

23         That, I don't know --

24    Q.  All right.

25    A.  -- who "you" is.  I'm looking up here to see if

Page 117

1  you got a "you" there, and I don't see who you is

2  referring to.

3    Q.  All right.  And it says, Granting actual equity

4  ownership at this time to Todd.

5         Is "Todd" referring to Todd Townsend?

6    A.  It could be.  That, I don't know.  Barbara,

7  Todd, Christopher.

8    Q.  Who is Barbara?  Is that Barbara Humphrey?

9    A.  I'm thinking Barbara Humphrey and

10  Christopher Thurber.

11    Q.  All right.  Christopher is Christopher Thurber?

12    A.  That's who I'm thinking, but I don't know.

13    Q.  It says, The LLC Agreement does contain

14  revisions for future grants of Class B membership units,

15  so-called profit interest grants, to one or more of them

16  if approved by the board.

17         So as DSM is being created, the operating

18  agreement allows for Todd Townsend, Barbara Humphrey and

19  Christopher Thurber to have a membership interest,

20  although it's a Class B-type interest; is that correct?

21    A.  Yeah, that looks like that's correct.  I thought

22  Todd Townsend was gone.

23    Q.  That's why I'm about to ask you about that.

24    A.  Oh, well, that -- that's why I don't know.

25  That's what it says.

Freedom Court Reporting
A Veritext Company
877-373-3660                                                    205-397-2397

1    Q.   Was Todd Townsend intended to be the leader of
2 DSM-3?
3    A.   That, you need to go with Mr. Staples.  I have
4 no clue.
5    Q.   Okay.
6    A.   I know Todd Townsend's name was mentioned in a
7 lot of different things.  You know what I'm saying?  I
8 have no clue on this here.
9    Q.   All right.  And then we go to page 36 there,
10 which is page 2 of the memorandum.
11    A.   (Witness complies.)
12    Q.   And we talk about -- Paragraph 7 deals with
13 distribution.
14        Do you see that?
15    A.   Yes, sir.
16    Q.   All right.  It says, The distributions will
17 be -- and I think it's sort of a priority, first -- the
18 first distribution is to Mrs. Blanchard.
19    A.   Yes.
20    Q.   In an amount equal to the positive difference
21 between $125,000 minus any compensation paid to
22 Mrs. Blanchard during each or such year.
23    A.   Yes, sir.
24    Q.   Okay.  So Ms. Julie is going to get $125,000?
25    A.   Yes.

1    Q.   That's the first distribution to be made,
2 correct?
3    A.   Yes.
4    Q.   Okay.  And then, Second, on a pro rata basis to
5 the members in accordance with their capital contribution
6 account.
7        Did I read that correctly?
8    A.   Yes, sir.
9    Q.   And then to the members, and it uses the words,
10 Initially Julie and Kim, in accordance with their
11 respective membership percentages.
12        Did I read that correctly?
13    A.   Yes, sir.
14    Q.   And then do you know if the putting in
15 parentheses, Initially to Julie and Kim, contemplates the
16 giving of membership interests to either family members or
17 to Todd Townsend, Barbara Humphrey or Christopher Thurber?
18    A.   That, I wouldn't know whether that meant that.
19        Now, may I put something on the record that
20 you said, that you made a mistake?
21    Q.   Sure.
22    A.   If we go to page -- it's 3, in the first
23 paragraph, which talks about the 125 that Julie was going
24 to get, it's almost spelling out, which I said earlier, is
25 the 25 and 40 that John and Kim got in this area.

1        Am I correct?
2    Q.   The document says that.
3    A.   Okay.
4    Q.   Page 39?
5    A.   Page 39.
6    Q.   Which is page 5 of the agreement.
7    A.   Oh, okay.
8    Q.   That deals with the women certification that we
9 talked about earlier today, correct?
10    A.   What line are you looking at?
11    Q.   Paragraph 12, Special WBE Provisions.
12    A.   (Witness reviews document.)
13        Oh, yeah.  Yes, sir.
14    Q.   All right.  Prior to December 31st, 2017, to
15 your knowledge, were there any modifications or changes to
16 the memorandum prepared by Mr. Eisenman and/or the
17 operating agreement of DSM-3?
18    A.   Not to my knowledge that I can say.
19    Q.   When did Mrs. Blanchard first begin using an
20 H. Walker Enterprises e-mail?
21    A.   Well, she's used it for a while because, you
22 know, she helps me on a lot of other different stuff that
23 deals with a lot of different things other than when she
24 started doing the broker thing.  She did appearances and a
25 lot of different things she was helping me with.  So

1 she's -- I think she's had it for a little while.
2    Q.   Was Mrs. Blanchard -- when would you say she
3 first became employed by H. Walker Enterprises?
4    A.   She never have.  I never paid her.
5    Q.   She's never been paid?
6    A.   No, sir.  She just helped me because
7 she's my -- she's my rock.
8    Q.   Now, did the waffles first become an item to be
9 sold in December of 2016?
10    A.   No, the waffles were before that.
11    Q.   The waffles did not come into being when you-all
12 met with PFG corporate in Richmond, Virginia?
13    A.   No, sir.  Waffles was before 2016.
14    Q.   All right.  In January of 2017, did Mr. Eisenman
15 indicate to Mr. Staples that you and he did not want
16 Simmons to have anything to do with the waffles?
17    A.   You -- me and --
18    Q.   Mr. Eisenman indicate to Mr. Staples that you
19 and Mr. Eisenman did not want Simmons having anything to
20 do with waffles?
21    A.   I don't think that was a statement.  I don't
22 think the statement is like that.
23    Q.   What do you think the statement is?
24    A.   The statement is if they're not involved like
25 what we were doing with the Jet situation, then they don't

Page 122

1 have anything to do with the waffles.
2     Q.    And not having anything to do, meaning under the
3 course of dealings between Simmons Prepared Foods and
4 H. Walker Enterprises and/or Renaissance Man Food
5 Services, Simmons would not participate in the 65/35
6 profit split?
7     A.    No.  What he was talking about in that was John
8 was the one that called Simmons and see if they can
9 deliver it because to deliver it from Atlanta, Georgia,
10 where HartyBake is located, to Arkansas, back to Georgia
11 would cost too much for the waffles, so Simmons couldn't
12 do it.
13          There's an e-mail, I think, that he asks
14 someone about it.  And so Simmons couldn't do that, so
15 they're not building that at all.  So that entity right
16 there is almost that they have nothing to do with it.
17 Yeah, so I think that's what you're asking about.  I
18 assume that's what you're asking about.
19     Q.    Okay.  I don't think that's what I'm asking
20 about.
21     A.    Oh, okay.
22     Q.    What I'm trying to get you to explain to me is
23 what is meant by Simmons having no involvement mean?
24     A.    That right there, that they have no involvement
25 in -- they wasn't shipping it.  They were not billing it,

Page 123

1 so they couldn't ship it.  They couldn't bill it, just for
2 that entity right -- not -- just for that sale there of
3 Jet because a -- a Stir distributor who was in, I think,
4 Brunswick, Georgia, there was no trucks or anything that
5 could deliver form Atlanta, Georgia, to Brunswick.
6 Simmons couldn't do that.
7          And for Simmons, what John wrote Simmons,
8 I'm not sure of the young lady, there's an e-mail, if they
9 can do that, and they couldn't do it.  So now we're going
10 to have to bill that, and the trucks are going to deliver
11 it.  My brother delivered it because he worked for Sysco,
12 so on his day off, he delivered it from HartyBake all the
13 way down to Brunswick to wherever Stir is located.
14     Q.    I was in the January 2017 time period.
15     A.    Okay.
16     Q.    It's my understanding that Jet Food had not even
17 come up yet in January of 2017.
18     A.    No, that's what I'm talking about.  If it -- a
19 scenario like Jet, where they have nothing to do with it,
20 they have nothing to do with it.  So that's what he's
21 talking about.
22     Q.    Let's back up then.
23     A.    Okay.
24     Q.    And I want to get some clarity.
25          In January 2017, with respect to the

Page 124

1 waffles being discussed at the time, were those waffles
2 that involved the Jet Food C-Store matter or were those
3 some different kind of waffles?
4     A.    I don't think there was any waffles in January
5 of -- wait a minute.  In 2017?
6     Q.    January of 2017.
7     A.    I don't think there was any -- I think we -- at
8 that time, they were trying to sell waffles, and they
9 weren't sure what they were going to do with the waffles
10 at that time.  So I don't think there was any waffles, but
11 that was a thing that was made, and I think Simmons
12 understood that, as well.  If they're not picking it up
13 and delivering and anything like that, that's the reason
14 they will be billed and did everything through in
15 Savannah.  Because they had nothing -- they were not even
16 touching it, doing anything with it.
17     Q.    In March of 2017, was there a food service
18 waffle order from PFG Lester in Nashville, Tennessee?
19     A.    Yes, sir.  I think PFG Lester -- I'm not sure of
20 the dates, but I think PFG Lester did order something.
21     Q.    Did you or Mr. Eisenman instruct Mr. Staples to
22 sell those waffles through H. Walker Enterprises, LLC?
23     A.    I never instructed Mr. Staples to sell anything
24 through H. Walker Enterprises, LLC.
25     Q.    Do you know when Mr. Staples first learned about

Page 125

1 the C-Store/Jet Foods waffle matter?
2     A.    When it first came about.
3     Q.    When was that?
4     A.    When it first started.  I don't know when it
5 first started, but John was in on the whole thing when it
6 first started.  He was the one that put the deal together
7 that they couldn't even deliver to Brunswick.  He was the
8 one that also picked the person out to order those bins
9 that I put in.  He's the one that got the people to order
10 the bins.  Julie had someone that designed them.  He found
11 the people that designed them.  I think there's an e-mail
12 to that, as well.
13          So he learned about that at the very
14 beginning of the whole deal.
15     Q.    Was it Mrs. Blanchard that communicated to
16 Mr. Staples about the Jet Food waffles in its stores?
17     A.    Yes, sir.
18     Q.    And when she communicated that to him, was she
19 acting on behalf of DSM-3 or H. Walker Enterprises?
20     A.    DSM-3.  She was selling.  She was the broker.
21 And you got to go back.  Remember, they have to sell.  And
22 I think you're forgetting about something.  This waffle
23 thing goes way back in starting of this.  And not to be
24 mean, but you're jumping way ahead how this waffle thing
25 came about.  And I'm not sure if you want to stay there or

1 go back.

2   Q.  Well, I'm trying to get into the Jet Food

3 waffles.

4   A.  Right.  And that's the reason the Jet Food

5 waffles started to be sold.

6   Q.  Right.  Now, I think you just told me that

7 Mr. Staples learning about --

8   A.  No, not learning about.  No, no.  Mr. Staples

9 knew it from the beginning.  He didn't learn about

10 Jet Food.  Mr. Staples was in on this at the very

11 beginning of the selling waffles to Jet Food store.

12   Q.  When did the beginning of the sale of waffles to

13 Jet Food first occur, month, year?

14   A.  I have to look that up somewhere.

15   Q.  Do you have anything to dispute that it was not

16 April or May of 2017?

17   A.  Like I said, I have to look that up, the date,

18 because the waffles was talked about all through a call on

19 Fridays.  I heard this.  Waffles were talked about.

20 Waffles, waffles, waffles, but no waffles were being sold.

21   Q.  What calls were taking place on Fridays?

22   A.  John has a call every Friday.

23   Q.  Every Friday?

24   A.  Every Friday they were having a call with all

25 the people from DSM and Renaissance Man.

1   Q.  And would that have included Mrs. Staples and

2 Blair Staples?

3   A.  That included everybody.  Everybody from the --

4 oh, sorry; everyone on the call.

5   Q.  So every Friday, Mr. Staples would initiate a

6 call involving employees at the time of DSM-3 and

7 Renaissance Man employees that were involved in sales

8 related to Renaissance Man?

9   A.  On Friday, Mr. Staples was initially calling not

10 just to DSM-3, but DSM-2, DSM-1, with Renaissance Man

11 employees and DSM employees.  That was a call on Fridays

12 that they had.

13   Q.  And what was the purpose of having the Friday

14 calls?

15   A.  To go over different things happening in the

16 company.

17   Q.  Was one of them to manage sales efforts?

18   A.  Yes, sir.

19   Q.  And Mrs. Staples would participate?

20   A.  Sometimes.

21   Q.  And Blair Staples would participate?

22   A.  Yes, sir.

23   Q.  And this happened every Friday?

24   A.  Well, every now and then, they may not have a

25 call, but the majority of Fridays, that's when the calls

1 were done.

2   Q.  And as a matter of routine, there was a call

3 every Friday?

4   A.  Yes, sir.

5   Q.  But it's your contention that Mr. Staples and

6 Mrs. Staples and Blair Staples were not working?

7   A.  Yes.  Because just because you initiate a call

8 don't mean you're doing any work.

9   Q.  Following these calls each week, did

10 Jennifer Dawson produce some documents that show which

11 regions and what persons were responsible for that region,

12 what their efforts of selling were?

13   A.  I'm not sure if she did.

14   Q.  You haven't seen those documents?

15   A.  No.  If you got them, I'd like to see them.

16   Q.  Okay.

17   A.  You have them?

18        MR. SIMMS:  I think we produced them in the

19 lawsuit.

20   Q.  (BY MR. SIMMS)  Would those documents be

21 reflective of activities being performed by Mrs. Staples

22 and/or Blair Staples?

23   A.  I think you're confused.  We're a company that

24 sells waffles.  Not one or two waffles, not three or four

25 waffles, not a case of waffles.  We sell a bunch of

1 waffles.  I think that's what you're confusing.  Selling

2 is not just selling one item.  Selling is -- you know,

3 we're a multimillion dollar company, not selling one item.

4   Q.  Yes, sir.  I'm not talking about waffles right

5 now.

6   A.  No, no.  I'm saying --

7   Q.  I'm talking about what documents were generated

8 after the weekly conference on Fridays that Ms. Dawson may

9 have prepared related to what each person who had a

10 region's activities were.

11   A.  Well, what's funny, I thought you didn't even

12 know about there was a call on Friday.

13   Q.  I think I know.

14        What I want to know is:  Have you looked at

15 those documents to see the level of work being performed

16 by Mrs. Staples --

17   A.  Yes, sir.

18   Q.  -- or Blair Staples?

19   A.  Yes, sir.

20   Q.  And what were your conclusions?

21   A.  They're not selling.

22   Q.  They're not selling?

23   A.  Yes, sir.

24   Q.  Okay.  Let's get back to the Jet Food waffle.

25        Did that selling of the Jet Food waffles in

1 Jet Food stores first come about in April or May of 2017?
2    A.   It was around that time.  I'm not sure of the
3 time it came about.
4    Q.   And did that first get communicated to
5 Mr. Staples by Mrs. Blanchard?
6    A.   Yes, sir, I assume it did.
7    Q.   All right.  And did she at some point indicate
8 to Mr. Staples to change the brand to Famous 34?
9    A.   No, sir.
10    Q.   No?
11    A.   No.  You want to know when that was initiated?
12    Q.   We're going to get to that.
13    A.   Okay.
14    Q.   Do you know if Mr. Staples had discussed
15 Simmons' involvement in the sale of waffles to Jet Food?
16    A.   I know he asked the people from Simmons if they
17 can deliver it to Jet.  I know that.
18    Q.   Do you know if he asked them if they wanted to
19 be involved in the sale of waffles to Jet Food and
20 Jet Food convenience stores?
21    A.   I doubt he would ask them if they wanted to be
22 involved in Jet Food.
23    Q.   Whether you doubt it or not, do you know if he
24 talked to them about it?
25    A.   No.

1    Q.   In April and May of 2017, had there been waffle
2 sales to any entities other than PFG Lester out of
3 Nashville?
4    A.   I think they had -- some restaurant in Bama may
5 have sold some, I think.
6    Q.   Baumhower's?
7    A.   I think that's it.
8    Q.   Did Mrs. Blanchard begin an effort to develop
9 the sale of waffles to Jet Food in their convenience
10 stores?
11    A.   Did she begin the effort?
12    Q.   Yes, sir.
13    A.   Yes, sir.
14    Q.   Was she the one leading that, or was that you?
15    A.   Oh, I helped to lead it because I knew
16 David Usry because he's from that area where I'm from.
17    Q.   Who is David Usry?
18    A.   He's one -- I think he's one of the ones that
19 sits on the board to buy things at Jet Food store.
20    Q.   Did you or Mrs. Blanchard, or maybe both of you
21 together, make a request to Mr. Staples to prepare a
22 presentation to be made to Mr. Usry at Jet Food related to
23 sale of waffles?
24    A.   No, sir.
25    Q.   Did you and Mrs. Blanchard and Mr. Staples have

1 a meeting with Mr. Usry at Mr. Usry's home, because he was
2 sick or had some health issues, related to sale of waffles
3 to Jet Food?
4    A.   Yes, sir.
5    Q.   When did that take place, Mr. Walker?
6    A.   Oh, geez, I don't remember the date, but I know
7 that did happen.
8    Q.   Now, did Mrs. Blanchard want what's known as end
9 cap and floor displays for these waffles in the Jet Food
10 stores?
11    A.   Mrs. Blanchard?
12    Q.   Mrs. Blanchard.
13    A.   She didn't want that.  David Usry wanted it.
14 That's what he wanted.  He said that's the only way they
15 could sell is having some type of end cap and display in
16 the store they can sell.
17    Q.   Did Mrs. Blanchard also want some type of
18 signage for the Jet Food stores?
19    A.   She didn't want that.  He wanted that.
20    Q.   Mr. Usry did?
21    A.   Yes, sir.
22    Q.   How many stores are we talking about for
23 Jet Food?
24    A.   50.
25    Q.   Did you instruct Mr. Staples not to worry about

1 the costs associated in doing the displaying and the
2 signage for the sale of these waffles in the 50 Jet Food
3 stores?
4    A.   I never even talked to him about anything that
5 costs.
6    Q.   And was the meeting with Mr. Usry in June of
7 2017?
8    A.   That could have been.
9    Q.   All right.  And this would have been down at
10 Mr. Usry's home, close to -- you grew up in -- is it
11 Wrightsville?
12    A.   Yes.  It's in Sandersville, Georgia.
13    Q.   So did you and Mrs. Blanchard and Mr. Staples
14 meet with Mr. Usry?
15    A.   Yes, sir.
16    Q.   And after that meeting was over with, outside of
17 Mr. Usry's residence -- let me back up.
18        What kind of condition was Mr. Usry under
19 at the time you-all had this meeting?  Was he bedridden,
20 in a wheelchair, or what?
21    A.   No, sir.  He was able to move around a little
22 bit.  I'm not sure what happened.  He was able to move
23 around.  There was a couple other people there.  They had
24 their marketing lady there, and there was one other
25 gentleman there.

1    Q.   Was there somebody there from Stewart Foods?

2    A.   Yes, there was.

3    Q.   Okay.  After the meeting inside with Mr. Usry,

4 did you and Mr. Staples and Mrs. Blanchard, in the process

5 of leaving, did you-all discuss what had taken place in

6 making a presentation to Mr. Usry about the waffles?

7    A.   No, sir, we never made a presentation.

8    Q.   Was Stewart Candies going to be the distributor

9 of the waffles?

10    A.   I don't know what you're calling Stewart.  It's

11 Stewart Distributors was going to be the distributor of

12 the waffles.  They make Stewart candy or something.

13    Q.   How were the waffles going to get from HartyBake

14 to Stewart?

15    A.   That's the problem that we had, and that's the

16 problem that it stemmed from, that Simmons couldn't

17 deliver because they were not delivering to Stewart down

18 in that area.  So we had to work out a deal to get the

19 waffles from HartyBake to Brunswick, Georgia, so it would

20 be cost effective.  Because, like I said, if you go

21 from -- and I think John found this out -- you go from

22 Atlanta to Arkansas, then back to Brunswick, it costs too

23 much.  So to be cost effective, we had to find a way out

24 to get from Atlanta to Brunswick.

25    Q.   Is Brunswick where Stewart Distributors are

1 located?

2    A.   I think so.  I think that's where they're

3 located.

4    Q.   Okay.  And do you know why the deliver -- let me

5 back up.

6         To your knowledge, did HartyBake have

7 freezer storage to maintain inventory of the Jet Food

8 waffles?

9    A.   No, I don't think so.

10    Q.   So when the waffles, if HartyBake was producing

11 them, are coming off the production line, they had to be

12 transported then and there to Stewart Distribution?

13    A.   I'm not sure what HartyBake has.  I just know

14 they made the waffles and picked up and sell.  If they

15 have freezer storage, they don't have a lot because

16 there's not a big place.  It's a small place.

17    Q.   And let me make sure I understand.

18         These waffles for Jet Food, were these

19 going to be individually packaged and have Famous 34 brand

20 on the outside of the packaging?

21    A.   Yes, sir.

22    Q.   And in order to prepare that packaging, would

23 there have to be film developed related to that?

24    A.   Yes, sir.

25    Q.   And are there two ways of developing the film,

1 one called digital and one a traditional having a plate as

2 opposed to digital?

3    A.   Yes, sir, I assume.

4    Q.   All right.  And -- okay.

5         So let me make sure I understand with

6 respect to the Jet Food waffles.

7         There was going to be some cost associated

8 in getting a film that would create the logo and the

9 packaging information that individually wrapped the

10 waffle?

11    A.   Yes, sir.

12    Q.   And there would have been costs associated in

13 having displays inside the Jet Food convenience stores,

14 correct?

15    A.   Yes, sir.

16    Q.   Now, is it your understanding that Stewart

17 Distribution, its distribution capabilities at the time

18 related to the Jet Food waffles only dealt with fresh and

19 nonperishable products?

20    A.   At that time, Stewart didn't have a freezer

21 storage.  So they had -- when it hit Stewart, they had to

22 get it out because they didn't have freezer storage.  They

23 just put in freezer storage not long ago.

24    Q.   Did Mr. Staples discuss with you and

25 Mrs. Blanchard that this was going to present a logistical

1 problem related to the distribution of the waffles in the

2 Jet Foods, and that the cost associated with it would be

3 prohibitive?

4    A.   No, we never talked about cost being

5 prohibitive.  We talked about we got a logistic problem.

6 What are we going to do to work it out?  And we worked it

7 out and found a way that we can do it.

8    Q.   Did you ever tell Mr. Staples that he did not

9 have authority to question the cost involved in doing the

10 Jet Food waffle?

11    A.   I've never said that to John.

12    Q.   So you deny that?

13    A.   Yes, I deny that.  I never said that to John.

14    Q.   Did you tell Mr. Staples that you were the CEO,

15 and that Simmons would pay for everything through the

16 normal process?

17    A.   I never told John something like that.  John

18 makes up a lot of crap.

19    Q.   You think that's crap?

20    A.   Yeah, that's crap.  That's a lie.  I never said

21 that.

22    Q.   But you would agree with me that in doing the

23 Jet Foods waffle, there were some costs associated in

24 doing that venture, correct?

