FILED

2019 Jul-16  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

Deposition of Kristin Caffey taken June 27, 2019

1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ALABAMA
2                      WESTERN DIVISION

3   KIMBERLY and JOHN STAPLES,        )
                                      )
4        Plaintiffs,                  )   CIVIL ACTION NO.
                                      )   7:18cv00160-LSC
5   v.                                )
                                      )
6   H. WALKER ENTERPRISES, LLC;       )
    RENAISSANCE MAN FOOD              )
7   SERVICES, LLC; and SIMMONS,       )
                                      )
8        Defendants.                  )

9

10

11            VIDEOTAPED ORAL DEPOSITION OF

12                    KRISTIN CAFFEY

13              THURSDAY, JUNE 27, 2019

14

15

16

17

18

19

20

21   Job NO. 30433

22   REPORTED BY:

23   MICHAEL E. MILLER, FAPR, RDR, CRR

24   Notary Public in and for the State of Texas

25   JOB NO. 30433

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 2..5

---

**Page 2**

1          VIDEOTAPED ORAL DEPOSITION OF KRISTIN

2  CAFFEY, produced as a witness at the instance of the

3  Defendants H. Walker Enterprises LLC and Renaissance

4  Man Food Services LLC and duly sworn, was taken in

5  the above-styled and numbered cause on the

6  above-referenced date, from 9:37 a.m. to 12:45 p.m.,

7  before Michael E. Miller, FAPR, RDR, CRR, Notary

8  Public in and for the State of Texas, reported by

9  realtime stenographic means at Greenberg

10 Traurig LLP, 1000 Louisiana Street, Suite 1700,

11 Houston, Texas, pursuant to the Federal Rules of

12 Civil Procedure.

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 3**

1 A P P E A R A N C E S :

2     WEBSTER HENRY BRADWELL COHAN
      SPEAGLE & DESHAZO, PC

3     BY: P. VAUGHAN RUSSELL JR., ESQUIRE
          vrussell@websterhenry.com

4     Two Perimeter Park South
      Suite 445 East

5     Birmingham, Alabama 35243
      (205) 380-3480

6     Counsel for Plaintiffs

7

8     GREENBERG TRAURIG LLP
      BY: MICHAEL J. KING, ESQUIRE

9         kingm@gtlaw.com
      Terminus 200

10    3333 Piedmont Road, N.E., Suite 2500
      Atlanta, Georgia 30305

11    (678) 553-2100
      Counsel for Defendants H. Walker

12    Enterprises LLC and Renaissance Man
      Food Services LLC

13

14    JACKSON LEWIS LLP
      BY: TALLEY R. PARKER, ESQUIRE

15        talley.parker@jacksonlewis.com
      500 North Akard, Suite 2500

16    Dallas, Texas 75201
      (214) 520-2400

17    Counsel for Defendant Simmons
      Prepared Foods

18

19 ALSO PRESENT:

20    JAMES STAPLES

21    HERSCHEL WALKER

22    JULIE BLANCHARD

23

24 VIDEOGRAPHER:

25    J.C. LOCAS

---

**Page 4**

1                    INDEX

2               KRISTIN CAFFEY

3                JUNE 27, 2019

4

5  APPEARANCES                                    3

6  PROCEEDINGS                                    7

7

8 EXAMINATION OF KRISTIN CAFFEY:

9     BY MR. KING                8

10    BY MR. RUSSELL             102

11

12 REPORTER'S CERTIFICATION                       114

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 5**

1                DEPOSITION EXHIBITS

2     NUMBER          DESCRIPTION          MARKED

3  Exhibit 1    Subpoena                      10

4  Exhibit 2    Requests For Production       11

5  Exhibit 3    Subpoena                      18

6  Exhibit 4    Affidavit of Kristin Caffey   31

7  Exhibit 5    Affidavit of Kristin Caffey   31

8  Exhibit 6    Affidavit of Kristin Caffey   31

9  Exhibit 7    Affidavit of Kristin Caffey   34

10             (Track Changes)

