FILED

2019 Jul-16  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA



# EXHIBIT B

Exhibits to Deposition of Kristin Caffey
taken June 27, 2019

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Alabama

| | |
|---|---|
| KIMBERLY and JOHN STAPLES, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  7:18-cv-00160-LSC |
| H WALKER ENTERPRISES , LLC;<br>RENAISSANCE MAN FOOD SERVICES, LLC; and SIMMONS FOODS, INC., | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:    KRISTIN CAFFEY: 2903 HIGHLAND LAKES DR, MISSOURI CITY, TX 77459-4218, FORT BEND COUNTY

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Greenberg Traurig, LLP<br>1000 Louisiana Street, Suite 1700<br>Houston, TX 77002 | Date and Time:<br>05/21/2019 10:00 am |
|---|---|

The deposition will be recorded by this method:    Recorded by audio, video, and stenographical means.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Attachment A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    04/17/2019

        *CLERK OF COURT*

                                                OR

_____            _____
    *Signature of Clerk or Deputy Clerk*                 *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Defendants H. Walker Enterprises, LLC and Renaissance Man Food Services, LLC         , who issues or requests this subpoena are:

Michael J. King, 3333 Piedmont Rd NE, Suite 2500, Atlanta, GA 30305, KingM@gtlaw.com, (678)553-2410

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

1

CAFFEY    6/27/19

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 7:18-cv-00160-LSC

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*

☐ I served the subpoena by delivering a copy to the named individual as follows:

on *(date)*                         ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $                for travel and $                for services, for a total of $        0.00

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT "A" TO KRISTEN CAFFEY SUBPOENA

### DEFINITIONS

1.

"HWE" means Defendant H. Walker Enterprises, LLC or any person acting or purporting to act for or on behalf of any Defendant, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of any Defendant.

2.

"RMFS" means Defendant Renaissance Man Food Services, LLC, or any person acting or purporting to act for or on behalf of any Defendant, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of any Defendant.

3.

"You" or "Your" means Kristen Caffey.

4.

"Communication" means any oral or written exchange of information, including but not limited to any telephone conversations, oral conversations other than telephone conversations, meetings, correspondence, letters, notes, reports, telegrams, telexes, facsimile transmissions, e-mails, text messages, and memoranda relating to each communication to, from, within the hearing of or witnessed by You.

5.

"Complaint" shall refer to the Plaintiffs' Third (Consolidated) Amended Complaint filed by Plaintiffs with respect to the Lawsuit.

6.

"Document" means any written or graphic matter or other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of notation made on such copy or otherwise, including, but not limited to: attachments, correspondence, emails, texts, instant messaging, memoranda, notes, messages, inter-office and intra-office telephone call slips, telephone logs, diaries, minutes, handwritten notes, books, reports, summaries, computer discs and tapes, ledgers, computer printouts, affidavits, transcripts, photographs, microfiche, microfilm, videotape, records and motion pictures, tapes, cassettes and discs, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing.

7.

"Diversified" means Diversified Sales and Marketing.

8.

"DFS" shall refer to Diversified Food Solutions or any person acting or purporting to act for or on behalf of DFS, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of DFS.

9.

"DSM" shall refer to DSM Sales and Marketing, LLC or any person acting or purporting to act for or on behalf of DSM, including but not limited to current and former employees,

- 2 -

agents, owners, attorneys, representatives or person acting or purporting to act on behalf of DSM.

10.

"J. Staples" means John Staples.

11.

"K. Staples" means Kym Staples.

12.

"Person" or "Persons" means individuals, associations, partnerships, corporations, and any other type of entity or institution whether formed for business purposes or any other purpose.

13.

"Simmons" shall refer to Simmons Prepared Foods, Inc. or any person acting or purporting to act for or on behalf of Simmons, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of Simmons.

14.

"Suit" or "Lawsuit" means this suit, which is styled Kimberly and John Staples v. H. Walker Enterprises, LLC; Renaissance Man Food Services, LLC; and Simmons Foods, Inc., Civil Action No. 7:18-cv-00160-LSC, filed in the United States District Court for the Northern District of Alabama.

15.

"Walker" means Herschel Walker.

- 3 -

## INSTRUCTIONS

### 1.

If You object to any part of a request and refuse to answer that part, state Your objection and answer the remaining portion of the request.  If You object to the scope or time period of a request and refuse to answer for that scope or time period, state Your objection and answer the request for the scope or time period You believe is appropriate (including in Your answer a specific statement as to why You believe the scope or time period is inappropriate).

### 2.

If any of the following requests cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying Your inability to answer the remainder and stating whatever information You have concerning the unanswered portions.  If Your answer is qualified in any particular, set forth the details of such qualification.

### 3.

You must produce all documents responsive to these requests which are in Your actual or constructive possession, custody or control, including all documents within the actual or constructive possession, custody or control of any representative, agent, employee, attorney, accountant, investigator or any person acting for You or on Your behalf.

### 4.

All documents are to be produced as they are kept in the usual course of business, in the files in which such documents have been maintained, and in the order within each file in which such documents have been maintained; or all documents shall be organized and labeled to

- 4 -

correspond with the requests below. All documents are to be produced along with copies of the file folders in which they are kept.

<div align="center">5.</div>

If You withhold any document(s) from production on the basis of a claim of attorney-client or any other privilege, or on the basis of the attorney work-product doctrine, You must set forth with specificity the privilege or work product claim and furnish a list identifying each document for which the privilege or work product doctrine is claimed, together with: (a) a brief description of the nature and subject matter, including the title and type of the document; (b) the date of preparation; (c) the name and title of the author(s); (d) the name and title of the addressee(s); (e) the name and title of all persons to whom the document was sent, including blind carbon copies; (f) the number of pages; (g) the document request(s) to which the withheld information or document is otherwise responsive; and (h) the complete basis upon which You contend You are entitled to withhold the information or document from production.

<div align="center">6.</div>

If You know of the existence, past or present, of any document requested herein, but are unable to produce such document because it is not presently in Your possession, custody or control, or in the possession, custody or control of Your agents, representatives, employees, or attorneys, You shall so state in Your response and shall identify (by title, if any, nature of document and subject matter) such document and shall identify (by name, address and telephone number) the person in whose possession, custody or control the document was last known to reside.

<div align="center">- 5 -</div>

7.

If any document requested herein has been lost, discarded or destroyed, the document so lost, discarded or destroyed shall be identified as completely as possible in Your response to the particular request, including, without limitation, the following information: date, content, author(s) and recipient(s) of the document(s); date of disposal; manner of disposal; and person disposing of the documents. You shall further identify in Your response to the request the name, address and telephone number of the person in whose possession, custody or control the document was last known to reside.

8.

If, in responding to the requests, You claim that there is any ambiguity in either a particular request or in a definition or an instruction applicable thereto, such claim shall not be used by You as a basis for refusing to respond, but You shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request.

9.

For purposes of interpreting or construing the following requests, the terms used are to be given their most expansive and inclusive interpretation unless otherwise specifically limited in the document request itself, which includes without limitation: (a) construing the words "and" and "or" used in any document request in the disjunctive or conjunctive as may be necessary to make the document request more inclusive; (b) construing the words "any" and "all" used in any document request to mean "any and all" as may be necessary to make the document request more inclusive; (c) construing the singular form of any word to include the plural and the plural

- 6 -

form to include the singular; and (d) construing the masculine form to include the feminine and the gender neutral form.

10.

Electronic records and computerized information are to be produced in an intelligible format together with a description of the system from which it is derived sufficient to permit rendering the material intelligible.

- 7 -

## REQUESTS FOR PRODUCTION

1.

All Documents created since January 1, 2015 related to a potential food broker business that would include any combination of the following Persons: You, Robert Thurber, John Goodman, Bud Taylor, Christopher Thurber, Todd Townsend, Chris Drazan, Kristen Caffey, J. Staples and K. Staples.

2.

All financial statements regarding RMFS.

3.

All Documents related to RMFS's sales volume.

4.

All Documents related to RMFS's revenue.

5.

All Documents related to RMFS's contract awards from Sysco.

6.

All Documents identifying RMFS's customer base.

7.

All price lists for RMFS products.

8.

All budgets regarding RMFS.

9.

All price lists for Simmons products purchased by RMFS.

- 8 -

10.

All Documents related to a meeting with Bud Taylor on October 25, 2017.

11.

All written communications between You and John Staples after January 1, 2018.

12.

All written communications between You and Keri Simms after January 1, 2018.

13.

All versions of the Affidavit given by You in this case dated February 11, 2019.

14.

All recordings of any telephone conversations with Walker.

- 9 -

## REQUESTS FOR PRODUCTION

1.

All Documents created since January 1, 2015 related to a potential food broker business that would include any combination of the following Persons: You, Robert Thurber, John Goodman, Bud Taylor, Christopher Thurber, Todd Townsend, Chris Drazan, Kristen Caffey, J. Staples and K. Staples. — N/A

2.

All financial statements regarding RMFS. — N/A

3.

All Documents related to RMFS's sales volume. — N/A

4.

All Documents related to RMFS's revenue. — N/A

5.

All Documents related to RMFS's contract awards from Sysco. — N/A

6.

All Documents identifying RMFS's customer base. — N/A

7.

All price lists for RMFS products. — N/A

8.

All budgets regarding RMFS. — N/A

9.

All price lists for Simmons products purchased by RMFS. — N/A

- 8 -

EXHIBIT
2
CAFFEY   6/27/19

10.

All Documents related to a meeting with Bud Taylor on October 25, 2017.  — N|A

11.

