## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

KIMBERLY STAPLES, *et al.*,            )
                                       )
    Plaintiffs,    )
                                       )
v.                                     )            7:18-cv-00160-LSC
                                       )
H. WALKER ENTERPRISES, LLC,            )
*et al.*,                              )
                                       )
    Defendants.    )

### Memorandum of Opinion

## I.     Introduction

Plaintiffs, John and Kimberly Staples (collectively "Plaintiffs"), bring this action against Defendants, H. Walker Enterprises, LLC ("HWE"), Renaissance Man Food Services, LLC ("RMFS"), and Simmons Food, Inc. ("Simmons") (collectively "Defendants"). Presently before the Court are cross motions for summary judgment filed by all parties. Specifically, Plaintiffs have each filed a motion for summary judgment asking the Court to grant summary judgment on liability for all claims asserted in their Second Amended Complaint. (*See* Docs. 69 & 71.) Defendants have filed motions for summary judgment seeking dismissal of all of Plaintiffs' claims against them. (*See* Docs. 72 & 76.) Additionally, Defendant RMFS

moves for summary judgment in its favor on two of the three counterclaims it has

filed against Plaintiffs. (*See* Doc. 76.) Defendants HWE and RMFS also ask that this

Court strike an affidavit submitted as part of Plaintiffs' evidentiary submissions.

(Doc. 106.) Finally, the parties have filed a Joint Status Report requesting that the

Court schedule an oral argument to consider these pending motions. (Doc. 103.)

These motions have been fully briefed and are ripe for decision.[1] For the

reasons that follow, Plaintiff John Staples's ("Mr. Staples's") motion (doc. 69) is

due to be DENIED, and Plaintiff Kimberly Staples's ("Mrs. Staples's") motion

(doc. 71) is also due to be DENIED. Defendant Simmons's motion (doc. 72) is due

to be GRANTED in PART and DENIED in PART, and Defendants HWE and

RMFS's motion (doc. 76) is also due to be GRANTED in PART and DENIED in

PART. Defendants HWE and RMFS's motion to strike (doc. 106) is due to be

DENIED. The parties' request for oral argument (doc. 103) is due to be DENIED.

## II.      Background[2]

---

[1]      Although afforded an opportunity to do so, Plaintiffs did not file reply briefs to support
their motions for summary judgment.

[2]      The majority of these facts are taken from the parties' "Agreement Concerning
Undisputed Facts" section of their Joint Status Report, which was filed on February 4, 2019. (Doc.
66.) Other relevant facts gleaned from the parties' motions for summary judgment are also
included. The Court "view[s] the materials presented and all factual inferences in the light most
favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206,
1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Because the
parties at some points move for summary judgment on the same issues, it is impossible for the
Court to recount all facts in the light most favorable to the nonmoving party. In the discussion

This case involves claims surrounding the termination of John Staples ("Mr. Staples") as well as Defendants' alleged interference with the relationship between his wife, Kimberly Staples ("Mrs. Staples"), and her employer DSM Sales and Marketing, LLC ("DSM3"). In 2009, Mr. Staples began his employment with Defendant Simmons, a food services industry business. During Mr. Staples's employment, Simmons provided him with written employment rules related to job performance, progressive discipline, and fair treatment. However, the parties dispute whether Simmons ever made any representations to Mr. Staples that his employment would only be terminated for cause. Although Simmons was Mr. Staples's direct employer, his job duties included serving as the general manager of Defendant RMFS, an entity that buys chicken from Simmons. RMFS would refund Simmons for Mr. Staples's compensation. Defendant HWE, which is owned by Herschel Walker ("Walker"), is the sole owner of RMFS. Under a profit-sharing agreement between HWE and Simmons, Simmons receives 35% of the profits generated by RMFS. Additionally, Simmons provides the back-office accounting functions for RMFS.

<hr>

section below, the Court will indicate where necessary the material facts taken in the light most favorable to the nonmoving party.

DSM3 is a company owned by Mrs. Staples and Julie Blanchard ("Blanchard"), who is also employed by HWE. DSM3 had a brokerage agreement with RMFS to broker the sale of RMFS's product. Mr. Staples signed the brokerage agreement on behalf of RMFS, and Mrs. Staples signed the agreement on behalf of DSM3. As part of its performance of administrative functions for RMFS, Simmons would send DSM3 commission checks representing the amount of commissions RMFS owed DSM3 under the brokerage agreement. These checks would be mailed to Mrs. Staples who would then deposit them in a DSM3 bank account. In addition to her ownership interest in DSM3, Mrs. Staples received an $85,000 annual salary from the company. DSM3 paid Mr. Staples $40,000 per year to work as a consultant for it.

On December 27, 2017, Mr. Staples lost his position as general manager of RMFS. The next day, on December 28, 2017, Mr. Staples's employment with Simmons was terminated. Around the same time period, on December 30, 2017, RMFS terminated its brokerage agreement with DSM3. Additionally, in either December 2017 or January 2018, Simmons withheld commission payments RMFS owed DSM3. Plaintiffs contend that these actions were taken in a concerted effort to sever their relationships with HWE, RMFS, Simmons, and DSM3. As evidence of this, Plaintiffs point to a memo sent to Walker on December 21, 2017. In the memo,

Ronald Eisenman ("Eisenman"), an attorney who represented Walker and prepared the paperwork necessary to form DSM3, detailed two proposals concerning Plaintiffs' future with these business entities. According to the memo, the proposals were discussed during a meeting held between Simmons's President and Walker on December 12, 2017.

Under Proposal A, which contemplated Plaintiffs going along with the proposal, Mr. Staples would agree to terminate his employment as general manager of RMFS, and his role as paid consultant to DSM3 would end. He would then sign a one-year consultant agreement with RMFS. Mrs. Staples would resign from her position with DSM3 and sign over her ownership interest in the company to Blanchard. Under Proposal B, which contemplated Plaintiffs refusing to cooperate with Proposal A, Simmons would terminate Mr. Staples's employment and RMFS would end its brokerage agreement with DSM3. Plaintiffs did not accept Proposal A, which they argue led to the actions taken by Simmons and RMFS in late December 2017. Mr. Staples testified that he believes that Defendants took these actions against him and his wife because he raised ethical concerns as to whether Simmons should be paying an invoice on behalf of RMFS for waffle packaging that Mr. Staples asserts was being sold through HWE rather than RMFS.

RMFS contends that it was Mr. Staples who acted unethically during his tenure as RMFS's general manager. RMFS asserts that while it employed Mr. Staples he: (1) sent an email to a competitor which contained confidential information concerning RMFS's sales and volume revenue; (2) caused RMFS to enter into a broker arrangement with Diversified Sales & Marketing, an entity that Mrs. Staples had a 60% ownership interest in; (3) paid unauthorized commissions on behalf of RMFS to DSM3; (4) asked a prospective broker for RMFS to hire Mrs. Staples and his daughter as a quid pro quo for RMFS's business; and (5) approved reimbursement of his personal expenses by RMFS.