25    A.   No, sir, I wouldn't agree with that.  Because

35 (Pages 134 - 137)

1 I'm saying I'll work it out. I'm the CEO; I worked it
2 out. It was worked out; then it worked.
3 Q. Let's back up.
4 I thought you agreed with me that we got
5 cost -- we're going to have to -- I'm talking about
6 Jet Food waffles now.
7 A. Okay. All right. Let's talk about it.
8 Q. We're going to have to pay HartyBake to make
9 them.
10 A. Right.
11 Q. We're going to have to buy some film that we
12 take and give to HartyBake, either through a plate or
13 digitally, to create a package to individually wrap the
14 waffle?
15 A. Right.
16 Q. There's a cost there?
17 A. Yes.
18 Q. There's cost in getting these display items in
19 50 Jet Food stores?
20 A. Yes, sir.
21 Q. There's cost associated in doing signage?
22 A. There is.
23 Q. There's cost associated in trying to find some
24 entity that has refr- -- or frozen transportation
25 capabilities, to take the product from HartyBake to the

1 Jet Food stores where they would be distributed into the
2 stores, correct?
3 A. Yes.
4 Q. But cost never came up in discussions between
5 you and Mr. Staples?
6 A. No, sir, because you got to look at a bigger
7 picture, which is what I look at.
8 Q. Okay.
9 A. Okay. And let me break it off to you a little
10 bit.
11 Q. All right. Break it off.
12 A. I'm going to break this off. I'm looking at a
13 bigger picture than Jet Food store. I'm looking at a
14 picture that Jet Food store also sells chicken. And
15 now -- John hadn't told you this -- today, end up that the
16 entity that I started, they're selling maybe $300,000 or
17 $400,000 a month of product on top of chicken and all
18 that, where Stewart is buying all of that. Had nothing to
19 do with that little selling to Jet. I was looking at
20 something a lot bigger than that, so it had nothing to do
21 with that, which is -- Simmons is profiting from that
22 pretty good.
23 So that's what I'm looking at. I'm not
24 talking about a cost because there was no cost involved.
25 You're talking about -- I don't even think there was a

1 profit made on the situation from Jet. I don't think
2 there was anything made. Because I'm looking on the other
3 end. If we get it in there, we got to get this waffle
4 showing, get it done, because when John first thought of
5 these waffles, he made the brand Mama's Cooking. Well,
6 Mama's Cooking is going to compete against Nabisco. Who
7 wants all the baking company to compete against all these
8 great baker companies? But Herschel Famous 34 waffles in
9 the south sold pretty good. So we didn't have to compete
10 against all that, so it got the leg to start running and
11 we sold chicken.
12 And also, not only did we sell 50 -- we
13 only sold 50 of those bins to Jet. The other 200 went to
14 U.S. Foods. So there was a lot of bigger pictures than
15 just Jet Food store.
16 Q. I want to talk about Jet Foods.
17 A. Well, you asked me about if there was cost, and
18 I said no, I'm looking at a bigger picture.
19 Q. Do you know when the film invoices and the
20 display invoices for Famous 34 waffles for Jet Foods came
21 in?
22 A. No, sir.
23 Q. Did Mr. Staples provide those invoices to you or
24 Mrs. Blanchard or Mr. Eisenman during a meeting you-all
25 had at Mr. Eisenman's law office in Atlanta in September

1 of 2017?
2 A. No.
3 Q. And during that meeting, did Mr. Eisenman or
4 Mrs. Blanchard or you agree that H. Walker Enterprises
5 would pay for the cost of those invoices?
6 A. No. We never talked about a invoice or paying
7 for no waffles or invoices.
8 Q. Did you -- in September of 2017, did you and
9 Ms. Blanchard take a trip to Hawaii?
10 A. Yes, probably.
11 Q. And during that trip, did Ms. Blanchard
12 communicate to Mr. Staples to -- that the purchase order
13 for the Jet Food waffles from HartyBake would be changed
14 from -- to be changed in some way?
15 A. I remember she said that.
16 Q. Why did that have to be done?
17 A. I don't remember what name was on it, but she
18 said she put the wrong name on it. So she had to change
19 it then.
20 Q. And was the purchase order to HartyBake to be
21 changed to show that it was coming out of the Savannah
22 office of H. Walker Enterprises?
23 A. That's where it came out of, so I don't know
24 what name was on it.
25 Q. And was the effort to sell the waffles through

1 H. Walker Enterprises to avoid the 65/35 profit share
2 arrangement with Simmons?
3           MR. KING: Objection, states facts not in
4 evidence.
5           Go ahead.
6    A.  Not at all.  I would never -- I don't cheat my
7 partners.  That's one thing.  And another thing, I don't
8 do nothing for money.  You may have to learn that about
9 me.  I do nothing for money.  Not like him.  I do nothing
10 for money, so I never would cheat my people that I was
11 doing work with.  I'm not going to cheat them.
12   Q.  You pointed at Mr. Staples, and you said you
13 don't do anything for money, unlike him.
14   A.  I never said unlike him, but if you want to say
15 that, unlike him.
16   Q.  Do you think that Mr. Staples has the right to
17 feel secure in having a job and having job security so he
18 can earn a living for himself and his family?
19   A.  Everybody has that right, but you can't cheat to
20 have that right.
21   Q.  How did Mr. Staples cheat with respect to the
22 Jet Food waffles?
23   A.  He's the one who created the problem.  He lied
24 about it.  He didn't tell the truth.  If he had told the
25 truth, that he was involved that whole time.  He's the one

1 that put the film, that ordered the waffles.  He's the one
2 that did the film.  He's the one that did all that, and
3 then he turned around, that I learned, and he said that I
4 was doing -- well, first of all, I hadn't, Julie hadn't
5 done -- he's the one that did part of it.  And you got all
6 the e-mails where you can trace that he was involved the
7 whole time.  John was involved.
8    Q.  He was involved because neither you nor
9 Ms. Blanchard knew who to order film from, who to order
10 displays from, or any of that, correct?
11   A.  That is totally false.  Ms. Blanchard knew
12 probably more about that than John because she ran outdoor
13 advertising for CBS for 30-some years, so she would know
14 where to order the film.
15          But John said he had someone better to do
16 it.  So he's ordered the film.  And I think Julie had --
17 and she drew the thing up or whatever.  He ordered it
18 then.  So he was in on the whole thing.  You can get the
19 e-mail trail to follow that.
20   Q.  Ms. Blanchard -- you were instructing
21 Mr. Staples what to do though, correct?
22   A.  No, sir.
23   Q.  Well, why didn't you and Ms. Blanchard do it
24 yourselves and not involve Mr. Staples?
25   A.  You want me to tell you?  Because he worked for

1 me.  He was the general manager.  He worked for me.
2    Q.  Because he works for you, and you're the big
3 dog, and if you tell him to do something, you expect him
4 to do it?
5    A.  No, that's not it.  I just assume he was doing
6 it.  Had nothing to do with anything.  I thought that's
7 what he was doing.  And he took the initiative to do it.
8 Had nothing to do about big dog, little dog.  I'm just not
9 Robert Thurber's puppet.  That's what I told you.
10          But I'm saying I had nothing to do with the
11 waffles.  John was involved -- when you look at the
12 e-mails, you will see he was involved the whole time.  And
13 then he turned around and just said that we did this when
14 he was involved the whole time.  So making a living is his
15 thing, but you got to do it the right way.
16          And remember, he also went to see you
17 before any of this started.
18   Q.  He didn't see me until after it --
19   A.  No, he went to see you before it started.
20   Q.  I don't think so.
21          Mr. Walker, when you told Mr. Staples to do
22 something, you expected him to do what you told him,
23 right?
24   A.  No, sir, because he never did.
25   Q.  He never did?

1    A.  No, he never did what I asked him to do.
2    Q.  And he stayed in place as the general manager
3 for the Simmons Prepared Foods and the H. Walker
4 Enterprises/Renaissance Man venture or relationship for
5 eight, almost nine years?
6    A.  You're 100 percent correct.  Until after the
7 last four years of his employment, that's when things
8 started going awry.
9    Q.  What went awry?
10   A.  Well, he hired his family, and -- and if you
11 remember, he said that he fired one broker, hired another
12 broker, fired another broker, hired another broker, fired
13 this broker, trying to connect this broker to this broker.
14 You know, I'm running a business.  I'm trying to sell
15 chicken.  You can't do it from what he was doing.
16          He was supposed to be a general manager of
17 Renaissance Man, not go out and do all this other stuff
18 he's doing, trying to sell this.  So I can't do that.
19   Q.  The agreement that created Diversified 3
20 contemplated that family members would be involved; did it
21 not?
22   A.  Well, that got nothing to do with Renaissance
23 Man.  I'm looking out for Renaissance Man.  I don't care
24 about DSM-3.  I don't care about DSM-3, 1, 2, 3, 4, 5.
25 They was supposed to be working for me.  That's what he

Page 146

1 was supposed to be doing. If he's doing DSM-3, that means
2 he's not doing his job for Renaissance Man, which is what
3 I said in his -- what -- the December the 27th.
4    Q.   DSM-1 and DSM-2 did a real good job, and
5 Renaissance Man sold a lot of product with them as
6 brokers, correct?
7    A.   They sold product. DSM-1 was let go. And the
8 reason they were let go is John said because one of the
9 people that owned DSM-1 dogcurses his daughter out. So
10 DSM-1 goes by the wayside. And now Randy Sanders come in.
11 Randy Sanders did something, so now Randy Sanders goes
12 out. Now this.
13        Well, you can't keep changing and doing all
14 this. You got to have some kind of togetherness. We're
15 trying to run a company. Whatever they're selling, they
16 could have sold more. They could have sold more.
17    Q.   Did you ever complain about the sales efforts of
18 DSM-1 or DSM-2 in writing?
19    A.   No, I didn't have to do it in writing because I
20 told him.
21    Q.   Okay.
22        THE WITNESS:  That's John Staples I was
23 talking about; sorry about that (indicating).
24    Q.   (BY MR. SIMMS)  Now, as far as the Jet Foods
25 waffles, did Ms. Blanchard have a connection with a

Page 147

1 company that could produce the film?
2    A.   She probably knew a lot of companies that could
3 produce the film.
4    Q.   If she did, why did she just instruct or direct
5 Mr. Staples to do that?
6    A.   She didn't instruct him to do it. John probably
7 volunteered to do it because he knew someone, because he
8 did Mama's Cooking, so he probably wanted to go so he
9 could do it. I have no clue.
10    Q.   If he suggested someone, wasn't he being
11 helpful?
12    A.   Yeah, that's what I said. He helped with all
13 this, and then he turned around and said it was just us.
14 But John helped. You just made it right, correct. He was
15 helpful. He helped with all of this.
16    Q.   Again, did Mr. Staples provide the invoices at a
17 meeting at Mr. Eisenman's office to you and Ms. Blanchard
18 so that could be processed through H. Walker
19 Enterprises?
20    A.   No, sir.
21    Q.   When was -- who is Natalie; is that your niece?
22    A.   Natalie is one of the Fitness Twins related to
23 Natalie and Adria.
24    Q.   All right. And Denise, is she your --
25    A.   Yeah, name is Tasha Denise Stokes.

Page 148

1    Q.   When were they first -- are they employees of
2 H. Walker Enterprises?
3    A.   No, sir.
4    Q.   They had H. Walker Enterprises e-mail addresses?
5    A.   You're right. They had e-mail addresses because
6 they did much more than just calling and doing
7 telemarketing. Tasha been working for me for umpteen
8 years on a lot of different things.
9        And the Fitness Twins started the company
10 out with me. When I first started Renaissance Man selling
11 chicken, they went to every food show -- a lot of food
12 shows with me. So they knew about Renaissance Man.
13    Q.   And George --
14    A.   Fiorelli.
15    Q.   -- Fiorelli, when was he first hired?
16    A.   I never really hired George. George was working
17 as an independent contractor. And I've known George for
18 years, and I thought he could help us out on some things
19 because he's absolutely incredible. So that's when George
20 came on, and he helped us out with some things. We were
21 losing business in the Contract Management part, which was
22 mentioned in an e-mail that I stated that to John, that
23 we're losing business in the Contract Management, and I
24 thought George could help us out there.
25    Q.   Did George have an e-mail address with H. Walker

Page 149

1 Enterprises?
2    A.   Yes, sir.
3    Q.   And where was the funds coming from to pay
4 Natalie, Denise, Adria, and George?
5    A.   Out of my pocket.
6    Q.   And that was paid for by H. Walker Enterprises?
7    A.   No, sir. That was paid for by all the other
8 stuff that I do.
9    Q.   And what was that?
10    A.   I have hotels; I have hospitals; I have Best
11 Fred Drapery companies. It was paid by all my appearances
12 and all the things I would do in there.
13    Q.   Was there an incident where George Fiorelli
14 showed up at an HMHost customer meeting?
15    A.   Yes, sir. From what I hear -- what I heard.
16    Q.   And was Matt Free with Simmons at that meeting?
17    A.   Yes, sir.
18    Q.   Did you learn after that meeting that Mr. Free
19 had issues with Mr. -- George showing up at that meeting?
20    A.   Well, what was interesting, I learned that --
21 you made a statement that that was our HMSHost for
22 Simmons; that's a Renaissance Man account. That's not a
23 Simmons account; that's a Renaissance Man account.
24        So Matt Free was invited as a guest to the
25 meeting because they do the chicken and they can help us

38 (Pages 146 - 149)
**App. 243**

Page 150

1 in doing the chicken. So it would have been Blaine would
2 have told me there was a problem there at the thing. But
3 I knew there was something happening. I'm not sure
4 exactly what.
5    Q.  Did you get the explanation of the incident from
6 Mr. Staples or from Blaine Walker?
7    A.  I think from John.
8    Q.  And what did John tell you happened?
9    A.  That Matt said that he worked for H. Walker
10 Enterprises or had a card or something. Like I say, I'm
11 not really sure, to -- no, no, no -- that he did something
12 with some other company that was competitive or something,
13 that he had worked with them or something competitive, and
14 the lady got mad or something.
15        So like I say, I'm not really sure what
16 happened, but that was sort of what John said or
17 something. And I don't remember the company that was
18 competitive to HMSHost.
19    Q.  Was Mr. -- George, was he sent to the meeting by
20 you?
21    A.  Yes, sir.
22    Q.  And was that to grow H. Walker Enterprises?
23    A.  No, sir. That was to learn what was going on
24 because he lived in that area. And one of the things I
25 wanted was to try to cut down on expenses, and that's

Page 151

1 where George lived, was in that area HMSHost is at, and
2 Marriott and some of the other good customers are located
3 at.
4        So I felt that it would be good to have a
5 face in front of those people so we don't have to do a lot
6 of traveling there. We have someone there so we can try
7 to pick up the Contract Management part.
8    Q.  And you learned that Mr. Free was upset about
9 Mr. -- George being there?
10    A.  Well, I didn't learn -- I learned it from being
11 here that Mr. Free was upset.
12        No, learned -- and I think John may have
13 told me as well.
14    Q.  Did the telemarketers or Denise call on Sysco on
15 behalf of H. Walker Enterprises?
16    A.  No, I thought they called on behalf of
17 Renaissance Man.
18    Q.  Have you seen the e-mail that Mr. Pierce with
19 Sysco sent regarding being contacted by either the
20 telemarketers or Denise?
21    A.  I have. It was really not Denise. It was
22 Adria, I think.
23    Q.  And that was communicated to Blaine Walker?
24    A.  Oh, I'm not sure who it was communicated to.
25        MR. SIMMS: All right. Need to take a

Page 152

1 break for lunch real quick.
2        (Recess in the proceedings from 1:31 to
3        1:39 p.m.)
4    Q.  (BY MR. SIMMS)  Now, was it your understanding
5 that Mr. Free, Matt Free, was upset concerning George
6 showing up at the HMSHost meeting?
7    A.  That's what I heard. I didn't -- he never
8 talked to me.
9    Q.  And then -- let me show you Exhibit 11, which is
10 Simmons 126 -- starts with Simmons 126.
11        (Exhibit 11 marked.)
12    A.  Yes, sir.
13    Q.  (BY MR. SIMMS)  Does that concern -- is that
14 Natalie?
15    A.  Yes, sir.
16    Q.  Is Natalie your niece?
17    A.  No, sir. Natalie is a friend.
18    Q.  Okay. Is she one of the Fitness Twins?
19    A.  Yes, sir.
20    Q.  Why was Natalie contacting Sysco?
21    A.  Natalie was calling because I had mentioned to
22 John that I didn't want -- like right now, all of his
23 people that are supposed to be brokers are like
24 telemarketers. All they're doing is sitting at home
25 making calls, on the computer, and not doing face-to-face.

Page 153

1 And as I was talking about earlier, John told me when I
2 first started the business, we got to get in front of
3 people's faces. Got to get in front of people's faces.
4        Well, everybody was sitting at home on
5 phone calls. And I said, that's not what's going to
6 happen. So I said, I will hire telemarketers that they
7 can make the calls, and what we can do is then the brokers
8 who are supposed to be doing the broker work can go out
9 now and start doing food shows and start getting in front
10 of different customers' faces. So that's the reason that
11 they were hired.
12    Q.  And what was your understanding as to what
13 Mr. Pierce at Sysco's complaint was by being contacted by
14 Natalie?
15    A.  Well, from what John told me, that Natalie
16 mentioned -- said something to him like a different
17 distributor, but then John also told me -- and Jeff Pierce
18 also told me that was no big deal. So John --
19    Q.  I want to know about this here (indicating).
20        Mr. Pierce contacted Blaine Walker,
21 correct?
22    A.  Right. That's what you told me. And I said
23 from my understanding -- you said from my understanding --
24 that's what I was told and stuff from this here
25 (indicating), that it was she said something about another

1 distributor when he was talking to Jeff Pierce to one of
2 the Sysco people. It wasn't Jeff Pierce. It was a Sysco
3 person and stuff. That's what my understanding was.
4    Q.  Do you believe that was -- created confusion
5 with the customers of the Simmons/H. Walker
6 Enterprises/Renaissance Man relationship?
7    A.  No. Why would that create confusion?
8    Q.  In October -- you see this is in October of
9 2017, correct?
10   A.  October 26th, 2017, yes, sir.
11   Q.  Prior to that date, did you contact Mr. Staples
12 and say, Somebody is telling Simmons not to pay my bills?
13   A.  No, sir. I contacted John -- no. I don't know
14 whether I contacted John or we were talking, and I asked
15 him, Did you tell Simmons not to pay a bill? But it had
16 nothing -- I didn't say, They don't pay my bills.
17   Q.  Did that relate to the Jet Foods invoices that
18 Carol Walker had submitted to Carmen Seal at Simmons?
19   A.  That's the only bill I ever submitted.
20   Q.  Did Mr. Staples respond to you and tell you that
21 he was the someone?
22   A.  No, sir. John wimped out again and said, Oh,
23 no, I didn't do that. Right?
24   Q.  Did you have a conversation with Matt Free on --
25 did you have conversation with Mr. Free concerning a price

1 increase related to the cost Simmons was going to charge
2 Renaissance Man?
3    A.  Yes.
4    Q.  When was that?
5    A.  Oh, I don't know the date that was.
6        (Exhibit 12 marked.)
7    Q.  (BY MR. SIMMS)  Let me show you Exhibit 12.
8        MR. KING:  Document number?
9        MR. SIMMS:  Oh, yeah, I'm sorry.
10       THE WITNESS:  Simmons 124.
11       MR. KING:  Simmons 124.
12   A.  (Witness reviews document.)
13       Okay.
14   Q.  (BY MR. SIMMS)  Prior to October 24th, did you
15 receive some updated pricing from Mr. Free?
16   A.  No, I received it from John. I never received
17 anything from Matt. Everything would come from John.
18   Q.  Okay. Did you call Mr. Free related to that?
19   A.  Yes, sir, I think I did.
20   Q.  Was that on October 24th, 2017?
21   A.  I don't know when it was, but I know I did talk
22 to Matt.
23   Q.  Did you tell Mr. Free that there was a
24 relationship where Simmons and H. Walker Enterprises or
25 Renaissance Man shared profits, and that if Simmons was

1 going to raise the pricing, then Renaissance Man was going
2 to stop sharing profits with Simmons?
3    A.  It wasn't like that, but it was something
4 similar to that.
5    Q.  What were you upset about?
6    A.  I wasn't upset about that. I wasn't upset. I
7 was just saying that's just business. If you're going to
8 do that, he didn't realize that we're doing the share
9 profit thing. So if you want to raise the price there,
10 we're going to bring the price down of what you're going
11 to get. So that's not being upset. That's like
12 negotiation. That ain't got nothing to do with being
13 upset. I wasn't upset about that.
14   Q.  Do you consider that a threat, that if --
15   A.  No. I considered that business.
16   Q.  And you weren't already upset with Mr. Free
17 about the HMHost (sic) incident?
18   A.  No, sir.
19   Q.  So are you telling me that you were not upset
20 with Mr. Free in any way about this indication that the
21 pricing was going to change?
22   A.  Not at all.
23   Q.  That -- October the 24th would have been the day
24 prior to you receiving an e-mail from David Jackson; is
25 that correct?

1    A.  Yes, sir.
2        (Exhibit 13 marked.)
3    Q.  (BY MR. SIMMS)  Let me show you what I'm going
4 to mark as Exhibit 13. And this appears to be a string of
5 e-mails that starts with RMFS 257 and goes through 260.
6    A.  Yes.
7        (Witness reviews document.)
8        Okay.
9    Q.  All right. Let's go to the -- 259 --
10   A.  Okay.
11   Q.  -- which appears to be page 3 of 4 of this
12 e-mail chain.
13   A.  (Witness complies.)
14       Yes, sir.
15   Q.  Prior to receiving this e-mail -- and it was
16 sent to you and your attorney, Mr. Eisenman, correct?
17   A.  Yes, sir.
18   Q.  And it's from David Jackson?
19   A.  Yes, sir.
20   Q.  And Mr. Jackson also copies the attorney for
21 Simmons Prepared Foods or Simmons Foods, correct?
22   A.  Yes, sir.
23   Q.  And the subject is, RMFS Board Meeting?
24   A.  Yes, sir.
25   Q.  Had you received communication from Mr. Jackson

1 prior to this communication about having a board meeting?
2    A.   Prior to this?
3    Q.   Yeah, for 2017.
4    A.   No, I don't think so.  I may have.  I don't
5 think so.  I may have, but I don't remember.
6    Q.   Would you agree with me that there had been no
7 board meeting in 2017?
8    A.   I could agree with you because -- yeah, that
9 could have been.
10   Q.   Mr. Jackson starts off this e-mail that says
11 he's, Been back in poultry for 12 months now, and it seems
12 it's time for Simmons and Renaissance Man to have a
13 discussion about the current state of business and how we
14 plan to proceed from here.
15   A.   Yes, sir.
16   Q.   Okay.  It says, There are concerning comments,
17 that he's hearing secondhand about the desire to continue
18 the arrangement, or if there truly is an arrangement.
19   A.   Yes, sir.
20   Q.   In addition, there are invoices being submitted
21 by other entities, HW Foods, which I think he clarified
22 that he meant H. Walker Enterprises, to pay for items that
23 Renaissance Man does not support.  Said these are both
24 very concerning to hear and raise questions about how the
25 business is being operated.