11 Exhibit 8    6/9/08 Sysco Press Release    56

12 Exhibit 9    E-mail(s) w/Attached Radian   65

13             Presentation

14 Exhibit 10   E-mail(s) w/Attached Radian   70

15             Presentation

16             RADIAN-GT-000014 -

17             RADIAN-GT-000018

18 Exhibit 11   E-mail(s)                     71

19             RADIAN-GT-000019

20 Exhibit 12   E-mail(s) w/Attachment(s)     73

21             RADIAN-GT-000108 -

22             RADIAN-GT-000110

23 Exhibit 13   Caffey Text Message           90

24             Conversation

25

---

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 6..9

---

Page 6

```
1              DEPOSITION EXHIBITS
2
3   Exhibit 14    Caffey Texas Driver's        113
4                 License
5   Exhibit 15    Affidavit of Kristin Caffey  113
6                 Notarized by Mr. Russell
7
8                    --o0o--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 7

1        PROCEEDINGS
2        (June 27, 2019 at 9:37 a.m.)
3        THE VIDEOGRAPHER:  Good morning.
4 We're on the record at 9:37 a.m. on Thursday,
5 June 27th, 2019 for the videotaped deposition of
6 Kristin Caffey.
7        We're taking this deposition in the
8 offices of Greenberg Traurig in Houston, Texas in
9 the action entitled Staples et al v. Walker et al.
10 The case number is 7:18cv00160-LSC.
11        This is taken before Mike Miller, the
12 reporter.  My name is J.C. Locas; I'm a certified
13 legal video specialist for EcoScribe Solutions.
14 This is page 1 of Volume 1.
15        Will counsel please identify
16 themselves and state whom they represent.
17        MR. KING:  Michael King on behalf of
18 H. Walker Enterprises LLC and Renaissance Man Food
19 Services LLC.
20        MR. PARKER:  Talley Parker for
21 defendant Simmons Prepared Foods.
22        MR. RUSSELL:  Vaughan Russell for
23 Kimberly and John Staples.
24        ///
25        ///

---

Page 8

1              KRISTIN CAFFEY,
2           having been duly sworn,
3           testified as follows:
4              EXAMINATION
5 BY MR. KING:
6   Q.  Good morning, Ms. Caffey.
7   A.  Good morning, Mr. King.
8   Q.  I understand that you've known Herschel
9 Walker since about 2000; is that correct?
10   A.  Approximately, yes.
11   Q.  Okay.  If you would, please tell me what
12 employment you have had from that point forward.
13   A.  I was with Sysco Corporation until
14 2013 -- actually, 2014.  Let me -- I was out on
15 medical leave.  And then I am employed by Radian
16 Group.
17   Q.  And that is who you're working for right
18 now?
19   A.  It is.
20   Q.  And what's your capacity at Radian Group?
21   A.  I'm a senior director.
22   Q.  And what does that involve?
23   A.  I manage a team on the ground --
24   Q.  Doing what?
25   A.  -- at Sysco.

---

Page 9

1   Q.  Sorry.  I didn't mean to interrupt you.
2        You manage a team on the ground at Sysco,
3 and what does your team do?
4   A.  They are category planners.
5   Q.  What does that mean?
6   A.  That means that they do analytics for
7 specific vendors that engage our assistance.
8   Q.  And how does that relate to Sysco?
9   A.  Sysco awards the supplier volume, and
10 they are deemed a captain, and then they employ a
11 person to be on-site for them, and we play as a
12 third-party consultant for that role.
13   Q.  Did you go directly from Sysco to Radian
14 Group in 2014?
15   A.  I did.
16   Q.  What was your position with Sysco at
17 2014?
18   A.  I was senior director of the poultry
19 department.
20   Q.  And did you hold any other positions at
21 Sysco during the period from 2000 until 2014?
22   A.  I was promoted on multiple occasions
23 within that, so I started out as a product manager.
24 I was with the company since '96.  I was at the main
25 warehouse facility first and then transitioned to

---

Page 10

1 Sysco corporate in 2000, and then held multiple
2 positions within poultry, seafood and pork while I
3 was there.
4          MR. KING:  Will you mark that,
5 please.
6          (Caffey Deposition Exhibit 1 marked.)
7 BY MR. KING:
8     Q.   I've handed you what has been marked as
9 Caffey Exhibit 1.
10    A.   Okay.
11    Q.   Do you recall receiving that subpoena?
12    A.   I do.
13    Q.   You'll notice at the document, page 16
14 and 17, identify a series of requests for production
15 of documents.
16          Do you recall reviewing that?
17    A.   I do.
18    Q.   Tell me what you did in order to search
19 for responsive documents to the subpoena.
20    A.   I looked through e-mails, through text
21 messaging, phone logs.
22    Q.   Anything else?
23    A.   That would have been the only place I
24 would have had business information.
25    Q.   Now, when you say e-mails, are you

Page 11

1 talking about personal e-mails?
2     A.   I'm talking all e-mails.
3     Q.   So what e-mail addresses did you review?
4     A.   My Sysco e-mail.
5     Q.   Which is -- what's the -- what is that?
6     A.   What is -- I'm sorry.
7     Q.   The e-mail address, the e-mail address
8 you're talking about.
9     A.   caffey.kristin@corp.sysco.com.
10    Q.   Okay.  Any others?
11    A.   My Radian e-mail.
12    Q.   What is that address?
13    A.   kcaffey@radiangroup.com.
14    Q.   Anything else?
15    A.   And personal, which is the rebeltoddy10
16 that you have.
17    Q.   Have you found any records responsive to
18 these requests that are not included in the written
19 response -- or the e-mail response that you sent to
20 the request for production?
21    A.   Not that I could find.
22          MR. KING:  This will be exhibit --
23 Caffey Exhibit 2.
24          (Caffey Deposition Exhibit 2 marked.)
25          ///

Page 12

1 BY MR. KING:
2     Q.   Did you prepare the notations that are --
3     A.   Yes.
4     Q.   -- included on this Exhibit 2?
5     A.   Yes, sir.
6     Q.   And the documents that are attached is
7 the collection of documents other than the
8 affidavits that you found?
9     A.   Yes, sir.
10    Q.   And as you sit here today, are you aware
11 of any additional documents that would be responsive
12 to this request that you couldn't find?
13    A.   Not that I'm aware of.
14    Q.   And are all the answers to these requests
15 for production accurate and true?
16    A.   Yes.
17    Q.   Did you use search terms to review
18 e-mails?
19    A.   I did.
20    Q.   How did you arrive at the search terms
21 that you utilized?
22    A.   By name, primarily.  I don't know what
23 else I would have looked for things.
24    Q.   That's -- so you used names?
25    A.   Yeah.

Page 13

1     Q.   And did you say that you had access to
2 your various documents on the Radian server when you
3 looked for documents?
4     A.   I have my document.  I don't have access
5 to other people's documents.
6     Q.   No, but you have access to your documents
7 that are on the Radian server that you searched; is
8 that right?
9     A.   I'm not sure I understand the question.
10    Q.   All right.  Presumptively, when you're
11 logged in to your computer using your Radian
12 access --
13    A.   Uh-huh.
14    Q.   -- you have access to electronic folders
15 and electronically stored documents and e-mails,
16 et cetera?
17    A.   I do not.
18    Q.   Okay.  Explain that.
19    A.   I do not use the Radian e-mail very
20 often.  That is not my main source e-mail for work.
21 My main source e-mail is the Sysco e-mail.
22    Q.   But in making this search, did you
23 attempt to review Radian documents?
24    A.   Of course.  Of course.
25    Q.   All right.  Similarly, when you searched

Page 14

1 your Sysco records --
2    A.    Uh-huh.
3    Q.    -- you had access to documents that are
4 maintained on that system; is that right?
5    A.    Well, maintained on Sysco's system?  I
6 want to make sure I'm understanding the question
7 properly.
8    Q.    Sure.  Yes.
9    A.    I don't have access to Sysco's systems.
10   Q.    The documents that you use --
11   A.    I have access to my e-mail.
12   Q.    Do you also create documents that are
13 stored electronically on a server at Sysco?
14   A.    I do not.
15   Q.    So if you create a document --
16   A.    Uh-huh.
17   Q.    -- other than an e-mail, if you create a
18 document, where does that get stored?
19   A.    I don't create documents.  I manage a
20 team.  I'm a liaison.  They create documents.  I do
21 not create documents.
22   Q.    All right.  If you receive a document
23 from a person on your team pertinent to your job, is
24 that document stored on a Sysco server?
25   A.    No.

Page 15

1    Q.    Where is it stored?
2    A.    It would -- I guess in my e-mail.  I
3 don't -- I mean, we don't have personal folders.
4 It's not a typical system.  It's used -- it's a
5 web-based e-mail.  There's not storage aspect to it,
6 so I'm not sure what --
7    Q.    Okay.
8    A.    -- what you're getting to here.
9    Q.    Well, I'm trying to understand exactly
10 how you have access to information.  So --
11   A.    Well, just like, I guess, anybody.  I
12 have an e-mail.  I have my phone that I use -- you
13 know, texting for business.  I'm not very tech
14 savvy, so that's why I'm having a hard time
15 understanding some of the things that you're asking
16 for.
17   Q.    If one of your team creates an Excel
18 spreadsheet --
19   A.    Uh-huh.
20   Q.    -- that has analytical information --
21   A.    Uh-huh.
22   Q.    -- where is that document?  Where does
23 that spreadsheet reside so that if changes need to
24 be made, they can be made?
25   A.    I assume that they would have their own

Page 16

1 folders that they would store their documents in.
2    Q.    On a personal computer?
3    A.    Yes.
4    Q.    Not on a Sysco server?
5    A.    We do not have a Sysco server.
6    Q.    Okay.  I know you're not doing this
7 intentionally --
8    A.    I'm not.  I'm sorry.
9    Q.    Sorry.  I know you're not doing this
10 intentionally, but this gentleman is trying to take
11 my questions and your answers, and when we
12 communicate over each other, it makes his job
13 miserable.  Okay for the film, but not for him.  So
14 if you'll try to let me finish my question, and I
15 will try to do the same for you.
16   A.    Okay.
17   Q.    So to the extent that somebody created a
18 document that you have reviewed at some point in
19 time, you would not be able to have produced it as
20 part of this subpoena unless it was attached to an
21 e-mail that you could search?
22   A.    Unless I was included on that, yes.
23   Q.    Unless you what?
24   A.    Unless I was included on it, I guess.
25 I -- again, I don't manage the documents.  I don't

Page 17

1 do documents.  That's not my job.
2    Q.    My question was with respect to documents
3 that were created by somebody else that were sent to
4 you --
5    A.    Uh-huh.
6    Q.    -- unless they were sent to you in an
7 e-mail that you kept --
8    A.    Uh-huh.
9    Q.    -- you would not have access to them for
10 purposes of responding to this subpoena; is that
11 right?
12   A.    It would depend on the document and who
13 it came from as to whether it was housed and whether
14 I would have access to something.  I mean, this is a
15 complicated question based on all the different
16 aspects that we do.  I mean, I -- I'm answering you
17 to the best of my ability in that respect.
18   Q.    I understand that you don't store any
19 documents on a Sysco system, correct?
20   A.    Uh-huh, correct.
21   Q.    You maintain a personal computer where
22 you may store documents.
23   A.    Uh-huh.
24   Q.    Right?
25   A.    Correct.

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 18..21

Page 18

1   Q.   And then --
2   A.   It's not a personal computer.  It's a
3 Radian computer.
4   Q.   And so if you have access to certain
5 documents at Radian --
6   A.   Uh-huh.
7   Q.   -- as part of your position, you could
8 have searched them as part of the process of
9 responding to this subpoena; is that right?
10   A.   If I had access to a folder, yes.
11 Possibly, yes.
12   Q.   But there was nothing that came up during
13 the course of your search that appeared to you to be
14 responsive to the subpoena?
15   A.   Correct.  Correct.
16         (Caffey Deposition Exhibit 3 marked.)
17 BY MR. KING:
18   Q.   I'm handing you what's being marked as
19 Caffey Exhibit 3.  Have you ever seen that document
20 before?
21   A.   No.
22         (Document review.)
23   A.   I've not seen this before.  I mean, there
24 are similar things to what you asked me of, but no.
25         ///

Page 19

1 BY MR. KING:
2   Q.   At any time has someone at Radian asked
3 you to assist Radian in the production of documents
4 responsive to a subpoena in this case?
5   A.   No, I have not.
6   Q.   Did anybody at Radian tell you that
7 Radian had been involved in the discovery process in
8 this case?
9   A.   I heard mention of it, but no one
10 mentioned it directly to me.
11   Q.   Meaning that you heard it from somebody
12 outside of Radian?
13   A.   No.
14   Q.   Okay.
15   A.   Meaning that there was hearsay of that.
16 But I'm not involved at the corporate headquarters,
17 so I don't know for sure.
18   Q.   Well, who told you anything about the
19 fact that a subpoena had been delivered to Radian?
20   A.   I don't recall.
21   Q.   Did any lawyer working on behalf of
22 Radian contact you with respect to the discovery
23 process involved in this case?
24   A.   No.  No.
25   Q.   When was the first time that you spoke to

Page 20

1 Keri Simms?
2   A.   When he reached out to me in respect to
3 do an affidavit.
4   Q.   When was that?
5   A.   I don't recall the exact date.
6   Q.   Was it this year?
7   A.   Yes.
8   Q.   Did he call you out of the blue?
9   A.   Yes.
10   Q.   Did you know to expect his call?
11   A.   I did not.
12   Q.   Had you had any conversation with John
13 Staples about needing an affidavit before you heard
14 from Mr. Simms?
15   A.   I did not.
16   Q.   Have you had discussions with John
17 Staples about this case?
18   A.   I had -- when I had received a phone call
19 from Herschel, I called him and asked him.
20   Q.   Anything else at any other time since
21 that call?
22   A.   I mean, other than he was sorry that I
23 was involved.  I made the decision on my own.
24   Q.   You made what decision on your own?
25   A.   To do the affidavit.

Page 21

1   Q.   What I'm trying to get at is I'd like to
2 do a timeline of your discussions with Mr. Staples
3 that had anything to do with this case.
4         So the first time that you had a
5 conversation with Mr. Staples was shortly after you
6 had this call with Herschel Walker?
7   A.   That is correct.
8   Q.   And do you recall roughly when that was?
9   A.   I don't know the exact date.  I do not.
10   Q.   Was it February or March of 2018 or in
11 that --
12   A.   Somewhere -- somewhere in that vicinity.
13   Q.   And you reached out to Mr. Staples
14 following that call with Mr. Walker?
15   A.   I did.
16   Q.   And what did you tell him?
17   A.   I asked him what the hell was going on.
18   Q.   Okay.  And what did he tell you?
19   A.   He said that there was a lawsuit.
20   Q.   Anything else?
21   A.   That he had been released from
22 Renaissance Man.
23   Q.   Anything else?
24   A.   That was about the extent of the
25 conversation.

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES

Kristin Caffey on June 27, 2019

Job 30433

Pages 22..25

Page 22

1    Q.   All right.

2    A.   With the exception of saying that I --

3 let me back up.

4         That I was concerned with what the tone

5 of the conversation was.

6    Q.   All right.  We'll get into that in

7 greater detail.

8    A.   Okay.

9    Q.   But -- so that was the first call you had

10 about the lawsuit?

11   A.   Yes, that I'm aware of.

12   Q.   Did you have any subsequent conversations

13 with Mr. Staples about -- about the case?

14   A.   No, not about the case.  I've had other

15 conversations with him, but nothing to do with the

16 case.

17   Q.   So when he said he was sorry for -- that

18 you were involved, when did that take place?

19   A.   When I was asked to do the affidavit and

20 I painstakingly decided that it was the right thing

21 to do.

22   Q.   So that would be a second call with

23 Mr. Staples --

24   A.   No.

25   Q.   -- about the case?

Page 23

1    A.   No, the first time was he was sorry that

2 I had received a call from Mr. Walker.  The second

3 time was about the affidavit aspect, and I already

4 had said that there were two conversations about

5 that.

6    Q.   And have you had any other conversations

7 with Mr. Staples that related to this case in any

8 way?

9    A.   No.

10   Q.   How many times have you talked to

11 Mr. Simms?

12   A.   Two, three at the most.

13   Q.   And have you had any conversations about

14 this case or your testimony today with Mr. Simms?

15   A.   No.

16   Q.   Have you had any conversations about your

17 affidavit or your testimony today with anybody else

18 in Mr. Simms' office?

19   A.   No.

20   Q.   So tell me, when you got the call from

21 Mr. Simms, did you reach out to anyone to discuss

22 the request that Mr. Simms was making of you to

23 submit an affidavit?

24   A.   My father.

25   Q.   Anybody else?

Page 24

1    A.   No.

2    Q.   All right.  Tell me what you can remember

3 of the first conversation you had with Mr. Simms.

4    A.   It was I understand that you had had a

5 call from Mr. Walker and would you be willing to go

6 on record with what that conversation was.

7    Q.   And what was your response?

8    A.   That I needed to really think about that,

9 because I had a relationship with Mr. Walker and a

10 long-term friendship as well as a working

11 relationship, along with Mr. Staples.  This was one

12 of the hardest decisions I have ever made.

13   Q.   So how did you leave it with Mr. Simms?

14   A.   That I would mull over it and get back to

15 him.

16   Q.   How long did you mull over it?

17   A.   Several days.

18   Q.   And then did you call him back or did he

19 call you back?

20   A.   I don't recall, to be honest.

21   Q.   Did he know -- as of the end of the first

22 call, did he have -- know the details of your

23 conversation with Mr. Walker?

24   A.   He knew some of it, yes, not the full

25 brethora [phonetic] of it.

Page 25

1    Q.   And he -- did he tell you that he had

2 learned of that conversation from Mr. Staples?

3    A.   I don't recall.

4    Q.   Did he try to tell you some of the

5 details of the call as he understood them at the

6 time?

7    A.   He did not.

8    Q.   So I'm confused by your answer, because

9 if you didn't tell him what the call -- what had

10 transpired in the call --

11   A.   Uh-huh.

12   Q.   -- how did you have any understanding of

13 what Mr. Simms understood had transpired during the

14 call?

15   A.   I had a phone call with him and we talked

16 briefly about the subject matter.  I did not go into

17 full detail.

18   Q.   And he didn't go into any detail?

19   A.   He went into some, that he was

20 understanding that a call had taken place, so I'm

21 sure that his client had given him, you know,

22 information in association with that, is the only

23 thing that I can think of, because I told you, you

24 know, earlier on that I did reach out to Mr. Staples

25 after the phone call.

Page 26

1    Q.    What transpired in the second call that
2 you had with Mr. Simms in relation to your
3 affidavit?
4    A.    I made the decision to do it, and we had
5 a conversation, and I laid out the full brethora of
6 what I felt the conversation was.
7    Q.    The details of your discussion with
8 Mr. Walker?
9    A.    With Mr. Walker.
10   Q.    And Mr. Simms interviewed you about those
11 details; is that right?
12   A.    He asked questions about specific things,
13 yes.
14   Q.    And then how did that discussion end up
15 in the form of the first draft of the affidavit?
16   A.    He -- he wrote it up based on our
17 conversation.
18   Q.    And you were expecting him to do that?
19   A.    Yes.
20   Q.    And how long was it between the time that
21 you had your conversation and the time that you had
22 the draft of the affidavit?
23   A.    I don't recall how many days it was.
24   Q.    Was it shortly thereafter?
25   A.    Honestly, I don't recall.

Page 27

1    Q.    Now, I've seen, through your production,
2 an original draft and a revised version of the
3 affidavit.
4    A.    Uh-huh.  Uh-huh.
5    Q.    Did you make the revisions that are
6 reflected?
7    A.    I did.
8    Q.    How long did you spend revising the
9 affidavit?
10   A.    I don't know.  I went through each
11 section pretty, you know, intensively to make sure
12 that it was correct to the best of my ability.
13   Q.    Did you consult anybody in making your
14 revisions?
15   A.    I did not.
16   Q.    Did you review any documents in making
17 your revisions?
18   A.    The affidavit that he had prepared.
19   Q.    No, did you look at any other documents
20 in connection with your revisions?
21   A.    No, sir.
22   Q.    Did you interview any other person in
23 connection with your revisions?
24   A.    Did I interview anyone else with --
25   Q.    Yes.

Page 28

1    A.    No, this was between me and Mr. Simms.
2    Q.    Did you talk with John Staples about the
3 revisions to your affidavit?
4    A.    Not that I'm aware of.
5    Q.    And you can't think of having talked
6 about the revisions to your affidavit with any other
7 party; is that correct?
8    A.    Correct.  No.
9    Q.    Now, what was the process, then?  After
10 you made the revisions, did you have a follow-up
11 conversation with Mr. Simms?
12   A.    I did not.
13   Q.    So what happened?
14   A.    I sent what I deemed to be revisions, and
15 he redid the document, sent that to me via e-mail.
16 I was having difficulty getting a signature, and I
17 copied and pasted a signature and sent it back to
18 him.
19   Q.    I don't understand what that means.  You
20 copied and pasted a signature?
21   A.    What do you mean you don't understand
22 what that means?
23   Q.    Well, when you say you were having
24 difficulty getting a signature --
25   A.    My system would not allow me to make a

Page 29

1 signature on the actual pad.  I didn't have the
2 right tool, I guess, to do that, so I had a -- I had
3 to take my signature from another document to put it
4 onto the document.
5    Q.    Okay.
6    A.    I have a saved signature for things.  I
7 didn't hand-do it, is all I'm saying.
8    Q.    All right.  So you have an ability to do
9 an electronic signature on your computer?
10   A.    Correct.
11   Q.    But in this case, you couldn't make that
12 function work?
13   A.    Based on whatever it -- the system was
14 in, I was having difficulty with that.
15   Q.    Did you have any conversations with
16 Mr. Simms about the execution of the affidavit?
17   A.    The -- I'm not sure what you mean.
18   Q.    I'm sorry, the signing.
19         Did you have any conversation with
20 Mr. Simms about signing the document?
21   A.    No, he said send it back to me and asked
22 me to sign it.  I just was trying to figure out how
23 to make a signature onto the document, and I
24 e-mailed it back to him.
25   Q.    Did anybody put you under oath in

Page 30

1 connection with signing the affidavit?
**2    A.    Put me under oath?**
3    Q.    Yes.  Did somebody, similar to what the
4 court reporter did at the start of this deposition,
5 ask you to raise your right hand or to swear or
6 anything like that?
**7    A.    I don't recall doing anything like that,**
**8 but that's not to say that we didn't talk about that**
**9 in the very first conversation.  I don't recall.**
10    Q.    No, I mean at the time that you signed
11 your affidavit, did somebody place you under oath in
12 the same fashion that the court reporter did at the
13 start of this deposition?
**14    A.    No.**
15    Q.    When you signed the affidavit, where
16 physically were you located?
**17    A.    At my -- I believe my home.**
18    Q.    Here in Texas?
**19    A.    Yes.**
20    Q.    Did you travel to Alabama in connection
21 with your affidavit?
**22    A.    I did not.**
23    Q.    Have you been in the state of Alabama in
24 2019?
**25    A.    I have not.**

Page 31

1         (Caffey Deposition Exhibit 4 marked.)
2 BY MR. KING:
3    Q.    All right.  I've handed you what's been
4 marked as Caffey Exhibit 4.  Is this Mr. Simms'
5 communication to you with the first draft of the
6 affidavit?
**7    A.    Yes, I believe so.**
8         (Caffey Deposition Exhibit 5 marked.)
9 BY MR. KING:
10    Q.    I've handed you what's been marked
11 Exhibit 5.  Is this the document that you sent back
12 to Mr. Simms?
**13    A.    It is.**
14         (Caffey Deposition Exhibit 6 marked.)
15 BY MR. KING:
16    Q.    I've handed you what's been marked as
17 Exhibit 6.  Have you ever seen this entire document?
**18    A.    I have.**
19    Q.    When did you see it?
**20    A.    With the exception of page 5.**
21    Q.    That's my point.
**22    A.    Okay.**
23    Q.    Have you ever seen page 5 before?  When I
24 say page 5, I'm actually at the very top, where the
25 document, it says page 6 of 7.

Page 32

**1    A.    Uh-huh.**
2    Q.    Is that the page you're looking at?
**3    A.    It is.**
4    Q.    And have you ever seen page 7 to that
5 same document?
**6    A.    Not that I recall.**
7    Q.    Have you ever met or been presented to
8 Elizabeth Popwell?
**9    A.    No.  But I don't reside in the state of**
**10 Alabama.**
11    Q.    Pardon me?
**12    A.    I don't reside in the state of Alabama.**
13    Q.    Did you show any identification to
14 Ms. Popwell by telephone, electronically, in any
15 form in connection with the notarization of this
16 affidavit?
**17    A.    I don't recall.**
18    Q.    Well, think -- if you haven't met
19 Ms. Popwell --
**20    A.    I understand that.**
21    Q.    -- and you haven't been placed under oath
22 before by Ms. Popwell --
**23    A.    Uh-huh.**
24    Q.    -- did you submit anything to
25 Ms. Popwell?

Page 33

**1    A.    Not to Ms. Popwell.**
2    Q.    In connection with your affidavit, do you
3 recall showing your driver's license to anybody?
**4    A.    No.**
5    Q.    In connection with the signature that you
6 put on this affidavit, did you communicate orally
7 with anyone authorizing the Notary to notarize your
8 signature?
**9    A.    By doing the affidavit, I believe I did.**
10    Q.    Specifically, did you have any
11 conversation with anyone in which you authorized a
12 Notary to notarize your signature?
**13    A.    I knew that it had to be notarized.**
14    Q.    Did you do anything -- did you talk to
15 anyone authorizing a Notary to notarize your
16 signature on this affidavit?
**17    A.    I talked to Keri Simms about it having to**
**18 be authorized.  I did not talk to Elizabeth,**
**19 whatever her last name was.  I apologize, I don't**
**20 remember now.**
21    Q.    And Mr. Simms did not put you under oath
22 in connection with that conversation, did he?
**23    A.    I do not recall that he did.**
24    Q.    Are you aware that it is a violation of
25 the criminal laws of Alabama for a Notary to