All written communications between You and John Staples after January 1, 2018.  — SEE ATTACHED

12.

All written communications between You and Keri Simms after January 1, 2018.  — AFFIDAVIT SEE ATTACHED

13.

All versions of the Affidavit given by You in this case dated February 11, 2019.  — SAME AS #12

14.

All recordings of any telephone conversations with Walker.  — N|A

- 9 -

Howdy friend, hope you are doing well. I've been traveling so much that I haven't kept up with you. 😎 Quick question - who is the poultry team at corporate now? Is it still Gates & Pierce? I'll be there on the 22nd & have plenty of free time. We should get together for breakfast or lunch.

Tue, Apr 9, 6:13 PM

Sorry, I can't talk right now.

Gates is Director of poultry .., Pierce now cat manager further processed .. joe don is sr director but Gates is running it right now

Sorry moms in hospital

Prayers for you & your mom 🙏 🤢

Thx you

# Prayers for you & your mom 🙏 😢

Thx you

Tue, Apr 16, 10:03 AM

# Good morning
# How is your mom

Hey you doing better thx u!



**Sun, Apr 21, 8:15 AM**



**Sun, Apr 21, 3:13 PM**



**Sun, Apr 21, 3:13 PM**



Hey I am not going to be able to meet up for lunch or dinner tomorrow I have to go do bloodwork for surgery Tuesday, and are saying can't eat past 6pm...

Ok. Praying for you &

Tue, Apr 23, 8:11 AM



## Praying for you today.

Tue, Apr 23, 1:16 PM

John this is Taylor



# Praying for you today.

Tue, Apr 23, 1:16 PM

John this is Taylor Kristin niece... she wanted me to text u when she was out of surgery... it went well ... lots of rest and healing to be done. I will let you know how she is later in week or perhaps she will feel up to it herself .

she is later in week or perhaps she will feel up to it herself .

Thank you so much. Answered prayers. As you undoubtedly know, your Aunt is a special lady. 🤍 👍

Awwww... and yes she is!

Delivered

Sun, Apr 28, 1:02 PM





**Delivered**

**Sun, Apr 28,** 1:02 PM



Hope you are feeling better!

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Alabama



**EXHIBIT**
**3**

KIMBERLY and JOHN STAPLES,

*Plaintiff*

v.

H. WALKER ENTERPRISES , LLC,
RENAISSANCE MAN FOOD SERVICES, LLC and SIMMONS FOODS, INC

*Defendant*

Civil Action No. 7:18-cv-00160-LSC

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: RADIAN MAGNIFY, INC. c/o RADIAN GROUP, INC.
ATTENTION: JENNIFER SCHATZ, 4600 W 77TH ST STE 380, EDINA, MN 55435-2603

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment "A" attached hereto.

| Place: Paradigm Reporting<br>1400 Rand Tower<br>527 Marquette Ave South, Minneapolis, MN 55402 | Date and Time:<br><br>08/03/2018 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/06/2018

*CLERK OF COURT*

OR _____

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendants H. Walker Enterprises, LLC and Renaissance Man Food Services, LLC _____, who issues or requests this subpoena, are

Michael J. King, Greenberg Traurig, LLC, 3333 Piedmont Rd NE, Suite 2500, Atlanta, GA 30305, KingM@gtlaw.com, (678)553-2410

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 7:18-cv-00160-LSC

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*

    ☐ I served the subpoena by delivering a copy to the named person as follows:

                                                on *(date)*               ; or

    ☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $              for travel and $          for services, for a total of $    0.00

I declare under penalty of perjury that this information is true.

Date:

                                        *Server's signature*

                                        *Printed name and title*

                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

# EXHIBIT A

## ATTACHMENT "A" TO RADIAN MAGNIFY, INC. SUBPOENA

## DEFINITIONS

1.

"HWE" means Defendant H. Walker Enterprises, LLC or any person acting or purporting to act for or on behalf of any Defendant, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of any Defendant.

2.

"RMFS" means Defendant Renaissance Man Food Services, LLC, or any person acting or purporting to act for or on behalf of any Defendant, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of any Defendant.

3.

"You" or "Your" means and includes Radian Magnify, Inc. and Your respective agents, attorneys, representatives or any person acting or purporting to act for or on behalf of You.

4.

"Communication" means any oral or written exchange of information, including but not limited to any telephone conversations, oral conversations other than telephone conversations, meetings, correspondence, letters, notes, reports, telegrams, telexes, facsimile transmissions, e-mails, text messages, and memoranda relating to each communication to, from, within the hearing of or witnessed by You.

5.

"Complaint" shall refer to the Plaintiffs' Third (Consolidated) Amended Complaint filed by Plaintiffs with respect to the Lawsuit.

6.

"Document" means any written or graphic matter or other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of notation made on such copy or otherwise, including, but not limited to: attachments, correspondence, emails, texts, instant messaging, memoranda, notes, messages, inter-office and intra-office telephone call slips, telephone logs, diaries, minutes, handwritten notes, books, reports, summaries, computer discs and tapes, ledgers, computer printouts, affidavits, transcripts, photographs, microfiche, microfilm, videotape, records and motion pictures, tapes, cassettes and discs, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing.

7.

"Diversified" means Diversified Sales and Marketing.

8.

"DFS" shall refer to Diversified Food Solutions or any person acting or purporting to act for or on behalf of DFS, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of DFS.

9.

"DSM" shall refer to DSM Sales and Marketing, LLC or any person acting or purporting to act for or on behalf of DSM, including but not limited to current and former employees,

- 2 -

agents, owners, attorneys, representatives or person acting or purporting to act on behalf of DSM.

10.

"J. Staples" means John Staples.

11.

"K. Staples" means Kym Staples.

12.

"Person" or "Persons" means individuals, associations, partnerships, corporations, and any other type of entity or institution whether formed for business purposes or any other purpose.

13.

"Simmons" shall refer to Simmons Prepared Foods, Inc, or any person acting or purporting to act for or on behalf of Simmons, including but not limited to current and former employees, agents, owners, attorneys, representatives or person acting or purporting to act on behalf of Simmons.

14.

"Suit" or "Lawsuit" means this suit, which is styled: Kimberly and John Staples v. H. Walker Enterprises, LLC; Renaissance Man Food Services, LLC; and Simmons Foods, Inc., Civil Action No. 7:18-cv-00160-LSC, filed in the United States District Court for the Northern District of Alabama.

15.

"Walker" means Herschel Walker.

- 3 -

## INSTRUCTIONS

1.

If You object to any part of a request and refuse to answer that part, state Your objection and answer the remaining portion of the request. If You object to the scope or time period of a request and refuse to answer for that scope or time period, state Your objection and answer the request for the scope or time period You believe is appropriate (including in Your answer a specific statement as to why You believe the scope or time period is inappropriate).

2.

If any of the following requests cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying Your inability to answer the remainder and stating whatever information You have concerning the unanswered portions. If Your answer is qualified in any particular, set forth the details of such qualification.

3.

You must produce all documents responsive to these requests which are in Your actual or constructive possession, custody or control, including all documents within the actual or constructive possession, custody or control of any representative, agent, employee, attorney, accountant, investigator or any person acting for You or on Your behalf.

4.

All documents are to be produced as they are kept in the usual course of business, in the files in which such documents have been maintained, and in the order within each file in which such documents have been maintained; or all documents shall be organized and labeled to

- 4 -

correspond with the requests below   All documents are to be produced along with copies of the file folders in which they are kept.

5.

If You withhold any document(s) from production on the basis of a claim of attorney-client or any other privilege, or on the basis of the attorney work-product doctrine, You must set forth with specificity the privilege or work product claim and furnish a list identifying each document for which the privilege or work product doctrine is claimed, together with: (a) a brief description of the nature and subject matter, including the title and type of the document; (b) the date of preparation; (c) the name and title of the author(s); (d) the name and title of the addressee(s); (e) the name and title of all persons to whom the document was sent, including blind carbon copies; (f) the number of pages; (g) the document request(s) to which the withheld information or document is otherwise responsive; and (h) the complete basis upon which You contend You are entitled to withhold the information or document from production.

6.

If You know of the existence, past or present, of any document requested herein, but are unable to produce such document because it is not presently in Your possession, custody or control, or in the possession, custody or control of Your agents, representatives, employees, or attorneys, You shall so state in Your response and shall identify (by title, if any, nature of document and subject matter) such document and shall identify (by name, address and telephone number) the person in whose possession, custody or control the document was last known to reside,

- 5 -

7.

If any document requested herein has been lost, discarded or destroyed, the document so lost, discarded or destroyed shall be identified as completely as possible in Your response to the particular request, including, without limitation, the following information:   date, content, author(s) and recipient(s) of the document(s); date of disposal; manner of disposal; and person disposing of the documents.  You shall further identify in Your response to the request the name, address and telephone number of the person in whose possession, custody or control the document was last known to reside.

8.

If, in responding to the requests, You claim that there is any ambiguity in either a particular request or in a definition or an instruction applicable thereto, such claim shall not be used by You as a basis for refusing to respond, but You shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request.

9.

For purposes of interpreting or construing the following requests, the terms used are to be given their most expansive and inclusive interpretation unless otherwise specifically limited in the document request itself, which includes without limitation: (a) construing the words "and" and "or" used in any document request in the disjunctive or conjunctive as may be necessary to make the document request more inclusive; (b) construing the words "any" and "all" used in any document request to mean "any and all" as may be necessary to make the document request more inclusive; (c) construing the singular form of any word to include the plural and the plural

- 6 -

form to include the singular; and (d) construing the masculine form to include the feminine and the gender neutral form.