At some point, Walker contacted Kristin Caffey ("Caffey"), a professional within the food services industry, to complain about Mr. Staples. Mr. Staples contends that at the time this conversation took place Sysco Corporation ("Sysco") employed Caffey. HWE and RMFS assert that Caffey was employed by Radian, another food services industry business. According to Caffey, Walker made disparaging remarks about Mr. Staples and told her that Mr. Staples had "stolen money from him or his business." (*See* Doc. 70-8 at 4.) Caffey then began to hear from others in the food services industry who reported receiving similar calls from Walker about Mr. Staples.

The parties agree that Mr. Staples's employment relationship with Simmons arose in Arkansas. Around May 2015, Mrs. Staples moved from Arkansas to Alabama. Mr. Staples followed Mrs. Staples to Alabama in either August or September of 2015 and worked remotely for Simmons until his termination. Thus, at the time of the events giving rise to this lawsuit, Plaintiffs were full-time residents of Alabama.

## III.     Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[3] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues

---

[3]     A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund*, 789 F.3d at 1213–14 (citing *Adickes*, 398 U.S. at 157. However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327

(1986). This standard does not change when a court is presented with cross-motions for summary judgment. *See Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984).

## IV.   Discussion[4]

The parties' summary judgment motions involve several discrete issues. Central to the parties' dispute is whether Alabama or Arkansas law applies to several of the claims asserted. The Court will first address which state's substantive law applies. After disposing of this choice of law issue, the Court will then address the claims brought by Plaintiffs in their Second Amended Complaint. The Court will finally address whether RMFS is entitled to summary judgment on its counterclaims.

### A.   Choice of Law

The parties dispute whether Arkansas or Alabama law governs Mr. Staples's claims for wrongful termination and tortious interference with his employment relationship with Simmons.[5] A federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins.*

---

[4]     The parties have requested that the Court schedule an oral argument to consider their motions for summary judgment. (Doc. 103.) The parties' written briefs adequately address the issues presented by their motions. Thus, the Court does not require additional argument, and the parties' request for oral argument is due to be denied.

[5]     The parties are in agreement that Alabama law governs the other claims asserted by Plaintiffs. As such, at this summary judgment stage, the Court will assume without deciding that Alabama law does indeed apply to those claims.

*Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Alabama law follows the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti*." *Precision Gear Co. v. Cont'l Motors, Inc.*, 135 So. 3d 953, 956 (Ala. 2013) (quoting *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009)). Under these principles, a contract is governed by the law of the place where the contract is made, and tort claims are governed according to the law of the state where the injury occurred. *See id.* Accordingly, to determine which state's substantive law applies, the Court must first determine whether these claims sound in contract or in tort.

Regardless of whether a tort claim arose from a business relationship, it is still treated as a tort claim for the purposes of Alabama's conflict-of-law precedent. *See Batey & Sanders, Inc. v. Dodd*, 755 So. 2d 581, 583 (Ala. Civ. App. 1999). Thus, Mr. Staples's claim for tortious interference with his business relationship with Simmons sounds in tort and is governed by the law of the state where Mr. Staples's alleged injury occurred.

Mr. Staples argues that Arkansas law governs this claim because his employment relationship with Simmons was based in Arkansas. However, under *lex loci delicti*, "it is not the site of the alleged tortious act that is relevant, but the site of the injury, or the site of the event that created the right to sue." *Glass v. S. Wrecker*

*Sales*, 990 F. Supp. 1344, 1347 (M.D. Ala. 1998). Where a plaintiff's damages are primarily financial in nature "the 'injury' for choice of law purposes occurs in the jurisdiction where those economic damages are felt." *See Doug's Coin & Jewelry, Inc. v. Am.'s Value Channel, Inc.*, No. 2:12-cv-1095-MHH, 2015 WL 3632228, at *8 (N.D. Ala. June 10, 2015) (citing *Fitts v. Minn. Mining & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991)). Consistent with this principle, federal courts applying *lex loci delicti* to tortious interference claims have repeatedly concluded that those claims are governed by the law of the state in which the plaintiff suffered an economic impact. *See, e.g.*, *Chambers v. Cooney*, No. 07-0373-WS-B, 2007 WL 2493682, at *11 (S.D. Ala. Aug. 29, 2007); *Bradbury Co. v. Teissier-duCros*, 387 F. Supp. 2d 1167, 1173 (D. Kan. 2005).

Here, the tortious interference with business relationship claim at issue is based on Mr. Staples's assertion that HWE and RMFS took actions that caused Simmons to terminate his employment. The damage that Mr. Staples alleges to have suffered from this interference is loss of income. Because this injury is financial in nature, the Court concludes that the law of the place where Mr. Staples suffered the economic impact of HWE and RMFS's alleged actions should be applied to this claim. It is undisputed that at the time of his termination and the alleged interference with his employment Mr. Staples resided in Alabama. Therefore, Mr. Staples's

financial injury from his loss of employment was necessarily felt in Alabama rather than Arkansas. Thus, Alabama law governs this claim.

Mr. Staples's wrongful termination claims are brought under three different theories of liability: (1) breach of express contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) termination in violation of public policy. (*See* Doc. 70 at 24–30.) Mr. Staples's claims for breach of the implied covenant of good faith and fair dealing and termination in violation of public policy are essentially claims for retaliatory discharge. This is evidenced by the cases Mr. Staples cites to support these claims. *See, e.g.*, *Smith v. Am. Greetings Corp.*, 804 S.W.2d 683, 684–85 (Ark. 1991) (noting that under Arkansas law there is an implied covenant of good faith and fair dealing which includes a prohibition on discharges "which contravene[ ] public policy"); *Scholtes v. Signal Delivery Serv., Inc.*, 548 F. Supp. 487, 494 (W.D. Ark. 1982). Similar to retaliatory discharge claims, which in Alabama are recognized when an employer terminates an employee for seeking to recover workers' compensation benefits, *see* Ala. Code § 25-5-11.1, the principles discussed in these cases apply to situations where an employee is fired for refusing to commit a wrong, for exercising a statutory right, or for otherwise seeking to "further the public good." *See Smith*, 804 S.W.2d at 684–85.

Under Alabama choice of law principles, "a claim alleging retaliatory discharge sounds in tort, not in contract." *Batey*, 755 So. 2d at 583. Thus, these claims are also governed by the law of the place of Mr. Staples's injury. Simmons asserts that, as with Mr. Staples's interference with business relationship claim, Alabama law should control Mr. Staples's wrongful termination claims because it is where he felt the economic impact of his termination. The Court disagrees. The Alabama Supreme Court has cautioned against utilizing a broad test where the place of financial harm is always determinative as to where a plaintiff's alleged injury occurred. *See Ex parte U.S. Bank Nat'l Ass'n*, 148 So. 3d 1060, 1071–72 (Ala. 2014). Instead, the court has reiterated that under *lex loci delicti* "the place of injury is in the state where the 'fact which created the right to sue' occurs." *See id.* at 1070 (quoting *Ala. Great S. R.R. v. Carroll*, 11 So. 803, 806 (Ala. 1892)). Thus, to determine whether it should apply the law of the place of financial harm a court must first look to the nature of the particular claim at issue. *See id.* (distinguishing malicious prosecution and bad faith insurance claims from tortious interference and fraud claims where federal courts sitting in Alabama have looked to the law of the state of plaintiffs' financial injuries).