1    A.   Yes, sir.
2    Q.   All right.  When you received this
3 communication, do you know what invoices Mr. Jackson was
4 talking about at that moment in time?
5    A.   At that time, no, sir.
6    Q.   All right.  He goes on to say from his
7 perspective, that Simmons and you entered into an
8 agreement, and then he's got paren, which was signed by
9 him but not by you, and that Simmons had acted in
10 accordance with that agreement for several years.
11       Did I read that correctly?
12   A.   Yes, sir.
13   Q.   And he says you-all are to be equity partners.
14       Do you agree with that?
15   A.   No, sir.  And he said that he didn't agree with
16 that.  That was a misstatement.
17   Q.   All right.  It says, For 2018 and after, he
18 wants absolute clarity on the agreement of behaviors for
19 both parties, so Simmons continues to bill and execute its
20 business plan for producing and selling chicken into food
21 service, distributive and retail segments.
22       Did I read that correctly?
23   A.   Yes, sir.
24   Q.   He's asking for adjustments to the agreement,
25 and asking your attorney, Ron, to provide a foundation

1 agreement.  And then he also suggests dates to meet, and
2 he also indicates why he's copying the company attorney
3 for Simmons, correct?
4    A.   Yes, sir.
5    Q.   And did you respond to this communication?
6    A.   Yes, sir.
7    Q.   Your response is dated what?
8    A.   It looks like October 26th, 2017, at
9 9:50-something a.m., so the next day.
10   Q.   All right.  Now, you would agree with me that
11 the phone call you'd had with Matt Free would have been
12 the day prior to receiving this e-mail from Mr. Jackson,
13 correct?
14   A.   No, I wouldn't agree with you there because,
15 like I said, I don't know when I had a call with
16 Matt Free.
17   Q.   I thought we indicated and -- looked at
18 communication that he generated to Mr. Jackson that
19 indicated when you and him had spoken.  I thought it was
20 October 24th.
21   A.   When who spoke?
22   Q.   You and Mr. Free.
23   A.   He just said he just received a call.  It was
24 October 24th, but it don't say when received a call.  It
25 could have been the 23rd or the -- I'm not sure.  I don't

1 know when it was.  Like I said, I don't know when it was.
2    Q.   All right.  Sometime before October 25th?
3    A.   Yes, sir.
4    Q.   Okay.  And is your response to Mr. Jackson,
5 document number -- it's on page 258?
6    A.   Yes, sir.
7    Q.   You start out by saying, Thanks for your letter.
8         Actually, it was an e-mail, correct?
9    A.   Yes, sir.
10   Q.   Said that you had tried to call Mr. Jackson a
11 couple of times to keep him informed of what had been
12 going on, but did not get a call back?
13   A.   Yes, sir.
14   Q.   What were you going to tell him was going on?
15   A.   No, I was going to tell him about the -- what
16 we're doing in the business, what's going on.
17   Q.   All right.  You say, I'm taking an even more
18 active role to grow Renaissance Man even more than before.
19   A.   Yes, sir.
20   Q.   How were you going to grow it?
21   A.   Renaissance Man?
22   Q.   Yeah.
23   A.   By selling more chicken.
24   Q.   To who?
25   A.   U.S. Foods, PFG, UniPro, other distributors.

1   Q.   Had you been directing Mr. Staples to grow
2  Renaissance Man?
3   A.   Well, I thought that was his job to do, was to
4  grow Renaissance Man.  Being general manager, you're
5  supposed to grow the business, I thought, unless I have a
6  bad idea.  But I thought that's what you're supposed to
7  do.
8   Q.   Well, Mr. Staples had been brought in to the
9  Simmons/H. Walker Enterprises/Renaissance Man relationship
10  by Simmons?
11   A.   No, by me.  And he was supposed to been general
12  manager.  He only been to Simmons for insurance.  He was
13  brought in by me to grow the food service side.
14   Q.   But he also had an obligation to respond to
15  Simmons related to their relationship, correct?
16   A.   No, sir.
17   Q.   So you disagree; back in the document, it says
18  that the board, which was made up two-fifths of Simmons,
19  he was not supposed to respond to their inquiries?
20   A.   No, he --
21        MR. KING:  Objection, assumes facts that
22  are not in evidence.
23        Go ahead.
24   A.   You are right.  That's the reason it wasn't
25  signed.  He had -- his loyalty was to Renaissance Man, and

1  David Jackson said it in his deposition, no, not to
2  Simmons, but to me.
3   Q.   (BY MR. SIMMS)  If Mr. Staples was being paid
4  by Simmons --
5   A.   Wait, don't -- stop.  Mr. Staples was being paid
6  by Renaissance Man.
7   Q.   What was happening was, under the relationship
8  between Simmons and H. Walker Enterprises and Renaissance
9  Man, Simmons was recouping what they were paying
10  Mr. Staples from that relationship?
11   A.   Right.  But every cent John did, and every cent
12  John got, everything John did was coming from the
13  Renaissance Man bank account, which is Renaissance Man,
14  which is Herschel Walker.
15   Q.   Which is controlled and operated by Simmons
16  Prepared Foods, correct?
17   A.   No.  It's controlled and operated by me.  They
18  just run -- run the inside thing.  But I'm the one that
19  answered.  It's my bank account.
20   Q.   That you allowed them to administer?
21   A.   Yes, sir.
22   Q.   You say, H. Walker Foods is a brand of
23  Renaissance Man that Simmons does invoice.
24        What are you talking about?
25   A.   H. Walker Food was a brand, and I think David

1  said somewhere about -- something about H. Walker Food,
2  which I was confused, but H. Walker Food was a brand that
3  we sell because of -- we were selling Cat Man to Sysco,
4  and to sell other product besides Cat Man, we were selling
5  other products, and the brand we were selling it under was
6  H. Walker Foods.
7   Q.   You know after attending Mr. Jackson's
8  deposition, that he was talking about invoices dealing
9  with H. Walker Enterprises?
10   A.   That's what I learned, yes, sir.
11   Q.   And you go on to say here that, H. Walker Foods
12  was created because of Marriott and U.S. Foods and Sysco
13  was tied in so tight with Renaissance Man through the
14  Cat Man.
15        When you say "H. Walker Foods," are you
16  referring to Walker Foods, LLC, or what are you referring
17  to?
18   A.   H. Walker Food is a brand.  It's just a brand.
19   Q.   Okay.
20   A.   Like Famous 34 is a brand.
21   Q.   So you're talking about brands here?
22   A.   Right.
23   Q.   Okay.  Then you start talking about trying to
24  build a stronger relationship with U.S. Foods.
25   A.   Yes, sir.

1   Q.   And then you say that, In preparation for the
2  U.S. Foods entry, we created retail package film, display
3  bins, because things were happening so fast and those are
4  the invoices I was asking to be paid.
5   A.   Yes, sir.
6   Q.   Actually, the invoices -- you weren't asking for
7  them to be paid; Carol Walker was asking for them to be
8  paid, correct?
9   A.   No, I was asking them to be paid.  Carol is a
10  partner of me.  So if I tell her what to do, she's going
11  to tell it so it's me, coming from me.
12   Q.   And those invoices didn't have anything to do
13  with U.S. Foods, did they?  They related to the Jet Food
14  waffle, did they not?
15   A.   You're wrong.  And if John had came to the
16  meeting, he would have known that at that time, we already
17  met with U.S. Foods, and U.S. Foods has already guaranteed
18  me that they wanted to do those bins and everything during
19  this time right here in October.  We had met with
20  U.S. Foods before then.
21   Q.   The U.S. Foods was going to supply the Jet Food
22  waffle?
23   A.   No.  They were going to supply their own waffle.
24  We already met with U.S. Foods to do their own waffle in
25  their food service side.

Page 166

1    Q.  Let's go back now.  Let me back up.
2        The invoices that you're talking about,
3    were these invoices that you directed Carol Walker to
4    submit to Carmen Seal at Simmons?
5    A.  Yes, sir.
6    Q.  Where did you get the invoices?
7    A.  Where did I get them from?  I never got them.  I
8    just heard about an invoice that I paid for.  I never got
9    anything on invoice.  I just trusted whoever gave me the
10   invoice that it needed to be paid because one thing I try
11   to do is not have debt.  I don't like debt.
12       So when whoever had the invoice that was
13   saying they want to be paid, and it had a problem getting
14   paid, I paid it.
15   Q.  Isn't it true that the invoices that Carol had
16   communicated to Carmen Seal with Simmons, you had been
17   provided by Mr. Staples during a meeting at Mr. Eisenman's
18   office in September?
19   A.  Not at all, no, sir, that never happened.
20   Q.  Well, explain to me, then, Mr. Walker, how Carol
21   could refer to Peachtree Packaging in the request she sent
22   to Carmen Seal.
23   A.  Well, because John was talking to Carol also.
24   He sent the thing to Peachtree Packaging at that time, and
25   they were working with Julie, as well.  So that's how

Page 167

1    Carol knew the invoices.  Carol knew nothing about who was
2    packaging or whatever.  This is John and Julie, and they
3    sent it to Carol, and Carol sent it up to Carmen, and I
4    said that I'd pay for it because the bill was coming due,
5    and I ended up paying for it.
6    Q.  Did Peachtree Packaging, was that related to
7    film or related to displays?
8    A.  I have no idea.  I'm not sure.  I think that
9    was -- I have no idea.
10   Q.  Would you agree with me that the Peachtree
11   Packaging invoice dealt with the Jet Food waffles?
12   A.  Oh, no, they probably did deal with some of
13   them.  They didn't deal with all of them.  They dealt with
14   50 of them.  There was 250.  So they dealt with a fifth of
15   them.  But there was another four-fifths that still is
16   there.
17   Q.  We're going to get to it in a moment, but I
18   think you wrote a check on November 27th to Peachtree
19   Packaging?
20   A.  Yeah, probably.
21   Q.  And when you wrote that check, who did -- what
22   did you think you were paying for?
23   A.  The film and those -- whatever that -- that
24   stuff they needed.
25   Q.  I thought we were talking about packaging now as

Page 168

1    opposed to film.
2    A.  No, it was both of them.  I was paying for both.
3    I'm not sure what the check was.  I just wrote a check to
4    pay.
5    Q.  Is it your understanding that Peachtree
6    Packaging prepared the film as opposed to the display
7    bins?
8    A.  As I say, I don't know.  The check was written
9    and paid for both of them.  I don't know how much the
10   check was.
11   Q.  As we sit here today, do you know who paid for
12   the film costs related to the Jet Food waffles?
13   A.  As we sit here today, I thought I did.  I
14   thought my check was $7,000.  So if it was $7,000, I
15   thought I paid.  So I have no clue, like I said.
16   Q.  You think your check included both the cost of
17   the displays and the film?
18   A.  I assume, yes, sir.
19   Q.  Wasn't there a different entity that prepared
20   the film besides Peachtree Packaging?
21   A.  Yes, sir.  I think so.
22   Q.  What's the name of that entity?
23   A.  I have no clue.
24   Q.  Although you were writing a check that you
25   thought included payment of their invoice, you don't know

Page 169

1    who they were?
2    A.  Right.
3    Q.  You go on down here, you'd love to go into 2018
4    with Simmons feeling comfortable with what you're trying
5    to do with Renaissance Man, is what you say, right?
6    A.  Yes, sir.
7    Q.  And then you say, I'm being told no on many
8    things or gotten different answers, and I thought I was
9    the CEO of Renaissance Man.
10   A.  Yes, sir.
11   Q.  Who were you being told no by?
12   A.  John said that they said no so that's who I was
13   told no by.  John said they said, no, they're not going to
14   pay it.  And he was pretending that he never had anything
15   to do with it, but he was behind the whole thing.
16   Q.  So when you say you're being told no, are you
17   being told no by Mr. Staples?
18   A.  Yeah, he said that they said no, they're not
19   going to pay the -- whatever bill I paid.  They were not
20   going to pay it.
21   Q.  And what do you mean by "getting different
22   answers"?
23   A.  Well, John told me no, and Carol said that
24   Carmen said she's not going to pay it and stuff.  So John
25   and Carol are standing there saying, no, they're not going

43 (Pages 166 - 169)

Page 170

1 to pay the thing.
2    Q.  Well, did that upset you that you were being
3 told no with respect to Mr. Staples?
4    A.  No.
5    Q.  Why did you include the statement you thought
6 you were the CEO?
7    A.  Because I'm the one that's supposed to be
8 running Renaissance Man.  And I didn't know at the time,
9 he was going behind my back trying to create something.  I
10 didn't know that.  So I thought I was the CEO running the
11 company.
12    Q.  What was he trying to create about these
13 invoices at the time?
14    A.  Well, what he tried to create that it was being
15 paid for just H. Walker Enterprises, which it wasn't.
16 There was a bigger picture there, is what I said, is that
17 these -- everything that was done on these waffles was
18 done to get the waffles moving because of what I was
19 hearing on those Friday calls.
20    Q.  The Peachtree Packaging related specifically to
21 the Jet Food waffles; did it not?
22    A.  No, sir.  That's not true.
23    Q.  All right.  What you -- you could have also said
24 right here in this sentence that you're the big dog?
25    A.  No.

Page 171

1    Q.  And you don't like to be told no, right?
2    A.  No, sir.
3    Q.  Then you say you're going to be back in touch
4 with some dates.
5        Were those the dates to meet?
6    A.  Yes, it probably was.
7    Q.  All right.  And then Mr. Jackson responds and
8 provides dates when he can meet, correct?
9    A.  Yes, sir.
10    Q.  And that response was on November the 29th,
11 correct?
12    A.  (Witness reviews document.)
13        Oh, it was sent to me on November 29th, but
14 I don't -- here, he's just talking about a time.
15    Q.  You had responded to Mr. Jackson on the 27th,
16 that afternoon, and -- suggesting a meeting in Atlanta on
17 the 12th.
18    A.  Yes, sir.
19    Q.  And then you said, e-mail some questions or
20 thoughts Simmons had that we should be thinking about or
21 getting info to help the meeting to go smoother?
22    A.  Yes, sir.
23    Q.  You didn't mention anything in that about the
24 termination of Mr. Staples, did you?
25    A.  No, sir.

Page 172

1    Q.  And that's the same day you wrote a check to
2 Peachtree Packaging, correct?
3    A.  Yes, sir.  Maybe.  I don't know when I wrote the
4 check.
5    Q.  Did you write the check before you drafted this
6 e-mail and sent it to David Jackson?
7    A.  I have no idea.  One had nothing to do with the
8 other.
9    Q.  Mr. Jackson responds on the 29th, and his
10 topics -- he sets forth 1 through 8 here, correct?
11    A.  Yes, sir.
12    Q.  No mention of termination of John Staples,
13 correct?
14    A.  Yes, sir.
15    Q.  First topic he says is, Broker representation,
16 arm's length versus semi-related party.  What is the
17 oversight for related party?  What is the business reason
18 for not directly employing the staff?
19        Do you know what he was talking about?
20    A.  No, sir.
21    Q.  In response to that, did you discuss at any time
22 with Mr. Jackson that the documents creating DSM-3 allowed
23 for the involvement and ownership by family members?
24    A.  No, sir.
25    Q.  Inclusive of Ms. Blanchard?

Page 173

1    A.  No, sir.
2    Q.  He mentioned in Paragraph 3, Segregating
3 business expenses of H. Walker Foods versus Renaissance
4 Man, correct?
5    A.  Yes, sir.
6    Q.  And you understand when he used the word
7 "H. Walker Foods," he's not referring to a brand; he
8 should have said H. Walker Enterprises; is that your
9 understanding?
10    A.  Since you told me now, it is my understanding.
11 But I looked at it for what it's worth here.
12    Q.  And he's wanting a commitment to have a signed
13 agreement by the end of the first quarter 2018, correct?
14    A.  Yes.
15    Q.  He talks about wanting to discuss the duration
16 of a new agreement; is that correct?
17    A.  Yes.
18    Q.  The Sysco award that was received in August of
19 2016, do you know what time period it related to?
20    A.  I think it -- in 2016, it probably went until
21 2018, two years maybe, and they may have rolled it over.
22    Q.  Do you know if that award was the reason
23 Mr. Jackson was talking about having the new agreement and
24 what the duration of the agreement would be?
25    A.  No, I have no clue what he was talking about.

1    Q.  All right.  He also wanted to talk about
2  carrying of inventory, correct?
3    A.  Yes, sir.
4    Q.  And then the next -- is the next communication
5  you have with Mr. Jackson when you-all meet in Atlanta on
6  the 12th of December?
7    A.  Yes, sir.
8    Q.  All right.  Let me show you what is Exhibit 14.
9        (Exhibit 14 marked.)
10   Q.  (BY MR. SIMMS)  What is Exhibit 14?
11       MR. KING:  What's the number?
12       MR. SIMMS:  Whatever the number is at the
13  bottom.  I didn't look at it.
14       MR. KING:  RMFS 303.
15   A.  (Witness reviews document.)
16   Q.  (BY MR. SIMMS)  What is that exhibit?
17   A.  303?
18   Q.  Yes, sir.
19   A.  Carol writing Carmen.
20   Q.  Why -- what's the date of that document?
21   A.  October 31st.
22   Q.  Was this information ever sent to Carmen Seal?
23   A.  Yes, I think so.
24   Q.  Well, if you look at the e-mail, that attaches a
25  letter of clarification, and then it's got

1  Ren Man/U.S. Foods.  It appears that Ms. Walker sent it to
2  herself instead of to Ms. Seal.
3        Do you see that?
4    A.  (Witness reviews document.)
5    Q.  I'm sorry; she sends the -- she sends what she's
6  going to send to Ms. Carmen Seal to Ms. Blanchard for
7  Ms. Blanchard to check it out?
8    A.  Well, yes, she probably did.
9    Q.  Why is Carol needing Ms. Blanchard's involvement
10  in communicating to Carmen Seal?
11   A.  Because Ms. Blanchard was the one that wrote
12  whatever the information that Carol was sending.  Carol
13  had no idea what was sending.  So there was a mistake made
14  somewhere, so she wrote it, and Carol wanted Julie to see
15  what it was.
16        So she wrote to Julie to say, This letter
17  here, is this what you want me to say?
18   Q.  And this deals with Famous 34 display bins
19  related to some invoicing from Peachtree Packaging?
20   A.  Yeah, I guess, I assume.
21   Q.  And were those the display bins related to the
22  sale of waffle with Jet Foods?
23   A.  Some of them, yes.
24   Q.  Why was an explanation to Ms. Carmen Seal
25  needing to be had back in October of 2017?

1    A.  Because Carmen may have asked for information,
2  so Carol sent her one.  And Carol wouldn't know what was
3  going on because she don't -- she do paperwork.  She don't
4  do this, so she wanted an explanation.
5    Q.  Says here, Herschel has also had correspondence
6  with David explaining that H. Walker is a brand and
7  Renaissance Man is not a new company.
8    A.  Okay.
9    Q.  And that's the communication we went over a
10  minute ago, where you wrote an explanation to Mr. Jackson
11  related to the invoicing and the H. Walker brand, correct?
12   A.  Yes.
13   Q.  You know now that Mr. Jackson was not talking
14  about H. Walker branding; he was talking about H. Walker
15  Enterprises?
16   A.  I found that out when I was here.
17   Q.  Okay.  Then down at the bottom, Carol says to
18  Ms. Blanchard, Please let me know if this is what you are
19  wanting and if it doesn't show the forwarding.
20        Do you know what she's talking about on
21  forwarding?
22   A.  No, sir.
23   Q.  Whether or not it was forwarded to Carmen Seal
24  or not?
25   A.  No, sir, I don't.

1    Q.  And then at the top, it appears that
2  Carol Walker has sent this -- this document where she's
3  communicating to you and Julie on October 31st, to you and
4  Julie again on January the 3rd of this year?
5    A.  Yes, sir.
6    Q.  Had you-all made inquiry to Carol about this?
7    A.  What I did is -- that was for your discovery.
8  You wanted discovery, and I knew that was a letter where
9  she was clarifying this to Carmen.  So instead of me
10  having to go through my computer to find all that junk, I
11  asked Carol if she could find it quicker and send it to
12  me, so that's when she sent it to me, and we sent it to
13  you in the discovery.
14   Q.  Actually, let me show you got --
15       MR. SIMMS:  You got another clip?
16       THE REPORTER:  (Indicating.)
17   Q.  (BY MR. SIMMS)  What is Exhibit 15, Mr. Walker?
18       (Exhibit 15 marked.)
19       MR. KING:  What's the number?
20       MR. SIMMS:  Yeah, I'm sorry; what's the
21  number?
22   A.  RMFS 304.
23   Q.  (BY MR. SIMMS)  And 305?
24   A.  Yes, 304 and 305.
25       (Witness reviews document.)

Page 178

1    Q.  Looking at 305 --
2    A.  Yes, sir.
3    Q.  -- it appears that Ms. Walker -- by the way,
4  does Ms. Walker work for H. Walker Enterprises and
5  Renaissance Man?
6    A.  She just works for Renaissance Man, but she does
7  work -- a lot of different things.
8    Q.  Well, if you look at 303, which I think was
9  Exhibit --
10       MR. KING:  14.
11   Q.  (BY MR. SIMMS)  -- Number 14?
12   A.  Okay.
13   Q.  Under Carol's signature line, she says she's the
14  Executive Assistant, Renaissance Man Food Services,
15  LLC/H. Walker Enterprises, right?
16   A.  Yeah.  That's cool that she write that.  She's
17  been with -- she's the longest employee that's been at
18  Renaissance Man.
19   Q.  Okay.  Let's look at 305.
20   A.  (Witness complies.)
21   Q.  It looks like Ms. Walker sends an e-mail to
22  Carmen Seal at Simmons requesting some money.
23   A.  Okay.
24   Q.  You agree with me?
25   A.  Yes, sir.

Page 179

1    Q.  $12,138.76, correct?
2    A.  Yes, sir.
3    Q.  And then she sends proof of the invoices and a
4  copy of the check from Herschel paying Peachtree
5  Packaging.
6    A.  Yes, sir.  I don't see a copy of the check.
7    Q.  Says, This $7,395 is to reimburse you for paying
8  Peachtree Packaging.
9    A.  Yes, sir.
10   Q.  And, again, did -- the Peachtree Packaging deal
11  with the Jet Food waffles?
12   A.  Part of it.
13   Q.  Not all of it?
14   A.  No, because some of -- whatever they were doing
15  went to other people, not just to Jet.  Jet only did
16  whatever part.
17   Q.  Did the check to Peachtree Packaging actually go
18  to Peachtree Packaging?
19   A.  As far as I know.  I hope it did, because they
20  haven't sent another invoice.
21   Q.  Well, do you know if Mr. Staples continued to
22  get invoices from Peachtree Packaging in the month of
23  December of 2017?
24   A.  I have no clue.
25   Q.  You don't know?

Page 180

1    A.  No, sir.
2    Q.  Would that be --
3       MR. KING:  You're talking over each other
4  again; I'm sorry.
5       THE WITNESS:  Oh, sorry.
6    Q.  (BY MR. SIMMS)  Would that be an indication
7  that perhaps the invoices had not been paid?
8    A.  No, because I assumed they were paid.
9    Q.  Then if you go to 304.
10   A.  (Witness complies.)
11   Q.  It looks like Ms. Seal responds to Ms. Walker.
12   A.  Okay.
13   Q.  Do you agree with me?
14   A.  Yes, sir.
15   Q.  And she says, Carol, I sent money on November
16  the 8th for Peachtree Packaging invoices, as Herschel said
17  he would pay us back for them.
18       I haven't seen communication indicating,
19  any time prior to November 8th, that you indicated to
20  Simmons that you were going to be paying for the Peachtree
21  Packaging invoices.
22   A.  I don't understand what you mean.
23   Q.  Well, do you know what Ms. Seal is referring to
24  as to when you made the agreement that you were going to
25  be paying for that?

Page 181

1    A.  No.
2    Q.  All right.  And Ms. Seal asked, did Carol just
3  hold the money and send Herschel's check to Peachtree?
4  And if that's the case, and Herschel's check has been sent
5  to Peachtree, Ms. Seal said she would delete the money
6  that she says you owe to Ren Man, and that Carol would not
7  need to send another ACH yet until we use up the credit.
8       Did I read that correctly?
9    A.  Yes, sir.
10   Q.  So would you agree with me that Ms. Seal is
11  indicating to Ms. Walker that the monies -- that the
12  Peachtree Packaging stuff had already been handled back on
13  November the 8th?
14   A.  No, I wouldn't agree with that because, like I
15  say, I don't know what they're talking about here.  I see
16  all this junk going back and forth, but I have no clue
17  what they're talking about.
18   Q.  Okay.
19   A.  And I can check my bank account sometime to see
20  if they cashed the check.  I don't know.
21   Q.  Looking at your -- do you have a copy of your
22  check?
23   A.  No, you didn't give me one.
24   Q.  Okay.
25       (Exhibit 16 marked.)