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 34..37

Page 34

1 notarize a signature without being presented
2 physically to the party that signs the affidavit?
3          MR. RUSSELL:  Object to form.
4    A.   I'm not aware.
5          (Caffey Deposition Exhibit 7 marked.)
6 BY MR. KING:
7    Q.   I've handed you what's been marked as
8 Exhibit 7.
9    A.   Uh-huh.
10   Q.   You will not have seen Exhibit 7 before.
11 Exhibit 7 is a creation of my office, which is done
12 through the use of a computer which took the first
13 version of your affidavit and compared it to the
14 affidavit as you signed it.
15   A.   Uh-huh.
16   Q.   Do you need to take a break?
17   A.   No, I'm okay.
18   Q.   So essentially, the language that has
19 been stricken appeared in the first draft, did not
20 appear in the final version; similarly, the
21 underlined language did not appear in the first
22 version and does appear in the version that's
23 signed.
24        Do you understand that?
25   A.   Uh-huh.  Yes.

Page 35

1          MR. RUSSELL:  Object to the
2 introduction.
3          MR. KING:  Pardon me?
4          MR. RUSSELL:  I said I object to the
5 introduction of the exhibit.
6 BY MR. KING:
7    Q.   Tell me, in looking at paragraph 4 -- and
8 you're free also to take a look at the exhibits that
9 I previously handed to you --
10   A.   Uh-huh.
11   Q.   -- which are Exhibit 4 and Exhibit 5, if
12 you care to, but I want to talk a little bit about
13 paragraph 4 of the affidavit.
14        Tell me what you recollect about the
15 creation of Herschel's Famous 34.
16   A.   I'm not sure what you mean by that
17 question.
18   Q.   Did you help create the brand Famous 34?
19   A.   Within Sysco, I did, yes.
20   Q.   Did it previously exist?
21   A.   It did.
22   Q.   What was it being used for?
23   A.   I -- I don't recall.
24   Q.   Within Sysco, what did you do to develop
25 the brand?

Page 36

1    A.   I made it where it was recognized as a
2 Sysco brand, which was a major significant part of
3 the selling process within the corporation; that the
4 MAs were given credit for selling Famous 34 as a
5 Sysco brand.  They got more commission for selling
6 Sysco brand at that time.
7        We introduced multiple new products.  We
8 did marketing behind it.  We did food shows behind
9 it.  We developed new innovative products.  There
10 was a multitude of things that go into bringing a
11 new brand on to Sysco.
12   Q.   How do you know that Sysco has always
13 considered Famous 34 brand to be exclusive to Sysco?
14   A.   Because I was part of bringing that on
15 board.
16   Q.   Well, it existed prior to the time that
17 you brought it on board, correct?
18   A.   Correct.  I don't know that there were
19 any sales.  I don't recall that.  All I know is what
20 we did with the brand when it was brought into
21 Sysco.
22   Q.   Are you aware of any assignments of that
23 brand to Sysco?
24   A.   I don't understand that question.
25   Q.   Any legal documents that you ever saw

Page 37

1 that showed a conveyance of the Famous 34 brand from
2 Mr. Walker to Sysco?
3    A.   We had a contract in reference to that
4 based on earned income and different things that we
5 do with any of our suppliers.
6    Q.   And do you recall that contract conveying
7 an interest -- Mr. Walker's interest in the
8 Famous 34 brand to Sysco?
9    A.   Again, I don't understand that question.
10   Q.   Well, so from an ownership standpoint of
11 intellectual property -- you understand that a brand
12 or a name or a trademark or a service mark or --
13   A.   Uh-huh.
14   Q.   -- something like that is considered
15 intellectual property, right?
16   A.   Okay.
17   Q.   Right?  You understand that?
18   A.   Yes.
19   Q.   Because it's property, there are rights
20 that the owner of that name --
21   A.   Okay.
22   Q.   -- holds.
23        The question is:  Do you know whether
24 Mr. Walker's interest in the Famous 34 brand was
25 actually outright conveyed to Sysco at any time

Page 38

1 through a legal document?
2    A.   I don't recall the specifics.  I mean,
3 you're talking 19 years ago almost.
4    Q.   Well, your affidavit is this year, and
5 you say that Sysco has always considered the
6 Famous 34 brand to be exclusive.
7    A.   We did.  When it was brought on board,
8 when Renaissance Man was brought on board as a
9 supplier to Sysco -- they do this with multiple
10 suppliers -- the brand was considered a Sysco brand
11 which no one else can produce Sysco brand.
12        So if he agreed to Famous 34 being a
13 Sysco brand, he could not use that anywhere else at
14 the time.
15    Q.   Are you aware of any change in that
16 position from Sysco's perspective between 2014 and
17 the time that you gave this affidavit?
18    A.   There could be because I haven't been
19 involved in it from that perspective.
20    Q.   So when you say that Sysco has always
21 considered the Famous 34 brand to be exclusive to
22 Sysco, that's up through and including --
23    A.   My time.
24    Q.   -- your time at Sysco?
25    A.   That is correct.

Page 39

1    Q.   And the fact that you currently head a
2 team that works intimately with Sysco does not put
3 you in a position to know what Sysco's current
4 attitude is about that brand, correct?
5    A.   I have nothing to do with the further
6 process side of the poultry division.
7    Q.   Let's turn to paragraph 5 of your
8 affidavit.
9    A.   Uh-huh.
10        MR. RUSSELL:  Of the actual affidavit
11 or of the document, Exhibit 7?
12        MR. KING:  Well, you know, I'm doing
13 this for my convenience and yours.  I'm going to be
14 asking about both the redactions and the additions,
15 so I'm going to continue to utilize Exhibit 7 with,
16 again, the invitation to Ms. Caffey to go ahead and
17 spend as much time as she needs to look at Exhibit 6
18 and Exhibit 5, if necessary, okay?
19        MR. RUSSELL:  Okay.
20 BY MR. KING:
21    Q.   Tell me what in 2008 about Mr. Walker's
22 book, Breaking Free, caused you individually to
23 become concerned regarding his mental health?
24    A.   We represented Mr. Walker as a brand
25 ambassador in the corporation, and in saying that,

Page 40

1 when he released his book that we did not know was
2 coming out, in reference to multiple personality
3 disorder, it was of concern to the corporation in
4 regards to whether or not we could continue the
5 relationship.
6        We were not made aware.  It was a PR
7 perspective nightmare.  We had multiple calls coming
8 in that we had to manage, and we -- there was
9 conversation of whether to continue on with the
10 brand.
11    Q.   Now, I understood your testimony just now
12 to be that it was a concern of the corporation.  Did
13 you say that?
14    A.   It was my concern and the corporation's
15 concern at the time.
16    Q.   So taking a look at paragraph 5 in
17 Exhibit 7, I note that you struck the words "Sysco
18 and" in that first sentence.
19    A.   Yes.
20    Q.   Given what -- your testimony this minute,
21 why did you strike the words "Sysco and" in the
22 second line?
23    A.   Because it was my responsibility first
24 because I managed the category, and then Sysco was
25 brought into it on the other side.  I don't know how

Page 41

1 else to answer that.
2    Q.   Well, Sysco was either concerned or it
3 wasn't.
4    A.   I was Sysco.  I don't know how else to
5 say that.  I was Sysco.  I was the senior director
6 responsible for the category, responsible for the
7 product, responsible for the brand at the time.
8        Robert Thurber, the senior vice president
9 of -- the corporation at that time was Sysco, was
10 responsible for the product, and concern.
11    Q.   So correctly, this should say "Robert
12 Thurber and I became concerned regarding his mental
13 health," shouldn't it?
14    A.   No.
15        MR. RUSSELL:  Objection.
16    A.   No.
17 BY MR. KING:
18    Q.   Why not?
19    A.   Because I was Sysco.
20    Q.   In the corporate governance of Sysco,
21 officers and directors of the company authorized to
22 make decisions on behalf of the company --
23    A.   Correct.
24    Q.   -- in its corporate governance, did you
25 have any role?

Page 42

1    A.    Did I have any role in?
2    Q.    Did you have any role in the corporate
3 governance of Sysco as an officer -- elected officer
4 or director?
5    A.    I was not an officer, no.
6    Q.    And were you a director?
7    A.    I was a senior director, yes.
8    Q.    No, no, no. Were you on the board of
9 directors of Sysco?
10    A.    That's not what you asked. No, I was
11 not.
12    Q.    Are you aware of any decisions made by an
13 officer of Sysco or the board of directors of Sysco
14 expressing Sysco's position of concern?
15    A.    I am aware.
16    Q.    Tell me what you're aware of.
17    A.    I don't recall the exact conversation --
18 again, this is a very long time ago -- but I was
19 brought into a meeting in reference to this
20 specifically.
21    Q.    Who was at the meeting? Who as a
22 corporate officer or corporate member of the board
23 of directors was in the meeting?
24    A.    I don't recall.
25    Q.    Are you even sure that there was a member

Page 43

1 of the board of directors or an officer of the
2 corporation in attendance at that meeting?
3    A.    Board of directors would not have been.
4    Q.    Are you aware of anybody who was an
5 elected officer of Sysco participating in that
6 meeting?
7    A.    I don't recall.
8    Q.    So when you talk in terms of Sysco had
9 internal discussions regarding the partnership,
10 you're referring to you and Mr. Thurber and other
11 people who had something to do with the brand; is
12 that right?
13    A.    Because I don't recall all the people, I
14 don't know how to answer you on that. I just -- I
15 don't recall all the people that were involved.
16 There was a multitude of people involved.
17    Q.    In connection with this affidavit, you
18 don't mean to suggest that you have been authorized
19 by Sysco Corporation to make the statement about
20 what Sysco intended to do with respect to its
21 relationship with Mr. Walker, do you?
22    A.    Rephrase the question.
23    Q.    Sure.
24         Do you believe that Sysco Corporation has
25 authorized you to speak with respect to its

Page 44

1 relationship with Mr. Walker?
2    A.    As of today?
3    Q.    Yes.
4    A.    Their relationship since I left the
5 company?
6    Q.    Yes.
7    A.    No.
8    Q.    How about as of February 11, 2019, were
9 you authorized?
10    A.    To speak on their behalf?
11    Q.    Correct.
12    A.    I wasn't speaking on their behalf, I was
13 speaking on my behalf.
14    Q.    As of February 11, 2019, were you
15 authorized to speak on behalf of Sysco Corporation
16 concerning its relationship with Mr. Walker?
17    A.    I wasn't referring to our relationship
18 with Mr. Walker.
19    Q.    It's a simple question.
20    A.    I understand that, and I'm answering you.
21    Q.    No, it's either a yes or a no.
22         As of February 11, 2019, were you
23 authorized by Sysco Corporation to speak with
24 respect to his relationship -- its relationship with
25 Mr. Walker?

Page 45

1         MR. RUSSELL: Objection, asked and
2 answered.
3    A.    I don't recall.
4 BY MR. KING:
5    Q.    You don't recall?
6    A.    I don't recall.
7    Q.    What --
8    A.    I'm not going to go back and forth about
9 this. I did -- I've answered the question multiple
10 times.
11    Q.    Evasively each time.
12    A.    I don't think that it's evasively. I was
13 talking about my experience with Mr. Walker and
14 Famous 34 at the time I was employed with Sysco. I
15 was not speaking in any other term.
16    Q.    The answer to the question is that you
17 were not authorized by Sysco Corporation as of
18 February 2019 to speak on its behalf concerning its
19 relationship with Mr. Walker; isn't that true?
20         MR. RUSSELL: Objection.
21    A.    I was not -- that is not true. I was not
22 speaking on behalf of Sysco.
23 BY MR. KING:
24    Q.    I'm not asking you who you were speaking
25 for.

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 46..49

Page 46

1   A.   Yes, you --
2   Q.   I'm asking you whether you have been
3 authorized by Sysco to speak, and the answer to that
4 is no, correct?
5         MR. RUSSELL:  Objection.
6 BY MR. KING:
7   Q.   The answer to that is no, correct?
8         MR. RUSSELL:  This has gone beyond
9 leading into badgering.  Was that a question or were
10 you supplying an answer that you wanted her to
11 confirm?
12 BY MR. KING:
13   Q.   The question is that you were not
14 authorized in February of 2019 to speak on behalf of
15 Sysco, were you?
16         MR. RUSSELL:  Same objection.  Is
17 there any indication of February 2019 that she spoke
18 on behalf of Sysco?
19         MR. KING:  You've made your
20 objection.  I'm still waiting on the answer to the
21 question.
22         MR. RUSSELL:  It's been asked and
23 answered.
24         MR. KING:  Are you just going to
25 stare at me?

Page 47

1   A.   I've answered your question.  I told you
2 I was not speaking on behalf of Sysco.
3 BY MR. KING:
4   Q.   Because you weren't authorized to do so,
5 right?
6         MR. RUSSELL:  Objection.
7   A.   I'm not...
8 BY MR. KING:
9   Q.   I know you don't like the answer, but
10 it's a pretty easy one to give.
11   A.   I'm not answering something I didn't do.
12 I mean, it's as simple as that.
13   Q.   So what in the book was upsetting to you?
14   A.   It was the PR concern.
15   Q.   What in the book caused a PR concern?
16   A.   Because it was based on mental health at
17 the time.
18   Q.   And what in the book, based upon mental
19 health, caused concern?
20   A.   There was just concern.
21   Q.   What?
22   A.   Because we represented him as a brand
23 ambassador to Sysco at the time.
24   Q.   And how did the book negatively impact
25 your representation and relationship?

Page 48

1   A.   At the end of the day it didn't.  There
2 was concern that it could.
3   Q.   Simply because it disclosed a mental
4 health issue?
5   A.   Simply because we weren't aware that it
6 was coming out, and we were blindsided and had
7 customers calling and we had other people --
8 suppliers, we had all kinds of people calling in
9 about it, and we didn't have answers to it.
10         So when a company is blindsided by
11 something, it creates issue and havoc.
12   Q.   What do you recall the customer issues or
13 the vendor issues to be with respect to the book?
14   A.   I don't recall the complete concerns.
15 There was just concern.
16   Q.   Isn't it right that it wasn't so much
17 concern as it was a question; isn't that right?
18   A.   It was concern.
19   Q.   Did you read the book at the time?
20   A.   I read parts of it, yes.
21   Q.   What do you remember of the interview
22 with CNN that caused concern?
23   A.   His ex-wife's conversation or interview
24 portion was very concerning.
25   Q.   In what respect?

Page 49

1   A.   She talked about him playing Russian
2 roulette, putting a gun up to his head and her
3 experience with him.  It was not flattering to
4 Mr. Walker at all.
5   Q.   It's in the book.
6   A.   It still wasn't flattering to Mr. Walker
7 in any shape or form.
8   Q.   Well, it indicated a psychosis that he
9 had under treatment; is that right?
10   A.   And I do not judge him for that.  I'm
11 just saying it was of concern and it was problematic
12 for us being engaged with him at the time.
13   Q.   All right.  With respect to the sales of
14 the book, what do you know about the sales of the
15 book?
16   A.   I know nothing about the sales of the
17 book.
18   Q.   All right.  You've previously stated that
19 you viewed yourself as Sysco.  When it says, Sysco
20 decided to wait to see if the book sold well, which
21 it did not, and so Sysco did not terminate its
22 relationship with Mr. Walker, where does that
23 information come from?
24   A.   Just we talked about it.  I mean, it just
25 didn't go -- we just didn't see it going way public

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES

Kristin Caffey on June 27, 2019

Job 30433

Pages 50..53

Page 50

1 to a point that there was any more concern of it.

2    Q.   Well, the question more specifically is

3 how do you know that the sales of the book did not

4 go well, as contained in your affidavit?

5    A.   I know that there wasn't concern for the

6 book sales based on everything died down, so we

7 assumed that there was very few sales of the book.

8 I don't -- I don't know what his sales were. I

9 can't tell you what his sales were. We assumed that

10 the sales were not great because the commotion died

11 down.

12    Q.   You assumed that in 2018 or you -- excuse

13 me. You assumed that in 2008 or did Mr. Staples

14 mention that to you in 2019?

15    A.   We assumed that in 2008.

16    Q.   And the assumption was not based upon any

17 review by you of any documents?

18    A.   No.

19    Q.   And you have no knowledge --

20    A.   No.

21    Q.   You have no knowledge as you sit here of

22 having ever seen any information about the sale of

23 the book; isn't that right?

24    A.   I did not.

25    Q.   So the statement that the book did not

Page 51

1 sell well, as contained in your affidavit, is not

2 based upon personal knowledge, is it?

3    A.   Yes, it's based on personal knowledge of

4 what I knew at the time. I don't know if he's sold

5 since then. I don't know any of those things. I

6 know at the time when the commotion died down, we

7 assumed that the sales of the book had not gone

8 well.

9    Q.   There's a difference between an

10 assumption and knowledge.

11    A.   Fair enough.

12    Q.   And my understanding is that you did not

13 know of your personal knowledge how the book sold,

14 correct?

15    A.   At the time I knew that it had not sold

16 well. I do not know what the total sales were.

17    Q.   How did you know that?

18    A.   Because we had conversations about it.

19    Q.   With whom?

20    A.   We had a conversation with Mr. Walker. I

21 had conversations with Simmons at the time --

22    Q.   About --

23    A.   -- and it died down -- about -- about

24 this. I made phone calls when we found out that it

25 had launched. I don't know how else to answer this.

Page 52

1 I mean, I don't have -- I didn't have access to the

2 numbers, but we knew that the sales were not

3 something to be concerned about any further.

4         Again, 11, 12, 13 years ago, I do not

5 recall the specifics of every conversation or every

6 piece of paper that came across my desk during that

7 time in regards to that. I do know that there was

8 concern.

9    Q.   In preparation for your deposition, have

10 you consulted anybody at Staples -- excuse me, at

11 Sysco?

12    A.   No. There's no reason for Sysco to be

13 brought into this.

14    Q.   In preparation for your deposition

15 testimony today, have you had any conversations with

16 anyone at Radian?

17    A.   No.

18         MR. KING: All right.

19         MR. RUSSELL: Can we take a break?

20         MR. KING: Yeah, I was just looking

21 at that. All right. It's been an hour and

22 15 minutes. We'll go off the record for a little

23 bit.

24         THE VIDEOGRAPHER: It's 10:42. We're

25 off the record.

Page 53

1         (Recess taken, 10:42 a.m. to

2         10:56 a.m.)

3         THE VIDEOGRAPHER: It's 10:56. We're

4 back on record.

5 BY MR. KING:

6    Q.   Let's move to paragraph 6 of Exhibit 7

7 concerning your communications with Simmons.

8         What was your purpose in communicating

9 with Simmons about the book?

10    A.   They were producing the Famous Walker

11 brand at the time.

12    Q.   So what was your purpose in communicating

13 with Simmons?

14    A.   They were aware that the book had come

15 out and that -- they were partners with Herschel's

16 company from that perspective. They were -- they

17 were my main contact in regards to that.

18    Q.   In regard to what?

19    A.   In regards to the relationship. They

20 were the producers of the product.

21    Q.   The product was sold by Mr. Walker's

22 company; is that right?

23    A.   The product was purchased through his

24 company. It was not created from his company.

25    Q.   Simmons, you understood, was Mr. Walker's

Page 54

1 partner, right?
2    **A.    Yes.**
3    Q.    So what was your purpose in contacting
4 Mr. Simmons -- excuse me, Mr. Walker's partner about
5 the book?
6    **A.    Because we were in partnership with them**
7 **as well, not just with Mr. Walker, in regards to**
8 **Famous 34.**
9    Q.    Well, my question is:  What were you
10 trying to accomplish?
11    **A.    We were trying to control a situation, a**
12 **slurry of phone calls that were coming in, and I was**
13 **trying to get answers in regards to that.**
14    Q.    And you can't remember what the substance
15 of those phone calls coming in was, right?
16    **A.    I don't recall the exact questions that**
17 **were coming in, no, sir.**
18    Q.    So what did you expect that Simmons was
19 going to be able to do in response to your questions
20 or concerns?
21    **A.    We needed them to be prepared if we did**
22 **have a PR situation to somehow be engaged in that**
23 **conversation.  They were a line-sight to the**
24 **operating companies and the customer, just as**
25 **Mr. Walker was, from a supplier standpoint.**

Page 55

1    Q.    Now, the draft of the affidavit as
2 corrected by you identified individual people at
3 Simmons, and you struck through those names,
4 correct?
5    **A.    I did because I didn't recall exactly who**
6 **I had talked to.  I mentioned these people by name**
7 **in our conversation originally, but I wasn't sure**
8 **exactly everybody at that time -- again, it's been**
9 **11 years -- of exactly who I spoke with.**
10    Q.    Did a public relations issue ultimately
11 require Simmons to intervene?
12    **A.    It did not.**
13    Q.    In the period after you finished at
14 Sysco, since -- well, in the period since you left
15 Sysco in 2014, how many times have you spoken with
16 Mr. Walker, would you say?
17    **A.    Never until the phone call --**
18    **A.    Until the --**
19    **A.    -- in 2018.**
20    Q.    Okay.
21    **A.    Which was surprising since the**
22 **relationship that we had had in the past and that he**
23 **knew that I was out ill, but that's another**
24 **conversation.**
25    Q.    Tell me, because your affidavit also

Page 56

1 identifies a call in the fall of 2017 in
2 paragraph 8.
3    **A.    And as I said, with the dates, I'm not a**
4 **hundred percent sure.  And I did write that, but I'm**
5 **not a hundred percent sure of the actual date of the**
6 **two calls.**
7    Q.    So you recollect two calls with --
8    **A.    I do.**
9    Q.    -- Mr. Walker?
10    **A.    I do.**
11         MR. KING:  Okay.  Just remember about
12 us talking over each other.
13         (Caffey Deposition Exhibit 8 marked.)
14 BY MR. KING:
15    Q.    I've handed you what's been marked as
16 Exhibit 8, which is a press release from Sysco --
17    **A.    Uh-huh.**
18    Q.    -- dated June 9, 2008 in which you
19 discuss the partnership with Renaissance Man and
20 Walker Foods, correct?
21    **A.    Uh-huh.**
22    Q.    By June 9, 2008, had your concerns about
23 the book been allayed?
24    **A.    Again, not recalling the dates of**
25 **everything, if this is when this is dated, I would**

Page 57

1 assume that that's correct.
2    Q.    So the book came out two months before
3 this press release, so had everything pretty much
4 died down by then?
5    **A.    By then, should have, yeah.**
6    Q.    Did you continue to have concerns about
7 Mr. Walker's mental health after this press release
8 came out in 2008?
9    **A.    I was concerned for him as a friend, but**
10 **other than that, at that time, we didn't deal**
11 **necessarily directly, as I've made statement to,**
12 **with Mr. Walker on a daily basis on the business**
13 **aspect of things.**
14    Q.    Did you --
15    **A.    He wasn't the representation.**
16    Q.    Did you ever observe in Mr. Walker any of
17 the symptoms that he discussed in connection with
18 the book?
19         MR. RUSSELL:  Object, calls for
20 speculation, for a medical opinion.
21    **A.    I mean, I've seen different things, but**
22 **not -- I'm not a doctor.**
23 BY MR. KING:
24    Q.    Well, did you observe anything that to
25 you struck you as exhibiting a multiple personality?

Page 58

1           MR. RUSSELL:  Same objection and as
2 to relevance.
3     A.   Again, I'm not a doctor.
4 BY MR. KING:
5     Q.   Did you observe him being physically
6 abusive to anyone?
7           MR. RUSSELL:  Same objection.
8     A.   No, I've never seen him -- I would never
9 even say that of the man, ever.
10 BY MR. KING:
11    Q.   All right.  So we're going to talk about
12 the calls, and instead of dealing specifically with
13 the dates, we're going to talk in terms of the first
14 call and the second call; is that fair?
15    A.   I will do my best.
16    Q.   Well, from the standpoint of I can't --
17 since I can't get specifically a date for either
18 call, but we're dealing with only two calls, right?
19    A.   Yes.
20    Q.   So --
21    A.   But again, it's been a year, so...
22    Q.   Fine.
23         Tell me what happened in the first call.
24 Who initiated it?  How did it occur?  What happened?
25 What was discussed?

Page 59

1     A.   I honestly don't a hundred percent recall
2 who initiated.  I know that we had a discussion and
3 it was a pleasant discussion, and at the end of that
4 conversation he asked me what I thought about John
5 Staples.
6     Q.   Had the conversation up to that point had
7 anything to do with Mr. Staples at all?
8     A.   I don't recall the complete context of
9 the conversation, just the last part of him asking,
10 and I gave him my answer of what I thought of
11 Mr. Staples.
12    Q.   And what was your answer?
13    A.   That I thought that he was doing a -- you
14 know, he did a good job for him and had nothing but
15 the utmost respect for him and was always looking
16 out for him.  That's what I felt.
17    Q.   Did Mr. Staples -- excuse me.
18         Did Mr. Walker say during the course of
19 that conversation anything that you viewed to be
20 defamatory as to John Staples?
21    A.   Not in --
22         MR. RUSSELL:  Objection --
23         THE WITNESS:  Go ahead.
24         MR. RUSSELL:  Speculation, calls for
25 a legal conclusion.

Page 60

1           MR. KING:  Do you understand my
2 question?
3           THE WITNESS:  Ask it again.
4 BY MR. KING:
5     Q.   Did Mr. Walker say anything in the first
6 conversation that you viewed to be defamatory as to
7 John Staples?
8           MR. RUSSELL:  Same objection.
9     A.   Not that I recall.
10 BY MR. KING:
11    Q.   Now, when I use the words "defamatory,"
12 I'm not using them in the legal context.  But did
13 you view anything that Mr. Walker said in that
14 conversation to intimate wrongful conduct by
15 Mr. Staples?
16    A.   The purpose -- the fact that he asked me
17 about him was a -- was a leading and fishing aspect,