<center>10.</center>

Electronic records and computerized information are to be produced in an intelligible format together with a description of the system from which it is derived sufficient to permit rendering the material intelligible.

<center>- 7 -</center>

## REQUESTS FOR PRODUCTION

1.

All Documents created since January 1, 2015 related to a potential food broker business that would include any combination of the following Persons:   You, Robert Thurber, John Goodman, Bud Taylor, Christopher Thurber, Todd Townsend, Chris Drazan, Kristen Caffey, J. Staples and K. Staples.

2.

All financial statements regarding RMFS

3

All Documents related to RMFS's sales volume.

4.

All Documents related to RMFS's revenue.

5.

All Documents related to RMFS's contract awards from Sysco.

6.

All Documents identifying RMFS's customer base

7.

All price lists for RMFS products.

8.

All budgets regarding RMFS.

9.

All price lists for Simmons products purchased by RMFS.

- 8 -

10.

All Documents related to a meeting with Bud Taylor on October 25, 2017.

11.

All Forms 1099, K1 and W-2 provided from Radian Magnify, Inc. to J. Staples for the years 2009 to 2017.

- 9 -



Reply   Reply All   Forward   Delete   Spam   More ▾

## Staples v. HWE/RMFS/Simmons Emailing: Affidavit.Kristin

✉ Keri Simms (KSimms@websterhenry.com)

To: you + 2 more      ▾ ∨

Dear Kristin:

Based on our phone calls I have created the attached draft of your affidavit.  If you wish to revise it pleas
me so I can timing attach it to some documents we must file with the court next Monday in the case.   ⊤

Your message is ready to be sent with the following file or link attachments:

Affidavit.Kristin

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain ty.

K. Donald Simms, Shareholder

Two Perimeter Park South . Suite 445 East . Birmingham, AL 35243
d: 205.518.8958  f: 205.380.3485  c: 205.835.7809

websterhenry.com

NOTICE: This e-mail is from a law firm, Webster, Henry, Bradwell, Cohan, Speagle & DeShazo P.C. ("W
received this e-mail in error, please notify the sender immediately, delete the e-mail and any attachment
existing client of Webster Henry, do not construe anything in this e-mail to make you a client unless it co
hold in confidence.  If you properly received this e-mail as a client, co-counsel or retained expert of Web
other privileges that may be available to protect confidentiality.



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

KIMBERLY and JOHN STAPLES,)
                              )

     Plaintiffs,             )

                              )

V.                          )   Civil Action No.: 7:18-cv-00160-LSC

                              )

H. WALKER ENTERPRISES,    )
 LLC;                         )
RENAISSANCE MAN FOOD     )
SERVICES, LLC; and SIMMONS )
                              )

     Defendants.         )

## AFFIDAVIT OF KRISTIN CAFFEY

STATE OF ALABAMA         )

COUNTY OF JEFFERSON    )

BEFORE ME, the undersigned, a Notary Public, on this day personally appeared Kristin Caffey, who is personally known to me, and first being duly sworn according to law, upon her oath deposes and states as follows:

1.    My name is Kristin Caffey. I am over the age of 19 years. I am a resident citizen of the State of Texas. I have personal knowledge of the following facts and state those under my own free will in this my Affidavit.

2.    I have known Herschel Walker and John Staples since at least the year 2000. I developed a business relationship with John Staples from working with him as the Senior Director of Poultry for Sysco Corporation when he worked for Tyson Foods. I developed a business relationship with Herschel Walker also as Senior Director of Poultry for Sysco Corporation.

1

3.   In 2000 I came to Sysco Corporate Headquarters from one of its operating companies in Houston, Texas. I began working with Robert Thurber EVP of Sysco at that time. Mr. Thurber met Herschel Walker through Mr. Thurber's wife at an America's Junior Miss Pageant. Mr. Thurber agreed to assist Mr. Walker in getting Mr. Walker into the food business through Sysco Corporation. Mr. Thurber asked me to assist.

4.   I assisted Mr. Walker and helped create the brand "Herschel's Famous 34" and its logo design. This was done while I was Senior Director of Poultry for Sysco. Sysco has always considered the brand to be exclusive to Sysco in the food service industry. I also assisted Mr. Walker in obtaining chicken products made by and supplied by poultry producing companies such as Pilgrim's Pride. I also assisted in obtaining other food items for Mr. Walker from food suppliers such as Carrington Seafood, Ventura Sauces, and Julian Allen's Catfish Company under the Herschel's Famous 34 Brand which I assisted in developing with Sysco Corporation.

5.   In 2008 when Mr. Walker's book titled *Breaking Free* came out and he did an interview with CNN, Sysco and I became concerned regarding his mental health and conduct to harm other people whom he deemed had slighted or disrespected him. Sysco had branded itself in the food industry with Mr. Walker. Because of the revelations contained in the Book and the CNN interview, Sysco intended to disassociate itself with Mr. Walker because Sysco had no advanced knowledge of the disclosures which were made in the Book and the CNN interview. Sysco was concerned with its public image by being associated with Mr. Walker particularly as concerned being branded together with him or his businesses. Sysco did, however, decided to wait to see if the book sold well, which it did not, and so Sysco did not terminate its relationship with Mr. Walker at that time.

6.   When the book and interview came to light, I spoke with employees of Simmons Prepared Foods, Inc. Todd Simmons, Chip Miller, Gary Murphy, and Mike Rogers. I knew Mr. Rogers was operating the entity under which Simmons was producing the chicken that Mr. Walker's company and Simmons were selling to Sysco at the time.

2

Simmons was aware of the multiple personalities of Mr. Walker as claimed and discussed by him in his book and the CNN interview concerning harms that Mr. Walker had taken against other persons including his ex-wife. I discussed these issues with Simmons because Sysco was concerned about the Public Relations of being associated with Mr. Walker and having branded food items with him and the entities he was doing business with including Simmons.

7. In 2013 I experienced some health problems and left my position as Senior Director of Poultry. I then went to work for another company to assist Sysco concerning Sysco's category management program of which Simmons and HWE/RMFS sold chicken food products to Sysco. I have maintained my Sysco email, office, and phone and I continue to have input at Sysco concerning chicken purchases by Sysco from outside vendors such as Simmons and HWE/RMFS.

8. In the late Fall of 2017 I received a phone call from Mr. Walker. The call was unexpected by me and came out of the blue. During the call I could tell I was on speaker and I was concerned that I was being recorded. Mr. Walker seemed to be fishing for information from me concerning John Staples. Mr. Walker asked me what I thought of John Staples. Mr. Walker knew I had a relationship with Mr. Staples through Tyson and through Robert Thurber for years in the food industry. Mr. Walker stated to me that Mr. Staples was no longer managing RMFS. Mr. Walker told me that Mr. Staples wasn't working, was playing, and not managing his business. I assured Mr. Walker that John Staples was a good honest person and supported Mr. Walker's interest a 100% percent and had grown the sales of Mr. Walker's business relationship with Simmons and Sysco for years. I had nothing negative to say about John Staples only positive opinions of him. The phone call ended. It was my opinion Mr. Walker was fishing for negative information concerning John Staples from me which I did not have.

9. After I received the above phone call Mr. Walker called me again. This second phone call was much different than the first. In this second call from Mr. Walker was no longer fishing for negative

information concerning Mr. Staples, but, instead began making disparaging, derogatory, and defamatory statements to me concerning John Staples.

10.   It was clear to me Mr. Walker intended to slight Mr. Staples and cause me to lower my opinions of Mr. Staples which I had previously shared with Mr. Walker from his early phone call to me discussed above. Mr. Walker told me John was not doing good things in the food industry. Mr. Walker stated that John had stolen money from him or his business. Mr. Walker stated that John was doing bad things concerning Sysco. Mr. Walkers stated that John Staples and some other people tried to steal his business.

11.   Mr. Walker clearly stated to me that John Staples lacked morals and was unethical. I told Mr. Walker I did not believe these statements and did not appreciate him trying to harm Mr. Staples in the food industry and John's ability to be employed and have an ongoing and future relationship with me and Sysco. I ended the phone call with Mr. Walker.

12.   After the second phone call from Mr. Walker I called Mr. Staples and informed him of the statements Mr. Walker made to me concerning him.  It was clear to me that Mr. Walker intended to damage and harm John's reputation with me and his relationship with Sysco and the food industry.

13.   After the second phone call from Mr. Walker I began to receive calls from other people I have known in the food industry for years. They indicated to me that Mr. Walker had been calling them making similar defamatory statements of and concerning John Staples. After I received these calls I informed Mr. Staples of these events as well.  It is my opinion based on Mr. Walker's statements to me and his acts of contacting other food industry professionals that he intended to harm Mr. Staples' reputation and business relationships in the food industry inclusive of with Sysco. Some of the other calls made by Mr. Walker were to other Sysco Corporation professionals.

4

Further Affiant sayeth not.


_____
Kristin Caffey


    SWORN TO AND SUBSCRIBED before me on this the _____ day of February 2019.  To certify which witness my hand and official seal.


SEAL:




_____
Notary Public in and for the State of Alabama




My Commission Expires: _____


5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

KIMBERLY and JOHN STAPLES,)
                                 )

    Plaintiffs,            )

                                 )

V.                           )   Civil Action No.: 7:18-cv-00160-LSC

                               )

H. WALKER ENTERPRISES,  )
  LLC;                         )

RENAISSANCE MAN FOOD    )

SERVICES, LLC; and SIMMONS )

                               )

    Defendants.          )

## AFFIDAVIT OF KRISTIN CAFFEY

STATE OF ALABAMA        )

COUNTY OF JEFFERSON    )

      BEFORE ME, the undersigned, a Notary Public, on this day personally appeared Kristin Caffey, who is personally known to me, and first being duly sworn according to law, upon her oath deposes and states as follows:

1.    My name is Kristin Caffey. I am over the age of 19 years. I am a resident citizen of the State of Texas. I have personal knowledge of the following facts and state those under my own free will in this my Affidavit.