Applying these principles, the Court concludes that the law of the place of termination should control Mr. Staples's wrongful discharge claims. Unlike with

tortious interference and fraud claims, retaliatory discharge claims do not require

plaintiffs to prove, as an element of those claims, financial injury. *See Ala. Power Co.*

*v. Aldridge*, 854 So. 2d 554, 563 (Ala. 2002) (noting that pursuant to Ala. Code § 25-

5-11.1 a *prima facie* case of retaliatory discharge requires a showing of: "(1) an

employment relationship, (2) an on-the-job injury, (3) knowledge on the part of the

employer of the on-the-job injury, and (4) subsequent termination of employment

based solely upon the employee's on-the-job injury and the filing of a workers'

compensation claim"). As such, although the place where a plaintiff suffered

financial injury from an alleged retaliatory discharge and the location of the plaintiff's

termination are typically the same, Alabama courts have mainly focused on where

the plaintiff was terminated when conducting a choice of law analysis on these types

of claims. *See, e.g., Batey*, 755 So. 2d at 583 ("It is undisputed that [plaintiff's]

employment was terminated in Georgia. Because the wrong complained of occurred

in Georgia, the law of Georgia applies."). Here, the record reflects that Simmons

terminated Mr. Staples in Arkansas. Thus, the Court will apply Arkansas law to his

retaliatory discharge claims.[6] Any contract that existed between Simmons and Mr.

---

[6]     Simmons contends that this result is inconsistent with the Second Amended Complaint's
assertion that venue is proper in this Court because "the acts giving rise to liability occurred in
the counties located in the Western Division of the Northern District of Alabama." (*See* Doc. 38
¶ 23.) The Court finds this argument unpersuasive. The venue statute provides that venue is
proper in "a judicial district in which a substantial part of the events or omissions giving rise to
the claim occurred." *See* 28 U.S.C. § 1391(b)(2). It does not require all acts giving rise to a

Staples was made in Arkansas. Accordingly, Arkansas law governs Mr. Staples's claims for breach of express contract as well.

### B. Count One: Interference with Business Relationship of Mr. Staples and Simmons

In Count One, Mr. Staples alleges that HWE and RMFS tortiously interfered with his employment relationship with Simmons by seeking to have Simmons terminate his employment. Under Alabama law, the elements of a claim for wrongful interference with a business relationship are: "(1) the existence of a [protectable] business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., LLC, v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). A defendant is a participant in rather than a stranger to a business relationship if "(1) [it] is an essential entity to the purported business relations; (2) the allegedly injured relations are inextricably a part of or depend upon [its] contractual or business relations; (3) [it] would benefit economically from the alleged injured relations; or (4) both [it] and the plaintiff are parties to a comprehensive interwoven set of contracts or relations." *Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d

---

plaintiff's claims to occur in that judicial district. Here, many of the acts complained of by Plaintiffs did in fact occur in this judicial district. It just so happens that "the act which created the right to sue" on Mr. Staples's wrongful termination claims occurred in Arkansas. Thus, under *lex loci delicti*, Arkansas law applies to those claims.

1143, 1156 (Ala. 2003) (quoting *Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc.*, 952 F. Supp. 1575, 1584 (N.D. Ga. 1996)).

Here, HWE and RMFS were participants in Mr. Staples's employment relationship with Simmons. Although Simmons was Mr. Staples's direct employer, Mr. Staples performed work for RMFS through Simmons. Indeed, it is undisputed that Mr. Staples's job duties for Simmons included serving as RMFS's general manager. Additionally, as part of the business relationship between Simmons and RMFS, RMFS would reimburse Simmons for the compensation it paid Mr. Staples. Therefore, Mr. Staples's employment relationship with Simmons was "inextricably a part of or depend[ed] upon" Simmons's relationship with RMFS. *Id.* As it is undisputed that HWE is the sole owner of RMFS, RMFS only existed because of HWE. Thus, without HWE, there would be no RMFS for Mr. Staples to manage. The fact that HWE and Simmons have a profit-sharing agreement where they split the profits generated by RMFS further demonstrates that these entities were interdependent and that HWE was not a stranger to Mr. Staples's employment relationship with Simmons. Mr. Staples acknowledges that HWE and RMFS were parties to what he refers to as "the Joint Venture [that he] managed." (*See* Doc. 87 at 15.) Based on these facts, it is apparent that Mr. Staples, Simmons, HWE, and

RMFS were all "parties to a comprehensive interwoven set of . . . [business relations]" connected to Mr. Staples's employment. *See Waddell*, 875 So. 2d at 1156.

Simply put, HWE, RMFS, and Simmons were all working together to generate profits from RMFS's sales. Simmons employed Mr. Staples to help generate profits for these three business entities. Accordingly, HWE and RMFS were not strangers to Mr. Staples's employment relationship with Simmons. Thus, with respect to Count One, Mr. Staples's motion for summary judgment is due to be denied, and HWE and RMFS's motion for summary judgment as to this Count is due to be granted.

## C.    Count Two: Interference with Business Relationship of Mr. Staples and DSM3

In Count Two, Mr. Staples alleges that RMFS and HWE wrongfully interfered with his consulting agreement with DSM3.[7] As with Count One, this claim fails because HWE and RMFS were participants in Mr. Staples's relationship with DSM3. Mr. Staples argues that HWE and RMFS were strangers to his relationship with DSM3 because neither entity was a party to his consulting agreement with

---

[7]    In his motion for summary judgment, Mr. Staples contends that Simmons is also liable for interfering with his consulting agreement with DSM3. (*See* Doc. 70 at 32–33.) This claim is not asserted against Simmons in Plaintiffs' Second Amended Complaint. (*See* Doc. 38.) Because Plaintiffs' Second Amended Complaint, which is the operative complaint, does not bring a claim against Simmons for interference with Mr. Staples's consulting agreement with DSM3, Mr. Staples's motion for summary judgment against Simmons on this claim is due to be denied. Further, any such asserted claim against Simmons is struck and dismissed.

DSM3. However, the test for whether or not a defendant was a stranger to a business relationship is not this narrow. Instead, a defendant is a participant in a business relationship if the defendant "has any beneficial or economic interest in, or control over, that relationship." *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 454 (Ala. 2004) (citation omitted).

Here, the brokerage agreement between RMFS and DSM3 provided that DSM3 was to broker the sale of RMFS's products. Because DSM3 was RMFS's broker, RMFS had an economic interest in DSM3's success. This included the success of its relationship with its consultants, such as Mr. Staples. As HWE is entitled to the majority of profits generated by RMFS, it too had an economic interest in Mr. Staples's success as a DSM3 consultant. Moreover, DSM3, Mr. Staples, HWE, and RMFS were all parties to a "comprehensive set of interwoven contracts." *See Waddell*, 875 So. 2d at 1156. As RMFS and HWE note, under the brokerage agreement, DSM3 received commissions from RMFS in exchange for selling RMFS's products. These commissions produced income for DSM3, which allowed it to pay Mr. Staples's consulting fee. Thus, Mr. Staples's ability to receive his $40,000 consultant fee was directly tied to RMFS's, and by extension HWE's, relationship with DSM3. Accordingly, HWE and RMFS were not strangers to Mr. Staples's consulting arrangement with DSM3. Therefore, with respect to Count

Two, Mr. Staples's motion for summary judgment is due to be denied, and HWE and RMFS's motion for summary judgment as to this Count is due to be granted.