46 (Pages 178 - 181)

1    Q.   (BY MR. SIMMS)   RMFS 311, is that a copy of
2  your check?
3    A.   Yes, sir, it appears it is.
4    Q.   In your check, you reference some invoices you
5  were paying in the Memo section of the check, correct?
6    A.   Yes, that looks like it.
7    Q.   And to me, it's more than one invoice, correct?
8    A.   Maybe.
9    Q.   Was one from Peachtree Packaging dealing with
10  displays, and another related to film?
11    A.   Could have been.  Like I said, I have no clue
12  what all of this did.
13    Q.   And do you know if all of what you were paying
14  related to the Jet Food waffles?
15    A.   Part of it.
16       (Exhibit 17 marked.)
17    Q.   (BY MR. SIMMS)   Exhibit 17 is going to be
18  RMFS 312.
19    A.   (Witness reviews document.)
20    Q.   Have you seen that before?
21    A.   Yes, I think I have seen this.
22    Q.   Okay.  This is an e-mail to Carol from
23  Ms. Blanchard, correct?
24    A.   Yes.
25    Q.   And Ms. Blanchard sends this from her mac.com

1  e-mail address, but under her signature line, she's got
2  "H. Walker Enterprises"; is that correct?
3    A.   Yes, sir.
4    Q.   And she is saying to Carol, Here's some details
5  for Carmen to clarify any confusion caused by the error
6  made in the PO to Peachtree Packaging for the Famous 34
7  waffle display bins, correct?
8    A.   Okay, yes, sir.
9    Q.   And she includes various points of sale related
10  to waffles, correct?
11    A.   Yes, sir.
12    Q.   And then she says, Renaissance Man has been
13  selling food service waffles, bulk and presliced.
14       The waffles that were going to be to
15  Jet Foods, those were not in bulk, were they?
16    A.   No, sir.  I think they were just -- wait.
17       Now, Jet has a food service arm, and
18  which -- out of South Carolina may deliver.  I'm not sure.
19  I know they were doing a sandwich.  So I don't know -- I
20  know they did the singles.  I don't know about the bulk,
21  but they could have.
22    Q.   Well, bulk is where the waffles are not
23  individually wrapped.  They're put into a plastic piece of
24  material with numerous waffles in it and sealed and then
25  dropped into a cardboard box, correct?

1    A.   Yes, and those are sliced.
2    Q.   And the waffles that were being sold to
3  Jet Foods were being individually wrapped for individual
4  sale, correct?
5    A.   True and false.  Like I said, they -- Jet also
6  owned a couple of like little restaurant things.  And I
7  know they made a sandwich for a little while.  So now, I
8  know it was being sold from the house out of South
9  Carolina, so I don't know whether they did the slice there
10  or not.  Now, that, I don't know.  But I know the
11  singles -- they did do a single.  I do know that.
12    Q.   Let me ask you this, Mr. Walker:  The film that
13  was ordered and dealt with the wrapping of the individual
14  waffles to be sold at Jet Foods, it was film related to
15  Famous 34, correct?
16    A.   Yes, sir.
17    Q.   Do you know if that was digital film or plate
18  film?
19    A.   I have no clue.  I wouldn't know the difference.
20    Q.   If it was either one, if it was plate, the plate
21  would have to be sent to HartyBake; or if it was digital,
22  the digital had to be sent to HartyBake?
23    A.   You're talking French to me.
24    Q.   Talking French to you?
25    A.   Yeah, I have no clue where they're sending it

1  to.
2    Q.   Well, if HartyBake is making the waffle, and
3  they're going to wrap them individually coming down the
4  production line, they need the plates or the film to make
5  the packaging that wraps it as it's coming down the line,
6  right?
7    A.   Yes, sir.
8    Q.   Do you know what entity prepared that film?
9    A.   No, sir.
10    Q.   She goes on to say that, In addition, we have
11  now launched a Famous 34 retail waffle that will be
12  distributed by U.S. Foods and, hopefully, by Sysco by year
13  end.
14    A.   Uh-huh.
15    Q.   These are marketed under the H. Walker Foods
16  brand like the Simmons chicken products, the Whole Hog
17  Sausage from Swaggerty, and the poultry items done by
18  Tip Top Poultry, all of which Simmons invoice.
19       Did I read that correctly?
20    A.   Yes, sir.  Yes, sir.
21    Q.   Says, The Famous 34 waffle is on the last page
22  on the attached set of H. Walker POS sheets.  Our first
23  big sale with the 34 waffles will go through U.S. Foods,
24  which is now distributing to C-Stores, as well as various
25  Grab-n-Go concepts, one being at the University of

1 Georgia.
2        The Famous 34 bins -- we're talking about
3 bins now; we're not talking about film, correct?
4     A.   Right.
5     Q.   That was ordered from Peachtree Packaging.
6        And my question to you is:  Does this
7 indicate that there's a separate film related to the
8 Jet Food waffles that were created from an entity other
9 than Peachtree Packaging?
10    A.   That's what I'm saying.  I have no clue.
11 Peachtree Packaging seems to be doing both of them.
12    Q.   The Famous 34 bins we ordered from Peachtree
13 Packaging are POS floor displays to hold the waffles and
14 generate increased sales at the C-Stores?
15        That's not true, is it, Mr. Walker?
16    A.   No, that's totally true.
17    Q.   What is true is that the Peachtree Packaging
18 invoices dealt with the packaging related to the Jet Food
19 waffle sales --
20    A.   Not true.
21    Q.   -- that H. Walker Enterprises intended to sell,
22 receive the revenue, and not share with Simmons?
23    A.   Totally not true.
24    Q.   Okay.
25    A.   And you can go to the University of Georgia now,

1 and you will see them; or you can go to Golden Pantry now
2 and you could see it as well.
3     Q.   Was the invoicing related to the Peachtree
4 Packaging concerning to you and Ms. Blanchard that it was
5 being sent to Simmons to be paid the cost?
6     A.   For $7,000?
7     Q.   Yes, sir.
8     A.   No.
9     Q.   It's not the $7,000, is it; it's the effort to
10 grow H. Walker Enterprises and not share in the profits
11 with Simmons and fund the expenses of that effort through
12 the Simmons/H. Walker/Renaissance Man relationship.
13        That's the issue, isn't it?
14    A.   No, sir.  I love Simmons.  They've made me a
15 great company.  And like I said earlier, I love the
16 relationship Simmons and I have had.  I don't care about
17 sharing with them.  They have -- we've built a great
18 company together.
19    Q.   Ms. Blanchard goes on to say that, In order to
20 meet production deadlines, I personally expedited and
21 created the PO to Peachtree Packaging and made the mistake
22 of using the H. Walker Foods brand name when, in fact, it
23 should have been issued from Renaissance Man; is that
24 correct?
25    A.   Yes, sir.

1     Q.   What Ms. Blanchard had done was she had changed
2 the PO to Peachtree Packaging related to the Jet Food
3 waffles, correct?
4     A.   Say that -- she had changed the PO?
5     Q.   Related to the Jet Food waffles.
6        When you and her were traveling to Hawaii,
7 didn't she change it then?  Isn't that the PO she changed?
8     A.   When she was in Hawaii, I thought she had
9 changed the PO.  It would have to be John and Blaine doing
10 that because I thought she didn't mess with anything with
11 PO over there.  But that, I couldn't answer to.  I have no
12 idea.  I don't know the mistake she made, but I --
13    Q.   The PO that Ms. Blanchard had issued out of the
14 Savannah office, it didn't deal with H. Walker Foods
15 brand; it dealt with H. Walker Enterprises as the entity
16 doing it, correct?
17    A.   No, I don't think it did.
18    Q.   Well, let me show you this document here.
19    A.   Okay.
20        (Exhibit 18 marked.)
21    Q.   (BY MR. SIMMS)  We'll make it Exhibit 18.
22        MR. KING:  What's the document number?
23        MR. SIMMS:  RMFS 325.
24    A.   Okay.
25    Q.   (BY MR. SIMMS)  Is that point of sale material

1 for the Famous 34 waffle?
2     A.   Yes.
3     Q.   Famous 34 waffle is the one that's going to be
4 sold to Jet Foods, correct?
5     A.   Yes.
6     Q.   It indicates that with respect to that waffle,
7 to contact Ms. Blanchard, and contact her at H. Walker
8 Enterprises, correct?
9     A.   Well, see, that's what's weird because -- and I
10 remember John wanted to change -- and I'm not sure if this
11 is the document, but change it to H. Walker Enterprises.
12 So I'm not sure if this is the sheet or that there was
13 another sheet.  This could be it.  Like I said, I don't
14 know, but I know he wanted to change it to H. Walker
15 Enterprises, and that's what he talked about, I think, in
16 the first meeting, during his deposition, how he was
17 manufacturing some of this stuff.
18    Q.   He's not manufacturing anything.
19    A.   Oh, yes, he was.
20    Q.   You and Ms. Blanchard are the manufacturers.
21    A.   Okay.
22    Q.   And you're trying to cover up what you were
23 trying to do through these explanations to Simmons.
24        And isn't it correct that this document
25 here was an enclosure that Ms. Blanchard sent to Carol for

1 Carol to use to try to explain to Carmen Seal at Simmons
2 what was taking place with respect to the Jet Food
3 waffles, and trying to make it appear that it was related
4 to the sale of waffles to U.S. Foods?
5    A.  No, because if you remember, we talked about him
6 changing a lot of stuff to H. Walker Enterprises.  And we
7 have e-mails of him wanting to change stuff to H. Walker
8 Enterprises, where he's telling his daughter to change
9 them, and also asked me about someone working for me for
10 H. Walker Enterprises.  So these are his manufacturing,
11 not H. Walker Enterprises.
12    Q.  Would you agree with me that the document I just
13 gave you, Exhibit 18, deals with Famous 34 waffles?
14    A.  Right, yes.
15    Q.  And it indicates to contact Ms. Blanchard with
16 H. Walker Enterprises?
17    A.  I would agree with that's what this says.  But
18 I'm agreeing that I don't agree, that I don't know whether
19 it's real or not.  And the reason why is because I've seen
20 other documents manufactured by him that's not real, by
21 John Staples.
22    Q.  Well, sir --
23    A.  So I'm not sure.
24    Q.  Okay.  This document did not come from
25 Mr. Staples.  This was a document that Ms. Blanchard

1 provided to Carol Walker, who acts and works for H. Walker
2 Enterprises or Renaissance Man, in Savannah, Georgia,
3 correct?  Okay?
4    A.  Okay, okay.  Yes, sir.
5    Q.  So this is something that Ms. Blanchard is
6 providing to Ms. Walker, and Mr. Staples is not even
7 involved in the supplying of the document to Ms. Walker,
8 is he?
9    A.  No, I'm saying that's fine.  But she worked for
10 a lot of different things, so H. Walker -- this is the
11 e-mail address and her phone number, so that's why I'm
12 confused at what you're getting at.
13        This doesn't say anything, but it says her
14 e-mail address and her phone number.
15    Q.  And then it says that, We can either reissue the
16 PO from Ren Man --
17        MR. KING:  I'm sorry; what are we looking
18 at?
19        MR. SIMMS:  Back on Document 312.
20    Q.  (BY MR. SIMMS)  Which Document 18 was an
21 enclosure.
22        Says, We can either reissue the PO from Ren
23 Man, or Herschel can pay Peachtree Packaging direct and
24 submit the invoice for reimbursement.
25        Why is the PO needing to be reissued from

1 Ren Man?
2    A.  Because it wasn't done right.
3    Q.  And what was wrong with it?
4    A.  I have no clue.  Like I said, all I know is she
5 said, it wasn't done right, it wasn't done right, and it
6 redone -- well, I reckon it was redone.  If you have the
7 PO, you can show it to me.  That would be nice.
8    Q.  Says, We want to get this invoice paid as it's
9 now past due.
10    A.  Yes.
11    Q.  Was Ms. Staples continuing to receive invoices
12 from Peachtree Packaging and continuing to send them to
13 you, Mr. Eisenman, or Ms. Blanchard, telling you-all to
14 pay them since this related to the Jet Food Famous 34
15 waffle?
16    A.  Mr. Staples never sent me an invoice telling me
17 to pay anything.  That's what's so funny.  He has never
18 sent me an invoice telling me to pay it.
19    Q.  Well, where did Ms. Blanchard receive the
20 invoice that she's talking to Carol about in Exhibit 312?
21    A.  She may have got it from Carol, calling and
22 sending it to Carol, but John has never sent an invoice to
23 me, to Julie, to Ron about, Pay this invoice.
24    Q.  How would Carol be receiving invoices from
25 Peachtree Packaging related to displays that Peachtree

1 Packaging prepared for the waffles?
2    A.  As I said, John was getting the invoices.  He
3 may have been sending them.  But I never received invoice.
4 Julie never received invoice.  Ron never received invoice.
5 Carol had no -- Carmen got the invoice.  I never seen an
6 invoice, and I got the thing to pay it, and I paid it
7 because it said it was going to be past due.
8    Q.  You agree with me that these communications from
9 Ms. Blanchard, inclusive of your communication to
10 David Jackson, all pertain back to Mr. Jackson raising the
11 issue of invoicing related to H. Walker Enterprises,
12 correct --
13    A.  As of what I --
14    Q.  -- in his October 25th e-mail?
15        MR. KING:  Why are you talking over him?
16    A.  No, I'm saying as I knew when he sent it there,
17 or as I know today?
18    Q.  (BY MR. SIMMS)  Back on October the 25th -- I
19 thought we went through this a few moments ago --
20    A.  No, no, no.  What I'm saying is, when he sent
21 that to me, I had no clue what Dave Jackson was talking
22 about.
23    Q.  If you had no clue what he was talking about,
24 how can you go about penning and drafting to him an
25 explanation the next day?

1    A.  Because he's the one that told me that they were
2  upset about the waffles.  And he had told me that he never
3  said not to pay them.  John was the one that told me this.
4  I didn't know anything about waffles.  I didn't even know
5  until this (indicating), until I've seen it now.  As I
6  said, I've seen this before.  I don't do that.
7    Q.  You and Ms. Blanchard were responding to the
8  invoices related to waffles back in October of 2017;
9  that's before this lawsuit happened, right?
10    A.  John was going and manufacturing -- remember, he
11  went in on a call.  Remember he went in on a call, the
12  conference call that you guys discussed with David, the
13  conference call, to tell him about something with the
14  waffles.  You forgot about that, about the waffle, the
15  conference call, that we were doing something wrong.  So
16  that's the manufacturing of the problems right there.
17    Q.  That upset you; you thought Mr. Staples was
18  manufacturing problems back in October of 2017?
19    A.  I didn't know it.
20    Q.  Well, again, you wrote an explanation to
21  Mr. Jackson the day after you received his communication
22  raising a concern related to invoicing.  I know he used
23  the word "H. Walker Foods," and you know he meant
24  H. Walker Enterprises?
25    A.  No, sir, I don't.  I thought he was -- that's

1  the reason I said H. Walker is a brand.  If he had said
2  H. Walker Enterprises, I probably would have answered him
3  to that, but he said H. Walker Foods.  That's why I
4  responded that's a brand.
5    Q.  And Ms. Blanchard, on October 31st, which is
6  within five or six days of you sending the response to
7  Mr. Jackson to his October 25th e-mail, where he raises
8  issues concerning invoicing, providing Carol an
9  explanation to provide to Carmen Seal.
10    A.  Okay.
11    Q.  Correct?
12    A.  Okay.  What are you getting at?
13    Q.  Now, let's go back.
14        Carmen Seal raised issues related to those
15  invoices herself internally as Simmons, correct?
16    A.  That's what I found out.
17    Q.  And she contacted Mr. Staples and asked him
18  about it?
19    A.  Yes.
20    Q.  And then when you found out that someone was
21  questioning some invoicing and some expenses, you
22  communicated to Mr. Staples and said, Someone is telling
23  Simmons not to pay my bills?
24    A.  I didn't say someone's telling them not to pay
25  our invoice.  I never said pay my bills, because I only

1  submitted one expense in the whole relationship I have
2  with Simmons so -- and that's $7,000.
3    Q.  Yeah.  I want to talk about what's going on in
4  October of 2017.
5    A.  Well, that's what I was talking about because I
6  said, one bill in -- how many years -- nine years of
7  $7,000, which didn't matter, and I didn't never thought
8  about that.
9    Q.  And Mr. Staples told you he was the someone who
10  had indicated to Simmons not to pay it, correct?
11    A.  Mr. Staples never told me that.  Mr. Staples
12  said, Oh, I don't know who's doing it.  I'll find out.
13  That's the only thing he's ever said.  He never told me he
14  was the one that said not to pay it.  Not one time.
15    Q.  If you had not had that discussion with
16  Mr. Staples, Mr. Walker -- listen to me --
17    A.  Okay.
18    Q.  -- how could you tell David Jackson in an e-mail
19  that someone is saying no to you, and you're the CEO of
20  the company?
21    A.  John had said they said, no, they're not going
22  to pay it.  And Carol said that they wasn't going to pay
23  it.  So that's how I said they're saying no.  But John
24  said he wasn't the one that told them not to pay it.
25    Q.  I thought you told me that he indicated to you

1  he was the one who told them not to pay it?
2    A.  No.  Go back and read it.  I said, John wimped
3  out again and said he was -- he said, Oh, no, I never said
4  anything.
5        MR. KING:  When you're done with this
6  line --
7        MR. SIMMS:  Want to take a break?
8        MR. KING:  I do when you're done with this
9  line.
10        MR. SIMMS:  Let me have a moment.  I may be
11  done with this line.
12        I'm done with this line.
13        (Recess in the proceedings from 2:47 to
14  2:59 p.m.)
15    Q.  (BY MR. SIMMS)  Mr. Walker, do you know who
16  SupplyOne is?
17    A.  SupplyOne?
18    Q.  SupplyOne.
19    A.  No, sir.
20    Q.  Do you know if they created the film and the
21  plate for film for the Famous 34 waffles to be sold to
22  Jet Foods?
23    A.  No, sir.
24    Q.  All right.  Did Simmons ever agree to pay the
25  Peachtree Packaging invoices?

Freedom Court Reporting
877-373-3660          A Veritext Company          205-397-2397

1    A.  Well, I have no idea.  I assume they did.

2    Q.  If they did, do you know why Blaine Walker would

3  correct himself in January of 2018 in communications with

4  HartyBake to tell them that they should maintain two

5  separate POs related to waffles they were making, one for

6  frozen bulk sales, versus retail waffles?

7    A.  I have no idea.

8    Q.  Any isn't it the reason he corrected himself is

9  because H. Walker Enterprises is selling waffles through

10  it that it doesn't intend to share in a profit with

11  Simmons?

12    A.  No, sir.

13    Q.  Well, why would Mr. Walker, Blaine Walker, tell

14  HartyBake to maintain two separate POs for the production

15  of waffles?

16    A.  I have no clue.

17    Q.  On December the 12th, 2017, there was a meeting

18  between you, David Jackson, Mr. Eisenman, and I think

19  Ms. Blanchard attended too, correct?

20    A.  Yes, sir.

21    Q.  Was there any other persons in the room besides

22  the ones I just mentioned?

23    A.  No, sir.

24    Q.  And Mr. Staples' termination was discussed,

25  correct?

1    A.  Yes, sir.

2    Q.  And why did you want to terminate Mr. Staples?

3    A.  I lost all type of trust in John.

4    Q.  What had he been doing that led to lack of

5  trust?

6    A.  What he'd been doing is he put on like, what,

7  three or four different brokers.  He wasn't doing what I

8  asked him to do.  We called a meeting; he don't come -- he

9  don't bring what I ask to come to the meeting when he come

10  to the meeting.

11        And I think one of the things that was

12  really, really terrible, one of the biggest meetings down

13  at Sysco that started at 1:00 in afternoon, John flew in

14  the night before, and he didn't go to lunch with us or

15  anything.  And he shows up to the minute about 40 minutes

16  late.  When he show up to the meeting, he's smelling like

17  perfume, and then the next thing that happened is John

18  said, Oh, when is the meeting over?  I got to go.  And I

19  knew then that something was going on with him.

20    Q.  By the way, the e-mails you talked about having

21  from Mike Rogers, was that from Tamajon Bivins?

22    A.  Yes, sir.

23    Q.  And did she ever work for Renaissance Man?

24    A.  No, sir.  She was a broker for Renaissance Man.

25    Q.  Is her e-mail address Tama, T-A-M-A-J-O-N-B

1  @yahoo.com?

2    A.  I have no clue what you're talking about.

3    Q.  Did you ever have a relationship with her?

4    A.  No, sir.

5    Q.  You deny that?

6    A.  I know who she is.

7    Q.  You deny having a relationship with Tamajon?

8    A.  I never had a relationship with Tamajon,

9  whatever her name, never have.

10    Q.  But you say she -- the e-mails you have

11  concerning Mr. Mike Rogers is from Tamajon?

12    A.  Yes, sir, and I have them.

13    Q.  And are those e-mails and -- that you have, have

14  an e-mail address for Tamajon as T-A-M-A-J-O-N-B

15  @yahoo.com?

16    A.  I have no clue.

17    Q.  So you terminated Mr. Staples because you think

18  he was with some other woman --

19    A.  No.

20    Q.  -- at the Sysco meeting?

21    A.  No, sir, that's not it.  There was a lot of

22  things he was terminated for.

23    Q.  All right.  And then Mr. Eisenman puts together

24  a memo that is sent by him to you and Mr. Jackson,

25  correct?

1    A.  Yes, sir.

2    Q.  Okay.  And is there anything in that memorandum

3  that Mr. Eisenman prepared that was not agreed upon during

4  the December 12th, 2017, meeting in Atlanta?

5    A.  I never looked at the memo until I saw it here

6  because I never -- memo didn't mean anything to me, but I

7  knew what I was going to do.

8    Q.  What were you going to do?

9    A.  Terminate John.

10    Q.  Do you have an employment agreement with

11  Mr. Staples?

12    A.  No, sir.  And I hate to say, I think that's the

13  wrong word to say "terminate."  I didn't terminate him.  I

14  offered him a consultant job with Renaissance Man because,

15  you know, since I was able to run Renaissance Man, I

16  didn't say who worked and did not work for me.

17    Q.  Did you need to have the discussion of

18  Mr. Staples' termination with a representative from

19  Simmons to agree on what you were doing?

20    A.  Not at all.

21    Q.  Not at all?

22    A.  Not at all.

23    Q.  Well, if they employed him, why wouldn't you

24  need their involvement?

25    A.  He was employed by Simmons only to be loaned out

1 to Renaissance Man. So I had a right to tell what I want
2 to do with my company, when if John was not doing what I
3 thought was right for Renaissance Man, I had the right to
4 get rid of him.
5          (Exhibit 19 marked.)
6          MR. KING: That's Exhibit Number what --
7          MR. SIMMS: 19; excuse me. RMFS 106.
8     Q. (BY MR. SIMMS) Again, was there -- well, I
9 think you answered my question.
10         You did not look at the memorandum you
11 received from Mr. Eisenman, which is Exhibit 19, because
12 you said you knew what you were going to do anyway; is
13 that right?
14    A. Yes, sir.
15    Q. Pardon?
16    A. Yes, sir.
17    Q. Okay. Reading the e-mail from Mr. Eisenman to
18 you and Mr. Jackson, Mr. Eisenman says to, Keep the
19 contents confidential so it does not get back to
20 Mr. Staples.
21         Is that what he says?
22    A. Yes, sir, that's what it says.
23    Q. Why was it important that the details of the
24 content of the memo not get back to Mr. Staples?
25    A. I reckon he wanted to wait until I talked to

1 John. I reckon. I have no clue what he meant by that.
2    Q. Let's talk about that.
3         When you talked to John, that was December
4 the 27th, 2017?
5    A. Yes, sir.
6    Q. What did you communicate to John that got him to
7 the Atlanta offices of Mr. Eisenman on December 27th,
8 2017?
9    A. That we wanted to talk to restructuring brokers.
10   Q. And did Mr. Jackson think there was going to be
11 a meeting with -- is it FCS or FCE?
12   A. FSE, I think.
13   Q. Did he think there was going to be a meeting?
14   A. Yes, sir.
15   Q. Did -- did either you or Mr. Eisenman inform
16 Mr. Staples that the meeting on the 27th was being
17 recorded?
18   A. No, sir.
19   Q. Were you aware that it was being recorded before
20 it took place, the recording?
21   A. I was the one that recorded it.
22   Q. How did you record it?
23   A. On my phone.
24   Q. So that recording comes from your phone and not
25 some device in -- the law firm owned?