18 in my opinion.
19    Q.   Did any of the words that he used
20 indicate wrongful conduct by Mr. Staples?
21    A.   Not in the first conversation.
22    Q.   Did anything in the words he used involve
23 embarrassing Mr. Staples?
24    A.   Not in the first conversation.
25    Q.   Did any of the words he used reflect

Page 61

1 poorly on Mr. Staples' reputation?
2     A.   Not that I recall in the first
3 conversation.
4     Q.   Did any of the words that he used
5 indicate that Mr. Staples had acted in violation of
6 the law?
7     A.   Not in the first conversation.
8     Q.   Did you view any of the words that
9 Mr. Walker used in that conversation as holding
10 Mr. Staples up to public rebuke?
11    A.   The fact that he asked me my opinion of
12 Mr. Staples led me to believe that he was on a
13 fishing expedition, and I've answered that a couple
14 of times.
15    Q.   But you didn't know what he was looking
16 for, did you?
17    A.   I had no idea what he was looking for,
18 but it was unlike him to have a conversation with me
19 of that sort, not to mention I hadn't heard from him
20 in four years.
21    Q.   So was Mr. Staples' reputation with you
22 harmed as a result of that first conversation?
23    A.   It made me question what was going on,
24 yes.
25    Q.   Was any -- answer the question.

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 62..65

Page 62

1        In your mind, did any of the words that
2 Mr. Walker used in that first conversation harm
3 Mr. Staples' reputation in your mind?
4     A.   It made me question Mr. Staples because
5 of a question -- a leading question that was
6 answered, yes.
7     Q.   What was the leading question?
8     A.   What I thought about Mr. Staples, how do
9 I think that he's doing.  Again, I hadn't talked to
10 the man in four years, being Mr. Walker, and to ask
11 that question out of the blue led me to believe
12 something was going on.
13    Q.   But you didn't know what in the context,
14 correct?
15    A.   No, I did not know.  I didn't know if
16 that was the question.  Sorry, I thought I had
17 already answered that.
18    Q.   Now, following the first telephone
19 conversation, did you contact John Staples?
20    A.   I did not.
21    Q.   Why not?
22    A.   Because it wasn't necessary to call John
23 Staples on that.
24    Q.   As a result of the first conversation,
25 did you contact any third parties?

Page 63

1     A.   Not that I'm aware of.
2     Q.   Anybody at Sysco?
3     A.   Not that I'm aware of.
4     Q.   Anybody at Sanderson Farms?
5     A.   No.
6     Q.   Anybody at Simmons?
7     A.   No.
8     Q.   Did you hear anything from John Staples
9 between that first call and the second call?
10    A.   In regards to what?
11    Q.   Did you have any conversations with John
12 Staples between the first call with Mr. Walker and
13 the second call with Mr. Walker?
14    A.   I'm sure I did.  I don't know specifics,
15 but I'm sure I -- I mean, I talk to him every once
16 in a while.
17    Q.   Did you have any discussion about his
18 business relationship with Ren Man during -- in that
19 period, between the first and second call?
20    A.   I would have had no reason to talk to
21 Mr. Staples about Renaissance Man.
22    Q.   Okay.  The question is:  Did you have any
23 conversation with John Staples between the first and
24 second call about John Staples' relationship with
25 Ren Man?

Page 64

1     A.   I do not recall.
2     Q.   Did you have any conversations with
3 anybody at Sysco, wherever --
4     A.   At Sysco --
5     Q.   -- Radian -- Sysco, Radian, whatever,
6 between the first and second call regarding John
7 Staples' relationship with Ren Man?
8     A.   I don't recall.  I really don't.  If
9 you've got something, show me.  I don't recall.
10    Q.   I'm just trying to get your answer.
11    A.   I'm just -- I'm just saying I don't -- I
12 don't recall.  Again, it's been a year.
13    Q.   Have you ever communicated directly with
14 Kim Staples?
15    A.   I have not.
16    Q.   Are you in any better position to give me
17 an idea of when the second call took place?
18    A.   I honestly don't know if it was January.
19 I -- at the end of 2017, in November of 2017, I went
20 septic and was in the hospital for two months, so it
21 was -- it had to have been after that.  That's all I
22 can tell you.
23    Q.   So the first call would have been prior
24 to that?
25    A.   I honestly do not remember dates.  I

Page 65

1 don't.
2     Q.   All right.  The only reason I'm asking is
3 because there is a date in your affidavit which says
4 in the late fall of 2017.
5     A.   And I said I -- I know I said that
6 because that's what I recollect, but I'm being very
7 honest that that's why I was not trying to put a
8 specific date because I was not -- I did not have
9 the specific date of the calls.  But they happened
10 around that time.
11    Q.   Did you have any involvement in the
12 consideration of a business transaction between
13 Radian Group and DSM Marketing?
14    A.   I was aware there was a conversation
15 about DSM, but I don't -- I wasn't involved in that
16 in any way, shape or form.
17    Q.   Let's take a look at some stuff here.
18    A.   Okay.
19         (Caffey Deposition Exhibit 9 marked.)
20 BY MR. KING:
21    Q.   I've handed you what's been marked as
22 Exhibit 9.
23    A.   Uh-huh.
24    Q.   This is totally unrelated to my last
25 question.  I'm not implying any connection between

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Pages 66..69

Page 66

1 the two.
2        There's a sentence at the bottom from
3 John Staples to Herschel that says:  This is what
4 I've been working on with Kristin for a few months.
5        And that covers an earlier e-mail that
6 you had sent attaching the document which appears at
7 the end of this exhibit.
8        Can you tell me what this proposition
9 related to?
10    **A.    This was solely an introduction of John**
11 **to Radian.  We were looking at the possibility of**
12 **going into the space of brokerage.  That's -- I**
13 **mean, that's as far as it went.  That's as far as my**
14 **contribution was.  I made an introduction.**
15    Q.    Mr. Staples talks in terms of having been
16 working with you for a period of a few months.  Is
17 your recollection different from that, from his?
18    **A.    I think he had been working with Radian**
19 **for a few months, and he may have been referring to**
20 **me as Radian.  I don't -- again, I wasn't involved**
21 **in the process.**
22    Q.    Did you help create the conceptual draft
23 that's attached to this e-mail?
24    **A.    I did not.**
25    Q.    Your e-mail of September 28, 2016 talks

Page 67

1 in terms of a discussion you were going to have that
2 day at 2:30.
3    **A.    Okay.**
4    Q.    Do you recall such a discussion?
5    **A.    I don't.  I don't know that I was**
6 **involved in the discussion per se.**
7    Q.    Do you know who created these -- this
8 document that you forwarded on September 28, 2016?
9    **A.    I don't recall.**
10    Q.    But it's your testimony that you were not
11 involved in -- in the specifics of this proposal?
12    **A.    I was not.**
13    Q.    Do you have any recollection of being
14 involved in any discussion about this business
15 relationship after September of 2016?
16    **A.    I wasn't involved in any discussions**
17 **other than I set an introduction because I knew the**
18 **parties.  That's the only part that I played.**
19    Q.    So that necessarily means that you didn't
20 have any further discussions with Mr. Walker or
21 Mr. Staples or the people at Radian about this
22 issue?
23    **A.    That is correct.**
24        MR. RUSSELL:  I'm going to object to
25 the offering of that exhibit.  It's not been

Page 68

1 authenticated.  She's not authenticated it.  It's
2 hearsay, among many other things.  I've never seen
3 it before.
4        MR. KING:  Well, I will do this.
5        **THE WITNESS:  I don't even know what**
6 **it is.**
7 BY MR. KING:
8    Q.    At the bottom of page 1 of Exhibit 9, is
9 that your Sysco e-mail address?
10    **A.    Where?**
11    Q.    At the bottom of page 1 of this
12 exhibit --
13    **A.    Yes.**
14    Q.    -- that is --
15    **A.    Yes, it is.**
16    Q.    Do you recognize the address to be John
17 Staples' then e-mail address?
18    **A.    I don't recall John Staples' e-mail**
19 **address ever.  It was probably in my saved contacts.**
20 **But if that's where it was sent, if I sent it, I**
21 **guess that's where it went.**
22    Q.    Do your e-mails generally contain the
23 information that's contained at the bottom of your
24 e-mail, your name, your office, your Radian Group, the
25 office number, and the cell number?

Page 69

1    **A.    Yes.  It doesn't look like that, though.**
2    Q.    And do you use your initials, KC?
3    **A.    No, I sign "Kristin" most often, but...**
4    Q.    Well, Mr. Staples, when he arrived here
5 today, called you -- or when you arrived here, he
6 called you KC.  Do you go by that?
7    **A.    Yeah, he calls me KC, yeah.  I just don't**
8 **sign things typically "KC."**
9        **I don't know what this is.**
10    Q.    Do you have any reason to think that you
11 did not send the e-mail that's identified under your
12 name on September 28?
13    **A.    I don't recall.  I don't.**
14    Q.    The attachment, do you recognize that to
15 be Radian's brand?
16    **A.    At one time.**
17    Q.    Is the header that this is a conceptual
18 draft something that you've noticed from time to
19 time on Radian documents?
20    **A.    Again, I don't create Radian documents.**
21 **I'm not -- again, I'm not involved in a lot of that,**
22 **so I don't know.**
23    Q.    You don't know that you've ever seen a
24 document that refers to a conceptual draft?
25        MR. RUSSELL:  I'm going to add an

Page 70

1 objection to this.  This is beyond the scope of the
2 affidavit, beyond the scope of what this deposition
3 was supposed to be about, which occurs beyond the
4 discovery deadline by agreement of the parties with
5 my understanding being that the testimony provided
6 by the witness was going to be based on her
7 affidavit.
8             This goes far beyond that, as have
9 several of these other items.  As a result, this --
10 these should be stricken and that testimony not
11 considered.
12             MR. KING:  That's fine.  You can take
13 that up later on.
14             Let me go ahead and mark this as
15 well.
16             (Caffey Deposition Exhibit 10
17             marked.)
18             MR. RUSSELL:  Let the same objection
19 stand for Exhibit 10.  This again goes beyond the
20 scope of the deposition parameters provided and
21 agreed upon by the parties beforehand.
22             MR. KING:  You can have a continuing
23 objection.  That's fine with me.
24 BY MR. KING:
25     Q.   I've handed you what's been marked as

Page 71

1 Exhibit 10, which is an e-mail from Chris Drazan to
2 you dated September 28th, 2016.
3         Do you see that?
4     **A.   Uh-huh.  I do.**
5     Q.   Mr. Drazan is the principal at Radian; is
6 that right?
7     **A.   He is.**
8     Q.   Do you know what his purpose was in
9 sending you this document?
10     **A.   Probably to pass it to the other party,**
11 **I'm assuming.**
12     Q.   Meaning to John Staples?
13     **A.   Yes.  If he didn't have his e-mail**
14 **address, he could have sent it to me to pass along.**
15     Q.   And again, that was your sole
16 involvement, is the introduction?
17     **A.   That was my involvement.**
18             (Caffey Deposition Exhibit 11
19             marked.)
20             MR. RUSSELL:  Standing objection
21 applies to this exhibit as well.
22 BY MR. KING:
23     Q.   All right.  I've handed you Exhibit 11
24 which is a -- in part, an e-mail from John Staples.
25     **A.   Uh-huh.**

Page 72

1     Q.   And I'm pointing -- I want to point out
2 specific language in the -- right here on the lower
3 third of the e-mail chain in which Mr. Staples
4 refers to speaking with Kristin after our conference
5 call today.
6     **A.   Uh-huh.**
7     Q.   And he's talking about the announcement
8 that Randy Sanders had stepped down from his role at
9 DSM.
10         Do you recall what that conversation was?
11     **A.   I do not recall.**
12     Q.   Do you have any recollection of any
13 discussion concerning Randy Sanders when he left
14 DSM?
15     **A.   I don't even know who Randy Sanders is.**
16     Q.   Do you have any understanding of what
17 Mr. Staples was referring to, what venture he's
18 talking about when he's talking about having a
19 smaller piece of a bigger pie?
20     **A.   I have no clue.**
21     Q.   And you, again, weren't involved in
22 discussions concerning some arrangement or
23 relationship between Radian and DSM?
24     **A.   I was not.**
25             (Caffey Deposition Exhibit 12

Page 73

1             marked.)
2             MR. RUSSELL:  Same standing objection
3 to this e-mail.
4             **THE WITNESS:  I don't know what this**
5 **is.**
6 BY MR. KING:
7     Q.   All right.  I've handed you an e-mail
8 from Chris Drazan of Radian to John Staples dated
9 September 15, 2017, with an attachment.
10     **A.   Uh-huh.**
11     Q.   Did you see this attachment at the time
12 it was sent around September 15, 2017?
13     **A.   I'm not speaking on behalf -- for Chris**
14 **Drazan.  I don't know what Chris Drazan did or did**
15 **not do.**
16     Q.   My question is very precise.  Did you
17 personally see this attachment --
18     **A.   I did not.**
19     Q.   And I need to finish the question.
20     **A.   Okay.  I apologize.**
21     Q.   Did you see this attachment at or around
22 September 15, 2017?
23     **A.   I've never -- I don't recall ever seeing**
24 **this document ever.**
25     Q.   And you didn't have any discussions

Page 74

1 internally with Mr. Drazan about this proposal or
2 concept?
3          MR. RUSSELL:  Objection.
4     A.   I don't recall having any conversations
5 with him about this piece of communication.  I've
6 never seen this piece of communication.
7 BY MR. KING:
8     Q.   I understand that.
9          Did you have any discussions with John
10 Staples about this concept?
11    A.   I did not.
12    Q.   And did you have any discussions with
13 Mr. Walker about this concept?
14    A.   No.
15    Q.   Tell me about the second call with
16 Mr. Walker.  And I understand dates are problematic,
17 but who do you remember making the call?
18    A.   Mr. Walker.
19    Q.   And I am right, that you can't pinpoint a
20 date?
21    A.   I'm sorry.  I wish I could give you a
22 date.  I cannot.  Perhaps Mr. Walker has it.
23    Q.   Tell me what you remember of the call.
24    A.   I remember that it was -- I was taken
25 back by the call.  Mr. Walker had informed me that

Page 75

1 Mr. Staples was relieved of his duties, he was let
2 go, and that he had done some unmentionable things
3 and was trying to take his company -- I'm trying to
4 remember exact words -- and that -- had stolen
5 money.  A multitude of things that, frankly, I was
6 taken back completely and surprised by the
7 conversation.
8     Q.   All right.  I know that you've identified
9 the same issue that I've identified, which is that
10 I'm going to want you to be able to tell me precise
11 words.
12          If you would like to take a break for a
13 few seconds -- a few minutes so that you can -- I'm
14 going to ask you to identify specific words that
15 were said that you can remember.  So if -- with that
16 predicate in mind, if you'd like me to proceed, I'll
17 proceed.  If you'd like to reflect on it a little
18 bit, I'm more than happy to take a break, but that's
19 going to be the issue that -- for the next question.
20    A.   I understand, and I -- I know that most
21 people can't remember every word that comes out of
22 their mouths and every word that's said, so I will
23 do my best is all I can tell you.
24    Q.   I'm just saying, if you'd like to take a
25 break we can take one.  If not, I will proceed.

Page 76

1     A.   At noon, if we're not done, I have to
2 take medication.  That's when we can take a break.
3     Q.   All right.  In connection with Mr. Walker
4 informing you that John Staples had been let go, did
5 he provide you the reason?
6     A.   The reasoning that he indicated was not
7 clear a hundred percent.
8     Q.   All right.  Well, what -- whether it was
9 clear or not --
10    A.   Uh-huh.
11    Q.   -- what do you remember Mr. Walker saying
12 on that subject?
13    A.   That he had done some -- some
14 underminded things.  I don't know that that was his
15 exact word.  That's my word.  And I think he said
16 some -- he had done some bad things.  I think that
17 that were -- those were his exact words, and that he
18 was trying to possible -- or not -- there was no
19 possibly.  He was trying to take his company, and
20 that there had been money taken.
21    Q.   Okay.  So I'm going to try to break these
22 things down --
23    A.   I understand.
24    Q.   -- into specific subjects.
25          The first subject you mentioned was that

Page 77

1 Mr. Walker had informed you that he had let John
2 Staples go.  Specifically on that issue, do you
3 remember him saying anything about the rationale, or
4 does that just feed into what you -- the other
5 issue, the other items?
6     A.   I don't know how it went exactly in
7 chronological order.  No, I do not.
8     Q.   Okay.  The next thing you said in answer
9 to this question or in these questions was that John
10 Staples had done some unmentionable or underminded
11 or bad things.
12    A.   Uh-huh.
13    Q.   You now think his words were "bad
14 things"?
15    A.   I believe that was the wording.
16    Q.   All right.
17    A.   I don't recall a hundred percent.
18    Q.   Now, I'll get to the money issue in a
19 second, and I understand about taking his company.
20          Other than those two things, did he tell
21 you what the bad things were?
22    A.   He did not elaborate on the bad things,
23 and I did not ask.
24    Q.   How long do you recollect this call
25 going?

Page 78

1    A.   15 minutes at the most.
2    Q.   And do you remember where you were at the
3 time?
4    A.   I was on Sysco's campus.
5    Q.   This was a cell phone call?
6    A.   I don't recall if it was my cell phone,
7 because my phones are forwarded to my cell phone, so
8 I don't recall.
9    Q.   And we're talking about a daytime call?
10   A.   Yes.
11   Q.   What did Mr. Walker say about trying to
12 take his company?
13   A.   He just said that John was trying to take
14 his company.
15   Q.   Did he elaborate on that?
16   A.   He just said that he's been trying to
17 take his company, and he mentioned a couple of other
18 people that were involved besides John.  He didn't
19 say their names.  He just said there are other
20 people that are involved.
21        And I kept saying to him over and over
22 during that conversation:  I'm so sorry that this is
23 happening and I'm sorry that this is happening to
24 you, and I'm sorry that this is happening to John.
25        I can't tell you how many times I said

Page 79

1 that in the conversation to get the conversation off
2 of the subject matter that he was speaking to
3 because I did not want to be a part of the
4 conversation.
5    Q.   Did he mention to you in connection with
6 this conversation that there was a lawsuit pending?
7    A.   He did.
8    Q.   And what did he tell you about the
9 lawsuit?
10   A.   He just said that -- he just said that
11 there was, indeed, a lawsuit.  Again, I don't know
12 the specifics.
13   Q.   Did he say how Mr. Staples was attempting
14 to take his company?
15   A.   He did not.
16   Q.   And did -- and he didn't mention who else
17 was involved in this effort?
18   A.   He did not.
19   Q.   And did you ask any follow-up questions
20 about that allegation?
21   A.   Again, I was trying to get off of the
22 subject matter because I did not want to be involved
23 because the call was not going in a good direction,
24 and I felt that it was not in Herschel's best
25 interest, nor was it in John's best interest.

Page 80

1    Q.   So the answer is you did not ask any
2 follow-up questions?
3    A.   I did not.  I said that in the beginning.
4    Q.   Tell me specifically what he said about
5 money being taken.
6    A.   He just said that he's -- he's stolen --
7 I don't remember the exact words.  It had something
8 to do with he's taken some money or he's -- I don't
9 recall the exact wording.  Or if it was over money.
10 I'm trying to do the best I can to give you the
11 exact wording, but I don't recall the exact wording.
12   Q.   Okay.  I am going to ask that you take a
13 break --
14   A.   Okay.
15   Q.   -- on this issue just to reflect on it
16 off the record, and then we'll come back to that.
17   A.   Okay.
18        THE VIDEOGRAPHER:  It's 11:41.  We're
19 off the record.
20        (Recess taken, 11:41 a.m. to
21        11:49 a.m.)
22        THE VIDEOGRAPHER:  It's 11:49.  We're
23 back on record.
24 BY MR. KING:
25   Q.   All right.  Ms. Caffey, I was asking you

Page 81

1 to reflect on what Mr. Walker said about money in
2 the course of the second conversation.
3        Can you tell me as -- on your personal
4 knowledge what Mr. Walker said on that subject?
5    A.   It was either that he had taken money or
6 stolen money.  I honestly do not recall the exact
7 words.  No matter how long I reflect on this, I
8 don't recall the exact words.  Again, I was trying
9 to change the subject matter and get off of him
10 talking about this.
11   Q.   Okay.  And before the break, you also
12 said that it might have been that he said something
13 that the issue was about money.
14   A.   Again, I do not recall the exact wording,
15 but it reflected on something derogatory towards
16 money, yes.
17        THE WITNESS:  Sorry, there's a gnat.
18 BY MR. KING:
19   Q.   All right.  I point out to you in
20 paragraph 10 of your affidavit --
21   A.   Uh-huh, because that's how I recall it.
22   Q.   You used the word "stolen money."
23   A.   (Nods head.)
24   Q.   Can you say for certain that your
25 affidavit on the use of the words "stolen money,"

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES                    Job 30433
Kristin Caffey on June 27, 2019                                      Pages 82..85

Page 82

1 "John had stolen money," can you say for certain
2 that your affidavit is correct on that subject?
3     A.    For my recollection, as I stated, I stand
4 by what I said because that's what I believe that
5 was said.
6     Q.    I thought that you said you couldn't
7 recollect what was said.
8     A.    No, that's not what I said.  I said I
9 didn't recollect his exact words.  I believe this to
10 be his exact words.
11    Q.    That John had stolen money?
12    A.    That's what I believe that he said, yes.
13    Q.    So why did you just tell me that you
14 couldn't remember the exact words?
15    A.    Because again, I said these are my --
16 what I'm saying that I determined the conversation
17 to be -- how he was saying it.  This is how I heard
18 it.
19    Q.    This is the way you interpreted the
20 words?
21    A.    The words.  And it could have been that
22 exact word.  I don't know that it was that exact
23 word.
24    Q.    All right.
25    A.    But this is how I interpreted it.  This

Page 83

1 is my -- this is -- I'm writing this based on what I
2 heard.
3     Q.    And I know that I'm plowing this same
4 ground, so I'm not going to stay here much longer,
5 but the words "John had stolen money" is not a,
6 quote/unquote, phrase as you recollect those words
7 being expressed by Mr. Walker.  Might have been, but
8 you can't say of your personal recollection that
9 that's what the words were; is that right?
10    A.    That's what I recall them to be, but I
11 cannot a hundred percent tell you that, and -- yes.
12    Q.    But what your interpretation -- what you
13 remember hearing certainly implicated that that was
14 what he was communicating?
15    A.    Yes.  Again, trying to get him off of the
16 subject matter.
17    Q.    All right.  You also mentioned that
18 Mr. Walker said multiple other things.  Do you
19 recall what the multiple other things were that he
20 talked about?
21    A.    Basically saying that John didn't have
22 any ethics and that he, again, was doing, quote, bad
23 things.  I'm going to continue to tell you that I
24 was trying to get him off of the subject matter.  I
25 kept saying I'm so sorry to hear that this is

Page 84

1 happening, that -- and so I wasn't a hundred percent
2 listening to every teeny-tiny word that he said, but
3 there was a big insinuation happening and it was
4 very defamatory towards Mr. Staples.
5     Q.    Now, what's your definition of
6 "defamatory"?
7     A.    My definition of "defamatory" would be
8 that you are -- how do I want to put -- you're
9 smearing someone's name.
10    Q.    What ethical violation did Mr. Walker
11 identify?
12    A.    Well, he talked about a money issue; that
13 was one.  And he talked about him doing bad things
14 and trying to take his company.
15    Q.    Did he identify any specific bad things
16 other than the money issue we've already talked
17 about?
18    A.    He possibly did within the conversation.
19 Again, I was trying to get him off of that subject
20 matter for his own good.
21    Q.    Do you remember any of the bad things
22 that he said?
23    A.    Taking money, being unethical, doing -- I
24 mean, he just kept saying those things.
25    Q.    Yeah, those are fairly conclusory -- with

Page 85

1 the exception of the money issue, those are
2 conclusory statements.  I'm just trying to see
3 whether he gave you any specifics.
4     A.    Specifics?  He -- he -- I think that
5 there were specifics.  Again, I was too busy trying
6 to get him off of the subject matter.
7     Q.    As you sit here today, you cannot
8 remember any specifics; is that right?
9     A.    No, I remember specifics.  I've told you
10 the specifics that I remember.
11    Q.    If the specifics we're talking about is
12 limited to the discussion about money and the
13 discussion about taking his company, are there any
14 other specifics that you recollect about bad things,
15 ethics?
16    A.    I think that those are bad enough.  I
17 think if someone was calling and accusing me of
18 trying to steal your company and that he's stolen
19 money and that he's been doing bad things and
20 unethical things behind the scenes, you're being
21 defamatory towards someone.
22          Regardless of whether we get into
23 specifics or not, the subject matter still was not a
24 good subject matter for Mr. Walker to be calling to
25 talk to me about, and I was trying to help him get

Page 86

1 off that subject matter.
2    Q.   I appreciate that.  But my job is to find
3 out whether there's anything more, not the effect it
4 had on you or the impact or -- I just want --
5    A.   Well, the reason --
6    Q.   -- I want to know what the universe --
7    A.   -- this was even done is because he
8 called me and because if that hadn't happened, this
9 doesn't happen (indicating).