2.    I have known Herschel Walker since 2002 or 2003 and John Staples since the year 2000. I developed a business relationship with John Staples from working with him as the Poultry Department Manager for Sysco Corporation when he worked for Tyson Foods. I developed a business relationship with Herschel Walker also as Poultry Department Manager for Sysco Corporation.

1



3.    In 2000 I came to Sysco Corporate Headquarters from one of its operating companies in Houston, Texas. I began working with Robert Thurber SVP of Sysco at that time. Mr. Thurber met Herschel Walker through Mr. Thurber's wife at an America's Junior Miss Pageant. Mr. Thurber agreed to assist Mr. Walker in getting Mr. Walker into the food business through Sysco Corporation. Mr. Thurber asked me to assist.

4.    Sysco has always considered the Famous 34 brand to be exclusive to Sysco in the food service industry. I also assisted Mr. Walker in obtaining chicken products made by and supplied by poultry producing companies such as Pilgrim's Pride and Tyson. I also assisted in obtaining other food items for Mr. Walker from food suppliers such as Carrington Seafood and Delta Pride under the Herschel's Famous 34 Brand.

5.    In 2008 when Mr. Walker's book titled *Breaking Free* came out and he did an interview with CNN, I became concerned regarding his mental health and reputation because Sysco had an exclusive business relationship with him. Walker's Famous 34 brand was being managed and marketed as a Sysco brand. Sysco had internal discussions regarding the partnership. Sysco decided to wait to see if the book sold well, which it did not, and so Sysco did not terminate its relationship with Mr. Walker at that time.

6.    When the book and interview came to light, I spoke with John Staples and managers of Simmons Prepared Foods, Inc. I also spoke to Mike Rogers about my concerns. He was operating the entity under which Simmons was producing the chicken that Mr. Walker's company and Simmons were selling to Sysco at the time. After I brought the Book and interview to Simmons' attention, they were aware of my concerns. I discussed these issues with Simmons because I was very concerned about the Public Relations of Sysco having a relationship with Mr. Walker and his/our brand based on the book and interview.

7.    In 2013 I experienced some health problems and left my position as Poultry Department Manager of Sysco. I then went to work for another company to assist Sysco concerning Sysco's category

2

management program (CATMAN). I have maintained my Sysco email, office, and phone.

8. In the late Fall of 2017 I received a phone call from Mr. Walker. The call was unexpected by me and came out of the blue. During the call I could tell I was on speaker and I was concerned that I was being recorded. Mr. Walker seemed to be fishing for information from me concerning John Staples. Mr. Walker asked me what I thought of John Staples. I assured Mr. Walker that John Staples was a good honest person and supported Mr. Walker's interest a 100% percent. Further that Mr. Staples had grown the sales of Mr. Walker's business relationship with Simmons and Sysco for years. I had nothing negative to say about John Staples only positive opinions of him. The phone call ended. It was my opinion Mr. Walker was fishing for negative information concerning John Staples from me which I did not have.

9. After I received the above phone call Mr. Walker called me again. This second phone call was much different than the first. In this second call Mr. Walker was no longer fishing for negative information concerning Mr. Staples. Instead he began making disparaging, derogatory, and defamatory statements to me concerning John Staples.

10. It was clear to me Mr. Walker intended to slight Mr. Staples and to cause me to lower my opinions of Mr. Staples. I had previously shared with Mr. Walker from his early phone call to me that I did not have any negative perception of Mr. Staples. Mr. Walker told me John was not doing good things in the food industry. Mr. Walker stated that John had stolen money from him or his business. Mr. Walker stated that John Staples and some other people tried to steal his business.

11. Mr. Walker clearly stated to me that John Staples lacked morals and was unethical. I told Mr. Walker I did not believe these statements and did not appreciate him trying to harm Mr. Staples in the food industry. I also indicated to him I did not appreciate him harming

3

John's ability to be employed and have an ongoing and future relationship with me and Sysco. I ended the phone call with Mr. Walker and have not spoken to him since.

12. After the second phone call from Mr. Walker I called Mr. Staples and informed him of the statements Mr. Walker made to me concerning him. It was clear to me that Mr. Walker intended to damage and harm John's reputation with me and his relationship with Sysco and the food industry.

13. After the second phone call from Mr. Walker I began to receive calls from other people I have known in the food industry for years. They indicated to me that Mr. Walker had been calling them making similar defamatory statements of and concerning John Staples. After I received these calls I informed Mr. Staples of these events as well. It is my opinion based on Mr. Walker's statements to me and his acts of contacting other food industry professionals that he intended to harm Mr. Staples' reputation and business relationships in the food industry inclusive of with Sysco. Some of the other calls made by Mr. Walker were to other Sysco Corporation professionals.

Further Affiant sayeth not.

Kristin Caffey

SWORN TO AND SUBSCRIBED before me on this the _____ day of February 2019. To certify which witness my hand and official seal.


SEAL:




_____
Notary Public in and for the State of Alabama



My Commission Expires: _____

FILED

2019 Feb-11  PM 03:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 8

## Affidavit Kristin Caffey



## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

KIMBERLY and JOHN STAPLES,)
)
    **Plaintiffs,**        )
)
**V.**                  )    **Civil Action No.: 7:18-cv-00160-LSC**
)
**H. WALKER ENTERPRISES,**   )
 **LLC;**                )
**RENAISSANCE MAN FOOD**   )
**SERVICES, LLC; and SIMMONS** )
)
    **Defendants.**       )

## AFFIDAVIT OF KRISTIN CAFFEY

**STATE OF ALABAMA**       )

**COUNTY OF JEFFERSON**    )

BEFORE ME, the undersigned, a Notary Public, on this day personally appeared Kristin Caffey, who is personally known to me, and first being duly sworn according to law, upon her oath deposes and states as follows:

1.    My name is Kristin Caffey. I am over the age of 19 years. I am a resident citizen of the State of Texas. I have personal knowledge of the following facts and state those under my own free will in this my Affidavit.

2.    I have known Herschel Walker since 2002 or 2003 and John Staples since the year 2000. I developed a business relationship with John Staples from working with him as the Poultry Department Manager for Sysco Corporation when he worked for Tyson Foods. I developed a business relationship with Herschel Walker also as Poultry Department Manager for Sysco Corporation.

1

3.    In 2000 I came to Sysco Corporate Headquarters from one of its
      operating companies in Houston, Texas. I began working with Robert
      Thurber SVP of Sysco at that time. Mr. Thurber met Herschel Walker
      through Mr. Thurber's wife at an America's Junior Miss Pageant. Mr.
      Thurber agreed to assist Mr. Walker in getting Mr. Walker into the food
      business through Sysco Corporation. Mr. Thurber asked me to assist.

4.    Sysco has always considered the Famous 34 brand to be exclusive to
      Sysco in the food service industry. I also assisted Mr. Walker in
      obtaining chicken products made by and supplied by poultry producing
      companies such as Pilgrim's Pride and Tyson. I also assisted in
      obtaining other food items for Mr. Walker from food suppliers such as
      Carrington Seafood and Delta Pride under the Herschel's Famous 34
      Brand.

5.    In 2008 when Mr. Walker's book titled *Breaking Free* came out and
      he did an interview with CNN, I became concerned regarding his
      mental health and reputation because Sysco had an exclusive business
      relationship with him. Walker's Famous 34 brand was being
      managed and marketed as a Sysco brand. Sysco had internal
      discussions regarding the partnership. Sysco decided to wait to see if
      the book sold well, which it did not, and so Sysco did not terminate its
      relationship with Mr. Walker at that time.

6.    When the book and interview came to light, I spoke with John Staples
      and managers of Simmons Prepared Foods, Inc. I also spoke to Mike
      Rogers about my concerns. He was operating the entity under which
      Simmons was producing the chicken that Mr. Walker's company and
      Simmons were selling to Sysco at the time. After I brought the Book
      and interview to Simmons' attention, they were aware of my
      concerns. I discussed these issues with Simmons because I was very
      concerned about the Public Relations of Sysco having a relationship
      with Mr. Walker and his/our brand based on the book and interview.

7.    In 2013 I experienced some health problems and left my position as
      Poultry Department Manager of Sysco. I then went to work for
      another company to assist Sysco concerning Sysco's category

2

management program (CATMAN).  I have maintained my Sysco
email, office, and phone.

8.    In the late Fall of 2017 I received a phone call from Mr. Walker.  The
call was unexpected by me and came out of the blue. During the call I
could tell I was on speaker and I was concerned that I was being
recorded.  Mr. Walker seemed to be fishing for information from me
concerning John Staples.  Mr. Walker asked me what I thought of
John Staples.  I assured Mr. Walker that John Staples was a good
honest person and supported Mr. Walker's interest a 100% percent.
Further that Mr. Staples had grown the sales of Mr. Walker's business
relationship with Simmons and Sysco for years. I had nothing
negative to say about John Staples only positive opinions of him.  The
phone call ended.  It was my opinion Mr. Walker was fishing for
negative information concerning John Staples from me which I did
not have.

9.    After I received the above phone call Mr. Walker called me again.
This second phone call was much different than the first.  In this
second call Mr. Walker was no longer fishing for negative
information concerning Mr. Staples. Instead he began making
disparaging, derogatory, and defamatory statements to me concerning
John Staples.