### D. Count Three: Civil Conspiracy – Interference with Business Relationship of Mr. Staples and DSM3

In Count Three, Mr. Staples asserts a civil conspiracy claim against HWE and RMFS, alleging that they conspired to interfere with his relationship with DSM3.[8] The tort of civil conspiracy consists of "the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means." *Johnson v. Shirley*, 539 So. 2d 165, 169 (Ala. 1988). "Conspiracy itself furnishes no civil cause of action. Therefore, a conspiracy claim must fail if the underlying act itself would not support an action." *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993) (internal citations omitted). As stated above, Mr. Staples's claim that HWE and RMFS interfered with his relationship with DSM3 fails as a matter of law. Accordingly, with respect to Count Three, Mr. Staples's

---

[8] Mr. Staples argues that Simmons is also liable for conspiring to interfere with his relationship with DSM3. (*See* Doc. 70 at 34–36.) But, as with Count Two, Mr. Staples did not bring this claim against Simmons in his Second Amended Complaint. (*See* Doc. 38.) Therefore, Mr. Staples's motion for summary judgment against Simmons on this claim is due to be denied. Further, any such asserted claim against Simmons is struck and dismissed.

motion for summary judgment is due to be denied, and HWE and RMFS's motion for summary judgment as to this Count is due to be granted.

**E.    Count Four: Intentional Interference with Business Relationship and Employment of Mrs. Staples**

In Count Four, Mrs. Staples brings an intentional interference with business relationship claim against all three Defendants, asserting that they interfered with her ownership interest and employment status with DSM3. Mrs. Staples's intentional interference with business relationship claim is based on the actions taken by Defendants towards DSM3 in December 2017 and January 2018. Specifically, Mrs. Staples points to Simmons's withholding of the commissions owed DSM3 and RMFS's termination of the brokerage agreement.

Though none of the Defendants had a direct contractual relationship with Mrs. Staples, they were not strangers to her allegedly injured relations with DSM3. As stated above, due to the brokerage agreement between RMFS and DSM3, RMFS and HWE had an economic interest in DSM3's business relationships. This included its relationship with Mrs. Staples. Moreover, Simmons also derived an economic benefit from DSM3's financial wellbeing. Because Simmons was entitled to a share of RMFS's profits, Simmons necessarily stood to benefit from any sales brokered by DSM3 on behalf of RMFS. Additionally, like Mr. Staples's consulting fee, Mrs. Staples's salary and the profits she earned from DSM3 were directly tied to

Defendants' business relationships. Because of the brokerage agreement, RMFS paid DSM3 commissions. DSM3 depended on Simmons to send it these commissions and used these commissions to help pay Mrs. Staples's salary. Thus, Defendants were participants in Mrs. Staples's relationship with DSM3.

The record also reflects that Mrs. Staples's ownership interest and employment with DSM3 were "inextricably a part of or dependent upon" Defendants' relationships with DSM3. *See Waddell*, 875 So. 2d at 1156. The gist of Mrs. Staples's interference claim is that RMFS's termination of the brokerage agreement with DSM3 and Simmons's withholding of the commissions were meant to end her ownership of DSM3 and employment status with the company.[9] Mrs. Staples admits that her claim is that Defendants terminated the brokerage agreement to "force or coerce [her] to sell her interest in and give up her employment in DSM3." (*See* Doc. 85 at 5.) If Defendants' relationships with DSM3 were such that suspension of those relationships would directly result in Mrs. Staples's relationship

---

[9]     Mrs. Staples also contends that Defendants poached employees from DSM3. (*See* Doc. 85 at 7.) However, after review of the evidentiary submissions referenced by Plaintiffs, the Court was unable to find any evidence that this occurred. There is evidence that due to Defendants' actions Mrs. Staples could no longer pay DSM3's employees. But this evidence merely reiterates that Mrs. Staples's ownership interest in DSM3 was dependent upon Defendants' relationship with DSM3. Evidence that Simmons fired Mrs. Staples's daughter around this same time period is also insufficient to support her interference claim. Mrs. Staples has failed to explain how her daughter's termination interfered with her relationship with DSM3. Moreover, as Simmons was the entity that employed Mrs. Staples's daughter, Mrs. Staples can hardly say that it was a stranger to that relationship.

with DSM3 ending, they were not strangers to Mrs. Staples's relationship with DSM3. Instead, this suggests that the only reason Mrs. Staples was able to maintain her relationship with DSM3 was because of DSM3's business relationships with Defendants. Thus, Mrs. Staples's interference claim fails as a matter of law.

Mrs. Staples's interference claim with respect to termination of the brokerage agreement also fails because RMFS had the right to terminate its brokerage agreement with DSM3. Tortious interference cannot be based upon a party doing what it has the right to do. *See Colonial Bank v. Patterson*, 788 So. 2d 134, 139 (Ala. 2000), *overruled on other grounds by White Sands*, 32 So. 3d at 12. Mrs. Staples admits that RMFS had the right to terminate the brokerage agreement for any reason. (*See* Doc. 75-3 at 8.) Additionally, the record reflects that RMFS had previously terminated two other brokerage agreements under similar provisions. (*See id.*) This demonstrates that termination of the brokerage agreement was justified, and thus, Defendants cannot be held liable for tortious interference for doing so. *See White Sands*, 32 So. 3d at 18 (maintaining that justification is an affirmative defense but noting that in certain circumstances defendants could be entitled to judgment as matter of law on defense of justification). Accordingly, with respect to Count Four,

Mrs. Staples's motion for summary judgment is due to be denied, and Defendants' motions for summary judgment as to this Count are due to be granted.[10]

### F.    Count Five: Breach of Fiduciary Duty

In Count Five, Mrs. Staples brings a breach of fiduciary duty claim against HWE and RMFS. The elements of a breach of fiduciary duty claim are "the existence of a fiduciary duty, a breach of that duty, and damage suffered as a result of that breach." *Aliant Bank. v. Four Star Invs., Inc.*, 244 So. 3d 896, 907 (Ala. 2017). Fiduciary relationships typically arise in one of four scenarios:

> (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer.

*Id.* at 916 (quoting *Swann v. Regions Bank*, 17 So. 3d 1180, 1193 (Ala. Civ. App. 2008)).

---

[10]    In her response to Simmons's motion for summary judgment on this claim, Mrs. Staples cites to Arkansas law, stating that Simmons is vicariously liable for HWE and RMFS's interference in her relationship with DSM3. (*See* Doc. 85 at 6.) However, as Mrs. Staples has previously conceded, Alabama law applies to her interference with business relationship claim. Any injury Mrs. Staples suffered as a result of Defendants' actions occurred in Alabama as she does not dispute: (1) that at the time of Defendants' actions she was a full-time resident of Alabama; (2) that Simmons would send the commission checks RMFS owed DMS3 to her Alabama address; and (3) that she operated DSM3 from her home in Alabama.

Mrs. Staples bases her breach of fiduciary duty claim on her assertion that both Eisenman and Blanchard were participants in the plan to force her out of DSM3. According to Mrs. Staples, due to Eisenman's position as the attorney who helped form DSM3 and Blanchard's position as a co-member of DSM3, their participation in this plan breached fiduciary duties owed her, and they did so as agents for HWE and RMFS.