1    A. Yes, sir.
2    Q. Why did you want to record it?
3    A. I didn't think about it. Just something to
4 record because John -- and you've seen it, he has a
5 tendency with the truth sometimes.
6    Q. Oh, I have --
7    A. No, I said John has the tendency with the truth.
8    Q. Well, we're trying to get to the truth.
9    A. Yes.
10   Q. And you are the one that recorded the meeting
11 with Mr. Staples?
12   A. Yes, sir.
13   Q. Did you tell him in that meeting that his
14 daughter was going to be terminated from her employment
15 with Simmons?
16   A. No. John asked me to hire his daughter at the
17 end. He said, Will you hire my daughter? And I said,
18 Yes, I'll hire your daughter. But, John, I won't be over
19 her. As long as she do the job, Blair will have a job.
20   Q. All right. Did you instruct Mr. Eisenman to
21 advise Mr. Jackson to keep the contents of the memorandum
22 confidential so it wouldn't get back to Mr. Staples?
23   A. Like I said, I never had -- this thing came to
24 me. I never looked at it. My mind was made up what I
25 wanted to do way before the 27th, by the 12th.

1    Q. When did you make up your mind what you were
2 going to do?
3    A. The meeting we had in November.
4    Q. The clear-the-air meeting?
5    A. Yes, sir.
6    Q. Did you express to Mr. Staples or Mrs. Staples
7 what you were going to do during that meeting?
8    A. No, sir.
9    Q. Did you send out a memo after that meeting to
10 all the people who worked for DSM, inclusive of
11 Mr. Staples and Renaissance Man, about what your plans
12 were about going forward in 2018?
13   A. I may have. I don't know if you got it. I may
14 have.
15   Q. If you had made up your mind that you were going
16 to terminate Mr. Staples before then, why send out that
17 memo?
18   A. Why not send it out? I'm terminating -- I hate
19 to say "terminate." I was getting rid of John. Everybody
20 else was staying.
21   Q. Was Mrs. Staples going to keep her ownership
22 interest in DSM-3?
23   A. No, sir. John knew Kim was leaving way before
24 that because that's the reason he kept trying to get all
25 these other brokers to buy his DSM-1, -2, and -3. He knew

1 that before. We talked about that. And he know we talked
2 about that.
3          I said, The job is not getting done. Your
4 family is not doing the work. I've said, I've terminated
5 my family when they were not working. And he made that
6 statement that, Oh, I fired my family. Yes, I did make
7 that statement. I have fired my family when they were not
8 working.
9          So that's the reason John was talking to
10 Radiant, talking to Core, talking to this and talking to
11 them, and all of these different brokers, and talking to
12 Robert to talk to me and all that.
13     Q.  Well, the reason he was talking to those
14 entities is because you were pressing him to find new
15 suppliers or change the makeup of Renaissance Man, because
16 Renaissance Man in 2015 learned that Sysco and other
17 potential food purchasers did not view Renaissance Man as
18 a supplier any longer; only viewed them as a broker.
19          Isn't that correct?
20     A.  That is totally wrong and that's a bold-face lie
21 from John. I won an award, just won an award as a
22 supplier from Sysco, and even on your own document, it
23 showed me -- 20 down, as it says, supplier is Renaissance
24 Man. So that's a lie. That is totally not the truth.
25     Q.  But you admit that you learned that Simmons

1 and/or Tip Top made a bid direct to Sysco without
2 Renaissance Man in 2015, correct?
3     A.  I learned -- John told me there was a bid.
4 Tip Top was bidding before alone. I learned that Simmons
5 wanted to bid on some products without Renaissance Man.
6     Q.  What product was that?
7     A.  I have no idea, but that was --
8     Q.  Was it part of the process?
9          MR. KING:  Can you please stop talking over
10 him when he's answering?
11     A.  You know, to be honest, I don't know. It might
12 have been as high as breasts. I'm not sure what product
13 it was.
14     Q.  (BY MR. SIMMS)  Did Sysco initiate the meeting
15 with Simmons about bidding direct?
16     A.  I have no clue.
17     Q.  Mr. Walker, why were there two plans, Plan A and
18 Plan B, concerning termination of Mr. Staples?
19     A.  I have no clue. That may have been Ron just
20 thought of a Plan A, Plan B. Like I said, I had no plan
21 but Herschel Walker, Plan A.
22          MR. SIMMS:  What document is that again?
23 It's probably part of the Renaissance Man.
24          MR. KING:  It's 106.
25          MR. SIMMS:  Number 106.

1     A.  Do you need it?
2     Q.  (BY MR. SIMMS)  No, you keep it. We're coming
3 back to it.
4          Was the agreement that was made between
5 you, Mr. Eisenman, Mr. Jackson, on December 12th, 2017,
6 the Plan A, and the difference between Plan B was whether
7 or not Mr. Staples cooperated?
8     A.  No. It had nothing to do with that, I don't
9 think, because my thing was, at first, I didn't want to
10 give Mr. Staples anything because of him being -- lying,
11 because of him not doing what he's supposed to do, and him
12 doing all the other things with expenses and his home
13 rent -- well, anyway...
14          So I didn't want to give him anything. I
15 got talked into offering what they call a "severance" and
16 stuff. I said, Okay, that's fine. And at the meeting,
17 John negotiated his package, and I negotiated with him. I
18 said, Okay. And he said, All in. Even at the end, he
19 said, Let's shake hands and leave here friends. He even
20 asked for a couple autographs.
21          And so I didn't have no Plan A or Plan B
22 and his cooperation. Because if he didn't want the first
23 plan, he was going to be fired and get nothing. So that
24 was the way I looked at it. And, you know, for him to
25 settle for the 255, he had to do something.

1     Q.  Who talked you into this so-called severance?
2     A.  Ron Eisenman and David Jackson said, No, you
3 need to offer him severance.
4     Q.  You didn't offer him severance, did you? You
5 offered him a job to be a consultant for a job you didn't
6 even know what it would be?
7     A.  You're 100 percent correct because I would have
8 never asked him to do anything. So he was going to get
9 $255,000 severance would have been even less because
10 severance is even less. But I offered him what he
11 negotiated. I didn't even negotiate that. He negotiated
12 that.
13     Q.  During the meeting on the 12th, did it come up
14 and discuss the aggressive discipline policy that Simmons
15 had with respect to Mr. Staples?
16     A.  No, sir.
17     Q.  Did it come up and get discussed that
18 Mr. Staples was not an at-will employee of Simmons?
19     A.  No, sir.
20     Q.  Was it discussed what the operating agreement of
21 DSM-3 required to pay Mrs. Staples for her ownership
22 interest in DSM-3?
23     A.  No, sir.
24     Q.  It was discussed that Mr. Staples had a
25 Consulting Agreement with DSM-3, correct?

Page 210

1    A.  I don't think that was -- I don't think that was
2 talked about either.  I don't think we talked about no
3 consulting anything.
4    Q.  Well, look at the memorandum of Mr. --
5    A.  Eisenman.
6    Q.  -- Eisenman, yes.
7        What document number was that again?
8        MR. KING:  106.
9    Q.  (BY MR. SIMMS)  Is the actual proposal
10 attached?  Is that Documents 106 through 108?
11    A.  (Witness reviews document.)
12        Yes, sir.
13    Q.  All right.  It says the proposals do not only
14 concern John, they concern Kim and Blair Staples too; is
15 that correct?
16    A.  Yes, sir.
17    Q.  So the entire family was going to be wiped out?
18        MR. KING:  Objection of characterization.
19 That's argumentative.
20    A.  No, because John asked me to hire Blair, so
21 Blair would have had a job, as far as I know.  Like I
22 said, this here (indicating), I never paid any attention
23 to, because I didn't -- this didn't have no relevance to
24 who -- or what I was doing.
25    Q.  (BY MR. SIMMS)  Did you and Mr. Eisenman

Page 211

1 discuss if word of this -- these proposals got back to
2 John what might happen?
3    A.  No, sir.
4    Q.  Okay.  Let's go over the proposal.  I think it
5 starts on page 107.
6    A.  Yes, sir.
7    Q.  And it starts out that it relates to
8 John Staples, Kim Staples, Blair Staples, and DSM Sales
9 and Marketing, correct?
10    A.  Where are you looking at?
11    Q.  I'm looking at Document 107, at the top in the
12 Reference.
13    A.  All right.
14    Q.  And Mr. Eisenman indicates, this is what was
15 discussed during the David Jackson meeting in Atlanta on
16 December the 12th, 2017, correct?
17    A.  No.  He doesn't say that's what was discussed.
18    Q.  Look right under the beginning, and it says,
19 Proposal A and B were discussed with David Jackson at the
20 meeting in Atlanta on December 12th, 2017, correct?
21    A.  Right.
22    Q.  Did you feel like that these proposals needed to
23 be discussed with Mr. Jackson?
24    A.  No.
25    Q.  You felt like you needed to collaborate or

Page 212

1 discuss it with Simmons?
2    A.  No.
3    Q.  Let's look at Proposal A concerning
4 John Staples.
5    A.  (Witness complies.)
6        Okay.
7    Q.  Under that proposal, John is to terminate his
8 employment as general manager at Renaissance Man?
9    A.  Yes, sir.
10    Q.  So under that proposal, Mr. Staples was going to
11 resign?
12    A.  I was going to get rid of him.
13    Q.  It says, John to terminate his employment; in
14 other words, it's discussing an action or some conduct or
15 behavior by Mr. Staples in doing something related to his
16 employment.
17        And I take that to mean that he was going
18 to resign as general manager of Renaissance Man.
19    A.  Well, I take it to mean, I don't know what Ron
20 is talking about.  Like I said, I made my mind up in
21 November that I was getting rid of John.
22    Q.  Okay.  It says here in parentheses, Simmons is
23 John's official employer.
24        Did I read that correctly?
25    A.  Yes, sir.

Page 213

1    Q.  And John would give up his role as a paid
2 consultant to DSM?
3    A.  Yes, sir.
4    Q.  Would you agree with me that that provision of
5 the proposal concerning John we just went over was
6 discussed on December the 12th, 2017?
7    A.  No, sir, I wouldn't, because it wasn't.
8    Q.  It wasn't discussed?
9    A.  About him giving up his role as consultant, no,
10 sir.
11    Q.  Well, certainly, by December 21st, 2017, it's
12 being discussed, and you received a copy of this by
13 e-mail, correct?
14    A.  Yes, sir.
15    Q.  Did you communicate back to Mr. Eisenman that
16 you disagreed with that provision of the proposal?
17    A.  No, sir, because as soon as I looked at it, it
18 didn't matter what he said; I knew what I wanted to do and
19 what I was going to do.  So it didn't matter what Ron
20 said.
21    Q.  Okay.  And would you agree, was a copy of this
22 also sent to Mr. Jackson?
23    A.  Yes, sir.  You said it was.  I assume it was.
24        (Witness reviews document.)
25        Yes, sir.

54 (Pages 210 - 213)

Page 214

1    Q.   Then it goes on to say, John is to sign a
2   one-year Consulting Agreement with Renaissance Man to
3   provide consulting services as requested by you.
4    A.   Yes, sir.
5    Q.   All right.  John is not going to provide any
6   further work for DSM; is that correct?
7    A.   Yes, sir.
8    Q.   And then it goes on down here, and it talks
9   about the consulting pay, and it says that, Assuming John
10  does not violate the Consulting Agreement, it talks about
11  what his pay would be; is that correct?
12   A.   Yes, sir.
13   Q.   All right.  And then it goes on to talk about,
14  This Consulting Agreement will contain a nondisparagement
15  provision so that John will not say anything negative
16  about Renaissance Man or Simmons for two years.  The
17  consulting year for one year plus one more.
18       Did I read that correctly?
19   A.   Yes, sir.
20   Q.   Now, let's assume that Mr. Staples had signed
21  the Consulting Agreement on January the 1st, 2018, and on
22  January the 2nd, 2018, you contended that he had said
23  something negative about Renaissance Man.
24       You could terminate the agreement and not
25  pay him any further monies, correct?

Page 215

1       MR. KING:  Objection to the extent that it
2   calls for him to interpret a legal document.
3       Subject to the objection, he can answer.
4    A.   Well, I'm more fair than most people.  So it's
5   according to what you call disparaging, or whatever he
6   said.  I wouldn't stop him from paying him.  When I agree
7   to something, I've got handshake deals that I've had for
8   over 20-something years.
9    Q.   (BY MR. SIMMS)  Was one of the things you
10  didn't want Mr. Staples discussing was the effort to sell
11  food products through H. Walker Enterprises, not share the
12  profit with Simmons, but bill Simmons for the cost
13  associated with doing so?
14   A.   No, sir.  How could I want that?  Because he was
15  doing that.  So I don't know how that would be an issue.
16  I never even thought about it.
17   Q.   No, he wasn't doing it.  You and Ms. Blanchard
18  were doing it.
19   A.   No, he was doing it.  He said we were selling.
20  I didn't say it.  He said we were selling.  We were not.
21  We were not selling through H. Walker Enterprises.  He
22  said that.
23   Q.   You disagree that the Jet Food waffles were
24  going to be sold through H. Walker Enterprises?
25   A.   Yes, sir.

Page 216

1    Q.   If that's true, why did Blaine Walker have to
2   correct HartyBake in January of 2018 that there were two
3   different POs related to the production of waffles by
4   HartyBake for Renaissance Man and/or H. Walker
5   Enterprises?
6    A.   As I said earlier, I have no clue why
7   Blaine Walker -- no relation -- would say that.
8    Q.   If he did say it, he'd have had to get direction
9   from somebody above him at H. Walker Enterprises or
10  Renaissance Man to say it, right?
11   A.   (Indicating.)
12   Q.   No, sir.
13   A.   Yes, sir.
14   Q.   Mr. Staples was gone as of December the 28th,
15  2017.
16   A.   That's the only way he would have got it.
17  Because I'm telling you I have not talked to Blaine about
18  HartyBake or waffles or anything.
19   Q.   Would Ms. Blanchard have talked to him about it?
20   A.   No, sir.
21   Q.   There's another provision here, a
22  nonsolicitation provision, so that John would not recruit
23  employees of Renaissance Man or Simmons for two years and
24  a release of any other liability.
25       What other liability was Mr. Staples going

Page 217

1   to be releasing?
2    A.   I have no clue.
3    Q.   Well, it looks like there's two things here.
4        One, he's giving up his job with Simmons,
5   and he's giving up his job as a consultant to DSM, right?
6    A.   Yes.
7    Q.   Okay.  Then we have a proposal related to
8   Mrs. Staples, correct?
9    A.   Yes.
10   Q.   It says, Kim will resign from DSM and sign over
11  all of her 50 percent ownership to Julie.
12   A.   Right.
13   Q.   So was it the intentions with you and
14  Ms. Blanchard that DSM-3 was going to continue into the
15  future?
16   A.   That DSM-3 was going to continue?
17   Q.   Yeah.
18   A.   By -- how now, by Julie or Kim?
19   Q.   Well, by Julie, if Mrs. Staples signed over her
20  50 percent ownership interest over to Ms. Julie.
21   A.   Yes, because John had changed brokers with
22  Sysco, I don't know how many times, every year.  So I
23  thought to keep the continuity, let's not change the
24  broker again.  There was no company without Renaissance
25  Man.  DSM was not making anything without Renaissance Man.

Freedom Court Reporting
877-373-3660                    A Veritext Company                    205-397-2397

1 Renaissance Man was their big cookie.  So there was no
2 company.
3         So what I was saying is to keep from
4 changing brokers again at Sysco, let's just keep DSM the
5 same.  It wouldn't matter -- we could have changed -- it
6 didn't matter whether she signed it over or not.  We could
7 have changed the name.  I just thought it would be quicker
8 and easier to keep the name what it was.
9    Q.  And are you familiar that Mr. Eisenman prepared
10 employment agreements inside DSM-3 related to Barbara
11 Humphrey and Christopher Thurber?
12    A.  No, sir.
13    Q.  Do you know if Mr. Eisenman had charged DSM-3
14 for preparing those employment agreements?
15    A.  No, sir.
16    Q.  When Mrs. Staples did not sign her ownership
17 interest in DSM to Julie, did Renaissance Man hire
18 Barbara Humphrey?
19    A.  Yes.
20    Q.  Did it attempt to hire Christopher Thurber?
21    A.  Yes, sir.
22    Q.  Do you consider that to be in violation of the
23 employment agreements that Mr. Eisenman had prepared for
24 DSM-3?
25    A.  No, sir.  John asked us to hire them in his

1 all-in account.  He didn't want his friends to lose their
2 jobs.  So will you hire my daughter, Christopher Thurber
3 and Barbara?  And when he said, Let's shake on it, I
4 assumed he was honest with his shake on it, and we got a
5 deal and get this done.
6    Q.  You also, prior to December the 12th, 2017, had
7 a phone conference with Robert Thurber, where you offered
8 to give Christopher Thurber ownership in Renaissance Man
9 if Robert Thurber got Renaissance Man into Tyson, correct?
10    A.  Yes, sir.
11    Q.  Was that a bribe?
12    A.  No, sir.  You want me to tell you what it was?
13    Q.  Yeah, tell me what it was.
14    A.  Shows that he was full of crap.  All I been
15 hearing about is he wanted Christopher Thurber to have
16 something.  And that's all he's talked about.  Well, they
17 led me on for months, they going to do a broker, they
18 going to do this, going to do -- well, I got a company
19 running.  Nothing ever been happening.
20         Well, DSM not making any money.  No one is
21 making money.  So I said, I'm going to show you that
22 Robert Thurber is full of crap.  I'm going to offer
23 Christopher a piece of Renaissance Man, who's making
24 money, and if he doesn't go for it, that will tell you
25 he's never going to do what he's telling John he's going

1 to do, which I did.  He didn't go for it, so that showed
2 that I was correct.
3         Is that not right?
4    Q.  I just wanted an explanation about that.
5         Mrs. Staples, if she resigned from DSM and
6 signed over her 50 percent ownership interest -- by the
7 way, how much was Mrs. Staples going to be paid for her 50
8 percent ownership?
9    A.  I don't know.  Was it $10 or whatever.
10    Q.  $10?
11    A.  It may have been.  Because, remember, she wasn't
12 worth anything without Renaissance Man anyway.  It was
13 worth zero.
14    Q.  And she's going to sign a release of any other
15 liability too, correct?
16    A.  I assume.
17    Q.  Then you-all talk about Blair Staples, right?
18    A.  Well, no.  That's not correct.  He wrote this.
19 We never talked about Blair or Kim in the meeting on the
20 12th.  They were never talked about.  This is something
21 Ron wrote that these people never talked about in that
22 meeting.  I don't remember ever talking about Kim or
23 talking about them.  We never talked about -- we mentioned
24 she would give up the -- on the 12th, she'd give up the
25 broker's thing, and with John and his thing, said give up

1 the broker thing, and John said, All in.  John asked us to
2 hire Blair, but this is before -- to hire Blair.
3    Q.  And this is before you met with Mr. Staples --
4    A.  Right.
5    Q.  -- and terminated him on the 27th?
6    A.  David Jackson and I never even mentioned Blair.
7 To be honest, I'm not even sure he even knew Blair.
8    Q.  Well, according to Mr. Eisenman, your lawyer,
9 you-all did discuss it, and he's memorializing it and then
10 providing you with a copy of the memo to indicate what
11 you-all discussed.
12    A.  That's totally not true.  That is totally not
13 true.  Ron says in this memo -- if you go back to the
14 front, Things we discuss, and he goes through a proposal
15 and stuff, what we propose that happens.  We never
16 discussed what was going to happen.
17         If anything we discussed what was going to
18 happen is John getting offered a consultant thing.
19 Brokers and all that stuff were never discussed.
20    Q.  Let's talk about what this document indicates
21 with respect to Blair Staples, okay?
22    A.  Okay.
23    Q.  It says, Blair's employment by DSM -- I'm
24 guessing that's DSM-3 -- through Simmons will terminate.
25         Did I read that correctly?

Page 222

1    A.  Yes, sir.
2    Q.  And then it says, Herschel/Julie, you may want
3  to give Blair two months' severance to give John extra
4  incentive to cooperate, in which event Blair will agree to
5  a nondisparagement provision so that she will not say
6  anything negative about RMFS, DSM or Simmons for two
7  years, a nonsolicitation provision so that she will not
8  recruit employees from RMFS or DSM for two years, and a
9  release of any other liability.
10        Did I read that correctly?
11    A.  Yes, sir.
12    Q.  Now, again, when -- I think you told me this,
13  when you were recording Mr. Staples on December 27th, it
14  was not discussed what was going to happen with
15  Blair Staples, was it?
16    A.  John asked us to hire Blair.  It's in the
17  recording.
18    Q.  Here's what I mean:  Did you tell Mr. Staples in
19  the recording that Blair Staples was going to be
20  terminated under Proposal A?
21    A.  We never discussed this here (indicating).  I
22  never discussed this when Ron sent this.  I knew what I
23  was going to do.  Had nothing to do with his Ron A, B, C,
24  or D.  I knew what I was going to do, which had nothing to
25  do with Kim or Blair.  I was going to terminate.  I knew

Page 223

1  what field I wanted to go in, and that's what I keep
2  saying.
3        This paper here (indicating) that Ron wrote
4  didn't matter to me.  When it came to me, I looked at the
5  front of it, and I knew what I was going to do, and I had
6  my mind made up.
7    Q.  This is my question to you, Mr. Walker:  Whether
8  Blair Staples' employment was being terminated was
9  discussed on December the 12th, 2017, or not, you
10  certainly knew on December 21st, 2017, that under
11  Proposal A, her, that being Blair Staples, employment by
12  DSM through Simmons would be terminated, correct?  That's
13  what this document says, a copy of which was sent to you.
14    A.  That was never sent to me.  Keep saying -- I
15  never read this.  Remember I said I looked at it and went
16  on.  This document was never discussed between anyone.
17    Q.  My question to you now is:  When you met with
18  Mr. Staples, and you're recording it, on December 27th,
19  did you disclose, tell, communicate in any way, to
20  Mr. Staples that Blair Staples' employment was going to be
21  terminated?
22    A.  No, because I never thought about Blair Staples,
23  and I never looked at this here document (indicating) to
24  even think about Blair.
25        When I saw the document at the beginning,

Page 224

1  when I looked at it, I saw Ron talking about this here
2  (indicating), I never looked at it anymore.
3    Q.  Isn't it true the reason you did not bring up
4  Blair in your meeting that you were recording with
5  Mr. Staples on December 27th is because you felt like if
6  you brought that up and disclosed what was going to happen
7  to Blair, he would not cooperate?
8    A.  No.  It didn't matter whether he cooperated or
9  not.  I was going to fire him from Renaissance Man anyway.
10  And if he worked for Simmons, he could have went back to
11  Simmons and went to work.  I was going to fire him from
12  Renaissance Man, which is what I wanted to do.  I wanted
13  him to leave Renaissance Man.
14    Q.  Let's go on down the document here.  We go to
15  Proposal B.
16        Do you see that?
17    A.  (Witness complies.)
18        Yes, sir.
19    Q.  And it's got in parentheses, If John refuses to
20  cooperate.
21    A.  Yes.
22    Q.  So Plan A dealt with what would happen if
23  Mr. Staples cooperated, and Plan B dealt with what would
24  happen if he did not cooperate, correct?
25    A.  Yes, sir.