10   Q.   I understand.  I just need to know the
11 universe of things that were said by Mr. Walker that
12 you heard that you remember.
13   A.   I understand that, and I'm -- I'm a
14 little emotional about this because I've got two
15 friends sitting at a table that are going after each
16 other and I got drug in the middle of it.  So
17 forgive me for having some emotion about it.
18       I do not remember specifically right at
19 this moment.  I've been through a shitshow myself in
20 the last few weeks with an illness.  I'm coming into
21 this.  I'm trying to recall for you every ounce of
22 everything that I can, and I'm telling you that this
23 was not a good conversation.
24       It was very derogatory towards
25 Mr. Staples, and it did not look good for

Page 87

1 Mr. Walker, and I tried to get him off of it.  I'm
2 giving you the words that I believe that he used
3 after knowing him for as long as I've known him,
4 that those were the terms that he used.
5       I don't have the nitpicking specifics.
6 Again, I was trying to get him off the subject
7 matter and trying to make -- turn it to a friendly
8 conversation, because I hadn't talked to him in
9 years.
10   Q.   Other than the first one?
11   A.   Other than the first conversation, yes,
12 which, again, was almost four years.
13       THE WITNESS:  Herschel, if there's
14 something else you want -- you can say, if you're
15 correcting me.
16       MR. RUSSELL:  He can't.
17       THE WITNESS:  No?  Okay.  Well...
18       MR. KING:  All right.
19 BY MR. KING:
20   Q.   Your affidavit states that Mr. Walker
21 said that John Staples lacked morals.
22       Other than as we've already described,
23 did he specify what morals Mr. Staples lacked?
24   A.   Well, if you've stolen money and you --
25 that's pretty immoral, so if that's what you're

Page 88

1 referring to.
2    Q.   I said -- okay.  No, my statement was --
3    A.   No.
4    Q.   -- other than that.
5    A.   No.
6    Q.   And other than that discussion about the
7 money, did he specify what ethical -- what conduct
8 was unethical by Mr. Staples?
9    A.   That he was trying to take his company;
10 that he was stealing money; so forth and so on.  The
11 same things that we've talked about.
12   Q.   Okay.  And again, when you use the term
13 "stealing" I've got to keep on coming back to that,
14 because you don't recollect him using that specific
15 phrase.
16   A.   I wouldn't have said it in here if I
17 didn't think that that's what he said, but I can't
18 be a hundred percent sure.
19   Q.   Okay.  I think that's clear.  All right.
20       Is it true as stated in paragraph 12 that
21 you then called Mr. Staples?
22   A.   I did.
23   Q.   All right.  Tell me what you recollect of
24 that conversation.
25   A.   I called Mr. Staples and said what the

Page 89

1 hell is going on?  I just received a call from
2 Mr. Walker, and he has told me that you have been
3 let go; that you have been doing bad things.  He's
4 smearing your name.  You need to get in front of
5 this.
6       I mean, that's how the conversation went,
7 that he was despairing his reputation and what the
8 heck was going on.
9    Q.   Did you tell him the specifics of what
10 Mr. Walker had said to you?
11   A.   I did, yes.  Of course I did.
12   Q.   Do you recall Mr. Walker saying that John
13 Staples had not been working while employed by
14 Ren Man?
15   A.   I don't recall.  Within that
16 conversation, there could have been that, but I
17 can't -- no, I can't recall a hundred percent, no.
18   Q.   Would it surprise you that Mr. Staples'
19 recollection of that conversation did not include
20 any reference to taking money?
21   A.   I have -- I don't -- I have no idea.
22   Q.   Well, if you told him that Herschel
23 Walker had accused John Staples of taking money --
24   A.   Yeah.
25   Q.   -- and you said that --

Page 90

1   **A.   Uh-huh.**
2   Q.   -- to John Staples, you would expect that
3 Mr. Staples would remember that, right?
4   **A.   I would think so, yes.**
5   Q.   All right.  On page 82 of Mr. Staples'
6 deposition, beginning --
7   **A.   I've not seen Mr. Staples' deposition.**
8   Q.   I'm going to hand it to you right now,
9 beginning at line 18, I asked him -- Mr. Staples to
10 describe what you had related as being defamatory,
11 and he said:  Other than I wasn't working and I was
12 trying to steal his company, no, those are the ones
13 that stuck with me.
14   **A.   Okay.**
15   Q.   All right?
16   **A.   Okay.  That was his recollection of the**
17 **conversation.  I...**
18   Q.   Does that in any way impact your
19 recollection of whether you -- what words you used
20 with respect to the money issue that we've been
21 discussing?
22   **A.   No.  No.**
23       (Caffey Deposition Exhibit 13
24       marked.)
25       **THE WITNESS:  Okay.**

Page 91

1 BY MR. KING:
2   Q.   I've handed -- if you'll take a look at
3 the third page of these text messages.
4   **A.   Uh-huh.**
5   Q.   Do you recollect receiving a text from
6 Mr. Walker with that document identified with the
7 question:  I would like to talk with you when you
8 have a chance?
9   **A.   I vaguely remember that.**
10       MR. RUSSELL:  I'm going to include my
11 standing objection to Exhibit 13.
12 BY MR. KING:
13   Q.   And if you'll look back at Exhibit 12,
14 which is also in front of you --
15   **A.   Uh-huh.**
16   Q.   -- you recognize that the screenshot that
17 he's included is the same as page 109 of the Radian
18 documents contained on Exhibit 12?
19   **A.   I don't --**
20       MR. RUSSELL:  Objection, calls for
21 speculation.
22   **A.   I've never seen -- I have no idea.**
23       MR. RUSSELL:  No way she can
24 authenticate that.
25   **A.   I have never seen this, so I can't say**

Page 92

**1 that.**
2 BY MR. KING:
3   Q.   In this second call that you had with
4 Mr. Walker, do you remember the subject of what's
5 contained on this screenshot being discussed?
6   **A.   No.**
7   Q.   Do you have any reason to believe that
8 the conversation that you're talking about took
9 place other than on or about March 12 or March 13 of
10 2018?
11       MR. RUSSELL:  Object to form.
12   **A.   What conversation?**
13 BY MR. KING:
14   Q.   The second call between you and
15 Mr. Walker.
16   **A.   I -- as I've told you, I do not remember**
17 **the dates.**
18   Q.   And you don't remember the subject of the
19 document that's reflected in this text message being
20 discussed in that second call?
21       MR. RUSSELL:  Same objection.
22   **A.   I -- if it was, I don't have -- I didn't**
23 **have anything to do with the document, so I probably**
24 **didn't discuss the document with him, if that's what**
25 **you're saying I did.  I did not, though.  I didn't**

Page 93

1 have anything to do with the document.
2 BY MR. KING:
3   Q.   Regardless of whether you had anything to
4 do with the document, do you remember that document
5 being the subject of your call -- conversation in
6 the second call?
7   **A.   No.**
8   Q.   Who have you discussed the second call
9 with other than John Staples and Keri Simms?
10   **A.   I told you earlier, my father.**
11   Q.   I'm sorry.  I thought that had to do with
12 the affidavit.
13   **A.   It did.  That was all part of it.**
14   Q.   Okay.  But specifically the second call
15 that you had with Mr. Walker that we've just been
16 talking about.
17   **A.   Correct.**
18   Q.   Contemporaneously with that conversation,
19 you called John Staples?
20   **A.   I did.**
21   Q.   Contemporaneously with the second call,
22 did you contact anybody else?
23   **A.   No.**
24   Q.   Did you mention anybody at -- did you
25 mention the call to anybody at Sysco?

Page 94

1    A.   No.
2    Q.   Did you mention the call to anybody at
3 Sanderson Farms?
4    A.   No.
5    Q.   All right.  In paragraph 13 of your
6 affidavit --
7    A.   Uh-huh.
8    Q.   -- you say that you received calls from
9 other people you have known --
10   A.   Uh-huh.
11   Q.   -- indicating that Mr. Walker had been
12 calling them and making defamatory statements
13 concerning John Staples.
14   A.   (Nods head.)
15   Q.   Who did you receive phone calls from?
16   A.   I'm not going to bring anybody else into
17 this.  He knows who he made phone calls to, so
18 you've got that information.
19   Q.   This is your affidavit.
20   A.   I understand that.  I didn't -- I'm --
21 I'm not going to use names in any way, shape or
22 form.  He knows who he called.
23   Q.   All right.  I want to know who the people
24 are from your mouth that you're referring to in
25 paragraph 13 of this affidavit.

Page 95

1    A.   I don't recall all -- I had two people
2 call me, but I do not recall who they were off the
3 top of my head.
4    Q.   Do you keep --
5    A.   But they approached me because they had
6 had a phone call, and I said I am not discussing
7 this in any way, shape or form with you.
8    Q.   And you're positive that you can't
9 remember the identity of either one of those two
10 people?
11   A.   I'm positive.
12   Q.   Do you keep any records that would
13 indicate who called you on this subject?
14   A.   No.
15   Q.   You mentioned that you informed
16 Mr. Staples of these calls; is that correct?
17   A.   That was all in the same conversation.  I
18 didn't give him names either, by the way.
19   Q.   The two people, do you tie them to Sysco?
20   A.   I don't recall.
21   Q.   What about Sanderson Farms?
22   A.   No.
23   Q.   Any other vendors?
24   A.   No.
25   Q.   Anybody at Radian?

Page 96

1    A.   No.
2    Q.   Did you have a conversation with Chris
3 Drazan about the second call?
4    A.   No.  No.
5    Q.   And I think this was early on, but since
6 you reported the second call to John Staples, have
7 you had any conversation with him about this subject
8 matter?
9    A.   Other than that day?  I don't -- I don't
10 recall that we have ever discussed it again, other
11 than with his attorney.
12   Q.   I understood the distinction.
13   A.   Okay.  Okay.  I just want to make sure.
14   Q.   Paragraph 11, you state that you did not
15 appreciate Mr. Walker harming Mr. Staples' ability
16 to be employed.
17   A.   I said that you needed -- yes, and I made
18 it more formal than it was, but I indicated to him
19 by saying things like this:  You could ruin
20 someone's reputation and then they're not hirable,
21 and that's not a good thing.
22   Q.   Are you aware of any potential employer
23 who has not hired John Staples because of comments
24 made by Mr. Walker?
25   A.   I wouldn't have any reason to know that.

Page 97

1 I'm not involved at that -- you know, with things
2 like that, so I have no clue.
3        MR. KING:  All right.  Let's take
4 10 minutes, please.
5        THE VIDEOGRAPHER:  12:15, we're off
6 the record.
7        (Recess taken, 12:15 p.m. to
8        12:26 p.m.)
9        THE VIDEOGRAPHER:  12:26, we're back
10 on record.
11 BY MR. KING:
12   Q.   At his deposition, John Staples made the
13 following statement:  Kristin said that she's not
14 going to divulge the name, but someone in the Sysco
15 corporate office told Sanderson Farms that my
16 relationship with them is not what it should be,
17 that she assumed that she had talked to Herschel,
18 but I don't have any direct knowledge of that.
19       Do you have any recollection of telling
20 Mr. Staples that someone in the Sysco office told
21 Sanderson Farms that his relationship with Sanderson
22 Farms was not what it should be?
23       MR. RUSSELL:  Same standing
24 objection.
25   A.   I have no recollection.

Page 98

1 BY MR. KING:
2    Q.   Did you communicate with Mr. Staples
3 about any impact at Sanderson Farms that
4 Mr. Walker's statements had made?
5    **A.   No, not that I recall.**
6    Q.   Did you have any conversations with
7 Mr. Staples that statements made by Mr. Walker had
8 had impact at the Sysco corporate office?
9    **A.   Say that again.**
10   Q.   Do you recall telling Mr. Staples that
11 statements made by Mr. Walker about Mr. Staples
12 had an impact at Sysco's corporate office?
13   **A.   No.**
14   Q.   Are you --
15   **A.   If I may?**
16   Q.   Go ahead.
17   **A.   The only time we ever had the discussion**
18 **is when I called him after the conversation with**
19 **Herschel and made the statement to him:  This could**
20 **hurt your relationships internally if you don't get**
21 **ahead of this.  So if that relayed to Sysco, that**
22 **could have relayed to any supplier at that point.**
23   Q.   But that was more speculative as opposed
24 to direct knowledge of -- well --
25   **A.   I don't know how he took the context of**

Page 99

1 the conversation.  I'm telling you what --
2    Q.   Right.  But the difference is that you're
3 not aware of anyone at Sysco saying they heard of
4 comments made by Herschel Walker about John Staples
5 that had an impact inside Sysco?
6    **A.   Not that I'm -- no, not that I'm aware**
7 **of.**
8    Q.   And the same is true as to Sanderson
9 Farms?
10   **A.   I don't know why Sanderson Farms is even**
11 **being discussed in this.**
12   Q.   Because Mr. Staples testified that the
13 comments that you heard from Mr. Walker had an
14 impact at Sanderson Farms.  That's the reason.  If
15 you want me to read it again --
16   **A.   I haven't seen the comment, so I don't**
17 **know, so that's...**
18   Q.   Okay.  I'm going to read it to you one
19 more time just --
20   **A.   No, I heard you.  You don't have to read**
21 **it one more time.  I got it.  I'm just saying, being**
22 **that I've never seen that, I was not aware that he**
23 **had made the statement, is all I was saying.**
24   Q.   My understanding of your affidavit is
25 that you did not believe the statements made by

Page 100

1 Mr. Walker about Mr. Staples; is that true?
2    **A.   Yes, I state that in the affidavit.**
3    Q.   And that's correct, isn't it?
4    **A.   Yes.**
5    Q.   Mr. Staples, in his testimony, mentioned
6 that you have influence over the poultry department
7 at Sysco to this day because you're a corporate
8 poultry category captain, so that if you're trying
9 to hurt him, you talk to someone at Sysco corporate.
10   **A.   Trying to hurt whom?**
11        MR. RUSSELL:  Same objection, this is
12 irrelevant to the affidavit and to the conversation
13 had.
14 BY MR. KING:
15   Q.   Concerning John Staples --
16        MR. RUSSELL:  She can't testify as to
17 what John Staples thought.  She can't testify as to
18 his state of mind.
19        MR. KING:  I heard your objection.
20 BY MR. KING:
21   Q.   His statement was that you have influence
22 at Sysco corporate because you're a corporate
23 poultry category, so that if you're trying to hurt
24 him, you talk to someone at Sysco corporate.
25        My question is this:  Are you aware of

Page 101

1 anyone other than yourself that Mr. Walker had
2 talked to at Sysco corporate in an attempt to hurt
3 Mr. Staples?
4    **A.   There had been made mention but not in**
5 **detail.**
6    Q.   Who?
7    **A.   I'm not going to divulge that.**
8    Q.   All right.  You have a right to read the
9 transcript of this deposition in advance -- in order
10 to make corrections.  Would you like to reserve that
11 right, or you can waive it.
12   **A.   I need to go through it all right now?**
13        MR. RUSSELL:  No, no, it's
14 typographical errors based on the transcript once
15 you receive it.  You have the right to review it and
16 sign it, or you can waive that and assume that the
17 court reporter's done the job correctly.
18        **THE WITNESS:  I'll waive it and**
19 **assume that he's done it correctly.**
20        MR. KING:  I don't have any
21 questions.
22        MR. RUSSELL:  All right.  I just have
23 a few.
24        ///
25        ///

Page 102

1          EXAMINATION
2 BY MR. RUSSELL:
3    Q.    Ms. Caffey, my name is Vaughan Russell.
4 We met for the first time earlier this morning.  I
5 represent Kimberly and John Staples in this case.  I
6 will try and keep my questions as brief as possible.
7          Your testimony here today revolves around
8 an affidavit executed by you regarding statements
9 made by Herschel Walker to you regarding John
10 Staples, correct?
11   **A.    Correct.**
12   Q.    And you have been sworn in and sworn that
13 you are Kristin Caffey, correct?
14   **A.    Yes.**
15   Q.    Will you review that document, please,
16 and tell me if that is a true and correct copy of
17 your affidavit.
18   **A.    Since I've seen it 50 times today...**
19          MR. RUSSELL:  Yeah.
20          MR. KING:  Have you handed her
21 Exhibit 6?
22          MR. RUSSELL:  No, I handed her a
23 clean copy.
24   **A.    Yes.**
25          MR. KING:  Have you got a copy for

Page 103

1 me?
2          MR. RUSSELL:  I did, but I drew on
3 it.
4          MR. KING:  I just want to know what
5 you've handed her.
6          MR. RUSSELL:  Here.  It's Exhibit 5,
7 is what it is.
8          MR. KING:  All right.  Exhibit 5.
9          MR. RUSSELL:  It's a clean copy of
10 Exhibit 5.  It doesn't have the Exhibit 5 marking.
11 BY MR. RUSSELL:
12   Q.    Is that your affidavit?
13   **A.    It is.**
14   Q.    Is that your signature on said affidavit?
15   **A.    Yes.**
16   Q.    All right.  Do you have a copy of your
17 driver's license on you?
18   **A.    Yeah, in my wallet, I guess I do, yeah.**
19 **There you go.**
20   Q.    We'll make a copy of this as an exhibit
21 as well.  Kristin Renee Caffey.
22          Is the signature on page 4 of this
23 affidavit your signature?
24   **A.    It is.**
25   Q.    Are the statements made in this affidavit

Page 104

1 your statements?
2   **A.    Do you need that or --**
3   Q.    No, ma'am, I don't.
4   **A.    Okay.**
5   Q.    Are your statements made in this
6 affidavit your statements?
7   **A.    They are.**
8   Q.    Are these statements made to the best of
9 your own personal knowledge?
10   **A.    Yes, they are.**
11   Q.    Are these statements made under your own
12 free will?
13   **A.    They are.**
14   Q.    Okay.  Did you understand at the time
15 that you returned this affidavit to Keri Simms that
16 the affidavit was going to need to be notarized and
17 then would be submitted to the court?
18   **A.    I understood that it would be notarized.**
19   Q.    Okay.
20   **A.    But not by whom.**
21   Q.    Okay.  Did you agree to it being
22 notarized?
23   **A.    Yeah.  I wouldn't have given him the**
24 **affidavit if I didn't.  I knew it had to be filed.**
25   Q.    And you don't have any objection to the

Page 105

1 affidavit's contents or anything like that, do you?
2   **A.    No.**
3   Q.    They've not misstated you at all?
4   **A.    No.**
5   Q.    All right.  Do you have any objection to
6 my notarizing your copy of this affidavit right now
7 as a Notary Public for the State of Alabama?
8   **A.    No.**
9   Q.    All right.  I'll do that and submit this
10 as an exhibit, on the 27th day of June, 2019.  Just
11 hang on to that for just a minute.
12   **A.    Okay.**
13   Q.    At the time that you spoke to Herschel
14 Walker on the first telephone call, which we believe
15 was late 2017, you were at Radian, correct?
16   **A.    Uh-huh.**
17   Q.    Yes?
18   **A.    Yes, I'm sorry, yes.**
19   Q.    That's okay.
20          At that time, did you have a business
21 relationship with Herschel Walker?
22   **A.    No.**
23   Q.    Okay.  Did Herschel Walker, when he
24 contacted you at Radian, give you any pretense as to
25 why he was calling you on that date?  Did he say

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES                                    Job 30433
Kristin Caffey on June 27, 2019                                                    Pages 106..109

Page 106

1 what he wanted?
2    A.    I don't recall.
3    Q.    Okay.  Do you recall having any
4 conversation about anything business related or
5 potentially business related?
6    A.    The only thing that was said, he said --
7 was possibly that Radian could be something that may
8 could help him with analytics later in life.  He
9 didn't use the word "analytics."  He just said could
10 maybe help them, you know, could help Renaissance
11 Man at some point.
12   Q.    Okay.
13   A.    It was just a statement.
14   Q.    Did he ask you what you thought of
15 Mr. Staples?
16   A.    He did.
17   Q.    And did you tell him that you had nothing
18 but positive things to say about Mr. Staples?
19   A.    That he had his best interests at heart
20 and so forth, yes.
21   Q.    And the conversation ended after that?
22   A.    Yes.
23   Q.    Do you recall whether -- or do you recall
24 any other details at all of that conversation?
25   A.    Other than what I've stated, no.

Page 107

1    Q.    Okay.  And the second telephone call
2 would have happened in early 2018; is that correct?
3    A.    No.
4    Q.    With -- from Herschel Walker, the second
5 telephone call that he made?
6    A.    No, it was in 2018.
7    Q.    I'm sorry.  In early 2018?
8    A.    Yes.  Yes.
9    Q.    I'm sorry.
10   A.    Yes.
11   Q.    Could it have been in February of 2018?
12   A.    February, March, that's what they're
13 stating it to be based on the text messages.
14   Q.    Right.  And did you know whether the text
15 messages have anything to do with the telephone
16 call, the second telephone call?
17   A.    I don't recall that, no.
18   Q.    Okay.  I just -- I just wondered if
19 there's any solid relationship between those texts
20 that we've been shown and the conversation that you
21 had with Herschel Walker regarding Mr. Staples.
22        Do you know of any?
23   A.    No.
24   Q.    Okay.  At the time that you spoke to
25 Mr. Walker on the second time in early 2018, did you

Page 108

1 have a business relationship with John Staples?
2    A.    No.
3    Q.    When John Staples' employment ended with
4 Herschel Walker, Simmons, and the other various
5 entities in this case, do you know what he did for
6 work thereafter?
7         MR. KING:  Objection to the form.
8         You can answer.
9    A.    No, I...
10 BY MR. RUSSELL:
11   Q.    No?
12   A.    No.
13   Q.    Okay.  Do you know whether Mr. Staples
14 currently works in the same industry, in other
15 words, the chicken supply industry?
16   A.    Not that I'm aware of.
17   Q.    The second telephone call, I understand
18 from your affidavit that you don't remember exact
19 wording of the discussion; is that right?
20   A.    That is correct.
21   Q.    But the gist of the conversation was that
22 Mr. Walker had called you for the sole purpose of
23 making derogatory statements about Mr. Staples; is
24 that right?
25   A.    Yes.

Page 109

1    Q.    Was there any pretense of any other
2 reason for the call other than for Mr. Walker to
3 speak negatively about Mr. Staples?
4    A.    Not -- no.
5    Q.    Okay.  To the best of your recollection,
6 did Mr. Walker state that John Staples had stolen
7 money from him or his business?
8    A.    Yes --
9    Q.    Did -- to the best -- I'm sorry, go
10 ahead.
11   A.    And I know I said that.  Again, to be
12 fair, I do want to say I don't know if it was that
13 exact word.
14   Q.    Sure, I understand and I --
15   A.    I just want that for the record.
16   Q.    I'm not asking for a quote from
17 Mr. Walker.  I'm just asking if you recall what the
18 conversation was.
19   A.    Because again --
20   Q.    When Mr. Walker suggested to you that
21 John Staples had stolen money from him, did you take
22 that to mean anything other than a criminal offense,
23 a theft?
24   A.    How else would you take that?
25   Q.    So yes, it would, in your mind --

Page 110

1   A.   Yes.  Yes.
2   Q.   -- create an accusation of an indictable
3 criminal offense, wouldn't it?
4   A.   Yes.
5   Q.   That being theft.
6        He also stated that Walker -- or Walker
7 stated that John Staples attempted to steal his
8 business?
9   A.   Yes.
10  Q.   But you don't really recall any other
11 detail regarding that, do you?
12  A.   No.
13  Q.   He said that John Staples lacked morals
14 and was unethical; is that correct?
15  A.   Yes.
16  Q.   But you don't recall any specific
17 statements of --
18  A.   Well, the statements that he was making
19 were --
20  Q.   Right.  Other than saying -- well, I
21 mean, obviously, other than -- other than theft,
22 right?  I guess what I -- the question is:  Is there
23 any other detail?  Did he say, well, he lacks morals
24 because he --
25  A.   No.

Page 111

1   Q.   -- doesn't -- you know, he jaywalks or
2 he -- you know, something other than what is
3 discussed in this affidavit?
4   A.   Yeah, as I've said before, I was trying
5 to get off of that subject matter to protect him and
6 Mr. Staples.
7   Q.   Okay.  From your perspective as an
8 executive in this industry, if you didn't know John
9 Staples personally and you received a telephone call
10 like this from Herschel Walker, would it concern you
11 regarding Mr. Staples' reputation in the business?
12  A.   Absolutely.
13  Q.   Would it concern you regarding any
14 current or potential future relationship you might
15 have with him as far as business goes?
16  A.   It may not stop me, but it would make me
17 question it, yes.
18  Q.   Whether you know John Staples or not?
19  A.   Yes.
20  Q.   Okay.  In the industry that you're in,
21 can statements made like these, even if they turn
22 out to not be true, can they be damaging to a
23 person's career in the industry?
24  A.   Absolutely.  You only have your name --
25 your name is the only thing you've got out there and

Page 112

1 your good word, so...
2   Q.   Is there any other reason that you can
3 think of why Herschel Walker would have called you
4 that second time other than to make negative
5 comments against John Staples?
6   A.   No.
7   Q.   Has anyone --
8   A.   And I don't say that easily.  I just want
9 to --
10  Q.   I understand.
11       Has anyone coerced you into testifying or
12 writing that affidavit?
13  A.   No.
14  Q.   Has anyone made you any promises of any
15 kind regarding compensation or anything like that
16 regarding this testimony --
17  A.   No.
18  Q.   -- or affidavit?
19  A.   No.
20  Q.   Are the contents of that affidavit still
21 your testimony in this matter?
22  A.   It is.
23  Q.   And thank you for that.  I have one
24 housekeeping question.
25       Robert Thurber was mentioned as someone

Page 113

1 that you had a conversation with regarding
2 Mr. Walker.  I believe it was around the time of the
3 book publication?
4   A.   Yeah, he was my boss at the time, yes.
5   Q.   What was his -- what was his job title,
6 if you recall?
7   A.   He was senior vice president.
8   Q.   So would that have made him an officer of
9 the company?
10  A.   He was.
11       MR. RUSSELL:  Okay.  Thank you.
12       THE WITNESS:  Okay.
13       MR. KING:  No, I don't have any more,
14 thanks.
15       THE VIDEOGRAPHER:  It's 12:45.  We're
16 off the record.
17       (Proceedings recessed at 12:45 p.m.)
18       (Caffey Deposition Exhibit 14 marked
19       after the conclusion of the
20       proceedings.)
21       (Caffey Deposition Exhibit 15 marked
22       after the conclusion of the
23       proceedings.)
24       (Pursuant to FRCP 30(e) review and
25       signature by the witness was waived.)

Page 114