10.   It was clear to me Mr. Walker intended to slight Mr. Staples and to
cause me to lower my opinions of Mr. Staples.  I had previously
shared with Mr. Walker from his early phone call to me that I did not
have any negative perception of Mr. Staples.  Mr. Walker told me
John was not doing good things in the food industry.  Mr. Walker
stated that John had stolen money from him or his business.  Mr.
Walker stated that John Staples and some other people tried to steal
his business.

11.   Mr. Walker clearly stated to me that John Staples lacked morals and
was unethical.  I told Mr. Walker I did not believe these statements
and did not appreciate him trying to harm Mr. Staples in the food
industry. I also indicated to him I did not appreciate him harming

John's ability to be employed and have an ongoing and future relationship with me and Sysco. I ended the phone call with Mr. Walker and have not spoken to him since.

12.   After the second phone call from Mr. Walker I called Mr. Staples and informed him of the statements Mr. Walker made to me concerning him. It was clear to me that Mr. Walker intended to damage and harm John's reputation with me and his relationship with Sysco and the food industry.

13.   After the second phone call from Mr. Walker I began to receive calls from other people I have known in the food industry for years. They indicated to me that Mr. Walker had been calling them making similar defamatory statements of and concerning John Staples. After I received these calls I informed Mr. Staples of these events as well. It is my opinion based on Mr. Walker's statements to me and his acts of contacting other food industry professionals that he intended to harm Mr. Staples' reputation and business relationships in the food industry inclusive of with Sysco. Some of the other calls made by Mr. Walker were to other Sysco Corporation professionals.

Further Affiant sayeth not.

Kristin Caffey

4

SWORN TO AND SUBSCRIBED before me on this the ___11th___ day of February 2019. To certify which witness my hand and official seal.

SEAL:

_____
Notary Public in and for the State of Alabama

My Commission Expires: ___8/30/2019___



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

KIMBERLY and JOHN STAPLES,

Plaintiffs,

V.

H. WALKER ENTERPRISES, LLC; RENAISSANCE MAN FOOD SERVICES, LLC; and
SIMMONS

Defendants.

Civil Action No.: 7:18-cv-00160-LSC

AFFIDAVIT OF KRISTIN CAFFEY

STATE OF ALABAMA      )

COUNTY OF JEFFERSON  )



BEFORE ME, the undersigned, a Notary Public, on this day personally appeared Kristin Caffey,
who is personally known to me, and first being duly sworn according to law, upon her oath
deposes and states as follows:

1.      My name is Kristin Caffey. I am over the age of 19 years. I am a resident citizen of the
State of Texas. I have personal knowledge of the following facts and state those under my own
free will in this my Affidavit.

2.      I have known Herschel Walker ~~since 2002 or 2003~~ and John Staples since ~~at least~~ the
year 2000. I developed a business relationship with John Staples from working with him as the
~~Senior Director of~~ Poultry **Department Manager** for Sysco Corporation when he worked for
Tyson Foods. I developed a business relationship with Herschel Walker also as ~~Senior Director
of~~ Poultry **Department Manager** for Sysco Corporation.

3.      In 2000 I came to Sysco Corporate Headquarters from one of its operating companies in
Houston, Texas. I began working with Robert Thurber ~~EVP~~SVP of Sysco at that time. Mr.
Thurber met Herschel Walker through Mr. Thurber's wife at an America's Junior Miss Pageant.
Mr. Thurber agreed to assist Mr. Walker in getting Mr. Walker into the food business through
Sysco Corporation. Mr. Thurber asked me to assist.

4.      ~~I assisted Mr. Walker and helped create the brand "Herschel's Famous 34" and its
logo design. This was done while I was Senior Director of Poultry for Sysco.~~ Sysco has
always considered the **Famous 34** brand to be exclusive to Sysco in the food service industry. I
also assisted Mr. Walker in obtaining chicken products made by and supplied by poultry
producing companies such as Pilgrim's Pride~~,~~ **and Tyson.** I also assisted in obtaining other food

items for Mr. Walker from food suppliers such as Carrington Seafood~~, Ventura Sauces, and Julian Allen's Catfish Company~~ and Delta Pride under the Herschel's Famous 34 Brand~~which I assisted in developing with Sysco Corporation~~.

5.      In 2008 when Mr. Walker's book titled Breaking Free came out and he did an interview with CNN, ~~Sysco and~~ I became concerned regarding his mental health and ~~conduct to harm other people whom he deemed had slighted or disrespected him. Sysco had branded itself in the food industry with Mr. Walker. Because of the revelations contained in the Book and the CNN interview, Sysco intended to disassociate itself with Mr. Walker because Sysco had no advanced knowledge of the disclosures which were made in the Book and the CNN interview. Sysco was concerned with its public image by being associated with Mr. Walker particularly as concerned being branded together with him or his businesses. Sysco did, however,~~ reputation because Sysco had an exclusive business relationship with him. Walker's Famous 34 brand was being managed and marketed as a Sysco brand. Sysco had internal discussions regarding the partnership. Sysco decided to wait to see if the book sold well, which it did not, and so Sysco did not terminate its relationship with Mr. Walker at that time.

6.      When the book and interview came to light, I spoke with ~~employees~~ John Staples and managers of Simmons Prepared Foods, Inc. ~~Todd Simmons, Chip Miller, Gary Murphy, and I also spoke to~~ Mike Rogers. ~~I knew Mr. Rogers~~ about my concerns. He was operating the entity under which Simmons was producing the chicken that Mr. Walker's company and Simmons were selling to Sysco at the time. After I brought the Book and interview to Simmons ~~was aware of the multiple personalities of Mr. Walker as claimed and discussed by him in his book and the CNN interview concerning harms that Mr. Walker had taken against other persons including his ex-wife,'~~ attention, they were aware of my concerns. I discussed these issues with Simmons because ~~Sysco~~ I was ~~very~~ concerned about the Public Relations of ~~being associated with Mr. Walker and~~ Sysco having ~~branded food items~~ a relationship with ~~him and the entities he was doing business with including Simmons~~ Mr. Walker and his/our brand based on the book and interview.

7.      In 2013 I experienced some health problems and left my position as ~~Senior Director of Poultry.~~ Department Manager of Sysco. I then went to work for another company to assist Sysco concerning Sysco's category management program ~~of which Simmons and HWE/RMFS sold chicken food products to Sysco.~~ (CATMAN). I have maintained my Sysco email, office, and phone ~~and I continue to have input at Sysco concerning chicken purchases by Sysco from outside vendors such as Simmons and HWE/RMFS~~.

8.      In the late Fall of 2017 I received a phone call from Mr. Walker. The call was unexpected by me and came out of the blue. During the call I could tell I was on speaker and I was concerned that I was being recorded. Mr. Walker seemed to be fishing for information from me concerning John Staples. Mr. Walker asked me what I thought of John Staples. ~~Mr. Walker knew I had a relationship with Mr. Staples through Tyson and through Robert Thurber for years in the food industry. Mr. Walker stated to me that Mr. Staples was no longer managing RMFS. Mr. Walker told me that Mr. Staples wasn't working, was playing, and not managing his business.~~ I assured Mr. Walker that John Staples was a good honest person

and supported Mr. Walker's interest a 100% percent ~~and,~~ **Further that Mr. Staples** had grown the sales of Mr. Walker's business relationship with Simmons and Sysco for years. I had nothing negative to say about John Staples only positive opinions of him. The phone call ended. It was my opinion Mr. Walker was fishing for negative information concerning John Staples from me which I did not have.

9.      After I received the above phone call Mr. Walker called me again. This second phone call was much different than the first. In this second call ~~from~~ Mr. Walker was no longer fishing for negative information concerning Mr. Staples~~, but, instead,~~ **Instead he** began making disparaging, derogatory, and defamatory statements to me concerning John Staples.

10.     It was clear to me Mr. Walker intended to slight Mr. Staples and **to** cause me to lower my opinions of Mr. Staples ~~which,~~ I had previously shared with Mr. Walker from his early phone call to me ~~discussed above.~~ **that I did not have any negative perception of Mr. Staples.** Mr. Walker told me John was not doing good things in the food industry. Mr. Walker stated that John had stolen money from him or his business. Mr. Walker ~~stated that John was doing bad things concerning Sysco. Mr. Walkers~~ stated that John Staples and some other people tried to steal his business.

11.     Mr. Walker clearly stated to me that John Staples lacked morals and was unethical. I told Mr. Walker I did not believe these statements and did not appreciate him trying to harm Mr. Staples in the food industry ~~and,~~ **I also indicated to him I did not appreciate him harming** John's ability to be employed and have an ongoing and future relationship with me and Sysco. I ended the phone call with Mr. Walker **and have not spoken to him since.**

12.     After the second phone call from Mr. Walker I called Mr. Staples and informed him of the statements Mr. Walker made to me concerning him. It was clear to me that Mr. Walker intended to damage and harm John's reputation with me and his relationship with Sysco and the food industry.

13.     After the second phone call from Mr. Walker I began to receive calls from other people I have known in the food industry for years. They indicated to me that Mr. Walker had been calling them making similar defamatory statements of and concerning John Staples. After I received these calls I informed Mr. Staples of these events as well. It is my opinion based on Mr. Walker's statements to me and his acts of contacting other food industry professionals that he intended to harm Mr. Staples' reputation and business relationships in the food industry inclusive of with Sysco. Some of the other calls made by Mr. Walker were to other Sysco Corporation professionals.

Further Affiant sayeth not.