Mrs. Staples's motion for summary judgment on her breach of fiduciary duty claim is due to be denied. While the Court agrees with Mrs. Staples that her relationship with Blanchard, as co-members of DSM3, is the type of relationship from which a fiduciary duty would normally attach, DSM3's LLC Agreement includes a provision that states that its members "waive to the fullest extent permitted . . . any duty or other obligation, if any, that a Member may have to the Company or another Member, (including fiduciary duties)." (*See* Doc. 95-5 at 41.) Viewing this evidence in the light most favorable to HWE and RMFS, Blanchard did not breach any duty by participating in plans to force Mrs. Staples out of her position with DSM3. Furthermore, at this summary judgment stage, the Court cannot conclusively determine whether Eisenman owed Mrs. Staples any fiduciary duties. As one of two members in a LLC that Eisenman helped form, it may have been reasonable for Mrs. Staples to place trust in Eisenman and assume that he would act

in her best interest in his dealings related to that LLC. However, HWE and RMFS have presented evidence that casts doubt as to whether Eisenman's relationship with Mrs. Staples rose to the level of a fiduciary. Specifically, Eisenman testified that "[i]n creating the DSM3 LLC Agreement, I acted solely as counsel to RMFS" and stated that he never communicated with Mrs. Staples about the DSM3 LLC Agreement, but instead, performed the legal work necessary to form DSM3 at the behest of Walker. (*See* Doc. 95-4 at 3.) Accordingly, Mrs. Staples is not entitled to summary judgment on her breach of fiduciary duty claim.

HWE and RMFS contend that they are entitled to summary judgment on this claim because any fiduciary duties Blanchard and Eisenman owed Mrs. Staples fell outside the scope of their agency relationships with HWE and RMFS. "The test to be applied in determining the existence of an agency relationship under the doctrine of respondeat superior is whether the alleged principal reserved a right of control over the manner of the alleged agent's performance." *Wood v. Shell Oil Co.*, 495 So. 2d 1034, 1036 (Ala. 1986). "Summary judgment on the issue of agency is generally inappropriate because this issue is a question of fact to be determined by the trier of fact." *See id.* at 1035.

A question of fact exists on the issue of whether Eisenman and Blanchard's relationship with Mrs. Staples arose out of their roles as agents for HWE and RMFS.

According to Mrs. Staples, Blanchard told her that "she worked for the parent company [HWE]" and appeared to have no "interest in helping out [DSM3] or being involved in the business." (*See* Doc. 73-1 at 11.) Moreover, Mr. Staples testified that Blanchard "constantly told us she worked for HWE" and "refused to even take a [DSM3] email address." (*See* Doc. 70-1 at 21.) Viewing this evidence in the light most favorable to Mrs. Staples, Blanchard's role as a member of DSM3, and the duties she incurred due to this role, fell within the scope of her agency relationship with HWE. Additionally, there is evidence that Eisenman's relationship with Mrs. Staples grew out of his relationship with HWE and RMFS. It appears from the record that Eisenman has a long-standing relationship with Walker and his companies and that he has performed various legal work for Walker throughout the years. Moreover, as stated, Eisenman testified that Walker was the person who directed him to prepare the necessary papers for the creation of DSM3 and that he believed he was acting solely as counsel to RMFS. Based on this evidence, a rational jury could conclude that Eisenman was acting as an agent of RMFS when he arguably assumed fiduciary obligations towards Mrs. Staples and subsequently breached those duties. Therefore, RMFS and HWE's motion for summary judgment on Mrs. Staples's breach of fiduciary duty claim is also due to be denied.

### G. Count Six: Mrs. Staples's Civil Conspiracy Claim

In Count Six, Mrs. Staples claims that Defendants conspired to harm her relationship with DSM3. The underlying torts that she says supports this claim are her intentional interference with business relationship and breach of fiduciary duty claims. Because Mrs. Staples's interference claim fails as a matter of law, she cannot use that claim to support a claim for civil conspiracy. *See Triple J Cattle, Inc.*, 621 So. 2d at 1225. However, as stated above, a question of fact remains as to whether HWE and RMFS can be held liable for breach of fiduciary duty. Therefore, HWE and RMFS's motion for summary judgment as to Count Six is due to be denied. Moreover, it is at least arguable that Simmons's withholding of the commission checks and alleged participation in the proposals outlined by Eisenman demonstrates that Simmons agreed to assist HWE, RMFS, and their agents in breaching the asserted fiduciary obligations. Thus, Simmons is not entitled to summary judgment on Count Six. Because, viewing the evidence in the light most favorable to Defendants, a rational jury could find that there was no breach of fiduciary duty, Mrs. Staples's motion for summary judgment as to Count Six is also due to be denied.

### H.    Counts Seven & Eight: Wrongful Termination

In Counts Seven and Eight, Mr. Staples brings claims for wrongful termination under several different theories of liability. The Court will address each in turn.

#### 1.    Express Contract

Mr. Staples states that his claims for breach of express contract are based on the following: (1) multiple assurances made to him by Simmons about his employment; and (2) written employment rules Simmons provided him related to job performance, progressive discipline, and fair treatment.

As an initial matter, Simmons argues that the Court should not consider Mr. Staples's claims for breach of express contract because they were made for the first time in his motion for summary judgment. The Court disagrees with Simmons's contention that it was not on notice that Mr. Staples's breach of contract claims were at least partly based on what Mr. Staples alleges were express representations made by Simmons. While Count Seven of the Second Amended Complaint is labeled as a claim for breach of "[i]mplied contract and [p]romissory [e]stoppel," the allegations contained within that count assert that Simmons's representatives "stated, represented, and promised Mr. Staples that in exchange for [his] promise or agreement to . . . come to work for Simmons and 'run' the special Simmons, HWE,

and/or RMFS relationship, Simmons would employ him indefinitely except for good cause." (*See* Doc. 38 ¶ 69.) Mr. Staples further alleged that "[b]ased on . . . statements, representations, and promises" from Simmons he entered into an employment relationship with Simmons. (*See id.* ¶ 70.) These allegations show that the essence of Mr. Staples's wrongful termination claim remains the same—that Simmons violated express representations made about his job security. Thus, the Court will consider whether Mr. Staples is entitled to summary judgment on his claim that Simmons terminated him in breach of its previous assurances.

Mr. Staples's motion for summary judgment under this theory of liability is due to be denied. Under Arkansas law, "an at-will employee may be discharged for good cause, no cause, or even a morally wrong cause." *Smith*, 804 S.W.2d at 684. Although Mr. Staples testified that Simmons told him that he would only be terminated for cause, (doc. 70-1 at 22), Simmons has presented conflicting evidence that suggests that Mr. Staples was actually an employee terminable at-will. For example, Mr. Staples's offer letter stated that Mr. Staples's employment with Simmons was at-will, and Simmons's President testified that Mr. Staples was never told that he could only be fired from Simmons for good cause. Thus, viewing the evidence in the light most favorable to Simmons, it did not need good cause to terminate Mr. Staples.

However, "when an employer makes definitive statements about what its conduct will be, an employee has a contractual right to expect the employer to perform as promised." *Crain Indus., Inc. v. Cass*, 810 S.W.2d 910, 915 (Ark. 1991). Thus, Arkansas courts have held that the employment at will doctrine does not apply "where there is an agreement that the employment is for a specified time, in which case firing may only be for cause, or where an employer's employment manual contains an express provision stating that the employee will only be dismissed for cause and that provision is relied upon by the employee." *Id.* at 913.