Page 225

1    Q.  And if Mr. Staples did not cooperate, he would
2  be terminated by Simmons and his employment as general
3  manager of Renaissance Man.
4        Did I read that correctly?
5    A.  Yes, sir.
6    Q.  Now, this proposal is not requiring some action
7  or behavior by Mr. Staples; it's referring to actions or
8  conduct that would be taken by Simmons.
9        Simmons is going to terminate him.
10    A.  No, I think I was going to terminate him also as
11  general manager of Renaissance Man, and then deal with
12  Simmons.  I was going to terminate him no matter what from
13  Renaissance Man.
14        So if Ron wrote that -- like I keep saying,
15  this document, I never looked at this document.
16  Renaissance Man was not going to have John Staples working
17  for Renaissance Man anymore.  So it doesn't matter what
18  this document says.  I never looked at it and didn't go by
19  this document.  I never did.
20    Q.  The other provision under John there is that,
21  Renaissance Man going to give 30-day notice to
22  Diversified Sales and Marketing terminating it as its
23  broker.
24        Did I read that correctly?
25    A.  Yes, sir.

1    Q.  And in fact, that was done before you received
2  any response by John Staples or Kimberly Staples with
3  respect to Mr. Staples signing the Consulting Agreement or
4  Mrs. Staples selling her interest to Julie for $10,
5  correct?
6    A.  I don't know when that was done.  Honestly, I
7  don't know when that was done.  I know John told me I
8  was -- I was at the Rose Bowl.  And I said, Mrs. Staples
9  supposed to get back in touch with me.  Because he said,
10  All in, handshake, let's love each other and kiss each
11  other, hugging, all this.  And then all of a sudden, I
12  never heard from John anymore.
13         If there was a problem with this, whatever
14  we agreed on, what he negotiated all-in, he could have
15  called me.  Like I said, I didn't hear from him.  I don't
16  know whether I sent him an e-mail or called John, and I
17  said, John, I'd like to get 2018 on a clean note.  Can you
18  tell me what you'd like to do or whatever?  And I didn't
19  hear from John anymore.
20         And the next morning, I think, when I got
21  back, early morning, I got something from John talking
22  about Simmons.  And I remember my answer was no and no,
23  and if I don't hear from you by the end of business today,
24  I'm pulling my deal, which is what I did.
25    Q.  Before you pulled your deal, had you not already

1  sent a notice to Diversified Sales and Marketing that the
2  broker agreement was being terminated in 30 days?
3    A.  I could have.  It didn't matter.  Like I said,
4  the broker was gone anyway.  So it didn't matter what the
5  broker thing was going to do.  They were going to be gone
6  anyway.
7    Q.  My question to you is:  Did you send a letter
8  terminating the broker arrangement within 30 days?
9    A.  As I said, I don't know when I sent the letter,
10  but I terminated the broker because they were going to be
11  gone way back in October.  John knew the broker was going
12  to be gone.  He knew he had to do something else with the
13  broker, and he kept running around, trying to get somebody
14  to buy his broker's company.
15    Q.  And was DSM-3 going to continue to keep going
16  forward?
17    A.  I have no idea.
18    Q.  The broker termination letter you wrote,
19  Mr. Eisenman says that was being done, that the
20  relationship was being suspended --
21    A.  Right.
22    Q.  -- until Mrs. Staples sold her interest to
23  Ms. Blanchard for $10, correct?
24    A.  It may have, yes, sir.
25    Q.  Was that done to force Mrs. Staples to sell her

1  ownership interest for the sum of $10?
2    A.  Not at all because Mrs. Staples didn't have a
3  company without Renaissance Man.  There was no money
4  without Renaissance Man.  So whether she kept Renaissance
5  Man or not, she didn't have a company.
6         So I could have terminated her and went on
7  about my business, which is what happened, or it would
8  have been easier that we kept the continuity for the Sysco
9  by going with DSM rather than changing the broker.  So
10  her -- DSM had no bearing to what John was doing, in my
11  opinion.
12    Q.  The termination of broker letter you wrote --
13    A.  Yes.
14    Q.  -- was it pre-prepared before you signed it on
15  December the 30th?
16    A.  No, no.
17    Q.  Well, the December 2017 date was typed out, but
18  it was left blank and "30" was inserted, correct?
19    A.  I have no idea.  I haven't seen it.  If you've
20  got it, show it to me, and let me look at it.
21    Q.  Well, isn't that an indication that the letter
22  had already been pre-prepared at some point?
23    A.  I have no idea.  But like I said earlier, DSM
24  was gone anyway, whether the letter was prepared in
25  October, November, December.  DSM was finished in my

1  opinion.
2    Q.  DSM was not going anywhere; Julie Blanchard was
3  going to own 100 percent of it, right?
4    A.  That would have been great and easier to do
5  because DSM was not selling.  And if they're not
6  working -- they were working for Renaissance Man, and if
7  they're not working, it's got to change.
8    Q.  What was going to happen was Ms. Blanchard was
9  going to take 100 percent of something that Mrs. Staples
10  had worked to build since October of 2016, correct?
11    A.  Nothing was built.  Anything that was there was
12  Renaissance Man.  There was nothing built.  That's what I
13  keep saying.  That's the reason he was fired.
14         He had agreed that his company would keep
15  Cat Man; that's the reason they had the broker.  Well, he
16  broke that agreement by putting all these other brokers --
17  taking money for all this other stuff and all this other
18  thing to keep his family going.  And I knew then DSM had
19  to go.
20         At that time, it didn't matter anything
21  about DSM, whether it was John's termination or whatever.
22  DSM was over, in my opinion.  And John knew that.  That's
23  the reason he talked to Radiant, Core, and Bud Taylor.
24  And Bud Taylor even mentioned in a letter.
25         So it's not me.  These are John's mentors.

1 Bud Taylor mentioned, John, I'm confused. I'm not sure
2 who in the heck would let anyone that Herschel Walker do
3 what you're doing to him in the sense that they're just
4 making phone calls and doing -- and I wasn't. I kept
5 complaining to John about it, and he did nothing.
6    Q.  Was it upsetting to you that Mr. Staples was
7 trying to keep his wife and his daughter employed?
8    A.  It was not upsetting to me to keep them
9 employed, but they've got to work.
10    Q.  What was upsetting to you was you didn't think
11 they were working?
12    A.  They were not working. And Blair said it, John
13 said it, and ask -- Gary Brown said it.
14    Q.  What was Julie Blanchard doing for DSM; was she
15 working?
16    A.  Oh, she was blowing it out. She's the one that
17 had been selling waffles, and she was the one that was
18 selling a lot of chicken. And what's funny about it, if
19 John was honest, when we went to that Jet Food show,
20 whatever thing, the company -- we're making money now is
21 because of Julie, and we're doing pretty good right now,
22 anything that she brought.
23        And she also brought U.S. Foods, so that's
24 why I said she was working. And I think everyone got
25 upset on a phone call on a Friday; everyone got upset, and

1 I made a statement, I said, Guys, I am tired of this. The
2 only one that can sell is Julie. And this had nothing to
3 do with Julie being my fiance, my girlfriend, my boon
4 coon, whatever this had to do with.
5        All I wanted people to do was sell, sell
6 chicken. That was it. No waffles. I didn't care about
7 waffles. No waffles, no anything. What I cared about is
8 selling chicken.
9    Q.  In December 2017, you anticipated that DSM-3
10 would continue on into the future, correct?
11    A.  No, sir.
12    Q.  Well, why in this proposal was there a plan for
13 that to happen?
14    A.  Well, we thought if Kim gets rid of it, it could
15 continue in the future. But if Kim kept it, it wasn't
16 going anywhere. They've had four years to make it go into
17 the future. Well, they never did.
18    Q.  Actually, they had been in existence for --
19    A.  Three-and-a-half years.
20    Q.  No.  DSM-3 came in existence in October of 2016,
21 correct?
22    A.  I think you're a little bit confused. That's
23 why you had DSM-1, DSM-2, DSM-3, because they kept
24 changing the names, but the people and all that changed,
25 because John fell out with the people that was on the

1 DSM-1, and then he fell out with the person that owned
2 DSM-2, and then he fell out with the person that owned
3 DSM-3. So that's what I'm saying, just because you change
4 the name doesn't mean that you don't owe bills and you
5 don't do your work. You still got to work. The same
6 people are there.
7    Q.  Under Proposal B, if Mr. Staples does not
8 cooperate, Kim Staples -- it indicates that DSM will end
9 after the brokerage agreement with Renaissance Man ends
10 and any profit after expenses will be split per the
11 current agreement.
12        Was the current agreement referring to the
13 operating agreement?
14    A.  I reckon. I don't know what their agreement
15 was.
16    Q.  And then Blair's employment will terminate?
17    A.  Yes, sir. That's what it says.
18    Q.  It looks like to me under either proposal,
19 Blair Staples' employment was going to terminate.
20    A.  That's what Ron wrote, but I never looked at
21 that.
22    Q.  Why was there so much planning involved
23 concerning the termination of Mr. Staples and then the --
24 addressing the ownership and employment of Kim Staples
25 with DSM-3 and the employment of Blair Staples with

1 Simmons?
2    A.  There was absolutely no planning involved in
3 anything. This letter has never been talked about at all.
4 This is the first time we've talked -- that I'm talking
5 about this letter right now with you. So we've talked
6 more about it.
7        I've never seen, except the front of this
8 letter, is the only thing I've ever seen of this letter
9 what it was talking about. This letter has never been
10 talked about, not at all.
11    Q.  So you disagree that there was planning and
12 proposals discussed during the meeting on December the
13 12th, 2017?
14    A.  I disagree that this letter -- you're talking
15 about this letter, was talked about. What I agreed to is
16 on December the 12th, David Jackson came in the meeting,
17 asked me about H. Walker Enterprises. I told him what
18 H. Walker Food was. He asked me something else. And I
19 told him. And the next question out of my mouth, which
20 you can see it on -- that's not the one that was
21 recorded -- I said, John Staples has lost his way. I
22 think it's time for me to let him leave. That was the
23 third thing I think -- I think Julie may have the notes.
24 You may have the notes of that.
25        And that was -- all that other stuff that

1 you're saying was talked about, this letter never been
2 talked about.  Right in the conversation with David
3 Jackson, probably 10 minutes into the conversation, I
4 said, John Staples has got to go, he's lost his way.
5     Q.  Was the meeting on December the 12th, 2017,
6 recorded by you?
7     A.  No, sir.
8     Q.  Do you know how Mr. Eisenman could prepare this
9 memorandum setting forth these different proposals and
10 what would happen to John Staples, Kim Staples, and
11 Blair Staples?
12     A.  He was in the meeting, so he may have added what
13 he thought should have happened.  This is his thoughts.
14 Like I said, I think David Jackson may have said we never
15 discussed this letter.  Have you -- if you listen to his
16 deposition, he said we never discussed this letter.  We
17 never have.
18     Q.  Julie Blanchard was in attendance at the
19 December 12th, 2017, meeting?
20     A.  Yes, sir.
21     Q.  In what capacity?
22     A.  I wanted her there.
23     Q.  Was she there as an agent, employee or
24 representative of H. Walker Enterprises, LLC?
25     A.  No.  She was there because I wanted her there.

1     Q.  Was she there because she's 50 percent owner of
2 DSM, LLC?
3     A.  No, she was there because I wanted her there.
4     Q.  But she was a 50 percent owner of DSM Sales and
5 Marketing, LLC, on December the 12th, 2017, wasn't she,
6 Mr. Walker?
7     A.  Yes, but that's irrelevant to the reason I
8 wanted her there.
9     Q.  And she was a representative of H. Walker
10 Enterprises, LLC, on December the 12th, 2017?
11     A.  No.  She had an e-mail that had that she never
12 worked for H. Walker Enterprises.  She had an e-mail.  She
13 worked for that, but doing a lot of different things,
14 never paid.  It was because I wanted her there.
15     Q.  She also indicated to Mrs. Staples in
16 communications that she worked for the parent company,
17 right?
18     A.  Right.
19     Q.  Parent company would be H. Walker Enterprises,
20 LLC?
21     A.  Right, but she never was paid.  She did a lot of
22 things for the parent company.
23     Q.  All right.  Exhibit 118 (sic), and I will have
24 to find you a copy.
25         MR. PARKER:  Are you talking about page 118

1 and 119?
2         MR. SIMMS:  Yeah, Renaissance Document 118
3 and 119.
4         (Exhibit 20 marked.)
5     Q.  (BY MR. SIMMS)  And this is Exhibit 20.
6     A.  (Witness reviews document.)
7     Q.  Is this an e-mail that you sent to
8 David Jackson?
9     A.  Yes, sir.  Can I finish reading this?
10     Q.  Yes; I'm sorry.
11     A.  Thank you.
12         (Witness reviews document.)
13         Yes, sir.
14     Q.  And the subject is, Staples' termination?
15     A.  Yes, sir.
16     Q.  Did anyone assist you in drafting this document?
17     A.  No.
18     Q.  It's to David Jackson, copied to Mr. Eisenman
19 and Ms. Blanchard, correct?
20     A.  Yes, sir.
21     Q.  And the subject is, Staples' termination.  It
22 doesn't say John Staples' termination; it uses Staples'
23 termination, plural, correct?
24     A.  Yes.  But isn't his name John Staples?
25     Q.  Well, it could have been referring to the

1 terminations of the entire family.
2     A.  Well, I wasn't.  I was referring to John.
3     Q.  You say you wanted to update him, correct?
4     A.  Yes.
5     Q.  We met with John Staples yesterday.
6         Who's "we"?
7     A.  Ron and I.
8     Q.  And told him that he was removed as general
9 manager of Renaissance Man, thanked him for the great work
10 he had done in the past for Renaissance Man.
11     A.  Yes, sir.
12     Q.  Since it is already December 28th, it may work
13 to end his employment with Simmons as of December 31st,
14 unless that crosses a payroll period.
15     A.  Yes, sir.
16     Q.  Please ask your -- is that human resource team?
17     A.  Yes, sir.
18     Q.  -- to do what is needed from the Simmons
19 perspective.
20         Why were you needing Simmons to do
21 something from their perspective?
22     A.  Because John was on loan to me from Simmons.
23 John only was hired to work for Renaissance Man.  He was
24 not hired to work for Simmons, only for Renaissance Man.
25         But if Renaissance Man gets rid of John, I

1 don't think he is going to stay at Simmons.  So I'm
2 telling David Jackson this right now.  He never was hired
3 for Simmons.  He was hired to work at Renaissance Man.
4     Q.  If in the fall of 2017, Simmons was not going to
5 step away from your company --
6     A.  Yes.
7     Q.  -- why would they post a job opening for a vice
8 president of food service distribution?
9     A.  Well, probably you ask them.
10     Q.  And was it possible that Mr. Staples could have
11 fulfilled that position?
12     A.  I doubt it.
13     Q.  Why do you doubt it?
14     A.  Because John is a little bit brass.  Not too
15 many people have favoritism towards John, and I think
16 David mentioned, He's a little bit of a bully and --
17     Q.  Are you a bully?
18     A.  No, sir, I never have.  Never have.
19         But John is a bully, and I never bullied
20 anyone.  I'm sort of loving.  You can see that.  And so I
21 doubt he would have been hired at Simmons.
22 It says, We discussed the following Consulting
23 Agreement terms.
24         You don't use the word we discussed, the
25 following "severance" terms, do you?

1     A.  No, because I didn't look at it as severance.
2     Q.  Okay.  Although we did state clearly that we
3 would discuss these terms with you.
4         Why are you needing to indicate to
5 Mr. Staples that you're going to discuss the terms with
6 Simmons?
7     A.  Because David and I had always talked that we
8 were going to be transparent.  The only reason we were not
9 transparent was because of John.  And we discussed in a
10 meeting what was happening was John was trying to turn us
11 against each other.  That's what I finally found out, that
12 John was going telling things that wasn't the truth.
13         So now, I want to be transparent with David
14 and tell David what we discussed, because we discussed
15 severance -- and I don't call it severance because
16 severance would have been less than $255,000.  So we
17 discussed a Consulting Agreement because, to me, severance
18 is what -- when you start talking about getting paid for
19 every three weeks of a year that you worked and all that.
20 It would have been less.
21     Q.  Wasn't Mr. Staples being transparent when he was
22 approached by Carmen Seal at Simmons when she questioned
23 the sale of retail waffles, and she was being provided
24 with invoices related to that?
25     A.  No.  I don't think so, but he may have thought

1 so.  How can he be transparent?  He could have said,
2 Herschel, I'm doing this.  He could've told me that.  So
3 he wasn't being transparent.  He went behind my back --
4 and I just found out this -- to talk to Simmons.
5         And he knew that this Jet thing -- well, if
6 he know the business, which I'm aware that he does, that
7 the Jet thing was $7,000 that we're talking about.  And
8 I'm not being mean because $7,000 is a lot of money for
9 some people.  $7,000, I paid that.  Like I say, this may
10 go to that thing.  So $7,000?
11     Q.  Do you know what would have happened with
12 Mr. Staples' employment with Simmons if he'd told
13 Carmen Seal to pay those invoices?
14     A.  Nothing.  Nothing would have happened because he
15 worked for Renaissance Man.
16     Q.  He also was responsible for answering to the
17 board of Simmons that made up two-fifths of the board --
18         MR. KING:  Objection.  Objection, assumes
19 facts that are not in evidence.
20         Go ahead.
21     Q.  (BY MR. SIMMS)  That's what the Memorandum of
22 Understanding said --
23     A.  No, no, it was never signed.  If you remember
24 what David Jackson said in his deposition, John running to
25 him was not what he was supposed to do.  He was general

1 manager of Renaissance Man.
2         I'm not saying that -- that's not the
3 reason he was fired.  He was not fired because of that.
4 Because I didn't know that.  He wasn't fired because of
5 that.
6     Q.  Because he told Carmen Seal not to pay those
7 invoices?
8     A.  No, he wasn't fired because of that.  I
9 didn't -- that had nothing to do with me releasing John.
10 It had zero to do with me releasing John.
11     Q.  When Ms. Seal came to John and asked him about
12 that, had she contacted you and asked you about it before
13 she came to him?
14     A.  No.
15     Q.  Had she asked, to your knowledge, Carol Walker
16 what that related to?
17     A.  No.
18     Q.  She asked Ms. Blanchard?
19     A.  No.
20     Q.  If she came to Mr. Staples and was inquiring to
21 him about, What does this concern?  What was Mr. Staples
22 supposed to do?
23     A.  Tell the truth and go through the whole ram and
24 tell her what it was.  He thought he had something.  He
25 had something, he said go through H. Walker Enterprises.

Page 242

1 But he didn't have anything. Like I said, I think -- me
2 letting John go had nothing to do with waffles.
3    Q.  Why would Mr. Staples need to have something?
4 I'm confused.
5    A.  Because he was -- I started getting on to John
6 about his family working. And this started -- remember,
7 John went to see his neighbor, who was an attorney, who
8 then called you, so there was some problems going on with
9 John in October. Remember that? He went to see you, and
10 you talked to him.
11        So whatever thing that you guys talked
12 about, which I don't know, that's when this started. I
13 have no clue. But what was going on was I have no clue
14 what's going on with John. This started way before that,
15 and John was not fired for waffles.
16    Q.  Do you know who Dione Bennett is?
17    A.  Yes, sir.
18    Q.  Do you know if she had a conversation with
19 Blaine Walker about the sale of these retail waffles to
20 Jet Food?
21    A.  I have absolutely no clue.
22        (Discussion held off the record from 3:58
23        to 3:58 p.m.)
24    Q.  (BY MR. SIMMS)  You're going forward here,
25 telling Mr. Jackson what the terms of the Consulting

Page 243

1 Agreement would be, correct?
2    A.  Yes, sir.
3    Q.  It says, John is going to be a consultant to
4 Renaissance Man on an as-needed basis for one year to work
5 on projects or matters as requested by you.
6        Did I read that correctly?
7    A.  Yes, sir.
8    Q.  He's going to be paid by Renaissance Man as a
9 company expense a consulting fee of $255,000.
10        Is that right?
11    A.  Yes, sir.
12    Q.  Is that going to be processed through the
13 Simmons/H. Walker Enterprises/Renaissance Man
14 relationship?
15    A.  You keep separating -- Renaissance Man wasn't
16 people paying it. It had nothing to do with it. It was
17 going to be paid by Renaissance Man. Simmons had 35
18 percent of it, so 35 percent of what was paid would have
19 been Simmons, I reckon. You can say that.
20    Q.  I guess what I'm talking about is, is it going
21 to come out of that account that's maintained under the
22 venture that the Memorandum of Understanding pertains to?
23    A.  Yes, sir.
24    Q.  Okay. By the way, if you believe in
25 transparency, why did you instruct Mr. Jackson not to let

Page 244

1 Mr. Staples have copies of the P&Ls anymore?
2    A.  Because -- I'm glad you asked that question,
3 because John kept taking -- when I was telling him about
4 making his family work, John in an e-mail to Robert was
5 almost saying, Oh, Herschel, be quiet. You make enough
6 money.
7        Why does it matter what I make? I'm not
8 out -- why would he say something like that? He made that
9 statement, and at that time, I said, this guy's gone nuts.
10 Why does it matter what I make? He's going to tell me I
11 make enough money. I wasn't -- I didn't build Renaissance
12 Man for money. I built it because I wanted to build a big
13 company.
14        When he said that, at that time, I said, I
15 don't think John needs to be knowing what's made in this
16 agreement, so that's the reason I told him that.
17    Q.  Would you agree with me that Mr. Staples could
18 also see changes in expenses and made inquiry as to what
19 it is that's causing the change in expenses?
20    A.  There was no changing in expenses except for
21 him. His $10,000 to Alabama. The only change in expenses
22 would have come from John. There was only one expense
23 I've ever put in there. One. That's the $7,000. All the
24 expenses was from John.
25    Q.  The truth of the matter is you didn't want

Page 245

1 Mr. Staples being the policeman anymore and saying no to
2 the effort by you or Ms. Blanchard to develop food
3 products that you were going to sell through H. Walker
4 Enterprises, not share the profit with Simmons, but
5 expense it to Simmons.
6        Isn't that what you were doing?
7    A.  No. No, I --
8    Q.  Isn't that why --
9        MR. KING:  Whoa, whoa, whoa. He's still
10 finishing his answer.
11    A.  No, go ahead.
12    Q.  (BY MR. SIMMS)  You dispute that?
13    A.  Sir?
14    Q.  You dispute that, correct?
15    A.  Yes, sir.
16    Q.  Why was there so much effort done to try to
17 explain to Simmons the Peachtree Packaging invoice and
18 what it pertained to?
19    A.  Because that's the invoice they didn't want to
20 pay. So I need to let them know the reason that they had
21 the invoice. Because I didn't understand why they didn't
22 want to pay it. And the reason they didn't want to pay
23 it, John said, do not pay it.
24        So they then assumed there was something
25 wrong. I didn't know this. I didn't know what was going

62 (Pages 242 - 245)
App. 267

Page 246

1 on. So that's the reason why -- they were trying to
2 explain what was going on with this Peachtree Packaging.
3 Peachtree Packaging today, that little
4 thing that John thought he got something over, is making a
5 lot of money right now, just with that little thing.
6 Q. You keep saying John thinks he got something
7 over. Sir, Carmen Seal came to John and asked him about
8 it. She's the one that caught it to begin with, not
9 John Staples.
10 Don't you know that?
11 A. I know that John went to see a lawyer in
12 October, and he went to see you after that --
13 Q. Well, he didn't go to see me.
14 A. Well, he talked to you after that. And then
15 also, he called a conference call with Simmons, and he
16 also went to see Simmons December 11th.
17 So you tell me.
18 Q. Didn't Simmons request the conference call?
19 A. No. John requested the conference call from
20 what I heard.
21 Q. Okay.
22 A. And you know --
23 Q. Mr. Free had him put in that conference call,
24 didn't he?
25 A. No, I think John wanted a conference call.