```
1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ALABAMA
2                  WESTERN DIVISION
3  KIMBERLY and JOHN STAPLES,     )
                                  )
4       Plaintiffs,               )  CIVIL ACTION NO.
                                  )  7:18cv00160-LSC
5  v.                             )
                                  )
6  H. WALKER ENTERPRISES, LLC;    )
   RENAISSANCE MAN FOOD           )
7  SERVICES, LLC; and SIMMONS,    )
                                  )
8       Defendants.               )
9
10
11          REPORTER'S CERTIFICATION
12     VIDEOTAPED ORAL DEPOSITION OF
13              KRISTIN CAFFEY
14         THURSDAY, JUNE 27, 2019
15
16       I, Michael E. Miller, FAPR, RDR, CRR, Notary
17  Public in and for the State of Texas, do hereby
18  certify that the facts as stated by me in the
19  caption hereto are true;
20       That there came before me the aforementioned
21  named person, who was by me duly sworn to testify
22  the truth concerning the matters in controversy in
23  this cause;
24       And that the examination was reduced to
25  writing by computer transcription under my
```

Page 115

```
1  supervision; that the deposition is a true record of
2  the testimony given by the witness.
3        I further certify that I am neither attorney
4  or counsel for, nor related to or employed by, any
5  of the parties to the action in which this
6  deposition is taken, and further that I am not a
7  relative or employee of any attorney or counsel
8  employed by the parties hereto, or financially
9  interested in the action.
10       Given under my hand and seal of office on
11  July 8, 2019.
12
13  Michael E. Miller
14  MICHAEL E. MILLER,
15  Fellow of the Academy of Professional Reporters
    NCRA Registered Diplomate Reporter
16  NCRA Certified Realtime Reporter
17  Notary Public in and for
    The State of Texas
18  My Commission Expires: 7/9/2020
19
20
21
22
23
24
25
```

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Index: 1..accurate

### Exhibits

**Exhibit 1** 5:3 10:6,9

**Exhibit 2** 5:4 11:23,24 12:4

**Exhibit 3** 5:5 18:16,19

**Exhibit 4** 5:6 31:1,4 35:11

**Exhibit 5** 5:7 31:8,11 35:11 39:18 103:6,8,10

**Exhibit 6** 5:8 31:14,17 39:17 102:21

**Exhibit 7** 5:9 34:5,8,10,11 39:11,15 40:17 53:6

**Exhibit 8** 5:11 56:13,16

**Exhibit 9** 5:12 65:19,22 68:8

**Exhibit 10** 5:14 70:16,19 71:1

**Exhibit 11** 5:18 71:18,23

**Exhibit 12** 5:20 72:25 91:13,18

**Exhibit 13** 5:23 90:23 91:11

**Exhibit 14** 6:3 113:18

**Exhibit 15** 6:5 113:21

### 1

**1** 7:14 10:6,9 68:8,11

**10** 70:16,19 71:1 81:20 97:4

**109** 91:17

**10:42** 52:24 53:1

**10:56** 53:2,3

**11** 44:8,14,22 52:4 55:9 71:18,23 96:14

**11:41** 80:18,20

**11:49** 80:21,22

**12** 52:4 72:25 88:20 91:13,18 92:9

**12:15** 97:5,7

**12:26** 97:8,9

**12:45** 113:15,17

**13** 52:4 90:23 91:11 92:9 94:5,25

**14** 113:18

**15** 52:22 73:9,12,22 78:1 113:21

**16** 10:13

**17** 10:14

**18** 90:9

**19** 38:3

### 2

**2** 11:23,24 12:4

**2000** 8:9 9:21 10:1

**2008** 39:21 50:13,15 56:18,22 57:8

**2013** 8:14

**2014** 8:14 9:14,17,21 38:16 55:15

**2016** 66:25 67:8,15 71:2

**2017** 56:1 64:19 65:4 73:9,12,22 105:15

**2018** 21:10 50:12 55:19 92:10 107:2, 6,7,11,25

**2019** 7:2,5 30:24 44:8,14,22 45:18 46:14,17 50:14 105:10

**27** 7:2

**27th** 7:5 105:10

**28** 66:25 67:8 69:12

**28th** 71:2

**2:30** 67:2

### 3

**3** 18:16,19

**30(e)** 113:24

**34** 35:15,18 36:4,13 37:1,8,24 38:6,12, 21 45:14 54:8

### 4

**4** 31:1,4 35:7,11,13 103:22

### 5

**5** 31:8,11,20,23,24 35:11 39:7,18 40:16 103:6,8,10

**50** 102:18

### 6

**6** 31:14,17,25 39:17 53:6 102:21

### 7

**7** 31:25 32:4 34:5,8,10,11 39:11,15 40:17 53:6

**7:18cv00160-lsc** 7:10

### 8

**8** 56:2,13,16

**82** 90:5

### 9

**9** 56:18,22 65:19,22 68:8

**96** 9:24

**9:37** 7:2,4

### A

**a.m.** 7:2,4 53:1,2 80:20,21

**ability** 17:17 27:12 29:8 96:15

**able** 16:19 54:19 75:10

**about** 8:9 11:1,8 19:18 20:13,17 21:24 22:10,13,14,25 23:3,4,13,16 24:8 25:16 26:10,12 28:2,6 29:16,20 30:8 33:17 35:12,14 39:4,14,21 43:19 44:8 45:8,13 48:9 49:1,14,16,24 50:22 51:18,22,23 52:3 53:9 54:4 56:11,22 57:6 58:11 59:4 60:17 62:8 63:17,21, 24 65:15 67:14,21 70:3 72:7,18 74:1, 5,10,13,15 77:3,19 78:9,11 79:8,20 80:4 81:1,10,13 83:20 84:12,13,17 85:11,12,13,14,25 86:14,17 88:6,11 92:8,9 93:16 95:21 96:3,7 98:3,11 99:4 100:1 106:4,18 108:23 109:3

**Absolutely** 111:12,24

**abusive** 58:6

**access** 13:1,4,6,12,14 14:3,9,11 15:10 17:9,14 18:4,10 52:1

**accomplish** 54:10

**accurate** 12:15

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES

Kristin Caffey on June 27, 2019

Job 30433

Index: accusation..attached

**accusation** 110:2

**accused** 89:23

**accusing** 85:17

**across** 52:6

**acted** 61:5

**action** 7:9

**actual** 29:1 39:10 56:5

**actually** 8:14 31:24 37:25

**add** 69:25

**additional** 12:11

**additions** 39:14

**address** 11:7,12 68:9,16,17,19 71:14

**addresses** 11:3

**advance** 101:9

**affidavit** 20:3,13,25 22:19 23:3,17,23 26:3,15,22 27:3,9,18 28:3,6 29:16 30:1,11,15,21 31:6 32:16 33:2,6,9,16 34:2,13,14 35:13 38:4,17 39:8,10 43:17 50:4 51:1 55:1,25 65:3 70:2,7 81:20,25 82:2 87:20 93:12 94:6,19,25 99:24 100:2,12 102:8,17 103:12,14, 23,25 104:6,15,16,24 105:6 108:18 111:3 112:12,18,20

**affidavit's** 105:1

**affidavits** 12:8

**after** 21:5 25:25 28:9 55:13 57:7 64:21 67:15 72:4 86:15 87:3 98:18 106:21 113:19,22

**again** 16:25 37:9 39:16 42:18 52:4 55:8 56:24 58:3,21 60:3 62:9 64:12 66:20 69:20,21 70:19 71:15 72:21 79:11,21 81:8,14 82:15 83:15,22 84:19 85:5 87:6,12 88:12 96:10 98:9 99:15 109:11,19

**against** 112:5

**ago** 38:3 42:18 52:4

**agree** 104:21

**agreed** 38:12 70:21

**agreement** 70:4

**ahead** 39:16 59:23 70:14 98:16,21 109:10

**Alabama** 30:20,23 32:10,12 33:25 105:7

**allayed** 56:23

**allegation** 79:20

**allow** 28:25

**almost** 38:3 87:12

**along** 24:11 71:14

**already** 23:3 62:17 84:16 87:22

**also** 14:12 35:8 55:25 81:11 83:17 91:14 110:6

**always** 36:12 38:5,20 59:15

**ambassador** 39:25 47:23

**among** 68:2

**analytical** 15:20

**analytics** 9:6 106:8,9

**announcement** 72:7

**another** 29:3 55:23

**answer** 25:8 41:1 43:14 45:16 46:3,7, 10,20 47:9 51:25 59:10,12 61:25 64:10 77:8 80:1 108:8

**answered** 45:2,9 46:23 47:1 61:13 62:6,17

**answering** 17:16 44:20 47:11

**answers** 12:14 16:11 48:9 54:13

**any** 9:20 11:10,17 12:11 17:18 19:2, 21 20:12,20 22:12 23:6,7,13,16 25:12, 18 27:16,19,22 28:6 29:15,19 32:13, 14 33:10 36:19,22,25 37:5,25 38:15 41:25 42:1,2,12 45:15 46:17 49:7 50:1,16,17,22 51:5 52:3,15 57:16 60:19,25 61:4,8,25 62:1,25 63:11,17, 22 64:2,16 65:11,16,25 67:13,14,16, 20 69:10 72:12,16 73:25 74:4,9,12 79:19 80:1 83:22 84:15,21 85:3,8,13 89:20 90:18 92:7 94:21 95:7,12,23 96:7,22,25 97:18,19 98:3,6,22 101:20 104:25 105:5,24 106:3,24 107:19,22 109:1 110:10,16,23 111:13 112:2,14 113:13

**anybody** 15:11 19:6 23:17,25 27:13 29:25 33:3 43:4 52:10 63:2,4,6 64:3 93:22,24,25 94:2,16 95:25

**anyone** 23:21 27:24 33:7,11,15 52:16 58:6 99:3 101:1 112:7,11,14

**anything** 10:22 11:14 19:18 20:20 21:3,20,23 30:6,7 32:24 33:14 57:24 59:7,19 60:5,13,22 63:8 77:3 86:3

**anywhere** 92:23 93:1,3 105:1 106:4 107:15 109:22 112:15

**anywhere** 38:13

**apologize** 33:19 73:20

**appear** 34:20,21,22

**appeared** 18:13 34:19

**appears** 66:6

**applies** 71:21

**appreciate** 86:2 96:15

**approached** 95:5

**Approximately** 8:10

**are** 9:4,10 10:25 11:18 12:2,6,10,14 13:7 14:3,12 18:24 27:5 33:24 35:11 36:22 37:19 38:15 42:12,25 43:4 46:24 64:16 74:16 78:7,19,20 82:15 84:8,25 85:1,13,16 86:15 90:12 94:24 96:22 98:14 100:25 102:13 103:25 104:5,7,8,10,11,13 112:20

**around** 65:10 73:12,21 102:7 113:2

**arrangement** 72:22

**arrive** 12:20

**arrived** 69:4,5

**ask** 30:5 60:3 62:10 75:14 77:23 79:19 80:1,12 106:14

**asked** 18:24 19:2 20:19 21:17 22:19 26:12 29:21 42:10 45:1 46:22 59:4 60:16 61:11 90:9

**asking** 15:15 39:14 45:24 46:2 59:9 65:2 80:25 109:16,17

**aspect** 15:5 23:3 57:13 60:17

**aspects** 17:16

**assignments** 36:22

**assist** 19:3

**assistance** 9:7

**association** 25:22

**assume** 15:25 57:1 101:16,19

**assumed** 50:7,9,12,13,15 51:7 97:17

**assuming** 71:11

**assumption** 50:16 51:10

**attached** 12:6 16:20 66:23

**attaching** 66:6

**attachment** 69:14 73:9,11,17,21

**attempt** 13:23 101:2

**attempted** 110:7

**attempting** 79:13

**attendance** 43:2

**attitude** 39:4

**attorney** 96:11

**authenticate** 91:24

**authenticated** 68:1

**authorized** 33:11,18 41:21 43:18,25 44:9,15,23 45:17 46:3,14 47:4

**authorizing** 33:7,15

**awards** 9:9

**aware** 12:10,13 22:11 28:4 33:24 34:4 36:22 38:15 40:6 42:12,15,16 43:4 48:5 53:14 63:1,3 65:14 96:22 99:3,6,22 100:25 108:16

### B

**back** 22:3 24:14,18,19 28:17 29:21,24 31:11 45:8 53:4 74:25 75:6 80:16,23 88:13 91:13 97:9

**bad** 76:16 77:11,13,21,22 83:22 84:13,15,21 85:14,16,19 89:3

**badgering** 46:9

**based** 17:15 26:16 29:13 37:4 47:16, 18 50:6,16 51:2,3 70:6 83:1 101:14 107:13

**Basically** 83:21

**basis** 57:12

**became** 41:12

**because** 24:9 25:8,23 36:14 37:19 38:18 40:23,24 41:19 43:13 47:4,16, 22 48:3,5 50:10 51:18 54:6 55:5,25 62:4,22 65:3,6,8 67:17 78:7 79:3,22, 23 81:21 82:4,15 86:7,8,14 87:8 88:14 95:5 96:23 99:12 100:7,22 109:19 110:24

**become** 39:23

**been** 8:2 10:8,23 19:7,19 21:21 30:23 31:3,10,16 32:7,21 34:7,19 38:18 43:3,18 46:2,22 52:21 55:8 56:15,23

58:21 64:12,21,23 65:21 66:4,15,18, 19 67:25 70:25 76:4,20 78:16 81:12 82:21 83:7 85:19 86:19 89:2,3,13,16 90:20 93:15 94:11 101:4 102:12 107:11,20

**before** 7:11 18:20,23 20:13 31:23 32:22 34:10 57:2 68:3 81:11 111:4

**beforehand** 70:21

**beginning** 80:3 90:6,9

**behalf** 7:17 19:21 41:22 44:10,12,13, 15 45:18,22 46:14,18 47:2 73:13

**behind** 36:8 85:20

**being** 18:18 34:1 35:22 38:12 49:12 58:5 62:10 65:6 67:13 70:5 80:5 83:7 84:23 85:20 90:10 92:5,19 93:5 99:11, 21 104:21 110:5

**believe** 30:17 31:7 33:9 43:24 61:12 62:11 77:15 82:4,9,12 87:2 92:7 99:25 105:14 113:2

**besides** 78:18

**best** 17:17 27:12 58:15 75:23 79:24, 25 80:10 104:8 106:19 109:5,9

**better** 64:16

**between** 26:20 28:1 38:16 51:9 63:9, 12,19,23 64:6 65:12,25 72:23 92:14 107:19

**beyond** 46:8 70:1,2,3,8,19

**big** 84:3

**bigger** 72:19

**bit** 35:12 52:23 75:18

**blindsided** 48:6,10

**blue** 20:8 62:11

**board** 36:15,17 38:7,8 42:8,13,22 43:1,3

**book** 39:22 40:1 47:13,15,18,24 48:13,19 49:5,14,15,17,20 50:3,6,7, 23,25 51:7,13 53:9,14 54:5 56:23 57:2,18 113:3

**boss** 113:4

**both** 39:14

**bottom** 66:2 68:8,11,23

**brand** 35:18,25 36:2,5,6,11,13,20,23 37:1,8,11,24 38:6,10,11,13,21 39:4,24 40:10 41:7 43:11 47:22 53:11 69:15

**break** 34:16 52:19 75:12,18,25 76:2, 21 80:13 81:11

**Breaking** 39:22

**brethora** 24:25 26:5

**brief** 102:6

**briefly** 25:16

**bring** 94:16

**bringing** 36:10,14

**brokerage** 66:12

**brought** 36:17,20 38:7,8 40:25 42:19 52:13

**business** 10:24 15:13 57:12 63:18 65:12 67:14 105:20 106:4,5 108:1 109:7 110:8 111:11,15

**busy** 85:5

### C

**caffey** 7:6 8:1,6 10:6,9 11:23,24 18:16,19 31:1,4,8,14 34:5 39:16 56:13 65:19 70:16 71:18 72:25 80:25 90:23 102:3,13 103:21 113:18,21

**caffey.kristin@corp.sysco.com.** 11:9

**call** 20:8,10,18,21 21:6,14 22:9,22 23:2,20 24:5,18,19,22 25:5,9,10,14, 15,20,25 26:1 55:17 56:1 58:14,18,23 62:22 63:9,12,13,19,24 64:6,17,23 72:5 74:15,17,23,25 77:24 78:5,9 79:23 89:1 92:3,14,20 93:5,6,8,14,21, 25 94:2 95:2,6 96:3,6 105:14 107:1,5, 16 108:17 109:2 111:9

**called** 20:19 69:5,6 86:8 88:21,25 93:19 94:22 95:13 98:18 108:22 112:3

**calling** 48:7,8 85:17,24 94:12 105:25

**calls** 40:7 51:24 54:12,15 56:6,7 57:19 58:12,18 59:24 65:9 69:7 91:20 94:8,15,17 95:16

**came** 17:13 18:12 52:6 57:2,8

**campus** 78:4

**can** 15:24 24:2 25:23 38:11 52:19 64:22 66:8 70:12,22 75:13,15,23,25 76:2 80:10 81:3,24 82:1 86:22 87:14 91:23 101:11,16 108:8 111:21,22 112:2

**can't** 28:5 50:9 54:14 58:16,17 74:19 75:21 78:25 83:8 87:16 88:17 89:17 91:25 95:8 100:16,17

**cannot** 74:22 83:11 85:7

**capacity** 8:20

**captain** 9:10 100:8

**care** 35:12

**career** 111:23

**case** 7:10 19:4,8,23 20:17 21:3 22:13, 14,16,25 23:7,14 29:11 102:5 108:5

**category** 9:4 40:24 41:6 100:8,23

**caused** 39:22 47:15,19 48:22

**cell** 68:25 78:5,6,7

**certain** 18:4 81:24 82:1

**certainly** 83:13

**certified** 7:12

**cetera** 13:16

**chain** 72:3

**chance** 91:8

**change** 38:15 81:9

**changes** 15:23

**chicken** 108:15

**Chris** 71:1 73:8,13,14 96:2

**chronological** 77:7

**clean** 102:23 103:9

**clear** 76:7,9 88:19

**client** 25:21

**clue** 72:20 97:2

**CNN** 48:22

**coerced** 112:11

**collection** 12:7

**come** 49:23 53:14 80:16

**comes** 75:21

**coming** 40:2,7 48:6 54:12,15,17 86:20 88:13

**comment** 99:16

**comments** 96:23 99:4,13 112:5

**commission** 36:5

**commotion** 50:10 51:6

**communicate** 16:12 33:6 98:2

**communicated** 64:13

**communicating** 53:8,12 83:14

**communication** 31:5 74:5,6

**communications** 53:7

**companies** 54:24

**company** 9:24 41:21,22 44:5 48:10 53:16,22,24 75:3 76:19 77:19 78:12, 14,17 79:14 84:14 85:13,18 88:9 90:12 113:9

**compared** 34:13

**compensation** 112:15

**complete** 48:14 59:8

**completely** 75:6

**complicated** 17:15

**computer** 13:11 16:2 17:21 18:2,3 29:9 34:12

**concept** 74:2,10,13

**conceptual** 66:22 69:17,24

**concern** 40:3,12,14,15 41:10 42:14 47:14,15,19,20 48:2,15,17,18,22 49:11 50:1,5 52:8 111:10,13

**concerned** 22:4 39:23 41:2,12 52:3 57:9

**concerning** 44:16 45:18 48:24 53:7 72:13,22 94:13 100:15

**concerns** 48:14 54:20 56:22 57:6

**conclusion** 59:25 113:19,22

**conclusory** 84:25 85:2

**conduct** 60:14,20 88:7

**conference** 72:4

**confirm** 46:11

**confused** 25:8

**connection** 27:20,23 30:1,20 32:15 33:2,5,22 43:17 57:17 65:25 76:3 79:5

**consideration** 65:12

**considered** 36:13 37:14 38:5,10,21 70:11

**consult** 27:13

**consultant** 9:12

**consulted** 52:10

**contact** 19:22 53:17 62:19,25 93:22

**contacted** 105:24

**contacting** 54:3

**contacts** 68:19

**contain** 68:22

**contained** 50:4 51:1 68:23 91:18 92:5

**Contemporaneously** 93:18,21

**contents** 105:1 112:20

**context** 59:8 60:12 62:13 98:25

**continue** 39:15 40:4,9 57:6 83:23

**continuing** 70:22

**contract** 37:3,6

**contribution** 66:14

**control** 54:11

**convenience** 39:13

**conversation** 20:12 21:5,25 22:5 24:3,6,23 25:2 26:5,6,17,21 28:11 29:19 30:9 33:11,22 40:9 42:17 48:23 51:20 52:5 54:23 55:7,24 59:4,6,9,19 60:6,14,21,24 61:3,7,9,18,22 62:2,19, 24 63:23 65:14 72:10 75:7 78:22 79:1, 4,6 81:2 82:16 84:18 86:23 87:8,11 88:24 89:6,16,19 90:17 92:8,12 93:5, 18 95:17 96:2,7 98:18 99:1 100:12 106:4,21,24 107:20 108:21 109:18 113:1

**conversations** 22:12,15 23:4,6,13, 16 29:15 51:18,21 52:15 63:11 64:2 74:4 98:6

**conveyance** 37:1

**conveyed** 37:25

**conveying** 37:6

**copied** 28:17,20

**copy** 102:16,23,25 103:9,16,20 105:6

**corporate** 10:1 19:16 41:20,24 42:2, 22 97:15 98:8,12 100:7,9,22,24 101:2

**corporation** 8:13 36:3 39:25 40:3,12 41:9 43:2,19,24 44:15,23 45:17

**corporation's** 40:14

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES

Kristin Caffey on June 27, 2019

Job 30433

Index: correct..document

**correct** 8:9 17:19,20,25 18:15 21:7 27:12 28:7,8 29:10 36:17,18 38:25 39:4 41:23 44:11 46:4,7 51:14 55:4 56:20 57:1 62:14 67:23 82:2 93:17 95:16 100:3 102:10,11,13,16 105:15 107:2 108:20 110:14

**corrected** 55:2

**correcting** 87:15

**corrections** 101:10

**correctly** 41:11 101:17,19

**could** 11:21 16:21 18:7 38:13,18 40:4 48:2 71:14 74:21 82:21 89:16 96:19 98:19,22 106:7,8,9,10 107:11

**couldn't** 12:12 29:11 82:6,14

**counsel** 7:15

**couple** 61:13 78:17

**course** 13:24 18:13 59:18 81:2 89:11

**court** 30:4,12 101:17 104:17

**covers** 66:5

**create** 14:12,15,17,19,20,21 35:18 66:22 69:20 110:2

**created** 16:17 17:3 53:24 67:7

**creates** 15:17 48:11

**creation** 34:11 35:15

**credit** 36:4

**criminal** 33:25 109:22 110:3

**current** 39:3 111:14

**currently** 39:1 108:14

**customer** 48:12 54:24

**customers** 48:7

**D**

**daily** 57:12

**damaging** 111:22

**date** 20:5 21:9 56:5 58:17 65:3,8,9 74:20,22 105:25

**dated** 56:18,25 71:2 73:8

**dates** 56:3,24 58:13 64:25 74:16 92:17

**day** 48:1 67:2 96:9 100:7 105:10

**days** 24:17 26:23

**daytime** 78:9

**deadline** 70:4

**deal** 57:10

**dealing** 58:12,18

**decided** 22:20 49:20

**decision** 20:23,24 26:4

**decisions** 24:12 41:22 42:12

**deemed** 9:10 28:14

**defamatory** 59:20 60:6,11 84:4,6,7 85:21 90:10 94:12

**defendant** 7:21

**definition** 84:5,7

**delivered** 19:19

**department** 9:19 100:6

**depend** 17:12

**deposition** 7:5,7 10:6 11:24 18:16 30:4,13 31:1,8,14 34:5 52:9,14 56:13 65:19 70:2,16,20 71:18 72:25 90:6,7, 23 97:12 101:9 113:18,21

**derogatory** 81:15 86:24 108:23

**describe** 90:10

**described** 87:22

**desk** 52:6

**despairing** 89:7

**detail** 22:7 25:17,18 101:5 110:11,23

**details** 24:22 25:5 26:7,11 106:24

**determined** 82:16

**develop** 35:24

**developed** 36:9

**did** 9:13,15,20 10:18 11:3 12:2,17,19, 20 13:1,22 19:6,21 20:8,10,11,15 21:15,16,18 22:12,18 23:21 24:13,16, 18,21,22 25:1,4,7,12,16,24 26:14 27:5,7,8,13,15,16,19,22,24 28:2,10,12 29:15,19,25 30:3,4,11,12,20,22 31:19 32:13,24 33:6,9,10,14,18,21,22,23 34:19,21 35:18,19,20,21,24 36:8,20 38:7 40:1,12,21 41:24 42:1,2 45:9 47:24 48:19 49:21 50:3,13,24,25 51:12,17 54:18,21 55:5,10,12 56:4 57:6,14,16,24 58:5,24 59:14,17,18

60:5,12,19,22,25 61:4,8,16 62:1,15, 19,20,25 63:8,11,14,17,22 64:2 65:8, 11 66:22,24 69:11 73:11,14,16,18,21 74:9,11,12 76:4 77:20,22,23 78:11,15 79:3,5,7,8,13,15,16,18,19,22 80:1,3 82:13 84:10,15,18 86:25 87:23 88:7, 22 89:9,11,19 92:25 93:13,20,22,24 94:2,15 96:2,14 98:2,6 99:25 103:2 104:14,21 105:20,23,25 106:14,16,17 107:14,25 108:5 109:6,9,21 110:23

**didn't** 9:1 25:9,18 29:1,7 30:8 47:11 48:1,9 49:25 52:1 55:5 57:10 61:15 62:13,15 67:19 71:13 73:25 78:18 79:16 82:9 83:21 88:17 92:22,24,25 94:20 95:18 104:24 106:9 111:8

**died** 50:6,10 51:6,23 57:4

**difference** 51:9 99:2

**different** 17:15 37:4 57:21 66:17

**difficulty** 28:16,24 29:14

**direct** 97:18 98:24

**direction** 79:23

**directly** 9:13 19:10 57:11 64:13

**director** 8:21 9:18 41:5 42:4,6,7

**directors** 41:21 42:9,13,23 43:1,3

**disclosed** 48:3

**discovery** 19:7,22 70:4

**discuss** 23:21 56:19 92:24

**discussed** 57:17 58:25 92:5,20 93:8 96:10 99:11 111:3

**discussing** 90:21 95:6

**discussion** 26:7,14 59:2,3 63:17 67:1,4,6,14 72:13 85:12,13 88:6 98:17 108:19

**discussions** 20:16 21:2 43:9 67:16, 20 72:22 73:25 74:9,12

**disorder** 40:3

**distinction** 96:12

**division** 39:6

**divulge** 97:14 101:7

**doctor** 57:22 58:3

**document** 10:13 13:4 14:15,18,22,24 15:22 16:18 17:12 18:19,22 28:15 29:3,4,20,23 31:11,17,25 32:5 38:1 39:11 66:6 67:8 69:24 71:9 73:24 91:6

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Index: documents..fashion