Kristin Caffey

SWORN TO AND SUBSCRIBED before me on this the —_____ day of

February 2019. To certify which witness my hand and official seal.

SEAL:

Notary Public in and for the State of Alabama

My Commission Expires:

Document comparison by Workshare 9.5 on Wednesday, May 22, 2019 1:30:11 PM

| Input: | |
|---|---|
| Document 1 ID | file://I:\Working_Space\Shin, Michael\1905 009382\Segment 1\5. Final\CAFFEY AFFIDAVIT_DRAFT.docx |
| Description | CAFFEY AFFIDAVIT_DRAFT |
| Document 2 ID | file://I:\Working_Space\Shin, Michael\1905 009382\Segment 2\5. Final\CAFFEY AFFIDAVIT_SIGNED.docx |
| Description | CAFFEY AFFIDAVIT_SIGNED |
| Rendering set | GT-1 |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 27 |
| Deletions | 31 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 58 |
|---|---|

**FOR IMMEDIATE RELEASE**

**Savannah, GA**
**June 9, 2008**

### SYSCO Awards Minority Supplier Contract

Houston, TX— SYSCO Corporation (NYSE:SYY), North America's largest foodservice marketer and distributor, today announced that it has awarded a twenty million pound chicken contract to minority-owned supplier Renaissance Man Food Services, LLC in support of its SYSCO® Classic Brand line of premium frozen chicken products. The contract is part of a SYSCO corporate initiative to source quality products from a diverse supplier base. Renaissance Man, a long-time SYSCO supplier, is wholly owned by H. Walker Enterprises, LLC, a company owned by former football great Herschel Walker.

"A number of our operating companies currently offer value-added meat and chicken products from Renaissance Man and Walker Foods, LLC," noted Kristin Caffey, SYSCO Director of Sourcing. "Renaissance Man and its affiliate, Walker Foods, LLC, have shown a real commitment to delivering the quality and service levels demanded by our operating companies and their customers. We are excited about taking our partnership to a much higher level." Walker Foods is a venture between H. Walker Enterprises and Simmons Prepared Foods, Inc.

Renaissance Man is a past recipient of annual SYSCO awards as one of its top suppliers and the "Heritage Award" awarded annually to SYSCO's top minority-owned suppliers. According to Herschel Walker, throughout his many years as a SYSCO supplier, SYSCO provided invaluable business guidance to ensure his company was prepared to compete in a tough marketplace. "Being prepared to service the complex needs of a world-class food distributor can be daunting," acknowledges Walker. "For my company to be getting that level of support from a customer like SYSCO is extraordinary and reflects SYSCO's commitment to building a diverse supplier base."

SYSCO is the global leader in selling, marketing and distributing food products to restaurants, healthcare and educational facilities, lodging establishments and other customers who prepare meals away from home. Its family of products also includes equipment and supplies for the foodservice and hospitality industries. For the fiscal year ended June 30, 2007, the company generated more than $35 billion in sales. For more information about SYSCO visit the company's Internet home page at www.sysco.com.

Renaissance Man, based in Savannah, Georgia and Walker Foods, based in Fayetteville, Arkansas, are privately held marketers of premium quality value-added chicken, pork and beef products for food service.



## Johnson, Kishma V. (LegalAsst-Atl-LT)

| | |
|---|---|
| **From:** | Herschel Walker <c93099@aol.com> |
| **Sent:** | Thursday, May 16, 2019 9:54 PM |
| **To:** | King, Michael (Shld-Atl-LT) |
| **Subject:** | Fwd: For our discussion today - FORWARDING STAPLES/CAFFEY CORRESPONDENCE |

-----Original Message-----
From: John Staples <john.staples@simfoods.com>
To: <EisenmanR@GTLAW.com> <EisenmanR@gtlaw.com>
Cc: Herschel Walker <c93099@aol.com>
Sent: Wed, Sep 28, 2016 3:38 pm
Subject: Re: For our discussion today

This is just "FYI" & "TBD" for now. I'll fill you both in as the conversations continue. Radian was hired by SYSCO to help with the CATMAN process and they recognize that manufacturers need a different type of "representation" than the "big 5" that SYSCO forces down their throats. By combining their abilities with ours, we can provide that type of representation. Radian has interest in merging with us - whether "us" is RMFS or DSM is TBD. I suspect it will involve both.

On Wed, Sep 28, 2016 at 3:20 PM, <EisenmanR@gtlaw.com> wrote:
Herschel—your work with the military should give you great connections with veteran owned businesses as well (including disabled vets). John those are separate categories as well.

Veteran owned and Disabled Veteran owned businesses are based upon that status and not upon ethnicity or gender.

What is Ren Man 2.0 vs 1.0 or 3.0?

Is Radian part of Sysco or she is a former Sysco executive still using a Sysco e-mail?

Would this be Ren Man now or new DSM Sales and Marketing as a broker?

**Ron Eisenman**
Shareholder
Greenberg Traurig, LLP | Terminus 200
3333 Piedmont Road NE | Suite 2500 | Atlanta, GA 30305
Tel 678-553-2345 | Fax 678-553-2346
EisenmanR@GTLAW.com | www.gtlaw.com

**GT** GreenbergTraurig

**From:** John Staples [mailto:john.staples@simfoods. com]
**Sent:** Wednesday, September 28, 2016 4:13 PM
**To:** Herschel Walker; Eisenman, Ron (Shld-Atl-CP)
**Subject:** Fwd: For our discussion today

FYI.
This is what I've been working on with Kristin for a few months. This could be huge.
Thanks.

---------- Forwarded message ----------
From: **Caffey, Kristin 000** <Caffey.Kristin@corp.sysco.com >
Date: Wed, Sep 28, 2016 at 2:12 PM



i

Subject: For our discussion today
To: "john.staples@simfoods.com" <john.staples@simfoods.com>, "jstaples@simfoods.com" <jstaples@simfoods.com>

John

Please see attached document for our discussion today at 2:30.

KC

Kristin Caffey
Sr. Director-Foodservice
Radian Group
Off: 281-584-1278
Cell:713-703-3422

--

---

*JOHN F. STAPLES*
 *GENERAL MANAGER*
 *RENAISSANCE MAN FOOD SERVICES*

E john.staples@simfoods.com
C 479.899.2733
O 479.215.2581
F 479.215.2774

*SIMMONS PREPARED FOODS*
*601 NORTH HICO*
*SILOAM SPRINGS AR 72761*
simfoods.simmonsglobal.com

---

*This email & any files transmitted with it are confidential and
intended solely for the entity to whom they are addressed.
If you have received this email in error destroy it immediately.
Trees grow slowly, think before you print this email.*

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us
immediately at postmaster@gtlaw.com, and do not use or disseminate such information.

--

---

JOHN F. STAPLES
GENERAL MANAGER
RENAISSANCE MAN FOOD SERVICES

E john.staples@simfoods.com

C 479.899.2733
O 479.215.2581
F 479.215.2774

**SIMMONS PREPARED FOODS**
601 NORTH HICO
SILOAM SPRINGS AR 72761
simfoods.simmonsglobal.com

---

*This email & any files transmitted with it are confidential and
intended solely for the entity to whom they are addressed.
If you have received this email in error destroy it immediately.
Trees grow slowly. think before you print this email.*

This is a Conceptual Draft - Not Intended for Broader Distribution

# RADIAN

Ren Man and Radian

Minority and Women Owned Business Enterprises
(MWBE) Solution Concept

September 2016



Copyright © 2016 Radian Inc. — Confidential

This is a Conceptual Draft - Not Intended for Broader Distribution

## Minority and Women Owned Business Enterprises (MWBE) -- Challenges to Solution Growth

While most broad line food service distributors, operators, institutions, retailers, and foodservice management firms have substantial MWBE sourcing and supplier targets, many have found it difficult to achieve these objectives. **Why?**

- MWBE suppliers can be small both in geographic reach and distribution scale.

- Often MWBE firms do not understand how to engage the customer or employ an effective approach to selling their goods.

- Many times the customer has to take on the role of developing the MWBE companies go to market strategy and marketing.

- Many successful, local MWBE firms often remain unknown at the national and regional level - they need a mechanism to drive increased scale.

- Talent acquisition necessary for growth is a significant barrier for many of these high quality, but small MWBE suppliers.

- The majority of these firms also have not invested in capabilities necessary to leverage the increasing availability of data and insights.

- Lack of comprehensive category solutions results in 'sifting through' myriad of suppliers to find quality options.

- Very few product 'solution bundles' exist for those that need a larger percentage of MWBE volume in their portfolio.

- Sourcing professionals can be challenged with how to incorporate MWBE firms (products) into their category plans and assortment strategies.

 *By designing a solution that addresses these challenges would afford foodservice distributors and operators with a more effective means of doing business with the MWBE community while meeting their own MWBE objectives.*

2

Copyright © 2016 Radian Inc. -- Confidential

RADIANRBP

This is a Conceptual Draft - Not Intended for Broader Distribution

## Solving Challenges to Minority and Women Owned Business Enterprises (MWBE) Solution Growth

Ren Man 2.0 will provide Sysco and its CMU's customers a comprehensive, efficient, and cost effective MWBE enterprises solution -- tailored around the suppliers services needs and capability requirements and creating scale across a portfolio of small and mid-sized women and minority owned suppliers.