As stated, there is at least a question of fact as to whether Simmons ever represented to Mr. Staples that he would only be fired for cause. Moreover, the Court does not read the written employment rules provided to Mr. Staples to be so definite to, as a matter of law, demonstrate that Simmons breached an agreement it made with Mr. Staples regarding his employment. The first provision Mr. Staples points to states that "each employee will receive a fair hearing and fair treatment" when he "bring[s] concerns and issues to the attention of Simmons Leadership." (Doc. 70-11 at 2.) Mr. Staples also points to Simmons's policy on disciplinary actions, which states that unsatisfactory job performance will be addressed through disciplinary actions, including "verbal warnings, written warnings, suspension, or termination of employment." (*Id.* at 5.) The policy goes on to state that "[t]he

proper disciplinary action to use is dependent on the seriousness, cost, potential cost, safety factor, and the number of times of the infraction." (*Id.*) These assurances are insufficient to warrant summary judgment in favor of Mr. Staples on his wrongful termination claim.

## 2.  Implied Covenant of Good Faith and Fair Dealing

Mr. Staples's motion for summary judgment on his wrongful termination claim under a theory of implied contract is also due to be denied. In Arkansas, even employment relationships terminable at-will contain an implied covenant of good faith and fair dealing, which under limited circumstances, allows at-will employees to bring a wrongful termination claim. *See Smith*, 804 S.W.2d at 684. According to Mr. Staples, Simmons breached this implied covenant of good faith and fair dealing by: (1) telling Mr. Staples the day before it allegedly met with the other Defendants to plan his ouster that Mr. Staples would lead Simmons's efforts to begin selling its products directly; (2) never indicating that it would terminate Mr. Staples's employment; and (3) going silent and allowing Mr. Staples to be terminated. (*See* Doc. 70 at 28.) Mr. Staples has failed to show that these are the types of circumstances that would lead an Arkansas court to hold that, as a matter of law, Simmons breached the implied covenant of good faith and fair dealing between them.

Therefore, Mr. Staples is not entitled to summary judgment under this theory of liability.

Simmons asserts that it is entitled to summary judgment because the undisputed evidence demonstrates that it fired Mr. Staples for cause. According to Simmons, because most of Mr. Staples's job duties involved tasks for RMFS, it had no need for his services once RMFS relieved him of his duties, and thus, was justified in terminating his employment. The Court is unconvinced that these facts entitle Simmons to summary judgment on this claim. Although it is true that Simmons waited to fire Mr. Staples until after RMFS had relieved him of his duties as general manager, there is evidence that Simmons was in discussions with RMFS regarding plans to terminate Mr. Staples several days before RMFS ended Mr. Staples's role as general manager. Indeed, it is arguable that Simmons was not a bystander to RMFS's decision to sever its ties with Mr. Staples, but instead, a willing participant in that decision. Viewing this evidence in the light most favorable to Mr. Staples, a rational jury could conclude that something other than RMFS's decision to end its relationship with Mr. Staples motivated Simmons to terminate his employment. As Simmons makes no other argument as to why, under Arkansas law, it should be granted summary judgment on this theory of liability, Simmons's motion for summary judgment on this claim is due to be denied.

### 3.    Public Policy Exception

Under the public policy exception to Arkansas's at-will employment doctrine, an employer may be liable for wrongful termination in:

> (1) cases in which the employee is discharged for refusing to violate a criminal statute; (2) cases in which the employee is discharged for exercising a statutory right; (3) cases in which the employee is discharged for complying with a statutory duty; and (4) cases in which employees are discharged in violation of the general public policy of the state.

*Sterling Drug, Inc. v. Oxford*, 743 S.W.2d 380, 383 (Ark. 1988) (quoting *Scholtes*, 548 F. Supp. at 494).

According to Mr. Staples, his termination falls within the public policy exception because he was terminated only after he raised ethical concerns regarding whether Simmons should be paying an invoice on behalf of RMFS for waffle packaging that Mr. Staples believed was being sold solely through HWE. Simmons has presented evidence that it terminated Mr. Staples for different reasons. Namely, that, after Walker decided he no longer wanted Mr. Staples to serve as the general manager of RMFS, Simmons determined that Mr. Staples's job duties would essentially be eliminated. Therefore, Mr. Staples's motion for summary judgment on his claims brought under the public policy exception to Arkansas's at-will employment doctrine is due to be denied.

Simmons contends that it is entitled to summary judgment on this claim because Mr. Staples's proffered reason for his termination is illogical. As Simmons notes, it appears that Mr. Staples's instructions that Simmons not pay the disputed invoices would save Simmons money. Nonetheless, the Court concludes that there is a question of fact as to whether Simmons terminated Mr. Staples due to the issues he raised regarding the payment of the waffle packaging invoices. Although it appears that Simmons would save some money by not paying these invoices, the record reflects that much of Simmons's profitability was dependent on its relationships with RMFS, HWE, and Walker. Thus, a reasonable jury could find that it was actually more beneficial for Simmons to turn a blind-eye to the invoices so that it could stay in Walker's good graces and maintain its business relationship with his companies.

Moreover, Mr. Staples has presented evidence that, during the time period leading up to his firing, his objections to the invoices were widely discussed. This includes evidence that, the day before Simmons's President met with Walker about the future of their companies' relationship, he discussed this issue with Mr. Staples and told Mr. Staples that he would try to bring clarity to the invoice issue at the meeting. Based on this evidence, the Court concludes that Simmons's argument as to why it cannot be held liable under Arkansas's public policy exception to the at-will

employment doctrine fails. Accordingly, Simmons's motion for summary judgment on this claim is due to be denied.

### 4.     Joint Venture Liability

In his motion for summary judgment, Mr. Staples claims that HWE and RMFS are liable for wrongful termination based on the theory of joint venture liability. However, Mr. Staples did not include a claim for wrongful termination against HWE or RMFS in his Second Amended Complaint. (*See* Doc. 38.) Instead, it appears that he asserted this claim for the first time in the parties' Joint Status Report, which was filed on February 4, 2019. This was well after the Scheduling Order's August 1, 2018 deadline for adding new causes action. (*See* Doc. 43 at 1.)

Mr. Staples has given no reason why the Court should allow him to amend his complaint to include wrongful termination claims against HWE and RMFS at this late stage in the litigation. Thus, the Court concludes that Mr. Staples is not entitled to amend his complaint to include a wrongful termination claim against HWE or RMFS. *See Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) (noting that under Federal Rule of Civil Procedure 16(b) a plaintiff must demonstrate good cause before being allowed to amend his complaint after the scheduling order's deadline to do so has passed). As this claim is not properly before this Court, Mr. Staples's motion for summary judgment against HWE and RMFS on his newly asserted

wrongful termination claim against them is due to be denied. Further, any such asserted claim is struck and dismissed.