Page 247

1 Q. Was Matt Free involved in that conference call?
2 A. He may have been, but I know John wanted the
3 conference call.
4 Q. Didn't you get upset with Matt Free, and then
5 you threatened him that if the price increases were
6 brought to bear, or came to fruition, that you would not
7 be agreeable to the 65/35 profit split with Simmons any
8 longer?
9 A. That's totally not the truth. I never
10 threatened Matt Free.
11 Q. And didn't you get upset when John Staples told
12 Simmons not to pay an expense that your company submitted
13 to Simmons to be paid?
14 A. No, because I didn't know he did that until
15 afterwards.
16 Q. You knew that that had taken place because you
17 had received that as a concern by David Jackson on
18 October 25th, 2017, in an e-mail from him, correct?
19 A. I didn't know John was the one that told him not
20 to pay it. I still didn't know that.
21 Q. You had had communications with Mr. Staples
22 where you questioned him, Who is telling Simmons not to
23 pay your invoices, correct?
24 A. And John said it wasn't him. He was going to
25 find out. Because as I said, he wimped out again, and it

Page 248

1 wasn't him. So I didn't know John was the one doing that.
2 Q. Isn't the truth is he told you that it was him
3 that had said no to that expense?
4 A. The truth is, no. And I know John would have
5 never done that.
6 MR. SIMMS: All right. Let's keep going on
7 here so we can try to finish this up.
8 MR. KING: Are you on this (indicating)
9 document still?
10 MR. SIMMS: Yeah, I'm still back on 118
11 here, which is Exhibit 20.
12 A. 20.
13 Q. (BY MR. SIMMS) You start next talking about
14 Kim Staples.
15 A. Uh-huh.
16 Q. She's going to "relinquish" -- is that your
17 word, Herschel, "relinquish"?
18 A. Yes, sir, relinquish, yes, sir.
19 Q. Nobody helped you write this?
20 A. I may have wrote it and Julie may have looked
21 over to make sure everything was right, but I wrote
22 everything here.
23 Q. Okay. To me, relinquish means give up.
24 A. That's right, give up.
25 Q. -- her ownership of the brokerage DSM, and Julie

Page 249

1 will own 100 percent going forward.
2 Did I read that correctly?
3 A. Yes, sir.
4 Q. So at the time you write this on December 28th,
5 2017, the intentions were for DSM-3 to continue on into
6 the future, correct?
7 A. Yes, sir.
8 Q. All right. However, as we discussed in our
9 meeting -- and I thought you told me you-all didn't
10 discuss this in the December 12th meeting, and that would
11 be the only meeting this could be referring to.
12 A. We never discussed it in the December 12th
13 meeting.
14 Q. Let's go on here. I'm on Paragraph 4.
15 A. Okay.
16 Q. Says, Going forward, however, as we discussed in
17 our meeting.
18 What meeting are you referring to,
19 Mr. Walker?
20 A. Okay. As we discussed in our meeting, DSM would
21 be the broker on record.
22 What I said to David Jackson, if Kim gives
23 up DSM, Julie runs DSM, we keep going. That's the only
24 thing was said, and move on. I thought that that was a
25 great deal for Kim, for John, what he asked for, 255, and

1 he said, All in, so that's what was great.

2  Q.  Can you answer my question?

3  A.  Yes, sir.

4  Q.  My question is:  What meeting are you referring

5 to in Paragraph 4?

6  A.  Wouldn't it be the meeting with John?

7  Q.  Sir, I don't know.  You tell me.

8  A.  The meeting with John.  We discussed in our

9 meeting Kim would give up DSM, and John was the one who

10 said she would give it up.

11  Q.  You're referring to the December 27th meeting

12 and not the December 12th meeting?

13  A.  Yes.  John said Kim would give up this, all-in.

14  Q.  But if you read this, referring Mr. Jackson back

15 to something, Mr. Jackson wasn't a participant in the

16 December 27th meeting, was he?

17  A.  Didn't matter.  What I'm talking about here is

18 as we discussed in our meeting, and I should have sent him

19 the tape, John talked about Kim giving up her portion.

20  Q.  I want to be sure.

21     Are you indicating -- when you say "our

22 meeting" --

23  A.  Yes.

24  Q.  -- you're talking about your meeting with John

25 or are you talking about the meeting with Mr. Jackson?

1  A.  The meeting with John.

2  Q.  Okay.  DSM will be the broker on record.

3     With who?

4  A.  Sysco.  As I was looking at the broker on record

5 with Sysco and any other distributors that we go out to do

6 business with.

7  Q.  And we will contract various boutique brokers to

8 handle the different regions throughout the country?

9  A.  Yes, sir.

10  Q.  Okay.  It says, Kim Staples is no longer

11 involved with Renaissance Man or DSM in any way.

12     Well, isn't it true that on that day,

13 December 28th, 2017, she still was because she had not

14 signed the Purchase Agreement related to her ownership

15 interest in DSM-3?

16  A.  Well, on that date, I didn't know that.  I just

17 went by what John told me.

18  Q.  And Blair Staples was not fired at this time?

19  A.  Right.

20  Q.  Although no promises were made as to her

21 employment?

22  A.  Correct.

23  Q.  It's true also that there was no mention to

24 John Staples on December 27th, 2017, about -- that

25 irrespective of his cooperation, Blair Staples was going

1 to lose her employment?

2  A.  No.  John asked us to hire Blair, and I promised

3 John, and I told John, I will hire Blair, but I said, I

4 will not be the manager.  As long as Blair did her job,

5 that was fine by me.

6  Q.  You knew on December 21st, 2017, that

7 irrespective of Mr. Staples' cooperation under Plan A or

8 Plan B, Blair Staples was going to lose her employment?

9     MR. KING:  Objection.  That is a gross

10 misrepresentation of his prior testimony.

11  A.  No, sir.

12  Q.  (BY MR. SIMMS)  Isn't that what the document

13 indicates?

14  A.  I can't say in the document; I never looked at

15 it.  And the document had nothing to do with what

16 Herschel Walker was going to do.

17  Q.  There will be no additional commission sent to

18 Kim Staples' attention, as we are setting up a new account

19 and will alert Simmons of the new address wire

20 information.

21     Why was there -- the commissions not being

22 sent to Mrs. Staples?

23  A.  Why was the commission at that time not sent to

24 Mrs. Staples?

25  Q.  Yes, sir.

1  A.  Is that the time that John said the thing about

2 the -- I don't know what date it was -- about somebody

3 taking an unauthorized commission, so everything -- that's

4 not the time?

5  Q.  I don't know.  You tell me what you're talking

6 about.

7  A.  No, you tell me.  That's what I'm saying, that

8 date, because I think that's around that time.  So we're

9 going to set up a new -- all that other thing because

10 there's going to be a whole new broker company from what I

11 know, because I thought Julie was now going to be 100

12 percent owner of DSM now.  So all the information got to

13 change from what it was.

14  Q.  And that reminds me of something, too.

15     You told someone in an e-mail, and it may

16 be this one, that you had looked at the bank account for

17 DSM-3, and you knew how much money was in it.

18     And that was back in late November or early

19 part of December 2017; is that correct?

20  A.  I don't think I said that.

21  Q.  Okay.

22  A.  You have to show me that e-mail.

23  Q.  I will.

24  A.  Okay.

25  Q.  You agree that Ms. Blanchard, prior to

1 December 12th, 2017, sent to Mrs. Staples a request for
2 her $125,000 and expenses associated with activities she
3 said she had been performing on behalf of DSM-3 and wanted
4 reimbursed, correct?
5     A.  Yes, sir.
6     Q.  And you agree that Ms. Blanchard sent that same
7 request to Mrs. Staples one day after the meeting in
8 Atlanta on December the 12th, 2017?
9     A.  I have no clue when she sent it to Kim.
10    Q.  And is it true that you instructed Mr. Staples
11 or Mrs. Staples to pay bonuses not only to DSM-3
12 employees, but also employees of Renaissance Man?
13    A.  I never instructed anyone to pay bonuses
14 anywhere.
15    Q.  Wasn't what you were trying to do was to deplete
16 the funds at DSM-3 because you knew you were going to do
17 that entity in, or to coerce Mrs. Staples to give up her
18 ownership interest for the sum of $10?
19    A.  No, sir.
20    Q.  You wouldn't do that?
21    A.  No, I wouldn't do that.  I didn't know what they
22 were doing.
23    Q.  You were asking should you or him alert the
24 necessary people at Simmons concerning the change in
25 John's status?

1     A.  Yes.
2     Q.  Why did you include Matt Free?
3     A.  Why did I include Matt Free?
4     Q.  Yes, sir.
5     A.  Matt Free was working with John.
6     Q.  And Mr. Free was also complaining about the
7 conduct of employees of H. Walker Enterprises dealing with
8 the customers of the Simmons/H. Walker Enterprises and
9 Renaissance Man relationship, correct?
10         MR. KING:  Objection to the form of the
11 question.
12         THE WITNESS:  Go ahead and answer?
13         MR. KING:  You may answer.  I think you
14 should listen to the question.
15         THE WITNESS:  No, I know.  I got the
16 question.
17    A.  As I said earlier on, I didn't know Matt Free
18 was doing that.
19    Q.  (BY MR. SIMMS)  You didn't know that Matt Free
20 had raised objection about George Fiorelli attending the
21 HMHost meeting --
22    A.  No.
23    Q.  -- and that that had caused an issue?
24    A.  No, I didn't know Matt Free had raised an issue
25 with that, until in this thing; I think you said it or

1 John may have said it, but I never knew that.
2     Q.  Wasn't that communicated -- there are two things
3 that Mr. Jackson was communicating to you in his
4 October 25th communication.  One dealt with the invoices
5 that were submitted for Simmons to pay.  The other dealt
6 with George Fiorelli, the Fitness Twins, the
7 telemarketers, Natalie contacted Sysco.
8         Weren't those other items?
9     A.  Well, no, they wouldn't deal with
10 George Fiorelli because as I said early on, HMSHost had
11 nothing to do with Simmons.  HMSHost was Renaissance Man.
12         So I'm not sure where you said he contacted
13 me about that.  And if he said that, he didn't say it in
14 his memo to me about who you just said.  And if you want
15 to speculate, I would do that.
16    Q.  At the HMHost event that George showed up for
17 with a business card saying he was employed by H. Walker
18 Enterprises --
19         MR. KING:  Objection.  That is not --
20    Q.  (BY MR. SIMMS)  -- was that a cutting --
21         MR. KING:  Nope, nope.  I'm going to make
22 my objection.  That is not the testimony.  He's been
23 identified as an independent contractor.
24         Now, I think we should take a break because
25 I think people are starting to say some things that they

1 shouldn't say, and everybody needs to relax a little bit.
2         MR. SIMMS:  Are you speaking about your
3 client saying things?
4         MR. KING:  No, I'm saying about you
5 misrepresenting the record.
6         MR. SIMMS:  I'm not misrepresenting the
7 record.
8         MR. KING:  He's already testified all day.
9 You just said he was an employee.  You know that's not
10 what the testimony was.
11         MR. SIMMS:  I know that he was an employee
12 from other documents.
13         MR. KING:  Okay.  Well, then, you need to
14 use them.
15         Let's take a break.
16         MR. SIMMS:  All right.  We'll take a break.
17         (Recess in the proceedings from 4:15 to
18         4:27 p.m.)
19    Q.  (BY MR. SIMMS)  Going on with this exhibit, on
20 118, RMFS 118, I was asking you about alerting the
21 necessary people at Simmons, that paragraph, before we
22 took a break.
23    A.  Which one now, what number?
24    Q.  Down where it says, Should I or you alert the
25 necessary people?

Page 258

1    A.  Okay.  Yes, sir.
2    Q.  Then you say to Mr. Jackson, John should no
3  longer be sent any correspondence or financial
4  information, or other Renaissance Man information, or be
5  asked to approve expenses.
6         Did I read that correctly?
7    A.  Yes, sir.
8    Q.  Blaine Walker will now handle these matters with
9  my involvement.
10         And what I really want to talk to you about
11  is the approving of expenses.  And I want to make sure I
12  get an answer to this question before I leave here today.
13         If the sale of the waffles, the retail
14  waffles, were not intended to be done through H. Walker
15  Enterprises and not share the revenue from those sales
16  with Simmons under the Memorandum of Understanding, why
17  would Ms. Blanchard change a PO that was sent to HartyBake
18  to produce those waffles through the Simmons relationship
19  to a PO for HartyBake to sell those waffles to H. Walker
20  Enterprises?
21    A.  Probably because she sent it wrong.  It probably
22  was a mistake, I assume.
23    Q.  And you agree with me, after what you say here,
24  that Blaine Walker is going to be handling these matters
25  with your involvement?

Page 259

1    A.  Yes, sir.
2    Q.  Okay.  And if the sale of the waffles was not
3  going to be through H. Walker Enterprises, and not share
4  the profit with Simmons under the Memorandum of
5  Understanding, why on January 25th, 2018, would
6  Blaine Walker tell HartyBake to produce waffles all under
7  the Renaissance Man/Simmons relationship, but within the
8  hour of telling them that, he tells them, No, keep two
9  different POs, one for H. Walker Enterprises and one for
10  Renaissance Man?
11    A.  Probably you got to ask Blaine.  Like I said, I
12  have no clue.
13    Q.  According to this, you were managing Blaine
14  after December 28th, 2017, right?
15    A.  Right, but as I said, no clue.
16    Q.  You don't know?
17    A.  I don't know.
18    Q.  Mr. Staples wasn't managing him, was he?
19    A.  No.
20    Q.  Did you instruct Blaine to correct that with
21  HartyBake?
22    A.  No.
23    Q.  After you sent this communication to
24  Mr. Jackson, you never received the Consulting Agreement
25  signed by Mr. Staples, correct?

Page 260

1    A.  No, sir.
2    Q.  And you never received the sale of Mrs. Staples'
3  interest in DSM-3 for $10 either, correct?
4    A.  No, sir.
5    Q.  And you are aware that on this date,
6  December 28th, 2017, that Mr. Jackson had Mr. Staples'
7  access to the Simmons computer system cut off; is that
8  correct?
9    A.  Yes, sir.
10    Q.  So as we sit here, do you know what day
11  Mr. Staples was terminated?
12    A.  The day he was terminated by me or by Simmons?
13    Q.  Well, who was he terminated by, first of all?
14    A.  Me.  I let him go from Renaissance Man on the
15  27th.
16    Q.  Let me show you what is Renaissance Man 111.
17         (Exhibit 21 marked.)
18    Q.  (BY MR. SIMMS)  This is Exhibit 21,
19  Renaissance Man 111.
20    A.  (Witness reviews document.)
21         Okay.
22    Q.  Was that Mr. Jackson's response to your e-mail
23  to him of December 28th, 2017?
24    A.  Well, you got them on the same page, so I
25  reckon.  I don't know.  I don't remember what his

Page 261

1  response -- I don't know -- like I say, I don't know
2  whether that was response -- they're on the same page.  Is
3  this the same thread?  I don't know.
4    Q.  All right.  Mr. Jackson says, He's out of the
5  office this week, but he will have the Simmons HR
6  department terminate Mr. Staples effective the end of the
7  week.
8         Did I read that correctly?
9    A.  Yes, sir.
10    Q.  I will have them retain his e-mails and will get
11  account information to Blaine.
12    A.  Okay.
13    Q.  Sounds like you were able to talk him into
14  Plan A, good deal?
15    A.  Yes, sir.
16    Q.  Is that the Plan A that's memorialized in the
17  communication from Mr. Eisenman on December 21st, 2017?
18    A.  I have no clue, because I haven't looked at it.
19  But from what I see here, it wouldn't have been Plan A
20  because he was -- Plan A was offered in the tape, I think,
21  $200,000, and he settled for $255,000.
22    Q.  Did you communicate any further with Mr. Jackson
23  after receiving this response from him and say, What do
24  you mean?  What are you talking about, Plan A?
25    A.  No.

Page 262

1    Q.   Now, before -- on this same day, December 28th,
2  2017, when you sent Exhibit 20, I think, to Mr. Jackson,
3  did the Consulting Agreement and the Purchase Agreement
4  concerning Mrs. Staples that were prepared by Mr. Eisenman
5  try to be sent by him to Mr. Staples' Simmons e-mail
6  address?
7    A.   Wait now.  Say that again.  You said the letter
8  I prepared for David Jackson?
9    Q.   No, the -- to your knowledge, was the Consulting
10  Agreement and the Purchase Agreement sent by Mr. Eisenman
11  to Mr. Staples on December 28th, 2017, and did they come
12  back because his e-mail access had been cut off, and then
13  you and Mr. Eisenman had to get a different e-mail address
14  from him to send those to?
15    A.   Yes, sir, I remember that.
16    Q.   All right.  Did either of those agreements have
17  a date by which Mr. Staples or Mrs. Staples had to sign
18  them by?
19    A.   In the thing, John and I agreed that we wanted
20  to do this quickly before the first of the year, in like
21  two days or three days and stuff, or whatever.  And so I
22  thought it was going to be done like the next day or
23  whatever.
24         And I think he said when he got home, I
25  think Kim said she didn't agree to her portion of it so --

Page 263

1  and I think if John had thought about it, I didn't care
2  whether Kim agreed; John could have still gotten the
3  $255,000.  I was fine with that.
4    Q.   What I'm really getting to is:  You or
5  Mr. Eisenman began communicating with Mrs. Staples and/or
6  Mr. Staples demanding execution of the Consulting
7  Agreement and the Purchase Agreement, correct?
8    A.   No.  I think I -- like I said, I don't know
9  whether I called or e-mailed John to ask him -- and it had
10  nothing to do with the Purchase Agreement, if this is
11  something you want to do.  And if it's not signed by --
12  and I don't know what day it was -- by blank day, I'm
13  rescinding it.  At the end of business, I'm pulling the
14  deal.
15    Q.   All right.  So what day did you communicate to
16  Mr. Staples and/or Mrs. Staples that the deals, I guess,
17  under the Consulting Agreement or the Purchase Agreement
18  were going to be withdrawn?
19    A.   I never talked with Mrs. Staples.  But I told
20  John.  I'm not sure what day that was.  Like I say, I
21  remember being at the Rose Bowl, and I was thinking at
22  that time, I haven't heard from John, and I had not heard
23  anything from him.
24         So I don't know whether I called him or,
25  like I said, I sent him something, but I remember telling

Page 264

1  him that if it's not done by a certain time, the deal is
2  off.
3    Q.   Prior to the communications you began having
4  with Mr. Staples or Mrs. Staples about demanding execution
5  of the operating agreement -- excuse me; the Consulting
6  Agreement and the Purchase Agreement, had Blaine Walker
7  communicated with Barbara Humphrey and Christopher Thurber
8  indicating to them that DSM-3 no longer existed?
9    A.   Oh, I think they had communicated to
10  them -- like I said, I never talked to Kim.  I think he
11  had communicated with them they were going to be working
12  with -- working with, I think, Renaissance Man.  I don't
13  think it was -- I don't know whether it was DSM or
14  whatever, because -- and I think they was going to be
15  working with Renaissance Man at that time.
16    Q.   Did that take place before you communicated and
17  made a demand on Mr. Staples or Mrs. Staples to sign the
18  Consulting Agreement and/or the Purchase Agreement?
19    A.   I never demanded.  I just said, if that's not
20  what you want to do, I'm going to pull the deal.  And not
21  a demand.  Like I said, he didn't want to do it.
22    Q.   When did you instruct anyone with Simmons not to
23  pay the December commission check to DSM-3?
24    A.   I don't know the date.  I think I was looking at
25  some invoices or something.  I don't remember the date.

Page 265

1  But then I saw, and I wrote John a letter and asked him
2  about taking unauthorized commission.
3    Q.   I'm not talking about the November commissions
4  with PFG and all that.
5         I'm talking about the December commission
6  check -- the December commissions to DSM.
7    A.   When did I write the letter?
8    Q.   When did you communicate with anyone at Simmons
9  instructing them not to send that check?
10    A.   I may have communicated with him before
11  December.  I'm not sure.  But it was sometime right after
12  I had got a letter from Julie saying that he -- or Kim was
13  in dispute.  And I said, Don't send out anything until
14  that thing is over because now I'm in a pickle between the
15  two of them.
16    Q.   What dispute was Kim and Julie in?
17    A.   I have no idea.  I know there was a problem.  So
18  you got to ask them two.
19    Q.   Isn't it true the reason you instructed Simmons
20  not to pay the December commissions was to use the holding
21  of the check as a means to force or coerce Mr. Staples'
22  execution of the Consulting Agreement and/or Mrs. Staples'
23  sale of her interest in DSM-3 for the sum of $10?
24    A.   No, sir.
25    Q.   That money still has not been paid and processed

1 by DSM-3 as we sit here today, has it?

2    A.   100 percent correct.

3    Q.   Okay.  All right.  So let me make sure I

4 understand with regard to DSM-3.

5         Ms. Blanchard gets her $125,000 before the

6 end of 2017, correct?

7    A.   Yes, sir.

8    Q.   Ms. Blanchard expenses all her expenses and gets

9 reimbursed before the end of 2017.

10   A.   Okay.

11   Q.   Is that correct?

12   A.   Yes, sir.

13   Q.   You had looked at the bank account?

14   A.   No, I say I'm not sure whether I looked at it.

15 I don't remember ever saying -- looking at a bank account

16 of DSM.

17   Q.   Okay.  Bonuses were paid to DSM employees?

18   A.   Nothing to do with me.

19   Q.   Bonuses were paid to Renaissance Man employees

20 out of DSM monies?

21   A.   Nothing to do with me.

22   Q.   Okay.  And then commissions coming in for

23 December were withheld and still haven't been paid to this

24 day, correct?

25   A.   Correct.  But compared to Julie on the -- her

1 $125,000, Julie was not paid for 15 months.  John and Kim

2 had already received their 85/40.  Julie hadn't been paid

3 in 15 months.  She -- you want -- and so she got her money

4 after 15 months.

5    Q.   She also got her money she says she was owed for

6 the three months --

7    A.   Of expenses.

8    Q.   -- of interest in DSM-3 for the year of 2016,

9 which was $31,250, correct?

10   A.   Yes.

11   Q.   And so before the end of 2017, she got

12 everything she says she was supposed to be owed, correct?

13   A.   She got her expenses and her money that she was

14 supposed to be paid, the same as what they got.  They on

15 an even keel on that.

16   Q.   I understand that.  I just want to know the

17 timing of when she got it.

18        She got it before the end of 2017, correct?

19   A.   You're right, but at the same as when they got

20 theirs, so there was an even keel, as I know it right now.

21   Q.   And that calculation for Ms. Blanchard was to be

22 paid from profits, a distribution in that manner, correct?

23 Her -- her share for 2016 and her share for 2017, not

24 talking about the expenses, but her $125,000 was to be

25 coming out of profits, right?

1    A.   No, sir, that never was said.

2    Q.   Oh, so she was going to get paid 125 -- she was

3 going to skim $125,000 off the top?

4    A.   Well, no, she was taking the money of what they

5 got, just like her salary, what they were getting, to even

6 out what she was getting.  So there was no skimming or

7 whatever.  That's a terrible word to say.

8    Q.   Well, it says, The first $125,000 of profit.

9    A.   Well, because they already got their money.  So

10 they were already paid in advance, his 40, her 85, so the

11 $125,000 is there.  They already had spent all the

12 expense, with most of it went to Renaissance Man.

13 Renaissance Man paid for DSM expenses, and they had taken

14 their rent and all that.  So that's what she got.

15   Q.   I'm not suggesting that she shouldn't get it.

16 I'm just trying to tie down when she did get it and the

17 manner that it was supposed to be calculated.