92:19,23,24 93:1,4 102:15

**documents** 10:15,19 12:6,7,11 13:2, 3,5,6,15,23 14:3,10,12,19,20,21 16:1, 25 17:1,2,19,22 18:5 19:3 27:16,19 36:25 50:17 69:19,20 91:18

**down** 50:6,11 51:6,23 57:4 72:8 76:22

**draft** 26:15,22 27:2 31:5 34:19 55:1 66:22 69:18,24

**Drazan** 71:1,5 73:8,14 74:1 96:3

**drew** 103:2

**driver's** 33:3 103:17

**drug** 86:16

**DSM** 65:13,15 72:9,14,23

**duly** 8:2

**during** 9:21 18:12 25:13 52:6 59:18 63:18 78:22

**duties** 75:1

---

**E**

**e-mail** 11:3,4,7,11,19 13:19,20,21 14:11,17 15:2,5,12 16:21 17:7 28:15 66:5,23,25 68:9,17,18,24 69:11 71:1, 13,24 72:3 73:3,7

**e-mailed** 29:24

**e-mails** 10:20,25 11:1,2 12:18 13:15 68:22

**earlier** 25:24 66:5 93:10 102:4

**early** 96:5 107:2,7,25

**earned** 37:4

**easily** 112:8

**easy** 47:10

**Ecoscribe** 7:13

**effect** 86:3

**effort** 79:17

**either** 41:2 44:21 58:17 81:5 95:9,18

**elaborate** 77:22 78:15

**elected** 42:3 43:5

**electronic** 13:14 29:9

**electronically** 13:15 14:13 32:14

**Elizabeth** 32:8 33:18

**else** 10:22 11:14 12:23 17:3 20:20 21:20,23 23:17,25 27:24 38:11,13 41:1,4 51:25 79:16 87:14 93:22 94:16 109:24

**embarrassing** 60:23

**emotion** 86:17

**emotional** 86:14

**employ** 9:10

**employed** 8:15 45:14 89:13 96:16

**employer** 96:22

**employment** 8:12 108:3

**end** 24:21 26:14 48:1 59:3 64:19 66:7

**ended** 106:21 108:3

**engage** 9:7

**engaged** 49:12 54:22

**enough** 51:11 85:16

**Enterprises** 7:18

**entire** 31:17

**entities** 108:5

**entitled** 7:9

**errors** 101:14

**essentially** 34:18

**et al** 7:9

**ethical** 84:10 88:7

**ethics** 83:22 85:15

**evasively** 45:11,12

**even** 42:25 58:9 68:5 72:15 86:7 99:10 111:21

**ever** 18:19 24:12 31:17,23 32:4,7 36:25 50:22 57:16 58:9 64:13 68:19 69:23 73:23,24 96:10 98:17

**every** 52:5 63:15 75:21,22 84:2 86:21

**everybody** 55:8

**everything** 50:6 56:25 57:3 86:22

**ex-wife's** 48:23

**exact** 20:5 21:9 42:17 54:16 75:4 76:15,17 80:7,9,11 81:6,8,14 82:9,10, 14,22 108:18 109:13

**exactly** 15:9 55:5,8,9 77:6

**EXAMINATION** 8:4 102:1

**Excel** 15:17

**exception** 22:2 31:20 85:1

**exclusive** 36:13 38:6,21

**excuse** 50:12 52:10 54:4 59:17

**executed** 102:8

**execution** 29:16

**executive** 111:8

**exhibit** 10:6,9 11:22,23,24 12:4 18:16,19 31:1,4,8,11,14,17 34:5,8,10, 11 35:5,11 39:11,15,17,18 40:17 53:6 56:13,16 65:19,22 66:7 67:25 68:8,12 70:16,19 71:1,18,21,23 72:25 90:23 91:11,13,18 102:21 103:6,8,10,20 105:10 113:18,21

**exhibiting** 57:25

**exhibits** 35:8

**exist** 35:20

**existed** 36:16

**expect** 20:10 54:18 90:2

**expecting** 26:18

**expedition** 61:13

**experience** 45:13 49:3

**Explain** 13:18

**expressed** 83:7

**expressing** 42:14

**extent** 16:17 21:24

---

**F**

**facility** 9:25

**fact** 19:19 39:1 60:16 61:11

**fair** 51:11 58:14 109:12

**fairly** 84:25

**fall** 56:1 65:4

**Famous** 35:15,18 36:4,13 37:1,8,24 38:6,12,21 45:14 53:10 54:8

**Farms** 63:4 94:3 95:21 97:15,21,22 98:3 99:9,10,14

**fashion** 30:12

**father** 23:24 93:10

**February** 21:10 44:8,14,22 45:18 46:14,17 107:11,12

**feed** 77:4

**felt** 26:6 59:16 79:24

**figure** 29:22

**filed** 104:24

**film** 16:13

**final** 34:20

**find** 11:21 12:12 86:2

**fine** 58:22 70:12,23

**finish** 16:14 73:19

**finished** 55:13

**first** 9:25 19:25 21:4 22:9 23:1 24:3,21 26:15 30:9 31:5 34:12,19,21 40:18,23 58:13,23 60:5,21,24 61:2,7,22 62:2, 18,24 63:9,12,19,23 64:6,23 76:25 87:10,11 102:4 105:14

**fishing** 60:17 61:13

**flattering** 49:3,6

**folder** 18:10

**folders** 13:14 15:3 16:1

**follow-up** 28:10 79:19 80:2

**following** 21:14 62:18 97:13

**follows** 8:3

**food** 7:18 36:8

**Foods** 7:21 56:20

**forgive** 86:17

**form** 26:15 32:15 34:3 49:7 65:16 92:11 94:22 95:7 108:7

**formal** 96:18

**forth** 45:8 88:10 106:20

**forward** 8:12

**forwarded** 67:8 78:7

**found** 11:17 12:8 51:24

**four** 61:20 62:10 87:12

**frankly** 75:5

**FRCP** 113:24

**free** 35:8 39:22 104:12

**friend** 57:9

**friendly** 87:7

**friends** 86:15

**friendship** 24:10

**front** 89:4 91:14

**full** 24:24 25:17 26:5

**function** 29:12

**further** 39:5 52:3 67:20

**future** 111:14

### G

**gave** 38:17 59:10 85:3

**generally** 68:22

**gentleman** 16:10

**gist** 108:21

**give** 47:10 64:16 74:21 80:10 95:18 105:24

**given** 25:21 36:4 40:20 104:23

**giving** 87:2

**gnat** 81:17

**good** 7:3 8:6,7 59:14 79:23 84:20 85:24 86:23,25 96:21 112:1

**governance** 41:20,24 42:3

**great** 50:10

**greater** 22:7

**Greenberg** 7:8

**ground** 8:23 9:2 83:4

**Group** 8:16,20 9:14 65:13 68:24

**guess** 15:2,11 16:24 29:2 68:21 103:18 110:22

**gun** 49:2

### H

**hand** 30:5 90:8

**hand-do** 29:7

**handed** 10:8 31:3,10,16 34:7 35:9 56:15 65:21 70:25 71:23 73:7 91:2 102:20,22 103:5

**handing** 18:18

**hang** 105:11

**happen** 86:9

**happened** 28:13 58:23,24 65:9 86:8 107:2

**happening** 78:23,24 84:1,3

**happy** 75:18

**hard** 15:14

**hardest** 24:12

**harm** 62:2

**harmed** 61:22

**harming** 96:15

**havoc** 48:11

**he** 20:2,8,22 21:18,19,21 22:17 23:1 24:18,21,22,24 25:1,4,5,7,18,19 26:12,16 27:18 28:15 29:21 33:22,23 38:12,13 40:1 49:8 55:22 57:15,17 59:4,13,14 60:16,19,22,25 61:4,11,12, 15,17 66:18,19 69:4,5,7 71:7,13,14 72:13 75:1,2 76:5,6,13,15,16,17,19 77:1,20,22 78:13,15,16,17,18,19 79:2, 5,7,8,10,13,15,16,18 80:4,6 81:5,12 82:12,17 83:14,19,22 84:2,12,13,15, 18,22,24 85:3,4 86:7 87:2,4,16,23 88:7,9,10,17 89:2,7 90:11 94:17,22 98:25 99:22 105:23,25 106:1,6,8,9,14, 16,19 107:5 108:5 110:6,13,18,23,24 111:1,2 113:4,7,10

**he's** 51:4 62:9 72:7,17,18 78:16 80:6, 8 85:18,19 89:3 91:17 101:19

**head** 39:1 49:2 81:23 94:14 95:3

**header** 69:17

**headquarters** 19:16

**health** 39:23 41:13 47:16,19 48:4 57:7

**hear** 63:8 83:25

**heard** 19:9,11 20:13 61:19 82:17 83:2 86:12 99:3,13,20 100:19

**hearing** 83:13

**hearsay** 19:15 68:2

**heart** 106:19

**heck** 89:8

**held** 10:1

**hell** 21:17 89:1

**help** 35:18 66:22 85:25 106:8,10

**her** 33:19 46:10 49:2 70:6 102:20,22 103:5

**here** 12:10 15:8 30:18 50:21 65:17 69:4,5 72:2 83:4 85:7 88:16 102:7 103:6

**Herschel** 8:8 20:19 21:6 66:3 87:13 89:22 97:17 98:19 99:4 102:9 105:13, 21,23 107:4,21 108:4 111:10 112:3

**Herschel's** 35:15 53:15 79:24

**him** 16:13 20:19 21:16,17 22:15 24:15,18 25:9,15,21 26:18 28:18 29:24 47:22 49:1,3,10,12 57:9 58:5,8 59:9,10,14,15,16 60:17 61:18,19 63:15 74:5 77:3 78:21 81:9 83:15,24 84:13,19 85:6,25 87:1,3,6,8 88:14 89:9,22 90:9 92:24 95:18 96:7,18 98:18,19 100:9,24 104:23 106:8,17 109:7,21 111:5,15 113:8

**hirable** 96:20

**hired** 96:23

**his** 16:12 20:10 25:21 39:23 40:1 41:12 44:24 48:23 49:2 50:8,9 53:23, 24 63:17 66:17 71:8,13 72:8 75:1,3 76:14,17,19 77:13,19 78:12,14,17 79:14 82:9,10 84:14,20 85:13 88:9 89:7 90:12,16 96:11 97:12,21 100:5, 18,21 106:19 109:7 110:7 113:5

**hold** 9:20

**holding** 61:9

**holds** 37:22

**home** 30:17

**honest** 24:20 65:7

**honestly** 26:25 59:1 64:18,25 81:6

**hospital** 64:20

**hour** 52:21

**housed** 17:13

**housekeeping** 112:24

**Houston** 7:8

**hundred** 56:4,5 59:1 76:7 77:17 83:11 84:1 88:18 89:17

**hurt** 98:20 100:9,10,23 101:2

---

**I**

---

**idea** 61:17 64:17 89:21 91:22

**identification** 32:13

**identified** 55:2 69:11 75:8,9 91:6

**identifies** 56:1

**identify** 7:15 10:14 75:14 84:11,15

**identity** 95:9

**ill** 55:23

**illness** 86:20

**immoral** 87:25

**impact** 47:24 86:4 90:18 98:3,8,12 99:5,14

**implicated** 83:13

**implying** 65:25

**include** 89:19 91:10

**included** 11:18 12:4 16:22,24 91:17

**including** 38:22

**income** 37:4

**indeed** 79:11

**indicate** 60:20 61:5 95:13

**indicated** 49:8 76:6 96:18

**indicating** 86:9 94:11

**indication** 46:17

**indictable** 110:2

**individual** 55:2

**individually** 39:22

**industry** 108:14,15 111:8,20,23

**influence** 100:6,21

**information** 10:24 15:10,20 25:22 49:23 50:22 68:23 94:18

**informed** 74:25 77:1 95:15

**informing** 76:4

**initials** 69:2

**initiated** 58:24 59:2

**innovative** 36:9

**inside** 99:5

---

**insinuation** 84:3

**instead** 58:12

**intellectual** 37:11,15

**intended** 43:20

**intensively** 27:11

**intentionally** 16:7,10

**interest** 37:7,24 79:25

**interests** 106:19

**internal** 43:9

**internally** 74:1 98:20

**interpretation** 83:12

**interpreted** 82:19,25

**interrupt** 9:1

**intervene** 55:11

**interview** 27:22,24 48:21,23

**interviewed** 26:10

**intimate** 60:14

**intimately** 39:2

**introduced** 36:7

**introduction** 35:2,5 66:10,14 67:17 71:16

**invitation** 39:16

**involve** 8:22 60:22

**involved** 19:7,16,23 20:23 22:18 38:19 43:15,16 65:15 66:20 67:6,11, 14,16 69:21 72:21 78:18,20 79:17,22 97:1

**involvement** 65:11 71:16,17

**irrelevant** 100:12

**issue** 48:4,11 55:10 67:22 75:9,19 77:2,5,18 80:15 81:13 84:12,16 85:1 90:20

**issues** 48:12,13

**items** 70:9 77:5

---

**J**

---

**J.C.** 7:12

**January** 64:18

**jaywalks** 111:1

**job** 14:23 16:12 17:1 59:14 86:2 101:17 113:5

**John** 7:23 20:12,16 28:2 59:4,20 60:7 62:19,22 63:8,11,23,24 64:6 66:3,10 68:16,18 71:12,24 73:8 74:9 76:4 77:1,9 78:13,18,24 82:1,11 83:5,21 87:21 89:12,23 90:2 93:9,19 94:13 96:6,23 97:12 99:4 100:15,17 102:5,9 108:1,3 109:6,21 110:7,13 111:8,18 112:5

**John's** 79:25

**judge** 49:10

**june** 7:2,5 56:18,22 105:10

### K

**KC** 69:2,6,7,8

**kcaffey@radiangroup.com.** 11:13

**keep** 88:13 95:4,12 102:6

**kept** 17:7 78:21 83:25 84:24

**Keri** 20:1 33:17 93:9 104:15

**Kim** 64:14

**Kimberly** 7:23 102:5

**kind** 112:15

**kinds** 48:8

**King** 7:17 8:5,7 10:4,7 11:22 12:1 18:17 19:1 31:2,9,15 34:6 35:3,6 39:12,20 41:17 45:4,23 46:6,12,19,24 47:3,8 52:18,20 53:5 56:11,14 57:23 58:4,10 60:1,4,10 65:20 68:4,7 70:12, 22,24 71:22 73:6 74:7 80:24 81:18 87:18,19 91:1,12 92:2,13 93:2 97:3,11 98:1 100:14,19,20 101:20 102:20,25 103:4,8 108:7 113:13

**knew** 24:24 33:13 51:4,15 52:2 55:23 67:17 104:24

**know** 12:22 15:13 16:6,9 19:17 20:10 21:9 24:21,22 25:21,24 27:10,11 36:12,18,19 37:23 39:3,12 40:1,25 41:4 43:14 47:9 49:14,16 50:3,5,8 51:4,5,6,13,16,17,25 52:7 59:2,14 61:15 62:13,15 63:14 64:18 65:5 67:5, 7 68:5 69:9,22,23 71:8 72:15 73:4,14 75:8,20 76:14 77:6 79:11 82:22 83:3 86:6,10 94:23 96:25 97:1 98:25 99:10, 17 103:4 106:10 107:14,22 108:5,13 109:11,12 111:1,2,8,18

**knowing** 87:3

**knowledge** 50:19,21 51:2,3,10,13 81:4 97:18 98:24 104:9

**known** 8:8 87:3 94:9

**knows** 94:17,22

**Kristin** 7:6 8:1 66:4 69:3 72:4 97:13 102:13 103:21

### L

**lacked** 87:21,23 110:13

**lacks** 110:23

**laid** 26:5

**language** 34:18,21 72:2

**last** 33:19 59:9 65:24 86:20

**late** 65:4 105:15

**later** 70:13 106:8

**launched** 51:25

**law** 61:6

**laws** 33:25

**lawsuit** 21:19 22:10 79:6,9,11

**lawyer** 19:21

**leading** 46:9 60:17 62:5,7

**learned** 25:2

**leave** 8:15 24:13

**led** 61:12 62:11

**left** 44:4 55:14 72:13

**legal** 7:13 36:25 38:1 59:25 60:12

**liaison** 14:20

**license** 33:3 103:17

**life** 106:8

**like** 15:11 21:1 30:6,7 37:14 47:9 69:1 75:12,16,17,24 91:7 96:19 97:2 101:10 105:1 111:10,21 112:15

**limited** 85:12

**line** 40:22 90:9

**line-sight** 54:23

**listening** 84:2

**little** 35:12 52:22 75:17 86:14

**LLC** 7:18,19

**Locas** 7:12

**located** 30:16

**logged** 13:11

**logs** 10:21

**long** 24:16 26:20 27:8 42:18 77:24 81:7 87:3

**long-term** 24:10

**longer** 83:4

**look** 27:19 35:8 39:17 40:16 65:17 69:1 86:25 91:2,13

**looked** 10:20 12:23 13:3

**looking** 32:2 35:7 52:20 59:15 61:15, 17 66:11

**lot** 69:21

**lower** 72:2

### M

**ma'am** 104:3

**made** 15:24 20:23,24 24:12 26:4 28:10 36:1 40:6 42:12 46:19 51:24 57:11 61:23 62:4 66:14 94:17 96:17, 24 97:12 98:4,7,11,19 99:4,23,25 101:4 102:9 103:25 104:5,8,11 107:5 111:21 112:14 113:8

**main** 9:24 13:20,21 53:17

**maintain** 17:21

**maintained** 14:4,5

**major** 36:2

**make** 14:6 27:5,11 28:25 29:11,23 41:22 43:19 87:7 96:13 101:10 103:20 111:16 112:4

**makes** 16:12

**making** 13:22 23:22 27:13,16 74:17 94:12 108:23 110:18

**man** 7:18 21:22 38:8 56:19 58:9 62:10 63:18,21,25 64:7 89:14 106:11

**manage** 8:23 9:2 14:19 16:25 40:8

**managed** 40:24

**manager** 9:23

**many** 23:10 26:23 55:15 68:2 78:25

**March** 21:10 92:9 107:12

**mark** 10:4 37:12 70:14

**marked** 10:6,8 11:24 18:16,18 31:1,4, 8,10,14,16 34:5,7 56:13,15 65:19,21 70:17,25 71:19 73:1 90:24 113:18,21

**marketing** 36:8 65:13

**marking** 103:10

**MAS** 36:4

**matter** 25:16 79:2,22 81:7,9 83:16,24 84:20 85:6,23,24 86:1 87:7 96:8 111:5 112:21

**maybe** 106:10

**me** 8:11,14 10:18 16:14 18:24 19:10 20:2 22:3 23:20 24:2 28:1,15,25 29:21,22 30:2 32:11 35:3,7,14 39:21 42:16 46:25 50:13 52:10 54:4 55:25 58:23 59:4,17 60:16 61:11,12,18,23 62:4,11 64:9,16 66:8,20 69:7 70:14,23 71:14 74:15,23,25 75:10,16 80:4 81:3 82:13 85:17,25 86:8,17 87:15 88:23 89:2 90:13 95:2,5 99:15 102:16 103:1 111:16

**mean** 9:1,5 15:3 17:14,16 18:23 20:22 28:21 29:17 30:10 35:16 38:2 43:18 47:12 49:24 52:1 57:21 63:15 66:13 84:24 89:6 109:22 110:21

**Meaning** 19:11,15 71:12

**means** 9:6 28:19,22 67:19

**medical** 8:15 57:20

**medication** 76:2

**meeting** 42:19,21,23 43:2,6

**member** 42:22,25

**mental** 39:23 41:12 47:16,18 48:3 57:7

**mention** 19:9 50:14 61:19 79:5,16 93:24,25 94:2 101:4

**mentioned** 19:10 55:6 76:25 78:17 83:17 95:15 100:5 112:25

**message** 92:19

**messages** 91:3 107:13,15

**messaging** 10:21

**met** 32:7,18 102:4

**Michael** 7:17

**middle** 86:16

**might** 81:12 83:7 111:14

**Mike** 7:11

**Miller** 7:11

**mind** 62:1,3 75:16 100:18 109:25

**minute** 40:20 105:11

**minutes** 52:22 75:13 78:1 97:4

**miserable** 16:13

**misstated** 105:3

**moment** 86:19

**money** 75:5 76:20 77:18 80:5,8,9 81:1,5,6,13,16,22,25 82:1,11 83:5 84:12,16,23 85:1,12,19 87:24 88:7,10 89:20,23 90:20 109:7,21

**months** 57:2 64:20 66:4,16,19

**morals** 87:21,23 110:13,23

**more** 36:5 50:1,2 75:18 86:3 96:18 98:23 99:19,21 113:13

**morning** 7:3 8:6,7 102:4

**most** 23:12 69:3 75:20 78:1

**mouth** 94:24

**mouths** 75:22

**move** 53:6

**mull** 24:14,16

**multiple** 9:22 10:1 36:7 38:9 40:2,7 45:9 57:25 83:18,19

**multitude** 36:10 43:16 75:5

---

### N

**name** 7:12 12:22 33:19 37:12,20 55:6 68:24 69:12 84:9 89:4 97:14 102:3 111:24,25

**names** 12:24 55:3 78:19 94:21 95:18

**necessarily** 57:11 67:19

**necessary** 39:18 62:22

**need** 15:23 34:16 73:19 86:10 89:4 101:12 104:2,16

**needed** 24:8 54:21 96:17

**needing** 20:13

**needs** 39:17

**negative** 112:4

**negatively** 47:24 109:3

**never** 55:17 58:8 68:2 73:23 74:6 91:22,25 99:22

**new** 36:7,9,11

**next** 75:19 77:8

**nightmare** 40:7

**nitpicking** 87:5

**nods** 81:23 94:14

**noon** 76:1

**nor** 79:25

**notarization** 32:15

**notarize** 33:7,12,15 34:1

**notarized** 33:13 104:16,18,22

**notarizing** 105:6

**Notary** 33:7,12,15,25 105:7

**notations** 12:2

**note** 40:17

**nothing** 18:12 22:15 39:5 49:16 59:14 106:17

**notice** 10:13

**noticed** 69:18

**November** 64:19

**number** 7:10 68:25

**numbers** 52:2

---

### O

**oath** 29:25 30:2,11 32:21 33:21

**object** 34:3 35:1,4 57:19 67:24 92:11

**objection** 41:15 45:1,20 46:5,16,20 47:6 58:1,7 59:22 60:8 70:1,18,23 71:20 73:2 74:3 91:11,20 92:21 97:24 100:11,19 104:25 105:5 108:7

**observe** 57:16,24 58:5

**obviously** 110:21

**occasions** 9:22

**occur** 58:24

---

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019
Job 30433
Index: occurs..positive

**occurs** 70:3

**offense** 109:22 110:3

**offering** 67:25

**office** 23:18 34:11 68:24,25 97:15,20 98:8,12

**officer** 42:3,5,13,22 43:1,5 113:8

**officers** 41:21

**offices** 7:8

**on-site** 9:11

**once** 63:15 101:14

**one** 15:17 19:9 24:11 38:11 47:10 69:16 75:25 84:13 87:10 95:9 99:18, 21 112:23

**ones** 90:12

**only** 10:23 25:22 58:18 65:2 67:18 98:17 106:6 111:24,25

**operating** 54:24

**opinion** 57:20 60:18 61:11

**opposed** 98:23

**orally** 33:6

**order** 10:18 77:7 101:9

**original** 27:2

**originally** 55:7

**other** 9:20 12:7 13:5 14:17 16:12 20:20,22 22:14 23:6 27:19,22 28:6 40:25 43:10 45:18 48:7 56:12 57:10 67:17 68:2 70:9 71:10 77:4,5,20 78:17,19 83:18,19 84:16 85:14 86:16 87:10,11,22 88:4,6 90:11 92:9 93:9 94:9 95:23 96:9,10 101:1 106:24,25 108:4,14 109:1,2,22 110:10,20,21,23 111:2 112:2,4

**others** 11:10

**ounce** 86:21

**our** 9:7 26:16 37:5 44:17 55:7 72:4

**out** 8:14 9:23 20:2,8 21:13 23:21 25:24 26:5 29:22 40:2 48:6 51:24 53:15 55:23 57:2,8 59:16 62:11 72:1 75:21 81:19 86:3 111:22,25

**outright** 37:25

**outside** 19:12

**over** 16:12 24:14,16 56:12 78:21 80:9 100:6

**own** 15:25 20:23,24 84:20 104:9,11

**owner** 37:20

**ownership** 37:10

---