MINORITY AND WOMEN OWNED SUPPLIERS

- King's Cheesecake
- Carla's Pasta
- Bigelow Tea
- [illegible]
- [illegible]
- [illegible]

*"Providing Minority and Women Owned suppliers the necessary sales, distribution, analytics, category and account management capabilities to grow within Sysco."*

**REN MAN 2.0**

Comprehensive Sales and Execution Process Management

A Strategic Partnership That Enables Overall Supplier And Distributor Brand Representation And Expansion

Renaissance Man Food Service + RADIAN

- Sales
- Account Management
- Sales Support
- Order Management,
- Field Support

- Category Planning
- Analytics
- Initiative Management
- Consultative Selling
- Field Execution

**Sales and Business Development**

- CMU Sales Support
- Channel and Market Level Sales Support
- Category Management Support
- Marketing Material Development
- Market-Level Sales Initiative Management

**Execution**

- Order Management
- Distribution and Replenishment Management
- Supplier and Market Area Issue Resolution
- Analytics and Score carding
- Distribution and Replenishment Management

*"Managing the complexity of Minority and Women Owned Supplier breadth, capabilities, brand representation requirements, and distribution across over 100 suppliers"*

**Sysco Diversity**

*"Providing Sysco's customers within its key CMU's a comprehensive, efficient, and cost-effective solution to their Minority and Women Owned Sourcing Objectives.*

SYSCO CMU AND CHANNELS

- Travel, Leisure, and Retail — *Retail Deli, Hotels, Casinos, Resorts, etc.*
- Healthcare — *Military, Hospitals, Senior Communities, Nursing Homes, etc.*
- Foodservice Management — *Foodbuy, Sodexo, Aramark, Marriot, etc.*

Copyright © 2010 Radian Inc. – Confidential

RADIAN RBP



This is a Conceptual Draft - Not Intended for Broader Distribution

## Pathways to Growth . . . Minority and Women Owned Business Enterprises (MWBE)

There are a number of options - and channels - to grow a Foodservice and Retail MWBE business:

1. **Sysco Facilitated** - Leverage Sysco's internal constituencies to drive meetings / relationships with potential customers and suppliers:

   a. **Minority Sourcing Department** - Relying on Karen to drive adoption through the CMUs and suppliers

   b. **CMU Leadership** - Presenting a MWBE solutions for the CMU leadership and sales teams that they may take to their customers

2. **Channel Direct** - Establish meetings and relationships with key participants in the industry channels (military, institutional foodservice, retail, etc.) to guide business to a specific distributor(s) (forced distribution).

3. **Supplier Supported** - Establish meetings and relationships with group of targeted suppliers that will engage Ren Man 2.0 to represent them within and across key food services and retail customers.

RADIANRBP

Copyright © 2016 Radian Inc. - Confidential

4

**Friday, July 13, 2018 at 1:55:27 PM Central Daylight Time**

**Subject:** Document . . .
**Date:** Wednesday, September 28, 2016 at 2:07:31 PM Central Daylight Time
**From:** CHRIS DRAZAN
**To:** Kristin Caffey
**Attachments:** SYSCO Diversity Structure - DRAFT.pdf

Here you go . . . .

Chris Drazan
*Managing Partner* | RADIAN | +1 (612) 865-1169



Page 1 of 1

RADIAN-GT 000014

This is a Conceptual Draft - Not Intended for Broader Distribution



 RADIAN

### Ren Man and Radian

Minority and Women Owned Business Enterprises
(MWBE) Solution Concept

September 2016

Copyright © 2016 Radian Inc. – Confidential

RADIAN-GT 000015

This is a Conceptual Draft - Not Intended for Broader Distribution

**Minority and Women Owned Business Enterprises (MWBE) -- Challenges to Solution Growth**

While most broad line food service distributors, operators, institutions, retailers, and foodservice management firms have substantial MWBE sourcing and supplier targets, many have found it difficult to achieve these objectives. Why?

- MWBE suppliers can be small both in geographic reach and distribution scale.

- Often MWBE firms do not understand how to engage the customer or employ an effective approach to selling their goods.

- Many times the customer has to take on the role of developing the MWBE companies go to market strategy and marketing.

- Many successful, local MWBE firms often remain unknown at the national and regional level - they need a mechanism to drive increased scale.

- Talent acquisition necessary for growth is a significant barrier for many of these high quality, but small MWBE suppliers.

- The majority of these firms also have not invested in capabilities necessary to leverage the increasing availability of data and insights.

- Lack of comprehensive category solutions results in 'sifting through' myriad of suppliers to find quality options.

- Very few product 'solution bundles' exist for those that need a larger percentage of MWBE volume in their portfolio.

- Sourcing professionals can be challenged with how to incorporate MWBE firms (products) into their category plans and assortment strategies.

 *By designing a solution that addresses these challenges would afford foodservice distributors and operators with a more effective means of doing business with the MWBE community while meeting their own MWBE objectives.*

Copyright © 2018 Radian Inc. – Confidential

RADIANRBP

RADIAN-GT 000016

This is a Conceptual Draft - Not Intended for Broader Distribution

### Solving Challenges to Minority and Women Owned Business Enterprises (MWBE) Solution Growth

Ren Man 2.0 will provide Sysco and its CMU's customers a comprehensive, efficient, and cost effective MWBE enterprises solution — tailored around the suppliers services needs and capability requirements and creating scale across a portfolio of small and mid-sized women and minority owned suppliers.



Copyright © 2016 Radian Inc - Confidential

RADIANREP

RADIAN-GT 000017

This is a Conceptual Draft - Not Intended for Broader Distribution

**Pathways to Growth . . . Minority and Women Owned Business Enterprises (MWBE)**

There are a number of options - and channels - to grow a Foodservice and Retail MWBE business:

1. **Sysco Facilitated** - Leverage Sysco's internal constituencies to drive meetings / relationships with potential customers and suppliers:
   a. **Minority Sourcing Department** - Relying on Karen to drive adoption through the CMUs and suppliers
   b. **CMU Leadership** - Presenting a MWBE solutions for the CMU leadership and sales teams that they may take to their customers

2. **Channel Direct** - Establish meetings and relationships with key participants in the industry channels (military, institutional foodservice, retail, etc.) to guide business to a specific distributor(s) (forced distribution).

3. **Supplier Supported** - Establish meetings and relationships with group of targeted suppliers that will engage Ran Mari 2.0 to represent them within and across key food services and retail customers.

Copyright © 2018 Radian Inc. - Confidential

RADIANRBP

RADIAN-GT 000018

**Subject:** Re: Opportunities

**Date:** Wednesday, October 12, 2016 at 1:45:44 PM Central Daylight Time

**From:** CHRIS DRAZAN

**To:** John Staples

John,

Anytime tomorrow morning for a quick call? If so, I'll send something over for your review tomorrow morning.

Chris

-----Original Message-----
From: John Staples <john.staples0803@comcast.net>
Date: Wednesday, October 5, 2016 at 9:46 AM
To: Radian Office DRAZAN <cdrazan@radiangroup.com>
Subject: Re: Opportunities

> Anytime after 3:00 this afternoon.
> (479)899-2733
>
> Sent from my iPad
>
>> On Oct 5, 2016, at 8:58 AM, Chris Drazan <cdrazan@radiangroup.com> wrote:
>
> John,
>
> Any time for a quick call today? I'm in Minneapolis though Thursday. If so, send me a good number to call you at and a
good time.
>
> Chris
>
>
>
>
>> On 9/29/16, 8:30 PM, "John Staples" <john.staples0803@comcast.net> wrote:
>>
>> Good evening.
>>
>> After speaking with Kristin after our conference call yesterday, I realized that I may have confused things with the
announcement that Randy Sanders had stepped down from his role at DSM. In truth, Randy had been thinking about this for
awhile and simply came to this decision shortly after I met with you in Nashville.
>>
>> As I mentioned on the phone, my goal and the goal of our group, remains the same - we want to be a part of a "new
age" sales & marketing agency! We are willing to consider virtually every type of partnership with Radian and our interest is
not in "having control". We simply want to be a part of a team effort. The combined efforts of "our folks" & "your folks" would
be fantastic!
>>
>> I learned a long time ago that "a smaller piece of a bigger pie is better than a bigger piece of a smaller pie."
>>
>> Let's work together to figure this out! I believe we will have great feedback to consider after the Tenet/Dietz & Watson
cutting on Monday.
>>
>> Have a great weekend.
>>
>> Sent from my iPad
>



EXHIBIT

11

CAFFEY  6/21/11

Page 1 of 1

**Friday, July 13, 2018 at 9:45:38 AM Central Daylight Time**

| | |
|---|---|
| **Subject:** | Revised Discussion Doc .... |
| **Date:** | Friday, September 15, 2017 at 8:42:44 AM Central Daylight Time |
| **From:** | CHRIS DRAZAN |
| **To:** | John Staples |
| **CC:** | John Staples |
| **Attachments:** | DSM Options 2.pdf |

For our call ...

Chris Drazan
*Managing Partner* l RADIAN l +1 (612) 865-1189



**Page 1 of 1**

RADIAN-GT 000108

 RADIAN
Magnify

**DSM and Magnify Options**
Go-forward alternatives with and without Renman

Review Magnify Proposal With
Herschel / Renman

**Elements**
- Magnify merges DSM team within Radian Magnify in exchange for 3 year buyout
- No continued Walker / RenMan equity position in the new entity
- Equity is distributed to key employees
- Continued brokerage arrangement with RenMan
- Brokerage 'rebate' for the first 3 years of the agreement
- Growth incentive for Magnify based on revenue growth thresholds
- John Staples remains an employee of RenMan (to ensure continuity / mitigate any perceived seller risk) for a minimum of 3 years.