## I. Count Nine: Civil Conspiracy – Wrongful Termination

In Count Nine, Mr. Staples brings a civil conspiracy claim against all three Defendants.[11] The underlying acts that Mr. Staples says support this claim are the acts that he points to as supporting the wrongful termination claims that he brings in Counts Seven and Eight. Simmons asserts that summary judgment is due to be granted on this claim because it is the only party named a Defendant to these underlying counts. Simmons is correct in that conspiracy requires "concerted action between two or more persons." *AmSouth Bank, N.A. v. Spigener*, 505 So. 2d 1030, 1040 (Ala. 1986) (quoting *Snyder v. Faget*, 326 So. 2d 113, 119 (1976)). However, "[a]

---

[11]     Although the parties have stated that they are in agreement that Alabama law applies to this claim, Mr. Staples and Simmons have, at various points, cited to both Alabama and Arkansas law when discussing Count Nine. Due to the Court's determination that Arkansas law governs Mr. Staples's wrongful termination claims, it questions whether Alabama law should apply to Mr. Staples's claim that Defendants conspired to terminate him. However, this distinction is of no moment because claims for civil conspiracy under Alabama and Arkansas law include the same elements. *Compare Johnson*, 539 So. 2d at 169 (noting that civil conspiracy consists of "the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means.") *with Chambers v. Stern*, 64 S.W.3d 737, 743 (Ark. 2002) ("[I]n order to prove a civil conspiracy, [one] must show a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another." (internal quotations and citations omitted)). As under Alabama law, Arkansas law provides that "conspiracy is not actionable in and of itself, but recovery may be had for damages caused by acts committed pursuant to the conspiracy." *See id.* Thus, as to Count Nine, the Court cites to Alabama law with the understanding that its analysis applies equally under Arkansas law.

civil conspiracy claim operates to extend, beyond the active wrongdoer, liability in tort to actors who have merely assisted, encouraged, or planned the wrongdoer's acts." *DGB, LLC v. Hinds*, 55 So. 3d 218, 234 (Ala. 2010) (quoting 16 Am. Jur. 2d *Conspiracy* § 57 (2009)). Thus, as long as a plaintiff shows that a defendant worked together with others to engage in unlawful conduct, it may bring a civil conspiracy claim against that defendant. *See id.*

Here, Simmons has failed to establish that it cannot be held liable for Mr. Staples's claims of wrongful termination. Moreover, it is at least arguable that the proposals outlined in Eisenman's memorandum demonstrate that HWE and RMFS assisted, encouraged, and planned Simmons's termination of Mr. Staples's employment. Accordingly, Defendants' motions for summary judgment as to Count Nine are due to be denied. Mr. Staples's motion for summary judgment as to this Count is also due to be denied because, as stated above, questions of fact remain as to whether he has a valid claim for wrongful termination.

### J. Count Ten: Defamation

In Count Ten, Mr. Staples brings a defamation claim against HWE and RMFS. To make out a defamation claim under Alabama law, "the plaintiff must show that the defendant was at least negligent, in publishing a false and defamatory statement to another concerning the plaintiff, which is either actionable without

having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1998) (internal citations and footnote omitted). "Spoken words that impute to the person of whom they are spoken the commission of an indictable criminal offense involving infamy or moral turpitude constitute slander actionable per se." *Id.* (citing *Ceravolo v. Brown*, 364 So. 2d 1155 (Ala. 1978)). If a statement constitutes slander per se, a plaintiff may succeed on his defamation claim even if he cannot prove actual harm to his reputation. *See Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887, 897 (Ala. 2004).

Mr. Staples's defamation claim is based on the testimony by Caffey that, at some point after the fall of 2017, Walker told her that Mr. Staples "had stolen money from him or his business." (*See* Doc. 70-8 at 4.)[12] HWE and RMFS's sole argument in support of their motion for summary judgment on Mr. Staples's defamation claim is that Mr. Staples is unable to show that this statement harmed his reputation. This argument, however, ignores the fact that Mr. Staples is not required to demonstrate that Walker's comments actually harmed his reputation because an accusation that

---

[12] Well after the briefing period had expired, HWE and RMFS filed a motion to strike Caffey's affidavit. (*See* Doc. 106.) The motion asserts that Caffey's deposition revealed that the affidavit was not actually acknowledged before a notary public and that Caffey now admits that she cannot recall the exact statements made by Walker. (*See id.*) This motion is due to be denied because it essentially asks the Court to strike Caffey's affidavit based on evidence obtained after the discovery and dispositive motion deadlines had passed.

Mr. Staples stole from Walker would constitute slander per se. *See Nelson*, 534 So. 2d at 1091–92 ("An oral publication imputing a crime of larceny falls within [the definition of slander per se].''). It is enough for Mr. Staples to present evidence that Walker negligently made this defamatory statement to Caffey. As he has done so, HWE and RMFS's motion for summary judgment on Mr. Staples's defamation claim is due to be denied.

Mr. Staples's motion for summary judgment on his defamation claim is also due to be denied. Walker denies making any defamatory statements about Mr. Staples. (*See* Doc. 95-1 at 8.) Thus, there is a question of material fact as to whether Walker ever told Caffey that Mr. Staples had stolen from him.

## K.     Count Eleven: Tortious Interference with Business Relationship with Sysco

In Count Eleven, Mr. Staples brings a tortious interference claim against HWE and RMFS, alleging that Walker's defamatory statements about him interfered with his business relationship with Sysco. This claim fails because Mr. Staples has not presented evidence that Walker's allegedly defamatory statements actually interfered with any of his relationships within the food services industry. *See White Sands*, 32 So. 3d at 14 (noting that for a plaintiff to succeed on a wrongful

interference with a business relationship claim he must show intentional interference with a protectable business relationship and damages).[13]

The only person connected to Sysco who testified that Walker made defamatory statements about Mr. Staples was Caffey. Mr. Staples has presented no evidence that Caffey ever repeated Walker's comments to Sysco employees or attempted to block Mr. Staples from working with Sysco due to these comments. In fact, according to her affidavit, Caffey disbelieved these comments, and they did not cause her to lower her opinion of Mr. Staples.

Mr. Staples also points to Caffey's testimony that other food industry professionals, including Sysco employees, called her and "indicated . . . that Mr. Walker had been calling them making similar defamatory statements" about Mr. Staples. (*See* Doc. 70-8 at 5.) But this evidence does not save Mr. Staples's tortious interference claim because it fails to show that any of these individuals took any adverse action against Mr. Staples as a result of Walker's statements. Caffey stated that it was her opinion that Walker contacted these individuals because he "intended to harm Mr. Staples'[s] reputation and business relationships in the food industry."

___

[13]     The parties agree that Alabama law applies to Count Eleven. (*See* Doc. 66 at 7.) Even if Arkansas law applied, Mr. Staples's failure to demonstrate that Walker's comments harmed his business relationships would be fatal to this claim. *See Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 215 S.W.3d 596, 601 (Ark. 2005) (noting that elements of tortious interference claim include "intentional interference [that] induc[es] or caus[es] a breach or termination of the relationship or expectancy.").

(*See id.*) However, she did not testify that she was aware that Walker's statements actually harmed any of Mr. Staples's business relationships.