18        It was from the profits?

19   A.   Well, to be honest, I don't know when she got it

20 or what it was from because, like I said, Kim was the

21 bookkeeper.

22   Q.   We talked about the provisions in the proposals

23 of execution of releases.

24        Do you know if a release had been sent to

25 Mr. Staples on Mrs. Staples and/or Blair Staples at any

1 time prior to the end of 2017?

2    A.   If any release?  No, sir, I don't know that.

3    Q.   Let me show you Exhibit 22.

4         (Exhibit 22 marked.)

5    Q.   (BY MR. SIMMS)  Which is Simmons 167.

6    A.   (Witness reviews document.)

7    Q.   Do you see that?

8    A.   Yes, sir.

9    Q.   That is an e-mail that apparently was penned by

10 Mr. Chip Miller.

11   A.   Yes.

12   Q.   He's also referred to as Donald L. Miller, Jr.,

13 I believe.

14   A.   Yes, sir.

15   Q.   And it pertains to Blair Staples; is that

16 correct?

17   A.   Yes, sir.

18   Q.   And it's in response to an e-mail that

19 Blair Staples sent to Mr. Chip Miller; is that correct?

20   A.   Yes, sir.

21   Q.   It looks like on January the 8th, Blair Staples

22 wrote Mr. Chip Miller and said she was, in shock this

23 afternoon when he called her.  She says that last

24 Thursday, which would have been January the -- whatever

25 date that would be, we can figure it out -- you told her

1 that she was a single mom, and you would take care of her,
2 and that you and Blaine Walker proceeded to tell her that
3 she still had a job and to keep doing her job.
4        She says, Technically, I'm a Simmons
5 employee, and I had no idea Simmons would terminate my
6 employment without justification. I get paid through
7 Simmons/Ren Man, not DSM. I would assume this is just
8 retaliation for my dad not staying onboard with Herschel.
9 May I meet with you to further understand this situation?
10       Did you and/or Blaine Walker indicate to
11 Blair Staples that she would continue to be employed?
12    A.   No, I did. But I never said she was a single
13 mom. But I did say she'd continue to be employed.
14    Q.   Okay. And then Mr. Jackson responds to
15 Mr. Miller up here at the top. Yes, this is a good
16 response. Her mom and dad set her up as a DSM employee.
17 Simmons and Ren Man no longer have a relationship with
18 DSM.
19       Well, there was a relationship with DSM on
20 January the 8th, 2018, correct?
21    A.   No, sir, not in my opinion.
22    Q.   When had that relationship ended? Because I
23 thought all along the intention was that Mrs. Staples
24 would sell her interest to Ms. Blanchard, and
25 Ms. Blanchard would continue on with DSM.

1    A.   But they didn't want to do it. She -- I told
2 them at the first of the year is going to be a good thing.
3 The first of the year came and nobody said anything.
4    Q.   Okay.
5    A.   So --
6    Q.   Go ahead.
7    A.   So I start changing up everything. And this
8 statement right here, there's more to Blair and stuff, if
9 you want me to tell you what happened there.
10   Q.   No. What I want to focus on right now is
11 apparently Simmons was under the impression on
12 January 8th, 2018, that there was no longer a relationship
13 between Simmons and Renaissance Man with DSM.
14   A.   No longer relationship with Simmons
15 and Ren -- Simmons never had a relationship with DSM.
16   Q.   Okay.
17   A.   Renaissance Man had a relationship with DSM, but
18 there was no longer a relationship with Renaissance Man
19 and DSM.
20   Q.   When had it effectively ended, that
21 relationship?
22   A.   When it took too long, and no one got a
23 response. By the 8th of this year, everything changed. I
24 think you got the letter and stuff.
25   Q.   You would agree with me that you sent the

1 termination of the Renaissance Man/DSM brokerage on
2 December 30th, 2017, correct?
3    A.   Right.
4    Q.   And the effective date of that was 30 days after
5 December the 30th, 2017, which would be January 30th,
6 2018, correct?
7    A.   There is a letter that -- the letter is sent,
8 there's no more work that DSM had to do for Renaissance
9 Man. So there was no more relationship with DSM and
10 Renaissance Man.
11   Q.   So had Mrs. Staples executed the Purchase
12 Agreement and sold her interest in DSM-3 to Ms. Blanchard
13 for $10, DSM-3 would have continued on. But since
14 Mrs. Staples had not done it, DSM-3 was terminated and no
15 longer had a relationship with Renaissance Man.
16       Is that what you're saying?
17   A.   The way DSM was structured --
18   Q.   Can you answer my question?
19   A.   That's what I'm doing.
20   Q.   Okay.
21   A.   The way DSM was structured, if Kim Staples
22 stayed in it -- and I'm sorry; DSM was gone. I heard
23 nothing from anyone from the time I talked with John. So
24 at that time, the 31st or whatever, I said, DSM is gone.
25 Whether it was sold to Julie after that, that would have

1 been great. If it wasn't, DSM was gone.
2    Q.   And the reason you felt comfortable in having
3 DSM gone is because you had depleted and satisfied yours
4 and Ms. Blanchard's interest in DSM prior to doing what
5 you just did and ending DSM, correct?
6    A.   No. They still got money in the bank, and they
7 have money in the bank still. They paid John another
8 consulting fee or something, and they paid
9 Christopher Thurber -- that's the -- well, there was money
10 in the bank. I don't know if there still is. I don't
11 know. There was money in the bank still. So I didn't
12 deplete anything.
13   Q.   And you also were comfortable in ending the
14 relationship with DSM because you had prevented DSM from
15 receiving its December 2017 commissions, correct, by
16 instructing Simmons to hold it?
17   A.   No, sir, because I still have it. And when this
18 is resolved, this thing is settled, they can have the
19 money.
20   Q.   Were you holding the commission check hostage to
21 try to coerce execution of the Consulting Agreement and/or
22 the Purchase Agreement from Mr. and Mrs. Staples?
23   A.   No, sir. John was gone whether he executed this
24 or not. Kim was gone whether executed or not. There was
25 going to be a change. So I didn't have to hold anything

Page 274

1 hostage or coerce or anything. Because like I said, there
2 was changes happening.
3    Q.   Why did you hold it if that was going to happen?
4    A.   Because he admitted that they were doing this
5 unauthorized -- unauthorized commission thing, and I said,
6 Wait a minute, let me -- do you want me to answer?
7    Q.   No, I think you're talking about the November
8 commission.
9    A.   No. This is this, too, because that involved
10 this commission as well.
11    Q.   December did?
12    A.   Yeah. They -- I got to calculate it now because
13 that still -- you got to calculate when -- the money there
14 as well. So now there's a dispute between these two. So
15 now, I'm going to hold it until they settle what they're
16 doing.
17    Q.   Okay. Speaking of the amount you held out of
18 the November commission, did DSM not perform work related
19 to PFG and those other entities that they were claiming
20 commission on?
21    A.   They performed a little bit, but that wasn't the
22 agreement that John and I had. And that's the reason he
23 wrote the letter. Remember, he wrote the letter agreeing,
24 that says -- you didn't know this. He wrote the letter.
25    Q.   I understand.

Page 275

1    A.   Okay.
2    Q.   But did you expect DSM to perform work that
3 benefitted Renaissance Man and not pay commissions?
4    A.   Well, I didn't expect DSM to make money for
5 something they didn't do. They got commission on Cat Man,
6 which they had nothing to do with that. John gave them
7 hundreds of thousands of dollars for something they never
8 had nothing to do with.
9       So the agreement John Staples and
10 Herschel Walker had was DSM would do this work for
11 Renaissance Man, and they will go outside of Renaissance
12 Man, that's where they're going to make the money.
13 They're going to sell, not just to Sysco, but U.S. Foods,
14 all these others.
15       So that was the agreement we had. They
16 ended up getting money that they never had to work for.
17 When do you ever do that? I'd love to have a job like
18 that. They never had to work for that.
19       And if you look, in 2016, there was
20 $700,000 at DSM-2, ended up getting $720,000-something.
21    Q.   Going on back here, Mr. Jackson says, This is
22 not retaliation. It is simply her employer who contracts
23 her employment with Simmons has had the relationship
24 terminated.
25       So he's saying that Renaissance Man has

Page 276

1 ended the relationship with DSM-3.
2    A.   Yes.
3    Q.   That's what he's referring to?
4    A.   Yes, sir. But there was something else that
5 happened in the whole instance right there.
6    Q.   What's that?
7    A.   Blair was asked to come to work. She didn't
8 come to work that next day when we were going to hire her.
9 And there was some invoices or something, and I'm not sure
10 whether Dione or someone said it was done, and it was not
11 done.
12       And so that's when -- and I think Blaine
13 tried to call her. I think Clinton called or something.
14 I'm not sure. And she said she had done them, and they
15 were not done. And Clinton called and Blaine tried to
16 call her. She never called them back.
17       And that's when I told John, I said, John,
18 I will protect Blair, I said, but I'm not going to be her
19 manager. I said, As long as she do the work, she will be
20 working. And if she had done the work, and that had not
21 happened, Blair would still be with me right now.
22    Q.   Had Renaissance Man approached Barbara Humphrey
23 and/or Christopher Thurber to offer them employment with
24 Renaissance Man before January 8th, 2017?
25    A.   Yes, sir.

Page 277

1    Q.   And do you consider that to be in violation of
2 the employment agreements that Mr. Eisenman had prepared
3 and billed Mrs. Staples 50 percent for?
4       MR. KING: Objection, that states facts
5 that are definitely not in evidence.
6    A.   No, I don't because John Staples said, I'm
7 all-in, and hired Blair, hired Barbara, hired Christopher.
8 And I said, Yes. And that's why I went out and said,
9 Okay, because if they had not been hired, they'd be fired
10 too. John wanted them to keep their job.
11    Q.   (BY MR. SIMMS) You knew before January the 8th
12 that Mr. Staples was not all-in because he had not sent
13 back the signed Consulting Agreement; Mrs. Staples had not
14 sold her interest for $10 in DSM; and you had pulled the
15 deals off the table; isn't that correct?
16    A.   Yes. But as I said, I'm a nice guy, and I kept
17 Barbara Humphrey and asked Christopher Thurber to come,
18 but Christopher Thurber didn't want to come. He got smart
19 so he's gone. Barbara is still working. So, no, I didn't
20 do anything wrong.
21       Because John asked me to hire them. So
22 when I hired them after his word, I'm not going to hire
23 them and fire them because of him not signing his
24 agreement. And I didn't know they even had one.
25    Q.   When you say "Christopher Thurber got smart,"

1 are you talking about in his mouth in something he said to
2 the big dog, Herschel, that he's no longer there?
3    A.  I never said anything about "big dog."
4    Q.  You said, Christopher Thurber got smart and he,
5 too, is no longer involved, or no longer there?
6    A.  He didn't want --
7    Q.  Isn't that what you just said?
8    A.  He didn't want to sign the agreement.
9    Q.  Sir, what I want to know is, what do you mean
10 "he got smart"?
11    A.  He wrote me a letter and said "H," something
12 about his uncle and all that.  I'm like, Guy, I don't have
13 time for this.  I'm selling chicken.  So I said, You're
14 gone too.  It had nothing to do with big dog.  It got to
15 do with work, business, and that's the way business was.
16    Q.  Because you felt like Christopher Thurber
17 disrespected you by being smart, he was gone?
18    A.  No.  He didn't disrespect me.  He disrespected
19 himself.
20    Q.  Okay.
21    A.  Not me, because I didn't care.  Because I was
22 trying to give him a job.  He needed a job.  I didn't.
23    Q.  What do you mean by --
24         MR. KING:  Excuse me; by my calculation,
25 you are now entering the last hour.

1         MR. SIMMS:  Oh, good.
2    Q.  (BY MR. SIMMS)  What do you mean by "he got
3 smart"?
4    A.  Well, he wrote me a letter saying, H.  He kept
5 sending me invoices from someone or whatever that he had
6 never sent invoices to me before.  So I had no clue what
7 he was doing.  So that is totally disrespect.  And I said,
8 No, I don't need someone that's going to have a round with
9 me like this.
10    Q.  He didn't call you Mr. Walker or Herschel, he
11 just said "H"?
12    A.  He said, "H," and something about "all these
13 invoices" and something.  I have no clue.  But he don't
14 send them to me.  So --
15    Q.  Go ahead.
16    A.  So I don't know what he was doing.  He said,
17 Write his uncle, who was an attorney too, about something.
18 It's like, I'm trying to give you work that John Staples
19 asked me to hire you, and you're saying write your uncle
20 about you working here.  I'm trying to give you a job.
21    Q.  So is my take-away with what you just said about
22 Mr. Christopher Thurber that if someone disrespects you,
23 they may be gone?
24    A.  No, because I've had a lot of people disrespect
25 me, and they're still with me.  Georgia Boston has

1 disrespected me a hundred times, and she's still with me.
2 She's been with me longer than anyone.
3    Q.  Anybody else that's disrespected you, and they
4 were going to be gone?
5    A.  A lot of people have.
6    Q.  I think in your book, you talk about some man
7 who sold you an automobile; you felt disrespected by that
8 man, right?
9    A.  Yes, sir.
10    Q.  And you were going to track him down.
11         And what were you going to do to him?
12    A.  Yes, sir.  He was going to be hurt.
13         And you forgot to say in that book now, I
14 saved about 4,500 to 6,000 soldiers a year now.
15    Q.  Was Mr. Thurber -- Christopher Thurber sending
16 you e-mails that he was receiving from Sysco after he was
17 no longer working for them?
18    A.  He was sending me e-mails from a company of
19 Sysco that his cousin worked there that he never sent
20 e-mails before.  And as I told him, Christopher, if
21 you-all was working like this before, sending me things,
22 because I asked for all these reports, you would still be
23 working.
24         You got that e-mail, I hope.  And I sent
25 the letter, just said, Hey, I wish you-all were working

1 like this before because that's what I want, work.  You
2 know, that's what I told him, I just want work.
3    Q.  I guess where I'm going with Christopher Thurber
4 is, wasn't he actually respecting you because he was no
5 longer working for DSM or Renaissance Man -- you're
6 shaking your head no and I haven't even finished my
7 question.
8    A.  I'm just shaking my head.  I'm just saying.
9 That's fine.
10    Q.  And he was getting e-mails from one of your
11 customers, and he wanted you to have them?
12    A.  Christopher Thurber was getting e-mails from his
13 cousin who worked at Sysco Orlando, who was there, sending
14 these e-mails.  He never sent anything before.  And that
15 was his customer that he was supposed to be doing work
16 with.  And those people never sent e-mails before.
17         So now, with Christopher Thurber getting
18 let go, now he's sending e-mail.  So you add that up.
19    Q.  Okay.
20         MR. SIMMS:  Let's take a quick break.
21         MR. KING:  Yep.
22         (Recess in the proceedings from 5:03 to
23         5:10 p.m.)
24         (BY MR. SIMMS)  Mr. Jackson testified that
25 the broker for the Renaissance Man/H. Walker

71 (Pages 278 - 281)

App. 276

Page 282

1 Enterprises/Simmons Prepared Foods relationship now is an
2 entity, and I may get the word wrong, Consolidated Broker
3 Management, Inc.?
4    A.  Yes.
5    Q.  Anyway, who is that?
6    A.  That's Julie.
7    Q.  And when was that entity formed?
8    A.  Right after -- I don't know.  A couple of weeks
9 after, I reckon, DSM in January sometime -- in January of
10 2018.
11    Q.  All right.  And who prepared that entity's
12 documents?
13    A.  I think Ron.  I think now.  Ron Eisenman.
14    Q.  And do you know where that entity is formed,
15 what state?  Is it a Delaware corporation; do you know?
16    A.  I don't know.
17    Q.  Were you copied on the Consulting Agreement
18 Mr. Eisenman prepared that was sent to Mr. Staples, or was
19 that just sent by Mr. Eisenman to Mr. Staples?
20    A.  On the --
21    Q.  Consulting Agreement.
22    A.  That was sent for -- I don't know.  I don't
23 think -- I don't know that I was copied or not on that.
24    Q.  I was going to ask you some questions about the
25 agreement, but I wanted to find out first if -- have you

Page 283

1 even read it?
2    A.  No, sir.
3    Q.  And the same question regarding the Purchase
4 Agreement for Mrs. Staples' shares or ownership interest
5 in DSM Sales and Marketing, LLC.
6        Have you read that agreement?
7    A.  No, sir.
8    Q.  Let me show you Renaissance Man 96 through 105.
9 We'll make that Exhibit 23.
10        (Exhibit 23 marked.)
11    Q.  (BY MR. SIMMS)  And if you could, you're going
12 to need to flip to the page that has the sales price, and
13 I think that's on page 2.
14    A.  (Witness reviews document.)
15    Q.  Do you find that part that references what
16 the --
17    A.  Number 2, the purchase price?
18    Q.  Yeah, is purchase price on page 2?
19    A.  Yes, sir.
20    Q.  And it was $10; is that correct?
21    A.  Yes, sir.
22    Q.  All right.  Can you show me where else in that
23 agreement, Mr. Walker, there is a release of other
24 liability contained in it?
25    A.  I have no idea if there was a release.  Do you

Page 284

1 want me to try to look for one?
2    Q.  Well, I didn't see one.
3    A.  Oh, okay.
4    Q.  And my question to you is:  If there -- assume
5 for me that there is no release language in the agreement.
6    A.  Okay.
7    Q.  And under Proposal A and/or B, Mrs. Staples was
8 going to give a release.
9        Do you know from whom the release was going
10 to be coming from?
11    A.  When you say under assumption and the release,
12 so this is assuming --
13    Q.  Assuming that document doesn't contain a
14 release, then my question to you is:  Do you know who the
15 release was going to be coming from?
16    A.  No, no idea.
17    Q.  All right.  And --
18        MR. KING:  Did you look at Paragraph 8?
19        MR. SIMMS:  Is it in 8?
20        MR. KING:  Uh-huh.
21        MR. SIMMS:  Can I see it?
22    A.  It's in Paragraph 8.
23    Q.  (BY MR. SIMMS)  Can I see the document?
24    A.  (Witness hands attorney document.)
25    Q.  All right.  Other than what is contained in

Page 285

1 Paragraph 8, are you aware of any release that
2 Mrs. Staples was going to be asked to execute that was in
3 the favor or benefitted Simmons Prepared Foods, Inc.?
4    A.  Say that again, that benefits Simmons.
5    Q.  I don't read that release as benefitting Simmons
6 so that's why I'm asking the question.
7        Are you aware of any release documents that
8 Simmons was going to have Mrs. Staples execute with
9 respect to the discussions set out in Proposal A or
10 Proposal B?
11    A.  Am I aware?  No, I'm not aware.
12    Q.  Okay.  Are you aware of any release agreement
13 that's not contained in the Consulting Agreement that was
14 sent to Mr. Staples by Mr. Eisenman?
15    A.  No, sir.
16    Q.  Okay.
17        MR. SIMMS:  I'm finished.
18        MR. KING:  We're finished.
19        MR. PARKER:  No questions.
20        (Deposition concluded at 5:19 p.m.)
21
22
23
24
25

CHANGES AND SIGNATURE

WITNESS NAME: HERSCHEL WALKER

DATE OF DEPOSITION: JANUARY 18, 2019

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |

I, HERSCHEL WALKER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_________________________________

HERSCHEL WALKER

THE STATE OF ___________ )

COUNTY OF ______________ )

Before me, _____________, on this day personally appeared HERSCHEL WALKER, known to me (or proved to me under oath or through ___________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of ________________________, 2019.

_______________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF __________________

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

KIMBERLY AND JOHN STAPLES, )
Plaintiffs )
)
VS. )CIVIL ACTION
)NO. 7:18-cv-00160-LSC
H. WALKER ENTERPRISES, LLC, )
RENAISSANCE MAN FOOD SERVICES,)
LLC, AND SIMMONS PREPARED )
FOODS, INC., )
Defendant )

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF HERSCHEL WALKER

JANUARY 18, 2019

I, Kathryn R. Baker, RPR, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, HERSCHEL WALKER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on the ____ day of January, 2019 to the witness or to the attorney for the witness for examination, signature and

return to me by the ____ day of February, 2019;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all counsel for parties of record:

Mr. Keri Donald Simms, Attorney for the PLAINTIFFS

Mr. Michael J. King, Attorney for the DEFENDANTS, H. WALKER ENTERPRISES, LLC, AND RENAISSANCE MAN FOOD SERVICES, AND THE WITNESS

Mr. Talley R. Parker and Mr. Ethan Davis, ATTORNEYS FOR THE DEFENDANT, SIMMONS PREPARED FOODS, INC.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

That $_________ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

Certified to by me this ____ day of January, 2019.

Kathryn R. Baker

KATHRYN R. BAKER, RPR, CSR #6955
Expiration Date: 04/30/2021
Veritext Legal Solutions
Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
817-336-3042

Page 290

1  1  To: Herschel Walker

2  2  Re: Signature of Deponent Herschel Walker

3  3  Date Errata due back at our offices:  02/28/2019

4  4

5  5  Greetings:

6  6  This deposition has been requested for read and sign by
      the deponent.  It is the deponent's responsibility to

7  7  review the transcript, noting any changes or corrections
      on the attached PDF Errata.  The deponent may fill

8  8  out the Errata electronically or print and fill out
      manually.

9  9

10 10  Once the Errata is signed by the deponent and notarized,
       please mail it to the offices of Veritext (below).

11 11

12 12  When the signed Errata is returned to us, we will seal
       and forward to the taking attorney to file with the

13 13  original transcript.  We will also send copies of the
       Errata to all ordering parties.

14 14

15 15  If the signed Errata is not returned within the time
       above, the original transcript may be filed with the

16 16  court without the signature of the deponent.

17 17

18 18  Please Email the completed errata/witness cert page
       to readandsign@veritext.com

19 19  or mail to

20 20  Veritext Production Facility

21 21  2031 Shady Crest Drive

22

23 22  Hoover, AL 35216

24

25 23  205-397-2397

Page 292

1  2  _____

2  3  Reason for change _____

3  4  Page _____ Line _____ Change _____

4  5  _____

5  6  Reason for change _____

6  7  Page _____ Line _____ Change _____

7  8  _____

8  9  Reason for change _____

9  10  Page _____ Line _____ Change _____

10 11  _____

11 12  Reason for change _____

12 13  Page _____ Line _____ Change _____

13 14  _____

14 15  Reason for change _____

15 16

16 17

17 18  _____

       DEPONENT'S SIGNATURE

18 19

       Sworn to and subscribed before me this ___ day of

19 20

20    _____, _____.

21 21

22

23 22  _____

24

25 23  NOTARY PUBLIC / My Commission Expires:_____

Page 291

1  1  ERRATA for ASSIGNMENT #3186282

2  2  I, the undersigned, do hereby certify that I have read the
      transcript of my testimony, and that

3  3

4  4  ___ There are no changes noted.

5  5  ___ The following changes are noted:

6  6

      Pursuant to Rule 30(7)(e) of the Federal Rules of Civil

7  7  Procedure and/or OCGA 9-11-30(e), any changes in form or
      substance which you desire to make to your testimony shall

8  8  be entered upon the deposition with a statement of the
      reasons given for making them.  To assist you in making any

9  9  such corrections, please use the form below.  If additional
      pages are necessary, please furnish same and attach.

10 10

11 11  Page _____ Line _____ Change _____

12 12  _____

13 13  Reason for change _____

14 14  Page _____ Line _____ Change _____

15 15  _____

16 16  Reason for change _____

17 17  Page _____ Line _____ Change _____

18 18  _____

19 19  Reason for change _____

20 20  Page _____ Line _____ Change _____

21 21  _____

22 22  Reason for change _____

23 23  Page _____ Line _____ Change _____

24

25 1  Page _____ Line _____ Change _____

74 (Pages 290 - 292)

App. 279

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

App. 280