## P

**p.m.** 97:7,8 113:17

**pad** 29:1

**page** 7:14 10:13 31:20,23,24,25 32:2, 4 68:8,11 90:5 91:3,17 103:22

**painstakingly** 22:20

**paper** 52:6

**paragraph** 35:7,13 39:7 40:16 53:6 56:2 81:20 88:20 94:5,25 96:14

**parameters** 70:20

**Pardon** 32:11 35:3

**Parker** 7:20

**part** 16:20 18:7,8 36:2,14 59:9 67:18 71:24 79:3 93:13

**participating** 43:5

**parties** 62:25 67:18 70:4,21

**partner** 54:1,4

**partners** 53:15

**partnership** 43:9 54:6 56:19

**parts** 48:20

**party** 28:7 34:2 71:10

**pass** 71:10,14

**past** 55:22

**pasted** 28:17,20

**pending** 79:6

**people** 43:11,13,15,16 48:7,8 55:2,6 67:21 75:21 78:18,20 94:9,23 95:1,10, 19

**people's** 13:5

**percent** 56:4,5 59:1 76:7 77:17 83:11 84:1 88:18 89:17

**Perhaps** 74:22

**period** 9:21 55:13,14 63:19 66:16

**person** 9:11 14:23 27:22

**person's** 111:23

**personal** 11:1,15 15:3 16:2 17:21 18:2 51:2,3,13 81:3 83:8 104:9

**personality** 40:2 57:25

**personally** 73:17 111:9

**perspective** 38:16,19 40:7 53:16 111:7

**pertinent** 14:23

**phone** 10:21 15:12 20:18 25:15,25 51:24 54:12,15 55:17 78:5,6,7 94:15, 17 95:6

**phones** 78:7

**phonetic** 24:25

**phrase** 83:6 88:15

**physically** 30:16 34:2 58:5

**pie** 72:19

**piece** 52:6 72:19 74:5,6

**pinpoint** 74:19

**place** 10:23 22:18 25:20 30:11 64:17 92:9

**placed** 32:21

**planners** 9:4

**play** 9:11

**played** 67:18

**playing** 49:1

**pleasant** 59:3

**please** 7:15 8:11 10:5 97:4 102:15

**plowing** 83:3

**point** 8:12 16:18 31:21 50:1 59:6 72:1 81:19 98:22 106:11

**pointing** 72:1

**poorly** 61:1

**Popwell** 32:8,14,19,22,25 33:1

**pork** 10:2

**portion** 48:24

**position** 9:16 18:7 38:16 39:3 42:14 64:16

**positions** 9:20 10:2

**positive** 95:8,11 106:18

**possibility**  66:11

**possible**  76:18 102:6

**possibly**  18:11 76:19 84:18 106:7

**potential**  96:22 111:14

**potentially**  106:5

**poultry**  9:18 10:2 39:6 100:6,8,23

**PR**  40:6 47:14,15 54:22

**precise**  73:16 75:10

**predicate**  75:16

**preparation**  52:9,14

**prepare**  12:2

**prepared**  7:21 27:18 54:21

**presented**  32:7 34:1

**president**  41:8 113:7

**press**  56:16 57:3,7

**Presumptively**  13:10

**pretense**  105:24 109:1

**pretty**  27:11 47:10 57:3 87:25

**previously**  35:9,20 49:18

**primarily**  12:22

**principal**  71:5

**prior**  36:16 64:23

**probably**  68:19 71:10 92:23

**problematic**  49:11 74:16

**proceed**  75:16,17,25

**proceedings**  7:1 113:17,20,23

**process**  18:8 19:7,23 28:9 36:3 39:6 66:21

**produce**  38:11

**produced**  16:19

**producers**  53:20

**producing**  53:10

**product**  9:23 41:7,10 53:20,21,23

**production**  10:14 11:20 12:15 19:3 27:1

**products**  36:7,9

**promises**  112:14

**promoted**  9:22

**properly**  14:7

**property**  37:11,15,19

**proposal**  67:11 74:1

**proposition**  66:8

**protect**  111:5

**provide**  76:5

**provided**  70:5,20

**psychosis**  49:8

**public**  49:25 55:10 61:10 105:7

**publication**  113:3

**purchased**  53:23

**purpose**  53:8,12 54:3 60:16 71:8 108:22

**purposes**  17:10

**pursuant**  113:24

**put**  29:3,25 30:2 33:6,21 39:2 65:7 84:8

**putting**  49:2

## Q

**question**  13:9 14:6 16:14 17:2,15 35:17 36:24 37:9,23 43:22 44:19 45:9, 16 46:9,13,21 47:1 48:17 50:2 54:9 60:2 61:23,25 62:4,5,7,11,16 63:22 65:25 73:16,19 75:19 77:9 91:7 100:25 110:22 111:17 112:24

**questions**  16:11 26:12 54:16,19 77:9 79:19 80:2 101:21 102:6

**quote**  83:22 109:16

**quote/unquote**  83:6

## R

**Radian**  8:15,20 9:13 11:11 13:2,7,11, 19,23 18:3,5 19:2,3,6,7,12,19,22 52:16 64:5 65:13 66:11,18,20 67:21 68:24 69:19,20 71:5 72:23 73:8 91:17 95:25 105:15,24 106:7

**Radian's**  69:15

**raise**  30:5

**Randy**  72:8,13,15

**rationale**  77:3

**reach**  23:21 25:24

**reached**  20:2 21:13

**read**  48:19,20 99:15,18,20 101:8

**really**  24:8 64:8 110:10

**reason**  52:12 63:20 65:2 69:10 76:5 86:5 92:7 96:25 99:14 109:2 112:2

**reasoning**  76:6

**rebeltoddy10**  11:15

**rebuke**  61:10

**recall**  10:11,16 19:20 20:5 21:8 24:20 25:3 26:23,25 30:7,9 32:6,17 33:3,23 35:23 36:19 37:6 38:2 42:17,24 43:7, 13,15 45:3,5,6 48:12,14 52:5 54:16 55:5 59:1,8 60:9 61:2 64:1,8,9,12 67:4,9 68:18 69:13 72:10,11 73:23 74:4 77:17 78:6,8 80:9,11 81:6,8,14, 21 83:10,19 86:21 89:12,15,17 95:1,2, 20 96:10 98:5,10 106:2,3,23 107:17 109:17 110:10,16 113:6

**recalling**  56:24

**receive**  14:22 94:15 101:15

**received**  20:18 23:2 89:1 94:8 111:9

**receiving**  10:11 91:5

**recess**  53:1 80:20 97:7

**recessed**  113:17

**recognize**  68:16 69:14 91:16

**recognized**  36:1

**recollect**  35:14 56:7 65:6 77:24 82:7, 9 83:6 85:14 88:14,23 91:5

**recollection**  66:17 67:13 72:12 82:3 83:8 89:19 90:16,19 97:19,25 109:5

**record**  7:4 24:6 52:22,25 53:4 80:16, 19,23 97:6,10 109:15 113:16

**records**  11:17 14:1 95:12

**redactions**  39:14

**redid**  28:15

**reference**  37:3 40:2 42:19 89:20

**referring**  43:10 44:17 66:19 72:17 88:1 94:24

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Index: refers..se

**refers** 69:24 72:4

**reflect** 60:25 75:17 80:15 81:1,7

**reflected** 27:6 81:15 92:19

**regard** 53:18

**regarding** 39:23 41:12 43:9 64:6 102:8,9 107:21 110:11 111:11,13 112:15,16 113:1

**Regardless** 85:22 93:3

**regards** 40:4 52:7 53:17,19 54:7,13 63:10

**relate** 9:8

**related** 23:7 66:9 90:10 106:4,5

**relation** 26:2

**relations** 55:10

**relationship** 24:9,11 40:5 43:21 44:1, 4,16,17,24 45:19 47:25 49:22 53:19 55:22 63:18,24 64:7 67:15 72:23 97:16,21 105:21 107:19 108:1 111:14

**relationships** 98:20

**relayed** 98:21,22

**release** 56:16 57:3,7

**released** 21:21 40:1

**relevance** 58:2

**relieved** 75:1

**remember** 24:2 33:20 48:21 54:14 56:11 64:25 74:17,23,24 75:4,15,21 76:11 77:3 78:2 80:7 82:14 83:13 84:21 85:8,9,10 86:12,18 90:3 91:9 92:4,16,18 93:4 95:9 108:18

**Ren** 63:18,25 64:7 89:14

**Renaissance** 7:18 21:22 38:8 56:19 63:21 106:10

**Renee** 103:21

**Rephrase** 43:22

**reported** 96:6

**reporter** 7:12 30:4,12

**reporter's** 101:17

**represent** 7:16 102:5

**representation** 47:25 57:15

**represented** 39:24 47:22

**reputation** 61:1,21 62:3 89:7 96:20 111:11

**request** 11:20 12:12 23:22

**requests** 10:14 11:18 12:14

**require** 55:11

**reserve** 101:10

**reside** 15:23 32:9,12

**respect** 17:2,17 19:22 20:2 43:20,25 44:24 48:13,25 49:13 59:15 90:20

**responding** 17:10 18:9

**response** 11:19 24:7 54:19

**responsibility** 40:23

**responsible** 41:6,7,10

**responsive** 10:19 11:17 12:11 18:14 19:4

**result** 61:22 62:24 70:9

**returned** 104:15

**review** 11:3 12:17 13:23 18:22 27:16 50:17 101:15 102:15 113:24

**reviewed** 16:18

**reviewing** 10:16

**revised** 27:2

**revising** 27:8

**revisions** 27:5,14,17,20,23 28:3,6,10, 14

**revolves** 102:7

**right** 8:17 13:8,10,25 14:4,22 17:11, 24 18:9 22:1,6,20 24:2 26:11 29:2,8 30:5 31:3 37:15,17 43:12 47:5 48:16, 17 49:9,13,18 50:23 52:18,21 53:22 54:1,15 58:11,18 65:2 71:6,23 72:2 73:7 74:19 75:8 76:3,8 77:16 80:25 81:19 82:24 83:9,17 85:8 86:18 87:18 88:19,23 90:3,5,8,15 94:5,23 97:3 99:2 101:8,11,12,15,22 103:8,16 105:5,6,9 107:14 108:19,24 110:20,22

**rights** 37:19

**Robert** 41:8,11 112:25

**role** 9:12 41:25 42:1,2 72:8

**roughly** 21:8

**roulette** 49:2

**ruin** 96:19

**Russell** 7:22 34:3 35:1,4 39:10,19 41:15 45:1,20 46:5,8,16,22 47:6 52:19 57:19 58:1,7 59:22,24 60:8 67:24 69:25 70:18 71:20 73:2 74:3 87:16 91:10,20,23 92:11,21 97:23 100:11,16 101:13,22 102:2,3,19,22 103:2,6,9,11 108:10 113:11

**Russian** 49:1

**S**

**said** 21:19 22:17 23:4 29:21 35:4 56:3 60:13 65:5 75:15,22 76:15 77:8 78:13, 16,19,25 79:10 80:3,4,6 81:1,4,12 82:4,5,6,7,8,12,15 83:18 84:2,22 86:11 87:21 88:2,16,17,25 89:10,25 90:11 95:6 96:17 97:13 103:14 106:6, 9 109:11 110:13 111:4

**sale** 50:22

**sales** 36:19 49:13,14,16 50:3,6,7,8,9, 10 51:7,16 52:2

**same** 16:15 30:12 32:5 46:16 58:1,7 60:8 70:18 73:2 75:9 83:3 88:11 91:17 92:21 95:17 97:23 99:8 100:11 108:14

**Sanders** 72:8,13,15

**Sanderson** 63:4 94:3 95:21 97:15,21 98:3 99:8,10,14

**saved** 29:6 68:19

**savvy** 15:14

**saw** 36:25

**say** 10:25 13:1 28:23 30:8 31:24 38:5, 20 40:13 41:5,11 55:16 58:9 59:18 60:5 78:11,19 79:13 81:24 82:1 83:8 87:14 91:25 94:8 98:9 105:25 106:18 109:12 110:23 112:8

**saying** 22:2 29:7 39:25 49:11 64:11 75:24 76:11 77:3 78:21 82:16,17 83:21,25 84:24 89:12 92:25 96:19 99:3,21,23 110:20

**says** 31:25 49:19 65:3 66:3

**scenes** 85:20

**scope** 70:1,2,20

**screenshot** 91:16 92:5

**se** 67:6

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019
Job 30433
Index: seafood..standpoint

**seafood** 10:2

**search** 10:18 12:17,20 13:22 16:21 18:13

**searched** 13:7,25 18:8

**second** 22:22 23:2 26:1 40:22 58:14 63:9,13,19,24 64:6,17 74:15 77:19 81:2 92:3,14,20 93:6,8,14,21 96:3,6 107:1,4,16,25 108:17 112:4

**seconds** 75:13

**section** 27:11

**see** 31:19 49:20,25 71:3 73:11,17,21 85:2

**seeing** 73:23

**seen** 18:19,23 27:1 31:17,23 32:4 34:10 50:22 57:21 58:8 68:2 69:23 74:6 90:7 91:22,25 99:16,22 102:18

**sell** 51:1

**selling** 36:3,4,5

**send** 29:21 69:11

**sending** 71:9

**senior** 8:21 9:18 41:5,8 42:7 113:7

**sent** 11:19 17:3,6 28:14,15,17 31:11 66:6 68:20 71:14 73:12

**sentence** 40:18 66:2

**September** 66:25 67:8,15 69:12 71:2 73:9,12,22

**septic** 64:20

**series** 10:14

**server** 9:7 14:13,24 16:4,5

**service** 37:12

**Services** 7:19

**set** 67:17

**several** 24:17 70:9

**shape** 49:7 65:16 94:21 95:7

**she** 39:17 46:17 49:1 91:23 97:17 100:16,17

**she's** 68:1 97:13

**shitshow** 86:19

**shortly** 21:5 26:24

**should** 41:11 57:5 70:10 97:16,22

**shouldn't** 41:13

**show** 32:13 64:9

**showed** 37:1

**showing** 33:3

**shown** 107:20

**shows** 36:8

**side** 39:6 40:25

**sign** 29:22 69:3,8 101:16

**signature** 28:16,17,20,24 29:1,3,6,9, 23 33:5,8,12,16 34:1 103:14,22,23 113:25

**signed** 30:10,15 34:14,23

**significant** 36:2

**signing** 29:18,20 30:1

**signs** 34:2

**similar** 18:24 30:3

**similarly** 13:25 34:20

**Simmons** 7:21 51:21 53:7,9,13,25 54:4,18 55:3,11 63:6 108:4

**Simms** 20:1,14 23:11,14,21,22 24:3, 13 25:13 26:2,10 28:1,11 29:16,20 31:12 33:17,21 93:9 104:15

**Simms'** 23:18 31:4

**simple** 44:19 47:12

**Simply** 48:3,5

**since** 8:9 9:24 20:20 44:4 51:5 55:14, 21 58:17 96:5 102:18

**sir** 12:5,9 27:21 54:17

**sit** 12:10 50:21 85:7

**sitting** 86:15

**situation** 54:11,22

**slurry** 54:12

**smaller** 72:19

**smearing** 84:9 89:4

**sold** 49:20 51:4,13,15 53:21

**sole** 71:15 108:22

**solely** 66:10

**solid** 107:19

**Solutions** 7:13

**some** 15:15 16:18 24:24 25:4,19 65:17 72:22 75:2 76:13,16 77:10 80:8 86:17 106:11

**somebody** 16:17 17:3 19:11 30:3,11

**somehow** 54:22

**someone** 19:2 85:17,21 97:14,20 100:9,24 112:25

**someone's** 84:9 96:20

**something** 17:14 37:14 43:11 47:11 48:11 52:3 62:12 64:9 69:18 80:7 81:12,15 87:14 106:7 111:2

**somewhere** 21:12

**sorry** 9:1 11:6 16:8,9 20:22 22:17 23:1 29:18 62:16 74:21 78:22,23,24 81:17 83:25 93:11 105:18 107:7,9 109:9

**sort** 61:19

**source** 13:20,21

**space** 66:12

**speak** 43:25 44:10,15,23 45:18 46:3, 14 109:3

**speaking** 44:12,13 45:15,22,24 47:2 72:4 73:13 79:2

**specialist** 7:13

**specific** 9:7 26:12 65:8,9 72:2 75:14 76:24 84:15 88:14 110:16

**specifically** 33:10 42:20 50:2 58:12, 17 77:2 80:4 86:18 93:14

**specifics** 38:2 52:5 63:14 67:11 79:12 85:3,4,5,8,9,10,11,14,23 87:5 89:9

**specify** 87:23 88:7

**speculation** 57:20 59:24 91:21

**speculative** 98:23

**spend** 27:8 39:17

**spoke** 19:25 46:17 55:9 105:13 107:24

**spoken** 55:15

**spreadsheet** 15:18,23

**stand** 70:19 82:3

**standing** 71:20 73:2 91:11 97:23

**standpoint** 37:10 54:25 58:16

**Staples** 7:9,23 20:13,17 21:2,5,13 22:13,23 23:7 24:11 25:2,24 28:2 50:13 52:10 59:5,7,11,17,20 60:7,15, 20,23 61:5,10,12 62:4,8,19,23 63:8, 12,21,23 64:14 66:3,15 67:21 69:4 71:12,24 72:3,17 73:8 74:10 75:1 76:4 77:2,10 79:13 84:4 86:25 87:21,23 88:8,21,25 89:13,23 90:2,3,9 93:9,19 94:13 95:16 96:6,23 97:12,20 98:2,7, 10,11 99:4,12 100:1,5,15,17 101:3 102:5,10 106:15,18 107:21 108:1,13, 23 109:3,6,21 110:7,13 111:6,9,18 112:5

**Staples'** 61:1,21 62:3 63:24 64:7 68:17,18 89:18 90:5,7 96:15 108:3 111:11

**stare** 46:25

**start** 30:4,13

**started** 9:23

**state** 7:16 30:23 32:9,12 96:14 100:2, 18 105:7 109:6

**stated** 49:18 82:3 88:20 106:25 110:6,7

**statement** 43:19 50:25 57:11 88:2 97:13 98:19 99:23 100:21 106:13

**statements** 85:2 94:12 98:4,7,11 99:25 102:8 103:25 104:1,5,6,8,11 108:23 110:17,18 111:21

**states** 87:20

**stating** 107:13

**stay** 83:4

**steal** 85:18 90:12 110:7

**stealing** 88:10,13

**stepped** 72:8

**still** 46:20 49:6 85:23 112:20

**stolen** 75:4 80:6 81:6,22,25 82:1,11 83:5 85:18 87:24 109:6,21

**stop** 111:16

**storage** 15:5

**store** 16:1 17:18,22

**stored** 13:15 14:13,18,24 15:1

**stricken** 34:19 70:10

**strike** 40:21

**struck** 40:17 55:3 57:25

**stuck** 90:13

**stuff** 65:17

**subject** 25:16 76:12,25 79:2,22 81:4, 9 82:2 83:16,24 84:19 85:6,23,24 86:1 87:6 92:4,18 93:5 95:13 96:7 111:5

**subjects** 76:24

**submit** 23:23 32:24 105:9

**submitted** 104:17

**subpoena** 10:11,19 16:20 17:10 18:9,14 19:4,19

**subsequent** 22:12

**substance** 54:14

**such** 67:4

**suggest** 43:18

**suggested** 109:20

**supplier** 9:9 38:9 54:25 98:22

**suppliers** 37:5 38:10 48:8

**supply** 108:15

**supplying** 46:10

**supposed** 70:3

**sure** 13:9 14:6,8 15:6 19:17 25:21 27:11 29:17 35:16 42:25 43:23 55:7 56:4,5 63:14,15 88:18 96:13 109:14

**surprise** 89:18

**surprised** 75:6

**surprising** 55:21

**swear** 30:5

**sworn** 8:2 102:12

**symptoms** 57:17

**Sysco** 8:13,25 9:2,8,9,13,16,21 10:1 11:4 13:21 14:1,13,24 16:4,5 17:19 35:19,24 36:2,5,6,11,12,13,21,23 37:2,8,25 38:5,9,10,11,13,20,22,24 39:2 40:17,21,24 41:2,4,5,9,19,20 42:3,9,13 43:5,8,19,20,24 44:15,23 45:14,17,22 46:3,15,18 47:2,23 49:19, 21 52:11,12 55:14,15 56:16 63:2 64:3, 4,5 68:9 93:25 95:19 97:14,20 98:8,21 99:3,5 100:7,9,22,24 101:2

**Sysco's** 14:5,9 38:16 39:3 42:14 78:4 98:12

**system** 14:4,5 15:4 17:19 28:25 29:13

**systems** 14:9

---

**T**

**table** 86:15

**take** 16:10 22:18 29:3 34:16 35:8 52:19 65:17 70:12 75:3,12,18,24,25 76:2,19 78:12,13,17 79:14 80:12 84:14 88:9 91:2 97:3 109:21,24

**taken** 7:11 25:20 53:1 74:24 75:6 76:20 80:5,8,20 81:5 97:7

**taking** 7:7 40:16 77:19 84:23 85:13 89:20,23

**talk** 28:2 30:8 33:14,18 35:12 43:8 58:11,13 63:15,20 85:25 91:7 100:9, 24

**talked** 23:10 25:15 28:5 33:17 49:1,24 55:6 62:9 83:20 84:12,13,16 87:8 88:11 97:17 101:2

**talking** 11:1,2,8 38:3 45:13 56:12 72:7,18 78:9 81:10 85:11 92:8 93:16

**talks** 66:15,25

**Talley** 7:20

**team** 8:23 9:2,3 14:20,23 15:17 39:2

**tech** 15:13

**teeny-tiny** 84:2

**telephone** 32:14 62:18 105:14 107:1, 5,15,16 108:17 111:9

**tell** 8:11 10:18 19:6 21:16,18 23:20 24:2 25:1,4,9 35:7,14 39:21 42:16 50:9 55:25 58:23 64:22 66:8 74:15,23 75:10,23 77:20 78:25 79:8 80:4 81:3 82:13 83:11,23 88:23 89:9 102:16 106:17

**telling** 86:22 97:19 98:10 99:1

**term** 45:15 88:12

**terminate** 49:21

**terms** 12:17,20 43:8 58:13 66:15 67:1 87:4

**testified** 8:3 99:12

**testify** 100:16,17

**testifying** 112:11

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES                    Job 30433
Kristin Caffey on June 27, 2019                                Index: testimony..volume

**testimony** 23:14,17 40:11,20 52:15
67:10 70:5,10 100:5 102:7 112:16,21

**Texas** 7:8 30:18

**text** 10:20 91:3,5 92:19 107:13,14

**texting** 15:13

**texts** 107:19

**theft** 109:23 110:5,21

**thing** 22:20 25:23 77:8 96:21 106:6
111:25

**things** 12:23 15:15 18:24 26:12 29:6
36:10 37:4 51:5 57:13,21 68:2 69:8
75:2,5 76:14,16,22 77:11,14,20,21,22
83:18,19,23 84:13,15,21,24 85:14,19,
20 86:11 88:11 89:3 96:19 97:1
106:18

**think** 24:8 25:23 28:5 32:18 45:12
62:9 66:18 69:10 76:15,16 77:13 85:4,
16,17 88:17,19 90:4 96:5 112:3

**third** 62:25 72:3 91:3

**third-party** 9:12

**thought** 59:4,10,13 62:8,16 82:6
93:11 100:17 106:14

**three** 23:12

**through** 10:20 27:1,10 34:12 38:1,22
53:23 55:3 86:19 101:12

**Thurber** 41:8,12 43:10 112:25

**Thursday** 7:4

**tie** 95:19

**time** 15:14 16:19 19:2,25 20:20 21:4
23:1,3 25:6 26:20,21 30:10 36:6,16
37:25 38:14,17,23,24 39:17 40:15
41:7,9 42:18 45:11,14 47:17,23 48:19
49:12 51:4,6,15,21 52:7 53:11 55:8
57:10 65:10 69:16,18,19 73:11 78:3
98:17 99:19,21 102:4 104:14 105:13,
20 107:24,25 112:4 113:2,4

**timeline** 21:2

**times** 23:10 45:10 55:15 61:14 78:25
102:18

**title** 113:5

**today** 12:10 23:14,17 44:2 52:15 69:5
72:5 85:7 102:7,18

**told** 19:18 25:23 47:1 85:9 89:2,22
92:16 93:10 97:15,20

**tone** 22:4

**tool** 29:2

**top** 31:24 95:3

**total** 51:16

**totally** 65:24

**towards** 81:15 84:4 85:21 86:24

**trademark** 37:12

**transaction** 65:12

**transcript** 101:9,14

**transitioned** 9:25

**transpired** 25:10,13 26:1

**Traurig** 7:8

**travel** 30:20

**treatment** 49:9

**true** 12:15 45:19,21 88:20 99:8 100:1
102:16 111:22

**turn** 39:7 87:7 111:21

**two** 23:4,12 56:6,7 57:2 58:18 64:20
66:1 77:20 86:14 95:1,9,19

**typical** 15:4

**typically** 69:8

**typographical** 101:14

---

### U

**Uh-huh** 13:13 14:2,16 15:19,21 17:5,
8,20,23 18:6 25:11 27:4 32:1,23 34:9,
15,25 35:10 37:13 39:9 56:17,21
65:23 71:4,25 72:6 73:10 76:10 77:12
81:21 90:1 91:4,15 94:7,10 105:16

**ultimately** 55:10

**under** 29:25 30:2,11 32:21 33:21 49:9
69:11 104:11

**underlined** 34:21

**undermineded** 76:14 77:10

**understand** 8:8 13:9 15:9 17:18 24:4
28:19,21 32:20 34:24 36:24 37:9,11,
17 44:20 60:1 74:8,16 75:20 76:23
77:19 86:10,13 94:20 104:14 108:17
109:14 112:10

**understanding** 14:6 15:15 25:12,20
51:12 70:5 72:16 99:24

**understood** 25:5,13 40:11 53:25
96:12 104:18

**unethical** 84:23 85:20 88:8 110:14

**universe** 86:6,11

**unless** 16:20,22,23,24 17:6

**unlike** 61:18

**unmentionable** 75:2 77:10

**unrelated** 65:24

**until** 8:13 9:21 55:17,18

**up** 18:12 22:3 26:14,16 38:22 49:2
59:6 61:10 70:13

**upon** 47:18 50:16 51:2 70:21

**upsetting** 47:13

**use** 12:17 13:19 14:10 15:12 34:12
38:13 60:11 69:2 81:25 88:12 94:21
106:9

**used** 12:24 15:4 35:22 60:19,22,25
61:4,9 62:2 81:22 87:2,4 90:19

**using** 13:11 60:12 88:14

**utilize** 39:15

**utilized** 12:21

**utmost** 59:15

---

### V

**vaguely** 91:9

**various** 13:2 108:4

**Vaughan** 7:22 102:3

**vendor** 48:13

**vendors** 9:7 95:23

**venture** 72:17

**version** 27:2 34:13,20,22

**vice** 41:8 113:7

**vicinity** 21:12

**video** 7:13

**view** 60:13 61:8

**viewed** 49:19 59:19 60:6

**violation** 33:24 61:5 84:10

**volume** 7:14 9:9

KIMBERLY and JOHN STAPLES vs H. WALKER ENTERPRISES
Kristin Caffey on June 27, 2019

Job 30433
Index: wait..years

---

## W

**wait**  49:20

**waiting**  46:20

**waive**  101:11,16,18

**waived**  113:25

**Walker**  7:9,18 8:9 21:6,14 23:2 24:5,
9,23 26:8,9 37:2 39:24 43:21 44:1,16,
18,25 45:13,19 49:4,6,22 51:20 53:10
54:7,25 55:16 56:9,20 57:12,16 59:18
60:5,13 61:9 62:2,10 63:12,13 67:20
74:13,16,18,22,25 76:3,11 77:1 78:11
81:1,4 83:7,18 84:10 85:24 86:11
87:1,20 89:2,10,12,23 91:6 92:4,15
93:15 94:11 96:15,24 98:7,11 99:4,13
100:1 101:1 102:9 105:14,21,23
107:4,21,25 108:4,22 109:2,6,17,20
110:6 111:10 112:3 113:2

**Walker's**  37:7,24 39:21 53:21,25 54:4
57:7 98:4

**wallet**  103:18

**wanted**  46:10 106:1

**warehouse**  9:25

**web-based**  15:5

**weeks**  86:20

**well**  14:5 15:9,11 19:18 24:10 28:23
32:18 36:16 37:10 38:4 39:12 41:2
49:8,20 50:2,4 51:1,8,16 54:7,9 55:14
57:24 58:16 68:4 69:4 70:15 71:21
76:8 84:12 86:5 87:17,24 89:22 98:24
103:21 110:18,20,23

**went**  25:19 27:10 64:19 66:13 68:21
77:6 89:6

**willing**  24:5

**wondered**  107:18

**word**  75:21,22 76:15 81:22 82:22,23
84:2 106:9 109:13 112:1

**wording**  77:15 80:9,11 81:14 108:19

**words**  40:17,21 60:11,19,22,25 61:4,
8 62:1 75:4,11,14 76:17 77:13 80:7
81:7,8,25 82:9,10,14,20,21 83:5,6,9
87:2 90:19 108:15

**work**  13:20 29:12 108:6

**working**  8:17 19:21 24:10 66:4,16,18
89:13 90:11

**works**  39:2 108:14

**write**  56:4

**writing**  83:1 112:12

**written**  11:18

**wrongful**  60:14,20

**wrote**  26:16

---

## Y

**year**  20:6 38:4 58:21 64:12

**years**  38:3 52:4 55:9 61:20 62:10
87:9,12