**Yes, Move Forward**

| OPTIONS | John with RenMan? | RenMan with Radian? |
|---|---|---|
| A. John Moves to Magnify: Transaction is completed by January 1 with John becoming a Radian Magnify employee with equity, etc. | No | Yes |
| B. John Stays with RenMan: The transaction is completed January 1 and John remains a RenMan employee. Equity is distributed to Kim et. al. and we begin aggressive growth beyond RenMan. John transitions into Magnify within 2 to 3 years. | Yes | Yes |

**No, Not Interested**

| OPTIONS | John with RenMan? | DSM with RenMan? |
|---|---|---|
| A. Status Quo: Do not pursue merger or DSM / Radian merger. | Yes | Yes |
| B. Slow Transition Away: Continue current DSM / RenMan relationship but Radian begins to hire key DSM employees and begins aggressive non-RenMan growth plans. New DSM business growth is through Magnify until scale is developed. | Yes | Yes |
| C. Immediate Transition Away: Wind-down DSM and terminate RenMan brokerage agreement. Radian hires key DSM employees and begins aggressive non-RenMan growth plans. | No | No |

RADIAN-GT 000109


**Magnify**

DSM and Magnify Options
Go-forward alternatives with and without Renman

<u>**Communication Plan**</u>

**September**

1. Robert and / or Bud contact Herschel:

"Herschel, we have met this company Radian and we think a deeper relationship with RenMen makes sense ,.. They take take DSM forward but more importantly, they can grow RenMan."

2. Kristin Caffey contacts Herschel:

"Herschel, I work for Radian and I really think you should consider a relationship with them ... they has some really deep relationships with Sysco and can driven RenMan forward."

**Early October**

3. Drazan contacts Herschel, schedule a presentation (Chris, James, etc.):

"Herschel, we would like to grow RenMan and our position in the foodservice and retail space. I'd like to acquire DSM and embed them into our Magnify and leverage our capabilities."

RADIAN-GT 000110

‹ Phone .ıll 🤙  1:27 PM  ◁ 70% 🔋

‹ 506

**K**

## Kristin Caffey Correct ›

~~I will call around 5:15 if~~
that works for u?  I did
try calling u back
yesterday .
Kristin



Mar 13, 2018, 12:09 PM

Call when you have a
chance, sorry I miss you
call earlier

Delivere

Mar 13, 2018, 1:10 PM

 Phone  1:27 PM  70%

‹ 506

K

Kristin Caffey Correct ›

Mar 13, 2018, 8:30 AM

I will call around 9:15 if that works for u? I did try calling u back yesterday .
Kristin

Mar 13, 2018, 12:09 PM

Call when you have a chance, sorry I miss you call earlier



**Kristin Caffey Correct** ›

ΙΙΘΙΙΟ:

Mar 12, 2018, 9:54 AM

Hey Herschel saw you
called , I am in mtg will
call when u get out

I not u

Mar 12, 2018, 11:05 PM



I would like to talk when
you have a chance

  



‹ **506**   

### Kristin Caffey Correct ›

iMessage
Nov 16, 2017, 4:20 PM

Got ur message thank you will call soon hope u r well Kristin

Jan 8, 2018, 5:43 PM

Hey Herschel enjoyed catching up with you couple weeks ago! I wanted to wish good luck in tonight's game ! I





## Texas
### DRIVER LICENSE

DIRECTOR

4d ...
9a Iss 02/05/2015
3 DOB 02/10/1967
1 CAFFEY
2 KRISTIN RENEE
8 2903 HIGHLAND LAKES DR
MISSOURI CITY TX 77459-0000
12 Restrictions A
16 Hgt 5-01          15 Sex F          9a End NONE
5 DD 16213510120003531738 7          18 Eyes BLU

4a DL 13876387
9 Class C
4b Exp 02/10/2021

USA
TX


tabbies
EXHIBIT
14
CAFFEY

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

KIMBERLY and JOHN STAPLES,)
                               )

     Plaintiffs,             )

                               )

V.                           )  Civil Action No.: 7:18-cv-00160-LSC

                               )

H. WALKER ENTERPRISES,  )
 LLC;                         )
RENAISSANCE MAN FOOD    )
SERVICES, LLC; and SIMMONS )
                               )

     Defendants.          )

## AFFIDAVIT OF KRISTIN CAFFEY

STATE OF ALABAMA        )

COUNTY OF JEFFERSON    )



BEFORE ME, the undersigned, a Notary Public, on this day personally appeared Kristin Caffey, who is personally known to me, and first being duly sworn according to law, upon her oath deposes and states as follows:

1.    My name is Kristin Caffey. I am over the age of 19 years. I am a resident citizen of the State of Texas. I have personal knowledge of the following facts and state those under my own free will in this my Affidavit.

2.    I have known Herschel Walker since 2002 or 2003 and John Staples since the year 2000. I developed a business relationship with John Staples from working with him as the Poultry Department Manager for Sysco Corporation when he worked for Tyson Foods. I developed a business relationship with Herschel Walker also as Poultry Department Manager for Sysco Corporation.

3.  In 2000 I came to Sysco Corporate Headquarters from one of its operating companies in Houston, Texas. I began working with Robert Thurber SVP of Sysco at that time. Mr. Thurber met Herschel Walker through Mr. Thurber's wife at an America's Junior Miss Pageant. Mr. Thurber agreed to assist Mr. Walker in getting Mr. Walker into the food business through Sysco Corporation. Mr. Thurber asked me to assist.

4.  Sysco has always considered the Famous 34 brand to be exclusive to Sysco in the food service industry. I also assisted Mr. Walker in obtaining chicken products made by and supplied by poultry producing companies such as Pilgrim's Pride and Tyson. I also assisted in obtaining other food items for Mr. Walker from food suppliers such as Carrington Seafood and Delta Pride under the Herschel's Famous 34 Brand.

5.  In 2008 when Mr. Walker's book titled *Breaking Free* came out and he did an interview with CNN, I became concerned regarding his mental health and reputation because Sysco had an exclusive business relationship with him. Walker's Famous 34 brand was being managed and marketed as a Sysco brand. Sysco had internal discussions regarding the partnership. Sysco decided to wait to see if the book sold well, which it did not, and so Sysco did not terminate its relationship with Mr. Walker at that time.

6.  When the book and interview came to light, I spoke with John Staples and managers of Simmons Prepared Foods, Inc. I also spoke to Mike Rogers about my concerns. He was operating the entity under which Simmons was producing the chicken that Mr. Walker's company and Simmons were selling to Sysco at the time. After I brought the Book and interview to Simmons' attention, they were aware of my concerns. I discussed these issues with Simmons because I was very concerned about the Public Relations of Sysco having a relationship with Mr. Walker and his/our brand based on the book and interview.

7.  In 2013 I experienced some health problems and left my position as Poultry Department Manager of Sysco. I then went to work for another company to assist Sysco concerning Sysco's category

2

management program (CATMAN).  I have maintained my Sysco email, office, and phone.

8.  In the late Fall of 2017 I received a phone call from Mr. Walker.  The call was unexpected by me and came out of the blue. During the call I could tell I was on speaker and I was concerned that I was being recorded.  Mr. Walker seemed to be fishing for information from me concerning John Staples.  Mr. Walker asked me what I thought of John Staples.  I assured Mr. Walker that John Staples was a good honest person and supported Mr. Walker's interest a 100% percent. Further that Mr. Staples had grown the sales of Mr. Walker's business relationship with Simmons and Sysco for years. I had nothing negative to say about John Staples only positive opinions of him.  The phone call ended.  It was my opinion Mr. Walker was fishing for negative information concerning John Staples from me which I did not have.

9.  After I received the above phone call Mr. Walker called me again. This second phone call was much different than the first.  In this second call Mr. Walker was no longer fishing for negative information concerning Mr. Staples. Instead he began making disparaging, derogatory, and defamatory statements to me concerning John Staples.

10.  It was clear to me Mr. Walker intended to slight Mr. Staples and to cause me to lower my opinions of Mr. Staples.  I had previously shared with Mr. Walker from his early phone call to me that I did not have any negative perception of Mr. Staples.  Mr. Walker told me John was not doing good things in the food industry.  Mr. Walker stated that John had stolen money from him or his business.  Mr. Walker stated that John Staples and some other people tried to steal his business.

11.  Mr. Walker clearly stated to me that John Staples lacked morals and was unethical.  I told Mr. Walker I did not believe these statements and did not appreciate him trying to harm Mr. Staples in the food industry. I also indicated to him I did not appreciate him harming

3

John's ability to be employed and have an ongoing and future relationship with me and Sysco. I ended the phone call with Mr. Walker and have not spoken to him since.

12. After the second phone call from Mr. Walker I called Mr. Staples and informed him of the statements Mr. Walker made to me concerning him. It was clear to me that Mr. Walker intended to damage and harm John's reputation with me and his relationship with Sysco and the food industry.

13. After the second phone call from Mr. Walker I began to receive calls from other people I have known in the food industry for years. They indicated to me that Mr. Walker had been calling them making similar defamatory statements of and concerning John Staples. After I received these calls I informed Mr. Staples of these events as well. It is my opinion based on Mr. Walker's statements to me and his acts of contacting other food industry professionals that he intended to harm Mr. Staples' reputation and business relationships in the food industry inclusive of with Sysco. Some of the other calls made by Mr. Walker were to other Sysco Corporation professionals.

Further Affiant sayeth not.

Kristin Caffey

4

SWORN TO AND SUBSCRIBED before me on this the _27th_ day of February 2019. To certify which witness my hand and official seal.

_June_

SEAL:

_____
Notary Public in and for the State of Alabama

My Commission Expires: _7/22/19_

5