HWE and RMFS have presented evidence that Mr. Staples's business relationships within the food industry were not harmed. Mr. Staples testified that he has not sought employment with Sysco since his termination from Simmons. (*See* Doc. 70-1 at 28.) He additionally testified that he had received no indication from Radian, the entity that HWE and RMFS contend employs Caffey, that its lack of interest in hiring him was based upon Walker's comments. (*See id.* at 29.) No other food services entity that Mr. Staples sought employment from directly asked him about Walker's comments. (*See id.*) Absent evidence that Walker's statements cost Mr. Staples employment opportunities or affected any other protectable business interest, Mr. Staples's tortious interference claim based upon those comments fails as a matter of law. Accordingly, with respect to Count Eleven, Mr. Staples's motion for summary judgment is due to be denied, and HWE and RMFS's motion for summary judgment as to this Count is due to be granted.[14]

---

[14]    HWE and RMFS object to Caffey's statement that other people within the food industry informed her that Walker had made defamatory statements about Mr. Staples, arguing that this constitutes inadmissible hearsay. (*See* Doc. 93 at 22.) Because the introduction of this evidence does not change the result of this Opinion, HWE and RMFS's objections to Mr. Staples's use of this evidence are moot.

## L.    RMFS's Counterclaims

In addition to asserting that it is entitled to summary judgment on all of Plaintiffs' claims against it, RMFS contends that it is entitled to summary judgment on: (1) its breach of fiduciary duty counterclaim against Mr. Staples; and (2) its aiding and abetting breach of fiduciary duty counterclaim against Mrs. Staples.

### 1.    Federal Rule of Civil Procedure 8(b)(6)

As a threshold matter, the Court will address RMFS's contention that Plaintiffs have, by default, admitted the majority of the factual allegations RMFS pled to support its counterclaims. Federal Rule of Civil Procedure 8(b)(6) provides that "[a]n allegation . . . is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6). Here, Plaintiffs failed to respond to paragraphs 23–70 of the counterclaims RMFS filed in response to the Second Amended Complaint. Relying on the Eleventh Circuit's decision in *Ashley v. Jaipersaud*, 544 F. App'x 827 (11th Cir. 2013), RMFS asserts that due to this omission the Court should consider Plaintiffs to have admitted all of the facts contained within these paragraphs. Plaintiffs, for their part, do not present any argument as to why Rule 8(b)(6) does not apply.

Nonetheless, the Court declines to deem Plaintiffs to have admitted the facts set forth in paragraphs 23–70 of RMFS's counterclaims. The Supreme Court has

admonished that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *United States v. Hougham*, 364 U.S. 310, 317 (1960). Thus, several federal courts have reasoned that "[t]he failure to deny the same allegations in an amended complaint does not constitute an admission . . . where the original complaint contained substantially the same allegations and the defendant denied them in answer to that complaint." *See Peak v. ReliaStar Life Ins. Co.*, No. 1:16-cv-3491-AT, 2018 WL 6380772, *2 (N.D. Ga. Sept. 28, 2018) (quoting *In re Izaguirre*, 166 B.R. 484, 489 (Bankr. N.D. Ga. 1994)); *Daniel v. Dekalb Cty. Sch. Dist.*, No. 1:10-CV-3455-SCJ-LTW, 2013 WL 12095217, at *4 (N.D. Ga. Dec. 23,2013), *report and recommendation adopted*, 2014 WL 12519801 (N.D. Ga. Feb. 26, 2014), *aff'd*, 600 F. App'x 632 (11th Cir. 2014) ("[W]hen the defendant answers an original complaint and the amended complaint makes substantially the same allegations, the denials in the original complaint suffices as a denial to substantially similar averments in the amended complaint and in such circumstances, a default judgment is not appropriate.").

Here, although, as RMFS notes, Plaintiffs did not respond to paragraphs 23–70 of their amended counterclaims, Plaintiffs did respond to substantially similar allegations contained within RMFS's original counterclaims. (*See* Doc. 31.) This

distinguishes this case from *Ashley* where, while the Eleventh Circuit noted that the defendant had answered the original complaint, it did not discuss whether the factual allegations made in the amended complaint were substantially similar to those made in the original complaint. *See Ashley*, 544 F. App'x at 829 & n.3. Moreover, ultimately, the Eleventh Circuit's holding in *Ashley* did not turn on the defendant's failure to respond to the plaintiff's amended complaint, but instead, was based on the court's conclusion that the defendant had failed to raise the arguments made on appeal before the district court. *See id.* at 829–30. As the factual allegations that Plaintiffs answered in their response to RMFS's original counterclaims are nearly identical to those made in RMFS's amended counterclaims, the Court concludes that it would be inappropriate to deem Plaintiffs' failure to respond to those claims as judicial admissions.

### 2. Breach of Fiduciary Duty

RMFS argues that Mr. Staples breached fiduciary obligations he owed it when he: (1) sent an email to a competitor which contained confidential information concerning RMFS's sales and volume revenue; (2) caused RMFS to enter into a broker arrangement with Diversified Sales & Marketing, an entity that Mrs. Staples had a 60% ownership interest in; (3) paid unauthorized commissions on behalf of RMFS to DSM3; (4) asked a prospective broker for RMFS to hire Mrs. Staples and

his daughter as a quid pro quo for RMFS's business; and (5) approved reimbursement of his personal expenses by RMFS. (*See* Doc. 77 at 34–37.) RMFS contends that Mrs. Staples is liable for aiding and abetting Mr. Staples's breach of fiduciary duty because she knew that he owed RMFS a duty of loyalty and care and profited from Mr. Staples's actions.

Because the Court has concluded that RMFS's failure to respond to these allegations did not constitute judicial admissions, RMFS is not entitled to summary judgment based on these unverified allegations. Mr. Staples has presented evidence that casts doubt as to whether he breached any fiduciary obligation owed RMFS. For example, he testified that Walker understood that Mrs. Staples would have an ownership interest in Diversified Sales & Marketing, and his daughter Blair's testimony contradicts RMFS's assertion that Mr. Staples used images of Walker without Walker's permission. Other evidence suggests that during his time as general manager Mr. Staples provided RMFS with documentation about the expenses he was approving on behalf of the company. Though Plaintiffs do not appear to dispute that Mr. Staples emailed RMFS's competitor or asked a prospective broker to hire his family members, RMFS has failed to sufficiently demonstrate that it suffered damages as a result of these actions. Thus, the Court cannot say, as a matter of law, that Mr. and Mrs. Staples are liable to RMFS on these

counterclaims. Accordingly, RMFS's motion for summary judgment on its breach of fiduciary duty counterclaims is due to be denied. As there are unresolved factual disputes surrounding these claims and Plaintiffs have not moved for summary judgment on RMFS's counterclaims, the Court declines to address, at this time, Plaintiffs' arguments that RMFS's claims are time-barred and that the defenses of estoppel and waiver apply.

## V. Conclusion

For the reasons stated above, Mr. Staples's motion for summary judgment (doc. 69) is due to be DENIED, and Mrs. Staples's motion for summary judgment (doc. 71) is also due to be DENIED. Simmons's motion for summary judgment (doc. 72) is due to be GRANTED in PART and DENIED in PART, and HWE and RMFS's motion for summary judgment (doc. 76) is also due to be GRANTED in PART and DENIED in PART. HWE and RMFS's motion to strike (doc. 106) is due to be DENIED. The parties' request for oral argument (doc. 103) is due to be DENIED. An Order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on July 24, 2019.

_____
L. Scott Coogler
United States District Judge

194800